## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE CLASS ACTION SETTLEMENT ADMINISTRATION LITIGATION**<br><br>**This Document Relates To:**<br>**ALL CASES** | **Misc. Action No. 25-179 (JDB);**<br>**MDL Docket No. 3162** |

## JOINT INITIAL MANAGEMENT REPORT

Pursuant to ¶ 5 of the Court's Initial Procedure Order No. 1 (ECF No. 8) ("IPO No. 1"), undersigned counsel for all Plaintiffs and Defendants in the current consolidated matters (collectively, the "Parties") file this Joint Initial Management Report in advance of the Initial Management Conference scheduled for March 27, 2026.  The Parties note that there are additional cases with additional plaintiffs and additional defendants that have been filed and are in the process of being consolidated.  Consistent with ¶ 4 of IPO No. 1, undersigned counsel held a meet-and-confer discussion on February 2, 2026, via Zoom and exchanged multiple emails following that videoconference.

Unless otherwise noted, the positions set forth below reflect the joint position of undersigned counsel for the Parties.  Where undersigned counsel for the Parties could not reach agreement, the current positions of the Parties are set forth separately under the labeled

headings.[1]  To the extent the *Baker* Plaintiffs and the *Whalen* Plaintiffs (as defined below) have

any different views among themselves, their positions are so indicated in subheadings under

"*Plaintiffs' Position*".  Counsel for the Parties will be prepared to address these issues during the

Initial Management Conference scheduled for March 27, 2026.  This Joint Initial Management

Report is organized to address all the issues set forth in ¶ 5 of IPO No. 1, beginning with a Table

of Contents for the Court's reference.

---

[1] Undersigned Plaintiffs' counsel note the purpose of the meet and confer process is to resolve disputes or, failing resolution, narrow the parties' differences as much as possible to present to the Court with positions that reflect the results of good-faith negotiation — not a transcript or recitation of the Parties' positions in negotiations.  It was in that spirit that undersigned Plaintiffs' counsel engaged in the meet and confer process in that spirit for this Joint Initial Report, anticipating that positions would naturally evolve over the course of multiple discussions before being presented to this Court. Defendants, however, elected to incorporate alleged quotations from meet and confer discussions to support Defendants' positions in this Initial Joint Report. Plaintiffs' counsel believe that doing so is antithetical to the purpose and spirit of the meet-and-confer process.  As such, undersigned Plaintiffs' counsel will not reference instances in which Defendants may have altered or abandoned their prior positions.  Undersigned Plaintiffs' counsel raise these concerns not to burden the Court with additional disputes, but to provide appropriate context for the asymmetry reflected in certain sections of this Joint Report.  *See infra* section H(b) (reciting Defendants' position on timing of discovery).

## TABLE OF CONTENTS

A.    Appointment of Leadership ................................................................................. i

B.    Previously Entered Orders ................................................................................10

C.    Proposed Schedule for Future Case Management Conferences ......................11

D.    Direct Filing of New Actions ...........................................................................12

E.    Addressing Related Actions ..............................................................................13

F.    Consolidated Pleadings .....................................................................................13

G.    Initial Disclosures Required by Fed. R. Civ. 26(a)(1)......................................18

H.    Discovery ..........................................................................................................18

     a.    Protective Order and ESI Protocol..........................................................18

     b.    Timing of Discovery ...............................................................................19

I.    Expert Disclosures ............................................................................................28

J.    Pretrial Motions ................................................................................................28

K.    Measures to Facilitate Resolution ....................................................................30

L.    Referral of Matters to U.S. Magistrate Judge ..................................................30

M.    Principal Factual and Legal Issues ...................................................................30

N.    Class Certification Procedures Under Fed. R. Civ. P. 23 .................................39

O.    Initial Census ....................................................................................................41

P.    Any Ongoing Criminal Investigations or Other Proceedings...........................41

Q.    Identities of all Defendant Corporations...........................................................41

A. <u>**Appointment of Leadership**</u>

*Plaintiffs' Position:*

i. **Timing.** Undersigned Plaintiffs agree that it would be beneficial to appoint Plaintiffs' leadership counsel as soon as practicable, so that the Parties can begin to effectively and efficiently litigate.

ii. **Structure.** Undersigned counsel for Plaintiffs, which includes all attorneys who have filed a case, or who is attorney of record in a case that has been consolidated in this MDL, at the time of the IPO, while deferring to the Court's preferences on a leadership structure, propose that the Court appoint Lead Counsel (with caveats described below by *Baker* and *Whalen* Plaintiffs) and an Executive Committee (together "Plaintiffs' Leadership Counsel").

Undersigned Plaintiffs' counsel are proponents of this structure as it is consistent with the Manual for Complex Litigation (Fourth) § 10.221 which contemplates multiple organizational structures for coordinating multiparty litigation, recognizing that a tiered leadership model — including committees working alongside lead counsel — is particularly appropriate where the scope, complexity, number of defendants, and volume of plaintiffs' claims so demands. An open application process that includes both a Lead Counsel position and Executive Committee positions serves the Court's interest in assembling the broadest pool of qualified applicants, maximizes the range of substantive expertise brought to bear on the litigation, and ensures that the diverse interests of all plaintiffs and proposed class members are fairly represented—a consideration the Manual specifically identifies as a core criterion for leadership appointments. *See* Manual for Complex Litigation (Fourth) §

1

10.22. An Executive Committee would not dilute Lead Counsel's authority; rather, it would provide structured support for the management of discovery, motions practice, and strategic decision-making, by distributing the substantial workload that complex litigation of this nature demands while maintaining clear lines of accountability.

**Baker Plaintiffs' Position:**

The *Baker* Plaintiffs'[2] Counsel, Edelson Lechtzin LLP, Seeger Weiss LLP, Aylstock, Witkin, Kreis & Overholtz PLC, Bradley/Grombacher LLP, Cory Watson, PC, Shay Persall Law LLC, Wood Law Firm LLC, and McNulty Law Firm, leadership on behalf of ***all*** MDL 3162 Plaintiffs which includes Lead Counsel and Executive Committee set forth in Section A (ii) and (iv), *infra*. As with their position regarding a single Master Consolidated Complaint, *Baker* Plaintiffs submit that the Court should appoint a unified leadership structure over the entirety of MDL 3162, rather than the two-track structure proposed by *Whalen* Plaintiffs. For the reasons set forth in Section F *infra*, *Baker* Plaintiffs' Counsel respectfully submit that a single Master Consolidated Complaint and unified leadership would promote greater efficiency and consistency, minimize duplication of effort, and eliminate the risk of ambiguous factual boundaries, conflicting positions, and unnecessary expense. Such an approach would likewise conserve the time and resources of both the Parties and the Court.

**Whalen Plaintiffs' Position:**

---

[2] Refers to Plaintiffs Tyler Baker, Lauren Wolf, Jennifer Barrett, Robert Barclay, Scott Dendy, Brooke Tennery and Mary Duarte.

*Whalen* Plaintiffs'[3] Counsel, Boies Schiller Flexner LLP and LTL Attorneys LLP, believe there is a question as to whether there should be a single track or two tracks (one track for each of the two claims discussed in sections M(1) and M(2) below), each with a lead counsel.

For example, in the *Blue Cross Blue Shield Antitrust Litigation* MDL 2406, 2:13-cv-20000-RDP (N.D. Ala.) before Judge David Proctor there were two tracks, each with co-lead counsel. Although all 34 defendants in each track were the same and although the claims asserted in each track were the same, because, as is the case here, the plaintiffs were different and had different damage calculations the two track approach avoided conflicts and expedited the case.

It would be possible to have two classes or a single overall class and subclasses; either might work. We defer to the Court which approach is most appropriate when the Court considers the common and unique parties and aspects of the two claims.

Given the current and anticipated actions consolidated in MDL 3162, all undersigned Plaintiffs' counsel do not see the need to appoint a state-federal liaison or liaison counsel at this time.

iii. **Selection Procedure.** The undersigned Plaintiffs' counsel propose an open application process, whereby any attorney who has filed a case in this MDL, or who is attorney of record in a case that has been removed or transferred to this MDL, may apply for a leadership position by written application (not to exceed five pages), submitted for *in camera* review, with appointments made by the Court upon

---

[3] Refers to Plaintiffs Mary Jane Whalen, Roger Tejon, Monica Meiloaica, Chasom Brown and Nicole Rieger.

consideration of the applications along with any *ex parte* in-person interviews and/or

virtual oral interviews or presentations regarding qualifications for the positions

sought that would be beneficial to the Court.  The undersigned Plaintiffs' counsel

supports an annual review by the Court of all leadership appointments.

### iv. Responsibilities and Authority of Leadership.

The undersigned Plaintiffs' counsel proposes the following responsibilities and

authorities of Lead Counsel and Executive Committee.

### 1. Plaintiffs' Lead Counsel

Plaintiffs' Lead Counsel has the following responsibilities:

- Attend and serve as leads and spokesperson for all Plaintiffs during the coordinated pretrial proceedings in response to any inquiries by the Court or opposing counsel.

- Make or submit any oral or written motions to the Court on behalf of the Plaintiffs, as well as oppose, when necessary, any motions submitted by the Defendants involving matters within the Lead Counsel's sphere of responsibilities (except as to matters specifically directed to individual Plaintiffs and their counsel).

- Negotiate and enter into stipulations with the Defendants regarding the litigation.

- Convene meetings of the Executive Committee for the purpose of proposing joint action and discussing and resolving matters of common concern.

