**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE CLASS ACTION SETTLEMENT ADMINISTRATION LITIGATION**<br><br>**This Document Relates To:**<br>**ALL CASES** | **Misc. Action No. 25-179 (JDB);**<br>**MDL Docket No. 3162** |

<u>**CONSOLIDATED CLASS ACTION COMPLAINT**</u>

**TABLE OF CONTENTS**

I.  NATURE OF THE ACTION ................................................................................................ 1

II. JURISDICTION AND VENUE ........................................................................................ 6

III. THE PARTIES................................................................................................................... 7

    A.  The Plaintiffs............................................................................................................. 7

    B.  The Administrator Defendants................................................................................ 19

    C.  The Bank Defendants.............................................................................................. 21

    D.  The FinTech Defendants ......................................................................................... 22

IV. SUBSTANTIVE ALLEGATIONS ................................................................................. 24

    A.  Class Action Settlement Administration................................................................. 24

        a.  Administration of the Settlement Fund ........................................................ 25

        b.  Notice to the Class, Objections, and Final Approval. ................................. 28

        c.  Distribution to the Class Members ............................................................... 29

    B.  Administrator Defendants........................................................................................ 30

        a.  The Administrator Defendants Responsibilities to the Class....................... 30

        b.  Administrator Defendants Advertise Their Fiduciary Role. ........................ 31

    C.  The Bank Interest Track.......................................................................................... 37

        a.  The Bank Defendants and Qualified Settlement Fund Accounts................. 37

        b.  The Bank Defendants' Fiduciary Status....................................................... 39

        c.  The Bank Defendants Advertise Their Fiduciary Role. ............................... 41

        d.  The Bank Interest Track – How It Worked.................................................. 48

    D.  The Digital Disbursement Track.............................................................................. 51

        a.  The Fintech Defendants................................................................................. 51

        b.  FinTech Expands into Class Action Settlements from Consumer Transactions.......... 53

        c.  How The Fintech Defendants Marketed Themselves. .................................. 55

        d.  The Digital Disbursement Track - How It Worked....................................... 59

    E.  Examples of the Conspirators' Execution of the Bank Interest and Digital Disbursement
        Tracks......................................................................................................................... 65

        a.  Exemplar Settlements Administered by Kroll.............................................. 65

i.    In re T-Mobile Settlement: Defendants Kroll, Huntington, Digital Disbursements, and Blackhawk ................................................. 65

ii.   In re: Yahoo! Data Breach Settlement: Defendants Kroll, Western Alliance, Digital Disbursements, and Blackhawk ................................... 71

iii.  Ariza et al v. Luxottica Retail North America: Defendants Kroll, Western Alliance, and Blackhawk .......................................................... 77

b.   Exemplar Settlements Administered by Epiq .................................................. 83

i.    In re Capital One Settlement: Defendants Epiq, Huntington, and Tremendous........................................................................................ 83

ii.   In re JUUL Labs: Defendants Epiq, Blackhawk, and Digital Disbursements....................................................................................... 89

iii.  In re Auto Parts: Defendants Epiq and Tremendous ............................... 94

iv.   In re Lithium Ion Batteries: Defendants Epiq and Blackhawk ................. 98

c.   Exemplar Settlements Administered by Angeion ....................................... 104

i.    In re: TikTok, Inc. Consumer Privacy Litigation: Defendants Angeion and Blackhawk........................................................................................ 104

ii.   Lundy v. Meta Platforms, Inc.: Defendant Angeion and Fintech Defendant ................................................................................................. 109

iii.  Fusion Elite All Stars v. Varsity Brands, LLC: Defendants Angeion and Huntington ............................................................................................ 114

d.   Exemplar Settlements Administered by JND.......................................... 118

i.    In re Equifax Data Breach: Defendants JND and Blackhawk ............... 119

ii.   Lerman v. Apple: Defendants JND and Huntington.............................. 123

iii.  In re Yahoo! Inc. Securities Litigation Settlement: Defendants JND and Huntington ........................................................................................ 128

F.   Breaches of Fiduciary Duties............................................................................. 133

a.   Administrator Defendants Breached Their Fiduciary Duties...................... 133

b.   Bank Defendants Breached Their Fiduciary Duties................................... 134

G.   Material Omissions, Predicate Acts, and Fraudulent Concealment............................. 135

a.   The Architecture of Concealment. ........................................................... 135

b.   Material Omissions and Predicate Acts...................................................... 136

c.   Fraudulent Concealment.......................................................................... 141

H.   The RICO Enterprise and Conspiracy ......................................................... 141

I.    Antitrust Allegations ............................................................................................. 152

X.   CLASS ALLEGATIONS ...................................................................................... 162

CLAIMS FOR RELIEF ...................................................................................................... 168

    COUNT I

      BREACH OF FIDUCIARY DUTIES ................................................................. 168

    COUNT II

      AIDING AND ABETTING BREACH OF FIDUCIARY DUTY ......................... 174

    COUNT III

      FRAUDULENT CONCEALMENT ...................................................................... 176

    COUNT IV

      FRAUD ................................................................................................................. 179

    COUNT V

      AIDING AND ABETTING FRAUD .................................................................... 181

    COUNT VI-A (PRIMARY)

      VIOLATION OF RICO, SECTION 1962(C) and 1964(C) – ANGEION
      ENTERPRISE ....................................................................................................... 183

    COUNT VI-B (PRIMARY)

      VIOLATION OF RICO § 1962(C) AND 1964(C) — EPIQ ENTERPRISE ......... 186

    COUNT VI-C (PRIMARY)

      VIOLATION OF RICO § 1962(C) AND 1964(C) — JND ENTERPRISE .......... 188

    COUNT VI-D (PRIMARY)

      VIOLATION OF RICO § 1962(C) AND 1964(C)— KROLL ENTERPRISE ..... 191

    COUNT VI-E

      VIOLATION OF 18 U.S.C. § 1962(d) — RICO CONSPIRACY ......................... 194

    COUNT VI-F

      AIDING AND ABETTING VIOLATIONS OF 18 U.S.C. § 1962(c) ................... 196

    COUNT VI-G

      ALTERNATIVE — PLEADED PURSUANT TO FED. R. CIV. P. 8(d)(2) ........ 199

    COUNT VI-H

ALTERNATIVE — PLEADED PURSUANT TO FED. R. CIV. P. 8(d)(2) ........ 200

COUNT VI-I

ALTERNATIVE — PLEADED PURSUANT TO FED. R. CIV. P. 8(d)(2) ........ 200

COUNT VI-J

VIOLATION OF 18 U.S.C. § 1962(a) ................................................... 201

COUNT VII

CIVIL CONSPIRACY ............................................................................ 201

COUNT VIII

NEGLIGENT MISREPRESENTATION ................................................. 203

COUNT IX

NEGLIGENCE ....................................................................................... 205

COUNT X

UNJUST ENRICHMENT ....................................................................... 206

COUNT XI

VIOLATION OF THE SHERMAN ACT, SECTION 1 ......................................... 207

PRAYER FOR RELIEF ................................................................................. 211

JURY DEMAND ........................................................................................... 212

## I.    NATURE OF THE ACTION

1.    The judiciary places trust in the administrators it appoints to oversee class action settlements. It must. Rule 23 requires the judiciary to find a class settlement fair, reasonable, and adequate before approval. This finding requires participation from court-appointed settlement administrators and banks that hold the qualified settlement fund ("QSF") deposits, to protect absent class members. That trust has one non-negotiable condition: complete disclosure.

2.    While serving as court-appointed administrators of class action settlement funds, the Administrator Defendants[1] secretly arranged to receive millions of dollars in undisclosed payments from the banks and payment platforms they used to distribute settlement proceeds. *All the Defendants said nothing*—neither to the courts that appointed them, nor to class counsel who recommended them, nor to the claimants who depended on them, because any disclosure would have unraveled the scheme.

3.    The scheme operated through two coordinated tracks from the time of preliminary approval through final approval. First, the Administrator Defendants directed class action settlement deposits to the Bank Defendants which placed them in QSFs that generated below-market returns, allowing the Bank Defendants to retain a portion of the interest those deposits should have earned while secretly sharing the remainder with the Administrator Defendants ("Bank Interest Track").

4.    Second, the Administrator Defendants routed settlement funds through electronic prepaid credit cards or gift cards ("eCards") issued by the FinTech Defendants, which skimmed QSF funds intended for distribution to the claimants through breakage (and other means) and then shared a portion of those proceeds with the Administrator Defendants ("Digital Disbursement Track").

---

[1] Capitalized terms used but not otherwise defined in this Introduction have the meanings ascribed to them in the body of this Consolidated Complaint.

5.    Breakage, the revenue generated when recipients fail to redeem prepaid card balances, and inactivity and maintenance fees, are the core of the FinTech Defendants' profit model. The FinTech Defendants build actuarial breakage projections into their financial projections, negotiate contracts that assign breakage income and other fees to themselves and cooperating administrators, and actively market their platforms to settlement administrators based on that revenue potential. While that business model may be troubling in any consumer context, it is categorically inappropriate when applied, in secret, to settlement funds intended only for the benefit of the class.

6.    This is a case about whether fiduciaries appointed by courts may secretly profit from that appointment. The answer is no. Rule 23, centuries of trust law, federal banking regulation, the law of unjust enrichment, and the Treasury Regulations governing QSFs all converge on that answer.

7.    The Administrator Defendants, Bank Defendants, and FinTech Defendants together constitute a racketeering enterprise within the meaning of 18 U.S.C. § 1961(1) & (4), whose pattern of predicate acts, including wire fraud, mail fraud, and money laundering, spans hundreds of cases, omissions in thousands of court filings, and years of sustained misrepresentation and concealment from the legal community. The enterprise pursued its shared purpose through two parallel tracks of racketeering: the systematic suppression of bank interest and the harvesting of funds through eCard breakage. The scheme's purpose was singular: to enrich the Defendants at the direct expense of the Class. That architecture is the hallmark of an ongoing criminal enterprise, not a single transaction with closed-ended continuity.

8.    The scheme was not case-by-case. The Administrator Defendants did not decide separately, in each case, whether to conceal their kickback arrangements. They made that decision once when they entered into the master service agreements and financial arrangements with the FinTech Defendants and Bank Defendants that governed their conduct across their book of

2

business. Every submission to the public and the judiciary thereafter was part-and-parcel of the wider illegal Enterprise.

9.     Plaintiffs were claimants who were to receive *pro rata* distributions from non-reversionary common fund settlements administered by the Administrator Defendants, whose distributions were silently reduced because the Defendants were extracting value from the very funds they were entrusted to protect and deliver to the Class.

10.     The Defendants' scheme was designed to be undetectable. The Administrator Defendants' undisclosed financial arrangements with the Bank Defendants and FinTech Defendants appeared nowhere in any bid or proposal for administrator selection, preliminary approval paper, administrator declaration, fee application, class settlement notice, class settlement website, post-distribution accounting, CAFA notice to Attorneys General, or elsewhere. Such disclosures were necessary to ensure the integrity of the judicial process. Rather, Defendants continued to publicly represent themselves as legitimate participants in legal proceedings, particularly regarding the administration of settlements and guardianship of settlement funds.

11.     The omissions were not oversight—they were the scheme. Todd B. Hilsee, a 34-year class action administration expert, documented in his October 2024 white paper[2] that executives of a leading QSF custodian bank approached him specifically to confirm that Administrator Defendants were systematically accepting payments from FinTech Defendants, taken from QSF money without the judiciary's knowledge. Administrator Defendants were simultaneously demanding that banks share the interest QSF accounts would otherwise earn.

---

[2] *See* Todd B. Hilsee, *Information on Potentially Deceptive Banking and Claims Administration Practices in Class Action Settlement "Digital Payment" Distribution and Reporting re: Allege Systematic Misappropriation of Qualified Settlement Fund Money Without Court Approval*, (October 16, 2024), https://www.hilseegroup.org/wp-content/uploads/2024/10/Hilsee-DP_QSF-White-Paper.pdf (last visited May 21, 2025) (hereinafter "Hilsee Report").

Hilsee's review of hundreds of publicly filed court records found no disclosure of these "discounts."

12.    A *Forbes* investigation published on May 21, 2025,[3] confirmed through independent reporting that an employee of FinTech Defendant Blackhawk Network sent a 2020 email in which three administrator industry insiders described the interest-sharing practice as "standard practice," and stated that "the judges approving settlements and the plaintiffs' lawyers representing consumers are largely unaware of how the digital cards work, or who is collecting the breakage they generate."

13.    The Declaration of Steven Weisbrot, Esq., CEO of Angeion, filed under penalty of perjury on August 14, 2025, in the $725 million Facebook settlement, confirmed that Angeion's master service agreement with Blackhawk Network predated its appointment as Settlement Administrator. The concurrent Declaration of Class Counsel confirmed that counsel "was not informed or aware of this agreement between Angeion and Blackhawk prior to these discussions" despite actively supervising the largest consumer privacy settlement in history.

14.    In a second proceeding, Weisbrot confirmed the same arrangement under oath. In *Woods v. Google, LLC*, No. 5:11-cv-01263-EJD (N.D. Cal.), following questions raised by the court at the August 21, 2025 final approval hearing, Weisbrot filed a supplemental declaration on August 22, 2025 disclosing that: (a) the identical Angeion-Blackhawk master service agreement governs that settlement; (b) "Angeion generates revenue in connection with the settlements for which Blackhawk acts as Angeion's subcontractor;" and (c) "[a]nticipated revenue to Angeion from Blackhawk thus enabled Angeion to offer and deliver administrative services for the charges

---

[3] *See* Jeff Kauflin, *Online Prepaid Cards Have Proliferated as a Way to Compensate Consumers Harmed by Companies. Critics Say Fintechs and Claims Administrators Have Unfairly Profited from the Trend*, FORBES, (May 21, 2025), https://www.forbes.com/sites/jeffkauflin/2025/05/21/how-private-equity-owned-companies-quietly-pocket-class-action-payouts/ (last visited May 1, 2026) (hereinafter "Forbes").

Angeion has described in its bid."[4] Angeion simultaneously filed a sealed Appendix Declaration (ECF No. 899-5) placing the actual Angeion-Blackhawk agreements before the court under seal as "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY," having refused to produce them voluntarily to class counsel. Disclosure came only because a judge forced it, after learning about this lawsuit.[5]

15.     Similarly, the Bank Defendants were not passive depositories who unknowingly received and retained settlement funds. The market for QSF deposits is a specialized institutional segment that sophisticated banking participants understand, including that interest on QSF assets belongs to the class. However, both Hilsee in his 2024 white paper and the 2025 *Forbes* article confirm that the Bank Defendants deliberately shorted the interest provided class members in the QSF and shared the spread with the Administrator Defendants.

16.     The Administrator Defendants concealed their standing arrangements and agreements with the other Defendants, often before securing retention by the parties, before seeking court appointment, and before any approval order was issued. By the time a final approval order was issued in any given settlement, Bank Defendants' interest suppression had already been in effect for months. After final approval, right before disbursement, that interest was fixed and was to be allocated *pro rata* to claimants an, the eCard selections were locked, and the projected breakage of unredeemed settlement funds was a certainty.

17.     Defendants' scheme was in place long before any particular settlement and was designed to be carried out without the knowledge of the judiciary. No individual settlement court, reviewing any individual filing in a single case, had visibility into the agreements governing the Administrator Defendants' book of business. A single settlement court with limited jurisdiction

---

[4] Declaration of Steven Weisbrot ¶¶ 47, 52, 64, *Woods v. Google, LLC*, No. 5:11-cv-01263-EJD (N.D. Cal.), ECF No. 899-3.
[5] *Id*. at ECF No. 899-5.

cannot reach a scheme spanning hundreds of cases in dozens of courts. The scheme was structured precisely so that no single court would ever see enough of to even suspect there was a scheme. Only a proceeding of this scope can.

18.     Plaintiffs bring this action to hold Defendants accountable for what they took, to return it to those from whom it was taken, and to ensure that the judiciary's trust in those it appoints is never again exploited. Plaintiffs seek: disgorgement of all unauthorized profits under *Restatement (Third) of Trusts* § 78; imposition of a constructive trust over all identifiable proceeds; RICO treble damages under 18 U.S.C. § 1964(c); antitrust damages under 15 U.S.C. § 15; an award of damage under various claims under common law; and such other relief as the Court deems appropriate.

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) (2), because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 proposed Class Members, and minimal diversity exists as Defendants are citizens of states other than the state of at least one Class Member. This Court has personal jurisdiction over Defendants because they are corporations that regularly conduct business in this District.

20.     This Court has jurisdiction under RICO pursuant to 18 U.S.C. § 1964.

21.     This Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. §1407, Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, the December 12, 2025 Transfer Order of the Judicial Panel on Multidistrict Litigation ("JPML") in MDL 3162 ("Transfer Order") related to this matter, and any future Transfer Orders as the JPML may enter.

22.     Venue is proper in this District under 28 U.S.C. §1407, Rule 7.1 of the Rules of Procedure of the JPML, and the Transfer Order related to this matter and any future Transfer

Orders as the JPML may issue. In the alternative, venue is proper in this District under 28 U.S.C. §1391(b) because all Defendants regularly conduct business in this District.

## III.    THE PARTIES

### A.  The Plaintiffs

23.    Plaintiff Tyler Baker, a citizen of Vermont, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed settlement administrators, including: (i) *Lundy v. Meta Platforms, Inc.*, Case No. 18-cv-6793-JD (N.D. Cal.) ($37.5 million settlement that was administered by Defendant Angeion); (ii) *Moog v. The Christian Broadcasting Network, Inc.*, Case No. 1:24-cv-00501 (E.D. Va.) ($4 million settlement administered by Defendant Kroll); (iii) *In re Juul Labs Inc. Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO (N.D. Cal) ($300 million settlement administered by Defendant Epiq, who directed digital payments via Defendant Blackhawk); and (iv) *In re Automotive Parts Antitrust Litigation*, Case No. 2:12-md-02311 (E.D. Mich.) ($1.2 billion settlement administered by Defendant Epiq, who directed digital disbursements through Defendant Tremendous). The amount of compensation Plaintiff received in each of the class action settlements listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

24.    Plaintiff Lauren Wolf, a citizen of Texas, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed settlement administrators, including: (i) *In re: Equifax, Inc. Customer Data Security Breach Litigation*, Case No. 1:17-md-02800-TWT (N.D. Ga.) ($380.5 million settlement administered by Defendant JND, who directed digital payments through Defendant Blackhawk); (ii) *Lithium-Ion Batteries Antitrust Litigation*, Case No. 13-MD-02420-YGR (N.D. Cal.) ($113 million settlement administered by Defendant Epiq, who directed digital payments through Defendant Blackhawk); (iii) *Kostka v. Dickeys Barbecue Restaurants*, Case. No. 3:20-cv-3424-K (N.D. Tx.) ($2.35 million settlement

administered by Epiq, who directed digital payments through Tremendous); and (iv) *Lerman v. Apple Inc.*, Case No. 15-cv-07381(SJ) (LB) (E.D.N.Y.) ($20 million settlement administered by JND, who deposited settlement funds with Huntington). The amount of compensation Plaintiff received in each of the class action settlements listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

25.    Plaintiff London A. Whitlaw, a citizen of Oklahoma, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed settlement administrators, including: (i) *In re: Equifax, Inc. Customer Data Security Breach Litigation*, Case No. 1:17-md-02800-TWT (N.D. Ga.) ($380.5 million settlement administered by Defendant JND, who directed digital payments through Defendant Blackhawk); (ii) *Blue Cross Blue Shield Payment*, Case No. 13-CV-200000-RDP (N.D. Ala.) ($2.67 billion settlement administered by Defendant JND); (iii) *Donahue v. Everi Holdings Settlement*, Case. No. 2018CH15419 (Cir. Ct. Ill.) ($14 million settlement administered by Defendant Angeion); (iv) the *Fabuloso* Settlement (collectively, *Patora v. Colgate-Palmolive Co.*, Case No. 7:23-cv-01888 (S.D.N.Y.), *Dixon v. Colgate-Palmolive America Inc*, Case No. 1:23-cv-00038 (W.D.N.C), and *Dorsey v. Colgate-Palmolive Company*, Case No. 7:23-cv-01426 (S.D.N.Y.) ($1.93 million settlement administered by Defendant Angeion, who directed digital payments through Defendant Digital Disbursements); (v) the *Pine-Sol Settlement* (collectively, *Swetz v. The Clorox Company* (7:22-cv-9374-PMH) (S.D.N.Y.); *Kossel v. The Clorox Company* (7:22-cv-10450-PMH) (S.D.N.Y.) and *Charles v. The Clorox Company* (4:22-cv-06855-HSG) (N.D. Cal.)) ($5.65 million settlement administered by Defendant Angeion); and (vi) *In re Juul Labs Inc. Marketing, Sales Practices, and Products Liability Litigation*, N.D. Cal. Case No. 19-md-02913-WHO ($300 million settlement administered by Defendant Epiq, who directed digital payments via Defendant Blackhawk). The amount of compensation Plaintiff received in each of the class action settlements

8

listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

26.    Plaintiff Davin A. Hetland, a citizen of California, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed settlement administrators, including: (i) *Vance v. Church & Dwight Co. Inc.*, Case No. 24LA190 (20th Judicial Cir. Ct.) (Ill.) ($6 million settlement administered by Defendant Angeion); (ii) *Natale v. 9199-4467 Quebec Inc. d/b/a Earth Rated Compost*, Case No. 2:21-cv-06775 (E.D.N.Y) ($825,000 settlement administered by Defendant JND); (iii) *Goldstein v. Henkel Corp, et al.*, Case No. 3:22-cv-00164 (AWT) (D. Conn.) ($1.95 million settlement administered by Defendant Angeion); (iv) *Counts, et al. v. Arkk Food Company*, Case No. 1:23-cv-00236 (N.D. Ill.) ($2 million settlement administered by Defendant Angeion); (v) *Wallin v. Naturelo Premium Supplements LLC*, Case No. 3:22-cv-05950 (D.N.J.) ($1.5 million settlement administered by Defendant Kroll); (vi) *Slaughter v. Virgin Scent, Inc.* Case No. 2:21-cv-02875 (C.D. Cal.), settled as *Brodowicz v. Walmart*, Case No. 2021-cv-60643 (S.D. Fla.) (a $3 million settlement administered by Defendant Angeion, who deposited settlement funds with Defendant Huntington National Bank); (vii) *Proskin v. Tzumi Innovations LLC*, Case No. 1:22-cv-05919 (S.D.N.Y.) ($2 million settlement administered by Defendant Angeion); (viii) *Kukorinis v. Walmart Inc.,* Case No. 8:22-cv-02402 (M.D. Fla.) ($45 million settlement administered by Defendant Angeion); (ix) *Jimenez v. Artsana USA, Inc.*, Case No. 7:21-cv-07933 (S.D.N.Y.) ($45 million settlement administered by Defendant Angeion); (x) *St. James v. Partnership HealthPlan of California*, No. FCS059095 (Cal. Super. Ct.) (settlement administered by Defendant Angeion); (xi) *Wallenstein v. Mondelez International, Inc., Mondelez Global, LLC, and Nabisco, Inc.,* Case No. 3:22-cv-06033 (N.D. Cal.) ($10 million settlement administered by Defendant Kroll); (xii) *Plowden v. Similasan Corp.*, Case No. 1:23-cv-02511 (D. Colo.) ($3.575 million case administered by Defendant Angeion); and (xiii) *Snow v. Align Technology Inc.*, Case No. 3:21-CV-03269-VC (N.D. Cal)

($31.75 million settlement administered by Defendant Epiq, who deposited settlement funds with Huntington National Bank). The amount of compensation Plaintiff received in each of the class action settlements listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

27.     Plaintiff David Allen Coleman, a citizen of Texas, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed settlement administrators, including: (i) *Proskin v. Tzumi Innovations LLC*, Case No. 1:22-cv-05919 (S.D.N.Y.) ($2 million settlement administered by Defendant Angeion); and (ii) *In re Juul Labs Inc. Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO (N.D. Cal.) ($300 million settlement administered by Defendant Epiq, who directed digital payments via Defendant Blackhawk). The amount of compensation Plaintiff received in each of the class action settlements listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

28.     Plaintiff Dana Smith, a citizen of New York, was a class member in certain class action cases, including: *In re: TikTok, Inc. Consumer Privacy Litigation*, Case No. 1:20-cv-4699, MDL No. 2948 (ND. Ill.) ($92 million settlement administered by Defendant Angeion, who directed digital payments via Defendant Blackhawk). The amount of compensation Plaintiff received in the class action settlement listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

29.     Plaintiff Tammy Ables, a citizen of Oklahoma, was a class member in certain class action cases, including: *In re: T-Mobile Customer Data Security Breach Litigation*, Case No. 4:21-md-03019 (W.D. Mo.) ($350 million settlement administered by Defendant Kroll, who directed digital payments through Defendants Digital Disbursements and Blackhawk, and deposited settlement funds with Defendant Huntington National Bank). The amount of compensation

10

Plaintiff received in the class action settlement listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

30.     Plaintiff Jennifer Costello, a citizen of New York, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed settlement administrators, including: *Fusion Elite All Stars v. Varsity Brands, LLC* Case No. 2:20-cv-02600-SHL-tmp ($43.5 million settlement administered by Defendant Angeion, who deposited settlement funds with Defendant Huntington National Bank). The amount of compensation Plaintiff received in the class action settlement listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

31.     Plaintiff Donald Coughlan, a citizen of New Jersey, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed settlement administrators, including: (i) *Ariza v. Luxottica Retail North America*, Case No. 17-cv-5216 (E.D.N.Y) ($39 million settlement administered by Defendant Kroll, who directed digital payments through Defendant Blackhawk, and deposited settlement funds with Defendant Western Alliance); (ii) *In re: Facebook Internet Tracking Litigation*, Case No. 5:12-md-02314 (N.D. Cal.) ($90 million settlement administered by Defendant Angeion, who directed digital payments through Defendant Blackhawk, and deposited settlement funds with Defendant Huntington National Bank) and (iii) *In re Equifax, Inc. Customer Data Security Breach Litigation*, Case No. 1:17-md-02800 (N.D. Ga.) ($380.5 million settlement administered by Defendant JND, who directed digital payments through Defendant Blackhawk). The amount of compensation Plaintiff received in each of the class action settlements listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

32.     Plaintiff Marissa Porter, a citizen of Florida, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed settlement administrators, including: (i) *In re Capital One Customer Data Security Breach*

*Litigation*, Case No. 1:19-md-02915 (E.D. Va) ($190 million settlement administered by Defendant Epiq, who directed digital payments through Defendant Tremendous, and who deposited settlement funds with Defendant Huntington National Bank); (ii) *In re: Post Meds, Inc. Data Breach Litigation*, Case No. 4:23-cv-05710 (N.D. Cal.) ($7.5 million settlement administered by Defendant Epiq); and (iii) *Holve v. McCormick & Company, Inc.*, Case No. 6:16-cv-06702 (W.D.N.Y.) ($3 million settlement administered by Defendant Angeion, who deposited settlement funds with Defendant Western Alliance Bank). The amount of compensation Plaintiff received in each of the class action settlements listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

33.    Plaintiff Sandeep Trisal, a citizen of New York, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed settlement administrators, including: (i) *In re Capital One Customer Data Security Breach Litigation*, Case No. 1:19-md-02915 (E.D. Va) ($190 million settlement administered by Defendant Epiq, who directed digital payments through Defendant Tremendous, and who deposited settlement funds with Defendant Huntington National Bank; and (ii) *In re Yahoo! Inc. Customer Data Security Breach Litigation*, Case No. 5:16-md-02752 (N.D. Cal.) ($117.5 million settlement administered by Defendant Kroll, who directed digital payments through Defendant Digital Disbursements, and who deposited settlement funds with Defendant Western Alliance Bank). The amount of compensation Plaintiff received in each of the class action settlements listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

34.    Plaintiff Alan Starzinski, a citizen of California, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed settlement administrators, including: (i) *In re Zoom Video Communications, Inc. Privacy Litigation*, Case No. 3:20-cv-02155 (N.D. Cal.) ($85 million settlement administered by Defendant

12

Epiq); (ii) *Lopez v. Apple*, Case No. 4:19-CV-04577 (N.D. Cal.) ($95 million settlement administered by Defendant Angeion); (iii) *Winston v. Peacock TV, LLC*, Case No. 1:23-cv-08191 (S.D.N.Y.) ($3.74 million settlement administered by Epiq); and (iv) *In re Plaid, Inc. Privacy Litigation*, Case No. 4:20-cv-03056 (N.D. Cal.) ($58 million settlement administered by Defendant Angeion, who deposited settlement funds with Defendant Huntington National Bank). The amount of compensation Plaintiff received in each of the class action settlements listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

35.     Plaintiff Chasom Brown, a citizen of California, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed settlement administrators, including: (i) *In re Yahoo! Inc. Customer Data Security Breach Litigation*, Case No. 5:16-md-02752 (N.D. Cal.) ($117.5 million settlement administered by Defendant Kroll, who directed digital payments through Digital Disbursements, and who deposited settlement funds with Defendant Western Alliance Bank); (ii) *In re Plaid, Inc. Privacy Litigation*, Case No. 4:20-cv-03056 (N.D. Cal.) ($58 million settlement administered by Angeion, who deposited settlement funds with Defendant Huntington National Bank); (iii) *In re Facebook, Inc. Consumer Privacy User Profile Litigation*, Case No. 3:18-md-02842-VC (N.D. Cal.) (a settlement administered by Defendant Angeion, who distributed digital payments through Defendant Blackhawk, and who deposited settlement funds with Defendant Huntington National Bank); and (iv) *Wang v. StubHub, Inc.*, No. CGC18564120 (Cal. Super. Ct.) ($2.5 million cash settlement administered by Defendant Angeion). The amount of compensation Plaintiff received in each class action settlement listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

36.     Plaintiff Roger Tejon, a citizen of Florida, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed

13

settlement administrators, including: (i) *In re Equifax, Inc. Customer Data Security Breach Litigation*, Case No. 1:17-md-02800 (N.D. Ga.) ($380.5 million settlement administered by Defendant JND, who directed digital payments through Defendant Blackhawk); (ii) *In re Capital One Customer Data Security Breach Litigation*, Case No. 1:19-md-02915 (E.D. Va) ($190 million settlement administered by Defendant Epiq, who directed digital payments through Defendant Tremendous, and who deposited settlement funds with Defendant Huntington National Bank); (iii) *In re Facebook, Inc. Consumer Privacy User Profile Litigation*, Case No. 3:18-md-02842-VC (N.D. Cal.) (a settlement administered by Defendant Angeion, who distributed digital payments through Defendant Blackhawk, and who deposited settlement funds with Defendant Huntington National Bank); (iv) *Snow v. Align Technology Inc.*, Case No. 3:21-CV-03269-VC (ND Cal) ($31.75 million settlement administered by Defendant Epiq, who deposited settlement funds with Huntington National Bank); and (v) *Marek v. Molson Coors Beverage Company*, Case No. 3:21-cv-07174-WHO (N.D. Cal.) (settlement administered by Defendant Angeion). The amount of compensation Plaintiff received in each class action settlement listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

37.     Plaintiff Sammuel Tsou, a citizen of California, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed settlement administrators, including: (i) *Dickens v. Thinx Inc.*, Case No. 1:22-cv-4286 (S.D.N.Y.) ($5 million settlement administered by Defendant Epiq); (ii) *In re: T-Mobile Customer Data Security Breach Litigation*, Case No. 4:21-md-03019 (W.D. Mo.) ($350 million settlement administered by Defendant Kroll, who distributed digital payments through Defendants Digital Disbursements and Blackhawk, and deposited settlement funds with Defendant Huntington National Bank); (iii) *Jenkins v. National Grid USA*, Case No. 2:15-cv-01219 (E.D.N.Y.) ($38.5 million settlement administered by Defendant Angeion); (iv) *In re Fairlife Milk Products Marketing and Sales Practices Litigation*, MDL No. 2909 (N.D. Ill.) ($21 million settlement

14

administered by Defendant Epiq); (v) *In re Procter & Gamble Aerosol Prods. Mktg. & Sales Practices Litig.*, Case No. 2:22-MD-03025 (N.D. Ohio) ($8 million settlement administered by Defendant Kroll); (vi) *Proskin v. Tzumi Innovations LLC*, Case No. 1:22-cv-05919 (S.D.N.Y.) ($2 million settlement administered by Defendant Angeion); (vii) *In re: Smashburger IP Holder LLC*, Case No. 2:19-CV-00993 (C.D. Cal.) (settlement administered by Defendant Kroll); (viii) *Perry v. Schnuck Markets Inc.*, Case No. 2022-CC10425 (Mo. Cir. Ct.) ($4 million settlement administered by Defendant Epiq, who deposited settlement funds with Defendant Western Alliance Bank); (ix) *Ross, et al. v. Panda Restaurant Group Inc., et al.*, Case No. 21STCV03662 (Cal. Super. Ct., L.A. Cty.) (settlement administered by Defendant Epiq); (x) *In re: Google Referrer Header Privacy Litigation,* Case No. 5:10-cv-4809-EJD (N.D. Cal) ($23 million settlement administered by Defendant Kroll); (xi) *Prescott v. Reckitt Benckiser LLC*, Case No. 20-cv-02101 (N.D. Cal.) ($3.275 million settlement administered by Defendant Epiq, who deposited settlement funds with Defendant Western Alliance Bank); (xii) *In re Juul Labs Inc. Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO (N.D. Cal.) ($300 million settlement administered by Defendant Epiq, who directed digital payments via Defendant Blackhawk); (xiii) *Snow v. Align Technology Inc.*, Case No. 3:21-CV-03269-VC (ND Cal) ($31.75 million settlement administered by Defendant Epiq, who deposited settlement funds with Defendant Huntington National Bank); (xiv) *In re: ConAgra Foods, Inc., Wesson Oil Products Liability Litigatio*n, Case No. 2291 (C.D. Cal.) (settlement administered by Defendant JND); (xv) *In re Equifax, Inc. Customer Data Security Breach Litigation*, Case No. 1:17-md-02800 (N.D. Ga.) ($380.5 million settlement administered by Defendant JND, and for which Defendant Blackhawk issued prepaid digital cards received by class members); (xvi) *Holve v. McCormick & Company, Inc.*, Case No. 6:16-cv-06702 (W.D.N.Y.) ($3 million settlement administered by Defendant Angeion, who deposited settlement funds with Defendant Western Alliance Bank); (xvii) *In re Capital One Customer Data Security Breach Litigation*, Case No. 1:19-md-02915

15

(E.D. Va) ($190 million settlement administered by Defendant Epiq, who directed digital payments through Defendant Tremendous, and who deposited settlement funds with Defendant Huntington National Bank); and (xviii) *In re Automotive Parts Antitrust Litigation*, Case No. 2:12-md-02311 (E.D. Mich.) ($1.2 billion settlement administered by Defendant Epiq, who directed digital disbursements through Defendant Tremendous). The amount of compensation Plaintiff received in each of the class action settlements listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

38.     Plaintiff Damond Hunter, a citizen of New Jersey, was a class member in certain class action cases, including: (i) *Patora v. Colgate-Palmolive Co.*, Case No. 23-cv-01118-VB (S.D.N.Y.) ($1.93 million settlement administered by Defendant Angeion, who directed digital payments through Defendant Digital Disbursements); (ii) *Brooks v. Thompson Reuters, Corp.*, Case No. 21-cv-01418 (N.D. Cal.) ($27.5 million settlement administered by Angeion, who deposited settlement funds with Defendant Huntington National Bank); (iii) *In re: Novartis and Par Antitrust Litigation*, Case No. 18-cv-04361-AKH (S.D.N.Y.) ($245 million settlement administered by Defendant Angeion, who deposited settlement funds with Defendant Huntington National Bank); (iv) *In re Juul Labs Inc. Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO (N.D. Cal.) ($300 million settlement administered by Defendant Epiq, who directed digital payments via Defendant Blackhawk); (v) *In re Robinhood Outage Litigation*, Case No. 3:20-cv-01626-JD (N.D. Cal.) (settlement administered by Epiq, who deposited settlement funds with Defendant Huntington National Bank); (vi) *In re Yahoo! Inc. Customer Data Security Breach Litigation*, Case No. 5:16-md-02752 (N.D. Cal.) ($117.5 million settlement administered by Defendant Kroll, who directed digital payments through Defendant Digital Disbursements, and who deposited settlement funds with Defendant Western Alliance Bank); (vii) *Broiler Chicken Grower Antitrust Litigation* (No. II), Case No. 6:20-md-02977 (settlement administered by Angeion); (viii) *In re: Google Referrer Header Privacy Litigation*,

16

Case No. 5:10-cv-4809-EJD (N.D. Cal) ($23 million settlement administered by Kroll); (ix) *Lundy v. Meta Platforms, Inc.*, Case No. 18-cv-6793-JD (N.D. Cal.) ($37.5 million settlement that was administered by Defendant Angeion); (x) *Goldstein v. Henkel Corp*, Case No. 3:22-cv-00164 (AWT) (D. Conn.) (a $1.95 million settlement administered by Defendant Angeion). The amount of compensation Plaintiff received in each of the class action settlements listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

39.    Plaintiff Nicole Rieger, a citizen of California, was a class member in certain class action cases, including: (i) *In re Yahoo! Inc. Customer Data Security Breach Litigation*, Case No. 5:16-md-02752 (N.D. Cal.) ($117.5 million settlement administered by Defendant Kroll, who directed digital payments through Defendant Digital Disbursements, and who deposited settlement funds with Defendant Western Alliance Bank); (ii) *In re Scripps Health Data Incident Litigation*, Case No. 37-2021-00024103 (Cal. Super Ct.); (iii) *Esposito v. Cellco Partnership d/b/a Verizon Wireless*, Case No. MID-L-006360-23 (N.J. Super. Ct. Law. Div.) ($100 million settlement administered by Defendant Angeion, who directed digital payments through Defendant Blackhawk); (iv) *Seegert v. P.F. Chang's China Bistro, Inc.*, Case No. 37-2017-00016131 (Cal. Super. Ct.) ($1 million settlement administered by Defendant JND); and (v) *In re Toll Roads Litigation*, Case No. 8:16-cv-00262 (C.D. Cal.) ($29 million settlement administered by Defendant Epiq). The amount of compensation Plaintiff received in the class action settlement listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

40.    Plaintiff Brooke Tennery, a citizen of Alabama, was a class member in certain class action cases, including *Slaughter v. Virgin Scent, Inc.* (Case No. 2:21-cv-02875) (C.D. Cal.), settled as *Brodowicz v. Walmart*, Case No. 2021-cv-60643 (S.D. Fla.) ($3 million settlement administered by Defendant Angeion, who deposited settlement funds with Defendant Huntington

17

National Bank). The amount of compensation Plaintiff received in the class action settlement listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

41.    Plaintiff Maya Duarte, a citizen of California, was a class member in certain class action cases, including *Slaughter v. Virgin Scent, Inc.* (Case No. 2:21-cv-02875) (C.D. Cal.), settled as *Brodowicz v. Walmart* (Case No. 2021-cv-60643) (S.D. Fla.) ($3 million settlement administered by Defendant Angeion, who deposited settlement funds with Defendant Huntington National Bank). The amount of compensation Plaintiff received in the class action settlement listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

42.    Plaintiff Mary Jane Whalen, a citizen of New York, was a class member in certain class action cases that resulted in settlements for which Defendants served as the court-appointed settlement administrators, including *In re Capital One Customer Data Security Breach Litigation*, Case No. 1:19-md-02915 (E.D. Va) ($190 million settlement administered by Defendant Epiq, who directed digital payments through Defendant Tremendous, and who deposited settlement funds with Defendant Huntington National Bank). The amount of compensation Plaintiff received in the class action settlement listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

43.    Plaintiff Robert Thomas Barclay, a citizen of Pennsylvania, was a class member in certain class action cases, including *In re: Equifax, Inc. Customer Data Security Breach Litigation*, Case No. 1:17-md-02800-TWT (N.D. Ga.) ($380.5 million settlement administered by Defendant JND, who directed digital payments through Defendant Blackhawk). The amount of compensation Plaintiff received in the class action settlement listed above was diminished by Defendants' illicit kickback schemes alleged herein, resulting in actual economic harm to Plaintiff.

44.    In connection with these class action settlements, Plaintiffs received class action settlement disbursements from Administrator Defendants. Unbeknownst to Plaintiffs and Class Members, the Administrator Defendants, and/or their subsidiaries and affiliates, received remuneration, compensation, or incentives from the Fintech Defendants and Bank Defendants that reduced payouts to class members, none of which were disclosed to the Courts, Plaintiffs or Class Members.

### B. The Administrator Defendants

45.    *Angeion Group.* Defendant Angeion Group, LLC, is a Pennsylvania limited liability company that maintains its principal executive offices at 1650 Arch Street, Suite 2210, Philadelphia, Pennsylvania. Angeion was one of the first settlement administrators to adopt digital payment methods. On its website, Angeion states that from 2014 to 2016, it "pushe[d] for industry change, advocating for modern communication and digital payments that eliminate the need for check-cashing stores."[6] These efforts appear to have paid off, as its website boasts, "In 2022 alone, Angeion sen[t] over 300 million electronic notices to class members and distribute[d] over 10 million digital disbursements."[7] And for 2024, Angeion projected that it would "distribute over 20 million digital disbursements."[8] In its administration of class action settlements, Angeion directed digital payment disbursements through co-conspirators Blackhawk Network and Digital Disbursements, and caused settlement funds to be deposited with co-conspirators Huntington National Bank and Western Alliance Bank.

46.    *Epiq.* Defendant Epiq Class Action & Claims Solutions, Inc., is an Oregon corporation with a principal place of business at 10300 SW Allen Blvd., Beaverton, Oregon. Defendant Epiq Systems, Inc., which owns Defendant Epiq Class Action & Claims Solutions, Inc.,

---

[6] *See* Angeion Grp., About Angeion, https://www.angeiongroup.com/about (last visited March 20, 2026) (emphasis added).

[7] *Id*. (emphasis added).

[8] *Id*.

is a Delaware corporation that maintains its principal executive offices at 501 Kansas Avenue, Kansas City, Kansas 66105. Collectively, Epiq Systems Inc. and Epiq Class Action & Claims Solutions, Inc., will be referred to as "Epiq." [9] According to Epiq's website, Epiq has administered "more than half of the nation's largest 100 [class action settlements]," and in those top 100 settlements alone, "Epiq managed $35.8 billion in settlements, more than $13 billion over the next closest claims administrator." [10] In its administration of class action settlements, Epiq directed digital payment disbursements through co-conspirators Blackhawk Network, Digital Disbursements, and Tremendous, and caused settlement funds to be deposited with co-conspirators Huntington National Bank and Western Alliance Bank.

47.     ***JND Legal Administration.*** Defendant JND Holdings, LLC, d/b/a JND Legal Administration ("JND"), a subsidiary of Sedgwick, is an Oregon limited liability company that maintains its principal place of business at 1201 2nd Ave Suite 3400, Seattle, Washington. JND's class action services include pre-settlement consultation, notice services, claims processing and validation, call center capabilities, settlement website design, and "an array of distribution services." [11] According to its website, "JND has disbursed billions of dollars in settlement benefits in a wide variety of forms," including "gift cards, vouchers, and electronic benefits." [12] In its

---

[9] Both of these entities are involved in class action administration. For example, in *In re JUUL Labs*, "Epiq Systems, Inc." was appointed as the Settlement Administrator, whereas in *In re Capital One*, "Epiq Class Action and Claims Solutions, Inc." was appointed the Settlement Administrator. The terms of use for the *In re Capital One* settlement website nevertheless links to the website for Epiq Systems, Inc., which provides: "Welcome to the Epiq Systems, Inc. (together with its subsidiaries and affiliates, 'Epiq') web site." *See* Epiq Sys., Inc., Terms of Use, https://www.epiqglobal.com/en-us/terms-of-us (last visited April 24, 2026).

[10] *See e.g.*, Epiq, Epiq Ranks No. 1 in Top 100 U.S. Class Action Settlements List for Seventh Year in a Row, https://www.epiqglobal.com/en-us/resource-center/announcements/epiq-ranks-no1-in-top-100-us-class-action-settlements-list-for-seventh-year-in-arow#:~:text=Epiq's%20reputation%20as%20the%20global,About%20Epiq (last visited April 24, 2026).

[11] *See* JND Legal Admin., Class Action Administration, https://www.jndla.com/class-action-administration (last visited April 24, 2026).

[12] *Id*.

administration of class action settlements, JND directed digital payment disbursements through co-conspirator Blackhawk Network, and caused settlement funds to be deposited with co-conspirator Huntington National Bank.

48.    ***Kroll Settlement Administration.*** Defendants Kroll LLC and Kroll Settlement Administration LLC are Delaware limited liability companies (collectively, "Kroll"), and maintain their principal place of business at 285 Fulton St., 31st Fl., New York, New York. In 2019, Kroll acquired the Heffler Claims Group, a leading settlement administrator.[13] Kroll advertises that it has managed more than 4,000 settlements, processed more than 100 million claims, and distributed more than $30 billion.[14] In its administration of class action settlements, Kroll directed digital payment disbursements through co-conspirators Blackhawk Network and Digital Disbursements, and caused settlement funds to be deposited with co-conspirators Huntington National Bank and Western Alliance Bank.

49.    Angeion, Epiq, JND, and Kroll will collectively be referred to herein as "Administrator Defendants".

**C. The Bank Defendants**

50.    ***Huntington National Bank.*** Defendant Huntington National Bank ("Huntington"), is a regional bank holding company that is FDIC insured and federally chartered, maintaining its principal executive offices in Columbus, Ohio. Huntington is a subsidiary of the publicly traded company Huntington Bancshares Inc. (NASDAQ: HBAN). Defendant Huntington is one of two

---

[13]Kroll, Duff & Phelps Acquires Heffler Claims Group, https://www.kroll.com/en/newsroom/duff-phelps-acquisition-heffler-claims-group (last visited April 24, 2026).
[14]Kroll, Settlement Administration, https://www.kroll.com/en/services/settlement-administration (last visited April 24, 2026).

major banks in the Settlement Deposit Market, advertising that it has handled over 7,800 settlements and distributed over $99 billion in settlement funds.[15]

51.    ***Western Alliance Bank.*** Defendant Western Alliance Bank ("Western Alliance") is a federally chartered bank and is a subsidiary of a publicly traded company, Western Alliance Bancorporation (NYSE: WAL), that maintains its principal executive offices in Phoenix, Arizona. Western Alliance and Huntington are the two banks with the largest market shares in the settlement deposit market. Western Alliance's website advertises that it has supported multiple settlements each exceeding $1 billion.[16]

52.    Huntington and Western Alliance will collectively be referred to herein as "Bank Defendants."

**D. The FinTech Defendants**

53.    ***Blackhawk Network Holdings.*** Defendant Blackhawk Network Holdings, Inc. ("Blackhawk"), is a Delaware corporation with its principal place of business at 6220 Stoneridge Mall Road, Pleasanton, California. Blackhawk is a prepaid payment network utilizing proprietary technology to offer consumers and businesses a broad range of prepaid cards in physical and electronic forms, as well as related prepaid products, payment services, and incentive solutions. In 2013, the company filed for a $200 million IPO on NASDAQ. Then, on January 16, 2018, Blackhawk announced that it would be acquired by Silver Lake and P2 Capital Partners for $3.5 billion. Blackhawk now operates as an American privately held company in the prepaid, gift card

---

[15]Huntington    Nat'l    Bank,    Settlement    Fund    Services, https://www.huntington.com/Commercial/industries/settlement-funds-services (last visited April 24, 2026).

[16]    W.    Alliance    Bank,    Settlement    Services, https://www.westernalliancebancorporation.com/expertise/legal/settlement-services (last visited April 24, 2026).

and payments industries. Blackhawk's website advertises that it "offer[s] a wide variety of alternative payment solutions for class action or appeasement settlements."[17]

54.    ***Tremendous.*** Defendant Tremendous, LLC ("Tremendous"), is a Wisconsin limited liability company with its principal place of business at 228 Park Ave S, PMB 62949, New York, New York. Tremendous operates as a payouts platform that allows businesses to send money, prepaid cards, and gift cards to recipients globally. According to its website: "We bulked up our engineering, customer success, and support to expand our technical and business capacity. By 2024, we'd grown past 100 employees in six countries, powering over 1 billion payouts for more than 10,000 businesses."[18] Tremendous further boasts about its "track record of success in class actions," advertising that it has disbursed more than $400 million to 5.7 million claimants in 200 cases.[19]

55.    ***Digital Disbursements.*** Defendant Digital Settlement Technologies, LLC d/b/a Digital Disbursements Payments ("Digital Disbursements"), is a Delaware limited liability company with its principal place of business at 520 Broadway, Suite 200, Santa Monica, California. Digital Disbursements was launched in 2019. In 2022, Digital Disbursements was acquired by, and operates as a wholly owned subsidiary of, Western Alliance. Western Alliance described Digital Disbursements as "the leading digital payment solution for class actions and other legal payments," and claimed that, as of 2022, it had partnered with "more than 60% of class action administrators" and "been awarded more than $2.5 billion in payments to recipients in more

---

[17] Blackhawk Network, Settlements & Appeasements, https://blackhawknetwork.com/uk-en/solutions/payments/settlements-appeasements (last visited Apr. 24, 2026).

[18] *See* Tremendous, Company History, https://www.tremendous.com/company-history/ (last visited May 21, 2025).

[19] Tremendous, Legal Disbursements, https://www.tremendous.com/industries/legal-disbursements/ (last visited Mar. 20, 2026).

than 130 countries."[20] Digital Disbursements focuses on providing digital payment solutions, particularly for mass payouts in industries like legal and financial services.

56.     Blackhawk, Tremendous, and Digital Disbursements will collectively be referred to herein as "FinTech Defendants".

57.     Defendants DOES 1-20 are fictitious names of currently unknown individuals/entities that participated in the conduct alleged herein and are jointly responsible for Defendants' actions. Plaintiffs collectively refer to the named Defendants and the DOES Defendants as the "Defendants." Plaintiffs will seek leave from the Court to amend this Complaint and allege the true names and capacities of these DOE defendants when they are ascertained.

## IV.     SUBSTANTIVE ALLEGATIONS

### A. Class Action Settlement Administration

58.     A class action is a type of lawsuit in which a large group of people with similar claims are permitted by a court to sue a defendant (typically a corporation and/or other legal entity) collectively through a representative plaintiff. To proceed as a class action, a lawsuit must satisfy the requirements of Federal Rule of Civil Procedure 23, which governs the certification, notice, and settlement of class actions in federal court.[21]

59.     After the parties enter into a settlement, and before they file anything with the Court, they work to select the fiduciaries to administer the settlement and distribute the settlement funds to the class. The parties typically solicit competing bids from settlement administrators, though no federal rule mandates a competitive bidding process. These bids typically take the form of competing term sheets or proposals. After reviewing and negotiating the terms of the

---

[20] W. Alliance Bank, *Western Alliance Acquires Leading Digital Payments Platform for Class Action Settlements and Broader Legal Industry, Digital Disburse*ments, https://www.westernalliancebancorporation.com/news/western-alliance-acquires-digital-disbursements (last visited Mar. 20, 2026).
[21] Most states have adopted analogous procedural rules governing class actions brought in state court. Those state court rules are incorporated herein by reference.

engagement, a settlement administrator is selected, and the selection is presented to the court as part of the preliminary approval submission.

60.     The parties then apply to the court presiding over the litigation for preliminary approval. Under Rule 23(e), no class action settlement may be given effect without court approval. The court reviews all material terms of the settlement agreement on behalf of the settlement class.

61.     If a court finds a settlement agreement submitted preliminarily agreeable, it issues a preliminary approval order pursuant to Rule 23(e)(1), conditioned on effective class notice and a process whereby all class members be given an opportunity to review the settlement, ask questions, and object if appropriate. The court simultaneously appoints a settlement administrator and, on occasion, a bank, responsible for administering the settlement and holding and distributing settlement funds held in a QSF, respectively. The court also approves the form of notice, and establishes timelines governing notice dissemination, the claims submission deadline, the objection and opt-out period, and the Final Fairness Hearing date.

62.     Between the issuance of the preliminary approval order and the final approval hearing, the Administrator Defendants provide notice, which they are typically engaged to prepare, to class members regarding the proposed settlement. The notices are to include all material terms and conditions of the proposed settlement, including the promised benefits that they will distribute, so that the class members can review, assess, ask questions, and object. Notices are disseminated by some combination of postal mail, electronic mail, settlement websites, social media, and newspapers of general circulation.

### a.  Administration of the Settlement Fund

63.     The settlement agreement dictates when the defendants pay the settlement amount. When settlement proceeds are deposited, they are held in a QSF, a court-supervised fund established under Treasury Regulation § 1.468B-1 *et seq*., until distribution to class members.

64. A QSF must satisfy three requirements: (1) it must be established pursuant to a governmental order, specifically here a court order; (2) it must be established to resolve or satisfy liability claims; and (3) it must be organized as a trust under applicable state law, or its assets must otherwise be physically segregated from the assets of all related parties. 26 C.F.R. § 1.468B-1(c). The segregation requirement is mandatory and foundational: QSF assets belong to the fund, and ultimately to the class member beneficiaries, and must be kept entirely separate from the assets of the administrator, the bank, or any other party.

65. A QSF is a separate taxable entity subject to federal income tax on its modified gross income for each taxable year it is in existence. 26 C.F.R. § 1.468B-2(a). Its modified gross income is computed by reference to gross income as defined in section 61 of the Internal Revenue Code. 26 C.F.R. § 1.468B-2(b); 26 U.S.C. § 61. Section 61(a)(4) explicitly provides that gross income includes interest from "whatever source derived." No provision of the Internal Revenue Code or the Treasury Regulations excludes from QSF gross income any of the following: interest earned on QSF deposits; float income generated on QSF funds during the period between fund deposit and claimant distribution; interchange fees or other transaction revenues generated by payment instruments funded with QSF assets; or potentially breakage (depending on the contractual relationship) and unredeemed balances of claimants who failed to redeem their distributions. All such monies therefore belong to the fund and ultimately to the class, not to the administrator, the bank, or the fintech platform.

66. The QSF administrator must account for all income on the accrual method under 26 C.F.R. § 1.468B-2(j), meaning interest must be recognized when earned. The scheme here was structured to exploit a critical gap in judicial oversight architecture. A QSF administrator is required under 26 C.F.R. § 1.468B-2(k)(1) to file an annual income tax return on Form 1120-SF reporting all fund income, including interest, under penalty of perjury, and to obtain a separate employer identification number for each settlement fund under 26 C.F.R. § 1.468B-2(k)(4). That

26

return should be the complete financial ledger of the fund: it shows exactly how much interest the fund earned, what happened to that interest, and what the administrator was paid, including any amount flowing back from the bank or the fintech platform. It is filed with the IRS only. It is not filed with the judiciary, not served on class counsel, and not provided to class members, rendering it categorically invisible to every party. Plaintiffs allege that the Form 1120-SF returns filed by the Administrator Defendants during the class period may contain, or conspicuously omit, material evidence of the scheme, and are available only through compelled discovery in this proceeding.

67.     The regulatory definition of "administrator" of a QSF under § 1.468B-2(k)(3) establishes a four-tier priority cascade: (i) the person designated or approved by the governmental authority that ordered or approved the fund; (ii) the person designated in the governing escrow, settlement, or similar agreement; (iii) the escrow agent, custodian, or other person in possession or control of the fund's assets; or (iv) the transferor(s). 26 C.F.R. § 1.468B-2(k)(3).

68.     The Administrator Defendants attach at tier (i) through court appointment under Rule 23(e) and at tier (ii) through designation in the operative settlement instrument in essentially every settlement they administered.

69.     The Bank Defendants' status as administrators is context-specific: where the operative order designated a Bank Defendant as trustee, co-administrator, or escrow-agent administrator, tier (i) or (ii) attaches; where the order designated the Bank Defendant only as depository or custodian, the administrator designation runs to the Administrator Defendant and no regulatory tier attaches to the bank. Plaintiffs allege the specific configuration for each Bank Defendant and each settlement at issue consistent with this framework.

70.     For national banks, the parallel principle is codified at 12 C.F.R. § 9.2(i), which defines "investment discretion" as "the sole or shared authority (whether or not that authority is exercised) to determine what securities or other assets to purchase or sell on behalf of the account," and at 12 C.F.R. § 9.2(e), which provides that any bank possessing investment discretion on behalf

of another acts in a fiduciary capacity, regardless of whether the account is labeled a custody account, a depository account, or otherwise.

### b. Notice to the Class, Objections, and Final Approval.

71.     Class members are almost entirely dependent on settlement administrators to provide relevant information about the proposed settlement through the notice plan. The settlement administrator acts as the hub of such notice, participating in the drafting of long and short-form content in notices, preparing and maintaining the dedicated settlement website, and hosting call center operations, including preparing scripts and training staff or AI. Through these many channels the settlement administrator informs class members about the material terms of the settlement, including the total settlement funds, the available benefits and allocation, and the fees and costs to be paid from the settlement funds, such as attorneys' fees and administrative costs. The settlement administrator will also prepare the claim form and process all submitted claims.

72.     Based on the notice the settlement administrator delivers to the class members (through email and mail, on the website and across social, media, and at its call center), the class members can decide what to do: submit a claim and/or object, opt out, or do nothing.

73.     The Administrator Defendants almost always prepare and send notices to the State Attorneys General (AGs), pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1715. CAFA requires disclosure of all material settlement terms to each AG so that any AG may also object to a settlement it finds unreasonable or improper. If an AG chooses to object, the AG or a coalition of AGs may file written objections or appear at the final approval hearing.

74.     The accuracy of the notice, and presentation of the material terms of the settlement, are necessary for both the class members and the AGs to decide if and on what grounds to object. If there are objections, the court will hear and consider the objections. If no objections are submitted, or if objections are otherwise overruled, the court will proceed on to a hearing for final approval of the settlement.

75.     During the pendency of hearing objections, and any subsequent appeals, the settlement funds may sit in the QSFs longer than the parties anticipated. The objections may lead to additional litigation, hearings, and appeals. During this time, QSF funds accrue interest or must otherwise be invested to increase in value for the benefit of the class.

76.     Once the time to object has lapsed and objections have otherwise been disposed of, the court prepares its final approval order after the conclusion of the final approval hearing. Rule 23(e) governs the settlement of class actions, requiring court approval before any class action may be dismissed, compromised, or settled. Under Rule 23(e)(2), the court must find that the settlement is fair, reasonable, and adequate before it may grant final approval.

77.     The court conducts a careful review of not just the material terms of settlement, but also declarations from the settlement administrator, which typically include: (a) a description of the notice program and confirmation that it was implemented as approved; (b) the number of class members who received notice, submitted claims, opted out, or objected; (c) the settlement administrator's recommended plan of allocation; (d) a breakdown of all administrative costs and fees sought; (e) any residual distribution recommendations; and (f) a certification that the proposed distribution is consistent with the settlement agreement and the court's preliminary approval order.

### c.   Distribution to the Class Members

78.     Once the court issues a final approval order, and the appeals period has run, typically the settlement administrator may distribute the settlement deposits to claimants. Claimants will receive their disbursement through the method they selected during the claim submission process (which occurs from preliminary approval to final approval), which may include options such as check, ACH direct deposit, or digital payment platforms like eCards, depending on what the settlement administrator makes available.

79.     At the time the court issues the final approval order, the QSF has accumulated all interest earned on the settlement deposits during the pendency of the claims submission and

appeals period. Just prior to distribution, the settlement administrator performs an allocation calculation for each class member, determining the precise disbursement amount each claimant is entitled to receive based on the total funds available in the QSF, including *accrued interest*, less any court-approved fees and costs. It is at this critical juncture, when the QSF balance is fixed, the interest has fully accrued, and the per-claimant allocation amounts have been determined, that the settlement administrator makes *pro rata* payments to the claimants, including transmittal of QSF fund to the FinTech Defendants for the distributions for which they are responsible.

**B. Administrator Defendants.**

80.    The Administrator Defendants are professional settlement administration companies that hold themselves out to the public, courts, class counsel, and defendants as neutral, court-supervised fiduciaries capable of administering complex class action settlements fairly and transparently. They compete for appointments by submitting bid proposals and term sheets representing that their selection of banks, payment platforms, and distribution methods are driven exclusively by the best interests of the class.

81.    Over the class period, the class action administration industry has grown into a multibillion-dollar industry, so profitable, in fact, that most leading firms have been acquired by private equity. The Administrator Defendants administered hundreds of settlements involving billions of dollars in QSF deposits and tens, if not hundreds, of millions of claimants.

**a. The Administrator Defendants Responsibilities to the Class.**

82.    Settlement administrators are not mere vendors franking envelopes. They fulfill each of the responsibilities assigned to them for the benefit of the class members and owe duties to the class:

(a)    First, based on their court-appointment, as a class settlement proceeds through the approval process set forth by Rule 23, settlement administrators assume an unambiguous duty of complete candor and disclosure to both the appointing court and to the class.

30

(b)     Second, as "administrators" of court-supervised QSFs, they are fiduciaries to the class. Among other things, they direct which bank hold QSF deposits, select platforms to distribute settlement payments to claimants, and determine what claimants received and through what mechanisms.

(c)     Third, as notice agents aware of facts material to the class, they guide the information that reaches class members.

83.     Accordingly, the full suite of trust law duties applies: the duty of loyalty (to act solely in the interest of the beneficiaries), the duty not to self-deal (to refrain from transactions that benefit the trustee at the beneficiaries' expense), the duty of impartiality (to balance the interests of all beneficiaries fairly and without favoritism), the duty of full disclosure (to keep beneficiaries reasonably informed of all material facts), the duty to account (to maintain accurate records and provide a full accounting of all receipts and disbursements), and the prudent investor duty (to invest and manage assets with the care, skill, and caution of a prudent investor acting in a similar capacity).

84.     The Administrator Defendants were sophisticated institutional actors who understood this framework precisely because they operated within it for decades on a daily basis. The duties described above were not obscure obligations they might have overlooked; they were the foundation of every appointment, every declaration they filed, and every notice they sent. Their concealment of undisclosed compensation arrangements was not inadvertent. It was a sophisticated choice made with full knowledge of the obligations those arrangements violated.

**b. Administrator Defendants Advertise Their Fiduciary Role.**

85.     Administrators advertise their skills and integrity as fiduciaries for class members, acting under the supervision of the judiciary. Indeed, as demonstrated below, each of the

31

Administrator Defendants has sought to encourage those in need of settlement administration services to place a great deal of trust and confidence in their expertise.

86.     Defendant Epiq advertises itself on its webpage as the "best-in-class" administrator to consumers and the judiciary, allegedly providing clients "clarity" and "confidence."[22] Epiq also advertises its administration services ensure "accuracy and efficiency."[23]

87.     Like the other Administrator Defendants, Epiq recognizes its fiduciary role, promising those in need of settlement administration services that its "expanded team of 800+ subject matter experts draws on their years of legal industry experience to form *collaborative client partnerships based on trust* in order to solve even the most difficult project challenges and demands to achieve success."[24] It further promises that it will be a "*Trusted Partner* to Help Navigate the Complexities of . . . Settlement Administration."[25] It encourages clients to "Partner with Epiq" because of its "Long-standing Reputation and Vast Experience," as well as "Advanced Technology and Expertise."[26] And it promises to "work with financial institutions to implement QSF agreements according to MSA terms and prevent unnecessary fees and disbursement requirements, as well as ensure compliance with Treasury Regulations."[27]

---

[22]Epiq, Class Action Administration, https://www.epiqglobal.com/en-us/services/class-action-mass-tort/class-action-administration (last visited May 15, 2026).

[23]Epiq, Class Action Administration, https://www.epiqglobal.com/en-us/services/class-action-mass-tort/class-action-administration/claims-administration (last visited May 15, 2026).

[24]Epiq, Client Services, https://www.epiqglobal.com/en-us/services/class-action-mass-tort/class-action-administration/client-services (last visited May 15, 2026) (emphasis added).

[25] Epiq, Mass Torts, https://www.epiqglobal.com/en-us/services/class-action-mass-tort/mass-torts (last visited May 15, 2026) (emphasis added).

[26] *Id*.

[27] Epiq, Mass Tort Fund Administration & Payments, https://www.epiqglobal.com/en-us/services/class-action-mass-tort/mass-torts/mass-tort-fund-administration-payments (last visited May 15, 2026).



88.     Defendant JND claims that its "team has overseen some of the most complex class action and mass tort cases in our country's history."[28] It touts itself as "the nation's leading legal administration and litigation support services provider," with "more than 250 employees."[29] It claims to use "honed processes, industry-leading technology and JND proprietary systems to deliver superior results in all facets of legal administration related to class action, mass torts, remediation programs, eDiscovery, legal notice and more."[30] It further claims that it has been "[n]amed the #1 Class Action Claims Administrator throughout our history" and to have "been recognized for excellence in claims administration by leading legal publications for nine consecutive years."[31]

89.     Like the other Administrator Defendants, JND recognizes its fiduciary role. JND tells those in need of settlement administration services that it "is well-known throughout the legal industry for providing the most responsive, *trustworthy*, and comprehensive legal administrative

---

[28] JND Legal Admin., https://www.jndla.com/ (last visited May 15, 2026).
[29] JND Legal Admin., Company Overview Fact Sheet, https://www.jndla.com/documents/fact-sheets/jnd-company-overview.pdf (last visited May 15, 2026).
[30] *Id.*
[31] *Id.*

services in the country."[32] Its website advertises a simple motto, "TRUST IS REFRESHING," again recognizing the unique trust and confidence placed in settlement administrators.[33] It further promises to "deliver the most responsive, *trustworthy* and technically superior results you will find."[34]



90.     Defendant Angeion markets itself as an "industry leader[]" in settlement administration, offering "expert consultation," "best-practices," and "proven processing methodologies" for coordinating settlement activities.[35] It claims to "lead[] the industry, setting new standards in legal noticing and class action administration."[36]

---

[32] JND Legal Admin., About JND, https://www.jndla.com/about-us#jnd-fact-sheets (last visited May 15, 2026) (emphasis added).

[33] JND Legal Admin, https://www.jndla.com/ (last visited May 15, 2026).

[34] *Id.*

[35] Angeion Grp., Claims Administration, https://www.angeiongroup.com/class-action/claims-administration (last visited May 15, 2026).

[36] Angeion Grp., About Angeion, https://www.angeiongroup.com/about (last visited May 15, 2026).

91.     Like the other Administrator Defendants, Angeion recognizes its fiduciary role. Prior to filing these lawsuits, Angeion's website explicitly encouraged those in need of settlement administration services to "*Count on Angeion for a trusted* and proven track record in claims administration" and a "new level of transparency to claims administration."[37] It also promised that its experts would "guide you through every step of notice and claims administration" and "help you understand the nuances and complexities of notice, claims processing, and distribution better than any objector."[38]

92.     Since these lawsuits were filed, Angeion seems to have scrupulously scrubbed any offer of "trust" from its website, as if such elision erases their duties to the judiciary and the class members with whom they communicated. Nevertheless, Angeion still encourages those in need of settlement administration services to rely on its "industry expertise and technology for all class action matters," promising to follow "best-practices" in administering settlements.[39] It promises to use its expertise to develop "Innovative solutions" that achieve "Unrivaled results."[40] It further encourages reliance on its one-of-a-kind fraud prevention system, claiming: "AngeionAffirm is the first and only fraud-prevention solution of its kind. Based on state-of-the-art technology and analysis of over a decade of historical claims data, it uses an innovative approach to tackling fraud."[41]

---

[37] Angeion                     Grp.,                     About                     Angeion, https://web.archive.org/web/20240226212556/https://www.angeiongroup.com/about/   (archived Feb. 26, 2024, last visited Mar. 31, 2026). (emphasis added).

[38] Angeion Grp., https://web.archive.org/web/20240226195545/https://www.angeiongroup.com/ (archived Feb. 26, 2024, last visited Mar. 31, 2026).

[39] Angeion Grp., Claims Administration, https://www.angeiongroup.com/class-action/claims-administration (last visited Mar. 31, 2026).

[40] *Id.*

[41] Angeion Grp., AngeionAffirm Fraud Prevention, https://www.angeiongroup.com/class-action/fraud-prevention (last visited May 15, 2026).



93.    Defendant Kroll advertises itself as "the leader in complex settlement administration providing end-to-end expertise for class actions, mass torts, and regulatory and government administrations."[42] It claims to have managed more than 4,000 settlements, processed over 100 million claims, and distributed more than $30 billion.[43]

94.    Like the other Administrator Defendants, Kroll recognizes its fiduciary role. It encourages those looking for a settlement administrator to choose Kroll as their "trusted administrator for even the most complex consumer class action matters."[44] It further promises to be a "Trusted partner for handling the notice and administration of securities litigation of all types and levels of complexity."[45] It encourages trust in its expertise, boasting that its "class action

---

[42]Kroll, Settlement Administration, https://www.kroll.com/en/services/settlement-administration (last visited Mar. 31, 2026).
[43] *Id.*
[44] Kroll, Class Action Settlement Administration, https://www.kroll.com/en/services/settlement-administration/class-action (last visited Mar. 31, 2026).
[45] *Id.*

settlement team is comprised of subject matter experts with decades of experience managing some

of the largest and most complex settlements in U.S. history."[46]

95.     Thus, each of the Administrator Defendants not only recognized their fiduciary role

but affirmatively encouraged those in need of settlement administration services to place unique

trust and confidence in their expertise.

**C. The Bank Interest Track.**

        **a.   The Bank Defendants and Qualified Settlement Fund Accounts.**

96.     The QSF banking business is, at its core, a competition among banks for the right

to hold settlement claimants' money. To understand how Bank Defendants came to hold the

settlement funds at issue in this case, and why they wanted to, requires understanding the structure

of the industry they operate in, the clients they cultivate, and the business model they have built

around the captive deposits that flow from class action settlements.

---

[46] *Id.*

37

97.    For a bank, a class action QSF is a prize. A single class action settlement can place hundreds of millions of dollars of stable, captive deposits on a bank's balance sheet with no credit risk, no marketing cost to acquire the underlying depositors, and no ability on the part of those depositors to move their money elsewhere. Banks in the settlement services industry have built entire business divisions around the pursuit of exactly these deposits.

98. The Bank Defendants earn a profit from QSF deposits in two ways:

(a)    The net interest spread. The difference between the interest rate paid on claimant funds held in QSF accounts and the rate the bank earns by deploying those same funds in commercial lending, securities, and other investment activities. When a defendant pays $500 million into a QSF, the bank does not hold cash in a vault, it deploys that money into commercial lending, Treasury securities, or other instruments, earning a market interest rate—four to five percent or higher in recent years—while paying the QSF account perhaps half a percent to two percent, if it pays meaningful interest at all. The difference, sometimes three percentage points or more on hundreds of millions of dollars, is the bank's profit. On a $500 million fund held for eighteen months, even a two percent spread represents $15 million flowing to the bank, silently, with no explicit fee charged and no disclosure to the claimants whose money it is.

(b)    Direct fees. Explicit fees charged for QSF administration, including account establishment fees, monthly maintenance and administration fees, per-transaction fees for wires and check issuance, tax preparation and Form 1120-SF filing fees, and technology and platform licensing fees.

99.    The Bank Defendants are not general-purpose community banks that occasionally encounter settlement accounts. They operate, and publicly market, a dedicated settlement services group, staffed by specialized bankers, marketed to a specific clientele, and designed to capture and retain settlement deposits across hundreds or thousands of cases simultaneously.

100.    Sometimes when an administrator is appointed, the administrator selects the depository bank for the QSF. For years, administrators have quietly created and operated within a system that follows no standardized requirement that their banking selection process be competitive, documented, disclosed to the court, or evaluated against an independent benchmark of what the market would pay for a deposit of that size. That said, they are bound by fiduciary duties and transparency to the courts that appoint them.

101.    Once funds are deposited into a QSF, they cannot be moved without court order. The bank that wins the initial deposit relationship holds a captive pool of funds for the duration of the settlement administration, which in complex cases can span multiple years. There is no competitive pressure on the bank to offer better terms once the funds are deposited.

102.    The court authorizes the existence and distribution of the funds but does not, as a routine matter, supervise the bank's compensation, the interest rate being paid on deposited funds, or the fees being deducted from the settlement corpus. The judiciary trusts the guardrails provided by the fiduciary duty imposed on the appointed administrator. The judiciary, like the attorneys and administrators who selected the Bank Defendants, extends to them the trust that a specialized fiduciary partner of their stature and experience appeared to warrant. And the Bank Defendants spent years appearing to earn such trust, through publications, sponsorships, educational materials, and relationship banking.

**b.  The Bank Defendants' Fiduciary Status.**

103.    The Bank Defendants' fiduciary status arises from multiple independent and converging sources, federal banking regulation, trust law, and constructive trust principles, each sufficient on its own.

104.    Under federal banking regulation, a national bank acts in a fiduciary capacity whenever it "possesses investment discretion on behalf of another," defined as "the sole or shared authority (whether or not that authority is exercised) to determine what securities or other assets

39

to purchase or sell on behalf of the account." 12 C.F.R. §§ 9.2(e), (i). Two features of this definition are dispositive. First, shared authority suffices. A bank need not hold exclusive control over QSF assets. Second, the existence of authority, not its exercise, is the trigger. A bank retaining the contractual right to direct asset selection acts in a fiduciary capacity even if it routinely defers to the administrator's instructions.

105.    The OCC and FDIC have each confirmed this functional analysis in their own words. The OCC Comptroller's Handbook on Asset Management Custody Services states that although "[c]ustody is generally not considered a fiduciary capacity under 12 CFR 9," a "custodian exercising discretion in managing a securities lending cash collateral pool would be acting in a fiduciary capacity and must comply with the relevant provisions of 12 CFR 9."[47] The FDIC's Trust Examination Manual reinforces this from a supervisory perspective, noting that some banks administer accounts in which "there is no 'trust' relationship, yet the bank often assumes full control of cash and assets, including investment discretion," and that in such cases "the bank's responsibilities exceed those exercised in passive, or directed personal trust accounts."[48] Together, these authorities confirm that the regulatory framework does not permit a bank to escape fiduciary status by characterizing its role as custodial or ministerial when it in fact exercises control over funds held for third-party beneficiaries.

106.    The Bank Defendants exercised precisely that discretion here. They determined interest rates credited to QSF accounts, controlled the deployment of QSF deposits, structured spread-sharing arrangements with the Administrator Defendants, and remitted payments from QSF assets. That conduct, directing or approving investment vehicles, exercising shared authority over asset disposition, and controlling the terms on which funds were held, constitutes the exercise of

---

[47] OCC Comptroller's Handbook: *Asset Management Custody Services* (2002), at 11.
[48] FDIC Trust Examination Manual § 10.

investment discretion within the meaning of 12 C.F.R. § 9.2(i) and triggers fiduciary status under 12 C.F.R. § 9.2(e).

107. Beyond regulatory status, the Bank Defendants are constructive fiduciaries by virtue of the functions they voluntarily assumed. A party that performs the acts of a fiduciary office, even without formal appointment, becomes a constructive fiduciary subject to all attendant obligations. The Bank Defendants built dedicated institutional divisions staffed by specialists who designed investment structures for QSF assets, charged fees for professional administration, trained specialized personnel, and published guidance on settlement trust asset management. That is trust administration, not banking. Having voluntarily assumed those functions, the Bank Defendants are bound by the obligations of that office.

108. Even if the Bank Defendants were regarded as purely passive depositories, fiduciary obligations would still attach. A party that receives funds with actual or constructive knowledge that those funds are held beneficially for others, and retains benefits generated by those funds, holds those benefits as a constructive trustee for the true beneficiaries. The Bank Defendants had layered, irrefutable notice of the beneficial ownership at issue: 26 U.S.C. § 468B(b)(3)(C) provides as a matter of statute that all earnings on QSF assets belong to the fund, and the Bank Defendants' own marketing materials, internal handbooks, and dedicated settlement services divisions confirm that they understood precisely the QSF framework and the beneficial ownership it creates.

109. As fiduciaries, the Bank Defendants owe the full suite of trust law duties to QSF beneficiaries: the duty of loyalty, the duty not to self-deal, the duty of impartiality, the duty of full disclosure, the duty to account, and the prudent investor duty. The label a bank attaches to its role, depository, custodian, escrow agent, does not determine the duties that apply. The substance of the relationship does.

**c.   The Bank Defendants Advertise Their Fiduciary Role.**

110.    The Bank Defendants did not merely accept QSF deposits. They built sophisticated, targeted business development operations designed to capture those deposits by positioning themselves as trusted fiduciary partners to the professional community that controls where settlement funds are placed. Banks competing in this space invest in conference sponsorships, legal industry trade organization memberships, academic partnerships with law schools, thought leadership publications, and direct relationship banking with claims administrators who control deposit decisions. The strategy is deliberate: identify the gatekeepers who decide where settlement funds go, cultivate those relationships, and convert them into a recurring pipeline of large, stable, captive deposits.

111.    Huntington operates and publicly markets what it calls its National Settlement team, a dedicated division of specialized bankers targeting law firms, claims administrators, and regulatory agencies across the class action and settlement administration industry.[49]

112.    Huntington's own website states that its National Settlement team has handled more than 7,800 settlements representing over $99 billion in funds distributed and more than 240 million checks disbursed over more than two decades.[50]

---

[49]    Huntington, National Settlement Funds Services, https://www.huntington.com/Commercial/industries/settlement-funds-services (last visited May 15, 2026).
[50] *Id.*

**Huntington Bank**

NATIONAL SETTLEMENT FUNDS

# Settlement services backed by decades of experience

Our National Settlement team has extensive experience working with law firms, claims administrators, and regulatory agencies in the class action, mass tort, and settlement administration industry.

We recognize the importance of your fiduciary role in settlement administration and offer a full suite of products, services, and support to help you navigate through every step of the process.

113.    Huntington further supports numerous legal and trade organizations in the industry, including the National Association of Shareholder and Consumer Attorneys, the Alliance for Justice, and the American Association for Justice, organizations whose memberships include the very claims administrators and plaintiff attorneys who make deposit decisions on claimants' behalf.[51]

114.    Western Alliance similarly operates its Juris Banking Group, a dedicated national banking division publicly described as providing specialized services across full-service banking, settlement services, digital disbursements, and specialized banking for bankruptcy matters,

---

[51] *Id*.; Huntington, *Banking Handbook for Settlement Funds*, https://www.huntington.com/-/media/pdf/commercial/national-settlements/national-settlement-handbook.pdf (last visited May 15, 2026).

marketed specifically to law firms, claims administrators, and related businesses managing complex class action, mass tort, and bankruptcy settlements.[52]

115.    Western Alliance has hosted an annual Class Action Law Forum in collaboration with the University of San Diego School of Law, featuring sitting federal judges and leading plaintiffs' attorneys, a co-branding strategy that positions Western Alliance as an institution of trust and expertise within the precise professional community that controls QSF deposit decisions.[53]

116.    Huntington publishes a free Banking Handbook for Settlement Funds for law firms, claims administrators, and court-appointed neutrals, covering best practices in the settlement industry. The Handbook's Selecting a Bank section instructs that bank fees "should be reviewed to allow selection of a bank with a competitive pricing schedule to maximize the economic benefit for the class," guidance Huntington published while simultaneously offering the below-market interest rate structures alleged herein.



---

[52]        W.        Alliance        Bank,        Legal        Banking,
https://www.westernalliancebancorporation.com/expertise/legal (last visited May 15, 2026).
[53]        W.        Alliance        Bank,        Settlement        Services,
https://www.westernalliancebancorporation.com/commercial-corporate/settlement-services (last visited May 15, 2026).

**BANK FEES**

Financial institutions charge settlement accounts for a variety of services including custodian/escrow fees, check activity, account reconciliation, positive pay, sweep accounts, monthly maintenance, bank statements, check copies, cashiers' checks, and wire transfers. Bank fees should be reviewed to allow selection of a bank with a competitive pricing schedule to maximize the economic benefit for the class.

Bank fees should also be compared with investment return, since a non-interest-bearing account may provide more benefit to the class depending on the interest rate environment.

117.    The Handbook's sample Custodian/Escrow Agreement expressly states that the settlement amount and all interest accrued thereon shall constitute the Settlement Fund and shall remain subject to the jurisdiction of the court, a representation Huntington made in template form to every administrator who requested the document, while simultaneously diverting that interest through arrangements no court ever saw. Huntington's own published article instructs counsel and administrators that in selecting a settlement bank they should ask whether the bank has trust powers and experienced advisors who can act in a fiduciary manner, and positions Huntington as the answer to that question.[54]

---

[54] Huntington, *Banking Handbook for Settlement Funds*, https://www.huntington.com/-/media/pdf/commercial/national-settlements/national-settlement-handbook.pdf (last visited May 15, 2026).

## SAMPLE CUSTODIAN/ESCROW AGREEMENT

This is a custodian/escrow agreement template that may be helpful for settlements. It is available as a Microsoft Word document upon request to melissa.villain@huntington.com. **PLEASE NOTE:** This agreement template is a starting point. The agreement should be reviewed by qualified legal counsel and customized to fit the circumstances surrounding the relevant settlement.

## CUSTODIAN/ESCROW AGREEMENT

This Custodian/Escrow Agreement dated _____ is made among _____ ("Class Counsel"), _____ ("Defense Counsel"), and **THE HUNTINGTON NATIONAL BANK**, as Custodian/Escrow agent ("Custodian/Escrow Agent").

**Recitals**

A. This Custodian/Escrow Agreement governs the deposit, investment and disbursement of the settlement funds that, pursuant to the Stipulation of Settlement (the "Settlement Agreement") dated _____ attached hereto as Exhibit A, entered into by, among others, Class Counsel on behalf of the Lead Plaintiffs and Defense Counsel on behalf of the Defendant, will be paid to settle the class action captioned _____ _____, pending in _____ (the "Court").

B. Pursuant to the terms of the Settlement Agreement, the Defendant has agreed to pay or cause to be paid the total amount of _____ in cash (the "Settlement Amount") in settlement of the claims brought against the Defendant in the Class Action.

C. The Settlement Amount, together with any interest accrued thereon, is to be deposited into Custodian/Escrow and used to satisfy payments to Authorized Claimants, payments for attorneys' fees and expenses, payments for tax liabilities, and other costs pursuant to the terms of the Settlement Agreement.

D. Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Settlement Agreement.

**Agreement**

1. Appointment of Custodian/Escrow Agent. The Custodian/Escrow Agent is hereby appointed to receive, deposit and disburse the Settlement Amount upon the terms and conditions provided in this Custodian/Escrow Agreement, the Settlement Agreement and any other exhibits or schedules later annexed hereto and made a part hereof.

2. The Custodian/Escrow Account. The Custodian/Escrow Agent shall establish and maintain an Custodian/Escrow account titled as _____ (the "Custodian/Escrow Account"). Pursuant to the Settlement Agreement, the Defendant shall cause the Settlement Amount to be deposited into the Custodian/Escrow Account within _____ days following entry of the Court's order preliminarily approving the settlement. Custodian/Escrow Agent shall receive the Settlement amount into the Custodian/Escrow Account; the Settlement Amount and all interest accrued thereon shall be referred to herein as the "Settlement Fund." The Settlement Fund shall be held and invested on the terms and subject to the limitations set forth herein, and shall be released by Custodian/Escrow Agent in accordance with the terms and conditions hereinafter set forth and set forth in the Settlement Agreement and in orders of the Court approving the disbursement of the Settlement Fund.

3. Investment of Settlement Fund. At the written direction of Class Counsel, Custodian/Escrow Agent shall invest the Settlement Fund exclusively in instruments or accounts backed by the full faith and credit of the United States Government or fully insured by the United States Government or an agency thereof, including a U.S. Treasury Fund or a bank account that is either (a) fully insured by the Federal Deposit Insurance Corporation ("FDIC") or (b) secured by instruments backed by the full faith and credit of the United States Government. Defendants shall not bear any responsibility for or liability related to the investment of the Settlement Fund by the Custodian/Escrow Agent.

4. Custodian/Escrow Funds Subject to Jurisdiction of the Court. The Settlement Fund shall remain subject to the jurisdiction of the Court until such time as the Fund shall be distributed, pursuant to the Settlement Agreement and on further order(s) of the Court.

118.    Both Bank Defendants actively marketed their understanding of and commitment to the fiduciary framework governing settlement administration. Huntington tells administrators

46

directly that it recognizes the importance of their fiduciary role in settlement administration, advertises solutions to help them meet their fiduciary demands, and positions its National Settlement team as equipped to help navigate every step of the process.[55]

119.    Western Alliance promises to support administrators' fiduciary role, describes its team as well-versed in legal industry best practices, and prominently features a class action attorney's testimonial that he has entrusted the bank with significant sums of money from the settlement of his class action cases, knowing that the funds will be safe and provide the highest possible return for the class.



120.    A bank that markets itself in these terms has represented to the professional community that directs deposits to it that it understands what fiduciary administration of settlement

---

[55]    Huntington, National Settlement Funds Services, https://www.huntington.com/Commercial/industries/settlement-funds-services (last visited May 15, 2026) ("We recognize the importance of your fiduciary role in settlement administration and offer a full suite of products, services, and support to help you navigate through every step of the process.").

funds requires. It cannot simultaneously disclaim that understanding when its conduct falls short of it.

### d.  The Bank Interest Track – How It Worked.

121.    The chart below illustrates the interest rate environment over the class period. The Bank Interest Track scheme was operative throughout this entire period, during the low-rate years preceding 2022 and during the high-rate years that followed. The chart is not a record of when the scheme began; it is a record of how dramatically the financial stakes increased as rates rose. During the period of historically suppressed rates, which remained near zero from approximately 2009 through early 2022, the scheme diverted smaller absolute dollar amounts per fund, but the structural arrangements were already in place and the concealment was total. Beginning in 2022, the Federal Reserve implemented a series of aggressive rate hikes that drove borrowing costs to their highest levels in over twenty years, transforming the pre-existing diversion mechanism into one generating millions of dollars in additional diverted class member funds per year:



122.    During this time the Administrator Defendants engaged in a deceptive and anticompetitive scheme to reap undisclosed kickbacks and compensation from the Bank Defendants throughout the class period. Rather than crediting interest earned on settlement deposits to the fund, the Administrator Defendants and Bank Defendants divided it between themselves, directly reducing what class members received. The scheme predated the post-2021 rate rise. Administrators had long steered QSF deposits to Bank Defendants in exchange for payments, an arrangement operating through informal understandings concealed from every supervising court.

123.    What changed in 2022, as the Federal Reserve drove rates to twenty-year highs, was the scale: a $500 million fund earning 4% rather than 0.5% generates over $17 million in diverted interest annually. The same quiet arrangement that had drained modest sums from class member recoveries became, almost overnight, a mechanism for extracting hundreds of millions of dollars from the people these administrators were appointed to serve.

124.    Todd Hilsee confirmed this in his 2024 white paper based, in part, on his direct communications with a Defendant Bank and settlement administrators. He wrote, a representative from a Defendant Bank "told me that Admins were asking banks to share the interest a QSF account would otherwise earn. This occurred, it was explained to me, because the judiciary and counsel were not informed of fully available interest rates, had no reason to question interest rates during the recent past low-interest rate environment, and counsel and the judiciary increasingly rely on Admins to handle more settlement duties." Hilsee confirmed that in every public record he reviewed, he found no disclosure to any court that QSF bank interest was diverted, establishing that the concealment was uniform, deliberate, and successful across the full scope of the scheme.[56]

---

[56] Hilsee Report, *supra* note 2.

125.    Journalist Jeff Kauflin further confirmed the allegations in this complaint in an article published by *Forbes* on May 21, 2025. In the article, Kauflin states he spoke with three industry insiders from settlement administrators who stated that "claims administrators sometimes take a cut of the interest income earned by settlement funds in the months or years before they're distributed." These insiders confirmed that the bank interest settlement administrators were receiving was "standard practice" in the industry. One former settlement administrator employee told *Forbes*: "Suddenly, we were making a lot of money that had nothing to do with the administration of benefits to class members," and that when the employee questioned whether the income needed to be disclosed to the judiciary as a separate revenue stream, he was told no, since it was "standard practice."[57]

126.    A second former employee stated: "When these administrators are pulling down 4% straight to them, with no benefit to the fund, there won't be a judge in the country that will think that's right."[58]

127.    Western Alliance confirmed the interest diversion practice in a statement to *Forbes*, stating: "Our clients, including claims administrators, choose the type of accounts (interest bearing versus non-interest bearing) they establish and how interest earned is dispositioned. As a financial institution, our role is to follow the direction of our account holder." Defendant Huntington stated to *Forbes* that "fairness, transparency, and consumer choice are fundamental to Huntington's payment solutions," a representation directly contradicted by its conduct as alleged herein.[59]

128.    On information and belief, the Administrator Defendants demanded that they be given a cut of the profits, in the form of a guaranteed rate of return on the deposit, that would be

---

[57] *Forbes*, *supra* note 3.
[58] *Id*.
[59] *Id*.

50

lower than the floating federal window interest rate. If the Bank Defendants refused, the Administrator Defendants threatened to pull their inventory of class action settlements from them.

129.    Alternatively, on information and belief, the Bank Defendants, recognizing the revenue opportunity created by rising interest rates, proactively offered below-market QSF interest rates to Administrator Defendants while retaining the spread as profit, and agreed to share a portion of those profits with some Administrator Defendants through Special Purpose Enterprises (SPEs) specifically established for such payments from the Bank Defendants, as an inducement to maintain exclusive deposit relationships.

130.    The Bank Interest Track of the scheme depressed payouts to class members. Had the undisclosed kickbacks not been paid, the money retained by Administrator Defendants and the Bank Defendants would have been distributed directly to Plaintiffs and Class Members as higher payments.

131.    The scheme is ongoing and has been maintained for years.

**D.  The Digital Disbursement Track.**

**a.  The Fintech Defendants.**

132.    The FinTech Defendants are digital payment companies whose core commercial business is the bulk distribution of prepaid cards, gift cards, and digital payments to large recipient populations on behalf of corporate clients. Breakage, the revenue generated when payment recipients fail to redeem their card balances, captured through inactivity fees, card maintenance charges, and expiration, is not a side effect of their business model. It is the business model.

133.    The FinTech Defendants build actuarial breakage projections into their financial planning, structure their pricing around anticipated redemption failures, and design their card products to maximize the portion of distributed funds that will go unredeemed or otherwise diminished by fees paid to the FinTech Defendants.

134.    Defendant Blackhawk Network is a titan in the fintech world operating across the $2.2 trillion global prepaid card market. Founded in 2001 as a subsidiary of Safeway Inc., Blackhawk originated by selling gift cards through grocery store locations and expanded into a global network operating across the prepaid, gift card, and payments industries. Blackhawk processed over $40 billion in transactions in 2023, operating across more than 75,000 retail locations and digital channels with over 10,000 brand partners. Its commercial clients include Fortune 500 companies using its platforms for corporate incentives, employee rewards, and customer loyalty programs.[60]

135.    Defendant Tremendous was co-founded in 2010 by CEO Nick Baum and COO Kapil Kale. The company started as a peer-to-peer gifting product called GiftRocket before pivoting to a business-to-business bulk payout platform. Tremendous describes itself as a reward and payout platform that makes it easy for businesses to send gift cards, prepaid cards, monetary options, and donations to anyone, anywhere in the world, used by companies to distribute research incentives, employee rewards, and customer incentives at scale.

136.    Tremendous understood precisely what made that model profitable. Internal Slack messages produced in the GiftRocket class action include a communication from Tremendous's vice president of business operations describing GiftRocket's breakage rates as "insane" and identifying those rates as the source of GiftRocket's profitability and its value as a client.[61] Tremendous celebrated that dynamic internally while presenting its platform in its new "class action market" as a neutral, low-cost distribution tool. Tremendous describes itself as fully remote, highly profitable, and self-funded, generating substantial profit without outside investment in a business it describes as free to use.[62]

---

[60]Blackhawk Network, https://blackhawknetwork.com/company (last visited May 17, 2026).
[61] *Forbes*, *supra* note 3.
[62] Tremendous, https://www.tremendous.com/  (last visited May 17, 2026).

137.    Defendant Digital Disbursements was co-founded in 2019 by Adam Jiwan and Jeff Richardson as Digital Settlement Technologies, operating as a digital payments platform focused specifically on class action settlements and other legal industry disbursements. Unlike Blackhawk and Tremendous, Digital Disbursements was built from the ground up for the "class action market," it has no significant commercial business outside it. Digital Disbursements partners with more than 60% of class action administrators and has been awarded digital distribution projects involving more than $2.5 billion in payments to recipients in more than 130 countries. In January 2022, Western Alliance completed the acquisition of Digital Disbursements, after which it operated as a wholly owned subsidiary of Western Alliance led by its existing team. Western Alliance's role as a Bank Defendant is addressed in the section above. Digital Disbursements' role as a FinTech Defendant is addressed in this section.

### b.  FinTech Expands into Class Action Settlements from Consumer Transactions.

138.    Until approximately 2018, payments in virtually all class action settlements were made by paper check. Claims administrators printed, mailed, and tracked tens of thousands or hundreds of thousands of checks, stale-dated uncashed checks after the applicable period, and reissued a significant portion. The funds of any uncashed checks remained in the QSF for further distribution to the class.

139.    In constant search for new "markets" to exploit, the FinTech Defendants recognized an opportunity in class settlements and moved to capture that new revenue stream."[63] The following graph shows the rapid explosion of the deployment of eCards in class settlements:

---

[63] *See* W. Alliance Bank, *2023 ANNUAL REPORT, Digital Payments in Class Actions and Mass Torts*, at p. 7, https://www.westernalliancebancorporation.com/sites/default/files/2023-10/2023-wab-dd-digital-payments-report.pdf (last visited Mar. 23, 2026).



**Growth in Digital Payment Selections**

16,739,555

3,194,145

243,536

2020    2021    2022

140.    This upswell of eCards in the context of class settlements did not create the breakage-dependent business model. Blackhawk and Tremendous had been operating that model commercially for years. They and Digital Disbursements only created the opening through which that model could be brought into the class action settlement market at scale, applied to a population of trust beneficiaries who had no idea what was happening to their money.

141.    The FinTech Defendants moved aggressively to capture that opening, marketing digital payments to the public, lawyers, courts, and government agencies as a superior alternative to paper checks across every channel available to them, while concealing in every one of those communications the breakage revenue that made digital payment profitable for themselves and for the administrators they were cultivating.

**c.  How The Fintech Defendants Marketed Themselves.**

142.    The judiciary, government agencies, and academics endorsed digital payment as superior to checks based on information the Defendants provided, information that was accurate in what it disclosed and false in what it omitted. They entered the class action settlement market by applying their existing commercial infrastructure to a new client category, settlement administrators distributing proceeds to class members. In doing so, the FinTech Defendants brought a breakage-dependent business model into a trust environment where it is anathema.

143.    In a March 2022 article,[64] Blackhawk stated that prepaid cards are more effective solutions than checks for paying out class action settlements and urged attorneys and administrators to switch to prepaid cards. Blackhawk recognized the importance of transparent reporting and visibility on the distribution of each and every payment, while disclosing nothing about the breakage it was simultaneously capturing from those distributions.

144.    Western Alliance and its Digital Disbursements subsidiary co-authored what they described as the largest study to date on the distribution of settlement payments in the legal industry, reporting a 98% payment success rate for digital payments when class members are offered a broad menu of payment options. The report further found that in 2022, 91% of class members and mass tort claimants who were presented with a pay menu elected to receive a digital payment, reflecting significant increases from 72% in 2020 and 83% in 2021.[65]

145.    Western Alliance and Digital Disbursements published articles touting digital payment tools as having driven down the cost of distributing proceeds to the class, while

---

[64]Blackhawk Network, *Prepaid Cards Are More Effective Solutions Than Checks for Paying Out Class Action Settlements*, Westlaw Today (Mar. 2022), https://today.westlaw.com/Document/I5a82f484b0f511ec9f24ec7b211d8087/View/FullText.html?transitionType=Default&contextData=(sc.Default)&firstPage=true (last visited Mar. 23, 2026). [65]W. Alliance Bank, 2023 Digital Payments in Class Actions and Mass Torts, https://www.westernalliancebancorporation.com/sites/default/files/2023-10/2023-wab-dd-digital-payments-report.pdf (last visited May 17, 2026).

simultaneously, in a January 2022 article,[66] criticizing the high fees that unbanked class members had to pay for check-cashing services.

146.    In a September 23, 2020 webinar,[67] Epiq promoted digital payment as offering security, convenience, cost-reduction, and improved fund disbursement in the COVID-19 environment, without disclosing the breakage costs eCards imposed on the class members they were supposed to serve.

147.    Kroll similarly published materials[68] promoting prepaid Visa cards as a worthy alternative to checks, citing a PYMNTS.com study finding that an estimated 833,000 consumers would have liked to receive disbursements via debit card and more than 1.6 million would have preferred them via prepaid card in 2018. Kroll acknowledged the fee to buy each card as a cost consideration and said nothing about the breakage that could consume the entire settlement amount for class members who never redeemed their cards.[69]

148.    A 2019 Federal Trade Commission Class Action Study[70] on notice efficacy and claims rates was accompanied by an FTC workshop that included discussion by claims administrators and others on the benefits of digital payment. That workshop, attended by regulators whose function is to protect consumers, reflected no awareness of breakage as a cost of eCards, because the defendants presenting at and participating in it disclosed none. The period following

---

[66] *See, e.g.,* W. Alliance Bank, Western Alliance Acquires Leading Digital Payments Platform for Class Action Settlements and Broader Legal Industry, https://www.westernalliancebancorporation.com/news/western-alliance-acquires-digital-disbursements (last visited May 15, 2026).

[67] Epiq, Digital Payments: *Best Practices for Efficiency in Class Actions* (Sept. 23, 2020) (webinar), https://litigationconferences.com/digital-payments-best-practices-for-efficiency-in-class-actions/ (last visited Mar. 23, 2026).

[68] Kroll, Electronic Payments in Class Action Settlements, https://www.kroll.com/en/insights/publications/settlement-administration/electronic-payments-in-class-action-settlements (last visited Mar. 23, 2026).

[69] *Id.*

[70] Fed. Trade Comm'n, Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns (Sept. 2019), https://www.ftc.gov/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns (last visited May 15, 2026).

the FTC workshop and study began the proliferation of digital payment in class actions. The Defendants shaped that proliferation with information they knew was incomplete.

149.    Thereafter, Defendant Western Alliance was a Founding Patron of the James F. Humphreys Complex Litigation Center at George Washington University Law School. Bank Defendants Huntington and Western Alliance, FinTech Defendant Digital Disbursements, and Administrator Defendant Angeion were each identified as Contributors to the Center's draft Guidelines and Best Practices in Class Actions, published in October 2021.[71] The specific defendants in this case, by name, participated in drafting the guidelines that courts, class counsel, and settling parties were then asked to rely on in making payment method decisions.

150.    Those Guidelines include the following recommendations, each of which the contributing Defendants simultaneously violated:

(a)    "The efficacy and cost of digital payments vary by method, but they usually are more effective and less expensive than paper checks." The contributing Defendants knew, and did not disclose, that the cost to class members of eCards, measured by breakage, frequently exceeds the cost of paper checks by an order of magnitude, and that in push distribution scenarios breakage can reach 80-90% of the total distributed amount.

(b)    "Settlement administrators and banks with class-action experience have the knowledge and expertise necessary to make informed judgments." The contributing Defendants drafted this language knowing it would be cited by the judiciary as a reason to defer to their recommendations on payment method selection, recommendations they were simultaneously making on the basis of undisclosed financial self-interest rather than class benefit.

---

[71] *See* James F. Humphreys Complex Litig. Ctr., George Washington Univ. Law Sch., *Guidelines and Best Practices in Class-Action Litigation* at 1, 4, https://www.law.gwu.edu/sites/g/files/zaxdzs5421/files/downloads/Class_Action_Universal_Guidelines_Public_Comment.pdf (last visited Mar. 23, 2026) ("Humphreys Class Action Guidelines").

(c)    "Virtual and physical prepaid cards and retail gift cards are particularly effective methods for making payments to unbanked individuals." The contributing Defendants drafted this language knowing that the prepaid card platforms they were recommending for unbanked class members, the most financially vulnerable members of the class, least likely to navigate activation processes and most likely to generate breakage, were the platforms from which they were simultaneously extracting the largest undisclosed revenue.

(d)    "The parties should provide the judiciary with sufficient information about the effectiveness of the distribution-payment method(s) when seeking preliminary approval of a settlement under Rule 23(e)(1), including estimates of costs and projected efficacy, sufficient for the judiciary to find that the effectiveness of the payment method is adequate." The contributing Defendants drafted this disclosure obligation into the guidelines they published for the judiciary and counsel to follow, and then violated it in every preliminary approval submission they made in every case they administered, by providing the judiciary with efficacy information while concealing the breakage costs and undisclosed compensation arrangements that were the actual basis for their payment method recommendations.

(e)    "Given the wide range of potential payment options, the settling parties should consult with a settlement administrator or a bank with class action experience to select the most effective payment method or combination of methods." This recommendation, that the judiciary and counsel should rely on the Defendants' expertise in selecting payment methods, was drafted by the very defendants who were simultaneously exploiting that reliance to select payment methods for undisclosed financial reasons.

151.    Even for those Defendants who did not directly author or contribute to the Guidelines, they nevertheless adopted, repeated, and utilized some or all of these talking points as part of their messaging.

152.    The marketing worked exactly as intended. From 2020 to 2022 alone, the number of class action cases using digital payments grew by a factor of ten, while the number of individual digital payment selections grew by a factor of more than sixty-eight, figures confirmed by a 2023 report published by Western Alliance and Digital Disbursements. Every case converted from check to eCards was a new source of breakage revenue that no court had been told existed.

**d.  The Digital Disbursement Track - How It Worked.**

153.    The Digital Disbursement Track operated through the exploitation of a structural feature of eCard distributions that distinguishes them legally and economically from every other method of paying class members: the debit-at-issuance mechanic.

154.    When a class action settlement distributes proceeds by paper check, the QSF is not debited until the claimant cashes the check. A check that is never cashed remains a liability of the QSF. The funds stay in the QSF and, after approximately 180 days, are redistributed to the settlement class on a *pro rata* basis if economically feasible.

155.    eCard distributions operate differently. The FinTech Defendants are paid from the QSF all funds for which class members elected eCard payments at the time the funds are distributed. That is, the payment is made from the QSF before it is even activated or redeemed by the class member. Funds loaded onto cards that are never activated or spent do not remain in the QSF and, as part of the scheme, do not return there. The funds simply remain with the FinTech Defendant, which retains the unredeemed balance and any fees as breakage which it, in turn, shares with the Administrator Defendant that selected the FinTech Defendant.

156.    This structural difference between checks and eCards is not incidental. It is the mechanism through which the Digital Disbursement Track operated. The debit-at-issuance structure converts a contingent distribution, one that remains in the QSF until a class member actually receives it, into a completed transfer to a payment platform the moment that QSF funds are distributed. That completed transfer extinguishes the court's control over those funds before

any class member has had an opportunity to redeem them. The Defendants exploited that extinguishment deliberately and systematically.

157. This arrangement was documented in the November 2, 2020 email disclosed in the 2025 *Forbes* article. In that email, in which a Blackhawk employee tells a settlement administrator: "we actually pay you to issue these cards," and offered a "discount" structured as a direct function of card expiration: a 6-month expiration with a $5.95/month inactivity fee yielded a 3.5% discount; 12 months yielded 3.0%; 18 months yielded 2.5%; and 24 months yielded 2.0%. The email thereby linked the Administrator Defendant's kickback directly to the shortness of the window before class members' balances were depleted through inactivity fees—the faster the FinTech recaptured class member funds, the greater the "additional revenue" to the Administrator Defendant. Based on a distribution of 500,000 virtual payments of $10 each, a modest $5 million distribution, the email projected the Administrator Defendant would net "$100,000 to $175,000 additional revenue plus whatever costs you save vs printing checks."[72]

158. The same email addressed the legal constraint that might otherwise have required unredeemed balances to revert to class members. It stated that "because these are actual bank accounts, you are no longer responsible for unclaimed property, [the FinTech] and our issuing bank fully indemnify against all escheat liability," confirming the arrangement was specifically designed to insulate the Administrator Defendant from unclaimed property laws that would otherwise require unredeemed balances to revert to class members.[73]

159. Blackhawk did not stumble into this structure. It specifically designed the discount schedule documented in the 2020 email to tie administrator compensation directly to the speed of breakage extraction, rewarding shorter expiration windows and higher inactivity fees with larger discounts. That structure did not create an incidental conflict of interest. It manufactured one

---

[72] *Forbes*, *supra* note 3.
[73] *Id*.

deliberately, aligning the administrator's financial incentive with the fastest possible depletion of settlement funds. The financial interests of the administrator and the FinTech were perfectly aligned and perfectly opposed to the interests of the claimants whose funds they were managing. Blackhawk further designed the escheat indemnification feature to eliminate the one legal mechanism that might otherwise have returned unspent funds to the people they belonged to.

160.    Each FinTech Defendants designed their compensation arrangements to be invisible to everyone except the Administrator Defendants who selected them. The scheme is documented in the standing master service agreements between the Administrator Defendants and the FinTech Defendants that counsel, the public, and the judiciary never saw. And they knew that the administrators they were approaching were court-appointed fiduciaries whose selection of payment platforms would be presented as a neutral, class-benefitting tool.

161.    At this point, Plaintiffs do not know who had the idea first: the FinTech Defendants or the Administrator Defendants, but either: (a) the FinTech Defendants designed and marketed the digital payment kickback program to Administrator Defendants, approaching each Administrator Defendant with a standardized undisclosed compensation structure as evidenced by the form email described in the Hilsee Report; or (b) Administrator Defendants solicited such arrangements from FinTech Defendants after learning of the revenue opportunity. Under either alternative, each of the Defendants adopted and developed the program knowing it required concealment from the judiciary to remain viable.

162.    The scheme grew substantially over time. By 2024, a bank with direct market knowledge confirmed to Hilsee that the "discounts" had grown from 2 to 3.5% to as high as 20%. Where digital payments are distributed by "push" method, in which the card is activated upon sending rather than requiring the class member to click and activate, breakage can reach 80 to 90% of the total distributed amount, with kickbacks to Administrator Defendants scaling accordingly. The same bank confirmed that Administrator Defendants were simultaneously demanding that

banks share the interest QSF accounts would otherwise earn, establishing that both extraction tracks were known to and participated in by the Bank Defendants.

163. Indeed, the Bank Defendants were not only passive observers in the Digital Disbursement Track. As explained above, after acquiring Digital Disbursements, Western Alliance aggressively marketed digital payment options as superior for class action settlements. In settlements in which Western Alliance held the QSF, such as the *In re Yahoo! Data Breach* settlement discussed in greater detail below, Digital Disbursements was chosen to distribute digital payment options. On information and belief, Western Alliance profited from breakage on digital payments issued by Digital Disbursements in those settlements. Likewise, on information and belief, in certain class action settlements, Huntington was able to select the digital payment options available to class members. In such settlements, Huntington entered into revenue-sharing arrangements with the FinTech Defendants, just like the Administrator Defendants had done.

164. The aggregate harm is substantial. Tremendous alone has facilitated $350 million in digital payments across 150 cases by its own account. In its 2025 article, Forbes estimates that over the past five years, $300 to $400 million in damages distributed to injured consumers through digital prepaid cards was left unspent, money that did not revert to the QSF but instead flowed to the FinTech companies issuing the cards, the banks they partnered with, and the settlement administrators who awarded them the contracts.

165. The harm is amplified in small-dollar settlements. Where individual distributions fall below the $600 threshold that triggers a Form 1099 reporting obligation, class members receive no tax form and have no IRS-facing reason to track whether their payment was redeemed. Unsophisticated claimants receiving small amounts are statistically more likely to abandon unredeemed cards. The Administrator Defendants knew this. The FinTech Defendants modeled it actuarially. And the judiciary was never told that the distribution method had been selected, in

whole or in part, because it was projected to generate revenue for the administrator at the direct expense of the class members the distribution was supposed to compensate.

166.    To further conceal their receipt of kickbacks, some or all the Administrator Defendants have, upon information and belief, formed SPEs to receive undisclosed payments from the FinTech Defendants outside of any account earlier subject to judicial review. SPEs were used to launder the proceeds of wire and mail fraud—money taken from the QSF under fraudulent pretenses—by concealing their nature, source, ownership, and control. The existence of these entities, and their purpose, has never been disclosed to Plaintiffs, class members, or any court.

167.    The Bank Defendants' knowledge of these schemes imposed another obligation on them: to report knowledge of the Administrator and FinTech Defendants' laundering of fraud proceeds, in violation of 18 U.S.C. § 1956. The Bank Defendants were required to maintain anti-money -laundering programs reasonably designed to assure and monitor compliance with the Bank Secrecy Act, including conducting ongoing monitoring to identify and report suspicious transactions. *See* 31 C.F.R. § 1020.210(b)(v)(B). The Bank Defendants were also required to file a Suspicious Activity Report when a transaction conducted or attempted "by, at, or through the bank" involved at least $5,000 and the Bank Defendant knew, suspected, or had reason to suspect that the transaction involved funds derived from illegal activity, was intended or conducted to hide or disguise funds or assets derived from illegal activity, or had no business or apparent lawful purpose. 31 C.F.R. § 1020.320(a)(2). Here, the Bank Defendants knew, or at minimum had reason to suspect, that QSF funds and QSF-derived interest were being diverted from court-supervised settlement funds through undisclosed Special Purpose Entities for the purpose of concealing kickbacks to the Administrator Defendants. Those transactions bore the hallmarks of money laundering because they involved proceeds obtained through fraud and fiduciary self-dealing, were routed through SPEs to conceal the nature, source, ownership, and control of the payments, and were designed to make the QSF records falsely appear to reflect legitimate claim payments, bank

charges, rebates, discounts, or administrative compensation. *See* 18 U.S.C. § 1956(a)(1)(B)(i). The Bank Defendants' obligations under the Bank Secrecy Act and its implementing regulations underscore that the transfers were not ordinary banking transactions, but suspicious transactions that required enhanced scrutiny, escalation, and reporting to federal regulators. Yet the Bank Defendants said nothing. The Bank Defendants' failure to stop, disclose, or otherwise prevent these transactions further underscores their participation in, and aiding and abetting of, this Digital Disbursement Track.

168.    The Administrator Defendants' position is not that disclosure was impractical or that the arrangements were immaterial. Their position is that they owed no disclosure obligation at all. In a declaration filed August 14, 2025, under penalty of perjury in *In re: Facebook, Inc. Consumer Privacy User Profile Litigation,* Case No. 3:18-md-02843-VC (N.D. Cal.), Angeion confirmed the precise pre-arranged financial relationship it concealed from the judiciary across every settlement it administered. Steven Weisbrot, Esq. confirmed that: (a) prior to Angeion's engagement as Settlement Administrator in the $725 million Facebook settlement, Angeion and Blackhawk had negotiated a master service contract, the "Statement of Work," governing the general terms for any future engagements in which Angeion subcontracts with Blackhawk, which applied to the *Facebook* settlement; (b) "Blackhawk has agreed to compensate Angeion in connection with each settlement for which Blackhawk acts as Angeion's subcontractor"; (c) Angeion refused to produce the Statement of Work to Class Counsel even after it was directly requested, offering only in camera review; and (d) "I have never understood Angeion to be subject to any legal obligation to provide information about each of its revenue sources, business relationships, or profit margins."[74] That last statement is dispositive: after being caught, Angeion

---

[74] Declaration of Steven Weisbrot, *In re: Facebook, Inc. Consumer Privacy User Profile Litigation,* Case No. 3:18-md-02843-VC (N.D. Cal.) (ECF No. 1238-3).

claimed it owed no disclosure obligation and admitted that it had failed to disclose these material facts in every settlement it administered.

169.    Class Counsel's concurrent declaration confirms the consequences of that position. Derek W. Loeser and Lesley E. Weaver confirmed that Class Counsel "was not informed or aware of this agreement between Angeion and Blackhawk prior to these discussions," notwithstanding their active supervision of the largest consumer privacy settlement in history.[75] Class Counsel further confirmed that despite months of negotiations, Angeion refused to forego its compensation from Blackhawk and refused to pay any of that compensation to the class, establishing that the arrangement is not incidental or historical, but ongoing and intentionally maintained.

**E. Examples of the Conspirators' Execution of the Bank Interest and Digital Disbursement Tracks.**

170.    The Defendants conspired to execute both the Bank Interest and Digital Disbursement Tracks across the Administrator Defendants' book of business, the true number of which is only known to the conspirators. The examples below illustrate their execution of these schemes in specific settlements.

**a.    Exemplar Settlements Administered by Kroll**

i.    *In re T-Mobile Settlement: Defendants Kroll, Huntington, Digital Disbursements, and Blackhawk*

171.    *In re T-Mobile Customer Data Security Breach Litig.*, No. 4:21-md-03019-BCW, (WD Mo.) ("*In re T-Mobile*"), was an MDL consolidating dozens of class actions arising from a data breach affecting approximately 76 million Americans. U.S. District Judge Brian C. Wimes in the Western District of Missouri presided over the MDL. Kroll was the court-appointed Settlement Administrator; Huntington served as the bank holding the QSF; and third-party fintech vendors Blackhawk and Digital Disbursements were used to facilitate distribution of settlement funds to

---

[75] Declaration of Class Counsel, *In re: Facebook, Inc. Consumer Privacy User Profile Litigation,* Case No. 3:18-md-02843-VC (N.D. Cal.) (ECF No. 1238-1).

class members. This case demonstrates the conspirators' execution of both the Bank Interest Track and the Digital Disbursement Track.

172.    The Settlement Agreement, executed on July 21, 2022, stated that Kroll would be the Settlement Administrator.[76] The Agreement established a $350 million non-reversionary common fund to compensate class members.[77] Kroll was named the "administrator" of the QSF within the meaning of Treasury Regulation § 1.468B-2(k)(3), and the fund was required to be deposited into a Qualified Settlement Fund.[78]

173.    Under the terms of the Settlement Agreement's Proposed Consumer Benefit Plan, the "Net Settlement Fund" was defined as the Settlement Fund minus administrative costs, attorneys' fees, service awards, and other expenses, with the remainder to be distributed to class members.[79] Because administrative costs were deducted before distribution, every dollar paid to Kroll or its conspirators reduced class members' recovery dollar-for-dollar.

174.    Class members were entitled to reimbursements of up to $25,000 for out-of-pocket losses, compensation for lost time, identity defense services, and identity restoration support.[80] To the extent funds remained, class members' payments would be increased *pro rata* until the fund was exhausted. Any remaining funds resulting from the failure of Settlement Class Members to timely negotiate a settlement check or to timely provide required tax information such that a

---

[76] Settlement Agreement ¶ 2.35, *In re T-Mobile Customer Data Security Breach Litig.*, No. 4:21-md-03019-BCW (W.D. Mo. July 21, 2022), ECF No. 158-1.

[77] Settlement Agreement ¶ 2.35, *In re T-Mobile Customer Data Security Breach Litig.*, No. 4:21-md-03019-BCW (W.D. Mo. July 21, 2022), ECF No. 158-1.

[78] *Id.* at ¶ 4.4.

[79] Settlement Agreement Proposed Consumer Benefit Plan ¶ 2, *In re T-Mobile Customer Data Security Breach Litig.*, No. 4:21-md-03019-BCW (W.D. Mo. 2022), ECF No. 158-2.

[80] Plaintiffs' Suggestions in Support of Motion for Preliminary Approval at 1, *In re T-Mobile Customer Data Security Breach Litig.*, No. 4:21-md-03019-BCW (W.D. Mo. 2022), ECF No. 158.

settlement check could issue, would be distributed to Settlement Class Members, or as otherwise ordered by the court. No funds could revert to T-Mobile under any circumstances.[81]

175.    On July 22, 2022, the plaintiffs filed a motion for preliminary approval of the settlement along with Jeanne Finegane's declaration as Managing Director and Head of Kroll Notice Media Solutions.[82] The court granted preliminary approval of the Settlement Agreement on July 26, 2022, appointing Kroll as the Settlement Administrator.[83]

176.    Pursuant to 28 U.S.C. § 1715, on July 28, 2022, Kroll served a CAFA notice on federal and state attorneys general.[84] The notice disclosed details about the settlement, including copies of the Settlement Agreement, Kroll's notice plan, and notices to class members.[85] The purpose of this disclosure was to enable federal or state attorneys general to review the settlement and related information and intervene if they determined it was not in the public interest.

177.    Between September 28, 2022, and October 24, 2022, Kroll implemented a massive campaign to provide class members with notice of their potential claims. Kroll sent millions of notices by mail (over 26 million postcard notices) and email (over 49 million email notices).[86] These notices informed class members of the lawsuit's details, their eligibility, their legal rights (such as opting out or objecting), settlement terms, and any deadlines they must meet, and directed potential class members to a website maintained by Kroll.

---

[81] Settlement Agreement at 3.2, *In re T-Mobile Customer Data Security Breach Litig.*, No. 4:21-md-03019-BCW (W.D. Mo. 2022), ECF No. 158-1.

[82] Plaintiffs' Motion for Preliminary Approval, In re T-Mobile Customer Data Security Breach Litig., No. 4:21-md-03019-BCW (W.D. Mo. 2022), ECF No. 157; Declaration of Jeanne C. Finegan, In re T-Mobile Customer Data Security Breach Litig., No. 4:21-md-03019-BCW (W.D. Mo. 2022), ECF No. 158-4.

[83] Order Granting Preliminary Approval of Class Action Settlement at 4-5, *In re T-Mobile Customer Data Security Breach Litig.*, No. 4:21-md-03019-BCW (W.D. Mo. July 26, 2022), ECF No. 162.

[84] Declaration of Scott Fenwick ¶ 4, Ex. A, *In re T-Mobile Customer Data Security Breach Litig.*, No. 4:21-md-03019-BCW (W.D. Mo. 2023), ECF No. 211-2

[85] *Id.*

[86] *Id.* at ¶¶ 11, 12.

178.    As noted above, Kroll directed potential class members to a website that it maintained so that they could learn more about the settlement and file claims. Participants who clicked on the website link to "Submit a Claim" learned that they could receive payments via digital payment method. The "FAQs" section of the website also touted the availability of "various digital payment options" and provided answers to 24 questions, from the basics of class action settlements through the details of the Settlement Agreement, payments to attorneys, and other expenses that would be paid from the QSF—including passing references to paying the costs of administering the settlement.[87]

179.    On January 10, 2023, a declaration of Scott Fenwick, a Senior Director of Kroll Settlement Administration LLC, was filed in support of a motion for final approval of the Settlement Agreement.[88] The Declaration noted that Settlement Class Members would be given the option of receiving an electronic payment as well as a traditional paper check.[89] The court granted final approval of the Settlement Agreement on June 29, 2023.[90]

180.    Following final approval, Kroll exercised substantial discretion and control in administering the distribution of the QSF. Kroll: calculated the Net Settlement Fund after deducting fees and administrative costs, including its own administrative costs and fees; determined the validity of claims; and directed the timing and method of distributions to class members. Kroll issued a first round of payments to class members by check and digital payment, and on information and belief, issued a second round of payments of the residue.

---

[87] T-Mobile Data Breach Settlement, Frequently Asked Questions, https://www.t-mobilesettlement.com/home/faqs2/ (last visited May 12, 2026).

[88] Declaration of Scott Fenwick (ECF No. 211-2) (cited supra note 78).

[89] *Id.* at ¶ 8.

[90] Order and Judgment Granting Final Approval of Class Action Settlement, *In re T-Mobile Customer Data Security Breach Litig.*, No. 4:21-md-03019-BCW (W.D. Mo. June 29, 2023), ECF No. 235.

181.    On information and belief, Huntington held the QSF in this case and served as the trustee bank. Class members who elected to be paid by check received a check from Huntington. An example check received by a class member is depicted below:



182.    Additionally, Kroll selected Digital Disbursements and Blackhawk to facilitate distribution of digital prepaid cards to class members. Class members who requested to be paid by digital prepaid card received an email from noreply@digitaldisbursements.com or t-mobilesettlement@hawkmarketplace.com containing a link to activate their payments or notifying them that further information was needed to process their payments. For example, class members who elected payments from digital prepaid cards offered by Blackhawk received emails stating, "You have received a Virtual Prepaid Mastercard® worth $56.54 as your T-Mobile Data Breach Settlement payment. Please follow the directions below to redeem your payment. You can spend these funds online anywhere Mastercard is accepted or add to a digital wallet and use it with Apple Pay, Google Pay, or Samsung Pay."

183.    On information and belief, the interest rate that Huntington paid to the *In re T-Mobile* QSF was less than 0.5%, which was far less than the market rate. Indeed, between July

2022 and at least May 2025, which is the approximate timeframe when Huntington held the QSF and then began issuing payments to the class, the federal funds rate was between 4 and 6%, and many banks offered interest rates near that amount. The Settlement Agreement required an initial deposit of $35 million within ten days of preliminary approval (July 26, 2022), and the remaining $315 million within twenty days of final approval (June 29, 2023) becoming final (after the 30-day appeal deadline).[91] This means that virtually all of the $350 million in funds should have accrued interest for almost 2 years—from approximately July 2023 to May 2025—when distributions began, and at least some portion of the funds should have been accruing interest for nearly 3 years—since July 2022. By not paying a market interest rate to the QSF, on information and belief, Huntington saved millions of dollars during the course of the administration of the *In re T-Mobile* settlement. Instead of paying those millions of dollars in interest to the QSF, Huntington paid a portion of that money to Kroll. Neither Huntington nor Kroll disclosed those payments, nor the amount of the interest payments that should have gone to the QSF, to the court or class members.

184.    Additionally, as noted above, a substantial number of payments were made to class members by digital prepaid card issued by Blackhawk and Digital Disbursements. On information and belief, instead of treating digital payments like uncashed checks—by preserving the funds in the QSF until redemption or returning unused amounts to the QSF after a reasonable period—Digital Disbursements and Blackhawk Network were permitted to retain a substantial portion of settlement funds intended for class members as breakage. Unbeknownst to the court or class members, Kroll received undisclosed compensation from Blackhawk and Digital Disbursements for choosing these Fintech Defendants to issue digital payments to class members. In exchange for

---

[91] Settlement Agreement at 3.1, *In re T-Mobile Customer Data Security Breach Litig.*, No. 4:21-md-03019-BCW (W.D. Mo. June 29, 2023), ECF No. 158-1.

this undisclosed compensation, these Fintech Defendants were able to profit at the class members' expense.

185.    Throughout the administration of the *In re T-Mobile* settlement, Kroll did not disclose that it would receive any compensation, kickbacks, or other financial compensation from third parties involved in holding or distributing settlement funds, including Huntington, Blackhawk, or Digital Disbursements, or that such payments and resulting arrangements would effectively reduce compensation to class members. Nor did Huntington, Blackhawk, or Digital Disbursements disclose that they were paying such compensation to Kroll. As detailed above, the conspirators had numerous opportunities to make this disclosure. Yet they did not. The failure to disclose these furtive arrangements rendered those communications materially false and misleading, and constituted material omissions.

> ii.    *In re: Yahoo! Data Breach Settlement: Defendants Kroll, Western Alliance, Digital Disbursements, and Blackhawk*

186.    *In re: Yahoo! Inc. Customer Data Security Breach Litigation*, Case No. 5:16-md-02752-LHK ("*In re Yahoo! Data Breach*"), was an MDL consolidating dozens of class actions arising from data breaches at Yahoo! that affected approximately 3 billion user accounts worldwide. U.S. District Judge Lucy H. Koh in the Northern District of California presided over the MDL. Kroll was the court-appointed Settlement Administrator; Western Alliance served as the bank holding the QSF; and third-party fintech vendors Digital Disbursements and Blackhawk were used to facilitate distribution of settlement funds to class members. This case demonstrates the conspirators' execution of both the Bank Interest Track and the Digital Disbursement Track.

187.    The Amended Settlement Agreement ("Settlement Agreement"), executed on April 8, 2019, stated that Heffler Claims Group, which was acquired by Kroll in July of 2019 while

administration of this settlement was ongoing, would be the Settlement Administrator.[92] The Agreement established a $117,500,000 non-reversionary common fund to compensate class members.[93] The agreement provided that the fund would be held in an interest bearing account maintained as a court-approved Qualified Settlement Fund pursuant to Treasury Regulation § 1.468B-1, *et seq.*[94]

188.    Under the terms of the Settlement Agreement, the "Net Settlement Fund" was defined as the Settlement Fund minus administrative costs, attorneys' fees, service awards, credit services, alternative compensation, and other expenses, with the remainder to be distributed to class members.[95] Because administrative costs were deducted before distribution, every dollar paid to Kroll or its conspirators reduced class members' recovery dollar-for-dollar.

189.    Class members were entitled to credit services or alternative compensation of up to $100 and reimbursement for out-of-pocket costs of up to $25,000. Any residual funds remaining in the Net Settlement Fund would be distributed: first, to *pro rata* payment increases for Class Members; second, to additional credit services; and third, to a *cy pres* distribution. No funds could revert to Yahoo! under any circumstances.[96]

190.    On April 9, 2019, a declaration of Jeanne C. Finegan, President and Chief Media Officer of HF Media, LLC, a division of Heffler, was filed with the Court in support of a motion for preliminary approval of the Settlement Agreement.[97] The Court granted preliminary approval of the Settlement Agreement on July 20, 2019.[98]

---

[92] Amended Settlement Agreement and Release at 8, *In re Yahoo! Inc. Customer Data Security Breach Litig.*, No. 5:16-md-02752-LHK (N.D. Cal. 2019), ECF No. 369-2.
[93] *Id.* at 11.
[94] *Id.* at 11-12.
[95] *Id.* at 6.
[96] *Id.* at 17-19.
[97] Declaration of Jeanne C. Finegan, *In re Yahoo! Inc. Customer Data Security Breach Litig.*, No. 5:16-md-02752-LHK (N.D. Cal. 2019), ECF No. 369-6.
[98] Order Granting Motion for Preliminary Approval, *In re Yahoo! Inc. Customer Data Security Breach Litig.*, No. 5:16-md-02752-LHK (N.D. Cal. 2019), ECF No. 390.

191.    Pursuant to 28 U.S.C. § 1715, on April 18, 2019, Heffler, on behalf of Yahoo!, served a CAFA notice on federal and state attorneys general. The notice disclosed details about the settlement, and included copies of the Settlement Agreement and notices sent to class members.[99] The purpose of this disclosure was to enable federal or state attorneys general to review the settlement and related information and intervene if they determined it was not in the public interest. Yahoo! filed the CAFA notice with the Court, along with copy of a declaration on Scott M. Fenwick, Chief of Operations of Heffler, attesting that Heffler had mailed the CAFA notice to the attorneys general.

192.    Between September 2019 and February 2020, Kroll (which now owned Heffler) implemented a massive notice campaign to provide potential class members with notice of their potential claims. In total, Kroll sent over 900 million emails to potential class members, placed notices in magazines, and placed notices in various places online.[100] These notices informed class members of the lawsuit's details, their eligibility, their legal rights (such as opting out or objecting), settlement terms, and any deadlines they must meet, and directed potential class members to a website maintained by Kroll.

193.    As noted above, Kroll directed potential class members to a website that it maintained so that they could learn more about the settlement and file claims. The "FAQs" provided answers to 35 questions, from the basics of class action settlements through the details of the Settlement Agreement, payments to attorneys, and other expenses that would be paid from the QSF—including passing references to paying the costs of administering the settlements.[101]

---

[99] Declaration of Scott M. Fenwick, Exhibit 1, *In re Yahoo! Inc. Customer Data Security Breach Litig.,* No. 5:16-md-02752-LHK (N.D. Cal. 2019), ECF No. 374-1.

[100] Declaration of Jeanne C. Finegan Concerning Implementation of Notice to Settlement Class Members, Exhibit 1 at 5–11, *In re Yahoo! Inc. Customer Data Security Breach Litig.*, No. 5:16-md-02752-LHK (N.D. Cal. 2019), ECF No. 414-1.

[101] *Yahoo! Data Breach Settlement*, https://yahoodatabreachsettlement.com/ (last visited May 11, 2026).

194.    On January 31, 2020, a declaration of Jeanne C. Finegan, President and Chief Media Officer of HF Media, LLC, a division of Kroll subsidiary Heffler, was filed with the Court in support of a motion for final approval of the Settlement Agreement,[102] and was posted by Kroll on the settlement website. The Court granted final approval of the Settlement Agreement on July 22, 2020.[103]

195.    Following final approval, Kroll exercised substantial discretion and control in administering the distribution of the QSF, including calculating the Net Settlement Fund after deducting fees and administrative costs (including its own administrative costs and fees), determining the validity of claims, and directing the timing and method of distributions to class members.

196.    Kroll touts its administration of this settlement on its website, where it states that it processed over 1.3 million claims:[104]

---

[102] Declaration of Jeanne C. Finegan, Exhibit 1, *In re Yahoo! Inc. Customer Data Security Breach Litig.*, No. 5:16-md-02752-LHK (N.D. Cal. 2019), ECF No. 414-1.

[103] Second Amended Order Granting Plaintiffs' Motion for Final Approval of Class Action Settlement, *In re Yahoo! Inc. Customer Data Security Breach Litig.*, No. 5:16-md-02752-LHK (N.D. Cal.), ECF No. 497.

[104] Kroll, Yahoo! Customer Data Security Breach Litigation (client story), https://www.kroll.com/en/client-stories/yahoo-customer-data-security-breach-litigation (last visited May 11, 2026).



197. Beginning in June of 2023, checks were issued to class members from Western Alliance Bank, c/o Kroll Settlement Administration LLC. After 90 days, the checks were non-negotiable, and unclaimed funds would return to the QSF. A photograph of a check issued to a class member by Kroll is provided below:



75

198.    In addition to checks, digital payments were issued through multiple means, including through Western Alliance's subsidiary, Digital Disbursements,[105] and MyPrepaidCenter and HawkMarketplace, which are operated by Blackhawk Network.[106] Digital Disbursements sent emails to class members containing their payments from "noreply@digitaldisbursements.com," and Blackhawk sent emails to class members containing their from "yahoodatabreachsettlement@hawkmarketplace.com."

199.    On information and belief, the interest rate that Western Alliance paid to the *In re: Yahoo! Data Breach* QSF was less than 0.5%, which was far less than the market rate. Indeed, as of June 2023, which is the approximate timeframe when Yahoo! began issuing payments to the class, the federal funds rate was over 5%, and many banks offered interest rates near that amount. The Settlement Agreement required that Yahoo! pay the full $117.5 million within twenty days of final approval (August 10, 2020). This means that virtually all of the $117.5 million in funds should have accrued interest for nearly three years, from August 2020 to June 2023, when distributions began. By not paying a market interest rate to the QSF, on information and belief, Western Alliance saved millions of dollars during the course of the administration of the *In re: Yahoo! Data Breach* settlement. Instead of paying those millions of dollars in interest to the QSF, Western Alliance paid a portion of that money to Kroll. Neither Western Alliance nor Kroll disclosed those payments, or the amount of the interest payments that should have gone to the QSF, to the Court or class members.

200.    Kroll did not disclose how many digital payments were made by Digital Disbursements or Blackhawk Network. On information and belief, a substantial number of the 1.3

---

[105]    Reddit post, r/Scams: Yahoo Data Breach Settlement Scam, https://www.reddit.com/r/Scams/comments/10nfyqy/yahoo_data_breach_settlement_scam/ (last visited May 11, 2026).

[106]Reddit post, r/yahoo: Settlement Payout Discussion, https://www.reddit.com/r/yahoo/comments/145e72r/settlement_payout/ (last visited May 11, 2026).

million claims processed were paid via these methods. Instead of either not charging the QSF until the claimant redeemed or claimed the digital payment cards or returning to the QSF after the digital payment cards went unclaimed or redeemed for 90 days (i.e., similar to the check), a substantial portion of the QSF that was intended for class members was taken by Digital Disbursements and Blackhawk Network. Unbeknownst to the Court or class members, Kroll received undisclosed compensation from Digital Disbursements and Blackhawk for choosing them to issue digital payments to class members. In exchange for this undisclosed compensation, Digital Disbursements and Blackhawk were able to profit at the class members' expense.

201.    Throughout the administration of the *In re: Yahoo! Data Breach* settlement, Kroll did not disclose that it would receive any compensation, kickbacks, or other financial compensation from third parties involved in holding or distributing settlement funds, including Western Alliance, Digital Disbursements, and Blackhawk Network, or that such payments would effectively reduce compensation to class members. Nor did Western Alliance, Digital Disbursements, and Blackhawk Network disclose that they were paying such compensation to Kroll. As detailed above, the conspirators had numerous opportunities to make this disclosure. Yet they did not. The failure to disclose these furtive arrangements rendered those communications materially false and misleading, and constituted material omissions.

### iii.    *Ariza et al v. Luxottica Retail North America: Defendants Kroll, Western Alliance, and Blackhawk*

202.    *Yesenia Ariza et al. v. Luxottica Retail North America*, E.D.N.Y. Case No. 1:17-cv-5216-PKC-LB ("*Ariza v. Luxotica*"), was a consolidated class action lawsuit alleging that Luxottica, also known as LensCrafters, violated certain laws by making material misrepresentations about the glasses it sold. U.S. District Judge Pamela K. Chen in the Eastern District of New York presided over the case. Kroll was the court-appointed Settlement

Administrator; Western Alliance served as the bank holding the QSF; and third-party fintech vendor Blackhawk was used to facilitate distribution of settlement funds to class members.

203.    The Settlement Agreement, executed on June 27, 2023, stated that Kroll would be the Settlement Administrator.[107] The Agreement established a $39 million non-reversionary common fund to compensate class members.[108] The fund was required to be deposited into an interest-bearing account that qualified as a Qualified Settlement Fund under Treasury Regulation § 1.468B.[109]

204.    Under the terms of the Settlement Agreement, the Net Settlement Fund was defined as the Settlement Fund less attorneys' fees and litigation expenses, service awards, and settlement administration expenses.[110] Because administrative costs were deducted before distribution, every dollar paid to Kroll or its conspirators reduced class members' recovery dollar-for-dollar.

205.    Class members were entitled to a pro rata share of the settlement fund, up to $50 per pair of prescription eyeglasses purchased during the class period, subject to pro-rata reduction if total claims exceeded the settlement fund. To the extent the QSF was not exhausted after the first distribution and there would be sufficient funds after payment of administrative costs to pay at least $1 to each claimant, any remaining funds were to be distributed to claimants on a pro-rata basis. Following any second distribution, all remaining funds would be subject to a *cy pres* distribution approved by the Court. No funds could revert to LensCrafters under any circumstances.[111]

---

[107] Class Action Settlement Agreement at 5, *Ariza v. Luxottica Retail N. Am.,* No. 17-cv-5216 (E.D.N.Y.), ECF No. 349-2.
[108] *Id.* at 5-6.
[109] *Id.* at 4.
[110] *Id.*
[111] *Id.* at 6.

206.    On September 20, 2023, the court granted preliminary approval of the settlement and appointed Kroll as the Settlement Administrator.[112]

207.    Pursuant to 28 U.S.C. § 1715, on August 10, 2023, and again on November 1, 2023, Kroll, on behalf of LensCrafters, served a CAFA notice on federal and state attorneys general. The notice disclosed details about the settlement, including copies of the Settlement Agreement and email and postcard notices created by Kroll, as well as a link to the settlement website maintained by Kroll.[113] The purpose of this disclosure was to enable federal or state attorneys general to review the settlement and related information and intervene if they determined it was not in the public interest.

208.    Between October and December of 2023, Kroll implemented a substantial campaign to provide class members with notice of their potential claims. Kroll sent over 12 million email notices and over 8 million postcard notices. These notices informed class members of the lawsuit's details, their eligibility, their legal rights (such as opting out or objecting), settlement terms, and any deadlines they must meet, and directed potential class members to a website maintained by Kroll. Claim forms included with the notices touted the availability of "a number of digital payment options to receive your Settlement payment," and offered that "Settlement payments may be digitally sent to you via email." [114]

209.    As noted above, Kroll directed potential class members to a website that it maintained so that they could learn more about the settlement and file claims. The "FAQs" section of the website provided answers to 21 questions, from the basics of class action settlements through

---

[112] Order Granting Preliminary Approval of Class Action Settlement and Authorizing Dissemination of Notice at 10, *Ariza v. Luxottica Retail N. Am.*, No. 17-cv-5216 (E.D.N.Y.), ECF No. 352.

[113] CAFA Notice for the Proposed Settlement at 9–25, *Ariza v. Luxottica Retail N. Am.*, No. 17-cv-5216 (E.D.N.Y.), ECF No. 356-2.

[114] Accufit Class Action Settlement Claim Form at 42, *Ariza v. Luxottica Retail N. Am.*, No. 17-cv-5216 (E.D.N.Y.), ECF No. 356-2.

the details of the Settlement Agreement, payments to attorneys, and other expenses that would be paid from the QSF, including passing references to paying the costs of administering the settlement.[115]

210.    On January 12, 2024, a declaration of Scott M. Fenwick, Senior Director of Kroll, was filed with the Court in support of a motion for final approval of the Settlement Agreement,[116] and was posted by Kroll on the settlement website. The Court granted final approval of the Settlement Agreement on September 27, 2024.[117]

211.    Following final approval, Kroll exercised substantial discretion and control in administering the distribution of the QSF. Kroll: calculated the Net Settlement Fund after deducting fees and administrative costs, including its own administrative costs and fees; determined the validity of claims; and directed the timing and method of distributions to class members. As of March 2026, Kroll had issued over 284,949 payments in total, with 155,954 electronic payments successfully negotiated, 116,572 checks cashed, and the remaining 12,423 checks rendered void.[118]

212.    An example of a settlement check sent to a class member from the Western Alliance Bank QSF account is below:

---

[115] Accufit Class Action Settlement Website, "Ariza et al v. Luxottica Retail North America Frequently Asked Questions" https://www.accufitclassaction.com/home/faqs2/ (last visited May 11, 2026).

[116] Declaration of Scott M. Fenwick, *Ariza v. Luxottica Retail N. Am.*, No. 17-cv-5216 (E.D.N.Y.), ECF No. 356-2.

[117] Memorandum & Order, *Ariza v. Luxottica Retail N. Am.*, No. 17-cv-5216 (E.D.N.Y.), ECF No. 375.

[118] Eleventh Supplemental Declaration of Scott M. Fenwick at 2, *Ariza v. Luxottica Retail N. Am.*, No. 17-cv-5216 (E.D.N.Y.), ECF No. 384.

213.    Although not disclosed to the Court, Kroll's digital payment options for class members included prepaid debit cards offered through HawkMarketplace, a business-to-business rewards management platform operated by Blackhawk Network.[119] As indicated on the Hawk Marketplace website below, Blackhawk controls and operates Hawk Marketplace:



214.    On information and belief, the interest rate that Western Alliance paid to the *Ariza v. Luxottica* QSF was less than 0.5%, which was far less than the market rate. Indeed, as of April

---

[119]Reddit post, r/classactions: Accufit Settlement Payment, https://www.reddit.com/r/classactions/comments/1jtxnqc/accufit_settlement_payment/; Reddit post, r/ClassActionLawsuitUSA: LensCrafters False Advertising Class Action (last visited May 11, 2026), https://www.reddit.com/r/ClassActionLawsuitUSA/comments/1biboei/lens_crafters_false_advertising_class_action/ (last visited May 15, 2026).

2025, which is the approximate timeframe when Kroll began issuing payments to the class, the federal funds rate was over 4.25%, and many banks offered interest rates near that amount. The Settlement Agreement required an initial deposit of $5.5 million within ten days of preliminary approval (September 30, 2023), and the remaining $33.5 million within ten days of final approval (October 7, 2024). This means that virtually all of the $39 million in funds should have accrued interest for at least six months—from October 2024 to April 2025—when distributions began, and at least some portion of the funds should have been accruing interest for over 2 years—from September 2023 to March 2026—when Kroll noted a remaining balance of more than $800,000 in the QSF.[120] By not paying a market interest rate to the QSF, on information and belief, Western Alliance saved at least hundreds of thousands of dollars during the course of the administration of the *Ariza v. Luxottica* settlement. Instead of paying that money as interest to the QSF, Western Alliance paid a portion of that money to Kroll. Neither Western Alliance nor Kroll disclosed those payments, or the amount of the interest payments that should have gone to the QSF, to the Court or class members.

215.    In total, claimants received over 155,000 digital payments (although the Defendants did not disclose how many were made by digital card issued by Blackhawk) across two rounds of distribution, constituting the majority of disbursements in the settlement.[121] On information and belief, instead of treating digital payments like uncashed checks—by preserving the funds in the QSF until redemption or returning unused amounts to the QSF after a reasonable period— Blackhawk was permitted to retain a substantial portion of settlement funds intended for class members as breakage. Unbeknownst to the Court or class members, Kroll received undisclosed compensation from Blackhawk for choosing Blackhawk to issue digital payments to class

---

[120] Eleventh Supplemental Declaration of Scott M. Fenwick at 2, *Ariza v. Luxottica Retail N. Am.*, No. 17-cv-5216 (E.D.N.Y.), ECF No. 384.
[121] *Id* at. ¶¶ 3-5.

members. In exchange for this undisclosed compensation, Blackhawk was able to profit at the class members' expense.

216.     Throughout the administration of the *Ariza v. Luxottica* settlement, Kroll did not disclose that it would receive any compensation, kickbacks, or other financial compensation from third parties involved in holding or distributing settlement funds, including Western Alliance or Blackhawk, or that such payments would effectively reduce compensation to class members. Nor did Western Alliance or Blackhawk disclose that they were paying such compensation to Kroll. As detailed above, the conspirators had numerous opportunities to make this disclosure. Yet they did not. The failure to disclose these furtive arrangements rendered those communications materially false and misleading, and constituted material omissions.

### b.  Exemplar Settlements Administered by Epiq

#### i.  *In re Capital One Settlement: Defendants Epiq, Huntington, and Tremendous*

217.     *In re Capital One Consumer Data Security Breach Litigation*, E.D. Va. Case No. 1:19-md-2915 ("*In re Capital One*"), was an MDL consolidating dozens of class actions arising from a data breach affecting approximately 98 million Americans. U.S. District Judge Anthony J. Trenga in the Eastern District of Virginia presided over the MDL. Epiq was the court-appointed Settlement Administrator; Huntington served as the bank holding the QSF; and third-party fintech vendor Tremendous was used to facilitate distribution of settlement funds to class members. This case demonstrates the conspirators' execution of both the Bank Interest Track and the Digital Disbursement Track.

218.     The Settlement Agreement, executed on January 31, 2022, stated that Epiq would be the Settlement Administrator and Huntington would be the trustee bank.[122] The Agreement

---

[122] Settlement Agreement and Release at 9, 12, *In re Capital One Customer Data Security Breach Litig.*, No. 1:19-md-02915-AJT (E.D. Va.), ECF No. 2219-1.

established a $190 million non-reversionary common fund to compensate class members. The fund was required to be deposited into a Qualified Settlement Fund at Huntington, and Epiq was named the "administrator" of the QSF within the meaning of Treasury Regulation § 1.468B-2(k)(3).[123]

219.    Under the terms of the Settlement Agreement's Proposed Consumer Benefit Plan, the "Net Settlement Fund" was defined as the Settlement Fund minus administrative costs, attorneys' fees, service awards, and other expenses, with the remainder to be distributed to class members.[124] Because administrative costs were deducted before distribution, every dollar paid to Epiq or its conspirators reduced class members' recovery dollar-for-dollar.

220.    Class members were entitled to reimbursements of up to $25,000 for out-of-pocket losses, compensation for lost time, identity defense services, and identity restoration support. To the extent the QSF was not exhausted, any remaining funds were to be used first to purchase additional identity defense and restoration services for class members, and second to increase payments to class members on a pro-rated basis. Any remaining funds from the failure of class members to timely negotiate a settlement check or to timely provide required tax information such that a settlement check could issue was to be distributed to other class members, or as otherwise ordered by the Court. No funds could revert to Capital One under any circumstances.[125]

221.    On January 31, 2022, a declaration of Cameron Azari, Senior Vice President of Epiq Class Action and Claims Solutions, was filed with the Court in support of a motion for preliminary approval of the Settlement Agreement.[126] The Court granted preliminary approval of

---

[123] *Id.* at 12.

[124] Proposed Consumer Settlement Benefits Plan, *In re Capital One Customer Data Security Breach Litig.*, No. 1:19-md-02915-AJT (E.D. Va.), ECF No. 2219-2 at 1.

[125] *Id.* at 2-3.

[126] Declaration of Cameron R. Azari, *In re Capital One Customer Data Security Breach Litig.*, No. 1:19-md-02915-AJT (E.D. Va.), ECF No. 2219-5.

the Settlement Agreement on February 7, 2022, appointing Epiq as the Settlement Administrator.[127]

222.    Pursuant to 28 U.S.C. § 1715, on February 10, 2022, Capital One served a CAFA notice on federal and state attorneys general. The notice disclosed details about the settlement, including copies of the Settlement Agreement, Epiq's notice plan, and notices to class members.[128] The purpose of this disclosure was to enable federal or state attorneys general to review the settlement and related information and intervene if they determined it was not in the public interest.

223.    Between April 25, 2022, and August 24, 2022, Epiq implemented a massive campaign to provide potential class members with notice of their potential claims. Epiq sent millions of notices by mail (over 17 million postcard notices) and email (over 120 million email notices).[129] These notices informed class members of the lawsuit's details, their eligibility, their legal rights (such as opting out or objecting), settlement terms, and any deadlines they must meet, and directed potential class members to a website maintained by Epiq.

224.    As noted above, Epiq directed potential class members to a website that it maintained so that they could learn more about the settlement and file claims. Participants who clicked on the website link to "Submit a Claim" learned that they could receive payments via digital payment method.[130] The "FAQs" section of the website also touted the availability of "various digital payment options" and provided answers to 25 questions, from the basics of class action settlements through the details of the Settlement Agreement, payments to attorneys, and

---

[127] Order Granting Preliminary Approval of Class Action Settlement, *In re Capital One Customer Data Security Breach Litig.*, No. 1:19-md-02915-AJT (E.D. Va.), ECF No. 2220.

[128] Class Action Fairness Act Notice at 3, *In re Capital One Customer Data Security Breach Litig.*, No. 1:19-md-02915-AJT (E.D. Va.), ECF No. 2221-1.

[129] Declaration of Cameron R. Azari at 4–7, *In re Capital One Customer Data Security Breach Litig.,* No. 1:19-md-02915-AJT (E.D. Va.), ECF No. 2251-1.

[130]Capital One Data Breach Settlement, Submit a Claim, https://web.archive.org/web/20220930024502/https://www.capitalonesettlement.com/en/Home/SubmitClaim (archived Sept. 30, 2022, last visited May 11, 2026).

other expenses that would be paid from the QSF—including passing references to paying the costs of administering the settlement.[131]

225.    On August 29, 2022, a declaration of Cameron Azari, Senior Vice President of Epiq Class Action and Claims Solutions, was filed with the Court in support of a motion for final approval of the Settlement Agreement, and was posted by Epiq on the settlement website. The Declaration noted that Settlement Class Members would be given the option of receiving a digital payment, including Paypal, Digital Mastercard, or "other options," as well as a traditional paper check.[132] The Court granted final approval of the Settlement Agreement on September 13, 2022.[133]

226.    Following final approval, Epiq exercised substantial discretion and control in administering the distribution of the QSF. Epiq: calculated the Net Settlement Fund after deducting fees and administrative costs, including its own administrative costs and fees; determined the validity of claims; and directed the timing and method of distributions to class members. Epiq determined that the Net Settlement Fund available for distribution totaled approximately $102.9 million. Epiq then distributed over $101 million to class members in an initial distribution, and an additional $5.7 million in a second distribution. These distributions were made via a combination of digital payments and checks to over 176,000 claimants.[134]

227.    An example of a settlement check sent to a class member from the Huntington QSF account is below:

---

[131]Capital          One          Data          Breach          Settlement,          FAQ, https://web.archive.org/web/20220930031007/https://www.capitalonesettlement.com/en/Home/Faq (archived Sept. 30, 2022, last visited May 11, 2026).
[132] Declaration of Cameron R. Azari at 12, *In re Capital One Customer Data Security Breach Litig.*, No. 1:19-md-02915-AJT (E.D. Va.), ECF No. 2251-1.
[133] Order and Judgment Granting Final Approval of Class Action Settlement, *In re Capital One Customer Data Security Breach Litig.*, No. 1:19-md-02915-AJT (E.D. Va. 2022), ECF No. 2263.
[134] Declaration of Amanda Sternberg at 2-4, *In re Capital One Customer Data Security Breach Litig.*, No. 1:19-md-02915-AJT (E.D. Va. 2025), ECF No. 2288-1.



228.    Additionally, through EpiqPay, class members could choose digital payment options, including a virtual MasterCard. Although not disclosed to the Court, Epiq had chosen Tremendous to assist in issuing digital payments, and many of the payments were distributed by Defendant Tremendous through a virtual MasterCard option.[135] The webpage showing digital payment options offered by Epiq , including virtual MasterCard, is depicted below:



229.    On July 18, 2025, a Declaration of Amanda Sternberg, Director of Epiq Class Action & Claims Solutions was filed with the Court, in support of a Motion for *Cy Pres*

---

[135]Reddit post, r/CreditCards: Capital One Data Breach Lawsuit Discussion https://www.reddit.com/r/CreditCards/comments/16tu6ej/capitalone_data_breach_lawsuit_did_a nyone_else/ (last visited May 11, 2026).

Distribution. The declaration provided the Court with a detailed account of where much of the $190 million in the QSF had gone after payment of fees and costs and two rounds of distributions to class members, and informed the Court that there remained $555,713.46 in the QSF.[136] The Court approved *Cy Pres* distribution of the remaining funds to a variety of organizations.[137]

230. On information and belief, the interest rate that Huntington paid to the *In re: Capital One* QSF was less than 0.5%, which was far less than the market rate. Indeed, as of October 2023, which is the approximate timeframe when Epiq began issuing payments to the class, the federal funds rate was over 5%,[138] and many banks offered interest rates near that amount.[139] The Settlement Agreement required an initial deposit of $15 million within ten days of preliminary approval (February 17, 2022), and the remaining $175 million within ten days of final approval (September 23, 2022). This means that virtually all of the $190 million in funds should have accrued interest for at least a year—from September 2022 to October 2023—when distributions began, and at least some portion of the funds should have been accruing interest for over 3 years— from February 2022 to July 2025—when the final *Cy Pres* distribution was approved. By not paying a market interest rate to the QSF, on information and belief, Huntington saved millions of dollars during the course of the administration of the *In re: Capital One* settlement. Instead of paying those millions of dollars in interest to the QSF, Huntington paid a portion of that money to Epiq. Neither Huntington nor Epiq disclosed those payments or the amount of the interest payments that should have gone to the QSF, to the Court or class members.

---

[136] Declaration of Amanda Sternberg at 4, *In re Capital One Customer Data Security Breach Litig.*, No. 1:19-md-02915-AJT (E.D. Va.), ECF No. 2288-1.

[137] Cy Pres Corrected Order, *In re Capital One Customer Data Security Breach Litig.*, No. 1:19-md-02915-AJT (E.D. Va.), ECF No. 2292.

[138] Bd. of Governors of the Fed. Reserve Sys., Federal Funds Effective Rate (FEDFUNDS), Fed. Reserve Bank of St. Louis FRED Database, https://fred.stlouisfed.org/series/FEDFUNDS (last visited May 11, 2026).

[139] *See, e.g.,* SoFi Bank, *SoFi Bank Rate Sheet* (Oct. 24, 2023), https://d32ijn7u0aqfv4.cloudfront.net/wp/wp-content/uploads/raw/SoFi-Bank-Rate-Sheet-October-24-2023.pdf (last visited May 11, 2026) (showing 4.6% APY on savings account).

231.    In total, claimants received over 296,000 digital payments (although the Defendants did not disclose how many were made by digital Mastercard issued by Tremendous) across two rounds of distribution, constituting the vast majority of the more than $100 million distributed— nearly 95% of payments issued in the first distribution, and 75% of payments issued in the second distribution.[140] On information and belief, instead of treating digital payments like uncashed checks—by preserving the funds in the QSF until redemption or returning unused amounts to the QSF after a reasonable period—Tremendous was permitted to retain a substantial portion of settlement funds intended for class members as breakage. Unbeknownst to the Court or class members, Epiq received undisclosed compensation from Tremendous for choosing Tremendous to issue digital payments to class members. In exchange for this undisclosed compensation, Tremendous was able to profit at the class members' expense.

232.    Throughout the administration of the *In re: Capital One* settlement, Epiq did not disclose that it would receive any compensation, kickbacks, or other financial compensation from third parties involved in holding or distributing settlement funds, including Huntington or Tremendous, or that such payments and resulting arrangements would effectively reduce compensation to class members. Nor did Huntington or Tremendous disclose that they were paying such compensation to Epiq. As detailed above, the conspirators had numerous opportunities to make this disclosure. Yet they did not. The failure to disclose these furtive arrangements rendered those communications materially false and misleading, and constituted material omissions.

        ii.    *In re JUUL Labs: Defendants Epiq, Blackhawk, and Digital Disbursements*

233.    *In re Juul Labs, Inc.*, N.D. Cal. Case No. 19-md-02913 ("*In re Juul*"), was an MDL consolidating class actions alleging deceptive marketing by JUUL Labs, Inc. ("JLI"). U.S. District

---

[140] Declaration of Amanda Sternberg at 1–2, *In re Capital One Customer Data Security Breach Litig.,* No. 1:19-md-02915-AJT (E.D. Va.), ECF No. 2288-1.

Judge William H. Orrick in the Northern District of California presided over the MDL. Epiq was the court-appointed Settlement Administrator; and third-party fintech vendors Blackhawk and Digital Disbursements were used to facilitate distribution of settlement funds to class members. This case demonstrates the conspirators' execution of the Digital Disbursement Scheme.

234.    The case involved two settlements, one with JLI and one with Altria. The JLI settlement is discussed here.

235.    The JLI Settlement Agreement established a $255 million non-reversionary common fund to compensate class members.[141] The fund was required to be deposited into a Qualified Settlement Fund.

236.    Under the terms of the Settlement Agreement, the "Net Settlement Fund" was defined as the Settlement Fund minus administrative costs, attorneys' fees, service awards, and other expenses, with the remainder to be distributed to class members.[142] Because administrative costs were deducted before distribution, every dollar paid to Epiq or its conspirators reduced class members' recovery dollar-for-dollar.

237.    Under the terms of the Plan of Allocation, class members were entitled to reimbursements for amounts paid for JUUL products, to be adjusted on a *pro rata* basis based on the total value of claims approved.[143] If any funds remained due to failure to cash checks or accept electronic payments within six months, any remaining funds would be used first to increase payments to class members who received an initial distribution. Any funds remaining six months

---

[141] Class Settlement Agreement at 3, *In re JUUL Labs, Inc. Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal.), ECF No. 3724-4.
[142] *Id.* at 4.
[143] Plan of Allocation for Economic Loss Settlement and Release at 5–6, *In re JUUL Labs, Inc. Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal.), ECF No. 3742-3.

after that second distribution would be distributed to a *Cy Pres* recipient with Court approval. No funds could revert to JLI under any circumstances.[144]

238.     On December 19, 2022, a declaration of Cameron Azari, Senior Vice President of Epiq Class Action and Claims Solutions, was filed with the Court in support of a motion for preliminary approval of the Settlement Agreement and was posted by Epiq on the settlement website.[145] The Court granted preliminary approval of the Settlement Agreement on February 7, 2022, appointing Epiq Systems, Inc., as the Settlement Administrator.[146]

239.     Pursuant to 28 U.S.C. § 1715, on December 29, 2022, Epiq served a CAFA notice on federal and state attorneys general. The notice disclosed details about the settlement, including copies of the Settlement Agreement and Epiq's notices to class members.[147] The purpose of this disclosure was to enable federal or state attorneys general to review the settlement and related information and intervene if they determined it was not in the public interest.

240.     Between March and April 2023, Epiq implemented a massive campaign to provide potential class members with notice of their potential claims. Epiq sent hundreds of thousands of notices by mail and millions by email.[148] These notices informed class members of the lawsuit's details, their eligibility, their legal rights (such as opting out or objecting), settlement terms, and any deadlines they must meet, and directed potential class members to a website maintained by Epiq.

---

[144] *Id.*

[145] Declaration of Cameron R. Azari, *In re JUUL Labs, Inc. Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal.), ECF No. 3724-13.

[146] Order Granting Preliminary Approval of Class Action Settlement, *In re JUUL Labs, Inc. Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal.), ECF No. 3779.

[147] Declaration of Stephanie J. Fiereck, Attachment 2, *In re JUUL Labs, Inc. Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal.), ECF No. 4056-3.

[148] Declaration of Cameron R. Azari at 6–8, *In re JUUL Labs, Inc. Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal.), ECF No. 4056-3.

241.    As noted above, Epiq directed potential class members to a website that it maintained so that they could learn more about the settlement and file claims. The "FAQs" section provided answers to 38 questions, from the basics of class action settlements through the details of the Settlement Agreement, payments to attorneys, and other expenses that would be paid from the QSF—including passing references to paying the costs of administering the settlement.[149]

242.    On June 23, 2023, a declaration of Cameron Azari, Senior Vice President of Epiq Class Action and Claims Solutions, was filed with the Court in support of a motion for final approval of the Settlement Agreement,[150] and was posted by Epiq on the settlement website. The Declaration noted that Settlement Class Members would be given the option of receiving a digital payment, including Paypal, Digital Mastercard, or "other options," as well as a traditional paper check.[151] The Court granted final approval of the Settlement Agreement on September 19, 2023.[152]

243.    Following final approval, Epiq exercised substantial discretion and control in administering the distribution of the QSF. Epiq: calculated the Net Settlement Fund after deducting fees and administrative costs, including its own administrative costs and fees; determined the validity of claims; and directed the timing and method of distributions to class members. Epiq determined that the Net Settlement Fund available for distribution totaled approximately $204.4 million, and that there were 842,004 valid claimants.[153] Epiq began a first round of distributions in October of 2024, and after that first round of payments, $15,351,264.82 remaining in the

---

[149]JUUL Class Action Settlement, FAQ, https://www.juulclassaction.com/en/Home/FAQ (last visited May 11, 2026).

[150] Declaration of Cameron R. Azari, *In re JUUL Labs, Inc. Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal.), ECF No. 4056-3.

[151] *Id.* at 16.

[152] Order Granting Final Approval of Class Action Settlement, *In re Juul Labs, Inc. Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal. 2023), ECF No. 4138.

[153] Request for Order Authorizing Distribution at 2–3, *In re JUUL Labs, Inc. Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal.), ECF No. 4325.

Qualified Settlement Fund. Epiq distributed the remaining funds to class members via a second round of distributions in March of 2026.[154]

244.    Although not disclosed to the Court, Epiq had chosen Blackhawk and Digital Disbursements to assist in issuing digital payments, and a substantial portion of the settlement fund was distributed to class members by prepaid cards issued by these fintechs. The class website informed class members that Blackhawk and Digital Disbursements would send emails to class members containing their digital prepaid cards:

> Please note that digital payments will be sent from multiple valid email addresses: If you selected an E-Mastercard or Amazon card, your payment email will come from JuulLabsInc@hawkmarketplace.com. If you selected Venmo or PayPal, those payments will be confirmed with those respective vendors directly, and you may also receive an email from noreply@digitaldisbursements.com. If you chose ACH, you will receive an email from noreply@digitaldisbursements.com once the payment goes through.

245.    On information and belief, instead of treating digital payments like uncashed checks—by preserving the funds in the QSF until redemption or returning unused amounts to the QSF after a reasonable period—Blackhawk and Digital Disbursements were permitted to retain a substantial portion of settlement funds intended for class members as breakage. Unbeknownst to the Court or class members, Epiq received undisclosed compensation from Blackhawk and Digital Disbursements for choosing them to issue digital payments to class members. In exchange for this undisclosed compensation, these Fintech Defendants were able to profit at the class members' expense.

246.    Throughout the administration of the *In re: JUUL* settlement, Epiq did not disclose that it would receive any compensation, kickbacks, or other financial compensation from third parties involved in holding or distributing settlement funds, including Blackhawk or Digital

---

[154] Order Authorizing Further Distribution, *In re JUUL Labs, Inc. Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal.), ECF No. 4489.

Disbursements, or that such payments and resulting arrangements would effectively reduce compensation to class members. Nor did Blackhawk or Digital Disbursements disclose that they were paying such compensation to Epiq. As detailed above, the conspirators had numerous opportunities to make this disclosure. Yet they did not. The failure to disclose these furtive arrangements rendered those communications materially false and misleading, and constituted material omissions.

### iii.    *In re Auto Parts: Defendants Epiq and Tremendous*

247.    *In re Automotive Parts Antitrust Litigation*, E.D. Mich. Case No. 2:12-md-02311 ("*In re Auto Parts*"), was an MDL consolidating dozens of class actions alleging that various automobile parts manufacturers conspired to fix prices, in violation of the Sherman Act. U.S. District Judge J. Kay Behm in the Eastern District of Michigan presided over the MDL. Epiq was the court-appointed Settlement Administrator, and third-party fintech vendor Tremendous was used to facilitate distribution of settlement funds to class members. This case demonstrates the conspirators' execution of the Digital Disbursement Track.

248.    *In re: Auto Parts* consisted of 144 separate settlements, each of which created non-reversionary common funds, that were ultimately pooled into a total $1,224,230,840.59 for distribution.[155] Under the terms of the settlement agreements, the costs of administration, attorney's fees, and other costs would be paid out of the settlement fund. Because administrative costs were deducted before distribution, every dollar paid to Epiq or its conspirators reduced class members' recovery dollar-for-dollar.

---

[155] Memorandum of Law in Support of End-Payor Plaintiffs' Motion for Distribution, *In re Automotive Parts Antitrust Litig.*, No. 2:12-cv-00103 (E.D. Mich. 2024), ECF No. 656 at 13.

249.    On October 13, 2015, the Court appointed Garden City Group to serve as the Settlement Administrator for the End Payor Plaintiffs.[156] Epiq acquired Garden City Group in 2018, and continued to serve as Settlement Administrator.[157] The litigation lasted more than a decade, and Epiq filed numerous declarations with the Court and engaged in several rounds of notice to class members, informing them about the settlements, how to submit a claim, or how to opt out or to object.

250.    Epiq maintained a settlement website to inform potential class members about the settlement. Participants who clicked on the website link to "Submit a Claim" learned that they could receive payments via digital payment method.[158] The "FAQs" section of the website provided answers to 20 questions, from the basics of class action settlements through the details of the Settlement Agreement, payments to attorneys, and other expenses that would be paid from the QSF—including passing references to paying the costs of administering the settlement.[159] The website advertised $1.2 billion in settlements, and directed all queries to Epiq:



---

[156] Corrected Order Granting End-Payor Plaintiffs' Motion to Disseminate Notice to the End-Payor Plaintiff Settlement Classes, *In re Automotive Parts Antitrust Litig.*, No. 2:13-cv-02203 (E.D. Mich. 2015), ECF No. 152.

[157] Declaration of Michelle M. La Count at 3, *In re Automotive Parts Antitrust Litig.*, No. 2:12-cv-00103 (E.D. Mich.), ECF No. 664-1.

[158] Capital One Data Breach Settlement Website, *Submit a Claim*, https://web.archive.org/web/20220930024502/https://www.capitalonesettlement.com/en/Home/SubmitClaim (last visited May 11, 2026).

[159] Capital One Data Breach Settlement Website, *FAQ*, https://web.archive.org/web/20220930031007/https://www.capitalonesettlement.com/en/Home/Faq (last visited May 11, 2026).

ℹ **Settlement Administrator Contact Information**

If you have additional questions, you may write to or call the Settlement Administrator at:

Auto Parts Settlements
c/o Epiq
P.O. Box 2017
Portland, OR 97208-2017
Toll-Free: 1-877-940-5043

251.    Epiq also administered disbursement of the settlement funds for all five rounds of settlements. Throughout that process, Epiq exercised substantial discretion and control in administering the distribution of the settlement funds. Epiq: deducted fees and administrative costs, including its own administrative costs and fees; determined the validity of claims; and directed the timing and method of distributions to class members.

252.    For example, on August 29, 2024, a declaration of Peter Sperry, Senior Project Manager at Epiq, was filed in support of a Motion for Distribution of $100 Minimum Payments to Authorized Claimants.[160] He described in detail the process that Epiq had followed to evaluate claim forms submitted across five rounds of settlements, and proposed a formula for a *pro rata* distribution to class members.[161] On August 29, 2024, the Court granted the Motion for Distribution and ordered Epiq to distribute $100 minimum payments from the Net Settlement Fund.[162]

253.    On December 27, 2024, a declaration of Michelle De La Count, Project Manager at Epiq, was filed with the Court, in which Epiq recommended that the Court set aside a reserve of 15% of the remaining settlement funds—approximately $150,000,000—for the payment

---

[160] Declaration of Peter Sperry, *In re Automotive Parts Antitrust Litig.*, No. 2:12-cv-00103 (E.D. Mich.), ECF No. 656-1.

[161] *Id.* at 17-20.

[162] Order Overruling FRS's Objections and Approving End-Payor Plaintiffs' Motion for Distribution, *In re Automotive Parts Antitrust Litig.*, No. 2:12-cv-00103 (E.D. Mich.), ECF No. 663.

of administrative costs and fees, attorneys' fees, and other costs.[163] On March 18, 2025, the Court granted that request and created the requested reserve fund.[164]

254.    Following that Order, Epiq distributed payments from the over $800 million remaining in the Net Settlement Fund to class members. Although not disclosed to the Court, Epiq had chosen Tremendous to assist in issuing digital payments, and a substantial portion of the massive settlement fund was distributed by Tremendous through a virtual prepaid card option.[165]

255.    On information and belief, instead of treating digital payments like uncashed checks—by preserving the funds in the QSF until redemption or returning unused amounts to the QSF after a reasonable period—Tremendous was permitted to retain a substantial portion of settlement funds intended for class members as breakage. Unbeknownst to the Court or class members, Epiq received undisclosed compensation from Tremendous for choosing Tremendous to issue digital payments to class members. In exchange for this undisclosed compensation, Tremendous was able to profit at the class members' expense.

256.    Throughout the administration of the *In re: Auto Parts* settlement, Epiq did not disclose that it would receive any compensation, kickbacks, or other financial compensation from third parties involved in holding or distributing settlement funds, including Tremendous, or that such payments and resulting arrangements would effectively reduce compensation to class members. Nor did Tremendous disclose that it was paying such compensation to Epiq. As detailed above, the conspirators had numerous opportunities to make this disclosure. Yet they did not. The

---

[163] Declaration of Michelle M. La Count at 28, *In re Automotive Parts Antitrust Litig.*, No. 2:12-cv-00103 (E.D. Mich.), ECF No. 664-1.

[164] Amended Order Approving End-Payor Plaintiffs' Motion for Pro Rata Distributions to Authorized Claimants at 5, *In re Automotive Parts Antitrust Litig.*, No. 2:12-cv-00103 (E.D. Mich.), ECF No. 2270.

[165] Doctor of Credit, Auto Parts Auto Purchase $1.04 Billion Class Action Settlement, https://www.doctorofcredit.com/auto-parts-auto-purchase-1-04-billion-class-action-settlement/ (last visited May 11, 2026).

failure to disclose these furtive arrangements rendered those communications materially false and misleading, and constituted material omissions.

### iv.    *In re Lithium Ion Batteries: Defendants Epiq and Blackhawk*

257.    *In re Lithium Ion Batteries Antitrust Litigation*, N.D. Cal. Case No. 4:13-md-02420-YGR ("*In re Lithium Ion Batteries*"), was an MDL consolidating numerous antitrust class actions against manufacturers of lithium-ion batteries. U.S. District Judge Yvonne Gonzalez Rogers in the Northern District of California presided over the MDL. Epiq and Sipree, Inc., were the court-appointed Settlement Administrators; and third-party fintech vendor Blackhawk was used to facilitate distribution of settlement funds to class members. This case provides an example of the conspirators' execution of the Digital Disbursement Track.

258.    This MDL involved numerous settlements totaling in excess of $100 million. As an exemplar, the Indirect Purchaser Plaintiffs settlement with LG Chem and its subsidiaries will be discussed here.

259.    The Settlement Agreement between Indirect Purchaser Plaintiffs and LG Chem, executed on November 14, 2016, established a $39 million non-reversionary common fund to compensate class members.[166] The fund was required to be treated as a Qualified Settlement Fund.[167]

260.    Under the terms of the Settlement Agreement's Proposed Consumer Benefit Plan, the "Net Settlement Fund" was defined as the Gross Settlement Fund of $39 million, less administrative costs, attorneys' fees, service awards, and other expenses, with the remainder to be distributed to class members.[168] Because administrative costs were deducted before distribution, every dollar paid to Epiq or its conspirators reduced class members' recovery dollar-for-dollar.

---

[166] LG Chem Settlement Agreement at 8, 12–13, *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal.), ECF No. 1652-3.
[167] *Id.* at 14.
[168] *Id.* at 8, 16.

261.     According to the initial distribution plan, Class members were entitled to *pro rata* distributions from the Net Settlement Fund based on the number of batteries they had purchased.[169] Any remaining balance after the initial distribution, whether as a result of tax refund, uncashed checks, or otherwise, would be redistributed to class members who submitted a valid claim. If such distribution was not economical, the remaining funds could be distributed through *cy pres* or allowed to escheat to federal or state governments, subject to Court approval. No funds could revert to LG Chem under any circumstances.[170]

262.     The Court granted preliminary approval of the Settlement Agreement on March 20, 2017, initially appointing Gilardi & Co. LLC and Sipree, Inc., as the Settlement Administrators.[171] The Court then granted final approval over several objections on October 27, 2017.[172] Two objectors filed appeals. On September 16, 2019, the Ninth Circuit Court of Appeals vacated the final approval order and remanded the case for further proceedings "to allow the district court to properly exercise its discretion consistent with Rule 23's rigorous procedural requirements."[173]

263.     On December 10, 2019, a declaration of Cameron R. Azari, the Director of Legal Notice for Hilsoft Notifications, a business unit of Epiq, was filed in support of a Motion to Direct

---

[169] LG Chem Settlement Agreement at 17, *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal.), ECF No. 1652-3; Motion for Preliminary Approval at 4–5, *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal.), ECF No. 1652.

[170] LG Chem Settlement Agreement at 18, *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal.), ECF No. 1652-3.

[171] Preliminary Approval Order at 3, *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal.), ECF No. 1714.

[172] Final Approval Order at 1, *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal.), ECF No. 2003.

[173] Memorandum Disposition at 3–4, *In re Lithium Ion Batteries Antitrust Litig.*, No. 17-17367 (9th Cir. 2019), ECF No. 2531.

Notice.[174] The motion requested a renewed preliminary approval of the LG Chem and related settlements under a revised *pro rata* distribution plan.[175]

264.    On January 10, 2020, the Court approved the revised distribution plan and appointed Epiq as the Settlement Administrator.[176] The Court also approved a notice plan to provide notice to the settlement class regarding the settlements and an updated distribution plan.[177]

265.    Beginning on February 11, 2020, Epiq implemented a massive campaign to provide potential class members with notice of their potential claims. Epiq sent over ten million email notices, placed digital banner advertisements online and through social media, sponsored Internet search listings, and released information through thousands of media websites.[178] These notices informed class members of the lawsuit's details, their eligibility, their legal rights (such as opting out or objecting), settlement terms, and any deadlines they must meet, and directed potential class members to a website maintained by Epiq.

266.    As noted above, Epiq directed potential class members to a website that it maintained so that they could learn more about the settlement and file claims. The "FAQs" section of the website provided answers to 15 questions, from the basics of class action settlements through the details of the Settlement Agreement, payments to attorneys, and other expenses that would be paid from the QSF—including passing references to paying the costs of administering the settlement.[179]

---

[174] Declaration of Cameron R. Azari, *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal.), ECF No. 2566-6.

[175] Indirect Purchaser Plaintiffs' Motion to Direct Notice at 1–2, *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal.), ECF No. 2566.

[176] Sipree, Inc., aka "Digital Pay," also remained as an administrator for this settlement.

[177] Order Granting Indirect Purchaser Plaintiffs' Motion to Direct Notice at 4, *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal. 2020), ECF No. 2571.

[178] Declaration of Cameron R. Azari at 8–11, *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal.), ECF No. 2613-5.

[179]Reverse the Charge Class Action Settlement, FAQ, https://web.archive.org/web/20230324042033/http://www.reversethecharge.com/faqs (archived Mar. 24, 2023, last visited May 11, 2026).

267.    On May 5, 2020, a declaration of Epiq's Cameron R. Azari, was filed in support of a motion for final approval of the Settlement Agreement,[180] and was posted by Epiq on the settlement website. The Court granted final approval of the Settlement Agreement on December 10, 2020.[181]

268.    Following final approval, Epiq exercised substantial discretion and control in administering the distribution of the QSF. Epiq calculated the Net Settlement Fund after deducting fees and administrative costs, including its own administrative costs and fees; determined the validity of claims; and directed the timing and method of distributions to class members.

269.    In total across multiple settlements including the LG Chem settlement, the Indirect Purchaser Plaintiffs recovered $113.45 million for the class.[182] After adding approximately $1.13 million in interest earned on the settlement fund, and deducting attorneys' fees, expenses, administration costs, service awards, and taxes, Epiq determined that the net settlement fund available for distribution was $70,702,515.77.[183] Epiq further determined that there were 1,087,233 valid claims submitted.[184]

270.    On information and belief, Epiq and/or Sipree determined that distributions would occur through Blackhawk's Hawk Marketplace prepaid digital cards. An excerpt of Epiq's settlement website's FAQ section explained that the settlement would be "using digital payments exclusively" and required class members to take additional steps to request a paper check:[185]

---

[180] Declaration of Cameron R. Azari at 3, *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal.), ECF No. 2613-5.

[181] Order Granting Indirect Purchaser Plaintiffs' Motion for Final Approval of Settlements at 25–26, *In re Lithium Ion Batteries Antitrust Litig.,* No. 4:13-md-02420 (N.D. Cal.), ECF No. 2681.

[182] Indirect Purchaser Plaintiffs' Plan and Schedule of Distribution, *In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal.), ECF No. 2766.

[183] *Id*.

[184] Declaration of Chris Whipps at 1*, In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420 (N.D. Cal.), ECF No. 2786.

[185]    Reverse    the    Charge    Class    Action    Settlement,    FAQ, https://web.archive.org/web/20240519183159/http://www.reversethecharge.com/faqs    (archived May 19, 2024, last visited May 11, 2026).

> **Am I able to receive a paper check?**
>
> By using digital payments exclusively, www.ReverseTheCharge.com eliminates the hassle and cost of paper check administration, printing, and mailing. As a result, a greater share of the settlement can be distributed to verified class members. Use the online claim form to register your claim. If you must receive a paper check because you cannot use instant digital payment, please submit a written request by July 19, 2019 to Lithium Batteries Indirect Purchaser Settlements, c/o Epiq, P.O. Box 10194, Dublin, OH 43017-3194.

271. The only payment method that Epiq specifically identified on the settlement website was retail eGiftcards and digital Mastercards from Blackhawk's HawkMarketplace:

> **What email address will deliver my digital payment?**
>
> Here is a list of valid domains you will encounter when receiving a digital payment.
>
> **Should you choose to unsubscribe or report this email as spam, you will become ineligible to receive a digital distribution payment.**
>
> - Pre-payment notices for digital payments will be sent from: payments@mail.reversethechargepayments.com.
> - Payment notifications will be sent from: payments@mail.reversethechargepayments.com.
> - Payment options accessed through the payment email will direct to: payments.reversethechargepayments.com.
> - Retail eGiftcards (like Target, Starbucks, Amazon, etc.) and Digital Mastercards will be delivered from: lithiumbatterySettlement@hawkmarketplace.com.

272. Of the 1,087,233, Epiq received 1,065,706 requests from class members for digital payment, reflecting over 98% of claims. Based on Epiq's determinations, between May 31, 2023, and June 27, 2023, Sipree, Inc. issued digital payments to claimants.[186] Between June 21, 2023, and February 12, 2024, Epiq distributed 1,545 checks and 19,983 wire transfers to the remaining claimants. After these distributions, $2,796,908.20 remained in the Net Settlement Fund, which Epiq and Sipree distributed to claimants in a second distribution.

273. An example of an email indicating a first-round distribution to Plaintiff Lauren Wolf via Blackhawk Network' HawkMarketplace is reflected below:

---

[186] *Id*. at 1.

---------- Forwarded message ---------
From: **Lithium-Ion Battery Settlement** <LithiumBatterysettlement@hawkmarketplace.com>
Date: Thu, Jun 8, 2023 at 10:39 AM
Subject: Your Lithium-Ion Battery Settlement Payment
To:

## You've Received a Virtual Prepaid Card!
### $1.96

274.    An example indicating a second-round distribution to Plaintiff Lauren Wolf member via Blackhawk Network' HawkMarketplace is reflected below:

**From:** Lithium-Ion Batteries Class Action <LithiumBatterysettlement@hawkmarketplace.com>
**Date:** February 27, 2024 at 20:24:34 CST

**Subject: Lithium-Ion Batteries Settlement: Your Second and Final Payment is Ready**
**Reply-To:** LithiumBatterysettlement@hawkmarketplace.com



# 🔋 Lithium-Ion Batteries Settlement
### Case No. 13-MD-02420 YGR (DMR)

## You've Received a Virtual Prepaid Card!
### $1.06

275.    In total, claimants received over 1 million digital payments from Blackhawk Network across two rounds of distribution, constituting the vast majority of the more than $70 million distributed. On information and belief, instead of treating digital payments like uncashed checks—by preserving the funds in the QSF until redemption or returning unused amounts to the

103

QSF after a reasonable period—Blackhawk was permitted to retain a substantial portion of settlement funds intended for class members as breakage. Unbeknownst to the Court or class members, Epiq and/or Sipree received undisclosed compensation from Blackhawk for choosing Blackhawk to issue digital payments to class members. In exchange for this undisclosed compensation, Blackhawk was able to profit at the class members' expense.

276.    Throughout the administration of the *Lithium Ion Batteries* settlement, Epiq and Sipree, Inc., each acting with knowledge of the other's actions, did not disclose that they would receive any compensation, kickbacks, or other financial compensation from third parties involved in holding or distributing settlement funds, including Blackhawk, or that such payments would effectively reduce compensation to class members. Nor did Blackhawk disclose that it was paying such compensation to Epiq and/or Sipree. As detailed above, the conspirators had numerous opportunities to make this disclosure. Yet they did not. The failure to disclose these furtive arrangements rendered those communications materially false and misleading, and constituted material omissions.

### c.    Exemplar Settlements Administered by Angeion

#### i.    *In re: TikTok, Inc. Consumer Privacy Litigation: Defendants Angeion and Blackhawk*

277.    *In re: TikTok, Inc. Consumer Privacy Litigation*, N.D. Ill. Case No. 1:20-cv-4699 (MDL No. 2948) ("*In re: TikTok*"), was an MDL consolidating class actions arising from the TikTok application's improper use of private data belonging to approximately 89 million Americans. U.S. District Judge John Z. Lee in the Northern District of Illinois presided over the MDL. Angeion was the court-appointed Settlement Administrator, and third-party fintech vendor Blackhawk was used to facilitate distribution of settlement funds to class members. This case provides an example of the conspirators' execution of the Digital Disbursement Track.

278.     The Settlement Agreement, executed on February 17, 2021, established a $92 million non-reversionary common fund to compensate class members.[187] The fund was required to be deposited into an escrow account established by the Settlement Administrator to create the Settlement Fund, which was a Qualified Settlement Fund as defined by Treas. Reg. § 1.468B-1. Angeion would be the "administrator" of the QSF within the meaning of Treasury Regulation § 1.468B-2(k)(3).[188]

279.     Under the terms of the Settlement Agreement, the Settlement Fund would first pay the costs of settlement administration, taxes, and attorney's fees, and any remaining money would be distributed to class members. [189] Any money remaining in the would be distributed on a *pro rata* basis to class members who received the first-round distribution, or if the Settlements Administrator determined that such payments were infeasible, as otherwise directed by the Court.[190] Because administrative costs were deducted before distribution, every dollar paid to Angeion or its conspirators reduced class members' recovery dollar-for-dollar.

280.     The Settlement Agreement involved two classes—a nationwide class and an Illinois subclass. Nationwide class members would receive one *pro* rata share of the settlement fund after fees and expenses were paid, and Illinois subclass members would receive six *pro rata* shares.[191] No funds could revert to TikTok under any circumstances.

281.     On February 25, 2021, a declaration of Steven Wiesbrot, a partner at Angeion, was filed with the Court in support of a motion for preliminary approval of the Settlement

---

[187] Settlement Agreement and Release at 4–5, *In re TikTok, Inc. Consumer Privacy Litig*., No. 1:20-cv-04699 (N.D. Ill.), ECF No. 122-1.
[188] *Id*. at 5.
[189] *Id*. at 7-8.
[190] *Id.* at 9.
[191] Motion for Preliminary Approval at 13–14, *In re TikTok, Inc. Consumer Privacy Litig*., No. 1:20-cv-04699 (N.D. Ill.), ECF No. 122.

Agreement.[192] On March 1, 2021, an additional declaration of Steven Weisbrot was filed with the Court, which provided the court with estimated notice and administration costs based on hypothetical claim filing percentages, as well as a breakdown of notice and administration costs per class member and per claim using the hypothetical claim filing percentages.[193] The Court granted preliminary approval of the Settlement Agreement on October 1, 2021, including the appointment of Angeion as Settlement Administrator.

282.    Pursuant to 28 U.S.C. § 1715, on March 5, 2021, Angeion served a CAFA notice on federal and state attorneys general on behalf of Defendants. The notice disclosed details about the settlement, including copies of the Settlement Agreement and Angeion's notices to class members.[194] The purpose of this disclosure was to enable federal or state attorneys general to review the settlement and related information and intervene if they determined it was not in the public interest.

283.    Starting on November 14, 2021, Angeion implemented a massive campaign to provide potential class members with notice of their potential claims, sending over 50 million email notices.[195] These notices informed class members of the lawsuit's details, their eligibility, their legal rights (such as opting out or objecting), settlement terms, and any deadlines they must meet, and directed potential class members to a website maintained by Angeion. In addition to direct email notice, Angeion employed a number of other methods of notice including a media

---

[192] Declaration of Steven Weisbrot, *In re TikTok, Inc. Consumer Privacy Litig.*, No. 1:20-cv-04699 (N.D. Ill.), ECF No. 122-12.

[193] Declaration of Steven Weisbrot, *In re TikTok, Inc. Consumer Privacy Litig.*, No. 1:20-cv-04699 (N.D. Ill. 2021), ECF No. 129.

[194] Declaration of Steven Platt, Exhibit A, *In re TikTok, Inc. Consumer Privacy Litig.*, No. 1:20-cv-04699 (N.D. Ill.), ECF No. 170-1.

[195] Declaration of Steven Platt at 2–3, *In re TikTok, Inc. Consumer Privacy Litig.*, No. 1:20-cv-04699 (N.D. Ill.), ECF No. 196.

notice program, a social media campaign utilizing Facebook, Instagram, and Twitter, a paid search campaign, and targeted social media advertisements to drive traffic to the settlement website.[196]

284.    The settlement website created by Angeion informed class members of the lawsuit's details, their eligibility, their legal rights (such as opting out or objecting), settlement terms, and any deadlines they must meet. Participants who clicked on the website link to view the "Claim Form" learned that they could receive payments via digital payment method, including PayPal, Venmo, and a Virtual PrePaid Card sent to their email.[197] The "FAQs" section of the website provided answers to 22 questions, from the basics of class action settlements through the details of the Settlement Agreement, payments to attorneys, and other expenses that would be paid—including passing references to paying the costs of administering the settlements.[198]

285.    On March 31, 2022, a declaration of Steven Platt, project manager at Angeion, was filed with the Court in conjunction with Plaintiffs' motion for final approval of the Settlement Agreement. The Declaration noted that Angeion had received 1,215,541 timely approved claims, of which 1,038,517 were for the Nationwide Class only and 177,024 were for the Illinois subclass.[199] The declaration also noted that Angeion had over $2 million in administrative costs, and estimated that it would incur a total of more than $3 million in costs. A Supplemental Declaration of Steven Platt was filed on May 31, 2022.[200] The Court granted final approval of the Settlement Agreement on July 28, 2022.

---

[196] *Id*. at 3-8.

[197] TikTok Data Privacy Settlement, Claim Form, https://web.archive.org/web/20211219123033/https://angeion-public.s3.amazonaws.com/www.TikTokDataPrivacySettlement.com/docs/TikTok+Claim+Form.pdf (archived Dec. 19, 2021, last visited May 10, 2026).

[198] TikTok Data Privacy Settlement, Frequently Asked Questions, https://web.archive.org/web/20211210131819/https://tiktokdataprivacysettlement.com/frequently-asked-questions.php (archived Dec. 10, 2021, last visited May 10, 2026).

[199] Declaration of Steven Platt at 9, *In re TikTok, Inc. Consumer Privacy Litig*., No. 1:20-cv-04699 (N.D. Ill.), ECF No. 196.

[200] Supplemental Declaration of Steven Platt, *In re TikTok, Inc. Consumer Privacy Litig.,* No. 1:20-cv-04699 (N.D. Ill.), ECF No. 241.

286.    Following final approval, Angeion exercised substantial discretion and control in administering the distribution of the QSF. Angeion: deducted fees and administrative costs, including its own administrative costs and fees; determined the validity of claims; and directed the timing and method of distributions to class members. By November 21, 2022, at which time distributions were still ongoing, Angeion had distributed virtually the entire $92,000,000 settlement fund, and only $3,244,884.27 remained.[201]

287.    Although not disclosed to the Court, Angeion used Blackhawk to issue digital payments through its Hawk Marketplace. Class members who received digital payments received an email from the email Tiktokdataprivacysettlement@hawkmarketplace.com, operated by Blackhawk. The email informed them, "You've received a Virtual Prepaid Card!" and required them to click a link in the email to activate the card.

288.    On information and belief, millions of dollars of payments to class members in the *In re: TikTok* settlement were distributed by Defendant Blackhawk through a virtual prepaid card option. On information and belief, instead of treating digital payments like uncashed checks—by preserving the funds in the QSF until redemption or returning unused amounts to the QSF after a reasonable period—Blackhawk was permitted to retain a substantial portion of settlement funds intended for class members as breakage. Unbeknownst to the Court or class members, Angeion received undisclosed compensation from Blackhawk for choosing Blackhawk to issue digital payments to class members. In exchange for this undisclosed compensation, Blackhawk was able to profit at the class members' expense.

289.    Throughout the administration of the *In re TikTok Consumer Privacy Litigation* settlement, Angeion did not disclose that it would receive any compensation, kickbacks, or other financial compensation from third parties involved in holding or distributing settlement funds,

---

[201] Joint Status Report by All Plaintiffs at 1, *In re TikTok, Inc. Consumer Privacy Litig.*, No. 1:20-cv-04699 (N.D. Ill.), ECF No. 280.

including Blackhawk, or that such payments and resulting arrangements would effectively reduce compensation to class members. Nor did Blackhawk disclose that it was paying such compensation to Angeion. As detailed above, the conspirators had numerous opportunities to make this disclosure. Yet they did not. The failure to disclose these furtive arrangements rendered those communications materially false and misleading, and constituted material omissions.

> ii. *Lundy v. Meta Platforms, Inc.: Defendant Angeion and Fintech Defendant*

290.    *Lundy v. Meta Platforms, Inc.*, N.D. Cal. Case No. 3:18-cv-06793 ("*Lundy v. Meta Platforms, Inc.*"), was a class action case arising from data privacy claims affecting approximately 70 million Americans. U.S. District Judge James Donato presided over the litigation. Angeion was the court-appointed Settlement Administrator, and, on information and belief, a Fintech Defendant whose identity is known to Angeion was used to facilitate distribution of settlement funds to class members. This case provides an example of the conspirators' execution of the Digital Disbursement Track.

291.    The Amended Settlement Agreement ("Settlement Agreement"), executed on February 15, 2023, stated that Angeion would be the Settlement Administrator.[202] The Agreement established a non-reversionary common fund of $37,500,000 to compensate class members.[203]

292.    Under the terms of the Settlement Agreement, the "Net Settlement Fund" was defined as the Settlement Fund less the cost of settlement notice and administration, attorneys' fees and expenses awards, and service awards, with the remainder to be distributed to class members.[204] Because administrative costs were deducted before distribution, every dollar paid to Angeion, or its conspirators reduced class members' recovery dollar-for-dollar.

---

[202] Amended Class Action Settlement Agreement and Release at 7, *Lundy v. Meta Platforms, Inc.*, No. 3:18-cv-06793 (N.D. Cal.), ECF No. 188-1.
[203] *Id.* at 8.
[204] *Id.* at 10-11.

293.    Class members who submitted valid claims were entitled to a *pro rata* distribution of the Net Settlement Fund. For any checks that were not cashed within ninety days or ACH transfers or digital payments that failed due to the class member providing incorrect information, the funds would return to the Net Settlement Fund. If money remained in the Net Settlement Fund after these distributions, the parties would confer to decide further distributions. No funds could revert to Meta Platforms under any circumstances.[205]

294.    On February 15, 2023, a declaration of Steven Weisbrot, President and Chief Executive Officer of Angeion was submitted to the Court in support of the motion for preliminary approval of the Amended Settlement Agreement.[206] On April 26, 2023, the Court granted preliminary approval of the settlement and appointed Angeion to be the Settlement Administrator.[207]

295.    Pursuant to 28 U.S.C. § 1715, on February 24, 2023, Angeion on behalf of Meta Platforms, served a CAFA notice on federal and state attorneys general. The notice disclosed details about the settlement and included copies of the Settlement Agreement and notices to class members. The Notice also directed the attorneys general to a settlement website maintained by Angeion.[208] The purpose of this disclosure was to enable federal or state attorneys general to review the settlement and related information and intervene if they determined it was not in the public interest.

296.    Beginning in May of 2023, Angeion implemented a massive campaign to provide potential class members with notice of their potential claims. As part of the campaign, Angeion

---

[205] *Id.* at 11-12.
[206] Declaration of Steven Weisbrot at 52-66, *Lundy v. Meta Platforms, Inc.*, N.D. Cal. Case No. 3:18-cv-06793 (N.D. Cal. 2023), ECF No. 188-1.
[207] Order re Preliminary Approval of Class Action Settlement, *Lundy v. Meta Platforms, Inc.*, No. 3:18-cv-06793 (N.D. Cal.), ECF No. 199.
[208] Declaration of Steven Weisbrot, Exhibit B, *Lundy v. Meta Platforms, Inc.*, No. 3:18-cv-06793 (N.D. Cal.), ECF No. 203-2.

used digital banner ad campaigns on desktop and mobile devices and social media ads via Facebook and Instagram, which allowed class members who saw and clicked on the ads to be transferred directly to the settlement website. Angeion also caused listings to be posted on two leading class action settlement websites and caused the notice to be published in People magazine. The settlement website, as well as the listing published in People magazine, informed class members of the lawsuit's details, their eligibility, their legal rights (such as opting out or objecting), settlement terms, and any deadlines they must meet, and directed potential class members to a website maintained by Angeion.[209]

297.    As noted above, Angeion maintained a website to inform class members about the settlement. Participants who clicked on the website link to "Submit a Claim" learned that they could receive payments via digital payment method, including a Virtual Prepaid Card, PayPal, Venmo, and Zelle.[210] The "FAQs" section of the website also provided answers to numerous questions, from the basics of class action settlements through the details of the Settlement Agreement, payments to attorneys, and other expenses that would be paid—including passing references to paying the costs of administering the settlements.[211]

298.    On September 11, 2023, a declaration of Steven Weisbrot was filed with the Court in support of a motion for final approval of the Settlement Agreement. Supplemental declarations followed on November 2, 2023, and January 18, 2024.[212] Each of these declarations purported to disclose Angeion's total compensation for administering the settlement. In the Supplemental

---

[209] *Id.* at 3-6.
[210] Facebook Location Tracking Settlement, Claim Form, https://web.archive.org/web/20230521163652mp_/https://angeion-public.s3.amazonaws.com/www.facebooklocationsettlement.com/docs/FB+Location+Tracking+Claim+Form+Final.pdf (archived May 21, 2023, last visited May 11, 2026).
[211] Facebook Location Tracking Settlement, FAQ, https://web.archive.org/web/20230723011323/https://www.facebooklocationsettlement.com/faqs (archived July 23, 2023, last visited May 11, 2026).
[212] Declarations of Steven Weisbrot, *In re Facebook Internet Tracking Litig.*, No. 5:12-md-02314-EJD (N.D. Cal.), ECF Nos. 203-2, 211-1, 217-1.

Declaration submitted on January 18, 2024, Mr. Weisbrot explained that, after deducting Angeion's notice and administrative costs, attorneys' fees, service awards, and other amounts, $28,827,623.81 would remain in the Net Settlement Fund. He further noted that Angeion had validated over 900,000 claims to date, that each claimant would receive approximately $32, and that over 97% of the claimants had elected to receive a digital payment.[213] The Court granted final approval of the Settlement Agreement on March 11, 2024, ordering that the entire Net Settlement Fund be distributed *pro rata* to class members who filed a valid claim.[214]

299.    Following final approval, Angeion exercised substantial discretion and control in administering the distribution of the QSF. Angeion: calculated the Net Settlement Fund after deducting fees and administrative costs, including its own administrative costs and fees; determined the validity of claims; and directed the timing and method of distributions to class members. Angeion determined that the Net Settlement Fund available for distribution totaled approximately $28.7 million. Angeion then distributed over $28.5 million to class members in an initial distribution. These distributions were made via a combination of digital payments and checks to over 900,000 claimants. In total, Angeion issued 887,864 digital payments totaling $28,076,451.57.

300.    On information and belief, many of these payments were virtual prepaid MasterCards offered by a Fintech Defendant, the identity of which is known to Angeion.[215] Below is an excerpt from the email sent from Angeion to Plaintiff Tyler Baker, reflecting the election of an E-MasterCard issued by the Fintech Defendant:

---

[213] Declaration of Steven Weisbrot at 4–5, *In re Facebook Internet Tracking Litig.*, No. 5:12-md-02314-EJD (N.D. Cal.), ECF No. 217-1.

[214] Order Re Final Approval and Attorney's Fees and Costs at 4, *In re Facebook Internet Tracking Litig.*, No. 5:12-md-02314-EJD (N.D. Cal.), ECF No. 222.

[215] Administrator's Post-Distribution Accounting Form at 2-3, *Lundy v. Meta Platforms, Inc.*, N.D. Cal. Case No. 3:18-cv-06793 (N.D. Cal. 2024), ECF No. 227-1.

ADDITIONAL FIELDS
Did you reside in the United States at any point between January 30, 2015 and April 18, 2018, inclusive?:
**YES**
Were you a Facebook user at any point between January 30, 2015 and April 18, 2018, inclusive, while you were residing in the United States?: **YES**
Did you have Location Services turned off for the Facebook application on your iOS or Android-based device(s) at any point in time between January 30, 2015 and April 18, 2018, inclusive?: **YES**
Did you access Facebook while Location Services was disabled for the Facebook application on your iOS or Android-based device(s) between January 30, 2015 and April 18, 2018, inclusive?: **YES**
Payment Method: **E-MasterCard**
Username 1: ▮▮▮▮▮▮▮
Email Address 1: ▮▮▮▮▮▮▮▮▮▮

Signature: ▮▮▮▮
Date: **5/25/2023 9:43:37**

If you would like to update any fields of your claim you can do so by clicking the edit claim link on top of the Submit Claim page on the Settlement Website. You can then log in to edit your claim using your Submitted Claim ID and Confirmation Code listed above.

If you have any questions regarding your Claim, please provide the Submitted Claim ID listed above and email us at: info@FacebookLocationSettlement.com.

Thank You,
Settlement Administrator
Facebook Location Settlement
www.FacebookLocationSettlement.com

301.    On September 5, 2024, Angeion's post distribution accounting report was filed with the Court in support of a Motion for *Cy Pres* Distribution. The declaration provided the Court with a detailed account of where much of the $37.5 million in the QSF had gone after payment of fees and the first distribution to class members, and informed the Court that there remained $277,035.99 in the Net Settlement Fund.[216]

302.    Although not disclosed to the Court, Angeion had chosen a Fintech Defendant, the identity of which is known to Angeion but not known to Plaintiffs, to assist in issuing digital payments, and many of the payments were distributed by that Fintech Defendant through a digital prepaid card option. As discussed above, in total class members received over 880,000 digital payments across two rounds of distribution, totaling more than $28 million.[217] On information and

---

[216] *Id*. at 4.
[217] *Id*. at 2-3.

belief, instead of treating digital payments like uncashed checks—by preserving the funds in the QSF until redemption or returning unused amounts to the QSF after a reasonable period—the Fintech Defendant was permitted to retain a substantial portion of settlement funds intended for class members as breakage. Unbeknownst to the Court or class members, Angeion received undisclosed compensation from the Fintech Defendant for choosing it to issue digital payments to class members. In exchange for this undisclosed compensation, the Fintech Defendant was able to profit at the class members' expense.

303.    Throughout the administration of the *Lundy v. Meta Platforms* settlement, Angeion did not disclose that it would receive any compensation, kickbacks, or other financial compensation from third parties involved in holding or distributing settlement funds, including the Fintech Defendant, or that such payments and resulting arrangements would effectively reduce compensation to class members. Nor did the Fintech Defendant disclose that it was paying such compensation to Angeion. As detailed above, the conspirators had numerous opportunities to make this disclosure. Yet they did not. The failure to disclose these furtive arrangements rendered those communications materially false and misleading, and constituted material omissions.

iii.    *Fusion Elite All Stars v. Varsity Brands, LLC: Defendants Angeion and Huntington*

304.    *Fusion Elite All Stars v. Varsity Brands, LLC* Case No. 2:20-cv-02600-SHL-tmp ("*Varsity Brands*"), was a class action lawsuit alleging Varsity Brands had unlawfully monopolized the all-star cheerleading events market. Chief U.S. District Judge Sheryl H. Lipman in the Western District of Tennessee presided over the case. Angeion was the court-appointed Settlement Administrator, and Huntington served as the bank holding the QSF. This settlement demonstrates the conspirators' execution of the Bank Interest Track.

305.    The Settlement Agreement, executed on March 15, 2023, did not name a Settlement Administrator, but stated that Huntington would be the trustee bank.[218] The Agreement established a $43.5 million non-reversionary common fund to compensate class members.[219] Pursuant to the Settlement Agreement, the fund was required to be deposited into an interest bearing account at Huntington National Bank and treated as a Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1.[220]

306.    Under the terms of the Settlement Agreement, all administrative costs, attorneys' fees, service awards, and other expenses were payable from the settlement fund, with the remainder to be distributed to class members.[221] Because administrative costs were deducted before distribution, every dollar paid to Angeion or its conspirators reduced class members' recovery dollar-for-dollar.

307.    Distribution of the net Settlement Fund to class members would be governed by a plan to be submitted by counsel and approved by the Court. No funds could revert to Varsity Brands under any circumstances.[222]

308.    On March 24, 2023, a declaration of Steven Weisbrot, President and Chief Executive Officer of Angeion, was filed in support of a motion for preliminary approval of the Settlement Agreement.[223] The Court granted preliminary approval of the Settlement Agreement on April 25, 2023, appointing Angeion as the Settlement Administrator.[224]

---

[218] Settlement Agreement at 15, *In re Inclusive Cheer Competition Antitrust Litig.*, No. 2:20-cv-02285 (W.D. Tenn.), ECF No. 329-2.
[219] *Id.* at 12, 17
[220] *Id.* at 15.
[221] *Id.* at 17-18.
[222] *Id.*
[223] Declaration of Steven Weisbrot, *In re Inclusive Cheer Competition Antitrust Litig.*, No. 2:20-cv-02285 (W.D. Tenn.), ECF No. 329-4.
[224] Order Granting Direct Purchaser Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement, *In re Inclusive Cheer Competition Antitrust Litig.*, No. 2:20-cv-02285 (W.D. Tenn.), ECF No. 336.

309.    Pursuant to 28 U.S.C. § 1715, on April 3, 2023, Varsity Brands served a CAFA notice on federal and state attorneys general. The notice disclosed details about the settlement, including copies of the Settlement Agreement, and Angeion's notices to class members.[225] The purpose of this disclosure was to enable federal or state attorneys general to review the settlement and related information and intervene if they determined it was not in the public interest.

310.    On May 25, 2023, Angeion sent notices and claim forms by mail to 7,749 pre-identified Gym Class members. Angeion also published notices in industry magazines; conducted digital media campaigns with over 42 million impressions; set up a toll-free hotline; and established a website devoted to the settlement, www.AllStarCheerAntitrustSettlement.com, that also allowed for electronic submission of claim forms.[226] These notices informed class members of the lawsuit's details, their eligibility, their legal rights (such as opting out or objecting), settlement terms, and any deadlines they must meet, and directed potential class members to a settlement website maintained by Angeion.

311.    As noted above, Angeion directed potential class members to its website so that they could learn more about the settlement and file claims. The website's "FAQs" page provided answers to 24 questions, from the basics of class action settlements through the details of the Settlement Agreement, filing a claim, payments to attorneys, and other expenses that would be paid from the QSF.[227]

---

[225] Direct Purchaser Plaintiffs' Memorandum of Law in Support of Unopposed Motion for Final Approval at 26, *In re Inclusive Cheer Competition Antitrust Litig.*, No. 2:20-cv-02285 (W.D. Tenn.), ECF No. 345-1.

[226] Declaration of Steven Weisbrot at 3–5, *In re Inclusive Cheer Competition Antitrust Litig.*, No. 2:20-cv-02285 (W.D. Tenn.), ECF No. 345-3.

[227] Allstar Cheer Antitrust Settlement Website, "FAQs", *available at:* https://web.archive.org/web/20260211211250/https://allstarcheerantitrustsettlement.com/faqs (last visited May 14, 2026).

312. On August 24, 2023, a declaration of Angeion's Steven Weisbrot was filed with the Court in support of a motion for final approval of the Settlement Agreement.[228] The motion for final approval and accompanying Plan of Allocation explained that the net Settlement Fund would be distributed to class members, and that any remaining amount due to uncashed initial payments would be redistributed *pro rata* to class members or, if economically infeasible, would be used to make a *cy pres* distribution.[229] On October 4, 2023, the court granted final approval of the Settlement Agreement and Plan of Allocation.[230]

313. Following final approval, Angeion exercised substantial discretion and control in administering the distribution of the QSF. Angeion: calculated the net Settlement Fund after deducting fees and administrative costs, including its own administrative costs; determined the validity of claims; and directed the timing and method of distributions to class members. Angeion determined that the net Settlement Fund available for distribution to totaled approximately $26.7 million.

314. On March 27, 2025, a Declaration of Angeion's Bach-Viet Nguyen was filed with the court in support of a Motion for Disbursement of Funds.[231] On April 11, 2025, the Court approved distribution of the Settlement Fund to class members.[232] On May 2, 2025, Angeion began to distribute settlement funds to class members.

315. On information and belief, the interest rate that Huntington paid to the *Fusion Elite All Stars v. Varsity Brands* QSF was less than 2.5%, which was significantly less than the market

[228] Declaration of Steven Weisbrot, *In re Inclusive Cheer Competition Antitrust Litig.*, No. 2:20-cv-02285 (W.D. Tenn.), ECF No. 345-3.

[229] Direct Purchaser Plaintiffs' Proposed Plan of Allocation at 12, *In re Inclusive Cheer Competition Antitrust Litig.,* No. 2:20-cv-02285 (W.D. Tenn.), ECF No. 345-2.

[230] Order, *In re Inclusive Cheer Competition Antitrust Litig.*, No. 2:20-cv-02285 (W.D. Tenn. Oct. 4, 2023), ECF No. 350.

[231] Declaration of Bach-Viet Nguyen, *In re Inclusive Cheer Competition Antitrust Litig.*, No. 2:20-cv-02285 (W.D. Tenn.), ECF No. 355-2.

[232] Order, *In re Inclusive Cheer Competition Antitrust Litig.*, No. 2:20-cv-02285 (W.D. Tenn. Apr. 11, 2025), ECF No. 356.

rate. Indeed, as of December 2023, when the Settlement Fund received its largest deposit, the interest rate was approximately 5.5%, and as of May 2, 2025, which is when Angeion began distributing funds from the QSF account, the federal funds rate was over 4.5%. Throughout that timeframe, many banks offered interest rates near those amounts. The Settlement Agreement required that Varsity deposit an initial $2 million into the QSF within 30 days of preliminary approval of the settlement (May 25, 2023), an additional $28 million deposit on December 1, 2023, and the remaining $13.5 million on December 1, 2024. This means that a substantial portion of the funds should have been earning interest for approximately 18 months—from December 2023 until May 2025—when distributions began, and at least some of the funds should have been accruing interest for nearly two years—the initial deposit in May 2023 through distribution in May 2025. By not paying a market interest rate to the QSF, on information and belief, Huntington saved hundreds of thousands of dollars during the course of the administration of the *Varsity Brands* settlement. Instead of paying interest payments to the QSF, Huntington paid a portion of that money to Angeion. Neither Huntington nor Angeion disclosed those payments, or the amount of the interest payments that should have gone to the QSF, to the Court or class members.

316.    Throughout the administration of the *Varsity Brands* settlement, Angeion did not disclose that it would receive any compensation, kickbacks, or other financial compensation from third parties involved in holding or distributing settlement funds, including Huntington, or that such payments and resulting arrangements would effectively reduce compensation to class members. Nor did Huntington disclose that it was paying such compensation to Angeion. As detailed above, the conspirators had numerous opportunities to make this disclosure. Yet they did not. The failure to disclose these furtive arrangements rendered those communications materially false and misleading, and constituted material omissions.

### d.  Exemplar Settlements Administered by JND

118

i. *In re Equifax Data Breach: Defendants JND and Blackhawk*

317.    *In re Equifax Data Breach Settlement*, N.D. Ga. Case No. 1:17-md-2800 ("*In re Equifax*"), was an MDL consolidating more than 200 class actions arising from a data breach affecting approximately 147 million Americans. U.S. District Judge Thomas W. Thrash, Jr., in the Northern District of Georgia presided over the MDL. JND was the court-appointed Settlement Administrator, and third-party fintech vendor Blackhawk was used to facilitate distribution of settlement funds to class members.

318.    The Settlement Agreement, executed on July 19, 2019, stated that JND would be the Settlement Administrator.[233] The Agreement established a $380,500,000 non-reversionary common fund to compensate class members (the "Consumer Restitution Fund Account"). Equifax further agreed to pay up to additional monthly installments up to a maximum of $125,000,000 to compensate for class members' out-of-pocket losses, to the extent that the Consumer Restitution Fund was exhausted. The funds were required to be deposited into a Qualified Settlement Fund, and JND was named the "administrator" of the QSF within the meaning of Treasury Regulation § 1.468B-2(k)(3).[234]

319.    Under the terms of the Settlement Agreement, JND was to use the Consumer Restitution Fund to pay administrative costs, attorneys' fees, service awards, and other expenses, with the remainder to be distributed to class members. If JND's administrative costs exceeded the amount disclosed to the Court *in camera*, either party could terminate the Settlement Agreement.[235] Because administrative costs were deducted before distribution, every dollar paid to JND or its conspirators reduced class members' recovery dollar-for-dollar.

---

[233] Settlement Agreement and Release at 7, *In re Equifax, Inc. Customer Data Security Breach Litig.,* No. 1:17-md-02800 (N.D. Ga.), ECF No. 739-2.
[234] *Id.* at 9-11.
[235] *Id.* at 24-26.

320. Class members were entitled to reimbursements of up to $20,000 for out-of-pocket losses, compensation for lost time, credit monitoring services, and identity restoration services. To the extent the QSF was not exhausted, any remaining funds were to used first to increase payments to class members on a pro-rated basis, second to purchase additional identity restoration services for class members, and third to purchase additional credit monitoring services. Any remaining funds resulting from the failure of class members to timely negotiate a settlement check or to timely provide required tax information such that a settlement check could issue was to be distributed to class members who had received initial distributions, or as otherwise ordered by the Court. No funds could revert to Equifax under any circumstances.[236]

321. On July 22, 2019, a declaration of Jennifer Keough, CEO and Founder of JND Legal Administration, was filed with the Court in support of a motion for preliminary approval of the Settlement Agreement.[237] The Court granted preliminary approval of the Settlement Agreement that same day, and appointed JND to serve as the Settlement Administrator.[238]

322. Pursuant to 28 U.S.C. § 1715, on August 1, 2019, counsel for Equifax served a CAFA notice on federal and state attorneys general. The notice disclosed details about the settlement, including copies of the Settlement Agreement, JND's notice plan, notices sent to class members.[239] The purpose of this disclosure was to enable federal or state attorneys general to review the settlement and related information and intervene if they determined it was not in the public interest.

---

[236] *Id.* at 14-16.
[237] Declaration of Jennifer M. Keough, *In re Equifax, Inc. Customer Data Security Breach Litig.*, No. 1:17-md-02800 (N.D. Ga.), ECF No. 739-6.
[238] Order Directing Notice at 5, *In re Equifax, Inc. Customer Data Security Breach Litig.*, No. 1:17-md-02800 (N.D. Ga.), ECF No. 742.
[239] Declaration of David L. Baser, Exhibit A, *In re Equifax, Inc. Customer Data Security Breach Litig.,* No. 1:17-md-02800 (N.D. Ga.), ECF No. 786-1.

323.    Between April 25, 2022, and August 24, 2022, JND implemented a massive campaign to provide potential class members with notice of their potential claims, using email, and digital and print ads to create over 1 billion impressions.[240] These notices informed class members of the lawsuit's details, their eligibility, their legal rights (such as opting out or objecting), settlement terms, and any deadlines they must meet, and directed potential class members to a website maintained by JND.

324.    As noted above, JND directed potential class members to a website that it maintained so that they could learn more about the settlement and file claims. The "FAQs" section of the website also touted the availability of "various digital payment options" and provided answers to 37 questions, from the basics of class action settlements through the details of the Settlement Agreement, payments to attorneys, and other expenses that would be paid from the QSF—including passing references to paying the costs of administering the settlement.[241]

325.    On December 5, 2019, a declaration of Jennifer Keough, CEO and Founder of JND Legal Administration, was filed with the Court in support of a motion for final approval of the Settlement Agreement,[242] and was posted by JND on the settlement website. The Court granted final approval of the Settlement Agreement on January 13, 2020, and amended that approval on March 17, 2020.[243]

326.    Following final approval, JND exercised substantial discretion and control in administering the distribution of the QSF. JND: calculated and deducted fees and administrative

---

[240] Declaration of Jennifer M. Keough at 11–25, *In re Equifax, Inc. Customer Data Security Breach Litig.,* No. 1:17-md-02800 (N.D. Ga.), ECF No. 900-4.
[241] Equifax Data Breach Settlement, FAQ, https://www.equifaxbreachsettlement.com/faq (last visited May 16, 2026).
[242] Declaration of Jennifer Keough, *In re Equifax Data Breach Settlement*, No. 1:19-md-02915-AJT (N.D. Ga.), ECF No. 900-4.
[243] Amended Order Granting Final Approval of Class Action Settlement, *In re Equifax Data Breach Settlement*, No. 1:19-md-02915-AJT (N.D. Ga.), ECF No. 1029.

costs, including its own administrative costs and fees; determined the validity of claims; and directed the timing and method of distributions to class members.

327.    Although not disclosed to the Court, JND had chosen Blackhawk to assist in issuing digital payments, and many of the payments were distributed by Defendant Blackhawk through a virtual prepaid card option. The settlement website revealed that JND had sent emails seeking to steer consumers to change their payment selection from check to PayPal or pre-paid card, and confirmed that pre-paid cards were issued to class members by BlackHawk Network's "HawkMarketplace." An excerpt of these "FAQs" is below:

---

**35. I received an email providing me the option of switching my claim payment selection from check to either PayPal or Pre-Paid card. Is this legitimate?**

If you received an email from info@equifaxbreachsettlement.com with an indication at the bottom of the email that the communication was from the Court-appointed Settlement Administrator (JND Legal Administration), the email is legitimate. If you did not want to change your payment selection, you did not need to do anything.  The time to switch your claim payment selection has now passed.

**36. I received an email that my Settlement payment was issued by pre-paid card. Is this legitimate?**

Settlement payments issued by pre-paid card were sent by email either from Distribution@EquifaxBreachSettlement.com or EquifaxDataBreachSettlement@hawkmarketplace.com. If you received a pre-paid card email and would like to verify that your Settlement payment was issued by pre-paid card, please call the Settlement Administrator at 1-833-759-2982. You may also contact the pre-paid card servicer at www.myprepaidcenter.com.

---

328.    Additionally, after the first rounds of distribution, JND issued a second *pro rata* distribution of remaining funds. According to the settlement website, JND did not offer class members any choice and issued all payments via pre-paid card through Blackhawk.

---

### Redistribution of Remaining Funds to Eligible Claimants:

Per Sections 5.4 and 5.5 of the Settlement Agreement, any remaining and/or unclaimed funds in the Consumer Restitution Fund are to be distributed *pro rata* to Settlement Class Members with valid claims for Time Spent and Alternative Compensation. Class Members with valid claims now eligible for an additional *pro rata* payment will receive their *pro rata* payment via electronic pre-paid card. Click here for information on how to activate your pre-paid card.

---

Clicking the link to activate the prepaid card took a class member took the class member to a website operated by Blackhawk, www.myprepaidcenter.com/redeem.

329.    On information and belief, a substantial portion of the $380.5 million *In re Equifax* settlement was distributed to class members via Blackhawk's digital prepaid cards. On information

122

and belief, instead of treating digital payments like uncashed checks—by preserving the funds in the QSF until redemption or returning unused amounts to the QSF after a reasonable period—Blackhawk was permitted to retain a substantial portion of settlement funds intended for class members as breakage. Unbeknownst to the Court or class members, JND received undisclosed compensation from Blackhawk for choosing Blackhawk to issue digital payments to class members. In exchange for this undisclosed compensation, Blackhawk was able to profit at the class members' expense.

330.    Throughout the administration of the *In re Equifax* settlement, JND did not disclose that it would receive any compensation, kickbacks, or other financial compensation from third parties involved in holding or distributing settlement funds, including Blackhawk, or that such payments would effectively reduce compensation to class members. Nor did Blackhawk disclose that it was paying such compensation to JND. As detailed above, the conspirators had numerous opportunities to make this disclosure. Yet they did not. The failure to disclose these furtive arrangements rendered those communications materially false and misleading, and constituted material omissions.

ii.    *Lerman v. Apple: Defendants JND and Huntington*

331.    *Lerman v. Apple, Inc.*, E.D.N.Y. Case No. 1:15-cv-07381-LB, was a class action lawsuit alleging that Apple fraudulently induced Americans to update their older iPhones, rendering the phones slow and inoperable. U.S. District Judge Sterling Johnson, Jr., in the Eastern District of New York presided over the case. JND was the court-appointed Settlement Administrator, and Huntington served as the bank holding the QSF.

332.    The Settlement Agreement, executed on May 3, 2022, stated that JND would be the Settlement Administrator and Huntington would be the trustee bank.[244] The Agreement

---

[244] Settlement Agreement and Release at 4–5, *Lerman v. Apple, Inc.*, No. 1:15-cv-07381-LB (E.D.N.Y.), ECF No. 155-3.

established a $20 million non-reversionary common fund to compensate class members.[245] The fund was required to be deposited into an interest bearing account, to be treated as a Qualified Settlement Fund, at Huntington, and JND was named the "administrator" of the QSF within the meaning of Treasury Regulation § 1.468B-2(k)(3).[246]

333.    Under the terms of the Settlement Agreement, the "Net Settlement Amount" was defined as the $20 million Gross Settlement Fund minus administrative costs, attorneys' fees, service awards, and other expenses, with the remainder to be distributed to class members.[247] Because administrative costs were deducted before distribution, every dollar paid to JND or its conspirators reduced class members' recovery dollar-for-dollar.

334.    Class members were entitled to cash payments of $15.00 per Apple device impacted, to be reduced *pro rata* if the value of claims submitted exceeded the Net Settlement Fund. If the total value of claims was less than the Net Settlement Amount, payments to class members would be increased *pro rata* until the fund was exhausted. Any residual would be distributed via *Cy Pres* distribution. Under no circumstances would any money return to Apple.[248]

335.    On May 3, 2022, a Settlement Administrator Protocol was filed with the Court in support of a motion for preliminary approval of the Settlement Agreement. The protocol stated that JND warranted that it knew of no reason why it cannot fairly and impartially administer the claim process, and that compensation to JND would not exceed $400,000.[249] The Court granted

---

[245] *Id.* at 3.
[246] *Id.* at 21.
[247] *Id.* at 10-12.
[248] *Id.*
[249] Settlement Administration Protocol at 1, *Lerman v. Apple, Inc.*, No. 1:15-cv-07381-LB (E.D.N.Y.), ECF No. 155-9.

preliminary approval of the Settlement Agreement on May 19, 2022 and appointed JND the Settlement Administrator.[250]

336.    Pursuant to 28 U.S.C. § 1715, on February 10, 2022, JND, on behalf of Apple, served a CAFA notice on federal and state attorneys general. The notice disclosed details about the settlement, including copies of the Settlement, JND's notice plan, and notices sent to class members.[251] The purpose of this disclosure was to enable federal or state attorneys general to review the settlement and related information and intervene if they determined it was not in the public interest.

337.    After preliminary approval, JND began the process of notifying class members. By no later than July 18, 2022, JND had sent over 1.35 million email notices and over 380,000 postcard notices to potential class members.[252] These notices informed class members of the lawsuit's details, their eligibility, their legal rights (such as opting out or objecting), settlement terms, and any deadlines they must meet, and directed potential class members to a website maintained by JND.

338.    As noted above, JND directed potential class members to a website that it maintained so that they could learn more about the settlement and file claims. The "FAQs" provided answers to 25 questions, from the basics of class action settlements through the details of the Settlement Agreement, payments to attorneys, and other expenses that would be paid from the QSF.[253]

---

[250] Order Certifying Settlement Class, Granting Preliminary Approval of Class Action Settlement, and Approving Form and Content of Class Notice, *Lerman v. Apple, Inc.*, No. 1:15-cv-07381-LB (E.D.N.Y. 2022) ECF No. 157.

[251] Declaration of Luiggy Segura, Exhibit 1, *Lerman v. Apple, Inc.*, No. 1:15-cv-07381-LB (E.D.N.Y.), ECF No. 158-1.

[252] Declaration of Luiggy Segura at 3–4, *Lerman v. Apple, Inc.*, No. 1:15-cv-07381-LB (E.D.N.Y.), ECF No. 160-3.

[253] Operating System Update Settlement, FAQ, https://web.archive.org/web/20221002200310/https://www.operatingsystemupdatesettlement.com/faq (archived Oct. 2, 2022, last visited May 11, 2026).

339.    On August 11, 2022, a declaration of Luiggy Segura, Vice President of JND, was filed with the Court in support of a motion for final approval of the Settlement Agreement.[254] The Court granted final approval of the Settlement Agreement on October 4, 2022.

340.    Following final approval, JND exercised substantial discretion and control in administering the distribution of the QSF. JND: calculated the Net Settlement Fund after deducting fees and administrative costs, including its own administrative costs and fees; determined the validity of claims; and directed the timing and method of distributions to class members. JND determined that, after deducting attorneys fees, and directed Huntington to deposit the remaining $10,617,758.60 in a distribution account set up by JND.[255] JND then deducted service awards, its own fees and costs, and estimated taxes, leaving $9,781,795.25 for distribution to class members, and distributed that amount via checks to class members on February 1, 2023.[256]

341.    On November 15, 2023, a Declaration of JND's Luiggy Segura was filed with the Court, in support of a Motion for Disbursement of Funds. The declaration provided the Court with a detailed account of the first round of distribution for class members, and informed the Court that due to uncashed checks, $119,923.47 remained in the QSF.[257] The Court approved distribution of the remaining funds via re-issued checks, payment of administrative costs to JND, and *Cy Pres* distribution.[258] On February 20, 2024, class counsel reported that JND would distribute $50,259.42 the *Cy Pres* recipient.[259]

---

[254] Declaration of Luiggy Segura, *Lerman v. Apple, Inc.*, No. 1:15-cv-07381-LB (E.D.N.Y.), ECF No. 160-3.

[255] Declaration of Luiggy Segura at 1, *Lerman v. Apple, Inc.*, No. 1:15-cv-07381-LB (E.D.N.Y.), ECF No. 174-2.

[256] *Id.* at 1-2.

[257] *Id.*

[258] Order Granting Motion for Disbursement of Funds, *Lerman v. Apple, Inc.*, No. 1:15-cv-07381-LB (E.D.N.Y. 2023), ECF No. 175.

[259] Letter Regarding Order Granting Motion for Disbursement of Funds, *Lerman v. Apple, Inc.*, No. 1:15-cv-07381-LB (E.D.N.Y.), ECF No. 176.

342.    On information and belief, the interest rate that Huntington paid to the *Lerman v. Apple* QSF was less than 0.5%, which was far less than the market rate. Indeed, as of February 1, 2023, which is the approximate timeframe when JND began issuing payments to the class, the federal funds rate was over 4.5%, and many banks offered interest rates near that amount. The Settlement Agreement required that Apple deposit the full $20 million settlement amount into the QSF within 30 days of preliminary approval of the settlement (June 18, 2022). This means that all of the $20 million in funds should have accrued interest for at least 8 months—from June 2022 to February 2023—when distributions began, and at least some portion of the funds should have been accruing interest for over 18 months—from June 2022 to February 2024—when the final *Cy Pres* distribution was issued. By not paying a market interest rate to the QSF, on information and belief, Huntington saved hundreds of thousands of dollars during the course of the administration of the *Lerman v. Apple* settlement. Instead of paying interest payments to the QSF, Huntington paid a portion of that money to JND. Neither Huntington nor JND disclosed those payments or the amount of interest payments that should have gone to the QSF, to the Court or class members.

343.    Throughout the administration of the *Lerman v. Apple* settlement, JND did not disclose that it would receive any compensation, kickbacks, or other financial compensation from third parties involved in holding or distributing settlement funds, including Huntington, or that such payments would effectively reduce compensation to class members. Nor did Huntington disclose that it was paying such compensation to JND. As detailed above, the conspirators had numerous opportunities to make this disclosure. Yet they did not. The failure to disclose these furtive arrangements rendered those communications materially false and misleading, and constituted material omissions.

                      *iii.    In re Yahoo! Inc. Securities Litigation Settlement:*
                              *Defendants JND and Huntington*

344.    *In re Yahoo! Inc. Securities Litigation*, No. 5:17-cv-00373 (N.D. Cal.) ("*In re Yahoo! Securities Litigation*"), was a securities class action arising from a decline in Yahoo!'s stock price following a consumer data breach. U.S. District Judge Lucy H. Koh in the Northern District of California presided over the case. JND was the court-appointed Settlement Administrator, and Huntington served as the bank holding the QSF. This settlement illustrates the conspirators' execution of the Bank Interest Track.

345.    The Settlement Agreement, executed on March 2, 2018, stated that JND would be the Settlement Administrator.[260] The Agreement established an $80 million non-reversionary common fund to compensate class members.[261] JND was named the "administrator" of the QSF within the meaning of Treasury Regulation § 1.468B-2(k)(3) and the fund was required to be deposited into a Qualified Settlement Fund at Huntington National Bank.[262]

346.    Under the terms of the Settlement Agreement, the "Net Settlement Fund" was defined as the Settlement Fund minus notice and administrative costs, attorneys' fees, service awards, taxes, and other expenses, with the remainder to be distributed to class members.[263] Because administrative costs were deducted before distribution, every dollar paid to JND or its conspirators reduced class members' recovery dollar-for-dollar.

347.    Class members were entitled to a *pro rata* share of the Settlement Fund corresponding to their respective economic losses as a result of the stock drop stemming from the fraud.[264] Any remaining funds to the failure of settlement members to timely cash their checks

---

[260] Stipulation and Agreement of Settlement at 9, *In re Yahoo! Inc. Securities Litig.*, Nos. 17-cv-00373-LHK, 17-cv-01525-LHK (N.D. Cal.), ECF No. 74.

[261] *Id.* at 9, 19.

[262] *Id.* at 5, 17–18.

[263] *Id.* at 6.

[264] Long Form Notice at 13–16, *In re Yahoo! Inc. Securities Litig.*, Nos. 17-cv-00373-LHK, 17-cv-01525-LHK (N.D. Cal.), ECF No. 74-2.

would be redistributed to class members, or distributed per *cy pres* if redistribution to class members would not be cost effective.[265] No funds could revert to Yahoo under any circumstances.[266]

348.    On March 2, 2018, the plaintiffs filed a motion for preliminary approval of the settlement.[267] The Court granted preliminary approval of the Settlement Agreement on May 9, 2018, appointing JND as the Settlement Administrator.[268]

349.    Pursuant to 28 U.S.C. § 1715, on March 9, 2018, Class Counsel served a CAFA notice on federal and state attorneys general.[269] The notice disclosed details about the settlement, and contained copies of relevant documents, including the Settlement, including JND's notice plan, and JND's notices to class members.[270] The purpose of this disclosure was to enable federal or state attorneys general to review the settlement and related information and intervene if they determined it was not in the public interest.

350.    Between May 29, 2018, and July 31, 2018, JND mailed over 773,000 notice packets to potential class members.[271] These notices informed class members of the lawsuit's details, their eligibility, their legal rights (such as opting out or objecting), settlement terms, and any deadlines they must meet, and directed potential class members to a website maintained by JND.

---

[265] *Id.*

[266] Stipulation and Agreement of Settlement at 22, 29, In re Yahoo! Inc. Securities Litig., Nos. 17-cv-00373-LHK, 17-cv-01525-LHK (N.D. Cal.), ECF No. 74.

[267] Plaintiffs' Motion for Preliminary Approval, *In re Yahoo! Inc. Securities Litig.*, Nos. 17-cv-00373-LHK, 17-cv-01525-LHK (N.D. Cal.), ECF No. 157; Declaration of Jeanne C. Finegan, *In re Yahoo! Inc. Securities Litig.*, Nos. 17-cv-00373-LHK, 17-cv-01525-LHK (N.D. Cal.), ECF No. 158-4.

[268] Preliminary Approval Order at 4–5, *In re Yahoo! Inc. Securities Litig.*, Nos. 17-cv-00373-LHK, 17-cv-01525-LHK (N.D. Cal.), ECF No. 105.

[269] Declaration of Judson E. Lobdell ¶ 1, Exhibit A, *In re Yahoo! Inc. Securities Litig.*, Nos. 17-cv-00373-LHK, 17-cv-01525-LHK (N.D. Cal.), ECF No. 117.

[270] *Id.*

[271] Declaration of Robert Cormio ¶¶ 3, 10, Exhibit A, *In re Yahoo! Inc. Securities Litig.*, Nos. 17-cv-00373-LHK, 17-cv-01525-LHK (N.D. Cal.), ECF No. 108-1.

351.    As noted above, JND directed potential class members to a website that it maintained so that they could learn more about the settlement and file claims. The "FAQs" section of the website provided answers to 25 questions, from the basics of class action settlements through the details of the Settlement Agreement, payments to attorneys, and other expenses that would be paid from the QSF—including passing references to paying the costs of administering the settlement.[272] Class members were directed to email or mail JND with questions about the settlement:



352.    On August 2, 2018, a declaration of Robert Cormio, a Director of Securities Class Actions JND Legal Administration, was filed in support of a motion for final approval of the Settlement Agreement.[273] The Court granted final approval of the Settlement Agreement on September 7, 2018.[274]

---

[272]Yahoo!    Securities    Litigation    Settlement    Website,    *FAQs*, https://web.archive.org/web/20220705153627/https://www.yahoosecuritieslitigation.com/faq (last visited May 15, 2026).
[273] Declaration of Robert Cormio, *In re Yahoo! Inc. Securities Litig.*, Nos. 17-cv-00373-LHK, 17-cv-01525-LHK (N.D. Cal.), ECF No. 108-1.
[274] Order Granting Motion for Final Approval of Settlement, *In re Yahoo! Inc. Securities Litig.*, Nos. 17-cv-00373-LHK, 17-cv-01525-LHK (N.D. Cal.), ECF No. 118.

353.    Following final approval, JND exercised substantial discretion and control in administering the distribution of the QSF. JND: calculated the Net Settlement Fund after deducting fees and administrative costs, including its own administrative costs and fees; determined the validity of claims; and directed the timing and method of distributions to class members.

354.    On April 17, 2020, a declaration of Luiggy Segura, Director of JND, was filed in support of a post-distribution accounting. Segura reported to the Court that JND had determined that $63.3 million remained for distribution to class members. On March 27, 2020, JND had distributed the funds to class members, sending 19,839 checks and 51 wire transfers from the Huntington National Bank QSF. JND reported that it anticipated distributing residual funds, if any, in June 2020.[275]

355.    On information and belief, the interest rate that Huntington paid to the *In re Yahoo Securities Litigation* QSF was less than 1%, which was far less than the market rate. Indeed, between March 2018 and at least March 2020, which is the approximate timeframe when Huntington held the fund and then began issuing payments to the class, the federal funds rate averaged 1.76% and ranged between approximately 1.5% and 2.5%,[276] and many banks offered interest rates near that amount throughout the same time period.[277] The Settlement Agreement required an initial deposit of $500,000 within 5 days of its execution (March 2, 2018), and the remaining $79.5 million within thirty days of preliminary approval (May 9, 2018).[278] This means that much of the $80 million in funds should have accrued interest for almost 2 years—from approximately June 2018 to March 2020, when distributions began—and at least some portion of

---

[275] Declaration of Luiggy Segura at 1–3, *In re Yahoo! Inc. Securities Litig.,* Nos. 17-cv-00373-LHK, 17-cv-01525-LHK (N.D. Cal.), ECF No. 131-1.
[276] Federal Reserve Bank of St. Louis, Federal Funds Effective Rates, https://fred.stlouisfed.org/series/FEDFUNDS (last visited May 16, 2026).
[277] SoFi Money Rates, Rates Effective as of: February 12, 2019, *available at:* https://d32ijn7u0aqfv4.cloudfront.net/wp/wp-content/uploads/raw/SoFi-Money-Rate-Sheet-2019-2-12.pdf (SoFi bank offering 2.25% APY in February 2019) (last visited May 16, 2026).
[278] Stipulation and Agreement of Settlement (ECF No. 74) at ¶ 13.

the funds should have accrued interest for more than 2 years—from March 2018 until June 2020, when the final residual distribution occurred. By not paying a market interest rate to the QSF, on information and belief, Huntington saved millions of dollars during the course of the administration of the *In re Yahoo Securities Litigation* settlement. Instead of paying those millions of dollars in interest to the QSF, Huntington paid a portion of that money to JND. Neither Huntington nor JND disclosed those payments, nor the amount of the interest payments that should have gone to the QSF, to the Court or class members.

356.    Throughout the administration of the *In re Yahoo! Securities Litigation* settlement, JND did not disclose that it would receive any compensation, kickbacks, or other financial compensation from third parties involved in holding or distributing settlement funds, including Huntington, or that such payments and resulting arrangements would effectively reduce compensation to class members. Nor did Huntington disclose that they were paying such compensation to JND. As detailed above, the conspirators had numerous opportunities to make this disclosure. Yet they did not. The failure to disclose these furtive arrangements rendered those communications materially false and misleading, and constituted material omissions.

357.    The above examples are a non-exhaustive list of settlements in which the conspirators' executed these schemes. On information and belief, other examples of cases in which final interest rates reported by a Defendant settlement administrator and Bank Defendant was less than .5% include: *Jowharah Hameed-Bolden et al v. Forever 21 Retail, Inc. et al*, No. 2:18-cv-03019-GW-JPR (C.D. Cal.), in which Epiq served as the settlement administrator and Western Alliance held the QSF; *Smith, et al. v. BHG XXXIV, LLC* and *BHG Holdings, LLC d/b/a Behavioral Health Group*, No. 24-CI-002796 (Ky. Cir. Ct., Jefferson Cnty.), in which Kroll was appointed as the settlement administrator and Western Alliance held the QSF; and *Culbertson et al v. Deloitte Consulting LLP*, No. 1:2020-cv-03962 (S.D.N.Y.), *Stoffers v. Daves, Inc.*, No. 20STCV35381 (Cal. Sup. Ct.), and *Guarnaschelli et al. v. East River*, No. 656099/2023 (Sup. Ct. N.Y.), in which

Angeion was appointed as the settlement administrator. On information and belief, in each of these cases, Bank Defendants in fact paid a sum certain between the market rate and the reported rate to the identified settlement administrator, and this additional renumeration, consideration, and/or compensation was not disclosed.

## F.  Breaches of Fiduciary Duties

358.    The fiduciary duties established in the preceding sections were not violated in isolation. Each act of self-dealing, each selection of a bank or fintech platform on the basis of a secret kickback arrangement, each fee application that disclosed partial compensation while concealing the rest, each distribution plan that recommended a payment method and bank selected for the administrator's benefit rather than the class's, was simultaneously a breach of multiple non-delegable fiduciary duties owed to the class and a predicate act of fraud committed through the courts and communication channels that the fiduciary relationship itself required. The specific duties breached, and the way each was breached, are set forth in Count I below. This section identifies the conduct that constitutes those breaches and its character as a common, cross-litigation scheme.

### a.  Administrator Defendants Breached Their Fiduciary Duties.

359.    Every selection of a Bank Defendant or FinTech Defendant by an Administrator Defendant was, at the moment it occurred, a breach of multiple non-delegable fiduciary duties owed to the class. These breaches were not isolated events. They were a common business practice replicated identically across every non-reversionary common fund settlement with *pro rata* distributions the Administrator Defendants administered during the class period. These breaches were built into their business model through understandings, relationships, and master service agreements that predated any individual appointment and governed their conduct across their book of business. That pattern of breach, uniform in mechanism and universal in application, forms the predicate from which the RICO and antitrust claims that follow arise.

**b. Bank Defendants Breached Their Fiduciary Duties.**

360.    The Administrator Defendants did not act alone. When a claims administrator directs hundreds of millions of dollars in claimant funds to a bank on terms that were never competitively evaluated, never disclosed, and never reviewed by any independent fiduciary acting on behalf of the class, and when that bank has spent years cultivating exactly that referral relationship, the bank is not an innocent holder of misdirected funds. It is a knowing and necessary participant in the breach of the duties it knew the administrator owed. The Bank Defendants built the system within which administrators directed deposits without competitive process, without disclosure, and without independent evaluation on behalf of the class.

361.    Beyond their participation in the Administrator Defendants' breaches, the Bank Defendants bear independent liability on three grounds fully developed in the Claims for Relief below.

362.    First, as custodians and depositories of court-supervised QSF assets held for identifiable beneficiaries, they owe independent fiduciary duties whose breach is actionable regardless of any characterization of their role as merely custodial.

363.    Second, even as depositories, banks that accept QSF assets with knowledge of their fiduciary character are subject to knowing receipt liability under Restatement (Third) of Restitution and Unjust Enrichment § 43, and are unjustly enriched by any interest they retain that belongs to the QSF as a matter of federal law, theories that operate independently of the 468B tax regulatory framework.

364.    Third, under the co-fiduciary accountability doctrine, a party that has actual or constructive knowledge of a co-fiduciary's breach and fails to take reasonable steps to compel redress bears independent liability for that breach. Restatement (Second) of Trusts § 224; Restatement (Third) of Trusts § 81. The Bank Defendants had exactly this knowledge: they specifically marketed settlement banking services to court-appointed administrators, understood

134

the QSF regulatory framework, and accepted years of exclusive deposit relationships premised on below-market interest structures, all while knowing those administrators owed disclosure obligations to supervising courts that the Banks' own silence made impossible to satisfy.

365.    The fiduciary breaches described in this section were not merely tortious. They were the mechanism of fraud. A fiduciary has a duty to volunteer information, and the violation of that duty is what transforms silence into misrepresentation, a principle that is the foundation of the fraudulent concealment and predicate act analysis in Section G that follows.

### G.  Material Omissions, Predicate Acts, and Fraudulent Concealment.

#### a.  The Architecture of Concealment.

366.    The scheme alleged herein was sustained through a carefully constructed architecture of interlocking omissions and half-truths as part of on-going and coordinated misrepresentations.  These omissions and half-truths were not limited to judicial proceedings, but are most clearly illustrated there. Defendants made recurring omissions in submissions to the judiciary, each designed to satisfy the immediate inquiries of any single settlement court while foreclosing any scrutiny of the wider, established relationships and agreements between the Defendants. The Administrator Defendants made affirmative representations to class members at every stage of settlement administration through final approval, that were literally true in what they disclosed and materially false in what they concealed.

367.    The FinTech Defendants designed and marketed the breakage-extraction program knowing that concealment was the condition of its continued operation.

368.    The Bank Defendants engineered the deposit structures that diverted QSF interest before it could reach the fund knowing that the administrators they were enriching were court-appointed fiduciaries prohibited from receiving undisclosed compensation.

369.    Without the infrastructure each provided, the scheme could not have operated. The judiciary routinely reviews documents, and never see the QSF's tax filings, banking agreements,

platform revenue-sharing contracts, or master service agreements. That gap was not incidental. It was the scheme. When a bank or payment platform is selected not on merit but because of a secret revenue-sharing arrangement with the administrator, the judiciary's ability to perform its oversight function is nullified.

### b. Material Omissions and Predicate Acts.

370.    Each material omission and half-truth identified below was actionable on multiple independent grounds: as a breach of the Administrator Defendants' non-delegable fiduciary duty of complete disclosure, as a predicate act of mail fraud under 18 U.S.C. § 1341 or wire fraud under 18 U.S.C. § 1343, or both. Plaintiffs incorporate the following list by reference into each cause of action in this Complaint. Plaintiffs reserve the right to supplement this list as discovery proceeds.

371.    **Omission 1: Bids and Proposals for Administrator Selection.** Before any court appointment, Administrator Defendants submitted bids and proposals to class counsel and settling parties that disclosed their administrative fees as if those fees represented the complete cost of administration. Administrator Defendants omitted that the payment methods they proposed to use would generate undisclosed financial benefits flowing back to themselves from funds designated for the class, and that the banking and fintech partners they proposed to use were selected pursuant to pre-arranged revenue-sharing arrangements rather than in the interest of the class. The bids and proposals appeared arms-length and complete when they were neither.

372.    **Omission No. 2: Court Submissions from Appointment Through Final Approval.** At every stage of each settlement, Administrator Defendants represented, expressly or by necessary implication, that they were neutral fiduciaries whose compensation was limited to the amounts disclosed, that they had no undisclosed financial interest in the payment mechanisms, banking partners, or distribution platforms they would use, and that their selection of those vendors was made solely in the interest of the class. What was omitted from every one of them: that the Administrator Defendants had established, were actively negotiating, or were already operating

pursuant to financial arrangements with the FinTech Defendants and Bank Defendants under which they would receive undisclosed compensation contingent on directing QSF assets through those parties' services; that their selection of payment platforms and banking partners was driven in part by pre-arranged revenue-sharing arrangements rather than class benefit; and that their actual total compensation would materially exceed the fees disclosed. No one had before it the information necessary to evaluate whether the administrator's vendor selections were made in the interest of the class or its own.

373. **Omission No. 3: Distribution Plans.** Administrator Defendants submitted distribution plans representing that the proposed payment method was selected to efficiently and completely serve class members. What was omitted: that the recommended payment mechanism was selected not solely for the benefit of the class but because it generated undisclosed financial benefits for the Administrator Defendants and FinTech Defendants, including float income, interchange fees, inactivity fees, and breakage revenues from card balances never redeemed.

374. **Omission No. 4: Costs of Administration.** In fee applications and related submissions, Administrator Defendants disclosed their administrative fees and represented, by the nature of that disclosure, that it provided a complete accounting of the economic benefits they would receive from the engagement. What was omitted: that the disclosed fees represented only a portion of their total compensation, which also included kickback and revenue-sharing payments from FinTech Defendants, revenue-sharing arrangements with Bank Defendants, float income diverted from QSF assets, breakage and unredeemed balance revenues, interchange fee revenues, and inactivity fee revenues.

375. **Omission No. 5: Residual Fund Provisions.** Each settlement agreement and distribution plan included provisions directing that unclaimed or unredeemed funds revert to the QSF for redistribution. Administrator Defendants omitted that the payment mechanisms they selected were specifically designed to cause unredeemed card balances to flow to the FinTech

137

Defendants and be shared with the Administrator Defendants rather than revert to the fund. Unlike uncashed checks, which remain in the QSF and revert pursuant to the settlement agreement, eCard distributions debit the QSF at the moment of issuance—meaning unredeemed balances never return to the fund regardless of what the settlement agreement provides. This structural feature was understood by the Administrator Defendants and exploited across every settlement in which digital payment cards were used, but was never disclosed.

376.    **Omission No. 6: Notices and Communications to Class Members.** Administrator Defendants transmitted notices to class members by mail, email, and class settlement websites, each presented as a complete and authoritative disclosure of the settlement amounts, claims deadlines, and payment options, but omitted entirely that the Administrator Defendants were receiving undisclosed compensation from FinTech and Bank Defendants out of the same settlement funds, that the payment method offered to class members was selected in part because it generated undisclosed financial benefits for the administrator, and that unredeemed digital payment balances would flow to the FinTech Defendants and the administrator rather than revert to the fund. Class members were told how much they might receive; they were never told that a portion of those funds was simultaneously being siphoned away through arrangements the administrator had made before their case was ever filed. Each mailed notice is a predicate act of mail fraud under 18 U.S.C. § 1341; each electronic transmission is a predicate act of wire fraud under 18 U.S.C. § 1343.

377.    **Omission No. 7: Post-Distribution Accountings**. Following distribution, Administrator Defendants, at times, filed accountings with the court reporting total payments distributed, claims processed, and administration costs incurred. Each representing a complete financial picture of the administration. What was omitted: that the Administrator Defendants had received additional compensation from the FinTech platforms used to make those distributions, that breakage from unredeemed digital payment cards had flowed to the Administrator and

138

FinTech Defendant rather than the QSF, and that the QSF had been debited for the full face value of issued eCards regardless of whether class members ever redeemed them.

378.    **Omission No. 8: QSF Deposit Interest.** Administrator Defendants and Bank Defendants had an affirmative, non-delegable duty to account for and preserve all QSF income for the exclusive benefit of the class. Neither ever disclosed that interest earned on QSF deposits was being systematically diverted to administrators before it could be credited to the fund, that the Bank Defendants were maintaining below-market interest rates on QSF accounts while earning significantly higher rates on the deployment of those same funds, or that a portion of the spread between those rates was being paid to the administrators who directed the deposits.

379.    **Omission No. 9: CAFA Notices to State Attorneys General.** In connection with each settlement for which Administrator Defendants served as administrator, CAFA notices were transmitted to the applicable State Attorneys General pursuant to 28 U.S.C. § 1715. These notices disclosed the material terms of the proposed settlement so that state regulators could evaluate and, if appropriate, object. The CAFA notice obligation is not a formality, it exists precisely so that state regulators, acting as a check on courts, can object to unreasonable or undisclosed arrangements in class settlements. Each CAFA notice disclosed settlement amounts, class definitions, and administrator identities, but omitted entirely that the Administrator Defendants were receiving or would receive undisclosed kickbacks from FinTech Defendants and Bank Defendants, that the payment methods proposed would generate undisclosed revenue for the administrator, and that QSF interest was being diverted rather than credited to the class. Regulators received enough information to appear informed but not enough to exercise their regulatory function. The systematic omission of these financial arrangements from every CAFA notice in every settlement administered during the class period deprived regulators of the information necessary to object and was deliberate, uniform, and in furtherance of the concealment that made the scheme possible.

380.    **Omission No. 10: Master Service Agreements "Made in Connection With" Settlement Administration.** The financial arrangements between the Administrator Defendants and the Bank and FinTech Defendants were memorialized in master service agreements negotiated at the enterprise level, governing the Administrator Defendants' conduct across their book of business. Through their concealment of these agreements, Defendants precluded assessment of potential conflicts with the Class members. The master service agreements were the governing documents of the entire scheme and, if disclosed, would have revealed it. Yet they appeared in the court record of no case the Administrator Defendants administered until after these lawsuits were filed. This allegation is now confirmed by direct evidence. In *Woods v. Google*, LLC, No. 5:11-cv-01263-EJD (N.D. Cal. Aug. 22, 2025), Angeion's CEO confirmed under oath that: (a) Angeion and Blackhawk negotiated a master service contract "prior to Angeion's engagement as Settlement Administrator"; (b) that contract "appl[ied] to the Settlement in this case"; (c) "Blackhawk has agreed to compensate Angeion in connection with each settlement for which Blackhawk acts as Angeion's subcontractor"; and (d) Angeion had never understood itself to be "subject to any legal obligation to provide information about each of its revenue sources, business relationships, or profit margins."[279] The actual agreements were placed before the *Woods* court only under seal as "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY," having been withheld from class counsel voluntarily.[280]

381.    **Omission No. 11: Bank Defendants' Independent Failure to Disclose Deposit Terms.** Independent of the Administrator Defendants' disclosure obligations, the Bank Defendants, as custodians of court-supervised QSF assets, owed an affirmative obligation to

---

[279] Declaration of Steven Weisbrot, *Woods v. Google*, LLC, No. 5:11-cv-01263-EJD (N.D. Cal. Aug. 22, 2025), ECF No. 899-3, ¶¶47, 52; *see also* Declaration of Steven Weisbrot, *In re Facebook Consumer Privacy User Profile Litig.*, No. 3:18-md-02843-VC (N.D. Cal.), ECF No. 1238-3.
[280] Declaration of Steven Weisbrot ¶¶ 2–3, *Woods v. Google, LLC*, No. 5:11-cv-01263-EJD (N.D. Cal.), ECF No. 899-5.

disclose to supervising courts and class counsel the material terms on which they held QSF deposits, at minimum, the interest rate paid on deposited funds, the rate earned on deployment of those funds, aggregate fees charged against the settlement corpus, and the financial arrangements under which a portion of the net interest spread was shared with the administrators who directed the deposits. The Bank Defendants made none of these disclosures in any court, to any class counsel, or in any document any party to any settlement could have reviewed.

### c.  Fraudulent Concealment

382.    The foregoing catalogue is illustrative, not exhaustive. The omissions were not inadvertent.

383.    The Administrator Defendants' and Bank Defendants' status as fiduciaries is not merely relevant to the breach of fiduciary duty claim. It is also relevant to the fraud. The duty to disclose is what transforms the omissions catalogued above into actionable misrepresentations: a party with no fiduciary or similar obligation may generally remain silent without committing fraud; a fiduciary that remains silent about a material fact it is obligated to disclose makes a misrepresentation by that silence, regardless of whether it affirmatively states anything false. Every fee application, every administrator declaration, every distribution plan, and every court submission that omitted the undisclosed compensation arrangements was, by virtue of that omission, a false statement, not because the words on the page were inaccurate, but because the duty to include more made the incompleteness itself the lie. That is the architecture of this fraud.

### H.  The RICO Enterprise and Conspiracy

384.    The RICO claims asserted herein are the federal statutory expression of what has already been alleged: a common scheme, pursued by associated Defendants occupying defined roles, through a pattern of predicate acts directed at a common victim—claimants receiving *pro rata* distributions from non-reversionary common benefit funds.

141

385. Each participant played a defined role within a coordinated enterprise that was greater than the sum of its bilateral relationships.

(a) The Administrator Defendants occupied the hub: they appointed and directed the enterprise's operations in each case, received undisclosed compensation through two parallel tracks, concealed those arrangements from supervising courts, and maintained the enterprise's operational secrecy across their collective book of business.

(b) The Bank Defendants served as the financial backbone of the Bank Interest Track: they designed and offered below-market QSF deposit structures, set the terms under which the spread between market rates and reported rates was shared with Administrator Defendants, and provided the banking accounts through which those payments were routed.

(c) The FinTech Defendants served as the operational backbone of the Digital Disbursement Track: they designed the breakage-extraction architecture, set the terms under which breakage, interchange, and inactivity fee revenues were gathered, took QSF funds intended for claimants, shared this breakage with Administrator Defendants, and through their enterprise-level market penetration, provided the infrastructure that connected the Administrator Defendants to a single common extraction program rather than a series of isolated bilateral deals.

386. Defendants as "persons" are legally distinct from the association-in-fact enterprise. The enterprise is the association among Administrator, Bank, and FinTech Defendants, a separate entity from any single defendant.

387. This flowchart connects the Administrator Defendants to the Bank and FinTech defendants, showing how they all funnel into a single "Enterprise" that siphons value from the QSFs:



388.    In each of the hundreds of cases at issue, the enterprise continued the same layered scheme across Administrator Defendants' book of business. Before any appointment, the Administrator Defendants promulgated representations and guidelines and submitted bids and proposals without disclosure of their pre-existing master services agreements and related financial arrangements with the FinTech Defendants and Bank Defendants. After appointment at preliminary approval, the Administrator Defendants submitted declarations and distribution plans, class settlement notices and websites, and CAFA notices without disclosing those agreements and arrangements. The Administrator Defendants used payment systems and banks they recommended, which were specifically structured to generate undisclosed profits on unredeemed QSF funds and interest that should have remained available to the claimants.

389.    The enterprise operated as a network, not a series and collection of bilateral deals, and the following allegations establish the rim evidence connecting the spoke defendants to each other and to the common scheme:

(a)    First: each Administrator Defendant knew that the other Administrator Defendants were participating in the same undisclosed compensation arrangements. Multiple industry insiders confirmed to *Forbes* that the practice of receiving undisclosed bank interest payments was "standard practice" in the industry, a characterization that could only be accurate if multiple administrators were simultaneously engaged in it and aware of each other's participation. The Hilsee Report similarly documents that the bank that approached Hilsee described the arrangements as industry-wide and confirmed that "Admins," plural, were demanding interest from banks, establishing mutual awareness among the Administrator Defendants. The Declaration of Steven Weisbrot confirms that Angeion maintained a master service agreement with Blackhawk that made the arrangement available across all of Angeion's settlements as a matter of standard enterprise contract. This admission is consistent with, and Plaintiffs allege on information and belief, the fact that the other Administrator Defendants maintained materially identical enterprise-level agreements with FinTech Defendants under the same industry-wide program. No Administrator Defendant that was aware of these arrangements as "standard practice" disclosed them at any time, a collective silence that protected not only their own arrangements but every other participant's arrangements simultaneously. Indeed, but-for the agreement between the Administrator Defendants, it was plainly in each Administrator Defendants' individual interest to disclose the other administrators' participation in the fraudulent schemes, thereby garnering a lion's share of the class action administration business. Thus, the Administrator Defendants' mutual non-disclosure was itself a coordinated act of concealment that constitutes rim evidence of the enterprise's network character.

144

(b)    Second: the FinTech Defendants knew they were operating an industry-wide program serving multiple administrator clients simultaneously, not merely providing bilateral services to each individually. The Declaration of Steven Weisbrot expressly describes the Angeion-Blackhawk master service agreement as an "enterprise-wide" arrangement, Weisbrot's own word, under which Blackhawk makes its digital payment platform "available" to settlements generally as a structural program. The 2020 Blackhawk email documented in the Hilsee Report, confirmed through *Forbes'* independent reporting as sent by a Blackhawk employee, offered the breakage-extraction program to a settlement administrator as a revenue opportunity available across all digital card distributions, language that describes a program, not a transaction. Each FinTech Defendant offered materially identical revenue-sharing terms to multiple competing administrator clients because it was operating a standardized program. Under this standardized program, each new administrator client joined an existing structure whose profitability depended on scale and whose concealment depended on collective silence.

(c)    Third: the Bank Defendants knew they were operating within an industry-wide deposit program serving multiple administrator clients. The bank that approached Hilsee confirmed awareness that the practice of sharing interest with administrators was industry-wide, not a bilateral arrangement unique to any single banking relationship. Each Bank Defendant was aware that the other was operating the same interest-sharing program with the same administrator clients. That awareness is established by the fact that the Administrator Defendants directed their books of QSF deposits almost exclusively to the two Bank Defendants, meaning each Bank Defendant's administrator clients were also the other Bank Defendant's administrator clients, and each bank's participation in the interest-sharing program was visible to, and relied upon by, the common administrator clients both banks served. Like the Administrator Defendants, any Bank Defendant individually would have been incentivized to disclose its competitor's involvement in this fraudulent scheme, thereby garnering more of the QSF deposit market for themselves. The

Bank Defendants' awareness that the program operated across both of them, and their collective decision not to disclose it, establishes that each Bank Defendant's participation was knowing and that its silence protected the enterprise's concealment across its full scope.

390.    Each Defendant that participated in the enterprise did so with knowledge that: (i) the compensation it received or facilitated was not disclosed to any supervising court, class counsel, or class member in any settlement during the class period; (ii) the concealment of those arrangements was essential to the program's continued operation, because disclosure would have exposed all participants to liability; (iii) their participation furthered the common objective of extracting undisclosed revenue from court-supervised settlement funds at the expense of the class members those funds were established to compensate; and (iv) the program operated across multiple administrators, multiple FinTech platforms, and both Bank Defendants simultaneously, making each participant's continued silence an affirmative act of concealment that protected not only their own arrangements but the arrangements of every other participant in the enterprise.

391.    The pattern of racketeering activity consists of the following categories of predicate acts, each replicated across hundreds of cases throughout the class period: (a) Wire fraud under 18 U.S.C. § 1343: each electronic filing or transmission between Defendants to organize, establish, and maintain the enterprise and its business, or of a bid or proposal for administrator selection, preliminary approval paper, administrator declaration, class settlement website, email notice to class members, or post-distribution accounting that contained or incorporated any of the material omissions identified herein; (b) Mail fraud under 18 U.S.C. § 1341: each document sent by the United States Postal Service, FedEx, or other private or commercial interstate carrier between Defendants to organize, establish and maintain the enterprise and its business, or class settlement notice mailed to class members and each CAFA notice mailed to State Attorneys General that omitted the Administrator Defendants' undisclosed financial arrangements with FinTech Defendants and Bank Defendants; and (c) Money laundering under 18 U.S.C. § 1956(a)(1)(A) and

(B): each transfer of the proceeds of wire and mail fraud from the FinTech and Bank Defendants to Special Purpose Entities belonging to the Administrator Defendants and/or periodic payments to the Administrator Defendants under master services agreements governing their schemes, was designed to perpetuate the ongoing enterprise and conceal and disguise the nature, source, ownership, and control of the funds. The number of predicate acts is not two, it is in the hundreds of millions or more—from setting up and continuing the enterprise between the Defendants, to the virtually countless fraudulent mail and email notices sent to each and every class member.

392. Alternative theory — Section 1962(d) Conspiracy: In the alternative, each Bank Defendant and each FinTech Defendant agreed to facilitate the enterprise's objectives by providing the financial and payment infrastructure through which undisclosed kickback payments were generated, routed, and concealed, with full knowledge that those arrangements were not disclosed and that concealment was essential to the program's continued operation. A section 1962(d) defendant need not commit predicate acts; it need only knowingly agree to facilitate an enterprise that does. Each Bank Defendant's and FinTech Defendant's agreement is established by its active, ongoing participation in a standardized program whose concealment was its defining operational requirement.

393. Plaintiffs are direct first-party victims. The predicate acts directly caused the injury — the court appointment and settlement approval was the instrument of the fraud, not an independent intervening cause. This injury is visually depicted as follows:

147



394.    Each Plaintiff and Class Member who submitted a valid claim in a settlement administered by an Administrator Defendant held a cognizable property interest in their court-approved proportionate share of the QSF sufficient to establish injury to "business or property" under 18 U.S.C. § 1964(c). The diversion of QSF assets through the undisclosed kickback arrangements alleged herein directly reduced the property to which each Plaintiff and Class Member was legally entitled, constituting an injury to property within the meaning of section 1964(c).

395.    The enterprise operated from at least 2015, when non-zero interest rates led to increasing profits via the Bank Interest Track. The Digital Disbursement Track increased in prominence at least as early as 2018 when digital payment volume in class actions began scaling materially. The enterprise still operates through the present, a period of more than eleven years. During that period, the enterprise executed its scheme across Administrator Defendants' book of business, generating hundreds of millions or billions of predicate acts of mail fraud and wire fraud. The predicate acts were the operational template of the enterprise, replicated with precision in

148

every case. A scheme operating for years across hundreds of proceedings plainly satisfies closed-ended continuity.

396.    The scheme is ongoing. As of the filing of this Complaint, the Administrator Defendants continue to administer settlements using the same digital payment platforms under the same undisclosed revenue-sharing arrangements, and the Bank Defendants continue to hold QSF deposits before final approval at artificially depressed rates. There is no indication that the enterprise has terminated or that any Defendant has disclosed or intends to disclose the arrangements. The threat of continued criminal activity is substantial, not speculative, and open-ended continuity is satisfied.

397.    Plaintiffs allege, on information and belief, that each Administrator Defendant agreed, or alternatively acted with conscious parallel commitment to a common scheme, to participate in the enterprise. The existence of the conspiracy agreement is established by the following plus-factors, which collectively make the conspiracy the more plausible explanation for the Administrator Defendants' uniform conduct than independent action: (1) multiple industry insiders described the bank interest sharing as "standard practice" to *Forbes* reporters, a characterization that is only accurate if competing administrators were simultaneously aware of and engaged in the same program; (2) the Hilsee Report documents that a major bank confirmed that "Admins," plural, were demanding interest from banks, establishing mutual awareness among administrator competitors; (3) the common use of each of the FinTech Defendants by multiple Administrator Defendants, including Digital Disbursements' 60%+ market penetration among class action administrators, demonstrates that each Administrator Defendant was aware that the same FinTech kickback program it was participating in was simultaneously operating across its competitors — making each administrator's continued participation a knowing agreement to join a multi-party program; (4) the Administrator Defendants submitted materially similar below-market interest rate quotes across hundreds of settlements, maintaining uniform pricing that

149

persisted through years of rising federal funds rates without any administrator breaking from the program to offer competitive rates to class members; and (5) no Administrator Defendant at any time disclosed the existence of the kickback arrangements, a uniform industry-wide silence that, given each administrator's awareness of the program's industry-wide operation, constitutes coordinated concealment rather than independent decision-making.

398.    A conspiracy may be inferred from parallel conduct undertaken with knowledge that other participants are acting in concert, without any direct evidence of an explicit agreement. Each of the five factors above independently satisfies that standard. Together, they compel the conclusion that a single conspiracy existed.

399.    The injuries suffered by Plaintiffs and the Class are capable of measurement on a classwide basis through standard financial and forensic methodologies.

(a)    For the Bank Interest Track, aggregate damages are calculable as the difference between the interest rate actually credited to each QSF during the class period and the rate that would have been paid in a competitive, unconflicted market for deposits of equivalent size and duration, applied to the aggregate QSF balances held by the Bank Defendants across all relevant settlements administered during the class period. That differential, compounded over the applicable holding periods, represents the total interest diverted from the class. The portion of that differential shared with Administrator Defendants through SPEs or other payment vehicles represents the kickback component subject to disgorgement independently of any market-rate calculation.

(b)    For the Digital Disbursement Track, aggregate damages are calculable as the total unredeemed eCard balances retained by the FinTech Defendants across all relevant settlements during the class period, plus all inactivity fees, maintenance charges, and interchange revenues extracted from QSF-funded distributions, less any amounts demonstrably returned to class members or to QSFs. The Administrator Defendants' share of those amounts, received through revenue-sharing arrangements, is separately subject to disgorgement.

(c)    In the alternative, damages across both tracks are measurable as the total undisclosed compensation received by each Administrator Defendant in connection with each settlement it administered during the class period, which represents the gap between what each court approved and what each administrator actually received, a gap documentable from, among others, the master service agreements and other accountings that remain in Defendants' exclusive possession and are subject to discovery in this proceeding.

400.    RICO claims are subject to a four-year statute of limitations running from the date the plaintiff discovered, or through the exercise of reasonable diligence should have discovered, their injury. Under the injury-discovery rule, the limitations period did not begin to run until Plaintiffs discovered the facts constituting the injury. The scheme alleged herein was designed to be undiscoverable: the undisclosed arrangements appeared in no court filing, no class settlement notice, no public accounting, and no other document accessible to Plaintiffs through reasonable diligence.

401.    The first public disclosure of the scheme was the Hilsee white paper, published October 16, 2024, which documented for the first time that settlement administrators were systematically receiving undisclosed payments from FinTech Defendants and Bank Defendants.

402.    The *Forbes* investigation, published May 21, 2025, provided further public corroboration, including independent confirmation of the 2020 Blackhawk kickback email and multiple industry insider admissions.

403.    The Weisbrot Declaration, filed August 14, 2025, in the *In re: Facebook, Inc. Consumer Privacy User Profile Litigation*, constituted the first sworn admission by any Administrator Defendant of the existence of an enterprise-level revenue-sharing agreement with a FinTech Defendant.

404.    Plaintiffs' claims, filed within four years of the Hilsee white paper, are timely under the injury-discovery rule.

151

405.    In the alternative, the limitations period is tolled under the doctrine of fraudulent concealment: the Administrator Defendants actively concealed the scheme in every court filing they made during the class period, making discovery impossible through the exercise of reasonable diligence, and Plaintiffs acted diligently upon discovery of the scheme by filing this action promptly after the Hilsee white paper and *Forbes* article brought the scheme to light.

## I.    Antitrust Allegations

406.    The Administrator Defendants—Epiq, Angeion, JND, and Kroll—are four of the largest providers of class action settlement administration services in the United States (the "Administrator Market"). Together, they control approximately 80% of the Administrator Market. As the entities appointed by the Courts to administer the disbursement of class settlement funds to class members, the Administrator Defendants have a direct relationship with the Courts and class members, as their duly appointed fiduciaries. They are recognized as household names in the class action administration industry. The Administrator Defendants dominate popular class action websites such as www.classaction.org, where they typically have to post notices and provide documents.

407.    As demonstrated above, the Administrator Defendants engaged in an anticompetitive and fraudulent scheme to reap hundreds of millions of dollars in undisclosed kickbacks and compensation from the Bank Defendants, while increasing the costs and depressing the payouts on thousands of class actions that a competitive Administrator Market would otherwise produce. Some time on or about 2015—when the interest rates in the United States started rising—Administrator Defendants entered into an ongoing agreement not to compete with each other, thereby increasing the cost and price of class administration services. This agreement included having Bank Defendants pay them the interest earned on class action settlement deposits that would have otherwise been distributed to class members and used to pay down the cost of class administration services.

408.    To maintain their hold of the Settlement Deposit Market, the Bank Defendants agreed to work with the Administrator Defendants looking to increase the cost and price of class administration services and pay the Administrator Defendants the kickbacks. In exchange, the Administrator Defendants agreed to eliminate competition among themselves and keep the interest earned on settlement funds from the thousands of class actions with the Bank Defendants that would otherwise have gone to class members. For their part, the Bank Defendants thereby maintained their power in the Settlement Deposit Market, leading to steady profits and liquidity for the Bank Defendants.

409.    The Bank Defendants were thereby incentivized to conspire with the Administrator Defendants in their anticompetitive scheme, and entered into these agreements deliberately, corruptly, and with intent to execute the kickback scheme. Indeed, the Administrator Defendants took cautious measures to conceal their receipt of kickbacks, including by forming SPEs to facilitate the kickback scheme. For their part, the Bank Defendants paid the kickbacks into these SPEs, which they knew was for the purpose of sending kickback payments to the Administrator Defendants without detection. This arrangement has been going on for years, including throughout the class period, without any disclosure to the Courts, class counsel, or consumers/class members to whom the Defendants are fiduciaries.

410.    The Administrator Market is a relevant and unique market because class action administrators offer a unique package of products and services, using specialized expertise and skills that others cannot readily provide. Class actions can present complicated problems, especially when it comes to large-scale class actions with tens of millions of class members. Class settlements may have varied and tight deadlines for specific industries or peculiar notices. Administrators need to know how to handle huge volumes of incoming calls and questions, answering them accurately and within the parameters of the settlement. Administrators need to know how to assess objections, filled out forms, and when additional questions need to be asked

of the counsel or court. And administrators need to know how to accurately disburse and track the tens to hundreds of thousands of claim payments made.

411.    There is a unique demand for these products and services, which means there are no reasonable or close substitutes for these products and services. Likewise, a hypothetical monopolist supplying that package could willfully impose small but significant price increases.

412.    As further described herein, the Administrator Defendants were financially motivated to eliminate competition amongst themselves and refer most of their class action settlement deposits to the Bank Defendants (and not the Bank Defendants' competitors), because both groups were financially motivated to maintain their anticompetitive and deceptive scheme.

413.    The Settlement Deposit Market is a relevant and unique market because handling Section 468B trust-accounts requires expertise and class action experience. Managing such trusts requires large quantities of disbursements at scale, and the pertinent IRS-regulations demand special handling throughout the life of the deposit. Once a class settlement is approved, the trustee bank typically has to cut thousands to hundreds of thousands of checks or distribute other forms of payments quickly and accurately, while complying with the strict requirements imposed by the court orders and the IRS, in addition to class action administrator instructions.

414.    This requires a scale and expertise that most banks do not have. Investment in the practice must be made for any competing bank to meet the rigorous requirements and demands of how QSF accounts are used for class action settlements.

415.    The Bank Defendants' settlement deposit services in the Settlement Deposit Market can include: (a) setting up and managing the QSFs funds (i.e., A Section 468B trust) established under Treasury Regulation § 1.468B3(e)(2)(ii), including opening accounts, reconciling accounts, fund recordkeeping, and ensuring proper tax reporting; (b) investing the QSF funds, and managing the investments properly; (c) regularly reporting to the settlement administrators and Courts (both directly and indirectly through the settlement administrators); (d) cutting checks and/or issuing

payments selected by the class members; (e) managing and reconciling the QSF fund during the class member deposit and redemption process; and (f) paying out interests and other returns on the deposits and investments, during reconciliation and reporting to the supervising courts.

416.    The need for scale and scalability is a barrier to entry to the Settlement Deposit Market. To cut thousands to hundreds of thousands of checks and distribute other payments quickly and accurately, banks not only need to invest in technology, but qualified staff. The technology and staff also need many accounts and disbursements to sustain them, because such large teams need to be sustained with steady work to stay profitable.

417.    That scale and scalability are critical, as evidenced by how both Huntington and Western Alliance typically oversee thousands of class action QSF-accounts at any given time. Plaintiffs and counsel are informed, and on that basis believe and allege, that no other banks have as many QSF accounts as Huntington and Western Alliance, who together control over 80% of the market.

418.    Another important barrier to entry to the Settlement Deposit Market is the long-standing relationships between class action administrators and trustee banks. The major class administrators tend to be responsible for hundreds, if not thousands, of class actions at the same time. If any major administrator has a long-standing relationship with a trustee bank, the referral relationship can present a major barrier of entry to new entrants.

419.    In addition, partially due to the unprecedented low interest rates between 2010 and 2020, the number of banks competing for QSF accounts had dwindled, leaving primarily the duopoly of = Huntington and Western Alliance intact. Scale ensured viability and profitability when interest rates were low.

420.    Once interest rates increased in the United States, starting in or about 2015, and again in 2022, the Bank Defendants were highly motivated to maintain their substantially increased

155

profits and market power, including by acting in concert to fix and maintain returns on QSF accounts.

421.    Indeed, Defendant Western publicly advertises "competitive interest rates and fee structure" as a key feature of its escrow phase solutions for class action and mass tort settlements. On its website, Western features a class action attorney testimonial stating: "I have entrusted the bank with significant sums of money from the settlement of my class action cases, knowing that the settlement funds will be safe and provide the highest possible return for the class until the settlement funds are distributed to class members."

422.    Defendant Epiq advertises its investment of the settlement funds and efficient handling of funds.[281] And Defendant Kroll advertises competitive market rates as part of its settlement fund escrow services.

423.    While it is unknown how long the Bank Defendants have been providing undisclosed benefits to the Administrator Defendants, Plaintiffs and counsel are informed, and on that basis believe and allege, the Defendants' undisclosed compensation arrangements were in place prior to 2015, and expanded no later than 2022, when the sudden rise of interest rates dramatically increased the financial stakes of the pre-existing deposit structures. The spike in rates beginning in 2022 transformed arrangements that had previously generated modest undisclosed income into ones generating millions of dollars per settlement, creating powerful new incentives to entrench and conceal the kickback scheme at unprecedented scale.

424.    Sometime around 2022, the potential for substantial profit on the QSF deposits became clear to the Bank Defendants. There were billions of dollars in potential deposits available from class action settlements every year, and the prospect of using these massive quantities of cash to create liquidity and investments was irresistible.

---

[281]Epiq, Tax and Treasury Services, https://www.epiqglobal.com/en-us/services/class-action-mass-tort/class-action-administration/tax-and-treasury (last visited May 15, 2026).

425. Plaintiffs and counsel are informed, and on that basis believe and allege, that as part of their agreements not to compete with each other for the best bank interest rates, the Administrator Defendants collectively and in coordination demanded that they be given a cut of the profits, in the form of a guaranteed rate of return on the deposit, that would be lower than the floating federal window interest rate. If the Bank Defendants refused, the Administrator Defendants threatened to pull their fleet of class settlements from them. These demands were made in concert and as part of their anticompetitive scheme: a threat by any single Administrator Defendant could not have been effective compared to the collective threat of all major administrators withdrawing their deposits simultaneously. The Bank Defendants' acquiescence to these demands from each Administrator Defendant demonstrates that the Bank Defendants understood the demands were coordinated across the Administrator Defendants.

426. The Administrator Defendants formed their anticompetitive agreement by coordinating through the Bank Defendants, including gaining assurance that no Administrator Defendant would be competitively compromised by joining the anticompetitive and fraudulent scheme. Indeed, during the times relevant and pursuant to the scheme, each of them made such demands on the Bank Defendants, received illegal and unfair remunerations from the Bank Defendants, and proceeded to hide these illicit transactions for themselves, and for each other.

427. The anticompetitive effects of this concerted action among the Administrator Defendants is that it raised the price of class action settlement administration services and lowered the total payouts to class members. Had the anticompetitive agreement not been formed and secret remunerations to the Administrator Defendants not been made, more money would have been paid to Plaintiff and Class Members, either as a result of reduced costs of administration or in the form of higher interest payments, or both.

428. To meet the Administrator Defendants' demands, the Bank Defendants also passed off the costs to the class members who have a right to the QSF deposits (and any accruing interest),

by uniformly offering class members below-market interest rates, often at rates lower than 0.5%. The rates provided by the Bank Defendants would have been significantly higher in a competitive market absent such collusion.

429.    Plaintiff and counsel are informed, and on that basis believe and allege, that the anticompetitive scheme had the further effect of depressing interest rates in the Settlement Deposit Market for the few class actions where interest rates higher than 0.5% per year were paid. The rates on those cases were still ultimately lower than what the rates would have been in a competitive market, because the Bank Defendants not only had to act in concert, but were afraid that non-participants and customers would find out about their anticompetitive scheme. Thus, and even then, the Bank Defendants continued to collude and report the same interest rate offered for prospective QSFs.

430.    For example, while Plaintiffs' counsel was requesting bids from the Bank Defendants in March of 2025, both Bank Defendants reported their bid to be less than 0.5% per year, without any desire to outbid each other.

431.    Defendants agreed to a scheme whereby: (a) the Bank Defendants would pay the Administrator Defendants a substantial portion of the difference between the interest rate reported on the QSF deposit, and the market interest rate; (b) the Administrator Defendants agreed in exchange to keep all of their class action settlement deposits with the two Bank Defendants; (c) the Bank Defendants would provide identical or near-identical bids, amounting to a substantially depressed interest rate for class members, on all QSF deposits, and maintain those interest rates thereafter; and (d) deposit the kickbacks into SPEs separately created by the Administrator Defendants to hide the scheme.

432.    But for Defendants' agreements, Administrator Defendants would have competed to obtain higher interest rates on QSF accounts from Bank Defendants in order to present the most

158

attractive bundle of settlement administration services. Plaintiffs and class members, therefore, would have received higher payouts from settlement distributions.

433.    For an example of a settlement from October 2023 outside of the anticompetitive scheme, when a state government was plaintiff in a class action settlement and the interest rate was disclosed to the court in August 2024, the effective interest rate was reported at over 4% on the QSF.[282]

434.    The Administrator Defendants' agreement is further evidenced by the structure of the antitrust conspiracy itself, which operated as a "hub and spoke" arrangement. Each Bank Defendant operated as a hub, and the Administrator Defendants took the kickbacks as spokes, with each Administrator Defendant knowing that the other Administrator Defendants were involved in the same arrangement so that none of them would be competitively disadvantaged by no longer seeking the highest interest rates from the banks for the benefit of class members.

435.    Further, Administrator Defendant's participation in the kickback scheme was economically rational only if it knew the other Administrator Defendants were receiving the same arrangements from the same Bank Defendants. Had any single Administrator Defendant refused to participate, it could have offered higher interest rates to class members and gained a competitive advantage in securing court appointments. That no Administrator Defendant broke ranks is powerful circumstantial evidence that each was aware of the others' participation in addition to assurances made by the Bank Defendants.

436.    Concentrated Market Structure: The Administrator Market and the Settlement Deposit Market are both highly concentrated. The four Administrator Defendants control approximately 80% of the Administrator Market, and the two Bank Defendants control over 80%

---

[282] Declaration of Divya Rao in Support of Motion for Notice of Parens Patriae Settlement ¶ 5, *People v. Vitol Inc.*, No. CGC-20-584456 (S.F. Super. Ct. Aug. 30, 2024).

of the Settlement Deposit Market. This high level of concentration facilitates collusion and makes coordinated action among the participants more feasible and more likely.

437.    The existence of the unlawful agreement among the Administrator Defendants is supported by their uniform parallel conduct and by plus factors that, taken together, demonstrate that their conduct was not the result of independent business decisions.

438.    Parallel Conduct: All Administrator Defendants engaged in the same pattern of steering settlement deposits to the same two Bank Defendants for below-market rates, despite the availability of higher-rate alternatives. All Administrator Defendants received kickbacks through the same mechanism—special purpose entities. All Administrator Defendants concealed the arrangements in the same manner by failing to disclose the kickbacks to the courts, class counsel, or class members. And both Bank Defendants provided identical or near-identical bids of less than 0.5% interest to Plaintiff's counsel despite a federal window rate of 4.33%, which is consistent only with coordinated, not independent, action.

439.    Prior to the rate rise beginning in 2022, below-market deposit arrangements generated small absolute spreads on QSF accounts. The spike in interest rates beginning in 2022 transformed the pre-existing deposit structures into ones generating unprecedented kickback revenue, a radical escalation in the scale of undisclosed compensation that is itself evidence the arrangements were formalized and entrenched during this period. The magnitude of the departure—from modest undisclosed income to tens of millions of dollars per settlement—constitutes a radical break from prior competitive conditions in the market.

440.    Motive to Conspire: There were billions of dollars in potential cash deposits available from class action settlements every year. When interest rates rose sharply beginning in 2022, the potential profit that could be extracted from these deposits through the spread between market rates and the rates reported to class members became enormous. The Administrator Defendants thus had a powerful shared financial motive to collude rather than compete, because

each administrator could extract above-market kickbacks only if the others did likewise—otherwise, a non-participating administrator could undercut on price and win court appointments at the expense of the colluding administrators.

441.    Acting Against Self-Interest: Class counsel often solicit competing bids from several settlement administrators, and those bids are reviewed and approved by the court. In a competitive market, an administrator that offered higher interest rates on settlement deposits would have a significant competitive advantage in securing court appointments, because the costs of claims administration are typically paid out of the total settlement fund and lower costs benefit class members. Steering deposits to banks that pay below-market interest rates for the benefit of the class is contrary to each Administrator Defendant's independent self-interest and fiduciary obligations. No rational economic actor would forgo the competitive advantage of offering superior returns to class members unless it was assured that its competitors were doing the same.

442.    Availability of Higher-Rate Alternatives: The Administrator Defendants' uniform refusal to use higher-yielding banking alternatives further demonstrates that their conduct was not the result of independent business judgment. American Deposit Management ("ADM") actively markets itself to settlement fund administrators, claiming to "offer unmatched benefits to fund administrators" and ensure settlement funds earn "a competitive rate of return." Esquire Bank offers qualified settlement fund solutions with products like CDARS®, which it describes as offering "a straightforward way to secure expanded multimillion-dollar FDIC insurance on CD investments, ensuring both safety and competitive returns for your funds." These readily available alternatives demonstrate that the Administrator Defendants had no legitimate reason to confine their deposits exclusively to the two Bank Defendants at below-market rates, and that their uniform conduct in doing so is explicable only by agreement.

161

X. CLASS ALLEGATIONS

443.    Plaintiffs bring all counts, as set forth below individually and as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of the following Classes, defined as follows:

> Class 1 (Digital Payment Class) — All persons in the United States who, between January 1, 2018 and the date of class certification, were members of a settlement class of a non-reversionary common fund in which a *pro rata* distribution was made and submitted a valid claim in a settlement in which the Administrator Defendants provided claims administration services and in which settlement distributions were made in whole or in part by digital payment card, prepaid card, or gift card, and whose distributions were reduced because unredeemed card balances were retained by a FinTech Defendant and/or Administrator Defendant.

> Class 2 (Undisclosed Kickback Class) — All persons in the United States who, between the beginning of the class period [to be confirmed through discovery, but no later than January 1, 2015] and the date of class certification, were members of a settlement class and submitted a valid claim in a settlement in which (a) the Administrator Defendants provided claims administration services, (b) the Bank Defendants held settlement deposits as depository or custodian, whether or not formally established pursuant to U.S. Treasury Regulations §1.468B-1 *et seq*., and (c) all or a portion of the interest earned on those deposits was withheld from the fund and paid to the Administrator Defendants or retained by the Bank Defendants.

> Class 3 (Interest Rate Suppression Class) — All persons in the United States who, between the beginning of the class period [to be confirmed through discovery, but no later than January 1, 2015] and the date of class certification, were members of a settlement class and submitted a valid claim in a settlement in which (a) the Administrator Defendants provided claims administration services, (b) the Bank Defendants held settlement deposits as depository or custodian pursuant to U.S. Treasury Regulations §1.468B-1 et seq., and (c) the Bank Defendants paid interest on settlement deposits at rates artificially depressed.

444.    Excluded from each Class are: Defendants; their respective parents, subsidiaries, and affiliates; their respective officers, directors, employees, and agents; any entity in which any Defendant has a controlling interest; the legal representatives, heirs, successors, or assigns of any

162

such excluded party; and the judicial officer(s) to whom this action is assigned and the members of their immediate families.

445.    This proposed Class definition is based on the information available to Plaintiffs at this time. Plaintiffs may modify the Class definition in an amended pleading or when they move for Class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

446.    **Numerosity – Fed. R. Civ. P. 23(a)(1):** The Classes are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the aggregate membership of the Classes numbers in the tens of millions. The exact size of each Class and the identities of individual members are ascertainable from Defendants' records, QSF account records, and court filings in the underlying settlements.

447.    **Commonality – Fed. R. Civ. P. 23(a)(2):** This action involves questions of law and fact common to the Class. Such common questions include, but are not limited to:

a)    Whether Defendants were fiduciaries with respect to Plaintiffs and the Class;

b)    Whether Defendants breached their fiduciary duties to Plaintiffs and the Class;

c)    Whether Defendants entered into contracts implied in fact with Plaintiffs and the Class;

d)    Whether Defendants engaged in fraud by omission;

e)    Whether Defendants were engaged in an anticompetitive scheme, in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1-7;

f)    Whether Defendants violated the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968;

g)    Whether Defendants were unjustly enriched by receiving undisclosed remuneration, incentives, and compensation;

h)      Whether the Defendants conspired;

i)      Whether Plaintiffs and Class Members are entitled to damages as a result of Defendants' wrongful conduct;

j)      Whether Plaintiffs and Class members are entitled to restitution as a result of the Defendants' wrongful conduct including but not limited to restitution and/or disgorgement.

k)      Whether the Administrator Defendants maintained a uniform, book-of-business-level policy of receiving undisclosed compensation from FinTech Defendants and Bank Defendants that was applied systematically to every settlement they administered during the class period, such that the existence, nature, and concealment of that policy is a common question resolvable on a classwide basis; and

l)      Whether each Class member's distributions were reduced by a calculable amount as a result of Defendants' uniform scheme, such that aggregate damages, disgorgement, and restitution are ascertainable on a classwide basis.

448.    **Typicality – Fed. R. Civ. P. 23(a)(3):** Plaintiffs' claims are typical of the claims of the members of each Class because their claims arise from the same course of conduct and are subject to the same legal theories.

(a)      As to the Digital Payment Class (Class 1): each named Plaintiff received, or was entitled to receive, a distribution from a settlement administered by one or more Administrator Defendants using a digital payment platform operated by a FinTech Defendant under a pre-arranged, undisclosed revenue-sharing agreement negotiated at the enterprise level before any individual settlement appointment, and each named Plaintiff's recovery was thereby reduced by the

164

same mechanism, breakage, interchange fees, and inactivity fee revenues extracted from QSF funds before reaching class members, that injured every member of Class 1.

(b)     As to the Undisclosed Kickback Class (Class 2): each named Plaintiff was a beneficiary of a QSF held by one or more Bank Defendants pursuant to a separate banking relationship under which the Bank Defendants paid below-market interest rates and remitted a portion of the suppressed interest to the Administrator Defendants as undisclosed compensation, and each named Plaintiff's distribution was reduced by the same mechanism, QSF interest diverted to Administrator Defendants rather than credited to the fund, that injured every Class 2 member.

(c)     As to the Interest Rate Suppression Class (Class 3): each named Plaintiff was a beneficiary of a QSF that earned interest at artificially depressed rates as a result of the Bank Defendants' coordinated rate-suppression, and each named Plaintiff's distribution was reduced by the resulting shortfall in QSF earnings that injured every Class 3 member.

449.    The FinTech revenue-sharing arrangement and the Bank Defendants' deposit relationship are distinct pre-arranged business agreements, negotiated separately, with different counterparties, and generating different revenue streams, but both were established (formerly through MSAs, or informally) before any individual settlement appointment, applied identically across the Administrator Defendants' book of business, and concealed through the same uniform omissions in every court filing, fee application, class notice, and CAFA notice in every case. The injury to the named Plaintiffs differs from the injury to other Class members only in amount, not in kind, mechanism, or legal theory.

450.    **Adequacy of Representation – Fed. R. Civ. P. 23(a)(4):** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class members Plaintiffs seeks to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; Plaintiffs intend to prosecute this action vigorously; and Plaintiffs' counsel have adequate financial means to vigorously pursue this action and ensure

165

the interests of the Class will not be harmed. Furthermore, the interests of the Class members will be fairly and adequately protected and represented by Plaintiffs and Plaintiffs' counsel.

451.  **Predominance – Fed. R. Civ. P. 23(b)(3):** The proposed Class action is appropriate for certification under Rule 23(b)(3) because questions of law and fact common to each Class predominate over any individual questions.

(a)    As to the Digital Payment Class (Class 1): the central common question is whether the Administrator Defendants (and at times Bank Defendants) maintained a pre-arranged, enterprise-level revenue-sharing agreement with one or more FinTech Defendants under which breakage, interchange fees, and inactivity fee revenues were extracted from QSF distributions and shared back to the Administrator Defendants as undisclosed compensation. This is the exclusive and predominant question. No individual question as to any Plaintiff or class member is relevant to Defendants' liability or Plaintiffs' damages.

(b)    As to the Undisclosed Kickback Class (Class 2): the central common question is whether the Administrator Defendants received undisclosed compensation from the Bank Defendants in the form of QSF deposit interest withheld from the fund and remitted to the Administrator Defendants through banking relationships. The existence, amount, and concealment of the kickback are common questions; no individual inquiry into any particular class member's circumstances is required. Aggregate damages for Class 2 are calculable as the difference between interest actually credited to each QSF and interest that would have been credited at market rates, net of the portion retained by the Bank Defendants as their legitimate margin. This is the exclusive and predominant question. No individual question as to any Plaintiff or class member is relevant to Defendants' liability or Plaintiffs' damages.

(c)    As to the Interest Rate Suppression Class (Class 3): the central common question is whether the Bank Defendants coordinated to suppress QSF deposit interest rates below competitive market levels in violation of Section 1 of the Sherman Act. That question is answerable

166

on a classwide basis. The rate-suppression is either a coordinated antitrust violation or it is not; that determination does not vary by class member. Aggregate damages for Class 3 are calculable as the spread between the rate actually paid and the competitive market rate, applied to QSF balances across the class period. This is the exclusive and predominant question. No individual question as to any Plaintiff or class member is relevant to Defendants' liability or Plaintiffs' damages.

452.    **Superior to other methods – Fed. R. Civ. P. 23(b)(3):** This class action is superior to other methods available to resolve the claims. Each class member's individual recovery is small relative to the cost of litigation. No individual settlement court reviewing a single case had or has visibility into the Administrator Defendants' book-of-business arrangements or the Bank Defendants' coordinated rate-suppression across hundreds of settlements; only this Court, with access to the full pattern of conduct, can adjudicate it. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a Class action in a single court presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

453.    In the alternative, certification is appropriate under Federal Rule of Civil Procedure 23(b)(1)(A) because individual courts reviewing individual settlements could reach inconsistent conclusions about whether the Administrator Defendants' undisclosed compensation arrangements were lawful, creating conflicting obligations for Defendants simultaneously administering hundreds of settlements in dozens of courts. Certification under Rule 23(b)(1)(B) is also appropriate because the total amount of disgorgement and restitution available from Defendants may be limited relative to the aggregate claims of the Classes, creating a risk that early adjudications deplete any available fund to the prejudice of absent Class members. Certification under Rule 23(b)(2) is further appropriate because Defendants have acted on grounds applying

generally to each Class, the same policy of undisclosed compensation applied across every settlement, such that final injunctive and declaratory relief directing disclosure, disgorgement, and compliance with fiduciary obligations is appropriate on a classwide basis. Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

454.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

455.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class members' names, email addresses, and mailing addresses from the class action settlements they administered. Defendants have already preliminarily identified Class members for the purpose of sending notices of class action settlements and distributing digital payment cards.

## CLAIMS FOR RELIEF

## <u>COUNT I</u>

### BREACH OF FIDUCIARY DUTIES
### (ADMINISTRATOR AND BANK DEFENDANTS)

456.    Plaintiffs repeat all previous allegations as if set forth in full.

457.    Plaintiffs bring this claim individually and on behalf of the Class.

458.    At all relevant times, the Administrator Defendants served as court-appointed settlement administrators and as "administrators" or trustees of the QSFs. By exercising discretionary authority and control over the administration, management, investment, and distribution of QSF assets, including (at times) determining which bank held QSF deposits, selecting which payment platforms distributed settlement proceeds, and controlling the information that was disclosed, the Administrator Defendants occupied positions of fiduciary trust

168

with respect to the class members whose funds they administered. The Bank Defendants, as custodians, escrow agents, "administrators," and depositories of court-supervised QSF assets held for the benefit of identifiable claimants, owed independent fiduciary duties arising from their exercise of discretionary authority over trust assets, the Treasury Regulations governing QSF administration, and, for national banks, the OCC fiduciary activity regulations at 12 C.F.R. Part 9. Fiduciary status attached to the Bank Defendants by virtue of the substance of their relationship to QSF assets, not any label they applied to their role.

459.   As fiduciaries, the Administrator Defendants and Bank Defendants owed the following duties to Plaintiffs and the Class, each of which is non-delegable and each of which was systematically violated:

(a)   The Duty of Loyalty: to act solely in the interest of the class member beneficiaries and to subordinate all personal and institutional financial interests to the interests of the class. Restatement (Third) of Trusts § 78.

(b)   The Duty Not to Self-Deal: to refrain from entering into any transaction in which the fiduciary's own financial interests were adverse to the interests of the beneficiaries, and to disgorge any benefit received as a result of self-dealing regardless of harm to the beneficiaries. Restatement (Third) of Trusts § 78, cmt. d(1).

(c)   The Duty of Impartiality: to administer the QSF without favoring the interests of any party, including the fiduciary itself and any party whose financial interests were structurally opposed to the class. Restatement (Third) of Trusts § 79.

(d)   The Duty of Prudent Administration: to administer each QSF with the care, skill, and caution of a prudent person acting in a like capacity, including the selection of agents, banking partners, and payment platforms based on what would best serve the class, and the ongoing monitoring and supervision of those agents. Restatement (Third) of Trusts §§ 77, 80.

169

(e)    The Duty of Full Disclosure: to keep the court, class counsel, and class member beneficiaries fully and accurately informed of all material facts bearing on the administration of the QSF, including the fiduciary's compensation, conflicts of interest, and financial arrangements with third parties. Restatement (Third) of Trusts § 82.

(f)    The Duty to Account: to maintain complete and accurate records of all QSF receipts, disbursements, and transactions, and to provide a full accounting of all compensation received in connection with each engagement, including compensation received from third parties. Restatement (Third) of Trusts § 83.

(g)    The Duty of Candor to the Tribunal: arising independently from the Administrator Defendants' status as court-appointed officers, to make full and accurate disclosures in every filing, declaration, and submission made to the appointing court, and to refrain from any communication that created a materially false or incomplete impression, whether through affirmative misstatement or omission of material fact. This duty is separate from and in addition to the trust law duties described above, and its violation is not excused by any disclosure made in any other document or proceeding.

460.    Defendants breached each of the foregoing duties through a common course of conduct:

(a)    Breach of the Duty of Loyalty and the Duty Not to Self-Deal. The Administrator Defendants entered into undisclosed financial arrangements with the Bank Defendants and FinTech Defendants under which they received substantial compensation, including interest-sharing payments, breakage revenues, interchange fee revenues, and other kickbacks, contingent on directing QSF deposits to the Bank Defendants and QSF distributions through the FinTech Defendants' platforms. The receipt of any personal financial benefit from a third party in connection with the administration of a trust, regardless of harm to the beneficiaries and regardless of the fiduciary's subjective belief in the soundness of the decision, constitutes a per

se breach of the duty of loyalty. Restatement (Third) of Trusts § 78, cmt. d(1). The Bank Defendants breached their independent duty of loyalty by structuring deposit arrangements that diverted QSF income to themselves and to the Administrator Defendants rather than crediting that income to the fund for the benefit of the class.

(b)     Breach of the Duty of Impartiality. The Administrator Defendants received undisclosed compensation from the Bank Defendants and FinTech Defendants whose financial interests were directly and structurally opposed to those of the class: every dollar of breakage the FinTech Defendants extracted was extracted from the class; every dollar of interest the Bank Defendants retained through below-market deposit structures belonged to the class. Simultaneously serving as fiduciaries to the class while receiving undisclosed compensation from parties whose profits came at the class's direct expense is an independent violation of the duty of impartiality, irrespective of any subjective belief that the decisions made were sound. The Bank Defendants breached the duty of impartiality by structuring arrangements that rewarded administrators for directing deposits to them, systematically favoring the administrator's financial interests over the interests of the class member beneficiaries.

(c)     Breach of the Duty of Prudent Administration. Selecting a payment platform or banking partner because it generates undisclosed revenue for the administrator—rather than because it offers the best terms for the class—is by definition imprudent administration. The Administrator Defendants delegated distribution to FinTech Defendants whose business model was premised on recapturing class member funds through breakage, without disclosing that delegation or its financial consequences. The Bank Defendants offered and maintained below-market interest rates on QSF accounts while deploying those same funds at significantly higher rates, a practice that no independent fiduciary acting solely in the interest of the beneficial owners would have permitted.

(d)    Breach of the Duty of Full Disclosure. Neither the Administrator Defendants nor the Bank Defendants disclosed, in any filing, accounting, declaration, notice, bid, proposal, or communication directed to any court, any class counsel, or any class member, the existence of the undisclosed financial arrangements described herein. The partial disclosures they did make, stating fees while concealing kickbacks, disclosing payment methods and partners while concealing financial interests in those methods, were affirmative misrepresentations under the half-truth doctrine. A partial disclosure by a fiduciary obligated to make complete disclosure is not merely incomplete. It is false, because it creates a misleading impression of complete transparency that the fiduciary knew to be inaccurate.

(e)    Breach of the Duty to Account. The Administrator Defendants' fee applications, administrator declarations, and post-distribution accountings disclosed their stated administrative fees and said nothing of the kickbacks, breakage revenues, interest-sharing structures, interchange fee arrangements, or other compensation received through their undisclosed arrangements with the Bank Defendants and FinTech Defendants. Any accounting that omits a material category of compensation is a misrepresentation. The Bank Defendants breached their duty to account by failing to disclose to any court, class counsel, or class member the material terms on which they held QSF deposits, the rates earned on deployment of those funds, or the financial arrangements under which a portion of the net interest spread was shared with the administrators who directed the deposits.

(f)    Breach of the Duty of Candor to the Tribunal. Each administrator declaration, fee application, distribution plan, and court submission filed by the Administrator Defendants in any case during the class period represented, by express statement and necessary implication, that the Administrator Defendant was a neutral and disinterested fiduciary whose compensation was limited to the amounts disclosed and whose selection of banking partners and payment platforms was made solely in the interest of the class. Each such submission omitted the

172

material undisclosed financial arrangements described herein. Because the Administrator Defendants were court-appointed they owed a duty of candor to the appointing court, a half-disclosure was a breach of the same magnitude as no disclosure at all.

461.    As a direct and proximate result of the foregoing breaches, Plaintiffs and the Class suffered damages including the diversion of interest income belonging to the QSF, the extraction of breakage and interchange revenue from settlement distributions, the inflation of total administration costs through undisclosed compensation channels, and the reduction of net class member recoveries across hundreds of settlements administered during the class period.

462.    Defendants are required to disgorge all unauthorized profits received in connection with the breaches described herein, including kickbacks, float income, interest diversions, breakage revenues, interchange fees, and inactivity fees, regardless of whether equivalent out-of-pocket losses are proven by each Class Member. Under the Restatement (Third) of Trusts § 78, a fiduciary that receives an unauthorized benefit holds that benefit in constructive trust for the beneficiaries from the moment of receipt. Under Restatement (Third) of Restitution & Unjust Enrichment § 43, a person who obtains a benefit in breach of a fiduciary duty, or in consequence of another's breach of such a duty, is liable in restitution to the person to whom the duty is owed. Each Defendant that received undisclosed compensation derived from QSF assets did so in breach of, or in consequence of the breach of, the fiduciary duties owed to the class, and holds those proceeds as constructive trustee for the class from the moment of receipt. Disgorgement of unauthorized profits is a remedy independent of and in addition to compensatory damages for proven losses, and its availability does not depend on a showing that the class would have received the precise amounts diverted had the arrangement not existed. Defendants must also restore to each QSF all losses caused by their breaches, to the extent not duplicative of disgorgement.

463.    Plaintiffs and the Class further seek a complete and independent accounting of all compensation received by each Defendant in connection with each settlement administered during

173

the class period, imposition of a constructive trust over all identifiable proceeds of the scheme, and such other equitable relief as the Court deems appropriate.

## COUNT II

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (FINTECH DEFENDANTS AND BANK DEFENDANTS)

464.    Plaintiffs repeat and re-allege all prior allegations as if fully set forth herein.

465.    Plaintiffs bring this claim individually and on behalf of the Class.

466.    The Administrator Defendants, as court-appointed settlement administrators and trustees of court-supervised QSFs, owed fiduciary duties to Plaintiffs and Class Members as described herein, including the duty of loyalty, the duty of full disclosure, the duty not to self-deal, the duty to account for all compensation received in connection with their appointments, and the duty to administer QSF assets exclusively for the benefit of class member beneficiaries. These duties arose from court appointment under Rule 23, and from trust law governing the QSFs established pursuant to 26 C.F.R. § 1.468B-1 *et seq*.

467.    The Administrator Defendants breached those fiduciary duties by secretly receiving compensation from FinTech Defendants and Bank Defendants in connection with settlements they administered, failing to disclose those arrangements to supervising courts, class counsel, and class members, submitting fee applications and administrator declarations that represented their compensation incompletely while concealing material additional compensation streams, and selecting payment platforms and depository banks for undisclosed financial reasons rather than class benefit.

468.    The FinTech Defendants had actual knowledge of the Administrator Defendants' fiduciary obligations. The FinTech Defendants specifically targeted court-appointed settlement administrators as their client base, marketed their platforms on the basis of undisclosed revenue the administrators would receive, and designed their compensation arrangements to be invisible to

supervising courts. The November 2, 2020 Blackhawk email, confirmed by *Forbes* through independent reporting, demonstrates that Blackhawk knew the recipient was a court-appointed fiduciary and structured its discount arrangement specifically to generate compensation outside any court-approved structure. A FinTech that markets to court-appointed fiduciaries on the basis of revenue those fiduciaries will receive without disclosing it to supervising courts knows it is facilitating a breach of the fiduciary's disclosure obligations.

469.    The Bank Defendants had actual knowledge of the Administrator Defendants' fiduciary obligations. The Bank Defendants specifically marketed settlement banking services to court-appointed administrators, published materials expressly acknowledging administrators' fiduciary roles and promising to support those roles, and designed below-market interest rate structures generating spreads shared with administrators through arrangements that appeared in no court filing. Western Alliance Bank confirmed to *Forbes* that it implemented interest diversions at administrator direction. Huntington published a Banking Handbook representing that all settlement interest remains subject to court jurisdiction while simultaneously implementing arrangements diverting that interest to administrators without court approval.

470.    The FinTech Defendants substantially assisted the Administrator Defendants' breaches of fiduciary duty by designing and marketing the undisclosed compensation arrangements, executing the master service agreements that made concealment the operative policy across all settlements, building the actuarial breakage projections that made kickbacks profitable, structuring the escheat indemnification feature to eliminate the statutory mechanism that would otherwise have returned unredeemed balances to class members, and actively marketing the undisclosed revenue program to administrators knowing it required concealment from supervising courts to remain viable.

471.    The Bank Defendants substantially assisted the Administrator Defendants' breaches of fiduciary duty by designing and implementing below-market interest rate structures

175

generating spreads shared with administrators, accepting QSF deposits into accounts structured to prevent disclosure of the interest diversion, implementing interest diversions at administrator direction as confirmed by Western Alliance's own public statement, and through Defendant Digital Disbursements providing the payment infrastructure through which breakage was simultaneously extracted on the Digital Disbursement Track.

472.    As a direct and proximate result of the FinTech Defendants' and Bank Defendants' aiding and abetting of the Administrator Defendants' breaches of fiduciary duty, Plaintiffs and Class Members suffered damages in the form of reduced settlement distributions, and loss of interest income to which they were entitled as QSF beneficiaries. Plaintiffs seek disgorgement of all unauthorized profits received by Defendants under Restatement (Third) of Trusts § 78, imposition of a constructive trust over all identifiable proceeds, and compensatory damages in an amount to be proven at trial.

### COUNT III

### FRAUDULENT CONCEALMENT
### (AGAINST ALL DEFENDANTS)

473.    Plaintiffs repeat all previous allegations as if set forth in full.

474.    Plaintiffs bring this claim individually and on behalf of the Class.

475.    Throughout the class period, Defendants concealed from Plaintiffs and class members the following material facts: (a) that the Administrator Defendants had entered into undisclosed financial arrangements with the Bank Defendants under which the Administrator Defendants received interest-sharing payments and other compensation contingent on directing QSF deposits to those banks, without competitive process and without disclosure to any supervising court; (b) that the Administrator Defendants had entered into undisclosed financial arrangements with the FinTech Defendants under which the Administrator Defendants received breakage revenues, interchange fee revenues, and other compensation contingent on directing QSF

176

distributions through those platforms, without disclosure to any supervising court; (c) that the Bank Defendants were paying below-market interest rates on QSF deposit accounts while earning significantly higher rates on deployment of those same funds, and were sharing a portion of that spread with the Administrator Defendants who directed the deposits; (d) that the FinTech Defendants were deliberately structuring payment instruments to maximize the likelihood that distributed funds would go unredeemed, and were retaining unredeemed balances as breakage revenue rather than returning those funds to the QSF or to class members; and (e) that the fees and compensation disclosed in fee applications, administrator declarations, distribution plans, and post-distribution accountings represented only a fraction of the total compensation Defendants received in connection with each engagement, and that the undisclosed balance was being extracted from funds that belonged to the class.

476.    Defendants did not merely fail to volunteer the concealed facts. They took affirmative steps to prevent discovery of them. The Administrator Defendants submitted fee applications, administrator declarations, and post-distribution accountings to supervising courts that stated administrative fees and created the affirmative impression that those fees represented the totality of their compensation — while omitting entirely the kickbacks, interest-sharing payments, breakage revenues, and interchange fee arrangements described herein. Each such submission was an affirmative act of concealment. The Bank Defendants structured their deposit arrangements to appear facially consistent with ordinary banking relationships, without disclosing the rate differential, the spread-sharing arrangements, or the volume incentives that made those relationships remunerative at the class's expense. The FinTech Defendants structured their payment platforms and governing agreements to characterize breakage retention as a standard feature of prepaid card products rather than a diversion of class member funds, and made no disclosure to any court of the financial interest they held in non-redemption of the instruments they administered.

477.    The concealed facts were material. Had any of the concealed facts been disclosed, a reasonable class member would have considered those facts significant in evaluating whether the QSF was being administered consistently with the class's interests, whether the compensation being paid to administrators, banks, and payment platforms was reasonable, whether the selection of those vendors was made on competitive terms in the interest of the class, and whether the fee applications and accountings presented to the court were complete and accurate. No class member receiving a distribution through a FinTech platform was told that the entity processing that distribution had a financial interest in the funds going unredeemed.

478.    Each Defendant knew that the concealed facts were material and knew that those facts had not been disclosed to the class. The Administrator Defendants knew that their fee applications and declarations created the false impression that their disclosed fees were their total compensation because they drafted those applications and declarations with knowledge of the undisclosed arrangements. The Bank Defendants knew that the rate differential, spread-sharing arrangements, and volume incentives were not disclosed to any class member because those arrangements were structured and maintained by the Bank Defendants themselves. The FinTech Defendants knew that their retention of breakage from QSF distributions was not disclosed and was not authorized under the regulatory framework governing QSF distributions. The concealment was not inadvertent. It was the condition on which the scheme depended. Disclosure of any one of the concealed facts would have exposed the entirety of the arrangement.

479.    Plaintiffs and the Class reasonably relied on the completeness of the disclosures made. That reliance was reasonable because the Administrator Defendants were court-appointed officers obligated by law to make complete disclosure and because Plaintiffs and class members had no independent access to the financial records, banking arrangements, or platform agreements that would have revealed the concealed facts. The information necessary to discover the scheme was in the exclusive possession of Defendants. Plaintiffs and the Class could not have discovered

178

the concealed facts through the exercise of reasonable diligence within any applicable limitations period.

480.    As a direct and proximate result of Defendants' fraudulent concealment, Plaintiffs and the Class suffered damages in an amount to be proven at trial, including the loss of interest income diverted through below-market deposit arrangements, the loss of distribution proceeds extracted as breakage and interchange revenue, the inflation of administration costs through undisclosed compensation channels, and the reduction of net class member recoveries across hundreds of settlements administered during the class period. Plaintiffs also seek disgorgement of all profits Defendants received as a result of the concealed arrangements, imposition of a constructive trust over all identifiable proceeds of the scheme, and such other relief as the Court deems appropriate.

## COUNT IV

### FRAUD
### (ALL DEFENDANTS)

481.    Plaintiffs repeat all previous allegations as if set forth in full.

482.    Plaintiffs bring this claim individually and on behalf of the Class.

483.    Administrator Defendants were responsible for transmitting class settlement notices (by mail and email), maintaining class settlement Websites, and presenting settlement terms to courts through every formal submission, including bids and proposals, preliminary approval papers, administrator declarations, distribution plans, fee applications, post-distribution accountings, and CAFA notices to State Attorneys General. Each of these communications required full and accurate disclosure of all material settlement terms so that Class Members could meaningfully decide whether to participate, seek clarification, or object.

484.    Each and every one of these communications was materially false and incomplete. Administrator Defendants systematically failed to disclose the secret remunerations, kickbacks,

179

and compensation arrangements they received in connection with their administration services, compensation paid directly out of gross settlement proceeds that correspondingly reduced Class Member recoveries. This information was plainly material: courts require settlement notices precisely so that Class Members can evaluate the economic terms of the bargain. None of it was ever disclosed.

485.    Each Defendant owed an independent duty to disclose the concealed facts to Plaintiffs and the Class. The Administrator Defendants, as court-appointed fiduciaries and given their unique position in relationship to the courts and the class, owed an unconditional duty of complete candor to the appointing court and a duty of full disclosure to the class members whose funds they administered. The Bank Defendants, as custodians and depositories of court-supervised trust assets held for identifiable beneficiaries, owed a duty of disclosure arising from their fiduciary relationship to those beneficiaries and from their knowing receipt of trust assets subject to that obligation. The FinTech Defendants, as entities receiving distributions from court-supervised QSFs on behalf of class member beneficiaries, owed a duty of disclosure arising from their role in the distribution chain and from the regulatory framework governing QSF distributions under 26 C.F.R. § 1.468B-2(d). The duty to disclose was not satisfied by any partial disclosure. A fiduciary that discloses its stated fee while concealing the existence of undisclosed compensation from third parties has not disclosed its compensation. It has misrepresented it.

486.    No Class member was made aware of the secret transactions, deals, or agreements underlying these misrepresentations.

487.    At all relevant times, Administrator Defendants knew the falsity of their representations, or recklessly disregarded it, and acted with intent to deceive Plaintiffs and class members. Their purpose was to secure administrator selection, obtain court approval of distributions on their preferred terms, and extract money and property that rightfully belonged to the class.

488.    Administrator Defendants intended Plaintiffs, Class Members, and courts to rely on their false and misleading statements and omissions, and to approve or refrain from objecting to settlements on those terms.

489.    Bank Defendants and FinTech Defendants actively participated in this fraud by designing and maintaining the financial arrangements that made Administrator Defendants' misrepresentations possible, and by themselves failing to disclose the terms on which they held QSF assets and generated breakage revenue.

490.    Plaintiffs and class members reasonably relied on Administrator Defendants' false and misleading statements and omissions. Their reliance was reasonable and no amount of diligence would have uncovered Defendants' concealed scheme.

491.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs and class members suffered actual financial harm: at minimum, their recoveries were diminished by the amount of kickbacks that should have offset administration costs. Plaintiffs and Class Members are entitled to compensatory, punitive, and/or nominal damages in an amount to be proven at trial.

## COUNT V

### AIDING AND ABETTING FRAUD
### (FINTECH DEFENDANTS AND BANK DEFENDANTS)

492.    Plaintiffs repeat and re-allege all prior allegations as if fully set forth herein.

493.    Plaintiffs bring this claim individually and on behalf of the Class.

494.    The Administrator Defendants committed fraud upon Plaintiffs and Class Members, by making materially false and misleading representations and omissions in their bids, proposals, administrator declarations, class settlement notices, post-distribution accountings, and CAFA notices, each of which misrepresented the Administrator Defendants' total compensation and omitted the undisclosed financial arrangements with FinTech Defendants and Bank Defendants, as more fully alleged in the fraud count above.

181

495.    The FinTech Defendants and Bank Defendants had actual knowledge of the Administrator Defendants' fraud. The Blackhawk email of November 2, 2020, sent to a settlement administrator, confirmed by *Forbes*, and documented in the Hilsee Report, demonstrates that Blackhawk knew its discount arrangement would not be disclosed to supervising courts. Western Alliance confirmed to *Forbes* that it implemented interest diversions at administrator direction with knowledge of the QSF regulatory framework. The FinTech Defendants' and Bank Defendants' master service agreements with Administrator Defendants, which no court ever saw, are themselves the instruments of fraud and the evidence of the FinTech Defendants' and Banks Defendants' knowledge of it.

496.    The FinTech Defendants and Bank Defendants provided substantial assistance to the Administrator Defendants' fraud. Without the FinTech Defendants' design and provision of the kickback compensation structure there would have been nothing to conceal and no motive for the fraudulent misrepresentations. Without the Bank Defendants' design and implementation of the interest-suppression structure there would have been no interest diversion to conceal. The FinTech and Bank Defendants did not merely benefit from the fraud, they created the financial arrangements that made the fraud necessary and profitable, and that is the most direct form of substantial assistance.

497.    As a direct and proximate result of the FinTech Defendants' and Bank Defendants' aiding and abetting of the Administrator Defendants' fraud, Plaintiffs and Class Members suffered out-of-pocket damages measured by the difference between the distributions they received and the distributions they would have received absent the fraud, in an amount to be proven at trial. Punitive damages are sought to the extent permitted by applicable law given the knowing and deliberate nature of each defendant's assistance.

182

## COUNT VI-A (PRIMARY)

### VIOLATION OF RICO, SECTION 1962(C) and 1964(C) – ANGEION ENTERPRISE (ANGEION, BANK DEFENDANTS, AND FINTECH DEFENDANTS)

498.    Plaintiffs repeat all previous allegations as if set forth in full.

499.    Plaintiffs bring this claim individually and on behalf of the Class.

500.    All Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

501.    The Angeion Enterprise is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of Defendant Angeion Group LLC as the hub, together with the FinTech Defendants through which Angeion directed digital payment disbursements and the Bank Defendants with which Angeion deposited QSF funds. The Angeion Enterprise is a legal entity distinct from Angeion itself.

502.    The common purpose of the Angeion Enterprise was to extract undisclosed compensation from court-supervised settlement funds: (a) through digital payment platforms generating undisclosed interchange fees and breakage; and (b) by placing QSF funds with Bank Defendants at below-market interest rates, with the spread paid back to Angeion, while concealing both arrangements from Class Members. The Angeion Enterprise has operated as a continuing unit across hundreds of class action settlements from at least 2015 to the present.

503.    Angeion conducted and participated in the operation and management of the Angeion Enterprise by: (i) directing settlement disbursements to FinTech Defendants and QSF deposits to Bank Defendants in exchange for undisclosed compensation; and (ii) submitting materially false and misleading documents to courts and Class Members — including bids and proposals, preliminary approval papers, administrator declarations, distribution plans, fee applications, class settlement notices and websites, post-distribution accountings, and CAFA notices, each omitting the undisclosed financial arrangements with the FinTech Defendants and Bank Defendants.

504. Angeion's own declaration in other class action settlements, submitted only after this litigation commenced, confirmed that Blackhawk agreed to compensate Angeion in connection with each settlement for which Blackhawk acted as Angeion's subcontractor, establishing a direct bilateral undisclosed compensation arrangement. The Bank Defendants and FinTech Defendants participated in the operation and management of the Angeion Enterprise by designing and maintaining the financial arrangements that made Angeion's misrepresentations possible, and by themselves failing to disclose to any court, class counsel, or Class Member the terms on which they participated.

505. Angeion conducted the affairs of the Angeion Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), consisting of repeated predicate acts of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and money laundering (18 U.S.C. § 1956(a)(1)), including communications as were made in certain settlements:

(a) On or about November 14, 2021, Angeion caused to be transmitted by interstate wire more than 50 million email notices to potential class members in *In re: TikTok, Inc. Consumer Privacy Litigation,* No. 1:20-cv-4699 (N.D. Ill.), informing recipients of their eligibility and directing them to a settlement website where Angeion offered digital payment options including virtual prepaid cards issued by Blackhawk. None of these notices disclosed that Angeion would receive compensation from Blackhawk in connection with digital payments, that such compensation was incorporated into Angeion's competitive bid, or that the use of Blackhawk's prepaid cards would generate breakage and fee revenue extracted from the $92 million QSF at the expense of class members.

(b) On or about March 31, 2022, a declaration of Steven Platt, project manager at Angeion, was transmitted by wire to the Court in *In re: TikTok* in support of Plaintiffs' motion for final approval of the settlement, with a supplemental declaration following on May 31, 2022. The declarations reported that Angeion had received 1,215,541 timely approved claims and

estimated total administrative costs exceeding $3 million, but omitted that Angeion would receive additional undisclosed compensation from Blackhawk for directing class members to Blackhawk's digital payment platform.

(c)    On or about March 5, 2021, Angeion caused a CAFA notice to be transmitted by United States mail to the Attorney General of the United States and the attorneys general of each state, pursuant to 28 U.S.C. § 1715, in connection with the *In re: TikTok* settlement. The notice included copies of the Settlement Agreement and Angeion's notice plan but omitted that Angeion maintained a pre-existing undisclosed compensation arrangement with Blackhawk under which Angeion would receive financial consideration for directing digital payment disbursements through Blackhawk's platform.

506.    These predicate acts are related, as each served the common purpose of concealing undisclosed compensation to maintain Angeion's appointment and secure court approval, and continuous, spanning hundreds of settlements from at least 2018 to the present.

507.    The Angeion Enterprise engaged in and affected interstate commerce through notices sent by mail and wire to Class Members across the country, electronic fund transfers, and court submissions filed across multiple federal districts.

508.    Plaintiffs and Class Members held a cognizable property interest in their proportionate shares of court-approved QSF distributions. Plaintiffs are direct victims of the predicate acts: each fraudulent court submission obtained judicial approval that Angeion needed to execute the scheme, and each diversion of QSF assets directly reduced Class Member recoveries. Plaintiffs and Class Members received less than they were entitled to in an amount to be proven at trial, and are entitled to treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c).

## <u>COUNT VI-B (PRIMARY)</u>

### VIOLATION OF RICO § 1962(C) AND 1964(C) — EPIQ ENTERPRISE
### (EPIQ, BANK DEFENDANTS, AND FINTECH DEFENDANTS)

509.    Plaintiffs repeat and incorporate all prior allegations.

510.    The Epiq Enterprise is an association-in-fact enterprise consisting of Epiq as the hub, together with the FinTech Defendants through which Epiq directed digital payment disbursements and the Bank Defendants with which Epiq deposited QSF funds. The common purpose was identical to that of the Angeion Enterprise: to extract undisclosed compensation at disbursement and deposit while concealing both arrangements from supervising courts and Class Members. Given that the FinTech Defendants partnered with more than 60% of class action administrators and that Epiq controls approximately 50% of the administrator market, on information and belief Epiq contracted with one or more FinTech Defendants on materially identical undisclosed compensation terms. The Epiq Enterprise has operated as a continuing unit from at least 2015 to the present.

511.    On information and belief, Epiq directed digital payment disbursements through one or more of the FinTech Defendants and deposited QSFs with both Bank Defendants. This belief is based on: (i) Digital Disbursements' public representation that it has partnered with more than 60% of class action administrators; (ii) Epiq's position as the largest settlement administrator in the country controlling approximately 50% of the market; (iii) the materially identical compensation structures documented across other Administrator Defendants; (iv) the industry-wide characterization of these arrangements as "standard practice"; and (v) public documentation showing that class members have received payments from FinTech Defendants in settlements administered by Epiq, and that Epiq has deposited settlement funds with Huntington. The specific contractual terms will be confirmed through discovery.

186

512. Epiq conducted and participated in the operation and management of the Epiq Enterprise by directing settlement disbursements to FinTech Defendants and QSF deposits to Bank Defendants in exchange for undisclosed compensation, and by submitting materially false and misleading documents in connection with each settlement it administered, including bids and proposals for administrator selection; preliminary approval motion papers and supporting declarations; administrator declarations submitted in connection with fee applications and distribution plans; class settlement notices transmitted by U.S. mail; class settlement notices transmitted by email; class settlement websites; post-distribution accountings; and CAFA notices to State Attorneys General, each omitting the undisclosed compensation arrangements. The Bank Defendants and FinTech Defendants participated in the operation and management of the Epiq Enterprise by designing and maintaining the financial arrangements enabling Epiq's misrepresentations. Each Defendant who aided and abetted predicate acts is liable as a principal under 18 U.S.C. § 2.

513. Epiq conducted the affairs of the Epiq Enterprise through a pattern of racketeering activity consisting of repeated predicate acts of mail fraud, wire fraud, and money laundering, which communications included:

(a) Between March and April 2023, Epiq caused hundreds of thousands of notices to be transmitted by United States mail and millions of email notices to be transmitted by interstate wire to potential class members in *In re Juul Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation*, No. 19-md-02913 (N.D. Cal.), informing recipients of their eligibility and directing them to a settlement website where Epiq offered digital payment options including prepaid cards issued by Defendants Blackhawk and Digital Disbursements. None of these notices disclosed that Epiq would receive compensation from Blackhawk and Digital Disbursements in connection with digital payments, or that breakage and fees on unredeemed prepaid cards would reduce class member recoveries from the $255 million QSF.

187

(b) On or about June 23, 2023, a declaration of Cameron Azari, Senior Vice President of Epiq Class Action and Claims Solutions, was transmitted by wire to the Court in *In re Juul Labs* in support of a motion for final approval of the settlement. The declaration described the payment options available to class members, including PayPal, Digital Mastercard, or "other options," but omitted that Epiq had selected Blackhawk and Digital Disbursements to issue those payments and that Epiq would receive undisclosed compensation from those entities in connection with that selection. The Court granted final approval on September 19, 2023, in reliance on a declaration that was materially false and misleading by omission.

(c) On or about December 29, 2022, Epiq caused a CAFA notice to be transmitted by United States mail to the Attorney General of the United States and the attorneys general of each State, pursuant to 28 U.S.C. § 1715, in connection with the *In re Juul Labs* settlement. The notice included copies of the Settlement Agreement and Epiq's notices to class members, but omitted that Epiq maintained undisclosed compensation arrangements with Blackhawk and Digital Disbursements under which Epiq would receive financial consideration for directing digital payment disbursements through those entities' platforms.

514. For the same reasons set forth in Count VI-A, Plaintiffs and Class Members suffered direct injury to their property interests in QSF distributions and are entitled to treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c).

### COUNT VI-C (PRIMARY)

**VIOLATION OF RICO § 1962(C) AND 1964(C) — JND ENTERPRISE
(JND, BANK DEFENDANTS, AND FINTECH DEFENDANTS)**

515. Plaintiffs repeat and re-allege all prior allegations.

516. The JND Enterprise is an association-in-fact enterprise consisting of Defendant JND Holdings LLC as the hub, together with Blackhawk and any additional FinTech Defendants through which JND directed digital payment disbursements, and the Bank Defendants with which

JND deposited QSF funds. JND's receipt of kickbacks from Blackhawk in the Equifax settlement is specifically alleged herein. Blackhawk's simultaneous participation in materially identical programs with multiple administrators establishes that JND knew the same program operated across its competitors. The JND Enterprise has operated from at least 2015 to the present. Even during periods when JND was not directly receiving kickbacks, JND participated in the enterprise's concealment by failing to disclose the kickback arrangements, constituting participation in the enterprise's conduct under § 1962(c) and the § 1962(d) conspiracy.

517. On information and belief, JND directed digital payment disbursements through one or more of the FinTech Defendants and deposited QSF funds with one or more of the Bank Defendants. This belief is based on: (i) Blackhawk's and Digital Disbursements' public representations that they have partnered with more than 60% of class action administrators, making JND's participation in the same program highly probable given its position as one of the largest settlement administrators in the country; (ii) the industry-wide characterization of these arrangements as "standard practice" by multiple settlement administration industry insiders; (iii) a Bank Defendant's confirmation that "Admins" (plural) were requesting interest-sharing arrangements, establishing that JND, as a major market participant, was among the administrators making such demands; and (iv) public documents showing that JND has distributed settlement funds through FinTech Defendants and deposited QSFs with Huntington. The specific contractual terms, bank partners, and special purpose entity structures will be confirmed through discovery.

518. JND conducted and participated in the operation and management of the JND Enterprise by directing settlement disbursements and QSF deposits to co-conspirators in exchange for undisclosed compensation, and by submitting materially false and misleading documents, including bids and proposals for administrator selection; preliminary approval motion papers and supporting declarations; administrator declarations submitted in connection with fee applications and distribution plans; class settlement notices transmitted by U.S. mail; class settlement notices

transmitted by email; class settlement websites; post-distribution accountings; and CAFA notices to State Attorneys General. The Bank Defendants and FinTech Defendants participated by designing and maintaining the enabling financial arrangements.

519.    JND conducted the affairs of the JND Enterprise through a pattern of racketeering activity consisting of repeated predicate acts of mail fraud, wire fraud, and money laundering, which communications included:

(a)    Between April 25, 2022, and August 24, 2022, JND caused notices to be transmitted by interstate wire and United States mail to potential class members in *In re Equifax, Inc. Customer Data Security Breach Litigation*, No. 1:17-md-02800 (N.D. Ga.), generating over 1 billion impressions through email, digital advertising, and print media, informing recipients of their eligibility and directing them to a settlement website where JND touted the availability of "various digital payment options" including virtual prepaid cards issued by Blackhawk through its HawkMarketplace platform. None of these notices disclosed that JND would receive compensation from Blackhawk in connection with digital payments, or that breakage and fees on unredeemed prepaid cards would reduce class member recoveries from the $380.5 million QSF. The settlement website revealed that JND sent emails steering class members to change their payment selection from check to prepaid card, and that JND issued all second-round payments exclusively via Blackhawk prepaid card without offering class members any choice.

(b)    On or about December 5, 2019, a declaration of Jennifer Keough, CEO and Founder of JND Legal Administration, was transmitted by wire to the Court in *In re Equifax* in support of a motion for final approval of the $380.5 million settlement, and was posted by JND on the settlement website. The declaration omitted that JND had selected Blackhawk to issue digital payments, that JND would receive undisclosed compensation from Blackhawk in connection with that selection, or that a substantial portion of the QSF would be distributed through Blackhawk's prepaid cards generating breakage and fee revenue at class members' expense. The Court granted

190

final approval on January 13, 2020, in reliance on a declaration that was materially false and misleading by omission.

520.    For the same reasons set forth in Count VI-A, Plaintiffs and Class Members suffered direct injury to their property interests in QSF distributions and are entitled to treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c).

**COUNT VI-D (PRIMARY)**

**VIOLATION OF RICO § 1962(C) AND 1964(C)— KROLL ENTERPRISE
(KROLL, BANK DEFENDANTS, AND FINTECH DEFENDANTS)**

521.    Plaintiffs repeat and re-allege all prior allegations.

522.    The Kroll Enterprise is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of Defendant Kroll Settlement Administration LLC as the hub, together with the FinTech Defendants through which Kroll directed digital payment disbursements and the Bank Defendants with which Kroll deposited QSF funds. The Kroll Enterprise is a legal entity distinct from Kroll itself. The common purpose of the Kroll Enterprise was to extract undisclosed compensation from court-supervised settlement funds: (a) through digital payment platforms generating undisclosed interchange fees and breakage; and (b) by placing QSF funds with Bank Defendants at below-market interest rates, with the spread paid back to Kroll, while concealing both arrangements. The Kroll Enterprise has operated as a continuing unit across hundreds of class action settlements from at least 2015 to the present.

523.    On information and belief, Kroll directed digital payment disbursements through one or more of the FinTech Defendants and deposited QSF funds with one or more of the Bank Defendants. This belief is based on: (i) Kroll's position as one of the largest settlement administrators in the country, having administered more than 4,000 settlements and distributed more than $30 billion, making it among the most probable participants in any industry-wide program operating across more than 60% of class action administrators; (ii) Digital

191

Disbursements' and Blackhawk's public representations that they have collectively partnered with more than 60% of class action administrators, a market penetration figure that, given Kroll's dominant market position, makes non-participation a statistical improbability; (iii) the materially identical special purpose entity concealment structures adopted by other Administrator Defendants operating in the same market during the same period, which independent actors do not develop in parallel without coordination; (iv) the industry-wide characterization of the bank interest scheme as "standard practice" by multiple settlement administration industry insiders, a characterization that would not apply to a scheme from which the largest administrators were absent; (v) a Bank Defendant's confirmation that "Admins" (plural) were requesting interest-sharing arrangements, which given Kroll's market dominance makes its participation in those demands highly probable; (vi) in March 2025, both Bank Defendants quoted identical below-market rates to multiple administrators without competitive bidding, confirming coordinated ongoing arrangements in which Kroll, as a dominant market participant, was almost certainly included; (vii) as of August 2025, quoted QSF deposit interest rates from Defendants remain below 0.5% annually despite a federal funds rate of 4.33%, confirming the arrangements remain active across the market in which Kroll continues to operate; and (viii) public documentation establishing that Kroll worked with the Bank and Fintech Defendants in settlements it administered. The specific contractual terms, FinTech partners, Bank partners, and special purpose entity structures will be confirmed through discovery.

524. Kroll conducted and participated in the operation and management of the Kroll Enterprise by: (i) directing settlement disbursements to FinTech Defendants and QSF deposits to Bank Defendants in exchange for undisclosed compensation; and (ii) submitting materially false and misleading documents to courts and Class Members, including bids and proposals for administrator selection, preliminary approval motion papers and supporting declarations, administrator declarations submitted in connection with fee applications and distribution plans,

192

class settlement notices transmitted by U.S. mail, class settlement notices transmitted by email, class settlement websites, post-distribution accountings, and CAFA notices to State Attorneys General, each omitting the undisclosed financial arrangements with the FinTech Defendants and Bank Defendants.

525.    The Bank Defendants and FinTech Defendants participated in the operation and management of the Kroll Enterprise by designing and maintaining the financial arrangements that made Kroll's misrepresentations possible, and by themselves failing to disclose to any court, class counsel, or Class Member the terms on which they participated. Each Defendant who aided and abetted the commission of predicate acts is liable as a principal under 18 U.S.C. § 2.

526.    Kroll conducted the affairs of the Kroll Enterprise through a pattern of racketeering activity consisting of repeated predicate acts of mail fraud, wire fraud, and money laundering, which communications included:

(a)    Between September 28, 2022, and October 24, 2022as court-appointed Settlement Administrator in *In re T-Mobile Customer Data Security Breach Litigation*, No. 4:21-md-03019 (W.D. Mo.), caused to be transmitted by United States mail more than 26 million postcard notices and by interstate wire more than 49 million email notices to potential class members nationwide, directing them to a settlement website maintained by Kroll. Each notice informed class members of their eligibility and directed them to Kroll's website, where Kroll offered digital payment options including virtual prepaid cards issued by Defendants Blackhawk and Digital Disbursements. None of these notices disclosed that Kroll would receive undisclosed compensation from those FinTech Defendants in connection with digital payments, or that Defendant Huntington was paying a sub-market interest rate on the $350 million QSF while sharing the retained spread with Kroll. The omission rendered each notice materially false and misleading.

(b)    On or about January 10, 2023, a declaration of Scott Fenwick, Senior Director of Kroll Settlement Administration LLC, was electronically filed with the Court in *In re*

*T-Mobile* in support of a motion for final approval, representing that class members would be given the option of receiving electronic payments while omitting that Kroll had selected Digital Disbursements and Blackhawk to facilitate those payments pursuant to undisclosed compensation arrangements and that the digital payment methods would generate breakage revenue shared between the FinTech Defendants and Kroll at the direct expense of class members

(c)   On or about July 28, 2022, Kroll caused a CAFA notice to be transmitted by U.S. mail to federal and state attorneys general in connection with *In re T-Mobile Customer Data Security Breach Litig.*, No. 4:21-md-03019-BCW (W.D. Mo.), which notice disclosed settlement terms and Kroll's identity as Settlement Administrator but omitted that Kroll maintained undisclosed compensation arrangements with Digital Disbursements and Blackhawk Network under which Kroll would receive financial consideration for directing digital payment disbursements through those platforms, and that Huntington would pay Kroll a portion of interest earned on the $350 million QSF through arrangements never disclosed to or approved by the Court.

527.   For the same reasons set forth in Count VI-A, Plaintiffs and Class Members suffered direct injury to their property interests in QSF distributions and are entitled to treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c).

**COUNT VI-E**
**VIOLATION OF 18 U.S.C. § 1962(d) — RICO CONSPIRACY**
**(ALL DEFENDANTS)**

528.   Each Defendant agreed and conspired to violate 18 U.S.C. § 1962(c) as alleged in Counts VI-A through VI-D. A conspirator need not personally commit predicate acts; knowing agreement that the conspiracy would involve a pattern of racketeering suffices.

529.   Each category of Defendant knowingly agreed to the conspiracy as follows. Each FinTech Defendant knowingly agreed that Administrator Defendants would omit digital payment compensation arrangements from disclosures to courts and class members, because the FinTech Defendants designed and operated the programs and pitched them to multiple administrators

194

simultaneously, each administrator who accepted knowing the same program was being offered industry-wide.

530.    Each Bank Defendant knowingly agreed that Administrator Defendants would omit QSF deposit interest arrangements from disclosures to courts and class members, because the Bank Defendants structured and maintained the below-market deposit arrangements and, as confirmed by the allegation that "Admins" (plural) were making coordinated demands on banks, knew those arrangements operated across the industry.

531.    Each Administrator Defendant, knowing that other administrators were maintaining the same industry-wide concealment, knowingly agreed to maintain the same silence, each administrator's nondisclosure being conditioned on and furthered by the others', making the mutual concealment itself the agreement.

532.    The following facts establish the knowing agreement beyond parallel conduct: (a) three industry insiders from multiple settlement administrators described the bank interest scheme as "standard practice," confirming each administrator knew the identical arrangement extended across its competitors; (b) a Bank Defendant confirmed that "Admins" (plural) were requesting interest-sharing arrangements, confirming each administrator knew the identical demand was being made industry-wide; (c) in March 2025, both Bank Defendants quoted identical below-market rates to multiple administrators without competitive bidding, confirming coordination; and (d) as of August 2025, quoted QSF interest rates remain below 0.5% annually despite a federal funds rate of 4.33%, confirming the arrangements are ongoing.

533.    As a direct and proximate result of the conspiracy, Plaintiffs and Class Members suffered injury to their property interests in QSF distributions and are entitled to treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c).

195

## COUNT VI-F

### AIDING AND ABETTING VIOLATIONS OF 18 U.S.C. § 1962(c)
### PURSUANT TO 18 U.S.C. § 2
### (FINTECH DEFENDANTS AND BANK DEFENDANTS)

534. Plaintiffs repeat and re-allege all prior allegations.

535. Plaintiffs bring this Count individually and on behalf of the Class.

536. Any person who aids, abets, counsels, commands, induces, or procures the commission of a federal offense is punishable as a principal under 18 U.S.C. § 2. Each FinTech Defendant and each Bank Defendant aided and abetted the Administrator Defendants' violations of 18 U.S.C. § 1962(c), as alleged in Counts VI-A through VI-D, and is liable as a principal to the same extent as the Administrator Defendants, subject to treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c).

537. As alleged in Counts VI-A through VI-D, each Administrator Defendant conducted and participated in the management and operation of its respective RICO enterprise through a pattern of racketeering activity. The predicate acts consisted of: (i) class settlement notices transmitted by mail and wire that presented eCard distributions as a neutral, class-serving option without disclosing the Administrator Defendants' pre-existing financial arrangements with the FinTech Defendants under which those administrators received undisclosed compensation contingent on directing distributions through those platforms; (ii) administrator declarations, fee applications, distribution plans, and post-distribution accountings electronically filed with supervising courts that omitted those financial arrangements and the interest-sharing arrangements with the Bank Defendants, creating the false impression that the Administrator Defendants' total compensation was limited to the amounts disclosed; and (iii) CAFA notices to State Attorneys General that omitted those financial arrangements. Each such transmission and filing was a predicate act of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. In

addition, the FinTech Defendants engaged in money laundering, in violation of 18 U.S.C. § 1956 by receiving QSF funds intended for Class members and diverting these funds to themselves and

538.    Each FinTech Defendant had actual knowledge of the Administrator Defendants' primary RICO violations and provided substantial assistance in their commission. Each FinTech Defendant: (i) specifically targeted court-appointed settlement administrators as its client base, with actual knowledge that those administrators were court-appointed fiduciaries obligated to make complete disclosure of all compensation arrangements to supervising courts; (ii) designed and marketed the undisclosed kickback structure—variously described as a "discount," "revenue sharing," or "additional revenue"—that gave Administrator Defendants a financial incentive to select its platform and a corresponding motive to conceal that selection rationale from supervising courts, as evidenced by the Blackhawk email of November 2, 2020, confirmed through independent reporting by *Forbes*, in which Blackhawk offered a court-appointed administrator "additional revenue" of up to 75,000 on a million distribution while stating "we actually pay you to issue these cards," with no proposal that this arrangement be disclosed to any court; (iii) executed and maintained master service agreements with Administrator Defendants establishing the undisclosed compensation arrangements as governing terms across those administrators' entire book of business, which agreements appeared in no court filing, fee application, administrator declaration, or CAFA notice in any case; (iv) provided actuarial breakage projections to Administrator Defendants quantifying the revenue those administrators would receive from unredeemed card balances, which projections were the instrument by which the FinTech Defendants induced Administrator Defendants to select their platforms for undisclosed financial reasons and to submit distribution plans and administrator declarations that misrepresented the basis for those selections; (v) operated the debit-at-issuance payment infrastructure through which QSF assets were transferred from the fund in full at the moment each eCard was issued and transmitted to a class member—not at the moment of redemption—thereby making the diversion

of class member funds irreversible before any court was given information sufficient to intervene; and (vi) structured the escheat indemnification provisions of their agreements to eliminate the legal mechanism—state unclaimed property laws—that would otherwise have required unredeemed eCard balances to revert to class members, with knowledge that doing so made the diversion of class member funds permanent absent affirmative litigation.

539.    Each Bank Defendant had actual knowledge of the Administrator Defendants' primary RICO violations and provided substantial assistance in their commission. Each Bank Defendant: (i) specifically marketed QSF banking services to court-appointed settlement administrators with actual knowledge of the QSF regulatory framework under 26 C.F.R. § 1.468B-1, *et seq*., and with actual knowledge that Administrator Defendants' selection of a depository bank was a fiduciary decision subject to court oversight and full disclosure requirements; (ii) designed and implemented below-market interest rate structures for QSF deposit accounts— paying rates as low as 0.5% annually against a federal funds rate of 4.33% or more—while deploying those same funds at significantly higher rates and remitting a portion of the net spread to the Administrator Defendants who directed the deposits, without disclosure; (iii) structured the relevant QSF deposit accounts in ways that concealed the rate differential, spread-sharing arrangements, and volume, rendering the Administrator Defendants' material omissions in their court filings undetectable and thereby substantially assisting in their commission; (iv) remitted payments to Administrator Defendants out of QSF assets, each of which diversion of class trust assets under state trust law, the duty of loyalty, and unjust enrichment; (v) violated federal anti-money laundering regulations by failing to report kickback payments from the FinTech Defendants to the Administrator Defendants that the Bank Defendants knew, suspected, or had reason to suspect constituted money laundering;  (vi) in the case of Western Alliance, acquired Digital Disbursements in January 2022 and thereby simultaneously provided the Bank Interest Track deposit infrastructure and the Digital Disbursement Track payment infrastructure, substantially

assisting in the operation of both tracks of the scheme across every settlement in which Western Alliance served as QSF depository and Digital Disbursements served as digital payment platform; and (vii) in the case of Huntington, entered into its own revenue-sharing agreements with FinTech Defendants for class action settlements where Huntington was able to choose the means of settlement disbursement.

540.    As a direct and proximate result of each FinTech Defendant's and each Bank Defendant's aiding and abetting of the Administrator Defendants' violations of 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 2, Plaintiffs and Class Members suffered direct injury to their property interests in their QSF distributions. Each class member who was a beneficiary of a QSF held by a Bank Defendant, or a settlement in which the FinTech Defendants took funds through breakage, suffered a reduction in distributable share equal to the interest suppressed through the Bank Defendant's below-market deposit structure and the portion of that spread remitted to the Administrator Defendant. Plaintiffs and Class Members are entitled to treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c), disgorgement of all unauthorized profits to be held in constructive trust for the benefit of the Class, and such other relief as the Court may deem appropriate.

## <u>COUNT VI-G</u>

**ALTERNATIVE — PLEADED PURSUANT TO FED. R. CIV. P. 8(d)(2)**
**VIOLATION OF RICO § 1962(C) AND 1964(C)**
**FINTECH DIGITAL PAYMENT ENTERPRISE**
**(ALL ADMINISTRATOR DEFENDANTS AND ALL FINTECH DEFENDANTS)**

541.    In the alternative, and only if the Court determines that Counts VI-A through VI-E do not adequately allege separate administrator-centered enterprises, Plaintiffs allege Count VI-G pursuant to Fed. R. Civ. P. 8(d)(2). Count VI-G alleges a single FinTech Digital Payment Enterprise consisting of all Administrator Defendants together with all FinTech Defendants. The common purpose was to extract undisclosed compensation through digital payment disbursement

programs via interchange fees, breakage on unredeemed prepaid cards, and related undisclosed remuneration, while concealing those arrangements from supervising courts. Each Administrator Defendant conducted and participated in this alternative enterprise through the predicate acts described herein. RICO injury is as alleged in Count VI-A.

## COUNT VI-H

**ALTERNATIVE — PLEADED PURSUANT TO FED. R. CIV. P. 8(d)(2)**
**VIOLATION OF RICO § 1962(C) AND 1964(C)**
**BANK DEPOSIT ENTERPRISE**
**(ALL ADMINISTRATOR DEFENDANTS AND ALL BANK DEFENDANTS)**

542.    In the alternative, and only if the Court determines Counts VI-A through VI-E do not adequately allege separate administrator-centered enterprises, Plaintiffs allege Count VI-G pursuant to Fed. R. Civ. P. 8(d)(2). Count VI-G pursuant to Fed. R. Civ. P. 8(d)(2). Count V-G alleges a single Bank Deposit Enterprise consisting of all Administrator Defendants together with all Bank Defendants. The common purpose was to cause QSF funds to be deposited with Bank Defendants at below-market interest rates, with the spread paid to Administrator Defendants through SPEs, while concealing those arrangements from supervising courts. Each Administrator Defendant conducted and participated in this alternative enterprise through the predicate acts described herein. RICO injury is as alleged in Count VI-A.

## COUNT VI-I

**ALTERNATIVE — PLEADED PURSUANT TO FED. R. CIV. P. 8(d)(2)**
**VIOLATION OF RICO § 1962(C) AND 1964(C)**
**UNIFIED ENTERPRISE**
**(ALL DEFENDANTS)**

543.    In the alternative, Plaintiffs allege Count VI-I pursuant to Fed. R. Civ. P. 8(d)(2). Count VI-I alleges a single Unified Enterprise consisting of all Defendants—all Administrator Defendants, all FinTech Defendants, and all Bank Defendants. The common purpose was to extract undisclosed compensation from court-supervised settlement funds at every stage—at disbursement (through the FinTech digital payment program) and at deposit (through the bank

interest kickback program)—while concealing both arrangements from supervising courts and class members. Each Defendant conducted and participated in the Unified Enterprise through the pattern of racketeering described herein. Plaintiffs plead the Unified Enterprise only as a last-resort alternative. RICO injury is as alleged in Count VI-A.

## COUNT VI-J

### VIOLATION OF 18 U.S.C. § 1962(a)
### INVESTMENT OF RACKETEERING PROCEEDS
### (ALL DEFENDANTS)

544.    Plaintiffs repeat all previous allegations as if set forth in full.

545.    Each Defendant received income derived, directly or indirectly, from a pattern of racketeering activity as alleged herein, including kickbacks, float income, interchange fees, breakage, and interest rate spreads extracted from court-supervised QSF assets.

546.    Each Defendant used and invested that income in the establishment, operation, and maintenance of the enterprise, including through the formation and funding of special purpose entities used to receive and conceal racketeering proceeds, and through the continued financing of the digital payment and bank deposit infrastructure that enabled the ongoing scheme.

547.    As a direct and proximate result of Defendants' use and investment of racketeering proceeds, Plaintiffs and Class Members suffered injury to their property interests in QSF distributions, separate from and in addition to the injury caused by the predicate acts themselves, in an amount to be proven at trial. Plaintiffs and Class Members are entitled to treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c).

## COUNT VII

### CIVIL CONSPIRACY
### (All Defendants)

548.    Plaintiffs repeat and re-allege all prior allegations as if fully set forth herein.

549.    Plaintiffs bring this claim individually and on behalf of the Class.

550.    Each Defendant agreed and combined with one or more other Defendants to accomplish an unlawful purpose, the extraction of undisclosed compensation from court-supervised QSF assets at the expense of class member beneficiaries, and to accomplish a lawful purpose by unlawful means, specifically by concealing those financial arrangements from the supervising courts that would have prohibited them. The agreement among Defendants is established by the following facts, each independently sufficient and collectively overwhelming:

551.    *First*, the FinTech Defendants marketed and operated materially identical undisclosed compensation programs with multiple Administrator Defendants simultaneously. Digital Disbursements publicly claimed to have partnered with more than 60% of class action administrators. Tremendous disclosed operations across more than 200 class action cases. Each Administrator Defendant that received a FinTech Defendant's proposal for digital payment services received, expressly or implicitly, information that the same program was already operating across its competitors.

552.    Second, three settlement administrator industry insiders confirmed to *Forbes*, as reported on May 21, 2025, that receipt of bank interest and digital payment revenue was "standard practice" across the settlement administration industry, establishing that each administrator knew others were engaged in the same arrangements. One former employee confirmed: "Suddenly, we were making a lot of money that had nothing to do with the administration of benefits to class members." A second confirmed: "When these administrators are pulling down 4% straight to them, with no benefit to the fund, there won't be a judge in the country that will think that's right." These statements establish both the agreement and each participant's knowledge that disclosure would end the scheme, the motive for the collective concealment that constitutes the conspiracy's overt act.

553.    *Third*, the Bank Defendants confirmed to the Hilsee white paper that "Admins" (plural) were demanding that banks share QSF interest, establishing that each Bank Defendant

knew multiple administrators were making the same demand simultaneously. Western Alliance confirmed to *Forbes* that it implemented interest diversions at administrator direction across its book of business, establishing a bilateral agreement between Western Alliance and each Administrator Defendant that selected it as depository.

554.    *Fourth*, some of the Administrator Defendants adopted materially identical SPE concealment structures to receive kickback payments outside accounts subject to judicial review. Competing fiduciaries do not independently develop identical concealment vehicles. The uniformity of the SPE structure across multiple competing administrators establishes coordination.

555.    In furtherance of the civil conspiracy, each Defendant committed overt acts including executing master service agreements with co-conspirators, directing QSF deposits and digital disbursements to co-conspirators on undisclosed financial terms, submitting court filings omitting those arrangements, and forming and funding SPEs to receive and conceal kickback payments.

556.    As a direct and proximate result of the civil conspiracy, Plaintiffs and Class Members suffered damages in the form of reduced settlement distributions and loss of QSF interest income to which they were entitled. All Defendants are jointly and severally liable for those damages. Plaintiffs also seek punitive damages to the extent permitted by applicable law given the deliberate and sustained nature of the conspiracy.

## COUNT VIII

### NEGLIGENT MISREPRESENTATION
### (ADMINISTRATOR DEFENDANTS)

557.    Plaintiffs repeat all previous allegations as if set forth in full.

558.    Plaintiffs bring this claim individually and on behalf of the Class.

559.    For purposes of this count only, in the alternative, Plaintiffs specifically disclaim any allegations of fraud and allege only negligence.

560.    Administrator Defendants had a duty to fully and accurately disclose, in their bids, proposals, agreements, contracts, and all court submissions, the full compensation they would receive for providing settlement administration services, including compensation in the form of kickbacks, float income, interchange fees, breakage, and related arrangements. In breach of that duty, Administrator Defendants omitted and/or affirmatively misrepresented that compensation.

561.    The compensation paid to a settlement administrator was material to Plaintiffs, Class Members, and the courts at every stage of the selection and approval process, because that compensation is paid from gross settlement proceeds and directly reduces Class Member recoveries. Administrator Defendants negligently disregarded the falsity of their representations and made omissions and misrepresentations of material fact that they knew or should have known were false and misleading.

562.    Administrator Defendants occupied a position of special confidence and trust with respect to Plaintiffs and Class Members. Given that relationship, Administrator Defendants had a duty to speak truthfully and with care, and it was entirely foreseeable that Plaintiffs, Class Members, and the courts would rely on their representations and omissions regarding compensation.

563.    Plaintiffs and Class Members did in fact rely on Administrator Defendants' false and misleading statements and omissions in selecting Administrator Defendants to administer dozens, if not hundreds, of class actions. That reliance was reasonable at all times, no amount of diligence would have revealed the falsity of Administrator Defendants' representations or the existence of their concealed compensation arrangements.

564.    Administrator Defendants' negligent misrepresentations caused actual financial harm: Class Members received diminished recoveries.

565.    As a direct and proximate result, Plaintiffs and Class Members are entitled to compensatory and nominal damages in an amount to be proven at trial, and punitive damages to the extent permitted by applicable law.

## COUNT IX

### NEGLIGENCE
### (ADMINISTRATOR DEFENDANTS)

566.    Plaintiffs repeat all previous allegations as if set forth in full.

567.    Plaintiffs bring this claim individually and on behalf of the Class.

568.    Administrator Defendants owed Plaintiffs and Class Members a duty to exercise reasonable care in managing and administering QSF assets in class action settlements. This duty arose from multiple independent sources: (i) the common law duty of care owed to foreseeable victims of negligent conduct—here, the Class Members whose settlement funds Administrator Defendants controlled; (ii) Administrator Defendants' voluntary assumption of responsibility as professional administrators who held themselves out as trusted, expert providers of class action settlement services; and (iii) the court-supervised nature of QSF administration, which placed Administrator Defendants in a role carrying well-defined obligations to act competently and in the interest of those whose funds they managed.

569.    Administrator Defendants breached these duties through the acts and omissions alleged throughout this Complaint, including by structuring QSF administration to extract undisclosed financial benefits—through kickbacks, float income, interchange fees, breakage, and related arrangements, rather than managing settlement funds with reasonable care for the benefit of the Class.

570.    But for Administrator Defendants' negligent breach of their duties, Class Members would have received greater recoveries: administration costs would have been lower, and funds diverted through the undisclosed compensation schemes would have remained

available to compensate the Class. As a direct and proximate result, Plaintiffs and Class Members have suffered financial loss and are entitled to compensatory, punitive, and nominal damages in an amount to be proven at trial.

## COUNT X

### UNJUST ENRICHMENT
### (ALL DEFENDANTS)

571.    Plaintiffs repeat all previous allegations as if set forth in full.

572.    Plaintiffs bring this claim individually and on behalf of the Class.

573.    Defendants received substantial financial benefits, including kickbacks, float income, interchange fees, breakage, and other undisclosed compensation, that were paid from or generated by QSF assets held for the exclusive benefit of Plaintiffs and the Class. These benefits were obtained through the concealed schemes alleged throughout this Complaint.

574.    Plaintiffs and Class Members conferred these benefits on Defendants, and were correspondingly deprived of them, without knowledge of the arrangements and without meaningful opportunity to object. Defendants' retention of these benefits is inequitable: they were extracted from settlement funds through undisclosed self-dealing, in breach of fiduciary duties, and in violation of the terms on which Defendants were appointed and approved.

575.    Defendants have been unjustly enriched at the direct expense of Plaintiffs and the Class. Equity and good conscience require that Defendants not be permitted to retain these benefits.

576.    Plaintiffs and the Class seek full restitution and disgorgement of all amounts by which Defendants were unjustly enriched, including all undisclosed compensation, financial benefits, and profits derived from the wrongful conduct alleged herein, to be held in constructive trust for the benefit of the Class pending distribution.

577.    To the extent Plaintiffs and the Class lack an adequate remedy at law to recover the full measure of Defendants' unjust enrichment, including equitable remedies such as constructive trust, accounting, and disgorgement, Plaintiffs seek equitable relief in the alternative.

## COUNT XI

**VIOLATION OF THE SHERMAN ACT, SECTION 1
(ADMINISTRATOR DEFENDANTS AND BANK DEFENDANTS)**

578.    Plaintiff repeats all previous allegations and incorporates them herein.

579.    Beginning sometime in 2015, the exact date being unknown to the Plaintiff and Class Members, being exclusively within the knowledge of Defendants, the Administrator Defendants and their co-conspirators entered into a continuing contract, combination, and/or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

580.    The Administrator Defendants agreed with each other that they would implement a scheme to raise, fix, maintain, or stabilize the cost of class action settlement administration services, causing anticompetitive effects without procompetitive justifications. The anticompetitive scheme centered around an agreement not to compete against each other for optimal bank deposit rates, in return for participating in a kickback scheme with the Bank Defendants.

581.    Each Administrator Defendant proceeded to act accordingly, in concert with one another. Indeed, during the times relevant, each of them made such demands on the Bank Defendants, received illegal and unfair remunerations from the Bank Defendants, and proceeded to hide these illicit transactions for themselves, and for each other. That the Administrator Defendants have been acting in concert to keep the kickbacks secret is easily evidenced by how little courts knew about these clandestine practices, and how the Administrator Defendants have been received the remunerations in SPEs.

582.    As part of the anticompetitive scheme, each Administrator Defendant also entered in an agreement with each of the Bank Defendants to raise, fix, maintain, or stabilize the cost of class action settlement administration services.

583.    The anticompetitive agreement among the Administrator Defendants raised the price of class action settlement administration services and lowered the total payouts to Plaintiffs and Class Members. Had the secret remunerations to the Administrator Defendants not been made, the money would have either reduced the costs of administration, or more money would have been paid out to Plaintiffs and Class Members.

584.    As a result of Defendants' unlawful conduct, the cost of class action administrator in the Administrator Market in the United States have been raised, fixed, maintained, or stabilized.

585.    The contract, combination, and/or conspiracy amongst Defendants consisted of a continuing agreement, understanding, and concerted action among the Administrator Defendants and their co-conspirators.

586.    Plaintiffs and members of the Class have thus been injured by the depressed, fixed, maintained, or stabilized payouts on class action settlements in the Settlement Deposit Market.

587.    For purposes of formulating and effectuating their contract, combination, and/or conspiracy, the Administrator Defendants and their co-conspirators did those things they contracted, combined for, and conspired to do, including:

(a)    Participating in meetings and conversations to discuss the costs and payments of class action settlement administration;

(b)    Communicating orally and in writing to fix the costs on class action settlement administration;

(c)    Agreeing to manipulate the payouts and costs of class action administration in the United States, in a manner that deprived Class Members and the country of free and open competition;

208

(d)    Issuing quotes and bids in accordance with the agreements reached;

(e)    Selling class administration services, including services for the Administrator Market, at noncompetitive prices;

(f)    Providing false statements to the public, including the courts, the AGs, the parties' attorneys, and the Class Members, regarding the noncompetitive prices of class action administration and the subsequent payouts; and

(g)    Helping to set up and paying the kickbacks into SPEs to receive the payments.

588.    For purposes of formulating and effectuating their contract, combination, and/or conspiracy, the Bank Defendants and their co-conspirators did those things they contracted, combined for, and conspired to do, including:

(a)    Participating in meetings and conversations to discuss the payouts on class action settlements;

(b)    Communicating orally and in writing to fix the payouts on class action settlements;

(c)    Agreeing to manipulate the payouts of QSFs and the costs of class action administration in the United States, in a manner that deprived Class Members and the country of free and open competition;

(d)    Issuing quotes and bids in accordance with the agreements reached;

(e)    Selling class administration services, including services for the Settlement Deposit Market, at noncompetitive prices;

(f)    Providing false statements to the public, including the courts, the AGs, the parties' attorneys, and the Class Members, regarding the noncompetitive prices and payouts on QSFs; and

(g)    Helping to set up and paying the kickbacks into SPEs to receive the payments.

589.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in that they paid more for settlement administration services than they needed to, and received less payouts than they otherwise would have, in an amount to be proven at trial. The conspiracy among the Defendants was both the "but for" and a material cause of Plaintiffs' harm. Absent the conspiracy, the alleged kickback scheme was not sustainable, as robust competition in the Settlement Administration market would have made the scheme infeasible. Hence, Plaintiffs' harm flows directly from the conspiracy among Settlement Administrators and from that which makes the agreement unlawful – the reduction of competition in the Settlement Administration market.

590.    Defendants' anticompetitive conduct had the following effects, among others.

(a)    Competition among Administrator Defendants and among the Bank Defendants has been restrained or eliminated;

(b)    The settlement administration costs have been fixed, stabilized, or maintained at artificially high levels;

(c)    The interest rates for QSFs have been fixed, stabilized, and maintained at artificially low levels; and

(d)    Individuals have been deprived of free and open competition.

591.    In addition to being per se unlawful, there is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' agreement that outweighs its harmful effect on Plaintiffs and Class Members and on competition. The Administrator Defendants' own public representations—including Kroll's claim to offer "the most competitive market rates" and the Bank Defendants' advertising of "competitive interest rates"—confirm that Defendants themselves recognize the importance of competitive pricing for settlement fund deposits. Their

210

fiduciary obligations require them to maximize returns for class members. There is no efficiency or pro-competitive rationale for uniformly accepting below-market rates and routing the difference to themselves through SPEs. The availability of alternative banking options offering competitive returns further demonstrates that no business justification exists for the Administrator Defendants' exclusive reliance on the Bank Defendants at artificially depressed rates.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated others, pray for relief as follows:

A.      For an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.      For equitable relief enjoining Defendants from soliciting, accepting, paying, or retaining undisclosed kickbacks, compensation, or financial benefits in connection with class action settlement administration;

C.      For equitable relief compelling Defendants to fully disclose all compensation received in connection with settlement administration services, and to administer QSFs in accordance with their fiduciary obligations, including by remitting interest earned on QSF assets and properly accounting for digital payment revenues;

D.      For an accounting by Defendants of all compensation, revenues, and financial benefits received in connection with the settlement administrations at issue;

E.      For an award of all available damages, including without limitation actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, including treble damages, as allowable by law;

F.      For all available equitable relief, including restitution, disgorgement of wrongfully retained revenues and profits, and imposition of a constructive trust for the benefit of the Class;

G.      For an award of punitive damages, as permitted by law;

211

H.      For an award of attorneys' fees and costs, and any other expenses, including expert witness fees, to the extent permitted by applicable law;

I.      Pre- and post-judgment interest; and

J.      Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

A jury trial is demanded by Plaintiffs on all claims so triable.

Dated: May 18, 2026

By

*Counsel for Plaintiffs*

*/s/ Christopher A. Seeger*
Christopher A. Seeger
Shauna B. Itri
**SEEGER WEISS LLP**
55 Challenger Road 6th Floor
Ridgefield Park, NJ 07660
(973) 639-9100
cseeger@seegerweiss.com
sitri@seegerweiss.com

*Plaintiffs' Lead Counsel*

David Boies
Adam Shaw
**BOIES SCHILLER & FLEXNER LLP**
333 Main Street
Armonk, NY 10504
914-749-8201
dboies@bsfllp.com
ashaw@bsfllp.com

Bryan F. Aylstock
**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ**
17 E. Main St
Ste 200
Pensacola, FL 32502
850-202-1010
baylstock@awkolaw.com

Kiley Grombacher
**BRADLEY/GROMBACHER, LLP**
31365 Oak Crest Drive,
Suite 240
Westlake Village, CA 91361
805-270-7100
kgrombacher@bradleygrombacher.com

212

Eric Lechtzin
**EDELSON LECHTZIN LLP**
411 S. State Street
Suite N-300
Newtown, PA 18940
(888) 758-5595
elechtzin@edelson-law.com

David S. Stone
**STONE & MAGNANINI LLP**
400 Connell Drive,
Suite 6200
Berkeley Heights, NJ 07922
(973) 218-1111
dstone@smcomplex.com

*Plaintiffs' Executive Committee*

213