**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE CLASS ACTION SETTLEMENT ADMINISTRATION LITIGATION | Misc. Action No. 25-179 (JDB); MDL Docket No. 3162 |
| This Document Relates To: ALL CASES | |

**ADMINISTRATOR DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF CONSOLIDATED MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

I.      The Settlement-Administration Process Under Rule 23 ........................................... 3

II.     Procedural History And Plaintiffs' Allegations ....................................................... 6

LEGAL STANDARD ............................................................................................................. 10

ARGUMENT ........................................................................................................................ 11

I.      Plaintiffs Cannot Plausibly Allege The Existence Of A Fiduciary Duty ................... 11

        A.      While Many States' Laws May Apply, Key Elements Are Dispositive Here ...... 11

        B.      Each Of Plaintiffs' Purported Bases For Imposing Fiduciary Duties Fails As A
                Matter Of Law ........................................................................................... 14

                1.      Rule 23 does not impose fiduciary duties on Administrator Defendants . 15

                2.      Treasury regulations for QSFs do not impose fiduciary duties on
                        Administrator Defendants .......................................................................... 21

                3.      Administrator Defendants' service of notice on class members does not
                        create or imply a fiduciary duty ................................................................. 23

                4.      Administrator Defendants' alleged marketing statements provide no  basis
                        on which to imply fiduciary duties ........................................................... 24

        C.      Plaintiffs' Failure To Plead The Existence Of A Fiduciary Relationship Requires
                Dismissal Of Plaintiffs' Fiduciary Duty Claims, Other State-Law Claims, And
                Civil RICO Claims ....................................................................................... 25

II.     Plaintiffs' Antitrust Claims Should Be Dismissed ................................................... 31

        A.      Plaintiffs Are Not Direct Purchasers ........................................................... 31

        B.      Plaintiffs Lack Antitrust Standing ............................................................... 34

        C.      Plaintiffs Allege No Agreement In Restraint Of Trade .................................. 38

III.    Plaintiffs' State-Law And RICO Claims Should Be Dismissed For Additional Reasons 43

        A.      Plaintiffs Fail To Allege Other Elements Of Breach Of Fiduciary Duty ............. 43

        B.      Plaintiffs' Fraudulent Concealment And Fraud Claims Fail On Other Elements
                Besides Lack Of Fiduciary Duty ................................................................... 44

                1.      Plaintiffs fail to plead reliance .................................................................. 45

                2.      Plaintiffs fail to plead causation ............................................................... 46

        C.      Plaintiffs' Civil Conspiracy Claim Fails ....................................................... 47

                1.      Plaintiffs fail to allege any agreement ...................................................... 47

                2.      Plaintiffs fail to allege any injury caused by an unlawful act in  furtherance
                        of a common scheme ................................................................................. 49

i

D.     Plaintiffs' Negligent Misrepresentation And Negligence Claims Fail On Other Elements............................................................................................................. 49

E.     Plaintiffs' Unjust Enrichment Claim Fails On Other Elements........................... 50

     1.     Plaintiffs do not allege that they conferred a benefit on any  Administrator Defendant........................................................................................ 50

     2.     Plaintiffs do not allege facts showing that retention was unjust ............... 52

F.     Plaintiffs' RICO Claims Fail For Reasons Beyond The Failure To Allege Predicate Acts of Fraud......................................................................................... 53

     1.     Plaintiffs fail to allege proximate cause or RICO injury ......................... 54

     2.     Plaintiffs fail to allege a viable enterprise................................................ 56

     3.     Plaintiffs allege no conduct of any enterprise's affairs............................ 57

G.     Plaintiffs Fail To Allege A RICO Conspiracy ..................................................... 59

IV.     Plaintiffs Lack Article III Standing.................................................................................. 60

CONCLUSION..................................................................................................................... 62

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdelhady v. George Washington Univ.*,
2022 WL 17364618 (D.D.C. Dec. 1, 2022)................................................................55

*Accident & Inj. Med. Specialists, P.C. v. Mintz*,
279 P.3d 658 (Colo. 2012).........................................................................................23

*United States v. Adefehinti*,
510 F.3d 319 (D.C. Cir. 2007)....................................................................................29

*AG Cap. Funding Partners, L.P. v. State St. Bank & Tr. Co.*,
896 N.E.2d 61 (N.Y. 2008)....................................................................................12, 17

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
367 F.3d 212 (4th Cir. 2004) .....................................................................................38

*Am. United Life Ins. Co. v. Martinez*,
480 F.3d 1043 (11th Cir. 2007) .................................................................................28

*Anderson v. Intel Corp. Inv. Policy Comm.*,
579 F.Supp.3d 1133 (N.D. Cal. 2022) .......................................................................44

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
256 F.3d 799 (D.C. Cir. 2001)....................................................................................34

*Antoine v. U.S. Bank Nat'l Ass'n*,
547 F.Supp.2d 30 (D.D.C. 2008)................................................................................30

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006).....................................................................................................54

*Apple Inc. v. Pepper*,
587 U.S. 273 (2019)...............................................................................................31, 34

*Ark. Teacher Ret. Sys. v. State St. Bank & Tr. Co.*,
512 F.Supp.3d 196 (D. Mass. 2020) ..........................................................................19

*Asa Accugrade, Inc. v. Am. Numismatic Ass'n*,
370 F.Supp.2d 213 (D.D.C. 2005)..............................................................................37

\* Authorities chiefly relied on are marked with an asterisk.

\* *Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................ *passim*

*Asnat Realty, LLC v. United Illuminating Co.*,
  253 A.3d 56 (Conn. App. Ct. 2021)...................................................................26

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)...........................................................................................34

*Aston v. Johnson & Johnson*,
  248 F.Supp.3d 43 (D.D.C. 2017).......................................................................52

*AT&T Corp. v. JMC Telecom, LLC*,
  470 F.3d 525 (3d Cir. 2006)...............................................................................41

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)................................................................................35, 37, 38

*Bank of N.Y. Mellon Tr. Co. v. Henderson*,
  107 F.Supp.3d 41 (D.D.C. 2015).......................................................................30

\* *Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................ *passim*

*Bernhard v. Farmers Ins. Exch.*,
  915 P.2d 1285 (Colo. 1996)...............................................................................18

*Binder v. District of Columbia*,
  1991 WL 11255755 (D.D.C. May 22, 1991).......................................................40

*Bishop v. Fla. Specialty Paint Co.*,
  389 So.2d 999 (Fla. 1980)..................................................................................12

*Blon v. Bank One, Akron, N.A.*,
  519 N.E.2d 363 (Ohio 1988)..............................................................................13

\* *Boyle v. United States*,
  556 U.S. 938 (2009)...........................................................................................56

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008)...........................................................................................55

*Brink v. Continental Ins. Co.*,
  787 F.3d 1120 (D.C. Cir. 2015).........................................................................30

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)...........................................................................................41

*Burch v. CertainTeed Corp.*,
    246 Cal.Rptr.3d 99 (Cal. Ct. App. 2019) ................................................................46

*Busby v. Capital One, N.A.*,
    932 F.Supp.2d 114 (D.D.C. 2013) ..........................................................................47

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986) ................................................................................................34

*Casio Computer Co. v. Sayo*,
    2000 WL 1877516 (S.D.N.Y. Oct. 13, 2000) .........................................................29

*Cass v. Fuller*,
    2016 WL 8078145 (N.D. Ala. Nov. 9, 2016) ..........................................................24

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001) ................................................................................................57

*Cent. Am. Bank for Econ. Integration v. Mossi*,
    2025 WL 2732731 (D.D.C. Sept. 25, 2025) ...........................................................59

*Cheeks v. Fort Myer Constr. Corp.*,
    216 F.Supp.3d 146 (D.D.C. 2016) ..........................................................................28

*United States v. Chestman*,
    947 F.2d 551 (2d Cir. 1991) ...................................................................................13

*City of Harper Woods Employees' Ret. Sys. v. Olver*,
    589 F.3d 1292 (D.C. Cir. 2009) ..............................................................................10

*City of Moundridge v. Exxon Mobil Corp.*,
    2009 WL 5385975 (D.D.C. Sept. 30, 2009) ...........................................................42

*CJS Indus. Inc. v. Dolce*,
    242 N.Y.S.3d 565 (N.Y. App. Div. 2025) ...............................................................46

*Clark-Williams v. Loc. 689, Amalgamated Transit Union*,
    37 F.Supp.3d 361 (D.D.C. 2014) ............................................................................10

*Connick v. Suzuki Motor Co.*,
    675 N.E.2d 584 (Ill. 1996) ......................................................................................26

*Coubaly v. Cargill, Inc.*,
    610 F.Supp.3d 173 (D.D.C. 2022) ..........................................................................61

*Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*,
    82 F.Supp.3d 344 (D.D.C. 2015) ............................................................................51

v

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC*,
  662 F.3d 913 (7th Cir. 2011) ...........................................................................................16

*Ctr. for Immigr. Studies v. Cohen*,
  410 F.Supp.3d 183 (D.D.C. 2019) ....................................................................................59

*Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*,
  941 F.2d 1220 (D.C. Cir. 1991) ........................................................................................59

*Davis v. Hanna Holdings, Inc.*,
  771 F.Supp.3d 552 (E.D. Pa. 2025) ..................................................................................33

*DeWitt Cnty. Pub. Bldg. Comm'n v. DeWitt County*,
  469 N.E.2d 689 (Ill. App. Ct. 1984) .................................................................................17

*In re Domestic Airline Travel Antitrust Litig.*,
  691 F.Supp.3d 175 (D.D.C. 2023) ........................................................................39, 40, 42

*Donaldson v. Borough of Madison*,
  213 A.2d 33 (N.J. Super. Ct. Ch. Div. 1965) ...................................................................20

*E. Savings Bank, FSB v. Papageorge*,
  31 F.Supp.3d 1 (D.D.C. 2014). Civil .................................................................................29

*Eller v. EquiTrust Life Ins. Co.*,
  778 F.3d 1089 (9th Cir. 2015) ..........................................................................................28

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
  837 F.Supp.2d 162 (S.D.N.Y. 2011) .................................................................................22

*In re Express Scripts, Inc., PBM Litig.*,
  2007 WL 4333380 (E.D. Mo. Dec. 7, 2007) ....................................................................11

*Feld Ent., Inc. v. ASPCA*,
  873 F.Supp.2d 288 (D.D.C. 2012) ....................................................................................28

*Fitts v. Minn. Mining & Mfg. Co.*,
  581 So.2d 819 (Ala. 1991) ................................................................................................12

*Fla. Audubon Soc'y v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) ............................................................................................62

*Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*,
  55 F.3d 181 (5th Cir. 1995) ..............................................................................................14

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ................................................................................................16

*Glassford v. Dufresne & Assocs., P.C.*,
    124 A.3d 822 (Vt. 2015) .................................................................................................46

*United States v. Green*,
    735 F.Supp.3d 8 (D.D.C. 2024) .....................................................................................56

*Greenpeace, Inc. v. Dow Chem. Co.*,
    808 F.Supp.2d 262 (D.D.C. 2011) ............................................................................56, 59

*Harpole Architects, P.C. v. Barlow*,
    668 F.Supp.2d 68 (D.D.C. 2009) ...................................................................................59

*HCP Laguna Creek CA, LP v. Sunrise Senior Living Mgmt., Inc.*,
    737 F.Supp.2d 533 (E.D. Va. 2010) ..............................................................................18

*U.S. ex rel. Heath v. AT&T, Inc.*,
    791 F.3d 112 (D.C. Cir. 2015) .......................................................................................44

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010) ...........................................................................................................54

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*,
    761 A.2d 1268 (Conn. 2000) .....................................................................................14, 17

*Hikma Pharms. USA Inc v. Amarin Pharma, Inc.*,
    146 S.Ct. 1391 (2026) ....................................................................................................36

*Hill v. Dep't of Interior*,
    151 F.4th 420 (D.C. Cir. 2025) ......................................................................................10

* *Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992) ............................................................................................37, 54, 55

*Hourani v. Mirtchev*,
    796 F.3d 1 (D.C. Cir. 2015) ...........................................................................................29

*Humana Inc. v. Teva Pharms. USA, Inc.*,
    787 F.Supp.3d 1298 (M.D. Fla. 2025) ...........................................................................54

* *Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ......................................................................................31, 33, 34, 55

*Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*,
    634 F.3d 1352 (11th Cir. 2011) .....................................................................................54

*Jacobson v. Hofgard*,
    168 F.Supp.3d 187 (D.D.C. 2016) .................................................................................49

*Johnson v. Comm'n on Presidential Debates*,
  869 F.3d 976 (D.C. Cir. 2017) ...................................................................................37

*Jones v. Meridian Towers Apartments, Inc.*,
  816 F.Supp. 762 (D.D.C. 1993) .................................................................................58

*Justice v. Anderson County*,
  955 S.W.2d 613 (Tenn. Ct. App. 1997) .....................................................................26

*Klaxon v. Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941) ...................................................................................................11

*Kochert v. Greater Lafayette Health Servs., Inc.*,
  463 F.3d 710 (7th Cir. 2006) ...............................................................................34, 35

*In re Kohler's Estate*,
  33 A.2d 920 (Pa. 1943) ..............................................................................................20

*Kontrick v. Ryan*,
  540 U.S. 443 (2004) ...................................................................................................10

*In re Korean Air Lines Disaster of Sept. 1, 1983*,
  932 F.2d 1475 (D.C. Cir. 1991) .................................................................................11

*Kovkov v. Law Firm of Dayrel Sewell, PLLC*,
  182 A.D.3d 418 (N.Y. App. Div. 1st Dep't 2020) .....................................................29

*Kratky v. Musil*,
  969 S.W.2d 371 (Mo. Ct. App. 1998) ........................................................................24

*Kreuzer v. Am. Acad. of Periodontology*,
  735 F.2d 1479 (D.C. Cir. 1984) ...........................................................................39, 40

*Kurd v. Republic of Turkey*,
  374 F.Supp.3d 37 (D.D.C. 2019) ...............................................................................47

*Leeder v. Nat'l Ass'n of Realtors*,
  601 F.Supp.3d 301 (N.D. Ill. 2022) ...........................................................................33

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ...................................................................................................41

*Lemond v. Manzulli*,
  2009 WL 1269840 (E.D.N.Y. Feb. 9, 2009) ..............................................................44

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ...................................................................................................36

*Lockerman v. S. River Elec. Membership Corp.*,
  794 S.E.2d 346 (N.C. Ct. App. 2016) ................................................................13

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  295 F.Supp.2d 30 (D.D.C. 2003) ..............................................................31, 37

*Lowrance v. Patton*,
  710 P.2d 108 (Okla. 1985) ...............................................................................16

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..........................................................................................60

*Macomber v. Travelers Prop. & Cas. Corp.*,
  894 A.2d 240 (Conn. 2006) ..............................................................................29

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024) ..........................................................................................30

*Martis v. Grinnell Mut. Reinsurance Co.*,
  905 N.E.2d 920 (Ill. App. Ct. 2009) ................................................................26

*Mawardi v. Cohen*,
  381 So.3d 1 (Fla. Dist. Ct. App. 2023) ............................................................17

* *McCarthy v. Recordex Service, Inc.*,
  80 F.3d 842 (3d Cir. 1996) .................................................................32, 33, 34

*McCormick v. McCormick*,
  455 N.E.2d 103 (Ill. App. Ct. 1983) ................................................................19

*McDowell v. CGI Fed. Inc.*,
  2017 WL 2392423 (D.D.C. June 1, 2017) ........................................................51

*United States v. McGill*,
  815 F.3d 846 (D.C. Cir. 2016) .........................................................................56

*Mideast Sys. & China Civ. Constr. Saipan Joint Venture, Inc. v. Hodel*,
  792 F.2d 1172 (D.C. Cir. 1986) .......................................................................60

*Mines v. Metagenics, Inc.*,
  2023 WL 2930557 (D.D.C. Apr. 13, 2023) ......................................................51

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) ....................................................................................38, 39

*Moses v. Diocese of Colo.*,
  863 P.2d 310 (Colo. 1993) ...............................................................................13

ix

*Moyer Tr. for Est. of Leonard v. Old Nat'l Bancorp*,
 2019 WL 939034 (Mich. Ct. App. Feb. 26, 2019) (per curiam)..............................................22

*MSP Recovery Claims, Series LLC v. Pfizer, Inc.*,
 728 F.Supp.3d 89 (D.D.C. 2024) .................................................................................31, 54, 55

*In re Musical Instruments & Equip. Antitrust Litig.*,
 798 F.3d 1186 (9th Cir. 2015) ..................................................................................................42

*FTC v. Mylan Labs., Inc.*,
 62 F.Supp.2d 25 (D.D.C. 1999)................................................................................................34

*Nat'l ATM Council, Inc. v. Visa*,
 922 F.Supp.2d 73 (D.D.C. 2013)..............................................................................................37

*Neumeier v. Kuehner*,
 286 N.E.2d 454 (N.Y. 1972).....................................................................................................12

*Nolte v. Cigna Corp.*,
 2013 WL 3586645 (C.D. Ill. July 3, 2013)...............................................................................20

*Nw. Airlines, Inc. v. FAA*,
 795 F.2d 195 (D.C. Cir. 1986)..................................................................................................60

*Oaks Mgmt. Corp. v. Superior Ct.*,
 51 Cal.Rptr.3d 561 (Cal. Ct. App. 2006).................................................................................22

*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*,
 68 Cal.Rptr.3d 828 (Cal. Ct. App. 2007).................................................................................47

*Oddo Asset Mgmt. v. Barclays Bank PLC*,
 973 N.E.2d 735 (N.Y. 2012).....................................................................................................14

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
 575 U.S. 175 (2015)...................................................................................................................30