- Coordinate discovery on behalf of the Plaintiffs, consistent with the requirements of Fed. R. Civ. P. 26, and in conjunction with the Plaintiffs' Executive Committee.

- Consult with and employ expert witnesses and consultants.

- Delegate specific tasks to other counsel or designated sub-committees in a manner that ensures that the Plaintiffs' pretrial preparation is conducted effectively, efficiently, and economically. Monitor the activities of co-counsel to ensure that schedules are met and unnecessary expenditures of time and funds are avoided.

- Maintain adequate time and disbursement records covering common benefit work of designated counsel and establish guidelines, subject to Court approval, as to the keeping of time records and expenses.

- Attend status and case management conferences, including preconference meetings with the Court and opposing counsel.

- Ensure that court orders are followed, schedules are met, discovery is conducted consistent with the requirements of Fed. R. Civ. P. 26, unnecessary expenditures of time and funds are avoided, and any negotiations are reasonably efficient and productive.

- Maintain adequate files of all pretrial matters, including establishing and maintaining a document or exhibit repository.

- Perform any task necessary to carry out the functions of Plaintiffs' Lead Counsel to properly coordinate the Plaintiffs' pretrial activities.

- Perform any other functions as may be expressly authorized and/or required by this Court.

## 2. Plaintiffs' Executive Committee

The Plaintiffs' Executive Committee should act under the supervision of Lead Counsel. Plaintiffs' Lead Counsel also serves as members of the Executive Committee. The Chair of the Executive Committee shall serve as the primary liaison between the Plaintiffs' Executive

Committee and Plaintiffs' Lead Counsel, and, in coordination with Plaintiffs' Lead Counsel, shall be responsible for organizing and supervising the activities of the Plaintiffs' Executive Committee and other plaintiffs' counsel to ensure efficiency, avoid duplicative work, and control costs.  The Plaintiffs' Executive Committee's responsibilities include the following:

    a.  Coordinate and oversee the activities of Plaintiffs' counsel during these consolidated pretrial proceedings, as well as monitor and ensure that work conducted by Plaintiffs' counsel is reasonably necessary and avoids unnecessary costs and duplication of effort.

    b.  Determine (after consultation with other Plaintiffs' counsel, as appropriate) the Plaintiffs' position on all matters arising during pretrial proceedings.

    c.  Perform any other task deemed necessary and proper for the Plaintiffs' Executive Committee to accomplish its responsibilities as defined by the Court's orders.

**v.    Proposed methods for communicating and reporting to court and non-leadership counsel.**

Plaintiffs' Lead Counsel shall be responsible for disseminating information from the Court to other Plaintiffs' counsel and *pro se* Plaintiffs, as appropriate.  The Parties defer to the Court on the decision to provide for online access to court hearings as a method for non-leadership counsel to monitor the proceedings.

**vi.    Limits on non-leadership counsel.**

The undersigned Plaintiffs' counsel proposes that, except as the Court may hereafter order, no general discovery of Defendants or other common action or work in this litigation will be taken, except at the direction, or with express permission, of Plaintiffs' Lead Counsel.

**vii.    Compensation.**

The undersigned Plaintiffs' counsel believes that the leadership appointed by the Court should propose and submit a Common Benefit process after their appointment.

### viii.    Defendants' Leadership

Plaintiffs believe that Defendants, like Plaintiffs, must organize themselves to ensure that the MDL can proceed efficiently.  Defendants' suggestion below that they should proceed without any lead, liaison or coordinating counsel, and without any structure at all, is inconsistent with MDL practice for good reason.  We will not respond to Defendants' argument except to say we are confident the Court will soon understand the merits of our claims and that Plaintiffs' counsel are working, and will work, in a coordinated and efficient manner to move this case forward properly.  All we ask is that Defendants do the same.

***Defendants' Position:***

Defendants agree that the Court should appoint leadership on behalf of all MDL Plaintiffs and defer to the Court on the details of that leadership structure.  As set forth in further detail below, however, Defendants believe that it is essential that any appointed Plaintiff leadership structure maximizes the likelihood that Plaintiffs take a single, consistent position on behalf of all Plaintiffs.  Defendants believe that separate consolidated complaints and separate plaintiffs' leadership structures are inappropriate, inefficient, strain judicial resources, and cause duplication of effort and needless expense.

A leadership structure for MDL Defendants is not necessary.  Defendants, through counsel, have coordinated promptly and effectively among themselves and with Plaintiffs. Defendants do not currently anticipate any impediments to continued coordination in this consolidated proceeding and, as set forth below, will endeavor in good faith to file joint briefs

where possible and will further work cooperatively in the interests of judicial efficiency and economy.

The following discussion speaks to Plaintiffs' leadership structure only.

### i.    Timing.

Defendants believe the Court should resolve Plaintiffs' leadership appointment as soon as practicable and, in all events, before Plaintiffs file a single Consolidated Master Complaint.

### ii.    Structure.

Defendants take no position on the specific attributes and functions of any particular component of Plaintiffs' leadership structure except that it is essential that any Plaintiff leadership structure maximize the likelihood that Plaintiffs take a single, consistent position. Plaintiffs have proven unable to coordinate effectively among themselves in their dealings with Defendants to date, resulting in unnecessary costs, confusion, and delays—all to Defendants' substantial prejudice. Disputes internal to Plaintiffs have already delayed this litigation and prevented agreements on central issues like consolidating the related cases and filing a single operative complaint, and straightforward procedural matters like staying the related cases pending decision by the Judicial Panel on Multidistrict Litigation.

For example, from June to August 2025, when only five cases now consolidated in this Court were pending, Defendants repeatedly asked Plaintiffs' counsel in those cases—Seeger Weiss, Boies Schiller, and LTL Attorneys—to provide a proposal for consolidation or coordination of those cases. Each time, Defendants were told that Plaintiffs' counsel were coordinating and a proposal would be forthcoming. No proposal ever came. Eventually, Seeger Weiss filed a motion asking the JPML to transfer and centralize those five cases. Boies Schiller and LTL Attorneys opposed in part, asking the JPML to consolidate in a different district and to

allow plaintiffs to split their claims between two consolidated complaints—a position mirrored by Boies Schiller and LTL Attorneys here (more on that below).

While that motion was pending, Defendants sought a coordinated stay of the pending actions, but Boies Schiller and LTL Attorneys refused to agree to stays in the *Tejon* and *Rieger* actions, respectively, even after Boies Schiller agreed to stays in the two *Whalen* actions and Seeger Weiss agreed to a stay in the *Baker* action.  The LTL Attorneys only agreed to a stay in the *Rieger* action after the *Rieger* court set a briefing schedule following Defendants' filing of a motion to enlarge time to answer, move, or otherwise respond to the complaint and related deadlines.  Defendants were thus forced to waste resources seeking stays while also preparing motions to dismiss that were certain to become moot.

Since the JPML consolidated and transferred the cases to this Court, Plaintiffs' communication and coordination have not improved.  During the February 2 meet-and-confer, Seeger Weiss and Boies Schiller led the call for Plaintiffs and collectively represented that Plaintiffs intended to file one consolidated complaint and expressed conceptual agreement concerning a stay of discovery during the pendency of the motions to dismiss (depending on the timing of motion to dismiss briefing and the resulting decision(s)).  On February 18, Seeger Weiss sent Defendants a draft of this Report on behalf of only a subset of Plaintiffs, which proposed a single consolidated complaint, as discussed by the Parties during their February 2 meet-and-confer.  But on February 20, Boies Schiller and LTL Attorneys provided an alternative draft report that proposed two separate amended complaints and separate Plaintiffs leadership counsel for each complaint, backtracking on Plaintiffs' representations during the meet-and-confer.  Both drafts reversed course about a discovery stay.

Schisms like those above have forced Defendants to respond separately to different Plaintiffs, who have consistently taken (and appear likely to continue taking) different or conflicting positions; would render the litigation unmanageable going forward; and defeat the purpose of consolidation. Whatever the resulting Plaintiffs' leadership structure, Defendants believe it must harmonize Plaintiffs' litigation positions, beginning with their agreement on a single Consolidated Master Complaint.

### iii. Selection Procedure.

Subject to their position above on Plaintiffs' leadership structure, Defendants take no position on the selection process for Plaintiffs' leadership.

### iv. Responsibilities and Authority of Plaintiffs' Leadership, Plaintiffs' Methods of Communicating and Reporting to Court and Non-leadership Counsel, Limits on Plaintiffs' Non-leadership Counsel, and Plaintiffs' Compensation.

Defendants reiterate that appointment of Plaintiffs' leadership is a threshold issue that the Court should resolve before the filing of a Consolidated Master Complaint. Defendants otherwise take no position on the responsibilities and authority of Plaintiffs' leadership, methods of communication with the Court and Plaintiffs' non-leadership counsel, limits on Plaintiffs' non-leadership counsel, and compensation of Plaintiffs' leadership.

### B. Previously Entered Orders

Pursuant to ¶¶ 11 and 12 of the of IPO No. 1, the Court stayed Defendants' deadlines to answer or otherwise respond to the initial complaints, stayed all discovery proceedings until further order of the Court, and tolled the time requirements to perform any acts or file any papers pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure until such time as a discovery schedule is established by order of the Court. The Parties agree that there are no other previously entered scheduling or other orders that need to be vacated or modified.