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*,
 926 F.Supp.2d 36 (D.D.C. 2013)........................................................................................38, 39

*Palmas Y Bambu, S.A. v. E.I. DuPont De Nemours & Co.*,
 881 So.2d 565 (Fla. Dist. Ct. App. 2004) ................................................................................46

*Paskas v. Illini Fed. Sav. & Loan Ass'n*,
 440 N.E.2d 194 (Ill. App. Ct. 1982) ........................................................................................13

*Pasternack v. Lab. Corp. of Am. Holdings*,
 59 N.E.3d 485 (N.Y. 2016)......................................................................................................46

*Perloff v. Transamerica Life Ins. Co.*,
 393 F.Supp.3d 404 (E.D. Pa. 2019) ......................................................................13

*Pernice v. Bovim*,
 2015 WL 5063378 (D.D.C. Aug. 26, 2015) ..........................................................51

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
 324 F.Supp.3d 1142 (S.D. Cal. 2018)....................................................................42

*Persson v. Smart Inventions, Inc.*,
 23 Cal.Rptr.3d 335 (Cal. Ct. App. 2005).................................................................13

*Pitts v. Rivas*,
 709 S.W.3d 517 (Tex. 2025)...............................................................................13, 14

*Queen v. Schultz*,
 747 F.3d 879 (D.C. Cir. 2014)..............................................................................32

*In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*,
 2020 WL 5016922 (D.D.C. Aug. 25, 2020) ..........................................................38

*Rattagan v. Uber Techs., Inc.*,
 553 P.3d 1213 (Cal. 2024) ...................................................................................50

*Reich v. Purcell*,
 432 P.2d 727 (Cal. 1967) ....................................................................................12

*Resol. Tr. Corp. v. KPMG Peat Marwick*,
 844 F.Supp.431 (N.D. Ill. 1994) .........................................................................22

* *Reves v. Ernst & Young*,
 507 U.S. 170 (1993)............................................................................................57

*Rise v. Bagshaw*,
 2025 WL 1380478 (D.D.C. May 13, 2025)........................................................47, 48

*Ronaldson v. Nat'l Ass'n of Home Builders*,
 2020 WL 3259226 (D.D.C. June 3, 2020).............................................................52

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
 682 F.3d 1043 (D.C. Cir. 2012) ...........................................................................59

*Saline Parents v. Garland*,
 88 F.4th 298 (D.C. Cir. 2023)..............................................................................60

*Scheck v. Gen. Elec. Corp.*,
 1992 WL 13219 (D.D.C. Jan. 7, 1992)..................................................................57

xi

*Schmidt v. U.S. Capitol Police Bd.*,
 826 F.Supp.2d 59 (D.D.C. 2011) ...............................................................................10

*United States v. Sci. Applications Int'l Corp.*,
 555 F.Supp.2d 40 (D.D.C. 2008) ...............................................................................10

*Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*,
 249 F.3d 1068 (D.C. Cir. 2001) .................................................................................55

*Sun Aviation, Inc. v. L-3 Commc'ns Avionics Sys., Inc.*,
 533 S.W.3d 720 (Mo. 2017) ......................................................................................25

*U.S. ex rel. Totten v. Bombardier Corp.*,
 286 F.3d 542 (D.C. Cir. 2002) ..................................................................................45

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021)...................................................................................................60

*U.S. Dominion, Inc. v. MyPillow, Inc.*,
 2022 WL 1597420 (D.D.C. May 19, 2022)..........................................................41, 47

*Valente v. Pepsico, Inc.*,
 90 F.R.D. 170 (D. Del. 1981) ....................................................................................19

*\* W. Assocs. Ltd. P'Ship v. Market Square Assocs.*,
 235 F.3d 629 (D.C. Cir. 2001)...............................................................................28, 58

*In re Watson Fentanyl Patch Prods. Liab. Litig.*,
 977 F.Supp.2d 885 (N.D. Ill. 2013) ..........................................................................11

*Wayman v. Amoco Oil Co.*,
 923 F.Supp.1322 (D. Kan. 1996)...............................................................................14

*Wendy D. Swiney, LLC v. Legacy Care, LLC*,
 2022 WL 17637444 (E.D. Va. Dec. 13, 2022) .........................................................13

*West v. Lynch*,
 845 F.3d 1228 (D.C. Cir. 2017)..................................................................................61

*Wiles v. Miller*,
 3 N.E.3d 226 (Ohio Ct. App. 2013)............................................................................46

*Wisniski v. Brown & Brown Ins. Co. of Pa.*,
 906 A.2d 571 (Pa. Super. Ct. 2006)...........................................................................17

*Woolard v. Regent Real Est. Servs., Inc.*,
 328 Cal.Rptr.3d 439 (Cal. Ct. App. 2024)..................................................................27

xii

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*,
913 F.2d 948 (D.C. Cir. 1990) ................................................................56, 58

*U.S. ex rel. Yelverton v. Fed. Ins. Co.*,
831 F.3d 585 (D.C. Cir. 2016) ...............................................................53

*Yenchi v. Ameriprise Fin., Inc.*,
161 A.3d 811 (Pa. 2017) .........................................................................13

**Statutes, Rules and Regulations**

15 U.S.C.
§1 ..............................................................................................................38
§15 ............................................................................................................34

18 U.S.C.
§1341 ........................................................................................................28
§1343 ........................................................................................................28
§1956 ........................................................................................................29
§1961 ........................................................................................................28
§1962 ..........................................................................................28, 29, 53, 59
§1964 ........................................................................................................54
§1964(c) ...................................................................................................55

29 U.S.C. §1002 .............................................................................................20

* Fed. R. Civ. P. 23 ............................................................................... *passim*

12 C.F.R.
§1005.18 ...................................................................................................9
§1005.20 ...................................................................................................9

26 C.F.R.
§1.468B-1 .............................................................................................4, 21
§1.468B-2 .........................................................................................4, 21, 22
§1.468B-3 .................................................................................................4

**Other Authorities**

Ann. Manual for Complex Litigation (4th ed.)
§21.132 .....................................................................................................23
§21.661 .....................................................................................................18

Board of Governors of the Federal Reserve System, *Report on the Economic
Well-Being of U.S. Households in 2018* (May 2019),
https://www.federalreserve.gov/publications/files/2018-report-economic-well-
being-us-households-201905.pdf .............................................................8

Easterbrook & Fischel, *Contract and Fiduciary Duty*, 36 J.L. & Econ. 425 (1993)......................21

Federal Deposit Insurance Corporation, *2023 FDIC National Survey of Unbanked and Underbanked Households*, https://www.fdic.gov/household-survey (last visited July 17, 2026).........................................................................................................8

Restatement (Third) of Torts: Liability for Economic Harm §3 (2020)..................................50, 62

Ribstein, *Are Partners Fiduciaries?*, 2005 U. Ill. L. Rev. 209 (2005)...........................................14

**INTRODUCTION**

Plaintiffs' complaint fails completely to state any claims against Administrator Defendants. Virtually all are based on the false premise that class-action settlement administrators owe fiduciary duties to class members of the settlements they administer.  They owe no such duty.  The complaint incorrectly contends that Federal Rule of Civil Procedure 23 makes them fiduciaries. Rule 23 assigns class counsel—not settlement administrators—the fiduciary obligation to protect class members, acting under the continuing supervision of the court.  Settlement administrators serve a different function altogether.  Rule 23 says nothing about settlement administrators, and none of the underlying settlements referenced in the complaint identifies any Administrator Defendant as a fiduciary.  That is because settlement administrators are third-party service providers retained by counsel and approved by the court for the limited purpose of ministerially implementing the terms of settlements negotiated by counsel.

The complaint also fails to allege—because it cannot plausibly do so—that the Administrator Defendants have any hallmarks of fiduciaries.  For example, as their name underscores, Administrator Defendants' responsibilities are *administrative*, defined by settlement agreements, court orders, and directions they receive from class counsel.  They therefore do not have the power to exercise independent discretion—an indispensable element of a fiduciary— because their activities are so circumscribed.  Administrator Defendants are also not fiduciaries because their relationship to a class does not reflect the power imbalance and vulnerability necessary for the law to imply the existence of a fiduciary duty.  Indeed,  the class is represented by class counsel.  The framework carefully worked out by Rule 23 precludes the conclusion that Administrator Defendants are fiduciaries.

Nearly all of the remaining claims collapse once the complaint's invalid premise is disposed of.  Absent a fiduciary duty, the claim that Administrator Defendants failed to disclose

1

business arrangements with Bank and FinTech Defendants necessarily fails.  So too do Plaintiffs' omission-based fraud, negligent-misrepresentation, negligence, civil-conspiracy, unjust-enrichment, and civil RICO claims—each of which depends on the existence of an affirmative duty to disclose arising from a nonexistent fiduciary relationship.

Plaintiffs' antitrust claims fail for different, fundamental reasons.  Plaintiffs are not direct purchasers of any product or service provided by Administrator Defendants, and Plaintiffs fail to adequately plead antitrust standing or an unlawful agreement.  If the Court rejects, as it should, Plaintiffs' fiduciary-duty theory and Sherman Act claim, the entire complaint should be dismissed and the Court need not look further.

But the complaint's defects do not end there.  For example, the state-law claims fail because Plaintiffs do not plausibly allege any breach, reliance, or causation.  And the complaint cannot patch up its core failures by repeatedly substituting conclusory characterizations for factual allegations and failing to satisfy Rule 9(b)'s pleading requirements.  The RICO claims fail because Plaintiffs do not plausibly allege a cognizable RICO injury, proximate causation, or a RICO enterprise.  And as Administrator Defendants' other arguments underscore, Plaintiffs lack Article III standing.  Plaintiffs' claims depend on speculative assumptions about how class counsel, courts, settlement administrators, banks, payment providers, and other actors supposedly would have behaved in a hypothetical world.  That is far too speculative and attenuated to satisfy the traceability requirement for Article III standing.

Administrator Defendants respectfully request that the complaint be dismissed with prejudice.

2

**BACKGROUND**

I.    THE SETTLEMENT-ADMINISTRATION PROCESS UNDER RULE 23

Class-action settlements and settlement administration follow a regimented process mandated by Rule 23.  Class-action settlements are negotiated between plaintiffs' counsel (or by class counsel, Fed. R. Civ. P. 23(g)) and defense counsel.  The settlement agreement typically includes negotiated provisions for notifying class members, submitting and approving claims, and distributing payments.    Dkt.123 ("Compl.") ¶¶62-63, 71.    Counsel may anticipate that administration of a settlement will be sufficiently complex to require professional assistance.  When this happens, counsel may solicit competitive bids from prospective settlement administrators.  *Id.* ¶59.  Counsel review the bids and select an administrator to propose to the court.  *Id.* ¶60.

Counsel then file a motion for preliminary approval of the settlement, including the settlement agreement and other documents relevant to the findings the court must make under Rule 23 to grant preliminary settlement approval.  Fed. R. Civ. P. 23(e)(1)(B).  These materials include a proposed notice plan, a proposed claim form, and a plan of distribution or other documents explaining how the settlement fund will be allocated among settlement class members, the methods by which settlement payments may be made to class members, and how any remaining funds may be disbursed.  Fed. R. Civ. P. 23(e)(1)(A)-(B).  The materials also may propose the appointment of an administrator to implement the notice and distribution process according to the settlement agreement's terms or upon class counsel's approval, including as to claim determinations and the handling of settlement funds.

Under Rule 23, the court reviews the proposed settlement's terms and counsel's proposal to decide whether it is likely to approve the settlement.  Compl. ¶¶60-62, 76-77; Fed. R. Civ. P. 23(e)(1)(B).  If the court finds that it is likely to grant final approval and certify the settlement

3

class, it issues a preliminary approval order establishing timelines, approving the notice plan, and appointing the settlement administrator.  Compl. ¶61; Fed. R. Civ. P. 23(e)(1)(B).  Class members are provided an opportunity to object to, or opt out of, the settlement.  Compl. ¶¶62, 72; Fed. R. Civ. P. 23(e)(5)(A).  The court then holds a fairness hearing, considers any objections, and determines whether to grant final approval and certify a settlement class (if no class has previously been certified).  *See* Compl. ¶¶74-77; Fed. R. Civ. P. 23(e)(2).  If class counsel or interim class counsel has not yet been appointed, the court will appoint class counsel for the settlement class.  Fed. R. Civ. P. 23(g), (c)(1)(B).  No class-action settlement can be approved unless the court finds that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

Following the court's approval, an escrow agent may open a bank account to hold the settlement deposit, depending on the settlement agreement's terms.  Compl. ¶61.  The settlement agreement may dictate various terms governing the account, such as which bank must hold the account.  The fund established and maintained pursuant to the court's order may be a qualified settlement fund ("QSF") under the federal tax code, but it is not required to be unless called for by the settlement agreement.  *Id.* ¶¶1, 63; *see also* 26 C.F.R. §1.468B-1(a), (c)(1).  QSF status provides certain income tax advantages to the settling defendant and class members.  26 C.F.R. §§1.468B-1, 1.468B-2, 1.468B-3.

Banks, including Defendants Huntington and Western Alliance, compete to attract settlement-fund deposits.  *See* Compl. ¶¶50-51.  According to Plaintiffs, banking for QSFs is a specialized service requiring economies of scale.  To successfully manage settlement funds, banks allegedly must be able to process disbursements quickly and accurately, comply with Treasury regulations governing QSF taxation, and deploy technology and staffing required to support multiple large settlements simultaneously.  *Id.* ¶¶96-99, 413-416.  Plaintiffs allege that the "need

for scale and scalability is a barrier to entry" in this market, and the low-interest-rate environment of the 2010s caused the number of banks that could provide these services to "dwindle[]." *Id.* ¶¶416-417, 419.

Following the court-approved notice plan, the administrator notifies class members of the settlement and their rights. Compl. ¶¶62, 71-72. Class counsel is closely involved in the notice process—drafting or revising, and ultimately approving the notice documentation and means of dissemination. Following the terms of the settlement agreement and the court's preliminary approval order, the administrator then sends out notices; gathers, reviews and approves claims; responds to class-member inquiries; and tracks opt-outs. *Id.* After the claims deadline, the administrator works with class counsel to submit for court approval an accounting of all claims to be paid. *Id.* ¶¶77-79. The accounting conforms to the distribution framework in the settlement agreement, as negotiated by counsel and approved by the court. *Id.* ¶¶61-62. Class counsel typically review or have the right to review claims that have been rejected by the administrator as being invalid. Once the distribution plan is approved, the administrator then works with the bank to disburse the funds in accordance with the approved distribution framework. *Id.* ¶¶76-79.

Historically, settlement funds were disbursed primarily using paper checks. Compl. ¶138. Many settlements continue to rely on checks, but class members now generally prefer the convenience of digital payments, which are often facilitated by FinTech companies like Defendants Blackhawk, Tremendous, and Digital Disbursements. *See id.* ¶144. Digital payments may take the form of Venmo transfers, Zelle payments, or prepaid debit cards, among others. *See id.* ¶¶213, 284, 297.

Throughout the settlement-administration process, an administrator is subject to at least three layers of oversight and direction to protect the class's interests. First, the administrator's

work is limited to executing the terms of the settlement negotiated by counsel and approved by the court, and is supervised and directed by class counsel, who serve as fiduciaries to the class. Fed. R. Civ. P. 23(g)(4). Second, the administrator and class counsel are overseen by the court, which retains ultimate authority to protect the interests of the class. Fed. R. Civ. P. 23(e)(2); *see also* Compl. ¶77. Third, class members are provided notice of the settlement terms that the administrator is bound to apply and have the opportunity to object to those terms, or opt out of settlements entirely. Compl. ¶¶62, 72; Fed. R. Civ. P. 23(e)(5).

## II.    PROCEDURAL HISTORY AND PLAINTIFFS' ALLEGATIONS

Plaintiffs are 21 former class members in various settled class actions. The settlement administrators named as defendants are Angeion Group LLC; Epiq Class Action & Claims Solutions, Inc.; JND Holdings, LLC d/b/a JND Legal Administration; and Kroll Settlement Administration LLC. Compl. ¶¶45-48.[1] Collectively, they have worked on thousands of settlements and disbursed billions of dollars to class members nationwide. *See id.* ¶¶45-48.

Plaintiffs raise two core sets of allegations, in what they call the "Bank Interest Track" and the "Digital Disbursement Track." Compl. ¶¶3-4. Plaintiffs assert that their allegations reflect "uniform industry-wide" conduct. *Id.* ¶397; *see also, e.g., id.* ¶389(a) ("arrangements" were "industry-wide"). But Plaintiffs have sued only certain administrators, banks, and fintech companies, and Plaintiffs previously sued five other administrators—Verita Global, LLC; Archer Systems, LLC; Verus, LLC; CPT Group, Inc.; and Simpluris, Inc.—that they subsequently dismissed without prejudice, Dkt.122. Plaintiffs also have acknowledged that class counsel are central participants—going so far as to insist that "one of the things we're going to have to address at some point is what did the lawyers know and when," and suggesting that some class counsel

---

[1] Plaintiffs also sued parent companies Epiq Systems, Inc. and Kroll, LLC, Compl. ¶¶46, 48, though they do not offer administration services. Both parent companies join in this motion.

6

could be added as defendants. Dkt.103(54:17-22). But, to date, Plaintiffs have not brought any claims against class counsel.

*Bank Interest Track.* Plaintiffs allege that Bank Defendants profit from managing QSFs by reinvesting deposits in interest-bearing accounts or lending them to borrowers. Compl. ¶¶2-3, 96-99. Those investments and loans allegedly yield higher rates of return than the banks pay to attract QSF deposits and pay interest on those deposits. *Id.* ¶¶98-99. Plaintiffs allege that Administrator Defendants have undisclosed agreements to share in some unspecified portion of Bank Defendants' profits from investing or lending deposits. *Id.* ¶¶121-124. According to Plaintiffs, as average interest rates rose from historically low levels, Bank Defendants' potential profits also rose because the spread grew between interest on loans or returns on investments and the interest paid to QSFs. *Id.* ¶¶121, 123.