C.   **Proposed Schedule for Future Case Management Conferences**

*Plaintiffs' Position:*

Undersigned Plaintiffs propose that regular monthly Case Management Conferences with the Court will promote efficiency and transparency regarding this litigation.  Undersigned Plaintiffs defer to the Court's calendar regarding the selection of specific dates.  For planning purposes, Plaintiffs respectfully suggest that the Court set dates now for Case Management Conferences for the remainder of 2026.  Undersigned Plaintiffs disagree with Defendants' counsel, and see no reason or benefit in delaying scheduling and conducting such conferences until after the Court has ruled on Defendants' motions to dismiss. Regular case management conferences in an MDL — even before a motion to dismiss ruling — allow the Court to maintain control over complex, multi-party litigation by addressing coordination issues, setting discovery parameters, and providing the parties a structured forum to negotiate  these items, all ensuring the docket does not stagnate while awaiting a dispositive ruling that may ultimately narrow but not resolve the case.

Plaintiffs further request that the Court, as appropriate, allow for counsel of record to appear and participate in such conferences remotely via a collaboration platform such as Zoom or Teams that the Court deems appropriate, taking into account information security and public access considerations.  Unless otherwise ordered, all substantive communication with the Court should be in writing, with copies to opposing counsel.

*Defendants' Position:*

Defendants agree with Plaintiffs that regular Case Management Conferences with the Court will promote efficiency and transparency regarding this litigation, and further join in Plaintiffs' request regarding remote collaboration platforms as appropriate.  But Defendants disagree with Plaintiffs on when such conferences should begin.  Defendants propose that

conferences at a regular cadence should begin, if necessary, after the Court's decision on Defendants' anticipated motions to dismiss.  As explained further in Section H, below, as a means of permitting the case to proceed in certain respects following the filing of a Consolidated Master Complaint, Defendants would agree to exchange initial disclosures and to negotiate a protective order and ESI protocol, but otherwise propose that discovery should be stayed. Should the Court agree to stay discovery, regular Conferences for the purpose of managing discovery—the main purpose for which Plaintiffs appear to seek Conferences—would not be necessary unless and until the case reaches discovery.  In the meantime, Defendants see no reason to burden the Court's docket with pre-scheduled Conferences.  If a dispute requiring the Court's intervention arises, the Parties can request a Conference at that time, if necessary.

### D.    <u>Direct Filing of New Actions</u>

The Parties agree that there is no need for a direct filing order at this time and that any tag-along actions should be automatically consolidated with this action pursuant to IPO ¶ 1.

*  *  *

The Parties jointly note that since this action was transferred and consolidated before this Court and a little over week before this Initial Joint Report was due to the Court, two additional actions subject to potential consolidation have been filed in the District Court for the District of New Jersey: *Hunter v. Epiq Sys., Inc. et al.*, 2:26-cv-02011 (D.N.J.), filed on February 25, 2026, and *Coughlan et al. v. Angeion Group, LLC, et al.*, 2:26-cv-02113 (D.N.J.), filed on February 27, 2026.  The *Hunter* action involves the same administrator defendants and bank defendants who are already Parties to this consolidated action.  The *Coughlan* action involves the same administrator defendants and bank defendants, plus five new settlement administrators as defendants who were not named in the original ten consolidated complaints: Verita Global, LLC;

12

Archer Systems, LLC; Verus, LLC; CPT Group, Inc.; and Simpluris, Inc.  *See* Complaint, *Coughlan et al. v. Angeion Goup, LLC, et al.*, 2:26-cv-02113, Dkt. 1 ¶¶ 27-31.  Neither *Hunter* nor *Coughlan* names any FinTech defendants.

### E.    <u>Addressing Related Actions</u>

The Parties do not currently anticipate litigation in state courts mirroring the legal claims reflected in the consolidated complaints in MDL 3162.  Should the current situation change, the Parties will address the coordination of related state-court actions in a future monthly Case Management Conference.  As a general matter, the Parties agree that it would be beneficial for there to be coordination between the MDL and any state-court proceedings, including with respect to general discovery.

### F.    <u>Consolidated Pleadings</u>

***Baker Plaintiffs' Position:***

*Baker* Plaintiffs' Counsel propose that consolidated pleadings – a Consolidated Master Complaint encompassing allegations of both the Digital Payment Kickback and Interest Rate Schemes and responsive pleadings directed to the Consolidated Master Complaint – would be appropriate and promote efficiency. Although the two alleged courses of conduct involve potentially two different sets of co-defendants — the FinTech Defendants and the Bank Defendants, respectively — both schemes center on the same Administrator Defendants, who allegedly received undisclosed compensation through both schemes. Critically, the settlements at issue in the two schemes are not mutually exclusive — many of the same settlements, and the same Administrator Defendants overseeing them, are implicated in both schemes. The Digital Payment Kickback Scheme involves revenue-sharing arrangements tied to digital payment distributions arising from those settlements, through which Administrator Defendants allegedly received revenue from FinTech Defendants funded by unredeemed digital payment and gift

13

cards. The Interest Rate Scheme involves arrangements with Bank Defendants through which Administrator Defendants allegedly received a portion of interest paid on QSF deposits — funds drawn from overlapping settlements administered by those same fiduciaries. All the alleged payments were concealed from the courts overseeing the relevant settlements, from class counsel, and from class members, and both were allegedly routed through special purpose entities created for that purpose. Given this common structure and overlapping settlement corpus, a single consolidated complaint is the more practical and efficient pleading vehicle.

The case for a single complaint is reinforced by the arguments *Baker* Plaintiffs advanced before the JPML in securing centralization of the related actions. In opposing the *Whalen* Plaintiffs' request to sever the Digital Payment Kickback Scheme claims from the Interest Rate Scheme claims, *Baker* Plaintiffs demonstrated that both sets of claims share a common factual core — the same Administrator Defendants, the same court-appointed fiduciary relationships, overlapping QSFs, and overlapping class members. Importantly, the underlying settlements at issue are not confined to one scheme or the other — many of the same settlements, administered by the same fiduciaries, generated funds implicated in both alleged schemes. As the JPML seemingly acknowledged when it declined to sever the two schemes and centralized all actions together before this Court, severing related claims increases the risk of creating murky factual dividing lines, confusion, and unnecessary expense for both the Court and the parties.

Discovery required to investigate and litigate both schemes will also be substantially overlapping. The same Administrator Defendant witnesses will likely be relevant to both the breakage and the interest-sharing arrangements. The SPE structures alleged to have been used to receive and conceal payments appear common to both schemes. Most significantly, the settlements that serve as the evidentiary foundation involve the same settlement documents and

QSF account records, and distribution data will frequently be at the center of both cases, regardless of whether a given settlement is implicated in one scheme or both. Proceeding under a single consolidated complaint avoids duplicative depositions, reduces the risk of inconsistent rulings on overlapping issues — particularly class certification — and conserves the time and resources of the parties and the Court.

A single complaint is also the more efficient path to class certification. Both schemes involve overlapping class members and the same core legal questions: fiduciary duties, revenue sharing, and harm. Because the settlements and Administrator Defendants overlap substantially across both theories, the factual record on liability, damages, and class-wide injury will be largely common. Bifurcating the claims would create the risks of inconsistent rulings on substantially similar class certification questions and would potentially require class members and other witnesses participate in two separate proceedings arising from the same conduct. A single consolidated complaint avoids that complexity and provides a more workable structure for managing this case through pretrial proceedings. Notably, *Baker* Plaintiffs' position generally aligns with Defendants' position on this issue.

### Whalen Plaintiffs' Position:

*Whalen* Plaintiffs' Counsel defers to the Court as to whether there should be a single Consolidated Master Complaint or two Consolidated Master Complaints (one for each of the two claims discussed in sections M(1) and M(2) below).

The original *Baker* plaintiffs filed the first digital payment claim on April 24, 2025.  The original *Whalen* plaintiffs filed the first interest rate price fixing and kickback claim on May 28, 2025.  All other complaints are based on these two claims although the *Reiger* complaint and the *Coughlin* complaint add additional facts and additional defendants.

Again, we will not respond to Defendants' lengthy argument below except to note that Defendants' appear to concede that there are two separate and distinct causes of action with separate facts, separate legal theories, certain unique defendants, and unique plaintiffs. There are common and unique aspects. The question is which predominates.

***Defendants' Position:***

Defendants agree with *Baker* Plaintiffs' Counsel that a single Consolidated Master Complaint should be filed addressing all theories of liability in this case and superseding all pending complaints. A single superseding Consolidated Master Complaint will promote efficiency and provide a single source of allegations relevant to discovery, if any. While Plaintiffs currently assert claims based on two legal theories—one set of claims against most of the "Administrator Defendants" and the "FinTech Defendants" based on digital payment cards and another set of claims against the "Administrator Defendants" and the "Bank Defendants" based on interest rates—the claims are similar and arise out of many of the same identified settlements.[4] Based on the ten already-consolidated complaints, Plaintiffs brought claims under each theory against most of the same set of Administrator Defendants. In pursuit of each theory, Plaintiffs seek to represent substantially similar nationwide classes and assert similar claims under federal law and common law. Plaintiffs bring claims under each theory arising from the same underlying settlements and agreements or understandings concerning the administration of those settlements. Should discovery proceed, it would inevitably involve many of the same or similar witnesses and documents. Thus, proceeding with two complaints would require

---

[4] The JPML recognized the same in deciding that both theories should be consolidated over Boies Schiller and LTL Attorneys' objection. *See In re Class Action Settlement Admin. Litig.*, 2025 WL 3563715, at *1-2 (J.P.M.L. Dec. 12, 2025).

examination of substantially the same settlement terms, disclosures, and administration terms, and force Defendants to respond separately to different Plaintiffs, who may express different or conflicting positions; threaten to render the case unmanageable; impose additional delay and expense on Defendants; and undermine the point of consolidation.