A central premise of Plaintiffs' complaint is that Administrator Defendants steered settlement deposits to banks promising favorable returns. Compl. ¶¶100, 358-359. But Plaintiffs acknowledge that Administrator Defendants often do not select the bank. *See id.* ¶100 ("*Sometimes* … the administrator selects the depository bank" (emphasis added)); *id.* ¶102 ("attorneys … who selected the Bank Defendants"). Settlement agreements—to which Administrator Defendants are not parties—referenced in the complaint underscore the point: the bank selection was often negotiated and made by class counsel. *See, e.g., In re TikTok, Inc. Consumer Priv. Litig.*, No. 1:20-cv-4699 (N.D. Ill.), Dkt.122-1, §4.3 ("Class Counsel shall select … the Settlement Fund escrow bank."), *cited at* Compl. ¶277; *In re Capital One Consumer Data Sec. Breach Litig.*, No. 1:19-md-2915 (E.D. Va.), Dkt.2219-1, §4.1 ("The Settlement Fund monies shall be held in the Settlement Fund Account, which shall be an account established at Huntington Bank."), *cited at* Compl. ¶217.

7

Plaintiffs do not allege that the rate of interest paid by any Bank Defendant on settlement deposits was concealed in any way by any Bank or Administrator Defendant, nor that interest rates on QSF accounts are not readily determinable by class counsel through statements issued by the bank.  Nor do Plaintiffs allege that rising interest rates since 2022 that are the basis for their Bank Interest Track, Compl. ¶¶122-123, was unknown to Plaintiffs, class members, or the public at large, such that the potential for increased profits by banks was somehow concealed.

***Digital Disbursement Track.***  Plaintiffs allege that FinTech Defendants, who act as third-party subcontractors to settlement administrators, also profit from their role in the settlement process and have undisclosed agreements to share a portion of those profits with Administrator Defendants.  As noted, class members often choose to be paid through digital cards, including those offered by FinTech Defendants.  Compl. ¶78.  Making available a prepaid-card option particularly serves the interests of the unbanked and underbanked members of a settlement class.  As of a 2019 report by the Federal Reserve, 22% of American adults 18+ are either unbanked or underbanked.[2]  Subsequent surveys have shown that about 4% of U.S. households were completely unbanked, meaning that no one in the household had a checking or savings account and therefore the household is reliant on alternative financial service products.[3]  For such class members, a digital payment card may be the only practical way to benefit from a settlement disbursement.

Plaintiffs assert that FinTech Defendants profit from "breakage" on digital payment cards, *i.e.*, unredeemed funds left on the cards, and that a portion of the breakage is paid to Administrator Defendants.  Compl. ¶¶5, 132-133.  Plaintiffs allege that Administrator Defendants steered

---

[2] Board of Governors of the Federal Reserve System, *Report on the Economic Well-Being of U.S. Households in 2018* (May 2019), https://www.federalreserve.gov/publications/files/2018-report-economic-well-being-us-households-201905.pdf.

[3] Federal Deposit Insurance Corporation, *2023 FDIC National Survey of Unbanked and Underbanked Households*, https://www.fdic.gov/household-survey (last visited July 17, 2026).

business to FinTech Defendants, who in turn promised Administrator Defendants a share of the supposed breakage. *Id.* ¶¶155, 159-162, 358-359. As Plaintiffs admit, however, "[c]laimants … receive their disbursement through the method *they selected* during the claim submission process." *Id.* ¶78 (emphasis added); *see also In re Equifax Inc. Customer Data Security Breach Litig.*, No. 1:17-md-2800 (N.D. Ga.), Dkt.739-2, Ex. 8 at 6 (*Equifax* claim form: "you can elect to receive your payment either by check or pre-paid card"). Nor is the potential for breakage on digital payment cards issued to class members a fact within the exclusive knowledge of any Administrator Defendant. For example, federal regulations permit debit card issuers to charge inactivity fees that result in breakage. 12 C.F.R. §1005.18(b)(2)(vii); *id.* §1005.20.

Plaintiffs also acknowledge that FinTech Defendants were sometimes selected by those other than Administrator Defendants. *See* Compl. ¶163. Counsel for the parties often propose not just the vendor, but the methods of payment available to the class, and those methods are submitted to the court for approval. *Supra* pp.3-4. Administrator Defendants, under the direction of class counsel, notify class members how to take full advantage of their rights, including various payment options. Those efforts included "massive notice campaign[s]" to "inform[] class members of … their legal rights," sometimes involving "over 900 million emails" with "over 1 billion [ad] impressions," or over "17 million postcard notices" per case. Compl. ¶¶192, 208, 223, 240, 283, 296, 323, 337.

\*        \*        \*

Following the Judicial Panel on Multidistrict Litigation's consolidation and transfer orders, Dkt.8 at 1, Plaintiffs filed their consolidated complaint alleging numerous causes of action against Administrator Defendants: (1) breach of fiduciary duties, Compl. ¶¶456-463; (2) fraudulent concealment, *id.* ¶¶473-480; (3) fraud, *id.* ¶¶481-491; (4) civil conspiracy, *id.* ¶¶548-556;

(5) negligent misrepresentation, *id.* ¶¶557-565; (6) negligence, *id.* ¶¶566-570; (7) unjust enrichment, *id.* ¶¶571-577; (8) multiple iterations of a RICO claim; (9) RICO conspiracy, *id.* ¶¶528-533; and (10) violation of the Sherman Act, *id.* ¶¶578-591. Plaintiffs seek damages and equitable relief. *Id.* at 211.

## LEGAL STANDARD

"To withstand a 12(b)(6) motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Hill v. Dep't of Interior*, 151 F.4th 420, 427 (D.C. Cir. 2025); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court "need not accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations." *City of Harper Woods Employees' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The court may consider "documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Clark-Williams v. Loc. 689, Amalgamated Transit Union*, 37 F.Supp.3d 361, 365 (D.D.C. 2014).

Under Rule 9(b), fraud allegations must meet "a heightened pleading requirement," requiring a party to "'state with particularity the circumstances constituting fraud.'" *United States v. Sci. Applications Int'l Corp.*, 555 F.Supp.2d 40, 47 (D.D.C. 2008). "'Conclusory allegations that a defendant's actions were fraudulent or deceptive do not satisfy Rule 9(b).'" *Id.* The plaintiff must plead the "'who, what, when, where, and how' … of the fraud." *Id.*

A 12(b)(1) motion to dismiss challenges a court's subject-matter jurisdiction and requires the court to "scrutinize the plaintiff's allegations more closely … than it would under" a 12(b)(6) motion. *Schmidt v. U.S. Capitol Police Bd.*, 826 F.Supp.2d 59, 65 (D.D.C. 2011). Plaintiffs bear the burden to establish jurisdiction. *Id.*; *see also Kontrick v. Ryan*, 540 U.S. 443, 455 (2004).

10

## ARGUMENT

### I.    PLAINTIFFS CANNOT PLAUSIBLY ALLEGE THE EXISTENCE OF A FIDUCIARY DUTY

Plaintiffs fail to plausibly allege facts supporting their core theory that Administrator Defendants owed Plaintiffs fiduciary duties.  Nor can they, because the bedrock legal principles concerning formation of fiduciary relationships common across jurisdictions preclude Plaintiffs from alleging such facts.  Plaintiffs' breach of fiduciary duty claim and all other claims resting on that premise (*i.e.*, all but their antitrust claim) fail for that reason alone.

### A.    While Many States' Laws May Apply, Key Elements Are Dispositive Here

At this motion to dismiss stage, the Court need not resolve the thorny question of which State's law may apply to each individual plaintiff's claims.  That is because all of Plaintiffs' claims fail on foundational elements, regardless of which State's law governs.  Administrator Defendants nevertheless briefly set out the governing principles here.

A district court sitting in diversity applies the choice of law rules of the forum State. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  When actions are transferred to a court as part of a multi-district litigation, the forum State is the State where the action was first filed.  *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1496 (D.C. Cir. 1991). The actions comprising this litigation were originally filed in Alabama, California, Florida, Missouri, New Jersey, New York, and Pennsylvania.  The consolidated complaint added seven Plaintiffs.  Insofar as the new plaintiffs are regarded as having filed their claims in this MDL, District of Columbia choice of law rules may apply to their claims.  *See In re Watson Fentanyl Patch Prods. Liab. Litig.*, 977 F.Supp.2d 885, 888 (N.D. Ill. 2013); *In re Express Scripts, Inc., PBM Litig.*, 2007 WL 4333380, at *2 (E.D. Mo. Dec. 7, 2007).

The next step requires the Court to apply the pertinent choice of law rules to determine which State's law should apply to each plaintiff's claims in each of the underlying transferred

11

cases.[4]  Given where the cases comprising this MDL were filed, where the underlying actions named in the complaint were filed, and the citizenship of the named Plaintiffs, there are, at least, 20 different States whose substantive law could apply to a given plaintiff's claims: (1) Alabama, (2) California, (3) Colorado, (4) Connecticut, (5) Florida, (6) Georgia, (7) Illinois, (8) Kentucky, (9) Michigan, (10) Missouri, (11) New Jersey, (12) New York, (13) North Carolina, (14) Ohio, (15) Oklahoma, (16) Pennsylvania, (17) Tennessee, (18) Texas, (19) Vermont, and (20) Virginia.[5]

While state law varies with respect to the existence and scope of fiduciary duties, States generally recognize that fiduciary duties may arise formally in select legal relationships, such as with trustees and attorneys, or may be implied based on the circumstances.  But no State imposes fiduciary obligations unless, at a minimum, all of the following four requirements are satisfied: (1) one party justifiably places a special degree of trust in another to act as a fiduciary and to subordinate its own interests to act for the benefit of the other party; (2) the other party consciously accepts or assumes that special responsibility to subordinate its interests and act solely for the first party's benefit; (3) the alleged fiduciary is empowered to exercise discretion to act in the interest of the first party and is authorized to perform more than ministerial tasks; and (4) the relationship of the parties is characterized by the dependence and vulnerability of the first party, and ceded control to the second party, in a way that transcends arm's-length commercial dealings.  *See, e.g.*, *AG Cap. Funding Partners, L.P. v. State St. Bank & Tr. Co.*, 896 N.E.2d 61, 67-68 (N.Y. 2008)

---

[4] The relevant States apply different variations of the choice-of-law test, potentially producing different results.  *See, e.g.*, *Bishop v. Fla. Specialty Paint Co.*, 389 So.2d 999, 1001 (Fla. 1980) (most-significant-relationship test); *Reich v. Purcell*, 432 P.2d 727, 730-731 (Cal. 1967) (governmental-interest analysis); *Fitts v. Minn. Mining & Mfg. Co.*, 581 So.2d 819, 820 (Ala. 1991) (*lex loci delicti* rule); *Neumeier v. Kuehner*, 286 N.E.2d 454, 456 (N.Y. 1972) (the place-with-the-greatest-interest analysis); *see also, generally* Appendix A (survey of States' choice-of-law rules).

[5] *See generally* Appendix B (organizing Plaintiffs and lawsuits by State).

("[F]iduciary obligations are wholly different from the performance of ministerial functions with due care."); *Persson v. Smart Inventions, Inc.*, 23 Cal.Rptr.3d 335, 350-351 (Cal. Ct. App. 2005) ("In the absence of evidence of any … vulnerability or incapacity, we decline to extend the scope of fiduciary obligations to an arms-length negotiation[.]"); *cf. United States v. Chestman*, 947 F.2d 551, 569 (2d Cir. 1991) (en banc) (reviewing common law principles of fiduciary duty and noting that "discretionary authority and dependency ... represent the measure of the paradigmatic fiduciary relationship").[6]

The alleged fiduciary must exercise such dominance, control, or superior authority that the trusting party cannot effectively protect its own interests. *Lockerman v. S. River Elec. Membership Corp.*, 794 S.E.2d 346, 352 (N.C. Ct. App. 2016) ("'Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen.'"); *Persson*, 23 Cal.Rptr.3d at 351.[7]  The importance of the services performed by the alleged fiduciary does not transform a commercial relationship into a fiduciary relationship. *Pitts v. Rivas*, 709 S.W.3d 517, 528 (Tex. 2025); *Paskas v. Illini Fed. Sav. & Loan Ass'n*, 440 N.E.2d 194, 199 (Ill. App. Ct. 1982) ("high degree of contractual responsibility" insufficient).  The alleged fiduciary must instead possess "substantial decision-making control over [the other party's] affairs." *Perloff v. Transamerica Life Ins. Co.*, 393 F.Supp.3d 404, 411 (E.D. Pa. 2019) (applying state law); *see also Wendy D. Swiney, LLC v. Legacy Care, LLC*, 2022 WL 17637444, at *7 (E.D. Va. Dec. 13, 2022)

---

[6] *See generally* Appendix C (survey of state law on fiduciary duty).

[7] *See also Yenchi v. Ameriprise Fin., Inc.*, 161 A.3d 811, 820-821 (Pa. 2017); *Moses v. Diocese of Colo.*, 863 P.2d 310, 322 (Colo. 1993); *Blon v. Bank One, Akron, N.A.*, 519 N.E.2d 363, 367-368 (Ohio 1988).

13

("Under Virginia law, '[a] fiduciary relationship exists where a party vests the other party with significant discretion in the management of affairs on its behalf.'").

Fiduciary duties are exceptional and will not be imposed merely because one party possesses greater expertise, experience, or bargaining power. *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 761 A.2d 1268, 1279-1280 (Conn. 2000); *see also Oddo Asset Mgmt. v. Barclays Bank PLC*, 973 N.E.2d 735, 740-741 (N.Y. 2012); Ribstein, *Are Partners Fiduciaries?*, 2005 U. Ill. L. Rev. 209, 232-233 (2005) ("The strong medicine of fiduciary duties is … appropriate only for a narrow class of cases."). Fiduciary relationships impose significant responsibilities beyond ordinary commercial or contract duties, which is why they "cannot be established 'inadvertently,'" *Wayman v. Amoco Oil Co.*, 923 F.Supp.1322, 1360 (D. Kan. 1996), and "will not be lightly created," *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 188 (5th Cir. 1995).[8]

### B. Each Of Plaintiffs' Purported Bases For Imposing Fiduciary Duties Fails As A Matter Of Law

Plaintiffs fail to allege facts plausibly showing that any of Administrator Defendants' relationships with Plaintiffs meet the above four core requirements necessary to establish that the Administrator Defendants owed fiduciary duties to class members. For example, Plaintiffs do not allege that any settlement agreement, approval order, or other agreement or document in the underlying settlements expressly designated an Administrator Defendant as a fiduciary. Nor do Plaintiffs allege that any statute, rule, regulation, or provision of Rule 23 identifies settlement administrators as fiduciaries.

Instead, departing from elemental fiduciary duty law and contrary to the basic legal structure of class actions, Plaintiffs ask this Court to infer a fiduciary relationship from the

---

[8] States may impose restrictions above and beyond these elements. *E.g.*, *Pitts*, 709 S.W.3d at 528 ("the special relationship must have existed 'prior to, and apart from, the agreement made the basis of the suit'"). Such idiosyncratic requirements are beyond the scope of this motion.

functions that settlement administrators typically perform.  Administrator Defendants' functions could not give rise to fiduciary duties in the absence of administrators exercising a form of discretionary authority that they were never granted and could not otherwise exercise consistent with Rule 23.  Because settlement administrators play a limited role circumscribed by settlement terms and under the supervision of class counsel who represent the interests of class members, Plaintiffs are legally foreclosed from alleging that the Administrator Defendants owed fiduciary duties to class members.

Unable to anchor their claims on accepted fiduciary duty law, Plaintiffs attempt to rest their claim on four assertions: (1) Administrator Defendants were appointed by courts to administer class settlements under Rule 23; (2) Administrator Defendants served as administrators of Qualified Settlement Funds under Treasury Regulation §1.468B; (3) Administrator Defendants acted as "notice agents aware of facts material to the class" and allegedly "guide[d] the information that reaches class members"; and (4) Administrator Defendants' marketing invoked concepts of trust, transparency, and expertise.  *See* Compl. ¶¶82, 85-95.  Each of these fails completely in asserting a basis for concluding that the Administrator Defendants were fiduciaries.

### 1.      Rule 23 does not impose fiduciary duties on Administrator Defendants

There is no merit to Plaintiffs' theory, Compl. ¶82(a), that Administrator Defendants are fiduciaries because they are appointed by courts to administer class settlements under Rule 23. The Rule says nothing about administrators.  The accompanying advisory committee notes mention administrators only once, when they advise that "[t]he court and counsel may wish to consider the use of class notice experts or professional claims administrators."  Plaintiffs' argument, that administrators become fiduciaries of class members merely by accepting a court appointment, is unsupported and inconsistent with Rule 23.

15

Rule 23 expressly assigns to class counsel all the fiduciary obligations Plaintiffs incorrectly ascribe to Administrator Defendants. *See* Fed. R. Civ. P. 23(g)(4) ("Class counsel must fairly and adequately represent the interests of the class."). Courts have long recognized class counsel's fiduciary duties to the class arising from Rule 23. *See, e.g.*, *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011) (class counsel should "prosecute the case in the interest of the class, of which they are fiduciaries"); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed."). Class counsel's fiduciary obligations to the class, including their obligations to oversee and approve the activities of settlement administrators, negate Plaintiffs' fiduciary duty claim against Administrator Defendants.