Furthermore, the Consolidated Master Complaint should be the operative pleading in this litigation, superseding all previously filed complaints. The Consolidated Master Complaint should not be merely an administrative complaint that summarizes the allegations in the individual, consolidated complaints but without legal effect. *See Gelboim* v. *Bank of America Corp.*, 574 U.S. 405, 413 n.3 (2015). A single, operative and superseding Consolidated Master Complaint will promote efficiency and provide a single source of all allegations relevant to motions to dismiss and discovery, if any. Defendants respectfully suggest that the most efficient way to resolve the apparent dispute between the Plaintiff groups is to ensure that the (single) Consolidated Master Complaint include separate and distinct causes of action based on the two legal theories alleged against the Administrator Defendants and Bank Defendants, on the one hand, and the Administrator Defendants and FinTech Defendants, on the other. This will help make it clear which allegations and claims apply to which Defendants and avoid unnecessary confusion when it comes to briefing.

Defendants understood from the Parties' February 2 meet-and-confer that Plaintiffs (including those represented by Seeger Weiss, Boies Schiller, and LTL Attorneys) agreed that a single Consolidated Master Complaint should be filed. Indeed, counsel for Boies Schiller represented during that meet-and-confer that it "will be more efficient to have a single consolidated complaint." Following the meet-and-confer, however, Boies Schiller and LTL

Attorneys, without explanation, changed positions and now appear to propose two complaints, either as a threshold position or an alternative position.

### G.    Initial Disclosures Required by Fed. R. Civ. P. 26(a)(1)

***Plaintiffs' Position:***

Plaintiffs believe that no changes should be made in the scope, form or timing of the Fed. R. Civ. P. 26(a)(1) initial disclosures.

***Defendants' Position:***

As a means of permitting the case to proceed in certain respects following the filing of a Consolidated Master Complaint and during a stay of discovery, Defendants believe that the Parties should exchange initial disclosures under Rule 26(a)(1) within 30 days after Plaintiffs file the Consolidated Master Complaint.  In no event should the Parties be required to exchange initial disclosures before Plaintiffs file the Consolidated Master Complaint because the allegations in the Consolidated Master Complaint will determine who the Parties identify as individuals likely to have discoverable information, what the Parties identify as the documents and things the Parties may use to support their claims and defenses, the computation of damages, and whether relevant insurance agreements exist.  *See* Fed. R. Civ. P. 26(a)(1)(A)(i)-(iv).

### H.    Discovery

#### a.    Protective Order and ESI Protocol

The Parties anticipate that Plaintiffs' Leadership Counsel and Defendants' counsel will negotiate a stipulated proposed protective order and a proposed protocol governing the preservation, collection, search, discovery, and production format of electronically stored information and hard copy documents, including a protocol governing the format and timing for production of privilege logs ("ESI Protocol") consistent with the Court's local rules and Guidelines Relating to the Discovery of ESI.

*Plaintiffs' Position:*

Undersigned plaintiffs' counsel propose the Court set a deadline of forty-five (45) days

from the appointment of Plaintiffs' Leadership Counsel to file with the Court proposed stipulated

orders or separate proposals for provisions where the Parties could not reach agreement.

*Defendants' Position:*

As a further additional means of permitting the case to proceed in certain respects

following the filing of a Consolidated Master Complaint and during a stay of discovery,

Defendants propose that the parties negotiate and file a protective order and an ESI Protocol 60

days after Plaintiffs file the Consolidated Master Complaint.  The nature of the allegations in the

Consolidated Master Complaint may impact the volume and burden associated with anticipated

productions and the contours of a mutually agreeable ESI protocol.

  **b.**  **Timing of Discovery**

*Plaintiffs' Position:*

Undersigned plaintiffs' counsel believes that an early exchange of information pursuant

to Fed. R. Civ. P. 16.1 would facilitate efficient management of MDL 3162. Accordingly, the

Court should order the Parties to either (1) engage in an early informal exchange of key relevant

information pursuant to Fed. R. Civ. P 16.1(b)(3)(C), or (2) alternatively order that the early

exchange proceed pursuant to Fed. R. Civ. P. 33 and 34.  *See* Rule 16.1(b)(3)(B) and Rule

16.1(b)(3)(C), Committee Notes on Rules (2025). Either process should result in the efficient,

targeted early exchange of information and/or discovery that Plaintiffs seek regarding key

information about the settlements at issue in this litigation, while respecting the burden that

broader discovery would impose on Defendants.

Allowing targeted discovery of readily accessible, non-privileged, non-custodial

information to proceed concurrently with briefing on the Motion to Dismiss is consistent with

Federal Rule of Civil Procedure 1's mandate to ensure the "just, speedy, and inexpensive determination" of this matter. Rule 26(a)(1) reinforces that principle, as it provides for initial disclosures to "accelerate the exchange of basic information about the case." Fed. R. Civ. P. 26, Committee Notes on Rules (1993). That imperative is heightened in the MDL context. Newly adopted Rule 16.1 requires the Court to structure "exchange[s of] information about the factual bases for [the parties'] claims and defenses." Fed. R. Civ. P. 16.1(b)(3)(B). As the Advisory Committee explained in adopting this requirement, "[e]xperience has shown that in many cases an early exchange of information about the factual bases for claims and defenses can facilitate efficient management" of an MDL proceeding. Fed. R. Civ. P. 16.1, Committee Notes on Rules (2025). Such exchanges of information "may be ordered independently from the discovery rules," or "under Rule 33 or 34." *Id.*

This is precisely a case where Rule 16.1's early discovery mechanism should be deployed. For years, Defendants, acting as fiduciaries, worked in secret to execute their schemes to profit from these settlements.  In doing so, they concealed these schemes from the courts, counsel, and the very beneficiaries to whom they owed duties of loyalty and disclosure. Plaintiffs seek only basic, readily accessible information uniquely within Defendants' possession, custody, and control. *See New Mexico v. Musk*, 770 F. Supp. 3d 192, 199 (D.D.C. 2025) (explaining, in the preliminary injunction context, the importance of expediting discovery "particularly . . . when the requested information is unavailable from other sources and within Defendants' exclusive control"). A stay of discovery will not streamline this case.

For example, in this targeted initial discovery, Plaintiffs will seek written discovery to identify the relevant class action settlements in which Defendants participated during the conspiracy period, potentially along with foundational documents—proposals, contracts, bank

records, and accountings. Presumably, this is non-privileged, non-custodial information that is readily accessible to Defendants. Targeted early disclosures are also directly relevant to arguments Defendants have previewed, including standing challenges based on the putative class representatives' participation in particular settlements, and motions to dismiss based on the terms of particular settlements.  Without early disclosure, this case risks devolving into a procedural loop with amendments to the complaint followed by renewed dismissal motions. Rule 16.1 was adopted to prevent precisely such inefficiencies.

In light of Plaintiffs' limited and targeted request for initial discovery (namely, written discovery to identify the relevant class action settlements), Defendants cannot meet their burden to justify a stay. The party moving for a stay of discovery bears the burden of showing "good cause" for the stay under Federal Rule of Civil Procedure 26(c) and "establishing its need," *Beecham v. Socialist People's Libyan Arab Jamahiriya*, 245 F.R.D. 1, 3 (D.D.C. 2007) (quoting *Clinton v. Jones*, 520 U.S. 681, 701 (1997)). "[B]are assertions that discovery will be unduly burdensome or that it should be stayed pending dispositive motions that will probably be sustained, are insufficient." *Id.* (quoting *People With Aids Health Grp. v. Burroughs Wellcome Co.*, No. CIV. A. 91-0574, 1991 WL 221179, at *1 (D.D.C. Oct. 11, 1991)); *IPOC Int'l Growth Fund Ltd. v. Diligence, LLC*, No. CV 06-1109 (PLF/AK), 2006 WL 8460103, at *2-*3 (D.D.C. Oct. 13, 2006) (allowing written discovery to proceed during motion-to-dismiss briefing). Here, the minimal burden of producing discrete, accessible records cannot outweigh the judicial interest in moving this MDL forward. *See, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, No. M21-95, 2002 WL 88278, at *1 (S.D.N.Y. Jan. 22, 2002) (denying in part motion to stay discovery in antitrust MDL and allowing "document discovery" and "interrogatories" to proceed because, in part, "defendants provide in only skeletal form the grounds on which they intend to

move to dismiss"); *In re Plastics Additives Antitrust Litig.*, No. Civ. 03-2038, 2004 WL 2743591, at *7 (E.D. Pa. Nov. 29, 2004) (denying motion to stay discovery and noting that "although the defendants may experience some future prejudice if this Court refuses to grant a stay of merits-based discovery . . . this prejudice is both remote and uncertain"); *Galaria v. Nationwide Mutual Ins. Co.*, 2013 WL 6578730, at *3 (S.D. Ohio Dec. 16, 2013) (denying a motion to stay discovery in a putative class action pending a motion to dismiss where defendant failed to identify any specific discovery request that was unduly burdensome); *New England Carpenters Health and Welfare Fund v. Abbott Labs.*, 2013 WL 690613, at *3 (N.D. Ill. Feb. 20, 2013) (denying a motion to stay discovery pending a motion to dismiss in a putative class action where defendants generically argued that class and merits discovery will be costly and "provide[d] no clear showing of its burden or cost with any anticipated discovery"); *In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-MD-2522 (PAM/JJK), *Order Denying Motion to Stay Discovery*, at 1–2 (D. Minn. July 24, 2014), ECF No. 138 (denying stay of discovery in MDL pending motion to dismiss briefing because "[s]taying discovery pending the motions to dismiss will only serve to delay the expeditious prosecution of this action"); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, No. 2:12-md-02328-SSV-JCW, *Pretrial Order No. 5*, at 2 (E.D. La. June 4, 2012), ECF No. 93 (declining to stay discovery in antitrust MDL pending resolution of the defendants' motion to dismiss).