***No Administrator Domination and Influence.*** Under Rule 23, the class's interests are protected at all stages by class counsel with the court as a backstop. By the time administration begins, the court has already evaluated class counsel's "experience in handling class actions," "knowledge of the applicable law," and "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class," and has deemed class counsel "adequate." Fed. R. Civ. P. 23(g)(1), (2). Class counsel's formal role as legal representative of the class precludes administrators from exercising the kind of "domination and influence" over the class needed to find the existence of a fiduciary duty. *See, e.g.*, *Lowrance v. Patton*, 710 P.2d 108, 111 (Okla. 1985). Nor do Plaintiffs allege that any of the sophisticated, experienced class counsel in any of the underlying settlement cases failed to satisfy their fiduciary duties to the class. And given that class counsel in all settlements under Rule 23 is bound to protect the class's interests, Plaintiffs do not and cannot allege any facts that would support an inference that Administrator Defendants

16

exercised the kind of one-sided "*de facto* control and dominance" in their relationships with class members necessary to imply a fiduciary relationship. *AG Cap.*, 896 N.E.2d at 68; *see also Wisniski v. Brown & Brown Ins. Co. of Pa.*, 906 A.2d 571, 577-579 (Pa. Super. Ct. 2006) (fiduciary relationship requires "overmastering influence" that is "extremely one-sided").

Plaintiffs' allegations regarding the process for retaining administrators are likewise inconsistent with implying a fiduciary relationship. The complaint alleges that Administrator Defendants were retained by the settling parties through competitive bidding processes in arm's-length transactions negotiated by experienced counsel, Compl. ¶59, negating any reasonable inference that administrators exercise domination or control over the class. *See Hi-Ho Tower*, 761 A.2d at 1279 (parties "dealing at arm's length [lack a] relationship of dominance and dependence"); *Mawardi v. Cohen*, 381 So.3d 1, 3 (Fla. Dist. Ct. App. 2023) (similar).

***No Independent Administrator Discretion.*** The roles of class counsel and the court under Rule 23 likewise belie Plaintiffs' conclusory allegations, Compl. ¶458, attributing to Administrator Defendants "discretionary authority and control over the administration" of settlement funds. Rule 23 vests such discretionary authority only in class counsel, and ultimately in the court as overseer. *See* Fed. R. Civ. P. 23(e)(1)(A); Rule 23(e)(1)(B), (2)(C)(ii). To approve a settlement, the court must find the administration procedures proposed by counsel adequate, including "details of the contemplated claims process and the anticipated rate of claims by class members," and the procedure for "the distribution of [settlement] funds." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. Plaintiffs do not allege that any specific terms in the underlying class-action settlements of which Plaintiffs were members empowered Administrator Defendants to exercise discretion on Plaintiffs' behalf, nor do they identify any meaningful act by any Administrator Defendant that was not subject to review by class counsel. *See DeWitt Cnty. Pub.*

17

*Bldg. Comm'n v. DeWitt County*, 469 N.E.2d 689, 700 (Ill. App. Ct. 1984) (no fiduciary duty where "the party allegedly subject to influence …. receives the bank's advice … but is intelligent" and capable of "making an independent investigation"); *Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1289 (Colo. 1996) ("The determination of whether a true fiduciary relationship exists depends upon the degree of control exercised by the fiduciary over the affairs of the other person.").

Plaintiffs allege nothing that shows any Administrator Defendant performed anything more than the ministerial acts of executing the settlements' terms. Stripped of conclusory characterizations, the complaint alleges that administrators were tasked with administering settlement funds, communicating information about the settlement to class members, processing claims, and making distributions. Compl. ¶¶61-62, 71, 77-79. They further allege that administrators were tasked with calculating the net settlement fund, determining claim validity, proposing banks and payment platforms, effectuating the timing and method of distributions, and performing an allocation calculation for each class member. *Id.* ¶¶79, 82(b), 180, 195, 226, 243, 286, 299, 313, 326, 340, 353. These are quintessentially ministerial tasks. As the Manual for Complex Litigation describes their role, administrators' responsibilities are delimited "in the order approving the settlement agreement," and "may include taking custody of settlement funds, administering the distribution procedures, and overseeing implementation of an injunction." Ann. Manual for Complex Litigation §21.661 (4th ed.) ("Manual"). And while administrators "may be charged with reviewing the claims" in some cases, *id.*, that is not a discretionary exercise because the procedure for reviewing claims is set by the settlement's terms or the approval order. *See HCP Laguna Creek CA, LP v. Sunrise Senior Living Mgmt., Inc.*, 737 F.Supp.2d 533, 549 (E.D. Va.

2010) (applying state law and distinguishing fiduciary relationships from those in which "the principal controls the manner in which the agent undertakes its duties").

The discretionary authority that Plaintiffs incorrectly attribute to Administrator Defendants rightfully belongs to class counsel alone. Absent special circumstances not alleged here, and notwithstanding Plaintiffs' conclusory allegations, administrators have no independent authority to "determin[e] which bank held QSF deposits, select[] which payment platforms distributed settlement proceeds," or "control[] the information that was disclosed" to the class. Compl. ¶458. Consistent with Rule 23, due to their experience and knowledge of the industry, administrators can and do *propose* forms of notice, depository banks, digital payment platforms, and distribution plans to *class counsel*, who in turn must scrutinize the proposals to ensure they are in the class's best interests before seeking court approval. *See Ark. Teacher Ret. Sys. v. State St. Bank & Tr. Co.*, 512 F.Supp.3d 196, 254 (D. Mass. 2020) (class counsel has fiduciary duty to investigate material facts). Plaintiffs admit as much when they allege that *the court*, on occasion, approves the bank responsible for "holding and distributing settlement funds held in a QSF" and "also approves the form of notice, and establishes timelines." Compl. ¶61.

***No Administrator Entrustment or Acceptance of Fiduciary Duty.*** Nothing in Rule 23 permits class counsel to transfer their fiduciary obligations to settlement administrators. *See Valente v. Pepsico, Inc.*, 90 F.R.D. 170, 173 (D. Del. 1981) ("The law is clear beyond question that class counsel have a continuing duty to class members to represent their interests vigorously in all phases of a class suit, including the administration of a settlement."). This comports with the traditional common law rule that fiduciaries may retain agents to advise or assist, but generally may not delegate their obligations involving judgment and discretion. *McCormick v. McCormick*, 455 N.E.2d 103, 111 (Ill. App. Ct. 1983) ("[A]lthough purely ministerial duties may be delegated

19

by a trustee, generally a trustee may not delegate powers and duties involving the exercise of judgment and discretion."); *accord In re Kohler's Estate*, 33 A.2d 920, 922 (Pa. 1943); *Donaldson v. Borough of Madison*, 213 A.2d 33, 39 (N.J. Super. Ct. Ch. Div. 1965). Plaintiffs effectively admit that class counsel cannot delegate their fiduciary obligations to administrators when they repeatedly portray Administrator Defendants' purported fiduciary duties as "non-delegable." *E.g.*, Compl. ¶¶358-359, 370, 378, 459.

If settlement administrators were intended to be fiduciaries for the class, the settlement documents, court orders, or some statute or Rule would reflect that status. But none does. Where that status is intended, Congress and the courts make that clear. Take ERISA, for example, where administrators may be responsible for administering settlement funds that constitute plan assets under 29 U.S.C. §1002(21)(A), requiring appointment of a fiduciary to manage plan assets. *E.g.*, *Nolte v. Cigna Corp.*, 2013 WL 3586645, at *5 (C.D. Ill. July 3, 2013) (ERISA case appointing "Settlement Administrator as fiduciaries of the Settlement Fund"). That the unique context of ERISA settlements could sometimes result in appointing administrators as fiduciaries underscores the lack of any such express designation here. Absent an express order designating a settlement administrator as a fiduciary, the creation of a fiduciary duty merely by inferring it from the settlement administrators' appointment would require the administrator to be reposed with a level of discretionary authority that fatally collides with Rule 23 and the legal framework that surrounds it.

In sum, while Plaintiffs pretend that a blanket rule imposing fiduciary duties on all settlement administrators already exists, in fact they are asking this Court to create a new, *post hoc* fiduciary rule from scratch. The invitation should be declined. Plaintiffs' proposal to rewrite Rule 23 would produce the predictable, undesirable consequences of increasing settlement

20

administration costs and reducing settlement funds available to class members going forward. Imposing new, unbounded legal duties on administrators outside of Rule 23 would force them to increase their prices to hedge against new legal risk, while simultaneously reducing competition by driving new entrants out of the settlement administration market. *See* Easterbrook & Fischel, *Contract and Fiduciary Duty*, 36 J.L. & Econ. 425, 428 (1993) (Imposing fiduciary duties "might produce a windfall for the plaintiff today. What of tomorrow? Prices and practices would adjust[.]"). Those negative consequences would far outweigh the benefits of any protections classes would receive, which would be wholly duplicative of what Rule 23 already provides.

Plaintiffs' effort to collapse the distinct functions of class counsel and settlement administrators and to create a new, redundant fiduciary role that is neither contemplated nor countenanced by Rule 23 impermissibly rewrites the class-action framework and must fail.

**2.      Treasury regulations for QSFs do not impose fiduciary duties on Administrator Defendants**

Nor is there any merit to Plaintiffs' allegation, Compl. ¶¶82(b), 63-69, that Administrator Defendants are fiduciaries because they serve in some cases as administrators of QSFs under Treasury Regulation §1.468B. The complaint identifies no provision of the QSF regulations that expressly or impliedly creates fiduciary duties owed by settlement administrators to class members, because none exists. *See* 26 C.F.R. §1.468B-1.

A QSF is a court-supervised fund established under Treasury Regulation §1.468B-1 to receive settlement proceeds, resolve claims, and distribute funds to eligible claimants. *Id.* §1.468B-1(e), (f). The regulation permits a QSF to be structured as either a "trust under applicable state law," or as an account whose assets are "segregated from other assets of the transferor." *Id.* §1.468B-1(c)(3). The regulation also defines the QSF administrator as "the person designated, or approved, by the governmental authority that ordered or approved the fund." *Id.* §1.468B-2(k)(3).

21

But it expressly acknowledges that a QSF administrator is a "trustee" only "if the qualified settlement fund is a trust." *Id.*

The QSF regulations do not transform administrators into fiduciaries. They merely identify who is responsible for filing tax returns, 26 C.F.R. §1.468B-2(k), and for performing certain ministerial tasks, such as reporting distributions to the IRS, *id.* §1.468B-2(l). In this way, the QSF administrator's obligations are similar to those of an independent auditor—not a fiduciary. *See Resol. Tr. Corp. v. KPMG Peat Marwick*, 844 F.Supp.431, 436 (N.D. Ill. 1994) ("[A]n independent auditor generally is not in a fiduciary relationship with its client. Some courts have gone as far as to observe that the nature of the independent auditor precludes a finding of fiduciary duty."); *cf. Oaks Mgmt. Corp. v. Superior Ct.*, 51 Cal.Rptr.3d 561, 570 (Cal. Ct. App. 2006) (cautioning "against the 'loose characterization' of financial relationships as 'fiduciary, quasi-fiduciary or fiduciary like'"). Nothing in the regulations vest QSF administrators with discretionary authority over the distribution of QSF assets, authorizes them to select the bank that will hold QSF funds, permits them to invest QSF funds, or empowers them to select payment vendors to distribute QSF assets. *Contra* Compl. ¶458. As discussed above, any such authority would have to come from approval or appointment orders under Rule 23, and Plaintiffs do not allege that any such orders conferred that authority here.

Administrators implement *the parties'* discretionary decisions regarding whether and how to establish the QSF, and perform the ministerial functions required by the Treasury regulations, subject to the oversight of class counsel. Serving as a QSF administrator creates no relationship of "great intimacy, confidentiality, reliance and superiority of influence," as "required for a fiduciary relationship." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F.Supp.2d 162, 194 (S.D.N.Y. 2011); *cf. Moyer Tr. for Est. of Leonard v. Old Nat'l Bancorp*, 2019

WL 939034, at *3 (Mich. Ct. App. Feb. 26, 2019) (per curiam) ("When a defendant does not have 'ultimate control' over a plaintiff's business decisions, no fiduciary duty arises.").

### 3. Administrator Defendants' service of notice on class members does not create or imply a fiduciary duty

Plaintiffs also contend that Administrator Defendants are fiduciaries because they acted as "notice agents aware of facts material to the class" and "guid[ed] the information that reaches class members." Compl. ¶82(c). Plaintiffs further allege in wholly conclusory fashion that class members are "almost entirely dependent" on settlement administrators to provide material information regarding proposed settlements through notices, settlement websites, claim forms, call centers, and other communication channels. *Id.* ¶71. Plaintiffs leap from those allegations to their bald legal conclusion that Administrator Defendants owe Plaintiffs "the full suite of trust law duties," including loyalty, disclosure, accounting, and prudence. *Id.* ¶¶82(c), 83.

Plaintiffs' conclusory allegations about administrator discretion and power imbalance in the provision of notice to class members are untenable and foreclosed by Rule 23. Class notice is *the court's* communication to the class, not the administrator's. Fed. R. Civ. P. 23(e)(1)(B). Both the content of class communications and their means of dissemination must be proposed by the parties and approved by the court. Fed. R. Civ. P. 23(e)(1)(A)-(B); Fed. R. Civ. P. 23 advisory committee's note to the 2018 amendment; Manual §21.132; *see also, e.g.*, Compl. ¶¶61-62. Plaintiffs allege no well-pled facts to the contrary. Nor can they. Preparing and serving notice to the class—as directed by counsel for the parties to the settlement, subject to class counsel oversight and court approval—is a prototypical administrative function. Merely serving as a conduit for settlement information has none of the hallmarks of "a special relationship of trust, reliance, influence, and control," *Accident & Inj. Med. Specialists, P.C. v. Mintz*, 279 P.3d 658, 663 (Colo.

2012), or the "surrender of independence by the subservient party," *Kratky v. Musil*, 969 S.W.2d 371, 377 (Mo. Ct. App. 1998), necessary to imply a fiduciary relationship.

### 4.     Administrator Defendants' alleged marketing statements provide no basis on which to imply fiduciary duties

Finally, Plaintiffs allege that Administrator Defendants are fiduciaries because their marketing statements sometimes invoked the concepts of trust, transparency, and expertise. Compl. ¶¶85-95. None of these allegations supports a plausible inference that any Administrator Defendant owed Plaintiffs fiduciary duties.

A business encouraging others to be confident of its services does not create a fiduciary relationship. *Cass v. Fuller*, 2016 WL 8078145, at *4 (N.D. Ala. Nov. 9, 2016) ("plaintiff may not simply allege a trusting relationship"), *R. & R. adopted*, 2017 WL 372275 (N.D. Ala. Jan. 26, 2017). Rather, plaintiffs must plausibly allege that they trusted the defendant "specifically to act as a fiduciary" and that the defendant was aware of those expectations. *Id*. The complaint does not allege that any Plaintiff relied on any Administrator Defendant's marketing statements, much less understood any Administrator Defendant to be assuming fiduciary obligations.

Nor do the marketing statements communicate an intent to accept fiduciary duties to millions of class members. The alleged statements are commercial representations concerning expertise, reliability, experience, and client service. *E.g.*, Compl. ¶92 (advertising "industry expertise and technology for all class action matters"); *id.* ¶94 (advertising being a "[t]rusted partner for handling the notice and administration of securities litigation of all types and levels of complexity"). These statements were directed to prospective customers, such as highly sophisticated law firms—not to class members—and they say nothing about fiduciary obligations.

Because the complaint alleges only ordinary expressions touting Administrator Defendants' competence and excellence, Plaintiffs' marketing allegations fail to support any

24

reasonable inference of a fiduciary relationship. *See Sun Aviation, Inc. v. L-3 Commc'ns Avionics Sys., Inc.*, 533 S.W.3d 720, 728 (Mo. 2017) ("[M]ere acknowledgement of a mutual trust and confidence between the parties in an ordinary, arms-length business relationship, alone, is insufficient to give rise to the heightened duty to disclose a material fact that accompanies a fiduciary relationship.").

### C. Plaintiffs' Failure To Plead The Existence Of A Fiduciary Relationship Requires Dismissal Of Plaintiffs' Fiduciary Duty Claims, Other State-Law Claims, And Civil RICO Claims

Plaintiffs' failure to allege a fiduciary duty defeats not just Plaintiffs' breach of fiduciary duty claim (Count I), but also Plaintiffs' other state-law claims and civil RICO claims (Counts III-IV, VI-X), as Plaintiffs effectively concede. *See* Compl. ¶383. Plaintiffs do not allege that any Administrator Defendant made any false statements of fact, much less ones meeting the heightened pleading requirements of Rule 9(b). Instead, the complaint alleges, over and over, that Administrator Defendants are liable for their silence. *See id.* ¶2 ("All the Defendants said nothing[.]"); *id.* ¶7 ("omissions in … court filings"); *id.* ¶44. A section of the complaint identifies "recurring omissions in submissions to the judiciary" and alleges that Administrator Defendants committed ten categories of alleged omissions that Plaintiffs incorporate "into each cause of action." *Id.* ¶¶366-381. Plaintiffs' theory is that "omissions … were the scheme." *Id.* ¶11.

As Plaintiffs admit, to state a claim based on an alleged omission, Plaintiffs must plausibly allege an affirmative duty to disclose. Compl. ¶383 ("[t]he duty to disclose is what transforms the omissions … into actionable misrepresentations."); *see also id.* ¶100 (emphasizing "fiduciary duties and transparency"). The only such duty Plaintiffs allege is "Administrator Defendants' non-delegable fiduciary duty of complete disclosure." *Id.* ¶370. Because Plaintiffs fail to allege the existence of a fiduciary duty, all of Plaintiffs' state law and RICO claims fail as a matter of law.