By contrast, a stay will cause concrete harm to Plaintiffs and the Courts. Some cases in this MDL have already been pending for nearly a year, and allege fraud schemes stretching back eight years. "Unnecessary delay inherently increases the risk that witnesses' memories will fade and evidence will become stale." *Pagtalunan v. Galaza*, 291 F.3d 639, 643 (9th Cir. 2002). Moving this case forward in a timely and efficient fashion is particularly important because the

settlements at issue in this litigation were conducted and completed under the authority of United States District Courts. Therefore, in addition to the interests of the Parties, important institutional interests support conducting discovery in a targeted, efficient fashion to ensure that the resolution of this MDL is not delayed. Moreover, the complaints allege ongoing conduct and seek injunctive relief. Delaying discovery delays exposure of conduct that the Defendants *in this very filing* confirm is still ongoing in federal courts nationwide.

To that end, within ten (10) days from the date the Consolidated Master Complaint or Complaints are filed, Plaintiffs Leadership Counsel will either, taking into account the Court's views, serve a First Set of Requests for Production of Documents and/or Interrogatories pursuant to Rule 16.1(b)(3)(B) and Fed. R. Civ. P. 33 and 34 on Defendants or serve a request for an exchange of key information outside the discovery rules pursuant to Fed. R. Civ. P. 16.1(b)(3)(C). During the Rule 26(f) Conference, which shall occur and be competed 45 days after the filing of the Consolidated Master Complaint or Complaints, the Parties shall meet and confer on Plaintiffs' early discovery requests to identify a targeted list of relevant, non-privileged, non-custodial files that Defendants will produce within forty-five (45) days from the date of the Rule 26(f) conference.

Beyond the early exchange of information contemplated by Fed. R. Civ. P. 16, Plaintiffs will seek discovery of the issues set forth in Plaintiffs' Statement on the Principal Factual and Legal Issues, set forth in Section M *infra*. The timing of this and all discovery will be discussed during the Fed. R. Civ. P. 26(f) conference and will depend upon Defendants' disclosures related to custodians and volume of documents. The Parties will meet and confer and develop a discovery schedule that will move this litigation along in an efficient and effective manner.

Considering the complexity of this case, undersigned Plaintiffs' counsel believe it will likely be necessary to enlarge the presumptive ten-deposition limit of Rule 30(a)(2)(A)(i) and the presumptive 25-interrogatory limit of Rule 33(a)(1). Rather than enlarging those presumptive limits now, Plaintiffs respectfully suggest it may be more prudent for the Court to wait until discovery is underway, when the parties will have a better sense of what discovery may be required.

Undersigned Plaintiffs' counsel respectfully defer to the Court's judgment as to whether the appointment of a Special Master to assist with oversight of fact discovery and ESI issues would be beneficial to the efficient administration of this MDL.

**Defendants' Position:**

Discovery should be stayed pending resolution of Defendants' anticipated Rule 12 motions to dismiss Plaintiffs' forthcoming Consolidated Master Complaint (whether it be one complaint, as *Baker* Plaintiffs' Counsel and Defendants propose; or two complaints, as *Whalen* Plaintiffs' Counsel propose). Subject to the content of the Consolidated Master Complaint(s), Defendants anticipate their motions will seek the complete dismissal of all claims based on, at minimum, fundamental and fatal pleading deficiencies. As the resolution of Defendants' motions to dismiss could be dispositive of the case, or at least could substantially narrow the claims in the case, any prior discovery has the potential to be futile, or irrelevant and disproportionate in light of any narrowed scope of the case. *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 174 F. Supp. 3d 375, 378 (D.D.C. 2016) (in multi-district litigation, declining to lift discovery stay, "even for a limited purpose, or to allow early discovery prior to the resolution of the planned motions to dismiss"); *Loumiet v. United States*, 225 F. Supp. 3d 79, 82 (D.D.C. 2016) ("courts in this district 'have often stayed discovery 'while a motion that would be thoroughly dispositive of

the claims in the Complaint is pending'"'"); *Moore v. Castro*, 2016 WL 10674309, at *1 (D.D.C.

Jan. 14, 2016) (Bates, J.) ("[I]t is often the case that discovery is inappropriate during the

pendency of a dispositive motion. 'A stay of discovery pending the determination of a

dispositive motion is an eminently logical means to prevent wasting the time and effort of all

concerned, and to make the most efficient use of judicial resources.'"); *Sai v. Dep't of Homeland

Sec.*, 99 F. Supp. 3d 50, 58 (D.D.C. 2015) ("[A] stay of the Rule 26(f) conference and of

discovery pending resolution of the threshold, dispositive motions is appropriate. … [T]heir

resolution will likely define the scope of discovery, if any."); *Chavous v. D.C. Fin. Resp.*, 201

F.R.D. 1, 2 (D.D.C. 2001) ("'well settled that discovery is generally considered inappropriate

while a motion that would be thoroughly dispositive of the claims in the Complaint is pending'"

(quoting *Anderson v. United States Attorneys Office*, 1992 WL 1259186, at *1 (D.D.C. June 19,

1992)).

The clear advantages to staying discovery here outweigh any potential harm that could

result from a temporary hold on the start of discovery. Discovery in a case of this size and

complexity would inevitably be burdensome and invasive, and would likely be contentious. The

same is true of Plaintiffs' requested pre-motion to dismiss discovery, which would be neither

"targeted" nor "limited." As Plaintiffs describe it, as just one example, they would seek

"foundational documents"—"proposals, contracts, bank records, and accountings"—for every

class action settlement within the alleged "conspiracy period." Based on the complaints filed to

date, the named Plaintiffs alone allege that they participated in no fewer than 23 different class

action settlements, and Plaintiffs' putative class claims would encompass thousands of different

class settlements. The settlements themselves are matters of public record and already available

to Plaintiffs, but the scope of any internal or bidding information of Defendants, including

confidential and proprietary information, that Plaintiffs might seek regarding these many settlements is by no means clear.  Burdensome and potentially intrusive discovery into Defendants' internal documentation concerning these settlements should await disposition of the motions to dismiss, and what Plaintiffs seek goes well beyond the sort of limited and focused pre-discovery tools described in Fed. R. Civ. P. 16.1(b).  Proceeding to discovery before the Court resolves Defendants' Rule 12 motions thus risks the Parties wasting significant, unnecessary resources at an early stage of the case.  Indeed, should the case proceed to discovery, Defendants anticipate the need for substantial third-party discovery as well, including discovery from class counsel in the underlying settlements invoked in any Consolidated Master Complaint(s).

Plaintiffs cannot credibly claim any prejudice from a modest stay until the Parties know the contours of the claims that remain, if any.  Plaintiffs emphasize that some of their cases have been pending "for nearly a year."  But, as described above in Section A, Plaintiffs are the reason these cases have been delayed.  Defendants pressed Plaintiffs for months on a consolidated or coordinated structure to move these cases forward.  Plaintiffs' own failure to coordinate and their inconsistent positions have continually delayed this litigation, and their inability even here to agree on a leadership structure or a consolidated complaint is delaying it further.  Plaintiffs' own conduct thus underscores there is no urgency that justifies imposing the huge burdens of discovery before knowing whether this case will proceed, and if so, in what form.  And until just recently, Plaintiffs appeared to agree.  Plaintiffs represented at the Parties' February 2 meet-and-confer that they were "flexible" on timing, with counsel for Boies Schiller stating:  "This is not a case where you have to jump into things immediately."  Notwithstanding any stay of discovery, Defendants would agree to exchange initial disclosures under Rule 26(a)(1) and negotiate and

file a protective order and an ESI Protocol 60 days after Plaintiffs file the Consolidated Master Complaint, as discussed above.

Defendants respectfully submit that the Court will benefit from a stay, as it would spare the Court from having to resolve potentially moot discovery disputes if some or all of Plaintiffs' claims are dismissed. Moreover, a stay will facilitate the efficient management of this MDL. Once the Court rules on Defendants' Rule 12 motions, the Parties will have a better sense of the live issues in the case and will have the Court's guidance on what the proper scope of discovery will be. Plaintiffs argue that "important institutional interests" support proceeding with discovery because the courts are involved, having approved the settlements at issue. If anything, that point works against Plaintiffs' position. As discussed below in Section M, individual settlement-approving courts are well aware of these lawsuits; have inquired into the issues when they deemed it appropriate, resulting in public hearings and filings; and, after careful consideration, decided to proceed with the settlements as structured.

Defendants believe it is premature to address whether this case would benefit from the appointment of an ESI special master or referral of discovery disputes to a magistrate judge. Defendants also believe that it is premature to address preferred discovery devices. Moreover, Rule 16.1(b)(3)(B) and (C), invoked by Plaintiffs, only instruct the Parties to advise the Court about how the Parties will exchange factual information. Those provisions do not govern the process of exchanging information. Proceeding with informal exchanges of information without Rule 33 and 34's known and recognized processes risks igniting unnecessary disputes and prolonging resolution of those disputes. That is especially true because, as explained above, Plaintiffs' proposed pre-motion to dismiss discovery is likely to be both broad and burdensome. The Parties should wait until after the Court renders its decision on Defendants' motions to

dismiss before engaging in discovery (if necessary) pursuant to the formal devices provided in Federal Rules of Civil Procedure.