25

***Fraud, Fraudulent Concealment, Negligent Misrepresentation, Unjust Enrichment.***
Plaintiffs' fraud, fraudulent concealment, negligent misrepresentation, and unjust enrichment
claims fail because omission-based liability under the law of every relevant State requires the
existence of an affirmative duty to disclose. *See Asnat Realty, LLC v. United Illuminating Co.*,
253 A.3d 56, 67 (Conn. App. Ct. 2021) ("Mere nondisclosure ... does not ordinarily amount to
fraud."); *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996) ("[F]or fraudulent
concealment, a plaintiff must allege that the defendant concealed a material fact when he was under
a duty to disclose that fact to plaintiff."); *Justice v. Anderson County*, 955 S.W.2d 613, 616 (Tenn.
Ct. App. 1997) ("Nondisclosure of a material fact may also give rise to a claim for fraudulent or
negligent misrepresentation when the defendant has a duty to disclose and the matters not disclosed
are material.").[9]  Plaintiffs attempt to satisfy that requirement solely by alleging that, "as court-
appointed fiduciaries," Administrator Defendants owed "a duty of full disclosure to the class
members whose funds they administered." Compl. ¶485.  They similarly allege that Administrator
Defendants occupied a position of "special confidence and trust" giving rise to "a duty to speak
truthfully and with care," *id.* ¶562, which is just another way of saying "fiduciary duty."  But
because Plaintiffs fail to plead facts sufficient to infer the existence of a fiduciary relationship,
*supra* §I.B, these omission-based tort claims necessarily fail.

Plaintiffs' unjust enrichment claim likewise fails because it merely seeks equitable relief
based upon the same deficient underlying theories of tortious or otherwise unjust or inequitable
conduct.  *See, e.g.*, *Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 928 (Ill. App. Ct.
2009) ("When an underlying claim of fraud … is deficient, a claim for unjust enrichment should

---

[9] *See generally* Appendices D, E & F (surveys of state law on fraud, fraudulent concealment, and
negligent misrepresentation).

26

also be dismissed.").[10]  Plaintiffs expressly tie their theory of unjust enrichment to the existence of a fiduciary duty and corresponding duty to disclose.  Compl. ¶6 (alleging that "the law of unjust enrichment" provides that "fiduciaries appointed by courts may [not] secretly profit from that appointment"); *id.* ¶574 (alleging benefits retained by administrators were "inequitable" because they were "undisclosed self-dealing, in breach of fiduciary duties" and "in violation of the terms on which Defendants were appointed and approved").  The absence of the predicate fiduciary duty means there is no enrichment alleged to be unjust or inequitable.

***Negligence.***  Plaintiffs' negligence claim similarly fails because negligence requires the existence of a legal duty.  *E.g.*, *Woolard v. Regent Real Est. Servs., Inc.*, 328 Cal.Rptr.3d 439, 447 (Cal. Ct. App. 2024) ("Duty 'is an essential element' of the tort of negligence.").[11]  Plaintiffs allege a "duty to exercise reasonable care in managing and administering QSF assets" that Administrator Defendants supposedly breached by failing to "manag[e] settlement funds with reasonable care for the benefit of the Class."  Compl. ¶¶568-569.  But Plaintiffs do not allege that Administrator Defendants failed to perform any duty imposed by the Treasury regulations governing QSF administration.  Nor do they allege that Administrator Defendants failed or negligently performed any requirement of any underlying settlement agreement.  The only "failure" Plaintiffs allege relative to Administrator Defendants' performance of their duties is the purported breach of their duty to disclose agreements with third-party payment card vendors and banks, which is premised exclusively on Plaintiffs' failed fiduciary duty theory.  *Id*. ¶370.

***Civil RICO.***  Plaintiffs' civil RICO claims likewise depend on the existence of a duty to disclose because their predicate act allegations are purely derivative of Plaintiffs' fatally flawed

---

[10] *See generally* Appendix G (survey of state law on unjust enrichment).

[11] *See generally* Appendix H (survey of state law on negligence).

fraud allegations. Pleading a RICO violation requires allegations of a "pattern of racketeering activity," 18 U.S.C. §1962(a)-(c), including well-pled allegations that one or more predicate criminal statutes have been violated, *id*. §1961(1); *infra* §III.F. Plaintiffs allege predicate acts of mail fraud and wire fraud. Compl. ¶391. RICO claims based on mail or wire fraud "'must be particularly scrutinized.'" *W. Assocs. Ltd. P'Ship v. Market Square Assocs.*, 235 F.3d 629, 637 (D.C. Cir. 2001). A violation of either fraud statute, 18 U.S.C. §§1341, 1343, requires allegations of (1) a scheme to defraud, (2) use of the mail or wires to further the scheme, and (3) specific intent to defraud. *See Feld Ent., Inc. v. ASPCA*, 873 F.Supp.2d 288, 317 (D.D.C. 2012).

Plaintiffs allege none of those things, much less "'the time, place and content of the false misrepresentations, the fact misrepresented[,] and what was retained or given up as a consequence of the fraud,'" with the particularity required by Rule 9(b). *Cheeks v. Fort Myer Constr. Corp.*, 216 F.Supp.3d 146, 157 (D.D.C. 2016). And it is settled that both statutes permit liability based on alleged omissions only where the defendant had an independent duty to disclose. *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015) ("Absent an independent duty, such as a fiduciary duty or an explicit statutory duty, failure to disclose cannot be the basis of a [RICO] fraudulent scheme."); *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065 (11th Cir. 2007) ("'[N]ondisclosure of material information can constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose either by statute or otherwise.'"). For all the reasons explained, absent a fiduciary duty there is no duty to disclose and Plaintiffs' predicate act allegations necessarily fail as a matter of law.

Plaintiffs also assert predicate acts of money laundering, but those are likewise derivative of the purported fraud because they concern "undisclosed payments," "money taken from the QSF under fraudulent pretenses," and "proceeds obtained through fraud and fiduciary self-dealing."

28

Compl. ¶¶166-167.   To assert a violation of the money-laundering statute, 18 U.S.C. §1956(a)(1)(A)-(B), Plaintiffs must allege that Administrator Defendants (1) "conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of unlawful activity; (3) the defendant knew that the proceeds were from unlawful activity"; and (4) the defendant either intended to promote the specified unlawful activity or knew the transaction was designed to conceal an element of the proceeds of specified unlawful activity.  *United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007) (discussing §1956(a)(1)(B)).  An element of any money-laundering claim is "that the money being laundered must in some way be associated with 'unlawful activity.'"  *Hourani v. Mirtchev*, 796 F.3d 1, 10 (D.C. Cir. 2015).  "[T]he statute defines 'unlawful activity,'" *id.*, and for the reasons explained, Plaintiffs do not plausibly allege any of the underlying offenses, *see* 18 U.S.C. §1956(c)(7) (listing offenses).

Thus, every alleged RICO predicate act depends upon the same nonexistent fiduciary duty to disclose and should be dismissed.  *See Casio Computer Co. v. Sayo*, 2000 WL 1877516, at *17 (S.D.N.Y. Oct. 13, 2000) (dismissing RICO claim where plaintiff's "sweeping allegations only provide conclusory statements that defendants' transactions were conducted for the purpose of concealing 'the nature … of the proceeds of specified unlawful activity'").

***RICO Conspiracy, Civil Conspiracy.***  Plaintiffs' remaining claims likewise rise or fall with their defective underlying tort theories.  Because the civil RICO claims fail, so too does the RICO conspiracy claim under §1962(d).  *See E. Savings Bank, FSB v. Papageorge*, 31 F.Supp.3d 1, 15 (D.D.C. 2014).  Civil conspiracy is likewise not an independent tort, but merely a theory for imposing liability based on participation in an underlying tortious act.  *See, e.g.*, *Kovkov v. Law Firm of Dayrel Sewell, PLLC*, 182 A.D.3d 418, 418 (N.Y. App. Div. 1st Dep't 2020); *Macomber*

29

*v. Travelers Prop. & Cas. Corp*., 894 A.2d 240, 254 (Conn. 2006).[12]  The only alleged "unlawful purpose" or "unlawful means" is alleged concealment of "undisclosed compensation" through omissions that supposedly violated fiduciary disclosure obligations.  Compl. ¶550.

***Plaintiffs' "Half-Truth" Theory.*** Plaintiffs' claims are not saved by their alternative contention that truthful statements by Administrator Defendants became actionable "not because the words on the page were inaccurate, but because the duty to include more made the incompleteness itself the lie."  Compl. ¶383.  That alleged "duty to include more" is nothing more than a reframing of the same failed assertion of a "fiduciary duty of complete disclosure."  *Id*. ¶370.  Because Plaintiffs fail to allege any fiduciary duty giving rise to a duty of additional disclosure, their circular, bootstrapping half-truth theory necessarily fails.

That theory also independently fails because Plaintiffs identify no specific statements that were supposedly rendered misleading—much less with the particularity required by Rule 9(b).  *See Brink v. Continental Ins. Co*., 787 F.3d 1120, 1127 (D.C. Cir. 2015); *Bank of N.Y. Mellon Tr. Co. v. Henderson*, 107 F.Supp.3d 41, 48 (D.D.C. 2015).  Half-truths "state the truth only so far as it goes, while omitting critical qualifying information" necessary to prevent representations from being misleading.  *Macquarie Infrastructure Corp. v. Moab Partners, L.P*., 601 U.S. 257, 263 (2024).  Pleading a half-truth therefore requires identification of "affirmative assertions … before determining if other facts are needed to make those statements" true.  *Id*. at 264; *see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).  Plaintiffs plead no such affirmative assertions.  Instead, they offer only conclusory allegations without identifying the "who, what, when, where, and how" of any supposed half-truths or the context necessary to explain why they were misleading.  *Antoine v. U.S. Bank Nat'l Ass'n*, 547 F.Supp.2d

---

[12] *See generally* Appendix I (survey of state law on civil conspiracy).

30, 36 (D.D.C. 2008); *see* Compl. ¶¶185, 201, 216, 232, 246, 256, 276, 289, 303, 316, 330, 343, 356, 371-374, 377, 379.  That is insufficient to state a claim, and because Plaintiffs' state law and RICO claims are irreducibly premised on their invalid fiduciary duty theory, Plaintiffs fail to state a tort or RICO claim for which relief can be granted, and those claims should be dismissed.

## II.    PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE DISMISSED

Having dispensed with all of Plaintiffs' state law and RICO claims premised on their invalid fiduciary duty theory, Plaintiffs' sole remaining claims are asserted under the federal antitrust laws (Count XI).  They fail for three independent reasons: (1) Plaintiffs are, at best, indirect purchasers who cannot recover damages under federal antitrust law; (2) Plaintiffs lack standing to assert any antitrust claim; and (3) Plaintiffs do not plausibly allege facts supporting any agreement in restraint of trade.  These fatal flaws in Plaintiffs' antitrust claims, together with the failure of Plaintiffs' fiduciary duty theory, defeat all of Plaintiffs' claims and require dismissal of the entire complaint.

### A.    Plaintiffs Are Not Direct Purchasers

As a threshold matter, only direct purchasers of goods or services can recover damages for a federal antitrust violation.  *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730-731, 745-747 (1977) (explaining policy reasons for limiting recovery to "direct purchasers" under federal antitrust law); *see also MSP Recovery Claims, Series LLC v. Pfizer, Inc.*, 728 F.Supp.3d 89, 104 (D.D.C. 2024) ("immediate buyers").  *Illinois Brick* "established a bright-line rule."  *Apple Inc. v. Pepper*, 587 U.S. 273, 281 (2019).  If "manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A."  *Id.* at 280.[13]

---

[13] *Illinois Brick*'s direct-purchaser requirement is "analytically distinct" from whether a plaintiff has suffered injuries that are too remote for antitrust standing.  *E.g.*, *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F.Supp.2d 30, 36 (D.D.C. 2003).  The broader requirement of antitrust standing, which includes directness of injury, is discussed below.

31

Plaintiffs have not alleged, and cannot plausibly allege, that they purchased goods or services from Administrator Defendants, much less that Plaintiffs were "direct," "immediate" purchasers. This is fatal to their antitrust damages claim. Plaintiffs allege that class counsel solicited competing bids from administrators. Compl. ¶¶59, 80, 371, 441. Once class counsel selected a settlement administrator, each court reviewed and approved the administrator's proposed scope of work and costs and appointed the administrator in a preliminary approval order. *Id.* ¶¶59-61, 77, 441. At no point did class members directly *purchase* or fund any transaction in the administration process, nor were they even involved in the selection of an administrator. Rather, they *received* a portion of the funds provided by settling defendants only *after* an administrator had been selected, and after costs and class-counsel fees were approved by the court. *See id.* ¶79.

The Third Circuit affirmed the dismissal of an analogous antitrust claim in *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842 (3d Cir. 1996). There, former medical-malpractice plaintiffs brought federal antitrust and RICO claims against photocopying services and hospitals for allegedly inflated costs of copying medical records in connection with their legal representations. The Third Circuit concluded that where, as here, "none of the plaintiffs retained their lawyers to act as *mere purchasing agents*," the lawyers had acted as independent contractors and were themselves "the direct purchasers of the hospital-record photocopies." *Id.* at 852 (emphasis added); *see also Queen v. Schultz*, 747 F.3d 879, 887 (D.C. Cir. 2014) (citing *McCarthy* with approval for the proposition that "attorneys generally are 'independent contractors' with respect to their clients").

That reasoning applies here with even more force. *McCarthy* was not a class action, and the plaintiffs there individually retained their lawyers. Even when directly retained by individual

clients, counsel procure myriad services that are incidental to the representations, including expert reports and testimony, court reporting fees, copy services, travel fees, and more. Under *McCarthy* and *Illinois Brick*, class counsel are the "direct" purchasers of administration services. That is fatal to Plaintiffs' antitrust damages claim and, as discussed below, Plaintiffs' RICO claims. *McCarthy*, 80 F.3d at 855; *infra* §III.F.

Plaintiffs cannot avoid *Illinois Brick* by asserting that settlement administrators are paid to provide services to class members from a settlement fund created for the class's ultimate benefit. A similar situation arises in the residential real estate context where a home *seller* pays the commission for the home *buyer*'s real estate agent through funds from the transaction. At least one district court has held that home buyers are indirect purchasers of buyer-broker services under *Illinois Brick* because the seller—not the buyer—contracts for the buyer-broker's commission in connection with the sale even though the services are provided to the home buyer. *Leeder v. Nat'l Ass'n of Realtors*, 601 F.Supp.3d 301, 308-311 (N.D. Ill. 2022); *see also Davis v. Hanna Holdings, Inc.*, 771 F.Supp.3d 552, 574-575 (E.D. Pa. 2025) ("[B]oth parties agree that Plaintiffs are indirect purchasers of buyer-broker services, as it is home *sellers*, not home *buyers*, who directly pay the buyer-broker's commission." (emphasis in original)). *Leeder* rejected the argument that buyers should be treated as direct purchasers because the commission is economically incorporated into the home's purchase price. That argument, the court explained, is a pass-through theory of injury—the same theory *Illinois Brick* forecloses. *Leeder*, 601 F.Supp.3d at 311; *see also McCarthy*, 80 F.3d at 853 ("the fact that the costs of the photocopies were passed on to the client on a dollar for dollar basis … is not dispositive").

At bottom, Plaintiffs do not allege that they directly paid any Administrator Defendant for its services, and "none of the plaintiffs retained their lawyers to act as mere purchasing agents

33

whose sole objective and function was to buy" administration services. *McCarthy*, 80 F.3d at 852.

Under the indirect-purchaser rule, the operative question is whether Plaintiffs made any direct

purchases. Plaintiffs have not. Under "the straightforward rule of *Illinois Brick*," *Apple*, 587 U.S.

at 280, Plaintiffs' antitrust claims for damages are foreclosed.

## B.    Plaintiffs Lack Antitrust Standing

Plaintiffs also cannot satisfy the related but independent requirement of showing that they

are the "proper party" to pursue an antitrust claim—*i.e.*, that they have "antitrust standing." *See*

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535

n.31 (1983). To assess whether a plaintiff is the proper party to bring an antitrust claim, courts

consider: (1) whether the plaintiff suffered an "antitrust injury," (2) the directness of the injury,

(3) whether the claim for damages is "speculative," (4) the existence of more direct victims, and

(5) the potential for duplicative recovery and the complexity of apportioning damages. *Andrx*

*Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806 (D.C. Cir. 2001).[14] These factors weigh

"heavily" against antitrust standing when there is a more direct, "identifiable class of persons

whose self-interest would normally motivate them to vindicate the public interest[.]" *Kochert v.*

*Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 718 (7th Cir. 2006).

Here, Plaintiffs were not parties to the transactions of which they complain. No plaintiff

is alleged to have had *any* involvement in the selection or retention of any Administrator, Bank,

---

[14] The antitrust standing requirement derives from Section 4 of the Clayton Act, which requires injury "by reason of" an antitrust violation. *See* 15 U.S.C. §15(a) (treble damages for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws"). Not all of the factors identified in *Associated General Contractors* are relevant to a plaintiff seeking only injunctive relief under Section 16 of the Clayton Act (*e.g.*, speculative damages). *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986). In any event, an indirect purchaser may not seek equitable monetary relief, such as restitution or disgorgement, under Section 16 to circumvent *Illinois Brick*. *See, e.g.*, *FTC v. Mylan Labs., Inc.*, 62 F.Supp.2d 25, 42 (D.D.C. 1999).

or FinTech Defendant. Counsel control the selection and terms of the engagement of administration services following a competitive bidding process. *See* Compl. ¶¶59-61, 77-80, 371, 441. Even assuming any plausible anticompetitive conduct—and there is none—class counsel themselves comprise an identifiable class whose economic self-interest and fiduciary duties would necessarily motivate them to vindicate any public interest. *See Kochert*, 463 F.3d at 718.