**I.**    **Expert Disclosures**

Other than those articulated in *infra* section N, related to class certification procedures, (which Defendants view as premature), the Parties do not currently anticipate any adjustments to Fed. R. Civ. P 26(a)(2) requirements.

**J.**    **Pretrial Motions**

*Plaintiffs' Position:*

The undersigned plaintiffs' counsel anticipate, motions to address case management and discovery issues that arise during the litigation, a class certification motion, Federal Rule of Civil Procedure 702 motions concerning experts, motions to strike and/or for summary judgment pursuant to Federal Rule of Civil Procedure 56 regarding Defendants' asserted defenses, and motions in limine.

After receiving the benefit of this Court's guidance during the initial case management conference on March 27, 2026, the Parties will confer on a case schedule and timing of the pretrial motions.

*Defendants' Position:*

Defendants anticipate filing Rule 12 motions to dismiss in response to the Consolidated Master Complaint and, if necessary, oppositions to class certification, motions to address case management issues that arise during the litigation, Rule 56 motions, Rule 702 motions concerning experts, and motions in limine.

With respect to upcoming Rule 12 motions, Defendants will endeavor to file consolidated briefs on generally applicable issues in the interests of judicial economy.  At this time, based on the complaints filed in the now-consolidated actions and the currently named Defendants,

Defendants anticipate that they likely will need to file at least three separate motion to dismiss briefs on generally applicable issues, one for each group of named Defendants: the "Administrator Defendants"; the "Bank Defendants"; and the "FinTech Defendants."[5]  Again based on the complaints filed in the now-consolidated actions, Plaintiffs' claims and allegations against each of the three groups of Defendants differ, and Defendants' arguments for dismissing each of set of claims likely will differ as well.  In addition, individual Defendants may require separate motion-to-dismiss briefing to address unique issues.  As a general matter, Defendants will also endeavor to file consolidated briefs on pretrial motions and other filings where possible.

Defendants believe that it would be premature for the Parties to meet and confer on a briefing schedule on motions to dismiss and other pretrial motions before Plaintiffs file their Consolidated Master Complaint.  Without that Complaint, Defendants do not know the full scope of Plaintiffs' operative allegations and cannot reasonably predict the necessary motion-to-dismiss briefing schedule.  As just one example, during the Parties' February 2 meet-and-confer, Plaintiffs indicated that even the identified parties may change:  Plaintiffs represented that they may add named defendants (and named plaintiffs).  To that point, the recently filed *Coughlan* action, by a different plaintiffs' firm, named five new settlement administrators as defendants. *See supra* Section D.  And although Plaintiffs committed to telling Defendants in advance of the Initial Management Conference if they intend to add more parties, claims, or allegations,

---

[5] In the now-consolidated actions before this Court, the Defendants are identified as follows: "Administrator Defendants"—Angeion Group LLC, Epiq Systems, Inc., JND Legal Administration, Kroll Settlement Administration; "Bank Defendants"—Huntington National Bank and Western Alliance Bank; and "FinTech Defendants"—Blackhawk Network Holdings, Inc., Digital Settlement Technologies LLC, and Tremendous LLC.  As noted above (*supra* Section D), a newly filed action not yet transferred to this Court, *Coughlan*, identifies five additional administrator defendants:  Verita Global LLC, Archer Systems, LLC, Verus, LLC, CPT Group, Inc., and Simpluris, Inc.

Defendants would still need time to evaluate the effect of these additions on potential consolidated briefing. Defendants similarly believe that a briefing schedule on other motions would be premature because the parties cannot predict which claims, by which Plaintiffs and against which Defendants, may proceed past a motion to dismiss.

**K.**    **Measures to Facilitate Resolution**

The Parties have not identified any measures which they currently believe will facilitate resolution of this matter.

**L.**    **Referral of Matters to U.S. Magistrate Judge**

At this time, the Parties do not believe it is necessary for the Court to refer any matters to a U.S. Magistrate Judge.

**M.**    **Principal Factual and Legal Issues**

***Plaintiffs' Statement:***

The Court's request for a joint statement of principal factual and legal issues is a well-established case management tool designed to provide the Court with a neutral framework for understanding the landscape of the litigation — not an opportunity for early advocacy. *See* Manual for Complex Litigation (Fourth) § 11.21 (describing the purpose of joint statements as orienting the court to the nature of the dispute through a balanced, collaborative submission). Undersigned Plaintiffs' counsel prepared their contributions to this section in that spirit, endeavoring to provide the Court with an objective overview of the claims and defenses at issue. Defendants, however, responded with argument and advocacy more appropriate for motion practice. Plaintiffs' submission below reflects the neutral, informational approach the Court's Order contemplated.

This litigation involves several putative class action lawsuits filed by former class action claimants against the companies that U.S. District Courts appointed to administer their

settlements (the "Administrator Defendants"), the banks that maintained their Qualified Settlement Funds (the "Bank Defendants"), and certain FinTech companies that distributed their settlement payments (the "Fintech Defendants").

By way of background, settlement administrators are routinely appointed by courts to manage class action settlements, including providing notice to class members, processing their claims, and distributing their funds. Settlement funds are typically deposited in qualified settlement funds ("QSFs") held by banks for months or years pending final distribution. During this period, the funds are supposed to earn interest for the benefit of class members.  And any disbursements from the QSFs are supposed to be disclosed to the courts and class members, that way objections and questions may be lodged, if necessary, given the parties contractual and fiduciary relationships.

Plaintiffs allege two primary kickback schemes in the class action lawsuits:

1.      Interest Rate Scheme: Administrator Defendants and Bank Defendants conspired to suppress interest rates paid on QSF deposits, and actively concealed their own misappropriations from the QSF deposits. Plaintiffs allege that Bank Defendants paid Administrator Defendants a portion of the difference between market rates and Defendant-reported rates as undisclosed kickbacks, in exchange for Administrator Defendants placing the QSFs with the Bank Defendants. These payments were also allegedly made to SPEs to conceal the transactions.

2.      Digital Payment Kickback Scheme: Administrator Defendants have increasingly distributed payments to class members via digital e-Cards rather than paper checks or digital direct deposit. These digital e-Cards generate "breakage"—revenue from e-Cards that are unredeemed or unclaimed by claimants. Plaintiffs allege that FinTech Defendants conspired with

Administrator Defendants to share a portion of this breakage with Administrator Defendants. Plaintiffs further allege that hundreds of millions of dollars in QSFs distributed through e-Cards left unclaimed over the past five years, and that the unused funds were either not returned to the QSFs or never should have left the QSFs until they were claimed (like checks) but instead were used to benefit the FinTech Defendants and the have been left unclaimed over the past five years, with the unused funds benefiting FinTech companies and Administrator Defendants rather than being returned to the QSFs. Administrator Defendants allegedly concealed these payments by routing them through special purpose entities ("SPEs").

Plaintiffs allege that these nationwide schemes were never disclosed to the courts that approved these settlements, class counsel, or class members. The undisclosed payments allegedly inflated settlement administration costs and/or reduced distributions to class members.

The principal factual and legal issues to be decided in this litigation will include:

1. Whether the Administrator Defendants, FinTech Defendants, and Bank Defendants were fiduciaries with respect to plaintiffs and class members;

2. Whether there are agreements between the Administrator Defendants and Bank Defendants, with plaintiffs and class members, regarding the settlements and QSFs;

3. Whether the Defendants owed an obligation to disclose material facts concerning their compensation in their proposals, communications with the courts, class settlement notices, and class settlement websites;

4. Whether a relevant "Administrator Market" exists;

5. Whether a relevant "Settlement Deposit Market" exists for QSF custodial services;

6.  Whether and to what extent these payment schemes raised the price of class action settlement administration services or lowered total payouts to class members;

7.  Whether the Administrator Defendants agreed to obtain payments from Bank Defendants and Bank Defendants agreed to pay Administrator Defendants the interest rates accrued from the QSFs;

8.  Whether the Defendants agreed to conceal these payments from Courts and Class Members and route them to SPEs;

9.  Whether Administrator Defendants received undisclosed payments from FinTech Defendants and Bank Defendants and whether that remuneration should have remained in the QSFs and been distributed to the Settlement Class;

10. Whether the Administrator Defendants created SPEs to conceal these payments;

11. Whether Defendants failed to disclose these payments to the Courts, Class Counsel, and class members;

12. Whether Defendants failed to seek court approval for this undisclosed compensation;

13. Whether Defendants placed their financial interests above class members' interests;

14. The total amount of undisclosed payments Administrator Defendants received and FinTech Defendants and Bank Defendants retained from the QSFs;

15. Whether and to what extent the Defendants were unjustly enriched at the expense of the class members they served;

16. Whether Defendants constituted an enterprise with a common purpose;

17. Whether Defendants committed mail and/or wire fraud and whether these acts formed a pattern.

**Defendants' Counter-Statement of the Case:**

The named Plaintiffs allege that they were class members in other, previous class action lawsuits, and that they did not receive the settlement amounts to which they were entitled because alleged agreements between the settlement administrators and other parties involved in settlement administration somehow depressed their individual payments. The named Plaintiffs seek to represent millions of unnamed class members across the United States, who participated in thousands of different class action settlements negotiated and supervised by different class counsel and approved by different courts.

Plaintiffs' allegations reflect a deeply flawed misunderstanding of the settlements at issue in these cases and of class settlement administration more generally. Plaintiffs' claims are without merit, their allegations fall far short of making out any valid claim under any legal theory, and they are rife with individualized issues that preclude class treatment should the litigation reach that stage.