Plaintiffs also fail to plead an injury proximately caused by Administrator Defendants' conduct or antitrust injury, the latter of which is an injury caused by the antitrust violation itself that is "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). Plaintiffs cannot allege any injury proximately caused by the alleged anticompetitive conduct because any alleged harm is purely conjectural. They repeatedly assume that any allegedly undisclosed compensation received by an Administrator Defendant necessarily diminished their individual awards dollar-for-dollar. *E.g.*, Compl. ¶¶173, 188, 204, 219, 236, 248, 260, 279, 292, 306, 319, 333, 346. But the complaint pleads no facts making that conclusion plausible while excluding other obvious alternatives. *See Iqbal*, 556 U.S. at 678 (insufficient to "plead[] facts that are 'merely consistent with' a defendant's liability). The complaint does not allege facts showing that disclosure of challenged arrangements would have caused class counsel or the courts to reject those arrangements; to select different administrators, banks, or payment providers; or otherwise to alter the economics of the underlying settlements. Nor does it allege that comparable administrators, banks, or payment providers were available on materially better terms, that the relevant Administrator Defendant would have performed the same services for lower compensation, or that any resulting savings would actually have increased distributions to class members rather than being reflected elsewhere in the settlement structure. The complaint

35

assumes that less compensation to administrators necessarily would have produced larger recoveries for the class, but such speculation is insufficient when Plaintiffs' allegations, at best, are merely "compatible with … unchoreographed free-market behavior." *Id.* at 680; *see also Hikma Pharms. USA Inc v. Amarin Pharma, Inc.*, 146 S.Ct. 1391, 1399 (2026) (plaintiff must plead facts "to rule out 'obvious alternative explanation[s]' for the defendant's conduct").

For example, Plaintiffs fail to allege that if an Administrator Defendant had disclosed alleged compensation agreements with vendors, the relevant class counsel or courts would have objected, the administrator would have agreed to provide the same services without increasing prices, the parties would have agreed to settlement terms with more funds for the class, or the relevant Plaintiff would have received more than they received. Nor do Plaintiffs allege that if an Administrator Defendant had disclosed such alleged agreements, some other administrator would have been available and willing to do the same work at a lower overall cost *and* that the relevant Plaintiff actually would have recovered more. At most, Plaintiffs rely on conclusory assertions of causation that are insufficient under Rule 8 (much less Rule 9(b), as required for fraud claims).

Even if Plaintiffs had alleged facts to establish that Administrator Defendants' alleged conduct was a but-for cause of their alleged injury, they would have to rely on a multi-step causal chain in which their alleged injury is far "too remote" from the purportedly unlawful conduct. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). Independent third parties—including courts, class counsel, other administrators and banks, attorneys general, and class members—would have to behave differently just for the *possibility* that class members might receive more money from class settlements had each Administrator Defendant disclosed alleged rebates and interest-sharing agreements. As discussed further below, that causal chain is

36

too attenuated to support Article III standing, *infra* §IV, much less an injury to support an antitrust claim.

Plaintiffs' claims would further require disentangling the harm allegedly caused by an Administrator Defendant from other unnamed, independent third parties, including class counsel who had fiduciary obligations to class members and who, under Plaintiffs' theory, would have failed to inquire into or object to the use of any rebates or interest-sharing agreements. *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 269 (1992) ("[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors."). And to avoid multiple recoveries, it would also be necessary to "adopt complicated rules apportioning damages," reinforcing Plaintiffs' inability to establish proximate cause. *See id.*

Nor can Plaintiffs allege *antitrust* injury, which "looks at the marketplace in general," *Nat'l ATM Council, Inc. v. Visa*, 922 F.Supp.2d 73, 81 (D.D.C. 2013), for "injury to commercial competition," *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 983 (D.C. Cir. 2017). Instead, Plaintiffs' complaint turns to abstractions. For instance, Plaintiffs allege that Administrator Defendants "agreed to eliminate competition" and "artificially reduc[ed] or eliminat[ed] competition," Compl. ¶¶408, 579, but these "bare and conclusory" allegations are insufficient because they merely parrot "the language of the antitrust statute," *Asa Accugrade, Inc. v. Am. Numismatic Ass'n*, 370 F.Supp.2d 213, 218 (D.D.C. 2005). "The antitrust injury requirement cannot be met by broad allegations of harm to the 'market.'" *Atl. Richfield*, 495 U.S. at 339 n.8. There are no non-conclusory allegations of harm to the purported Administrator Market, which consists of separate administrators managing separate funds in separate class actions based on separate, individualized negotiations between the respective administrators,

37

banks, and class counsel.  Plaintiffs thus fail to allege that they suffered any loss "from a competition-*reducing* aspect or effect" of Administrator Defendants' behavior.  *Id.* at 344 (emphasis in original).

As a result of the indirect nature of the injury alleged, the existence of a more direct identifiable group that would be motivated to vindicate any anticompetitive conduct, the complex apportionment of damages, and the lack of any antitrust injury, Plaintiffs are not the proper parties to bring a private antitrust action and lack antitrust standing.

### C.    Plaintiffs Allege No Agreement In Restraint Of Trade

Even setting aside the fatal, threshold problems of lack of direct purchases and standing, Plaintiffs lack the fundamental underpinning for a Sherman Act §1 claim—"'enough factual matter … to suggest that an agreement was made'" in restraint of trade.  *In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*, 2020 WL 5016922, at *29 (D.D.C. Aug. 25, 2020).

The Sherman Act prohibits unreasonable restraints of trade by "contract, combination … or conspiracy."  15 U.S.C. §1.  A plaintiff must plausibly allege (1) "that the defendants entered into some agreement," (2) "that at least one defendant committed an overt act in furtherance of the conspiracy," and (3) "that the agreement constituted an unreasonable restraint of trade."  *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 926 F.Supp.2d 36, 42 (D.D.C. 2013).

Plaintiffs have not plausibly alleged the existence of an anticompetitive agreement through either direct or circumstantial evidence.  *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).  Direct evidence is "'explicit and requires no inferences to establish the proposition … being asserted.'"  *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004).  Direct evidence is akin to a "'smoking gun'" and "extremely rare in antitrust cases."  *Id*.  Plaintiffs allege nothing of the sort.  The complaint is riddled with conclusory allegations that Defendants "engaged in an anticompetitive … scheme," Compl. ¶¶407, 425, 580;

38

"agreed to eliminate competition," *id.* ¶408; or generally "conspired," *id.* ¶¶170, 409.  Those "bare assertion[s] of conspiracy will not suffice." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Plaintiffs allege no more support circumstantially for an agreement involving Administrator Defendants, either amongst themselves or with Bank Defendants.[15]  To allege a plausible §1 claim based on circumstantial evidence, the facts pleaded must "exclude the possibility of independent action," *Monsanto*, 465 U.S. at 768, requiring plaintiffs to produce "more evidence … the less plausible the charge of collusive conduct," *In re Domestic Airline Travel Antitrust Litig.*, 691 F.Supp.3d 175, 192 (D.D.C. 2023).  Because market competitors will gravitate toward similar conduct even in a competitive environment, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556.

Rather, plaintiffs must allege "one or more plus factors" that plausibly "makes it 'more likely than not' that parallel conduct … was the result of a preceding agreement rather than interdependent action." *Domestic Airline*, 691 F.Supp.3d at 192; *see also Oxbow*, 926 F.Supp.2d at 46-47 ("plaintiffs must plead 'plus factors' that suggest collusion").  Plus factors include allegations that defendants had "a motivation to enter into a conspiracy"; acted "in contradiction of their own economic interests," *Kreuzer v. Am. Acad. of Periodontology*, 735 F.2d 1479, 1488 n.12 (D.C. Cir. 1984); or made "complex and historically unprecedented changes in pricing structure … at the very same time," *Twombly*, 550 U.S. at 556 n.4.

First, Plaintiffs do not plausibly allege any horizontal agreement among Administrator Defendants.  A conspiracy inference "may only be drawn … when an alleged conspirator has acted contrary to his own independent interest." *Kreuzer*, 735 F.2d at 1487-1488.  But under Plaintiffs' own theory, Administrator Defendants acted in a profit-maximizing manner: they allegedly

---

[15] The Sherman Act §1 claim does not name the FinTech Defendants.  *See* Compl. ¶¶578-591.

negotiated arm's-length transactions with Bank Defendants to increase compensation for class-settlement services.  Compl. ¶¶2-4, 96-99, 121-124.  Plaintiffs assume that, but for a conspiracy, Administrator Defendants would have competed for "higher interest rates on QSF accounts," yet Plaintiffs also allege that Administrator Defendants' individual profits increased with greater spreads between the lower interest rates on QSFs and higher market interest rates.  *Id.* ¶¶431-432.

Even under Plaintiffs' understanding of the Administrator Market, Administrator Defendants independently "pursu[ing] their own respective self-interests" would produce the very outcomes Plaintiffs allege are suggestive of an unlawful agreement.  *See Binder v. District of Columbia*, 1991 WL 11255755, at *5 (D.D.C. May 22, 1991) (granting motion to dismiss because plaintiffs' allegations failed to show defendants "acting contrary to their independent economic well-beings").  Because "a benign explanation for the action" is at least "equally" if not "more plausible than a collusive explanation, the action cannot constitute a plus factor."  *Domestic Airline*, 691 F.Supp.3d at 193.  Plaintiffs' failure to allege acts against self-interest is fatal to their §1 claim.  *See Kreuzer*, 735 F.2d at 1487-1488.

Plaintiffs fail to plead any other plus factor.  Plaintiffs allege that "[s]ome time on or about 2015 … Administrator Defendants entered into an ongoing agreement not to compete."  Compl. ¶¶407, 579.  But beyond that conclusory allegation, Plaintiffs offer nothing specific explaining how or why Administrator Defendants supposedly stopped competing.  The complaint does not identify any meeting, communication, speaker, document, term, or mechanism by which any Administrator Defendant agreed with any other Administrator Defendant to restrain competition.  Nor are there allegations regarding the pre-2015 market, the prior competition between Administrator Defendants, or any lack of competition after 2015, let alone "complex and historically unprecedented changes in pricing structure."  *Twombly*, 550 U.S. at 556 n.4.  Plaintiffs

40

fall back on purported similarities in Administrator Defendants' structured fee arrangements with banks, but "parallel conduct alone is insufficient to show a conspiratorial agreement." *U.S. Dominion, Inc. v. MyPillow, Inc.*, 2022 WL 1597420, at *7 (D.D.C. May 19, 2022).

Second, Plaintiffs do not plausibly allege an anticompetitive agreement between Administrator Defendants and Bank Defendants. At most, the complaint describes alleged vertical, bilateral compensation arrangements between particular administrators and particular banks.[16] To bridge the gap between individual, bilateral compensation agreements, Plaintiffs allege, "on information and belief," that administrators either demanded a cut of bank profits and threatened to move business if banks refused or, alternatively, that the banks proactively offered below-market QSF rates and shared "a portion" of profits with "some" Administrator Defendants through special purpose entities (SPEs). Compl. ¶¶ 128-129. Critically, Plaintiffs do not plausibly allege any facts suggesting collective agreement among the Administrator Defendants or the Bank Defendants.

For instance, Plaintiffs point to 2015 as the date of the purported conspiracies merely because, after 2015, national interest rates began to rise while interest on QSF accounts allegedly did not increase proportionally. Compl. ¶¶395, 407. Under Plaintiffs' theory, the "price of class administration services" began to rise. *Id.* ¶¶407-408. But "rising prices do not themselves permit an inference of a collusive market dynamic." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco*

---

[16] The complaint rests on a *per se* theory based on an alleged collective agreement to fix prices. *E.g.*, Compl. ¶581. Vertical business relationships, however, "are to be judged according to the rule of reason." *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007). Here, Plaintiffs have failed to plead any anticompetitive effects that arise from the individual, vertical business relationships between individual Administrator Defendants and individual Bank Defendants that are separate from their deficient theory of collective price fixing, and therefore Plaintiffs have not pleaded a claim under the rule of reason. *See, e.g.*, *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006) (affirming dismissal of complaint that attempted to "squeeze the restraint into the *per se* realm" but did not allege a violation of the rule of reason).

41

*Corp.*, 509 U.S. 209, 237 (1993). So "[e]ven if the plaintiffs' theory for parallel behavior is accepted," they do not plausibly allege anything "to support the conclusion that the defendants' pricing decision was not just parallel behavior." *City of Moundridge v. Exxon Mobil Corp.*, 2009 WL 5385975, at *6 (D.D.C. Sept. 30, 2009), *aff'd*, 409 F.App'x 362 (D.C. Cir. 2011).

Plaintiffs' allegations fall even shorter because, according to them, the Administrator Market and the market for QSF deposits are highly concentrated. Compl. ¶¶406, 417, 436 (alleging that the four Administrator Defendants "control approximately 80% of the Administrator Market" and the two Bank Defendants "control over 80% of the [QSF] market"). In a concentrated market, "conscious parallelism" is "a common reaction of 'firms … that recognize their shared economic interests and their interdependence with respect to price and output decisions' [and] is 'not in itself unlawful.'" *Twombly*, 550 U.S. at 553-554 (alterations omitted). Thus, it is "particularly difficult to allege sufficient facts to support a plausible inference of conspiracy in a concentrated market," as firms in such markets often "'arrive at identical decisions independently.'" *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 324 F.Supp.3d 1142, 1154 (S.D. Cal. 2018) (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015)); *see also Domestic Airline*, 691 F.Supp.3d at 193 (courts "must be cautious" in assessing "facial plausibility" in concentrated markets "because rational, independent actions … can be nearly indistinguishable from horizontal price fixing").[17] Because Plaintiffs have failed to allege a plausible agreement amongst the Administrator Defendants or collectively with Bank Defendants, the antitrust claim should be dismissed for this independent reason.

---

[17] Plaintiffs allege that a threat by a "single Administrator Defendant" to withdraw QSF deposits "could not have been effective" in incentivizing banks to pay for QSF deposits. Compl. ¶425. But because of the allegedly concentrated market, one administrator taking "independent action" to move its deposits to another bank offering greater compensation indeed could have changed bank behavior, further undermining any assertion of a conspiracy. *See Twombly*, 550 U.S. at 557.

III.    **PLAINTIFFS' STATE-LAW AND RICO CLAIMS SHOULD BE DISMISSED FOR ADDITIONAL REASONS**

For all the reasons explained above, Plaintiffs' failure to plead facts raising a plausible inference of a fiduciary relationship combined with their failure to plead a viable antitrust claim requires dismissal of the complaint in its entirety, and the Court need not consider Plaintiffs' claims any further.  Nevertheless, Plaintiffs' state-law and RICO claims fail for multiple additional reasons that likewise compel dismissal.

A.    **Plaintiffs Fail To Allege Other Elements Of Breach Of Fiduciary Duty**

Even assuming that Plaintiffs plausibly alleged a fiduciary duty, the fiduciary-duty claim fails because the complaint does not plausibly allege a breach.  Rather than pleading facts showing conduct that violated particular fiduciary obligations, the complaint labels ordinary commercial arrangements "kickbacks," "self-dealing," and "undisclosed compensation," simply concluding that those arrangements breached duties of loyalty, prudence, impartiality, disclosure, accounting, and candor.  Compl. ¶¶459-465.  Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, as they do not "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555.

The complaint assumes, rather than plausibly alleges, that the challenged financial arrangements were themselves breaches of fiduciary duties.  Plaintiffs repeatedly characterize alleged rebates, interest-sharing arrangements, supposed breakage revenue, and other vendor compensation as inherently disloyal or self-dealing.  *E.g.*, Compl. ¶¶128-130, 157-169, 460-462. But the complaint pleads virtually no facts regarding the terms of the alleged arrangements; whether they violated any settlement agreement, court order, or governing legal requirement; or why they were improper rather than ordinary commercial compensation arrangements.  Nor does the complaint allege facts showing that the alleged arrangements actually constituted the type of

43

conflicted transaction or self-dealing prohibited by fiduciary law. *See Lemond v. Manzulli*, 2009 WL 1269840, at \*5-6 (E.D.N.Y. Feb. 9, 2009) (dismissing fiduciary-duty claims where allegations failed to establish breach, as "mere existence of generous executive compensation is not sufficient" for self-dealing); *Anderson v. Intel Corp. Inv. Policy Comm.*, 579 F.Supp.3d 1133, 1156 (N.D. Cal. 2022) ("allegations that support at most the potential of a conflict of interest are not sufficient to state a claim for breach of the duty of loyalty").

Nor do Plaintiffs plausibly allege breaches of the particular fiduciary duties they invoke. For example, Plaintiffs allege that Administrator Defendants acted imprudently by selecting banks and payment vendors that allegedly generated additional compensation for the administrators, Compl. ¶¶462-463, yet plead almost no facts regarding industry practice, available alternatives, competing bids, comparative pricing, or what a prudent administrator supposedly would have done differently.    Similarly, Plaintiffs allege that Administrator Defendants breached duties of impartiality because every dollar retained by banks or fintech providers necessarily belonged to the class, *id*. ¶461, but that allegation merely states Plaintiffs' legal conclusion rather than facts showing the favoring of third parties over beneficiaries, *see Lemond*, 2009 WL 1269840, at \*5-6.

Finally, for the reasons already discussed, Plaintiffs fail to plausibly allege that any purported breach proximately caused them injury.  Plaintiffs accordingly fail to allege a breach of fiduciary duty claim for which relief can be granted.