### 1. Settlement Administration and Court Oversight

By way of brief background, modern class actions frequently involve hundreds of thousands or millions of class members, administration periods spanning from weeks to many years, and complex settlement agreements and notice and distribution plans. The work of administering settlements varies from case to case, not least because each settlement arises from a settlement agreement and exhibits with provisions unique to each action. But in general, courts—at class counsel's request and recommendation—routinely appoint independent, experienced settlement administrators to perform numerous tasks important to effective

settlement administration.  These administrative tasks generally include: implementing sophisticated multi-media notice programs; detecting increasingly significant and technology-driven fraudulent claims; managing claims intake, assessment, and validation; coordinating with banks holding settlement funds; overseeing qualified settlement fund ("QSF") accounting under Treasury Regulation § 1.468B, where applicable; and distributing settlement proceeds pursuant to court-approved plans.  Settlement administrators perform these tasks pursuant to agreements and/or other understandings with class counsel.

Settlement administrators are generally retained via competitive bidding run by the settling parties.  Given the wide range of activities they may perform, settlement administrators frequently work with, or subcontract certain work streams to, numerous vendors, including digital payment providers and banks.  In any given settlement, class counsel may direct the use of one particular vendor over another.  Market-based efficiencies developed through preexisting or enterprise-level relationships between administrators and vendors help to keep settlement administration costs down to the benefit of the class.

Generally, class counsel are well recognized as fiduciaries for the classes they represent; settlements administrators, digital payment providers, and banks are not.

### 2.  Plaintiffs' Allegations

The named Plaintiffs are allegedly dissatisfied with how the settlement administration process played out in certain settlements in which they claim to be class members.  Plaintiffs have yet to file a Consolidated Master Complaint, making the legal and factual issues uncertain, and have suggested they may add further defendants.  But as it stands, they advance two theories arising out of the individual settlements they invoke.

#### a.  <u>Digital Payment Cards</u>

Plaintiffs allege that certain Administrator Defendants received some portion of purported improper "breakage" revenue from FinTech Defendants, who issue or coordinate through the use of vendors the issuance of the digital payment cards used to distribute certain settlement funds to class members in certain settlements. Defendants deny these allegations. Plaintiffs misunderstand and mischaracterize how digital payment cards work and ignore the legal disclosures about payment cards made to class members on official settlement websites and other formal settlement communications.

Digital payment cards can provide an efficient, low-friction distribution option and can reduce printing and mailing costs associated with paper checks, potentially leaving more settlement funds available for class members. They also may facilitate access to funds for class members who prefer not to receive checks or do not use traditional banking services. When offered alongside other options, class members frequently choose to receive payment via digital card for convenience and speed. Settlement administrators engage digital payment vendors, such as FinTech Defendants, after obtaining permission from the Court to distribute settlement payments through digital payment cards. Those digital payment vendors provide the payment cards at the direction of settlement administrators; they do not negotiate or determine settlement terms, calculate class members' award amounts, decide how any settlement fund is allocated, or communicate with the class or court.

Since Plaintiffs lodged their digital-payment allegations, individual courts have continued to grant final approval to class settlements in which a digital payment card option was offered to the settlement class. In response to media reporting about Plaintiffs' allegations, certain courts requested additional information from the court-appointed administrator about any financial relationship between the administrator and digital payment card vendors. In each case, the court

reviewed *in camera* the underlying vendor or subcontractor agreements between the administrator and the digital payment card vendor and ultimately approved the use of digital payment cards.  The courts that have provided an explanation have reasoned that any arrangement between the settlement administrator and digital payment card vendor did not reduce the value of the settlement fund; the terms of card use had been, or would be, adequately explained to the class; and the court was satisfied that class members would be able to receive the entire amount of their settlement payment.  Some courts expressed a preference to have received greater disclosure and an expectation about affirmative disclosure of any pre-existing arrangements between administrators and vendors going forward.

   b. <u>Settlement Fund Allegations</u>

   Plaintiffs also allege that the Administrator and Bank Defendants participated in a purported conspiracy in which the administrators agreed to use the banks to hold and disburse class action settlement funds in exchange for alleged improper payments generated from the interest those settlement funds earned on the open market.  Defendants deny these allegations.

   Plaintiffs' settlement fund theory is not grounded in reality.  Administrators compete to be selected and retained by class counsel—including by the same firms representing the Plaintiffs here—and are ultimately appointed by courts on class counsel's motions.  Banks compete to be retained to hold the settlement funds as deposits.  Such competition provides class members with the widest selection of payment/distribution options at the lowest cost to the fund.  Moreover, banks also are often expressly identified in the settlement agreement negotiated by class counsel (to which Defendants are not parties), and often are selected directly by class counsel.  In other instances, banks are selected by the administrator subject to approval and oversight of class counsel.  Administrators and banks manage settlement funds according to the terms of the

settlement agreement and directives of class counsel, who are fiduciaries to the class. The banks do not have direct relationships with class members; their contractual relationships are either with class counsel or administrators. Class counsel may request from the depository holding the funds monthly statements reflecting settlement fund principal and interest.

Managing settlement funds involves not only securely investing the deposits, but also facilitating the payment of thousands or millions of claims following a claims process, which includes monitoring and detecting claims fraud. Given that many of the necessary steps can be divided between the bank and administrator, certain administrators and certain banks may have financial arrangements in place which enable them to efficiently and effectively manage these services. Additionally, class counsel often prefer to work with the same banks across multiple settlements because of those banks' expertise with respect to the settlement administration process and the efficiencies and quality of service which grows out of that expertise.

### 3. Plaintiffs' Claims and Anticipated Motions

Based on the two flawed theories above, Plaintiffs assert federal and state law claims, including antitrust, RICO, fraud, implied contract, and breach of fiduciary duty. Defendants anticipate moving to dismiss Plaintiffs' claims under Rule 12 and Rule 9(b) after Plaintiffs file a Consolidated Master Complaint(s). Because Plaintiffs' cases allege putative classes that consist in turn of numerous prior class actions, their claims will implicate the terms of the already final class action settlement agreements and related settlement approval orders. Defendants anticipate that the terms of these agreements and orders concerning the named Plaintiffs' claims will impact motion-to-dismiss briefing.

Plaintiffs seek to certify nationwide classes of unprecedented scope and variation. The proposed class is comprised of all individuals who themselves were members of thousands of

class actions in which the administrators, banks, and digital payment vendor defendants played widely varying roles in the settlement administration process, as defined by the individual settlement, court orders, and directives by class counsel.  If the cases survive a motion to dismiss, they will present extensive individualized issues that preclude class treatment.

Finally, the same class counsel who represent Plaintiffs have selected, hired, and entered into agreements with the administrator defendants to administer numerous class settlements. Defendants may need to take discovery and/or potentially raise issues arising from those engagements and the discovery concerning them.

**N.    Class Certification Procedures Under Fed. R. Civ. P. 23**

*Plaintiffs' Position:*

Undersigned Plaintiffs' counsel propose that the Leadership Counsel appointed by the Court in MDL 3162 be designated as interim class counsel pursuant to Federal Rule of Civil Procedure 23(g) to represent the putative class and, in the event a class or classes are certified, be appointed as permanent class counsel.

Undersigned plaintiffs' counsel believe substantial fact discovery is needed in advance of filing any dispositive motions. A court faced with a motion for class certification must assess whether the record is sufficient to determine if the prerequisites of Rule 23 have been met and, if so, how to define the class with appropriate precision. That determination cannot be made in a vacuum. Here, the claims at issue involve complex schemes and defenses that require meaningful development through discovery before the Court can meaningfully evaluate the scope of the proposed class, the predominance of common questions, and the manageability of a class action — all of which implicate both certification requirements and overlapping merits issues. Deferring certification briefing until after substantial fact discovery will allow the parties

to present the Court with a record capable of supporting an informed and durable certification

decision, rather than one requiring revisitation.

This approach is consistent with the obligations imposed by Rule 23(c)(1)(A) and the

guidance of Manual for Complex Litigation § 21.133, both of which underscore the parties' duty

to provide the Court with sufficient information to support a well-reasoned certification ruling.

Adequate time for fact discovery is essential to satisfying that obligation. This is not a case

where early certification is warranted by a weak merits posture or straightforward class

definition — to the contrary, the strength of Plaintiffs' claims and the intricacies of the alleged

conduct make it all the more important that certification be decided on a fully developed record.

Proceeding in that manner serves the interests of efficiency and judicial economy, ensuring that

any class ultimately certified — or denied — rests on a complete and accurate understanding of

the facts, the defenses, and the true contours of the claims at issue.

As such, Plaintiffs propose filing their motion for class certification after substantial

completion of fact discovery.  Under this proposal, Plaintiffs would disclose any class

certification experts and provide their Rule 26 reports when they file their class certification

motion, and Defendants would have the right to depose those experts before filing their

opposition. Likewise, Defendants would disclose any class certification responding experts and

provide their Rule 26 reports when filing their opposition, and Plaintiffs would have the right to

depose those experts before filing their reply. At the same time as they file that reply, Plaintiffs

would disclose class certification rebuttal experts and provide their Rule 26 reports. The Parties

will confer on a class certification briefing schedule and process when conferring on the overall

case schedule prior to presenting it to the Court.

***Defendants' Position:***

Defendants take no position on the designation of interim class counsel. For avoidance of any doubt, however, Defendants dispute that class certification is warranted, and Defendants preserve and do not waive any arguments against class certification.