**B.     Plaintiffs' Fraudulent Concealment And Fraud Claims Fail On Other Elements Besides Lack Of Fiduciary Duty**

Plaintiffs' fraudulent-concealment and fraud claims fail for reasons beyond the absence of a fiduciary duty or duty to disclose.  Fundamentally, Plaintiffs' fraud allegations lack the "particularity" that Rule 9(b) requires. *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015).  To meet the heightened pleading threshold, "matters such as the 'time, place, and

contents of the *false* representations'" must be "pleaded with specificity." *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002) (emphasis in original). The complaint generally alleges omissions across hundreds or thousands of settlement documents with scant facts about any of them, and nothing that comes close to satisfying Rule 9(b).

### 1.    Plaintiffs fail to plead reliance

Plaintiffs fail to plead with particularity reliance on any purported omissions.[18] The complaint alleges that Plaintiffs "reasonably relied on the completeness of the disclosures made" in "fee applications, administrator declarations, and post-distribution accountings to supervising courts" that allegedly omitted material facts. Compl. ¶¶476, 479. But Plaintiffs do not allege that they ever saw or had any reason to see those documents, much less that they actually relied on the omitted facts to their detriment. Nor does the complaint allege that class members would have acted differently if different disclosures had been made. The only supposedly misleading statements by Administrator Defendants *to class members* were in "notices" and "websites" discussing "settlement amounts, claims deadlines, and payment options." *Id.* ¶376. Yet Plaintiffs fail to explain how or why those public-facing materials—approved by class counsel and the court—would include information about administrators' compensation structures or vendor relationships, nor how such information would affect class members' decisions "whether to participate, seek clarification, or object." *Id.* ¶483. Class members have no role in selecting administrators, nor is it logical (let alone plausibly alleged) that they would decline to participate based on disclosures about the administrator.

To the extent Plaintiffs' fraud-based claims rest on a third-party reliance theory, the complaint contains only conclusory allegations that any court, class counsel, or state attorney

---

[18] *See generally* Appendices D & E (survey of state law on fraud and fraudulent concealment).

45

general actually relied on the absence of information concerning rebates, interest-sharing arrangements, or other compensation in making decisions.  Compl. ¶¶371-379.  Plaintiffs do not plausibly allege that any court would have denied approval, selected a different administrator, required different banking arrangements, or otherwise altered rulings had the allegedly omitted information been disclosed.  Nor do Plaintiffs allege that any class counsel or attorney general would have taken different action if the information had been disclosed.  Instead, the complaint merely assumes that disclosure would have mattered.  Such speculation is insufficient.

Moreover, as to the four jurisdictions that do not recognize third-party reliance (Florida, New York, Ohio, and Vermont), Plaintiffs cannot plead a viable claim at all.  *See Palmas Y Bambu, S.A. v. E.I. DuPont De Nemours & Co.*, 881 So.2d 565, 570-573 (Fla. Dist. Ct. App. 2004); *Pasternack v. Lab. Corp. of Am. Holdings*, 59 N.E.3d 485, 491-492 (N.Y. 2016); *Wiles v. Miller,* 3 N.E.3d 226, 239 (Ohio Ct. App. 2013); *Glassford v. Dufresne & Assocs., P.C.,* 124 A.3d 822, 831 (Vt. 2015).  Still others, including California, follow the Restatement (Second) of Torts, under which "a plaintiff can sue the maker of a misrepresentation where the misrepresentation was made to a third party and the maker intends or has reason to expect that the misrepresentation *will be repeated or communicated by the third party* to the plaintiff," inducing the plaintiff's *own* reliance on it.  *Burch v. CertainTeed Corp.*, 246 Cal.Rptr.3d 99, 111 (Cal. Ct. App. 2019) (emphasis added).  Plaintiffs make no such allegations here.

### 2.    Plaintiffs fail to plead causation

Plaintiffs also fail to plausibly allege that the alleged fraud was the actual or proximate cause of any alleged damages.  To state a claim, Plaintiffs must allege facts showing that they would have recovered more money in settlement distributions if an Administrator Defendant had disclosed the existence of the purported rebates and interest-sharing agreements.  *E.g.*, *CJS Indus. Inc. v. Dolce*, 242 N.Y.S.3d 565, 567 (N.Y. App. Div. 2025) (alleged fraud must be "the proximate

46

cause of the claimed losses"); *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 68 Cal.Rptr.3d 828, 869-870 (Cal. Ct. App. 2007) (damages must be "the 'proximate' or 'legal' result of the fraudulent conduct" ).[19] For the reasons discussed above, Plaintiffs fail to do so, and their fraud claims should be dismissed for this reason, too.

### C.   Plaintiffs' Civil Conspiracy Claim Fails

Plaintiffs' conspiracy claim fails because, as discussed, they fail to allege any viable underlying tort. But the claim also fails for other reasons. As relevant here, a civil-conspiracy claim requires an agreement among two or more individuals to commit an underlying tort, an allegedly unlawful objective or means, overt acts in furtherance of the agreement, and damages resulting from those acts.[20] Plaintiffs' allegations fail on these essential elements.

### 1.   Plaintiffs fail to allege any agreement

An agreement is the "principal" and "essential" element of a conspiracy claim. *Kurd v. Republic of Turkey*, 374 F.Supp.3d 37, 51, 61-62 (D.D.C. 2019); *Rise v. Bagshaw*, 2025 WL 1380478, at *9 (D.D.C. May 13, 2025). To plead that element, Plaintiffs must allege that there was an *actual* agreement among Defendants; the existence of a common goal, if not actually discussed or agreed upon, is insufficient. *See Kurd*, 374 F.Supp.3d at 61-62. Courts routinely dismiss conspiracy claims when a plaintiff fails to plead specific facts indicating an agreement or meeting of the minds. *E.g.*, *MyPillow*, 2022 WL 1597420, at *8-9; *Busby v. Capital One, N.A.*, 932 F.Supp.2d 114, 140-141 (D.D.C. 2013).

Plaintiffs allege that "each Defendant agreed and combined with one or more other Defendants" to extract undisclosed compensation from court-supervised QSF assets and to conceal

---

[19] *See generally* Appendices D & E (survey of state law on fraud and fraudulent concealment).

[20] *See generally* Appendix I (survey of state law on civil conspiracy).

47

those arrangements. Compl. ¶550. That is a conclusion, not a fact. The complaint does not identify any meeting, communication, document, speaker, recipient, date, or anything else showing that any Administrator Defendants reached any agreement with any other Defendant to act tortiously.

Generalized statements from unnamed industry insiders, reports, or articles do not save Plaintiffs' claims. For example, the complaint alleges that Forbes spoke with "three industry insiders" who said that unnamed administrators sometimes receive a share of interest income, and that one former employee described such income as "standard practice." Compl. ¶¶12, 125. At most, these allegations may suggest that someone, somewhere in the settlement-administration industry may have engaged in conduct Plaintiffs dislike. But the complaint in no way pleads facts showing that Administrator Defendants had a meeting of the minds and an actual agreement to engage in such conduct. *See Iqbal*, 556 U.S. at 678 (claim is plausible only when the pleaded facts allow a reasonable inference that *the defendant* is liable for the misconduct alleged).

At most, Plaintiffs plead parallel conduct, such as FinTech Defendants marketing materially similar programs to multiple Administrator Defendants, industry insiders describing interest sharing or digital-payment revenue as "standard practice," a bank allegedly stating that unidentified "Admins" were demanding interest sharing, and some administrators allegedly using similar "special purpose entity" structures. Compl. ¶523. That, too, is insufficient. Such allegations of conduct that is "typical of how the parties might reasonably be expected to behave" are "undoubtedly insufficient" to establish an agreement. *Rise*, 2025 WL 1380478, at \*9. "Without more, parallel conduct does not suggest conspiracy." *Twombly*, 550 U.S. at 556-557. A complaint must plead facts that place parallel conduct "in a context that raises a suggestion of a preceding agreement," not conduct that "could just as well be independent action." *Id*. at 557.

48

Plaintiffs' theory does the opposite, asking this Court to infer an agreement from "standard practice" in the industry.  Compl. ¶¶389(a), 552.  But if conduct is standard practice, it is at least as consistent with independent business decisions, shared market incentives, and common vendor relationships as with conspiracy.  *See Twombly*, 550 U.S. at 566 ("there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway").

The complaint's attempt to find agreement in "collective silence" fares no better.  Compl. ¶¶389(a), 554.  Plaintiffs do not allege facts suggesting that any Administrator Defendant actually agreed with any other Administrator Defendant to omit the same information. And any alleged parallel nondisclosure hardly indicates affirmative coordination. There is only one way *not* to disclose something, making any alleged similarity in non-disclosure unremarkable.

### 2. Plaintiffs fail to allege any injury caused by an unlawful act in furtherance of a common scheme

Finally, as discussed above, Plaintiffs' allegations of injury caused by Administrator Defendants' alleged conduct are speculative and conclusory.  *Supra* pp.35-36.  Plaintiffs' failure to plead any injury specifically resulting from conspiracy vitiates their Article III standing to press such a claim, *infra* §IV, and fails to state a claim for which relief can be granted.

### D. Plaintiffs' Negligent Misrepresentation And Negligence Claims Fail On Other Elements

Plaintiffs' negligent misrepresentation claim similarly fails.  Negligent misrepresentation claims based on omissions, like fraud and fraudulent concealment claims based on omissions, require allegations of a duty to disclose, reliance, and causation, all satisfying the particular requirement of Rule 9(b). *See Jacobson v. Hofgard*, 168 F.Supp.3d 187, 206 (D.D.C. 2016).[21]  As a result, Plaintiffs' negligent misrepresentation claim fails for the same reasons as their fraud and

---

[21] *See generally* Appendix F (survey of state law on negligent misrepresentation).

fraudulent concealment claims. *Supra* §III.B. And as with other claims discussed, Plaintiffs' failure to plausibly plead causation and injury requires dismissal and underscores the lack of traceability required for Plaintiffs to establish Article III standing. *Infra* §IV.

Plaintiffs' negligence claim further fails for the independent reason that it is barred by the economic-loss rule. The economic-loss rule provides that "there is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract between the parties." Restatement (Third) of Torts: Liability for Economic Harm §3 (2020).[22] Developed "to ensure that the law of contract would not 'drown in a sea of tort,'" the rule prohibits tort recovery for "*negligently* inflicted 'purely economic losses,' meaning financial harm unaccompanied by physical or property damage." *Rattagan v. Uber Techs., Inc.*, 553 P.3d 1213, 1224 (Cal. 2024) (emphasis in original). Plaintiffs' negligence and negligent misrepresentation claims allege exclusively economic losses. Compl. ¶564 (alleging "actual financial harm" to class members via "diminished recoveries"); *id.* ¶570 ("Plaintiffs and Class Members have suffered financial loss"). The economic-loss rule bars any recovery in negligence.

### E.    Plaintiffs' Unjust Enrichment Claim Fails On Other Elements

As relevant, the elements of unjust enrichment include: (1) the plaintiff conferred a benefit on the defendant, (2) the defendant retained the benefit, and (3) it would be unfair under some equitable theory for the defendant to keep the benefit.[23] Plaintiffs fail to plead critical elements.

#### 1.    Plaintiffs do not allege that they conferred a benefit on any Administrator Defendant

Plaintiffs allege that Administrator Defendants were unjustly enriched because they received undisclosed shares of interest spread and breakage that were "paid from or generated by

---

[22] *See generally* Appendix H (survey of state law on the economic-loss rule).

[23] *See generally* Appendix G (survey of state law on unjust enrichment).

50

QSF assets." Compl. ¶¶3-4, 573, 576. But no Plaintiff alleges that they *themselves* conferred those shares on any Administrator Defendant, and their allegation that the amounts Administrator Defendants received belonged to Plaintiffs is a bare legal conclusion. This failure is fatal, and courts routinely dismiss unjust enrichment claims where the plaintiff fails to plead facts showing that a benefit was conferred by the plaintiff or belonged to the plaintiff in equity. *E.g.*, *McDowell v. CGI Fed. Inc.*, 2017 WL 2392423, at *9 (D.D.C. June 1, 2017) (dismissing claim because plaintiff failed to allege conferral of the alleged benefit); *Mines v. Metagenics, Inc.*, 2023 WL 2930557, at *8 (D.D.C. Apr. 13, 2023) (enrichment of defendant was not at plaintiff's expense).

The complaint identifies two supposed sources of enrichment: interest "spread" shared by Bank Defendants and "breakage" shared by FinTech Defendants. Compl. ¶¶3-4, 573-576. Neither theory pleads a benefit conferred by any Plaintiff on any Administrator Defendant.

First, as to interest spread, Plaintiffs allege that Bank Defendants paid below-market interest on QSF deposits, "saved millions of dollars," and paid "a portion of that money" to Administrator Defendants. *E.g.*, Compl. ¶183; *see also id.* ¶¶121-129. These allegations describe payments from banks to administrators out of the *bank's* retained spread, with no explanation of how or why the money would belong to Plaintiffs. *See Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 82 F.Supp.3d 344, 358-359 (D.D.C. 2015) (dismissing unjust enrichment claim because plaintiffs "identified only benefits that [d]efendants … received from third parties or from other defendants").

The missing allegation is the one that the law requires. Plaintiffs cannot plead unjust enrichment absent facts showing that Administrator Defendants hold money that, "in justice and equity," belongs to Plaintiffs. *Pernice v. Bovim*, 2015 WL 5063378, at *7 (D.D.C. Aug. 26, 2015) (dismissing unjust enrichment claim for this reason). Plaintiffs instead ask the Court to conclude

51

that sharing by a Bank Defendant of any portion of their spread with an Administrator Defendant necessarily decreases the relevant Plaintiff's award. But as discussed, they plead no concrete facts showing how any Plaintiff's recovery would have increased by the amount allegedly paid by any Bank Defendant to any Administrator Defendant. Such speculation is not a plausible allegation that Plaintiffs conferred a benefit on an Administrator Defendant. *See Aston v. Johnson & Johnson*, 248 F.Supp.3d 43, 56 (D.D.C. 2017) (benefit was "too remote and speculative").

Plaintiffs' breakage theory fails for the same reason. Plaintiffs allege that, when distributions were made using digital cards, funds were paid from the QSF to FinTech Defendants at issuance, and funds loaded onto cards that were never activated or spent never returned to the QSF. Compl. ¶¶153-155. Plaintiffs further allege that FinTech Defendants retained breakage and shared some portion of the resulting revenue with Administrator Defendants. *Id*. ¶¶ 4-5, 157-159, 573. This theory again describes alleged payments that are not from *Plaintiffs* to Administrator Defendants, and Plaintiffs allege no actual facts, beyond mere conclusions and speculation, regarding how any such money—already retained by FinTech Defendants—would go to Plaintiffs. Plaintiffs thus do not plausibly allege that any of them conferred a benefit on any Administrator Defendant through breakage.

### 2.    Plaintiffs do not allege facts showing that retention was unjust

Plaintiffs also fail to plead facts showing injustice. This element turns on "'the particular circumstances giving rise to the claim.'" *Ronaldson v. Nat'l Ass'n of Home Builders*, 2020 WL 3259226, at *7 (D.D.C. June 3, 2020). The circumstances alleged here do not allow for a plausible inference that any retention of any benefits would be unjust. Plaintiffs rely on their assertion that the alleged payments were unlawful or fraudulent. Compl. ¶¶573-574. But as explained, Plaintiffs fail to plausibly allege, for a variety of independent reasons, that the alleged payments were in any way unlawful or fraudulent.

52

Furthermore, as explained, Plaintiffs cannot show that it would be unjust for Administrator Defendants to retain benefits when those benefits were not at Plaintiffs' expense. Looking to the circumstances surrounding digital payments alleged in the complaint, there is no plausible claim that the retention of any alleged benefit from breakage was unjust. Plaintiffs allege that *claimants* choose how to receive distributions from a variety of options, including checks, ACH transfers, and digital cards. Compl. ¶78. Plaintiffs also allege only that breakage occurs when recipients choose digital cards and then fail to activate, redeem, or spend them. *Id.* ¶155. On those allegations, any breakage retained by FinTech Defendants and allegedly shared with Administrator Defendants depends on intervening choices and events, namely, the claimant's payment selection and the claimant's later non-redemption.

Plaintiffs do not plausibly allege that equity requires Administrator Defendants to pay Plaintiffs money arising from Plaintiffs' own decisions, especially when Plaintiffs do not plead that any Administrator Defendant forced any claimant to choose digital payments or prevented claimants from fully redeeming their cards.

**F.    Plaintiffs' RICO Claims Fail For Reasons Beyond The Failure To Allege Predicate Acts of Fraud**

In addition to failing to plead the required predicate acts of wire/mail fraud and derivative theory of money laundering as described above, Plaintiffs' RICO claims should be dismissed for multiple additional reasons. For a RICO violation under 18 U.S.C. §1962(c), Plaintiffs must allege: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity; (5) causing injury to Plaintiffs' business or property. *U.S. ex rel. Yelverton v. Fed. Ins. Co.*, 831 F.3d 585, 589 (D.C. Cir. 2016). Key elements are absent here.

53

### 1.    Plaintiffs fail to allege proximate cause or RICO injury

Plaintiffs' RICO claims should be dismissed for the independent reason that Plaintiffs do not allege they were injured in their "business or property by reason of" a RICO violation. *See* 18 U.S.C. §1964(c). This statutory language imposes a "proximate cause" requirement: a plaintiff must demonstrate "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). A link that is "too remote," "purely contingent," or "indirect[]" is insufficient. *Id.* at 271, 274; *see Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006) (no proximate cause if alleged injury depends on actions "entirely distinct from the alleged RICO violation"); *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10 (2010) (same given intervening decisions by third parties); *see also Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*, 634 F.3d 1352, 1358-1359 (11th Cir. 2011).