Plaintiffs' proposal for the sequencing and timing of class certification and discovery is premature because the Parties cannot predict which claims, by which Plaintiffs, and against which Defendants, may proceed past motions to dismiss. Defendants believe that a schedule for the filing of Plaintiffs' class certification motion and for discovery should be set after the Court resolves Defendants' Rule 12 motions. Based on the complaints filed in the consolidated actions, Defendants believe that Plaintiffs' claims and allegations in the Consolidated Master Complaint will present myriad class preclusive issues. Therefore, in the event that the Court denies Defendants' Rule 12 motions in whole or in part, Defendants believe that the next critical stage of this case should be class certification, before the parties invest significant time in discovery.

### O.    Initial Census

At this time, the Parties do not see the benefit or utility of conducting a census of the current consolidated or future filed cases.

### P.    Any Ongoing Criminal Investigations or Other Proceedings

The Parties are unaware of any formal criminal investigations or other proceedings related to the allegations in the cases filed in MDL No. 3162.

### Q.    Identities of all Defendant Corporations

Defendants have complied and will continue to comply with Local Civil Rule 26.1 governing disclosure of corporate affiliations and financial interests.

Dated: March 6, 2026

| | |
|---|---|
| ***Counsel for Baker Plaintiffs*** | ***Counsel for Defendants*** |

Christopher A. Seeger
Daniel Jorge Marcet
**SEEGER WEISS LLP**
55 Challenger Road 6th Floor
Ridgefield Park, NJ 07660
(973) 639-9100
Email: cseeger@seegerweiss.com
dmarcet@seegerweiss.com

Shauna B. Itri
Scott A. George
Benjamin R. Barnett
**SEEGER WEISS LLP**
325 Chestnut St.
Suite 917
Philadelphia, PA 19106
(215) 564-2300
Email: sitri@seegerweiss.com
sgeorge@seegerweiss.com
bbarnett@seegerweiss.com

Eric Lechtzin
Marc H. Edelson
**EDELSON LECHTZIN LLP**
411 S. State Street
Suite N-300
Newtown, PA 18940
(844) 579-4876
Fax: 267-685-0676
Email: medelson@edelson-law.com
elechtzin@edelson-law.com

*Counsel for Plaintiffs Tyler Baker and Lauren Wolf*

Albinas J. Prizgintas
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2100 Pennsylvania Avenue, NW
Washington, DC 20037
202-663-6719
Email: albinas.prizgintas@wilmerhale.com

Sonal Naresh Mehta
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
650-600-5051
Email: Sonal.Mehta@wilmerhale.com

*Counsel for Defendant Epiq Systems, Inc.*

J. Gordon Cooney, Jr.
Franco A. Corrado
William T. McEnroe
Matthew D. Klayman
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103-3007
215-963-5000
Email: gordon.cooney@morganlewis.com
franco.corrado@morganlewis.com
william.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

Randall M. Levine
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, DC 20004
202-373-6541
Email: randall.levine@morganlewis.com

*Counsel for Defendant Angeion Group LLC*

Bryan F. Aylstock
**AYLSTOCK, WITKIN, KREIS &**
**OVERHOLTZ, PLC**
17 E. Main St
Ste 200
Pensacola, FL 32502
850-202-1010
Email: baylstock@awkolaw.com

*Counsel for Plaintiff Jennifer Barrett and*
*Robert Barclay*

Kiley Grombacher
**BRADLEY/GROMBACHER, LLP**
31365 Oak Crest Drive,
Suite 240
Westlake Village, CA 91361
805-270-7100
Fax: 805-270-7589
Email:
kgrombacher@bradleygrombacher.com

James D. Barger
**AYLSTOCK WITKIN KREIS &**
**OVERHOLTZ, PLLC**
200 E Main Street
Ste 200
Pensacola, FL 32502
850-202-1010

Fax: 850-916-7449
Email: jbarger@awkolaw.com

*Counsel for Plaintiff Robert Barclay*

Douglas Dellaccio, Jr.
Hunter Phares
**CORY WATSON, PC**
2131 Magnolia Ave S
Birmingham, AL 35242
205-328-2200
Email: ddellaccio@corywatson.com
hphares@corywatson.com

David J. Weiner
Robert J. Katerberg
Sonia Kuester Pfaffenroth
**ARNOLD & PORTER KAYE SCHOLER**
**LLP**
601 Massachusetts Ave, NW
Washington, DC 20001
202-942-5000
Email: david.weiner@arnoldporter.com
robert.katerberg@arnoldporter.com
sonia.pfaffenroth@arnoldporter.com

Eskandar Alex Beroukhim
**ARNOLD & PORTER KAYE SCHOLER**
**LLP**
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017-5844
213-243-4059
Email: Alex.Beroukhim@arnoldporter.com

*Counsel for Defendant JND Legal*
*Administration*

David J. Lender
Gregory Silbert
**WEIL, GOTSHAL & MANGES, LLP**
767 Fifth Avenue
New York, NY 10153-0119
212-833-8153
Email: david.lender@weil.com
greg.silbert@weil.com

*Counsel for Defendant Blackhawk Network*
*Holdings, Inc.*

Jess M. Krannich
John A. Pearce
Paul J. Sampson
W. Bradford Barber
Rebecca J. Nelson
**WILSON SONSINI GOODRICH &**
**ROSATI, Professional Corporation**
95 South State Street, Suite 100
Salt Lake City, Utah 84111

43

Darla Lashay Persall
**SHAY PERSALL LAW, LLC**
611 7th Street SW
Cullman, AL 35055
256-841-7800
Fax: 256-841-7808
Email: shay@persalllaw.com

*Counsel for Plaintiff Scott Dendy*

Edward K. Wood, Jr.
**WOOD LAW FIRM LLC**
PO Box 382434
Birmingham, AL 35238
205-612-0243
Email: kirk@woodlawfirmllc.com

*Counsel for Plaintiffs Brooke Tennery and Mayra Duarte*

Peter J McNulty
**MCNULTY LAW FIRM**
827 Moraga Drive
Los Angeles, CA 90049
310-471-2707
Fax: 310-472-7014
Email: peter@mcnultylaw.com

*Counsel for Plaintiff Mayra Duarte*

------------------------------------------------------

***Counsel for Whalen Plaintiffs***

David Boies
Alex Boies
**BOIES SCHILLER & FLEXNER LLP**
333 Main Street
Armonk, NY 10504
914-749-8201
Fax: 914-749-8300
Email: dboies@bsfllp.com
Email: aboies@bsfllp.com

Telephone: (801) 401-8510
Facsimile: (866) 974-7329
JKrannich@wsgr.com
JPearce@wsgr.com
PSampson@wsgr.com
BBarber@wsgr.com
RNelson@wsgr.com

*Counsel for Defendant Tremendous LLC*

Brendan P. Cullen
Kyle W. Mach
Paul H. Lazarow
**SULLIVAN & CROMWELL LLP**
550 Hamilton Avenue
Palo Alto, CA 94301-2010
650-461-5600
Email: cullenb@sullcrom.com
machk@sullcrom.com
lazarowp@sullcrom.com

*Counsel for Defendants Digital Settlement Technologies LLC and Western Alliance Bank*

Jeffrey L Kessler
George E. Mastoris
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166-4103
212-294-4698
Email: jkessler@winston.com
gmastoris@winston.com

Amanda L. Groves
**WINSTON & STRAWN LLP**
333 S. Grand Avenue
Los Angeles, CA 90071
213-615-1851
Email: agroves@winston.com

*Counsel for Defendant Huntington National Bank*

Scott M. Ahmad
Reid F. Smith
**WINSTON & STRAWN LLP**

Mark C. Mao
**BOIES SCHILLER & FLEXNER LLP**
44 Montgomery Street
41st Floor
San Francisco, CA 94104
415-293-6800
Fax: 415-293-6899
Email: mmao@bsfllp.com

James Lee
Augusto Alberto Cividini
**BOIES, SCHILLER & FLEXNER, LLP**
100 SE Second Street
Suite 2800
Miami, FL 33131
305-539-8400
Email: jwlee@bsfllp.com
Email: acividini@bsfllp.com

Adam R. Shaw
**BOIES, SCHILLER & FLEXNER LLP**
30 South Pearl Street
12th Floor
Albany, NY 12207
518-434-0600
Email: ashaw@bsfllp.com

Michael S. Mitchell
**BOIES, SCHILLER & FLEXNER LLP**
1401 New York Avenue, NW
Washington, DC 20005
(202) 237-2727
Fax: (202) 237-6131
Email: mmitchell@bsfllp.com

Alison Anderson
Samantha D. Parrish
**BOIES SCHILLER FLEXNER LLP**
2029 Century Park East
Suite 1520
Los Angeles, CA 90067
213-995-5720
Email: alanderson@bsfllp.com
sparrish@bsfllp.com

300 N. LaSalle Drive, Suite 4400
Chicago, IL 60654
312-558-3197
Email: sahmad@winston.com
rfsmith@winston.com

*Counsel Kroll Settlement Administration LLC*

*Counsel for Plaintiffs Mary Jane Whalen,*
*Roger Tejon, Monica Meiloaica, and Chasom*
*Brown*

Caleb Liang
David Ammons
Kevin B. Kelly
**LTL ATTORNEYS LLP**
300 S. Grand Ave.
Suite 3950
Los Angeles, CA 90071
213-612-8900
Fax: 213-612-3773
Email: caleb.liang@ltlattorneys.com
david.ammons@ltlattorneys.com
kevin.kelly@ltlattorneys.com

*Counsel for Plaintiff Nicole Rieger*

46