For the reasons discussed above, Plaintiffs have not plausibly alleged that their purported injuries were proximately caused by any alleged predicate acts. This failure has particular salience in the RICO context. Plaintiffs allege that they were paid a below-market interest rate on QSF deposits, Compl. ¶¶121-131, and that FinTech Defendants retained unredeemed balances from QSF-funded distributions, *id.* ¶¶153-169. What is allegedly harmed in either case is the QSF, which Plaintiffs admit is a "separate taxable entity." *Id.* ¶65. Any harm to an individual class member is therefore derivative and indirect. Because the chain of causation Plaintiffs allege requires the Court "to move well beyond the first step" in order to connect the predicate act to their injuries, their "theory cannot meet RICO's direct relationship requirement." *Hemi*, 559 U.S. at 10; *supra* §III.B.2 (similar defect for Plaintiffs' fraudulent concealment and fraud claims).

Plaintiffs also cannot recover under RICO because "*Illinois Brick*'s indirect-purchaser rule applies in civil RICO cases." *MSP Recovery*, 728 F.Supp.3d at 105; *see also Humana Inc. v. Teva Pharms. USA, Inc.*, 787 F.Supp.3d 1298, 1303 (M.D. Fla. 2025) (collecting cases). The indirect-

purchaser rule applies to RICO claims because "RICO's private-right-of-action provision is almost identical to the Clayton Act provision that grounds *Illinois Brick*, suggesting that the two provisions should carry the same meaning." *MSP Recovery*, 728 F.Supp.3d at 105. Accordingly, for the same reasons that Plaintiffs' antitrust claim fails under the indirect-purchaser rule, *supra* §II.A, Plaintiffs' RICO claims also fail.

There is yet another related problem: no named plaintiff has established that he or she was "injured in *his* [or her] business or property," as required to have standing to pursue a RICO claim. 18 U.S.C. §1964(c) (emphasis added). A mere expectancy, as one may have in interest accruing on settlement funds, does not satisfy this statutory standard. *Cf. Abdelhady v. George Washington Univ.*, 2022 WL 17364618, at *5 (D.D.C. Dec. 1, 2022) (deprivation of workers' compensation benefits does not qualify as injury to plaintiff's property), *appeal docketed*, No. 25-7034 (D.C. Cir. Mar. 17, 2025).

Plaintiffs' attenuated theory of causation discussed above is fatal to their RICO claims: "In most cases" alleging misrepresentation, "the plaintiff will not be able to establish even but-for causation"—let alone proximate causation—"if no one relied on the misrepresentation." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008). Plaintiffs offer the conclusory allegation that they "reasonably relied on the completeness of the disclosures made," Compl. ¶479, but they do not identify a single disclosure they ever relied upon, nor do they identify any notice (or other communication) that they received, *see id.* ¶¶23-44. Plaintiffs likewise never plead that they would have objected if they believed that Administrator Defendants were receiving interest revenue, that their objection would have swayed class counsel or the courts to act differently, or that such actions would have ensured higher payouts. Plaintiffs' RICO claims should thus be dismissed. *E.g., Holmes*, 503 U.S. at 268; *see also Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris*

55

*Inc.*, 249 F.3d 1068, 1076 (D.C. Cir. 2001) (reversing denial of motion to dismiss RICO claims premised on "remote, contingent, derivative, and indirect" injuries); *Greenpeace, Inc. v. Dow Chem. Co.*, 808 F.Supp.2d 262, 270 (D.D.C. 2011) (dismissing RICO claim with no "direct connection between the predicate criminal act and the injury").

### 2.    Plaintiffs fail to allege a viable enterprise

Plaintiffs assert—but fail to allege facts showing—that Administrator Defendants were part of an enterprise. Compl. ¶¶384-390, 498-527. Establishing an enterprise requires allegations that Administrator Defendants "function[ed] as a continuing unit" with (1) a common purpose, (2) relationships among the associates, and (3) longevity necessary to accomplish the purpose. *Boyle v. United States*, 556 U.S. 938, 944-946 (2009); *United States v. McGill*, 815 F.3d 846, 930 (D.C. Cir. 2016). Entities acting "independently and without coordination" do not form a RICO enterprise; "interpersonal relationships" are required. *Boyle*, 556 U.S. at 946, 947 n.4; *see also United States v. Green*, 735 F.Supp.3d 8, 27 (D.D.C. 2024).

Here, the complaint describes ordinary commercial relationships of administrators hiring banks to hold deposits and administrators hiring payment vendors to process distributions. Plaintiffs label those relationships an "association-in-fact enterprise." Compl. ¶¶501, 510, 516, 522. And they contend that the enterprise "operated as a network" because industry participants were aware of the standard practices in their industry as memorialized in master service agreements. *Id.* ¶389(a). But *any* industry involves awareness of standard practices. The relationships asserted in the complaint are typical of any service-provider agreement, where one party provides services and the other pays for them. Plaintiffs would "'RICOize' … relationships not readily identifiable as being within the enacting intent of Congress," and thereby expose a broad swath of legitimate business relationships to RICO's treble damages regime. *Yellow Bus*

56

*Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 913 F.2d 948, 955 (D.C. Cir. 1990) (en banc).

Plaintiffs' allegations that Administrator Defendants, on the one hand, and Bank and FinTech Defendants, on the other hand, failed to disclose the terms of the alleged agreements does not change the analysis. *E.g.*, Compl. ¶389. The purported failure to disclose every term of a financial agreement does not transform a commercial relationship into a criminal enterprise, especially when there is no affirmative duty to make such a disclosure. *Supra* §I.B.

Worse still, Plaintiffs allege numerous RICO counts with overlapping articulations of the enterprise. Compl. ¶¶498-547. There are four administrator-centered enterprises (Counts VI-A through VI-D) and three alternative enterprise theories (Counts VI-G through VI-I). This kitchen-sink approach, alleging seemingly every possible permutation, confirms that Plaintiffs cannot even identify the enterprise. Such "vaguely pleaded, bald allegation[s]" are "insufficient … to establish a RICO enterprise." *Scheck v. Gen. Elec. Corp.*, 1992 WL 13219, at *3 (D.D.C. Jan. 7, 1992).

### 3.    Plaintiffs allege no conduct of any enterprise's affairs

Plaintiffs' RICO claims also fail because Plaintiffs have not alleged that any Administrator Defendant conducted any enterprise's affairs. To satisfy the "conduct" element, a defendant must have had "some part in directing" the enterprise's affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). That standard requires participation "in the operation or management of the enterprise itself," not merely the provision of services that incidentally further the enterprise's objectives. *Id.* at 185. Liability thus requires a showing that "the defendants conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (quotation marks omitted). Allegations that a defendant participated "in the affairs of an enterprise," such as by entering a contract, are not enough; the

57

complaint instead must allege facts showing the defendant's "participation in *the conduct* of an enterprise's affairs." *Yellow Bus*, 913 F.2d at 955-956 (emphasis in original).

Plaintiffs' allegations fall far short. For each iteration of the alleged enterprise, Plaintiffs assert that Administrator Defendants "directed the enterprise's operations." Compl. ¶385(a). But that is a conclusory legal assertion, not a fact. Plaintiffs do not make a single nonconclusory factual allegation demonstrating that any Administrator Defendant directed the affairs of a purported enterprise. There are, for example, no allegations that any Administrator Defendant gave or received commands or participated in any chain of command. Instead, the complaint alleges (in conclusory fashion) that Administrator Defendants independently administered settlements by selecting banks to hold QSF deposits, engaging vendors to process distributions, and distributing settlement notices—all as part of their own separate businesses. *E.g.*, *id.* ¶¶385, 503, 505, 512-513. One's own business is not "conduct" within the scope of RICO. *See Western Assocs.*, 235 F.3d at 637 ("ordinary business disputes" do not establish RICO liability).

Any purported predicate act of racketeering by any Administrator Defendant, such as distributing settlement notices through the U.S. mail, may not stand in for the requisite conduct. A predicate act may satisfy the "conduct" element only when those acts were "the vehicle" through which a defendant actually conducted the enterprise's affairs. *Yellow Bus*, 913 F.2d at 954-955; *accord Jones v. Meridian Towers Apartments, Inc.*, 816 F.Supp. 762, 771-772 (D.D.C. 1993). But here, the predicate acts consist entirely of the ordinary business of settlement administration, such as mailing and emailing court-approved settlement notices or filing documents with the courts.

Plaintiffs have alleged that several independent companies performed their distinct and lawful roles in the class-action settlement industry and ask this Court to conclude that the sum of those independent activities is the conduct of a criminal enterprise. Absent "'further factual

58

enhancement,'" RICO does not permit such a result. *Harpole Architects, P.C. v. Barlow*, 668 F.Supp.2d 68, 75-76 (D.D.C. 2009) (quoting *Iqbal*, 556 U.S. at 678); *see also Cent. Am. Bank for Econ. Integration v. Mossi*, 2025 WL 2732731, at *14 (D.D.C. Sept. 25, 2025) (dismissing RICO count given lack of allegations regarding the defendant conducting the enterprise's affairs).

### G.    Plaintiffs Fail To Allege A RICO Conspiracy

Plaintiffs' RICO conspiracy claim should be dismissed because Plaintiffs have not adequately alleged a RICO violation or an agreement to violate RICO.  If a plaintiff "fails to state a claim under §1962(c), its conspiracy claims under 18 U.S.C. §1962(d) must likewise fail." *Greenpeace*, 808 F.Supp.2d at 274; *accord Ctr. for Immigr. Studies v. Cohen*, 410 F.Supp.3d 183, 194 (D.D.C. 2019).  Here, as the allegations in Plaintiffs' RICO conspiracy count (Compl. ¶¶528-533) do not "add anything substantive" to their failed RICO allegations, their RICO conspiracy claim "must fail as well." *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1232 (D.C. Cir. 1991).  This Court need go no further.

Even if more were needed, to state a claim for a RICO conspiracy, the complaint must plead an agreement to violate RICO, requiring allegations that "(1) two or more people agreed to commit a subsection (c) offense, and (2) a defendant agreed to further that endeavor." *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012) (footnote omitted); *see also Ctr. for Immigr. Studies*, 410 F.Supp.3d at 188 (same).  It will not suffice if "a defendant acted in ways consistent with a conspiratorial agreement, but also equally well explained by legitimate economic incentives." *RSM*, 682 F.3d at 1051-1052.  As discussed in relation to Plaintiffs' other conspiracy-based claims, Plaintiffs have made no nonconclusory factual allegations showing that any Administrator Defendant agreed to commit a RICO violation. Instead, Plaintiffs ask this Court to infer an agreement from parallel conduct, but that is not enough.

*Supra* §II.C.  And allegations of uniform non-disclosure are insufficient, as it would be perfectly natural for competitors to independently conclude that disclosure is not required.

## IV.    PLAINTIFFS LACK ARTICLE III STANDING

Administrator Defendants return to a point that would ordinarily come first—that Plaintiffs lack Article III standing—because all the defects identified above demonstrate this Court's lack of jurisdiction here.  To demonstrate standing at the pleading stage, Plaintiffs must plausibly allege that they "suffered an injury in fact," "the injury was likely caused by the defendant[s]," and their injuries "would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  "Failure to establish any one element requires dismissal[.]"  *Saline Parents v. Garland*, 88 F.4th 298, 304 (D.C. Cir. 2023).

Plaintiffs cannot show "a causal connection between the injury and the conduct complained of," in other words, that the injury is "'fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court.'"  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-561 (1992) (alterations in original).  "[T]he mere possibility that causation is present is not enough; the presence of an independent variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied."  *Mideast Sys. & China Civ. Constr. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1178 (D.C. Cir. 1986).

Causation theories are particularly problematic when based on chains of events, guesses about how past events would have played out, or predictions of how third parties would have acted under other circumstances.  Standing "will not be satisfied simply because a chain of events can be hypothesized in which the action challenged eventually leads to actual injury."  *Nw. Airlines, Inc. v. FAA*, 795 F.2d 195, 201 (D.C. Cir. 1986).  "There is no standing where the court would have to accept a number of very speculative inferences and assumptions in any endeavor to connect

60

the alleged injury with [the challenged conduct] or … with the specific defendants." *Coubaly v. Cargill, Inc.*, 610 F.Supp.3d 173, 181 (D.D.C. 2022) (citations and quotation marks omitted), *aff'd*, 144 F.4th 343 (D.C. Cir. 2025). Nor can plaintiffs establish standing by "pil[ing] conjecture on conjecture" about the actions of third parties. *West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017).

As discussed above, Plaintiffs' theorized causal chain regarding "diminished" settlement payments fails at nearly every step. The settlements were negotiated by those who are not parties here, including class counsel and defense counsel, who later filed approval motions for each settlement. *E.g.*, *In re T-Mobile Customer Data Sec. Breach Litig.*, No. 4:21-md-3019 (W.D. Mo.), ECF Nos. 157, 210; *In re Yahoo! Customer Data Sec. Breach Litig.*, No. 5:16-md-2752 (N.D. Cal.), ECF Nos. 368, 413. The underlying courts reviewed the terms and approved the settlements. *E.g.*, *T-Mobile*, ECF No. 235; *Yahoo! Data Breach*, ECF No. 497. Each Plaintiff's payment was governed by the specific terms of the underlying settlement agreement. Compl. ¶¶63, 173, 188, 204, 219, 236, 248, 260, 279, 292, 306, 319, 333, 346. And critically, according to Plaintiffs' own allegations, interest and breakage are not taken from the settlement funds. *E.g.*, *id.* ¶¶98, 155-157. Rather, the payments flow from the banks' spread and breakage from unused digital cards allegedly retained by the FinTech Defendants. *Id.*

To conclude that interest and breakage payments reduced Plaintiffs' settlement amounts dollar for dollar requires the Court to indulge the following speculation:

- The 60-plus sets of class counsel in the underlying settlements, the reviewing courts, and class members all lacked knowledge about any alleged interest or breakage payments;

- The interest payments were substantial for each settlement;[24]

---

[24] Many of the settlements involved small funds, which could not have generated significant

- Where digital payments were available, breakage was substantial for each settlement;

- Class counsel and defense counsel would have negotiated minimal fixed compensation for Administrator Defendants in the 60-plus settlements;

- The 60-plus courts would not have approved settlements involving interest or breakage payments unless Administrator Defendants made minimal compensation from the fund;

- Plaintiffs were entitled to proportional settlement payments (not, *e.g.*, fixed sums), and all those proportional payments were actually reduced by administration expenses;[25]

- The settlement agreements permit Plaintiffs to receive bank interest, breakage, or otherwise more than the amounts prescribed in the settlement agreements; and,

- Any cost savings from reduced administration expenses or residual settlement funds after initial distributions would be distributed to Plaintiffs, rather than consumed by other costs, directed to *cy pres* recipients, or rendered economically infeasible to distribute.[26]

In sum, the complaint exhibits a "protracted chain of causation" that standing law prohibits. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996).

### **CONCLUSION**

The Court should dismiss all of Plaintiffs' claims against Administrator Defendants with prejudice.

---

interest or spread. *E.g.*, *Wallin v. Naturelo Premium Supplements LLC*, No. 3:22-cv-5950 (D.N.J.) ($1.5 million); *Moog v. Christian Broad. Network, Inc.*, No. 1:24-cv-501 (E.D. Va.) ($4 million).

[25] Not every settlement required proportional payments based on funds available after administration expenses. *E.g.*, *In re Procter & Gamble Aerosol Prods. Mktg. & Sales Pracs. Litig.*, No. 2:22-md-3025 (N.D. Ohio), ECF No. 23-1 §3 (fixed cash payment amounts that could be reduced only if claims exceeded available funds); *In re Smashburger IP Holder LLC*, No. 2:19-cv-993 (C.D. Cal.), ECF No. 65-2 ¶¶41-42 (capped cash payments, subject to modifications).

[26] The complaint admits that decisions about residual settlement funds are often left to the discretion of class counsel and the courts. Compl. ¶¶205, 261, 279, 293, 307.

Dated: July 17, 2026

/s/ J. Gordon Cooney, Jr.

J. Gordon Cooney, Jr.
Franco A. Corrado
William T. McEnroe
Matthew D. Klayman
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
Telephone: 215-963-5000
gordon.cooney@morganlewis.com
franco.corrado@morganlewis.com
william.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

Randall M. Levine
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: 202-373-6541
randall.levine@morganlewis.com

*Attorneys for Defendant Angeion Group LLC*

/s/ David J. Weiner

David J. Weiner
Robert J. Katerberg
Sonia Kuester Pfaffenroth
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
Telephone: 202-942-5000
david.weiner@arnoldporter.com
robert.katerberg@arnoldporter.com
sonia.pfaffenroth@arnoldporter.com

Eskander Alex Beroukhim
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017-5844
Telephone: 213-243-4059
Alex.Beroukhim@arnoldporter.com

*Attorneys for Defendant JND Legal Administration*

Respectfully submitted,

/s/ Albinas Prizgintas

Albinas Prizgintas (DC Bar No. 1006955)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000
albinas.prizgintas@wilmerhale.com

Sonal Mehta
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
(650) 858-6000
sonal.mehta@wilmerhale.com

Denis Hurley
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
denis.hurley@wilmerhale.com

*Attorneys for Defendant Epiq Systems, Inc. & Epiq Class Action & Claims Solutions, Inc.*

/s/ Scott M. Ahmad

Scott M. Ahmad
Reid F. Smith
WINSTON TAYLOR LLP
300 N. LaSalle Dr.
Chicago, IL 60654-3406
Telephone: 312-558-5600
scott.ahmad@winstontaylor.com
reid.smith@winstontaylor.com

*Attorneys for Kroll Settlement Administration LLC and Kroll, LLC*

63