**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE CLASS ACTION SETTLEMENT ADMINISTRATION LITIGATION | Misc. Action No. 25-179 (JDB); MDL Docket No. 3162 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**BANK DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'**
**CONSOLIDATED CLASS ACTION COMPLAINT**

Defendants Western Alliance Bank and The Huntington National Bank (together, the "Bank Defendants") hereby move this Court, for the reasons set forth in the accompanying Memorandum of Points and Authorities in Support of their Motion to Dismiss the Consolidated Class Action Complaint, for an order dismissing all of Plaintiffs' claims against them pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The Bank Defendants respectfully request an oral hearing on this motion pursuant to this Court's Local Civil Rule 7(f).

Date: July 17, 2026                          Respectfully submitted,

                                             /s/ *Brendan P. Cullen*
                                             Brendan P. Cullen
                                             (cullenb@sullcrom.com)
                                             Kyle W. Mach
                                             (machk@sullcrom.com)
                                             Paul H. Lazarow
                                             (lazarowp@sullcrom.com)
                                             SULLIVAN & CROMWELL LLP
                                             550 Hamilton Avenue
                                             Palo Alto, California 94301
                                             Telephone: (650) 461-5600
                                             Facsimile: (650) 461-5700

                                             *Counsel for Defendant Western Alliance Bank*

                                             /s/ *Jeffrey L. Kessler*
                                             Jeffrey L. Kessler
                                             George E. Mastoris
                                             Tyler M. Dato
                                             WINSTON TAYLOR LLP
                                             200 Park Avenue
                                             New York, NY 10166
                                             Phone: (212) 294-6700
                                             Fax: (212) 294-4700
                                             Jeffrey.Kessler@winstontaylor.com
                                             George.Mastoris@winstontaylor.com
                                             Tyler.Dato@winstontaylor.com

                                             Amanda L. Groves
                                             WINSTON TAYLOR LLP
                                             333 S. Grand Avenue
                                             Los Angeles, CA 90071
                                             Phone: (213) 615-1700
                                             Fax: (213) 615-1750
                                             Amanda.Groves@winstontaylor.com

                                             Lauren E. Duxstad
                                             WINSTON TAYLOR LLP
                                             200 S. Biscayne Boulevard, Suite 1700
                                             Miami, FL 33131
                                             Phone: (305) 910-0500
                                             Fax: (305) 910-0505
                                             Lauren.Duxstad@winstontaylor.com

*Counsel for Defendant The Huntington National Bank*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE CLASS ACTION SETTLEMENT ADMINISTRATION LITIGATION** | **Misc. Action No. 25-179 (JDB); MDL Docket No. 3162** |
| **THIS DOCUMENT RELATES TO:** **ALL ACTIONS** | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

*Page*

INTRODUCTION ........................................................................................................................1

RELEVANT BACKGROUND ......................................................................................................3

I.     THE BANK DEFENDANTS PLAY A LIMITED ROLE IN THE
SETTLEMENT ADMINISTRATION PROCESS ...............................................................3

II.    THERE IS NO PRIVITY BETWEEN THE BANK DEFENDANTS AND
MEMBERS OF THE CLASS ..............................................................................................5

III.   THE BANK DEFENDANTS' PURPORTED PARTICIPATION IN THE
ALLEGED CONSPIRACY ..................................................................................................5

IV.   THE COMPLAINT CONTAINS INCONSISTENT ALLEGATIONS
REGARDING THE INTEREST RATES OFFERED TO CLASS MEMBERS BY
THE BANK DEFENDANTS .................................................................................................7

V.    THE COMPLAINT IDENTIFIES TWO PURPORTEDLY RELEVANT
MARKETS .............................................................................................................................8

LEGAL STANDARDS ................................................................................................................8

ARGUMENT .................................................................................................................................9

I.     THE COMPLAINT'S STATE-LAW CLAIMS SHOULD BE DISMISSED
(COUNTS I-VI, X) ................................................................................................................9

       A.    The Bank Defendants Had No Fiduciary Duties to Plaintiffs...................................9

       B.    Even Assuming a Fiduciary Duty Existed, Plaintiffs Still Cannot Plausibly
State a Claim for Breach of Such a Duty (Count I) .................................................17

       C.    Plaintiffs Cannot Plausibly Assert a Fraudulent Concealment or Fraud
Claim (Counts III, IV)............................................................................................18

       D.    The Aiding and Abetting Claims Are Insufficiently Pled (Counts II, V)..............21

       E.    The Civil Conspiracy Claim Is Legally Deficient (Count VII) ............................23

       F.    Plaintiffs Fail to Plausibly Allege an Unjust Enrichment Claim (Count X)..........25

II.    THE RICO CLAIMS ARE FATALLY FLAWED ...........................................................27

       A.    The Complaint's RICO Theory Fails to State a Claim Against the Bank
Defendants (Count VI)............................................................................................27

|  | 1. | The Alleged "Enterprise" Is Nothing More Than Ordinary Commercial Relationships | 27 |
|  | 2. | Plaintiffs Allege Routine Banking Services, Not the "Operation" of an "Enterprise" | 27 |
|  | 3. | The Complaint Identifies No Predicate Acts by the Bank Defendants | 28 |
|  | 4. | The Complaint Cannot Establish Proximate Cause | 31 |
|  | 5. | The Complaint Fails to Plead any Investment of Racketeering Proceeds | 31 |
|  | B. | The RICO Conspiracy and Aiding and Abetting Claims Fail | 32 |
| III. |  | THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE ANY ANTITRUST CLAIM AS TO THE BANK DEFENDANTS (COUNT XI) | 33 |
|  | A. | Plaintiffs Do Not Allege Any Agreement Between the Bank Defendants | 33 |
|  | B. | The Alleged Parallel Conduct Is Equally Consistent with Lawful Competition | 35 |
|  | C. | The Complaint's "Plus Factors" Do Not Apply to the Bank Defendants | 37 |
|  | D. | The Complaint's Own Allegations Undermine Its Market Definition | 38 |
|  | E. | Plaintiffs Cannot Show Antitrust Injury | 39 |
| IV. |  | THE RICO AND ANTITRUST CLAIMS ARE ALSO TIME-BARRED | 39 |
| V. |  | PLAINTIFFS LACK ARTICLE III STANDING | 42 |
| CONCLUSION |  |  | 42 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abacus Fed. Sav. Bank v. Lim*,
   75 A.D.3d 472 (N.Y. App. Div. 2010) ...................................................................25

*Al-Aulaqi v. Panetta*,
   35 F. Supp. 3d 56 (D.D.C. 2014) .........................................................................14

*Albion All. Mezzanine Fund, L.P. v. State St. Bank & Tr. Co.*,
   8 Misc. 3d 264 (N.Y. Sup. Ct. 2003) ...................................................................20

*Alexander & Alexander of N.Y., Inc. v. Fritzen*,
   68 N.Y.2d 968 (N.Y. App. Div. 1986) .................................................................25

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
   225 Cal. App. 4th 1451 (2014) ...........................................................................15

*Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*,
   158 Cal. App. 4th 226 (2007) .......................................................................17, 18

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
   7 Cal. 4th 503 (1994) ...................................................................................24, 25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................10, 19, 35

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir.1999)..................................................................................39

*Bates v. Nw. Hum. Servs., Inc.*,
   466 F. Supp. 2d 69 (D.D.C. 2006) ................................................................31, 32

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................. *passim*

*Berdeaux v. OneCoin Ltd.*,
   561 F. Supp. 3d 379 (S.D.N.Y. 2021)..................................................................24

*Bernstein v. JPMorgan Chase Bank, N.A.*,
   775 F. Supp. 3d 701 (S.D.N.Y. 2025)..................................................................18

*Blon v. Bank One, Akron, N.A.*,
   519 N.E.2d 363 (Ohio 1988)...............................................................................20

*Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*,
819 F.2d 151 (6th Cir. 1987) ...............................................................................32

*Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of the U.S.*,
258 F. Supp. 3d 1 (D.D.C. 2017) .........................................................................10

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)..............................................................................................32

*\*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)..........................................................................................37, 38

*Burch v. CertainTeed Corp.*,
246 Cal. Rptr. 3d 99 (Cal. Ct. App. 2019).............................................................22

*Cal X-Tra v. W.V.S.V. Holdings, L.L.C.*,
276 P.3d 11 (Ariz. Ct. App. 2012).........................................................................23

*\*Casey v. U.S. Bank Nat'l Ass'n*,
127 Cal. App. 4th 1138 (2005) ..............................................................................23

*\*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001)...............................................................................................29

*Chalabi v. Hashemite Kingdom of Jordan*,
503 F. Supp. 2d 267 (D.D.C. 2007), *aff'd*, 543 F.3d 725 (D.C. Cir. 2008)...........................42

*Chapman v. N. Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008)...................................................................................41

*\*Chazen v. Centennial Bank*,
61 Cal. App. 4th 532 (1998) .............................................................................11, 16

*\*Cheeks v. Fort Myer Constr. Corp.*,
216 F. Supp. 3d 146 (D.D.C. 2016)......................................................28, 30, 33, 34

*Chi v. MasterCard Int'l, Inc.*,
2014 WL 5019917 (N.D. Ga. Oct. 7, 2014) ..........................................................30

*Chien v. United States*,
2019 WL 4602119 (D.D.C. Sept. 23, 2019) .............................................................5

*City of Moundridge v. Exxon Mobil Corp.*,
2009 WL 5385975 (D.D.C. Sept. 30, 2009), *aff'd sub nom. City of
Moundridge, KS v. Exxon Mobil Corp.*, 409 F. App'x 362 (D.C. Cir. 2011)....................36, 38

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
92 F.4th 381 (2d Cir. 2024) ...................................................................................37

*Collins v. eMachines, Inc.*,
     202 Cal. App. 4th 249 (2011) ....................................................................................21

*Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Indus. Materials
     Corp.*,
     887 F. Supp. 2d 9 (D.D.C. 2012)...............................................................................42

*Corsello v. Verizon N.Y., Inc.*,
     967 N.E.2d 1177 (N.Y. 2012).....................................................................................27

*People ex rel. Cuomo v. Coventry First LLC*,
     13 N.Y.3d 108 (2009) .................................................................................................11

*Curtis-Shanley v. Bank of Am.*,
     970 N.Y.S.2d 830 (App. Div. 2013) ...........................................................................10

*\*Danielsen v. Burnside–Ott Aviation Training Ctr., Inc.*,
     941 F.2d 1220 (D.C. Cir.1991) .............................................................................33, 34

*De Wit v. Firstar Corp.*,
     879 F. Supp. 947 (N.D. Iowa 1995)............................................................................30

*Demaree v. Castro*,
     2023 WL 6465881 (S.D.N.Y. Oct. 4, 2023) ...............................................................30

*DeVries Dairy, L.L.C. v. White Eagle Coop. Ass'n, Inc.*,
     974 N.E.2d 1194 (Ohio 2012).....................................................................................23

*Dickson v. Microsoft Corp.*,
     309 F.3d 193 (4th Cir. 2002) ......................................................................................35

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
     136 F.3d 554 (8th Cir.1998) .......................................................................................40

*Ekopel D.O.O. v. Citibank, N.A.*,
     717 F. Supp. 3d 17 (D.D.C. 2024) (Bates, J.)..............................................................9

*Filler v. Hanvit Bank*,
     2003 WL 22110773 (S.D.N.Y. Sept. 12, 2003)..........................................................25

*Fleites v. MindGeek S.A.R.L.*,
     801 F. Supp. 3d 1011 (C.D. Cal. 2025) .....................................................................26

*Freedom Watch, Inc. v. Google, Inc.*,
     368 F. Supp. 3d 30 (D.D.C. 2019), *aff'd*, 816 F. App'x 497 (D.C. Cir. 2020).........................38

*Freeman v. Sorchych*,
     245 P.3d 927 (Ariz. Ct. App. 2011)......................................................................26, 27

*Geier v. Conway, Homer & Chin-Caplan, P.C.*,
  983 F. Supp. 2d 22 (D.D.C. 2013) ..................................................................................28

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ..............................................................................................44

*Georgia Malone & Co. v. Rieder*,
  973 N.E.2d 743 (N.Y. 2012) ...........................................................................................27

*Gould v. M & I Marshall & Isley Bank*,
  860 F. Supp. 2d 985 (D. Ariz. 2012) ..............................................................................20

*Groob v. KeyBank*,
  843 N.E.2d 1170 (Ohio 2006) ...............................................................................10, 11, 21

*Gross v. Wright*,
  185 F. Supp. 3d 39 (D.D.C. 2016) ...................................................................................40

*Gulf Coast Mar. Supply, Inc. v. United States*,
  867 F.3d 123 (D.C. Cir. 2017) ...........................................................................................9

*Hambleton v. R.G. Barry Corp.*,
  465 N.E.2d 1298 (Ohio 1984) .........................................................................................26

*Hamilton Rsrv. Bank Ltd. v. Democratic Socialist Republic of Sri Lanka*,
  134 F.4th 73 (2d Cir. 2025) .................................................................................12, 19, 28

*Heinert v. Bank of Am., N.A.*,
  410 F. Supp. 3d 544 (W.D.N.Y. 2019) ...........................................................................24

*Hemi Grp., LLC v. City of N.Y., N.Y.*,
  559 U.S. 1 (2010) .............................................................................................................28

*Hourani v. Mirtchev*,
  796 F.3d 1 (D.C. Cir. 2015) .............................................................................................32

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ....................................................................................................41, 42

*In re Jan. 2021 Short Squeeze Trading Litig.*,
  584 F. Supp. 3d 1161 (S.D. Fla. 2022), *aff'd*, 76 F.4th 1335 (11th Cir. 2023) .......10

*Kachuck Enters. v. Mission Produce, Inc.*,
  823 F. Supp. 3d 1054 (C.D. Cal. 2026) ..........................................................................27

*Kaufman v. Cohen*,
  760 N.Y.S.2d 157 (App. Div. 2003) ...........................................................................23, 24

*Kesselman v. Nat'l Bank*,
  188 Ariz. 419 (Ct. App. 1996) ................................................................................11

*Kidron v. Movie Acquisition Corp.*,
  40 Cal. App. 4th 1571 (1995) ................................................................................26

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)................................................................................................42

*Kurtz-Ahlers, LLC v. Bank of Am., N.A.*,
  48 Cal. App. 5th 952 (2020) ..................................................................................10

*Lama Holding Co. v. Smith Barney Inc.*,
  668 N.E.2d 1370 (N.Y. 1996)...........................................................................20, 21

*In re Late Fee & Over-Limit Fee Litig.*,
  528 F. Supp. 2d 953 (N.D. Cal. 2007) ...................................................................39

*Lazar v. Superior Ct.*,
  12 Cal. 4th 631 (1996) ...........................................................................................20

*Lectrodryer v. SeoulBank*,
  91 Cal. Rptr. 2d 881 (Ct. App. 2000) ....................................................................26

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  27 F. Supp. 3d 447 (S.D.N.Y. 2014)......................................................................27

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  801 F. Supp. 3d 330 (S.D.N.Y. 2025), *appeal dismissed sub nom*...........................39

*In re Libor-Based Fin. Instruments Antitrust Litig. v. The Royal Bank of Scotland
  PLC*,
  2025 WL 4092207 (2d Cir. Dec. 10, 2025) ...........................................................39

*Link v. Wabash R.R. Co.*,
  370 U.S. 626 (1962)................................................................................................43

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  2016 WL 5719749 (S.D.N.Y. Sept. 29, 2016)........................................................25

*Mandarin Trading Ltd. v. Wildenstein*,
  944 N.E.2d 1104 (N.Y. 2011)...........................................................................26, 27

*Martinez v. Welk Grp., Inc.*,
  907 F. Supp. 2d 1123 (S.D. Cal. 2012)...................................................................18

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013).........................................................................36, 37, 39

*McAlister v. Citibank (Ariz.), a Subsidiary of Citicorp*,
    829 P.2d 1253 (Ariz. Ct. App. 1992) ..................................................................10

*Med. & Chiropractic Clinic, Inc. v. Oppenheim*,
    981 F.3d 983 (11th Cir. 2020) ..........................................................................44

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
    175 F. Supp. 2d 593 (S.D.N.Y. 2001)................................................................26

*Miller v. Am. Nat'l Bank & Tr. Co. of Chi.*,
    4 F.3d 518 (7th Cir. 1993) ..........................................................................11, 16

*Molecular Diagnostics Lab'ys v. Hoffmann-La Roche Inc.*,
    402 F. Supp. 2d 276 (D.D.C. 2005) ..................................................................42

*Morgulis v. Bus Patrol Am., LLC*,
    2026 WL 603607 (2d Cir. Mar. 4, 2026)............................................................27

*In re Mortg. Fund '08 LLC*,
    527 B.R. 351 (N.D. Cal. 2015) ........................................................................24

*Mosaic Fin. Ltd. v. Mut. S'holder Servs., LLC*,
    767 F. Supp. 3d 619 (N.D. Ohio 2025)..........................................................11, 17

*Moss v. BMO Harris Bank, N.A.*,
    258 F. Supp. 3d 289 (E.D.N.Y. 2017) ............................................................29, 30

*MSP Recovery Claims, Series LLC v. Pfizer, Inc.*,
    728 F. Supp.3d 89 (D.D.C. 2024)..................................................................33, 42

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ......................................................................35, 37

*Nasrawi v. Buck Consultants LLC*,
    231 Cal. App. 4th 328 (2014) ..........................................................................23

*O'Dell v. Vrable III, Inc.*,
    200 N.E.3d 1208 (Ohio Ct. App. 2022)..........................................................20, 21

*Orbit Elec., Inc. v. Helm Instrument Co.*,
    167 Ohio App. 3d 301 (Ohio Ct. App. 2006) ......................................................25

*P.T. Bank Central Asia v. ABN AMRO Bank N.V.*,
    301 A.D.2d 373 (N.Y. App. Div. 2003) .............................................................20

*Peoples Westchester Sav. Bank v. F.D.I.C.*,
    961 F.2d 327 (2d Cir. 1992)............................................................................16

*Persson v. Smart Inventions, Inc.*,
   125 Cal. App. 4th 1141 (2005) ...................................................................................11

*PhantomALERT v. Apple, Inc.*,
   762 F. Supp. 3d 8 (D.D.C. 2025) ...............................................................................40

*Philip S. Schwartzman, Inc. v. Pliskin, Rubano, Baum & Vitulli*,
   187 N.Y.S.3d 702 (App. Div. 2023) ...........................................................................19

*In re Platinum-Beechwood Litig.*,
   426 F. Supp. 3d 14 (S.D.N.Y. 2019) ..........................................................................25

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ................................................................................40, 41

*In re Rail Freight Fuel Surcharge Antitrust Litig. (No. I)*,
   2025 WL 1784519 (D.D.C. June 27, 2025) ................................................................37

*\*Rattagan v. Uber Techs., Inc.*,
   17 Cal.5th 1 (2024) ....................................................................................................20

*Real World Media LLC v. Daily Caller, Inc.*,
   744 F. Supp. 3d 24 (D.D.C. 2024) ...............................................................................9

*Regions Bank v. Wieder & Mastroianni, P.C.*,
   423 F. Supp. 2d 265 (S.D.N.Y. 2006) ........................................................................16

*Republic of Kazakhstan v. Stati*,
   380 F. Supp. 3d 55, 62-63 (D.D.C. 2019) ..................................................................32

*\*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ...................................................................................................29

*Robinson-Smith v. Gov't Emps. Ins. Co.*,
   424 F. Supp. 2d 117 (D.D.C. 2006) .....................................................................43, 44

*Rosenberg v. Rosenberg*,
   580 N.Y.S.2d 319 (N.Y. App. Div. 1992) ..................................................................14

*\*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
   682 F.3d 1043 (D.C. Cir. 2012) ...........................................................................30, 34

*S.H. v. District of Columbia*,
   270 F. Supp. 3d 260 (D.D.C. 2017) ...........................................................................31

*Salinas v. United States*,
   522 U.S. 52 (1997) .....................................................................................................28

*Sandza v. Barclays Bank PLC,*
    151 F. Supp. 3d 94 (D.D.C. 2015)................................................................32, 33

*Scott v. J.P. Morgan Chase & Co.,*
    296 F. Supp. 3d 98 (D.D.C. 2017)..............................................................5

*Sec. & Exch. Comm'n v. RPM Int'l, Inc.,*
    282 F. Supp. 3d 1 (D.D.C. 2017)................................................................9

*Shopoff & Cavallo LLP v. Hyon,*
    167 Cal. App. 4th 1489 (2008) ...................................................................19

*Snyder v. Wells Fargo Bank, N.A.,*
    594 F. App'x 710 (2d Cir. 2014) ................................................................13

*Solano v. Delmed, Inc,*
    759 F. Supp. 847, 853-54 (D.D.C. 1991)....................................................42

*Standard Chartered PLC v. Price Waterhouse,*
    945 P.2d 317 (Ariz. Ct. App. 1996)............................................................11, 18

*Stern v. Charles Schwab & Co.,*
    2010 WL 1250732 (D. Ariz. Mar. 24, 2010) .............................................23

*Sullivan v. Pulte Home Corp.,*
    290 P.3d 446 (Ariz. Ct. App. 2012), *vacated in part,* 232 Ariz. 344, 306 P.3d
    1 (2013).......................................................................................................21

*In re Sunpoint Sec., Inc.,*
    350 B.R. 741 (Bankr. E.D. Tex. 2006) .......................................................30

*Superb Motors Inc. v. Deo,*
    776 F. Supp. 3d 21 (E.D.N.Y. 2025) ..........................................................29

*Tavilla v. Cephalon, Inc.,*
    870 F. Supp. 2d 759 (D. Ariz. 2012) ..........................................................20

*Terry v. First Merit Nat'l Bank,*
    75 F. Supp. 3d 499 (D.D.C. 2014)..............................................................1, 4, 18, 20

*Town & Country Chrysler Plymouth v. Porter,*
    464 P.2d 815 (Ariz. Ct. App. 1970)............................................................20, 21

*U.S. Bank Nat'l Ass'n v. Ables & Hall Builders,*
    696 F. Supp. 2d 428 (S.D.N.Y. 2010).........................................................18

*United States v. Diaz,*
    176 F.3d 52 (2d Cir. 1999)..........................................................................29

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ................................................................................... 19

*\*Vichi v. Koninklijke Philips Elecs. N.V.*,
  62 A.3d 26 (Del. Ch. 2012) ........................................................................................ 27

*Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Loc. No. 395
  Pension Tr. Fund*,
  38 P.3d 12 (Ariz. 2002) ....................................................................................... 20, 25

*Williams v. Aetna Fin. Co.*,
  83 Ohio St. 3d 464 (Ohio 1998) ................................................................................. 25

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
  389 F.3d 1251 (D.C. Cir. 2004) ................................................................................. 10

*Williamson Oil Co. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ................................................................................. 37

*\*Wright v. Ernst & Young LLP*,
  152 F.3d 169 (2d Cir. 1998) ....................................................................................... 22

**Statutes**

12 U.S.C. § 92a ................................................................................................................ 13

15 U.S.C. § 15b ............................................................................................................... 42

18 U.S.C. § 2 ................................................................................................................... 34

18 U.S.C. § 1341 ............................................................................................................. 30

18 U.S.C. § 1343 ............................................................................................................. 30

18 U.S.C. § 1956 ........................................................................................................ 30, 32

18 U.S.C. § 1962 .......................................................................................... 2, 28, 29, 33, 34

26 U.S.C. § 468B(b)(3)(C) ........................................................................................ 16, 17

**Other Authorities**

12 C.F.R. § 9 ................................................................................................................... 13

12 C.F.R. § 9.1 ................................................................................................................ 13

12 C.F.R. § 9.2 ................................................................................................................ 13

26 C.F.R. §§ 1.468B-1-2 ............................................................................................. 4, 14

Fed. R. Civ. Proc. 9(b) ..................................................................................................... *passim*

Fed. R. Civ. Proc. 12(b)(1) ...............................................................................................45

Fed. R. Civ. Proc. 23..........................................................................................................44

**INTRODUCTION**

In a unique twist on the usual class action formula, the Consolidated Class Action Complaint (the "Complaint") presents a class action about class actions. Plaintiffs allege a sprawling conspiracy, purportedly infecting hundreds of class action settlements, in which administrators, banks, and financial technology companies agreed to deprive hundreds of thousands of class members of the monies that should have been paid to them. According to Plaintiffs, this fanciful conspiracy gives rise to fiduciary duty, RICO, and even antitrust violations. But each of these (sometimes inconsistent) theories of the case is fatally deficient both as a legal and factual matter. With respect to Defendants Western Alliance Bank and The Huntington National Bank ("Bank Defendants") in particular, Plaintiffs' claims center on the purported underpayment of interest on funds administered by settlement administrators. The Complaint's factual allegations, however, simply tell a story of banks providing everyday banking services. The Bank Defendants are alleged to have held and invested money according to direction from class counsel and settlement administrators. That routine, ordinary course conduct does not support any of Plaintiffs' claims against the Bank Defendants, warranting their dismissal.

*First*, the claim for breach of fiduciary duty must be dismissed because there is no basis on which to impose fiduciary duties on the Bank Defendants. It is clear from the face of the Complaint that the Bank Defendants maintained ordinary debtor-creditor relationships with the administrators and had no direct dealings (let alone fiduciary relationships) with Plaintiffs. Plaintiffs alternatively try to locate such a relationship with the Bank Defendants in state common law, federal regulations, and/or a purported "constructive" fiduciary relationship that transcends the levels of separation between them. But each of these paths leads them nowhere, and the Court should find that no fiduciary relationship with the Bank Defendants has been validly pled. This demands the dismissal of not only the claims for breach of fiduciary duty, but also the fraud and fraudulent

-1-

concealment claims, which depend on the existence of such a fiduciary relationship as well as plausible allegations of scienter and reliance, which similarly appear nowhere in the Complaint.

*Second*, the Complaint's RICO claims against the Bank Defendants must be dismissed for multiple reasons. Absent a fiduciary duty, there can be no fraud to support a RICO claim; the only "predicate acts" alleged against the Bank Defendants are mail and wire fraud (and purportedly laundering proceeds therefrom), which depend on a fiduciary relationship. Plaintiffs also have not pled any facts plausibly showing that the Bank Defendants were part of any association-in-fact enterprise separate from the alleged pattern of racketeering activity. Even if such an enterprise were assumed to exist, Plaintiffs do not plead that Bank Defendants played a meaningful role in its operation or management (as opposed to simply engaging in ordinary course commercial dealings at the behest of an alleged enterprise's members). Finally, Plaintiffs' claims fail because they have not alleged that their purported injuries were directly and proximately caused by the Bank Defendants' conduct. Specifically, there were at least two intervening steps between the Bank Defendants and Plaintiffs' claimed injury: first, the selection of a bank by class counsel or an administrator, and second, class counsel's investment instructions to the bank. That separation renders Plaintiffs' claimed injuries too remote to support a RICO claim. Finally, without a cognizable Section 1962(c) claim, Plaintiffs' Section 1962(d) RICO conspiracy claims against Bank Defendants also necessarily fail.

*Third*, the Complaint fails to adequately plead any antitrust claims against the Bank Defendants. Plaintiffs fail to allege the existence of *any* communication between the Bank Defendants about the interest they would provide in class action settlements, much less allegations plausibly supporting an inference that they conspired with one another or with the Administrator Defendants to "artificially depress" the interest rates available to members of the alleged class.

Plaintiffs seek to make up for this pleading failure by pointing to a number of alleged "plus factors," but the Complaint's allegations regarding the commercial and regulatory environment make clear that the Bank Defendants' actions were more consistent with unilateral and rational economic activity than with any alleged conspiracy. That alone requires dismissal of Plaintiffs' antitrust claim. Dismissal is also warranted because Plaintiffs have failed to plausibly allege a relevant antitrust market or antitrust injury.

*Finally*, a significant portion of Plaintiffs' antitrust and RICO claims against the Bank Defendants are also time-barred. The interest rates paid to class members in the various settlements that are the subject of the alleged conspiracy were known or available to Plaintiffs and class counsel at the time the payments were made, and class counsel, which included some of the most sophisticated law firms in the country, were obliged to ensure their clients' interests were being served. Under such circumstances, there can be no plausible allegations of fraudulent concealment sufficient to toll the four-year statute of limitations.

The Court should dismiss all claims against the Bank Defendants with prejudice.

**RELEVANT BACKGROUND**[1]

**I.      The Bank Defendants Play a Limited Role in the Settlement Administration Process**

Western Alliance and Huntington are the only "Bank Defendants" named in the Complaint. Compl. ¶ 52. Western Alliance is a state chartered bank headquartered in Phoenix, Arizona. *Id*. ¶ 51.[2] Huntington is an FDIC-insured federally chartered bank headquartered in Columbus, Ohio. *Id.* ¶ 50.

---

[1] To avoid repetition, Bank Defendants incorporate by reference the background information in the Administrators' Motion to Dismiss and focus on those facts specific to the Bank Defendants.

[2] Western Alliance is located in Arizona and is a "State Chartered Bank[], member of the Federal Reserve System," not a federally chartered bank. *See Declaration of Paul H. Lazarow in Support of Bank Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint* (the

Banks play a limited role in the settlement administration process. After parties reach a settlement, class counsel selects a claims administrator to administer the settlement and distribute funds. *Id*. ¶ 59. Administrators "compete for appointments by submitting bid proposals and term sheets." *Id.* ¶ 80. Once selected, the administrator is presented to the court as part of the preliminary approval submission. *Id.* ¶ 59. Critically, it is the *administrators and class counsel*—not the banks—who are selected by the courts. *See, e.g.*, *id.* ¶¶ 82, 102, 110. The Complaint concedes that courts do not directly monitor banks because the "judiciary trusts the guardrails provided by the fiduciary duty imposed on the appointed administrator." *Id.* ¶ 102. And although it goes unmentioned, class counsel have their own fiduciary obligations to the class. *See infra,* § IV.[3]

Once a court approves a proposed settlement agreement, settlement funds are deposited into a bank account known as a qualified settlement fund (or "QSF"). Compl. ¶¶ 60-63, 82(b). A QSF is a court-supervised fund established under and governed by Treasury Regulation § 1.468B-1 *et seq*. *Id.* ¶ 63. The bank opens and maintains the QSF account at the direction of class counsel and/or the administrator. As alleged, once deposited into a QSF, the funds cannot be moved without a court order. *Id.* ¶ 101. But, as Huntington's *Banking Handbook for Settlement Funds*[4]

---

"Lazarow Declaration"), Ex. 1 (FDIC BankFind Suite website); *see also Terry v. First Merit Nat'l Bank*, 75 F. Supp. 3d 499, 511 n.10 (D.D.C. 2014) (taking judicial notice of information on OCC website to determine defendant's status as federally chartered bank).

[3] The Administrator Defendants" or "Administrators" are Angeion Group, LLC ("Angeion Group"); Epiq Class Action & Claims Solutions, Inc. and Epiq Systems, Inc. (collectively, "Epiq"); JND Holdings, LLC, d/b/a JND Legal Administration ("JND"); and Kroll LLC and Kroll Settlement Administration LLC (collectively, "Kroll").

[4] *See Declaration of Tyler M. Dato in Support of Bank Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint*, Ex. 1.

(the "Handbook"), cited by Plaintiffs, Compl. at ¶¶ 116-118, makes clear, funds may be disbursed from a QSF at the instruction of class counsel, also. Handbook at 8.[5]

The Complaint asserts that the administrator selects the QSF bank, *id.* ¶ 82(b), but the materials cited in the Complaint paint a more complex story—class counsel is responsible for directing investment of the settlement funds. Indeed, the Handbook makes clear that Huntington's investments of the monies held in its QSFs are made at the written direction of class counsel. *See* Handbook at 7. In any event, Plaintiffs do not adequately allege that the banks exercise any discretion or authority over the assets in which QSF funds are invested.

## II.    There Is No Privity Between the Bank Defendants and Members of the Class

Plaintiffs allege in broad strokes that the Bank Defendants owe fiduciary duties to class members that purportedly arise from the banks' alleged roles as custodians, escrow agents, and depositories of court-supervised QSF assets. Compl. ¶¶ 103, 458.[6] But Plaintiffs do not (and cannot) allege any *contractual* relationship between class members and the Bank Defendants that could give rise to a fiduciary duty.

## III.    The Bank Defendants' Purported Participation in the Alleged Conspiracy

Plaintiffs allege that the Bank Defendants agreed to a scheme by which the Administrator Defendants were remitted a "substantial portion" of the difference between QSF investment

---

[5] Documents referenced in the Complaint are incorporated by reference and appropriate to consider on a motion to dismiss. *See Chien v. United States*, 2019 WL 4602119, at *4 (D.D.C. Sept. 23, 2019) ("courts may consider '… documents attached as exhibits or incorporated by reference in the complaint' or 'documents upon which the plaintiff's complaint necessarily relies'") (citations omitted); *Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 105 (D.D.C. 2017).

[6] In an attempt to attach fiduciary obligations to the Bank Defendants, Plaintiffs suggest that a QSF bank may also be considered an "administrator," but concede that whether that is true is "context-specific." *Id.* ¶¶ 68–69. In any event, there are no factual allegations that either Bank Defendant served in such a role, and so the Complaint's mention of that hypothetical possibility should be viewed as what it is: an implicit concession that the Bank Defendants were not fiduciaries.

returns and market interest rates to incentivize the administrators to select them as the QSF depositary bank. Compl. ¶ 431. However, as alleged, the Bank Defendants entered into this purported conspiracy at least as early as 2015 and endured a "period of historically suppressed rates," *id.* ¶¶ 121, 423, during which the purported conspiracy would not have made any economic sense. Doing so was nevertheless rational, according to the allegations, because the Bank Defendants somehow had the foresight at that time to know that interest rates would increase dramatically *years* later (and after a completely unprecedented pandemic to boot).

The Complaint is incoherent as to what this "scheme" looked like in practice, alleging two different and internally inconsistent "conspiracies" when discussing Plaintiffs' antitrust and RICO claims, respectively. With respect to the antitrust claims, the Complaint describes two separate purported "hub and spoke" arrangements, whereby "[e]ach Bank Defendant operated as a hub, and the Administrator Defendants took the kickbacks as spokes." *Id.* ¶ 434. But the Complaint does not allege any agreement between the two purported "hubs." Indeed, it contains no factual allegations of *any* communications between Western Alliance and Huntington at all, much less communications about interest rates, revenue-sharing terms, or any aspect of the alleged scheme. *See, e.g.*, *id.* ¶¶ 121–131, 170–357. At most, the Complaint suggests that each Bank Defendant had an "awareness" that the other was also participating in an "interest-sharing program" because the Administrator Defendants directed deposits to both banks. *Id.* ¶ 389(c).

For its RICO claims, the Complaint turns the alleged conspiracy inside out, alleging that the Administrator Defendants "occupied the hub" and "appointed and directed the enterprise's operations in each case," *id.* ¶ 385(a), while the Bank Defendants—presumably as part of a "wheel" with only two spokes—are alleged to have "served as the [conspiracy's] financial backbone." *Id.* ¶ 385(b). The alleged RICO conspiracy had two tracks: the Digital Disbursements

Track, involving disbursements through the FinTech Defendants,[7] and the Bank Interest Track relating to how the class funds were held in QSF funds before being disbursed. *Id*. ¶¶ 96-169. The Bank Defendants are alleged to have participated in the Bank Interest Track.[8]

## IV.    The Complaint Contains Inconsistent Allegations Regarding the Interest Rates Offered to Class Members by the Bank Defendants

Plaintiffs allege that the Bank Defendants passed off the cost of the Administrator Defendants' kickback demands by "uniformly offering class members below-market interest rates, often at rates lower than 0.5%." Compl. ¶ 428. Plaintiffs also allege in conclusory fashion that the "Bank Defendants continued to collude and report the same interest rate offered for prospective QSFs" and attempt to leave the reader with the conclusion that they regularly "provide[d] identical or near-identical bids." *Id*. ¶¶ 429–31. However, Plaintiffs fail to allege *any* instances of "identical" rates being offered. The closest they come is a single example from March 2025, in which the Bank Defendants ostensibly both offered a rate of less than 0.5% per year, *id*. ¶ 430, which still allows divergence. For other exemplar settlements, Plaintiffs allege differing interest rates ranging from "less than 0.5%" to "less than 2.5%." *Id*. ¶¶ 183, 214, 315, 355.

Nor do Plaintiffs allege what the "market" interest rate was. Although the Complaint refers to the federal funds rate, *see id*. ¶ 121, that is not the market rate. The retail rate will be significantly less than the federal funds rate, which represents the rate at which banks borrow from each other and is thus more akin to a wholesale rate. In other words, if a depository institution fully paid out

---

[7] The "FinTech Defendants" or "FinTechs" are Blackhawk Network Holdings, Inc. ("Blackhawk"), Tremendous, LLC ("Tremendous"), and Digital Settlement Technologies LLC ("Digital Disbursements").

[8] Although Plaintiffs include conclusory allegations that the Bank Defendants participated in the Digital Disbursements Track, Compl. ¶ 163, they fail to allege adequately any facts supporting that assertion. These allegations also fail for the same reasons stated in the Administrator Defendants' Motion and FinTech Defendants' Motion.

the federal funds rate for its deposits, its incentive to take those deposits would decrease and perhaps disappear. Plaintiffs thus offer no support for their conclusory allegations of uniform, below-market interest rates offered by the Bank Defendants.

## V.    The Complaint Identifies Two Purportedly Relevant Markets

The Complaint identifies two different markets—the Administrator Market and the Settlement Deposit Market. *See id.* ¶¶ 406–413. While not explicitly defined in the Complaint, the Administrator Market appears to be the market for class action administration, and the Settlement Deposit Market is the "handling of Section 468B trust-accounts," or QSFs. *Id.* ¶¶ 406, 413, 415. The Bank Defendants allegedly operate only in the Settlement Deposit Market. *Id*. ¶¶ 406, 409.

Plaintiffs allege that "the cost of class action administrator [sic] in the *Administrator Market* in the United States have been raised, fixed, maintained, or stabilized" as a result of Defendants' unlawful conduct, *id.* ¶ 584 (emphasis added), and that "Plaintiffs and members of the Class have … been injured by the depressed, fixed, maintained, or stabilized payouts on the class action settlements in the *Settlement Deposit Market*." *Id.* ¶ 586 (emphasis added). Importantly, however, Plaintiffs concede that Administrator Defendants had alternatives available to the QSFs provided by the Bank Defendants, including American Deposit Management and Esquire Bank.[9] *Id.* ¶ 442.

### LEGAL STANDARDS

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also*

---

[9] Publicly available documents confirm that Chris Seeger (Plaintiffs' Lead Counsel) served on the board of directors of Esquire Financial Holdings, Inc. ("Esquire Holdings") until at least 2016. Lazarow Decl. Ex. 2 at Art. 7, § B. Esquire Holdings is the parent company of Esquire Bank, N.A. *See* Lazarow Decl. Ex. 3 at Item 1.01; *see Sec. & Exch. Comm'n v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 10 n.4 (D.D.C. 2017) (taking judicial notice of SEC filings on motion to dismiss).

*Real World Media LLC v. Daily Caller, Inc.*, 744 F. Supp. 3d 24, 31 (D.D.C. 2024) (Bates, J.). "Courts need not, however, accept 'legal conclusions, legal contentions couched as factual allegations, [or] unsupported factual allegations' in the complaint." *Ekopel D.O.O. v. Citibank, N.A.*, 717 F. Supp. 3d 17, 25 (D.D.C. 2024) (Bates, J.) (quoting *Gulf Coast Mar. Supply, Inc. v. United States*, 867 F.3d 123, 128 (D.C. Cir. 2017)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Claims sounding in fraud must be pled with particularity as to the who, what, when, where, and how. *See United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004). *Twombly* should be applied with particular rigor in antitrust cases. *See* 550 U.S. at 556-59 (recognizing that "antitrust discovery can be expensive" and that a complaint must do more than allege parallel conduct).

## ARGUMENT

## I.   The Complaint's State-Law Claims Should Be Dismissed (Counts I-VI, X)

### A.   *The Bank Defendants Had No Fiduciary Duties to Plaintiffs*

A bank's relationship with its depositors is nearly always an ordinary debtor-creditor relationship—the bank certainly does not owe fiduciary duties to every individual or entity that makes a deposit.[10] A fiduciary relationship arises, as a general matter, only when there is (i)

---

[10] *Groob v. KeyBank*, 843 N.E.2d 1170, 1175 (Ohio 2006) ("[I]t is clear that a fiduciary duty does not arise between a bank and a prospective borrower unless there are special circumstances."); *McAlister v. Citibank (Ariz.), a Subsidiary of Citicorp*, 829 P.2d 1253, 1258 (Ariz. Ct. App. 1992) ("[T]he relationship between a Bank and an ordinary depositor, absent any special agreement, is that of debtor and creditor.") (internal quotations omitted); *Kurtz-Ahlers, LLC v. Bank of Am., N.A.*, 48 Cal. App. 5th 952, 956 (2020) (similar); *Curtis-Shanley v. Bank of Am.*, 970 N.Y.S.2d 830, 832 (App. Div. 2013) (similar). At this stage, the Court need not engage in an exhaustive choice-of-law analysis to dispose of Plaintiffs' claims because the principles governing the claims are materially similar across all potentially relevant jurisdictions. *See also* Admin. Defs. Mot. § I.A. To avoid repetition, Arizona (Western Alliance's principal place of business and situs of the

"special confidence and trust . . . reposed in the integrity and fidelity" of the bank that the bank knowingly accepts, (ii) a "resulting position of superiority or influence" through which the bank exercises control over entrusted property, and (iii) reasonable reliance by the customer.[11]

The Complaint's allegations do not satisfy any of these elements. The Complaint does not allege that any Plaintiff had direct dealings with either Bank Defendant, much less a long-standing advisory relationship in which the Bank Defendant exercised "investment discretion" over Plaintiffs' funds. Instead, the Bank Defendants and Plaintiffs are strangers, separated by at least two, and perhaps three, intermediaries—the Administrator Defendants, class counsel, and the supervising court. *See* Compl. ¶¶ 61, 82(b), 100. Courts have consistently refused to imply fiduciary duties on a depository bank even where funds were court-supervised and held for identifiable third parties. *See Miller v. Am. Nat'l Bank & Tr. Co. of Chi.*, 4 F.3d 518, 519–21 (7th

---

deposit-taking conduct, account structuring, and rate-setting attributed to Western Alliance, *see* Compl. ¶ 51), Ohio (Huntington's principal place of business and corresponding situs as to Huntington, *see id.* ¶ 50), and California and New York (home to a substantial number of the Named Plaintiffs), are used as exemplar jurisdictions. *See In re Jan. 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1179 (S.D. Fla. 2022), *aff'd*, 76 F.4th 1335 (11th Cir. 2023) (applying choice of law rules of transferee court forum state where MDL parties filed master, superseding complaint); *see also Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of the U.S.*, 258 F. Supp. 3d 1, 8-10 (D.D.C. 2017) (applying Section 145 of Restatement (Second) Conflicts of Laws to determine state with most significant relationship to claims); Restatement (Second) Conflicts of Laws § 145 cmts. c, e (finding state where alleged conduct took place to be important factor). The relevant principles reflected in those states' laws are generally consistent with others. *See* Admin. Defs. Mot. Appendices A-I.

[11] *See Groob*, 843 N.E.2d at 1173; *see also Mosaic Fin. Ltd. v. Mut. S'holder Servs., LLC*, 767 F. Supp. 3d 619, 656 (N.D. Ohio 2025); *Standard Chartered PLC v. Price Waterhouse*, 945 P.2d 317, 335 (Ariz. Ct. App. 1996) (requiring "peculiar reliance in the trustworthiness of another," "great intimacy, disclosure of secrets, [or] intrusting of power," and a "substitution of [the fiduciary's] will" for the beneficiary's); *Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1159-61 (2005) (requiring (1) vulnerability of one party, (2) empowerment of the stronger party by the weaker, (3) the stronger party's solicitation or acceptance of that empowerment, and (4) prevention of effective self-protection by the weaker party); *People ex rel. Cuomo v. Coventry First LLC*, 13 N.Y.3d 108, 115 (2009) (requiring "a high level of confidence and reliance in another, who thereby exercises control and dominance over [them]").

Cir. 1993) (no duty owed by bank that held court-supervised funds and renewed a certificate of deposit at 7.5% when treasury rates were 14%–17%).[12]

Plaintiffs offer six alternative (and overlapping) theories to bypass these dispositive roadblocks. None establishes any fiduciary duty owed by the Bank Defendants to Plaintiffs.

***Discretionary Authority Over QSF Assets.*** Plaintiffs first allege that the Bank Defendants "owed independent fiduciary duties arising from their exercise of discretionary authority over trust assets," Compl. ¶ 458, including by "determin[ing] interest rates credited to QSF accounts, control[ling] the deployment of QSF deposits, structur[ing] spread-sharing arrangements with the Administrator Defendants, and remitt[ing] payments from QSF assets," Compl. ¶¶ 104–106. Yet Plaintiffs cite no contractual provision, court order, or trust instrument granting either Bank Defendant authority to make QSF investment decisions, and they identify no statute, regulation, or settlement agreement empowering Bank Defendants to direct the disposition of QSF assets. Instead, the Complaint admits that administrators—not the Bank Defendants—"direct which bank hold[s] QSF deposits." Compl. ¶ 82(b); *see also id.* ¶ 100.

Plaintiffs are conflating a bank's ordinary commercial discretion with respect to its deposits, on the one hand, and a fiduciary's discretion over a beneficiary's assets, on the other. Setting the interest rate paid on a deposit account is something that every depository institution does every day. It is a unilateral bank decision about its *own* balance sheet, in which the depositor has no interest. "A deposit establishes a debtor-creditor relationship between the bank and the depositor in which the former becomes indebted to the latter for the amount of the deposit. . . . The

---

[12] *See also Chazen v. Centennial Bank*, 61 Cal. App. 4th 532, 537 (1998) ("It follows that commercial banks have no duty to police their fiduciary accounts and are not liable for the misappropriation of trust funds by the trustee.") (cleaned up); *Kesselman v. Nat'l Bank*, 188 Ariz. 419, 424 (Ct. App. 1996) (bank owed no duty to disclose account irregularities to third-party beneficiaries).

depositor is not entitled to the profits earned by the bank, even if those profits could in theory be traceable to his deposited funds." *Hamilton Rsrv. Bank Ltd. v. Democratic Socialist Republic of Sri Lanka*, 134 F.4th 73, 81 n.4 (2d Cir. 2025) (cleaned up).

***12 C.F.R. § 9 (OCC Regulations).*** Plaintiffs next invoke the OCC's fiduciary-activity regulations at 12 C.F.R. § 9—specifically, the definitions of "fiduciary capacity" at 12 C.F.R. § 9.2(e) and "investment discretion" at 12 C.F.R. § 9.2(i). Compl. ¶¶ 70, 104-06, 458.[13] But 12 C.F.R. §§ 9.2(e) and 9.2(i) recognize and classify fiduciary status; they do not create the duties that flow from it. *Snyder v. Wells Fargo Bank, N.A.*, 594 F. App'x 710, 713 (2d Cir. 2014) (OCC regulations "do no more than reinforce [bank's] existing duty under the contract and New York law"). Even if Plaintiffs had pled facts establishing that the Bank Defendants "act[ed] in a fiduciary capacity" under 12 C.F.R. § 9 (and they have not), such duties still need a source. Plaintiffs identify none.

Moreover, 12 C.F.R. § 9 does not transform every depository relationship into a fiduciary one. The regulation applies only when the bank "act[s] in a fiduciary capacity," defined by reference to roles such as "trustee, executor, administrator . . . , guardian, . . . [or] investment adviser," and to "any capacity in which the bank possesses investment discretion on behalf of another." 12 C.F.R. §§ 9.1(c), 9.2(e). And "investment discretion" in turn is defined as "the sole or shared authority . . . to determine what securities or other assets to purchase or sell on behalf of the account." *Id.* § 9.2(i). Setting the interest rate the bank pays on a demand deposit does not qualify. *See* Compl. ¶ 70. Plaintiffs' contrary reading, *see id.* ¶¶ 105–106, would convert every demand-deposit relationship into a fiduciary account, an outcome the regulation expressly

---

[13] 12 C.F.R. § 9 applies only to national banks and to specified federal branches of foreign banks. 12 C.F.R. § 9.1(c); *see* 12 U.S.C. § 92a. These regulations do not apply to Western Alliance since it is a state-chartered bank.

forecloses. *See* 12 C.F.R. § 9.1(c) (limiting 12 C.F.R. § 9 to fiduciary activities); OCC Comptroller's Handbook: Custody Services, at 11 (2002) ("Custody is generally not considered a fiduciary capacity under 12 CFR 9.").[14]

*26 C.F.R. § 1.468B (Treasury Regulations).* Plaintiffs' Treasury-Regulations theory is also unavailing. Section 1.468B establishes federal income-tax treatment of QSFs, defines the QSF "administrator," and assigns to that administrator certain tax filing and reporting obligations. 26 C.F.R. §§ 1.468B-1(c), 1.468B-2(k)(3). It says nothing about interest rates, deposit pricing, or fiduciary duties owed to QSF beneficiaries—those subjects lie outside the scope of the IRS's tax regulatory framework altogether. The regulation contemplates that the QSF "administrator" "may include a trustee if the qualified settlement fund is a trust," *id.* § 1.468B-2(k)(3). But any trustee duties flow from the court order or trust instrument, not from § 1.468B. *See Rosenberg v. Rosenberg*, 580 N.Y.S.2d 319, 320 (N.Y. App. Div. 1992) (no fiduciary relationship where agreement did not impose any duties or contractual undertaking). Plaintiffs allege no specific court order or settlement agreement imposing fiduciary duties on either Bank Defendant. Moreover, even if Section 1.468B imposed fiduciary duties on the QSF "administrator," which it does not (*see* Admin. Defs. Mot. § I.B.2), Plaintiffs themselves allege that the Administrator Defendants—not the Bank Defendants—are the QSF "administrators" under § 1.468B-2(k)(3) in all but some "context-specific" circumstances that are never alleged to have actually occurred. Compl. ¶¶ 65-66, 69, 80–84, 458.

---

[14] The OCC Comptroller's Handbook for Custody Services is available at the OCC's public website, https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/custody-services/index-custody-services.html (last accessed July 17, 2026). *See* Lazarow Decl. Ex. 4; *see also Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014) ("[J]udicial notice may be taken of public records and government documents available from reliable sources.").

***"Knowing Receipt" under Restatement (Third) of Restitution § 43.*** Plaintiffs next invoke Section 43 of the Restatement (Third) of Restitution and Unjust Enrichment to argue that accepting "QSF assets with knowledge of their fiduciary character" imposed fiduciary duties even though Bank Defendants were mere "depositories." Compl. ¶ 363. This is wrong. Section 43 does not impose some independent fiduciary duty; it permits disgorgement from a person who "obtains a benefit . . . in consequence of *another's* breach of fiduciary duty." Restatement (Third) of Restitution & Unjust Enrichment § 43(c) (emphasis added); *see also Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1483 (2014). It therefore depends on a primary breach by another fiduciary—as alleged here, the Administrator Defendants. Yet Plaintiffs do not plausibly allege that Administrator Defendants breached any such duty. *See* Admin. Defs. Mot. § III.A. Plaintiffs cannot convert a remedies provision into a duty-imposing rule.

***"Co-Fiduciary Accountability."*** Plaintiffs similarly attempt to invoke the "co-fiduciary accountability" doctrine of Restatement (Second) of Trusts § 224 and Restatement (Third) of Trusts § 81 to impose fiduciary duties on the Bank Defendants. Compl. ¶ 364. This attempt also fails. Those provisions apply only to a trustee's liability for a co-trustee's breach. *See* Restatement (Second) of Trusts § 224 (addressing liability for breach of trust committed by a co-trustee); Restatement (Third) of Trusts § 81(1)–(2) (explicitly limiting the doctrine to circumstances where "a trust has more than one trustee"). The Complaint's own formulation requires the Bank Defendants to already be "co-fiduciar[ies]." Compl. ¶ 364. The doctrine does not (on its own) impose fiduciary duties on Bank Defendants.

***"Constructive" Fiduciary Status.*** Plaintiffs' final theory alleges that the Bank Defendants are "constructive fiduciaries by virtue of the functions they voluntarily assumed," Compl. ¶ 107, and, in the alternative, that "[e]ven if the Bank Defendants were regarded as purely passive

-14-

depositories, fiduciary obligations would still attach" because they received QSF deposits "with actual or constructive knowledge that those funds are held beneficially for others," *id*. ¶ 108. But an ordinary banking relationship does not transform into a fiduciary one merely because a bank allegedly knows deposited funds are held for another's benefit. *See Miller*, 4 F.3d at 520-21 (bank has no duty even when holding funds supervised for the benefit of an identifiable minor beneficiary pursuant to court order); *see also Chazen*, 61 Cal. App. 4th at 537. And courts routinely reject the imposition of fiduciary duties unless agreed to by *both parties* (i.e., the account holder *and* the bank). *Regions Bank v. Wieder & Mastroianni, P.C.*, 423 F. Supp. 2d 265, 270 (S.D.N.Y. 2006) ("Although Regions may have reposed trust or confidence in W & M by transferring the money into the account, this does not give rise to a fiduciary duty because W & M never accepted a relationship of trust or confidence with respect to Regions."). This is true even where funds are held in accounts pursuant to statute. *See Peoples Westchester Sav. Bank v. F.D.I.C.*, 961 F.2d 327, 330–32 (2d Cir. 1992) (rejecting argument that bank's knowledge that a lawyer's IOLA account held funds that "did not belong to [the lawyer], but rather to her clients or other beneficial owners" imposed duties on the bank, noting that "[i]n maintaining an IOLA account, the lawyer, not the bank, is charged with a fiduciary duty to the client"). Indeed, the fact that QSF funds were put in interest-bearing accounts is "very strong evidence that the title to the money deposited passed out of the depositor by the act of making the deposit" and thus, that neither Plaintiffs nor the Bank Defendants intended that the QSF funds would impose fiduciary duties on the Bank Defendants. *Id*. at 331.

Nonetheless, according to Plaintiffs, Bank Defendants knew class members beneficially owned QSF fund interest because (1) 26 U.S.C. § 468B(b)(3)(C) supposedly provides that all earnings on QSF assets belong to the fund, and (2) the Bank Defendants' marketing materials

"confirm that they understood precisely the QSF framework and the beneficial ownership it creates." Compl. ¶ 108. Neither theory is well pled. First, 26 U.S.C. § 468B(b)(3)(C) does not impose fiduciary duties on QSF banks and certainly does not mandate (for all purposes) that "all earnings on QSF assets belong to the fund" as alleged by Plaintiffs. *Id*. Instead, § 468B(b)(3)(C) merely provides that for determining taxation applicable to the QSF, the income reported to the IRS must include the interest generated by the QSF fund. And the Internal Revenue Code's generic definition of "gross income" to include interest from "whatever source derived" is irrelevant. *Id*. ¶ 65. The statutory provisions cited by Plaintiffs do not mandate which party is the "beneficial owner" of the QSF interest, nor what interest rate a bank is required to provide on those QSF funds.

Plaintiffs' marketing-materials theory also fails. The cited materials—which were directed to *settlement administrators* and "the professional community that controls where settlement funds are placed," not to Plaintiffs, Compl. ¶¶ 107, 110–111, 114—do not establish either that Bank Defendants "voluntarily assumed" fiduciary duties to class members or that the Bank Defendants had knowledge that the class members were the "beneficial owners[]" of some unknown amount of QSF interest. Compl. ¶¶ 107–108. Marketing a settlement-services group to *administrators* is not the "knowing[] undertak[ing] to act on behalf and for the benefit" of those administrators (much less for the "beneficial owner" class members) that creates fiduciary relationships. *Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 158 Cal. App. 4th 226, 246 (2007) (internal quotations omitted); *see also Mosaic Fin. Ltd.*, 767 F. Supp. 3d at 656 ("One party cannot unilaterally turn the other into a fiduciary simply by reposing trust in them."). Plaintiffs nowhere allege that either Bank Defendant represented to Plaintiffs that it was a fiduciary or trustee of the purported Class; the cited language refers to others' fiduciary roles, like class counsel's, and to Huntington's offer to "help" others meet their disclosed fiduciary obligations. Compl. ¶¶ 112, 117–

118, 118 n.55. These allegations show, at most, that the Bank Defendants marketed banking services to fiduciaries (like class counsel)—not that they represented themselves as fiduciaries or undertook fiduciary obligations directly to QSF beneficiaries.[15]

\* \* \*

Plaintiffs' six theories thus collapse into a single, indefensible assertion: that holding QSF deposits and pricing them on commercial terms transforms a bank into a trustee of the settlement class. Plaintiffs therefore fail to plead a fiduciary duty owed by the Bank Defendants, and Counts I, III, and IV should be dismissed.

### B.    Even Assuming a Fiduciary Duty Existed, Plaintiffs Still Cannot Plausibly State a Claim for Breach of Such a Duty (Count I)

Plaintiffs' breach-of-fiduciary-duty claim fails for two additional reasons. *First*, even if a fiduciary duty existed (which it did not), Plaintiffs do not plausibly allege breach. Instead, the Complaint merely labels ordinary commercial banking—setting interest rates on demand deposit accounts and investing proceeds—as fiduciary misconduct. Compl. ¶ 460. At best, Plaintiffs rely on conclusory allegations that the Bank Defendants agreed to "share" profits with the Administrator Defendants, assuming (without factual support) that every dollar of QSF interest

---

[15] The Complaint elsewhere refers to generalities in the Bank Defendants' marketing materials (*see, e.g.*, Compl. ¶¶ 117, 119), but generalized marketing of competence, experience, and trustworthiness, does not create a fiduciary relationship. *See Martinez v. Welk Grp., Inc.*, 907 F. Supp. 2d 1123, 1133 (S.D. Cal. 2012) (no fiduciary duty even where "sellers routinely make representations concerning their product, often on the basis of a claimed expert knowledge about its utility and value"); *see also Apollo Cap. Fund*, 158 Cal. App. 4th at 244–246 (no fiduciary duty where placement agent represented investors could "trust and rely on [its] expertise in evaluating investments"); *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 442–43 (S.D.N.Y. 2010) ("bank's generalized desire for its customers to 'trust' it, place 'confidence' in it, and 'continue doing business' with it, is not sufficient" to create fiduciary relationship); *Bernstein v. JPMorgan Chase Bank, N.A.*, 775 F. Supp. 3d 701, 711–12 (S.D.N.Y. 2025) (advertisements and marketing statements do not create duty necessary for negligent-misrepresentation claim); *Standard Chartered PLC*, 945 P.2d at 336 (no fiduciary duty where defendant "pitched hard" for plaintiff's business, stressing its expertise, reputation and knowledge of prospective client).

necessarily belongs to class members. *Id.* ¶¶ 128–130, 460(b), 469. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to satisfy basic pleading standards, *Iqbal*, 556 U.S. at 678, let alone Rule 9(b). *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003) (Rule 9(b) applies to any claim that "sound[s] in fraud," including non-fraud claims "grounded in fraud").

*Second*, any purported damages are speculative as a matter of law. Plaintiffs' alleged injury is the difference between the rate the Bank Defendants paid on QSF deposits and a hypothetical "competitive, unconflicted" market rate. *See* Compl. ¶¶ 399(a), 442. But the Complaint identifies no contractual or court-ordered obligation requiring Bank Defendants to pay any particular rate, much less a treasury-equivalent or federal-funds-rate-tracking rate. Absent such an obligation, a depositor "is not entitled to the profits earned by the bank, even if those profits could in theory be traceable to his deposited funds." *Hamilton*, 134 F.4th at 81 n.4. Damages predicated on a hypothetical rate the bank never agreed (and had no obligation) to pay are speculative on their face.[16]

### C.   Plaintiffs Cannot Plausibly Assert a Fraudulent Concealment or Fraud Claim (Counts III, IV)

In Counts III and IV, Plaintiffs allege that the Bank Defendants' failure to disclose "interest-sharing payments" to Administrator Defendants amounted to fraudulent concealment and fraud. Compl. ¶¶ 475, 485. Both claims fail for at least three independent reasons.[17]

---

[16] Because speculative damages fail to state a cognizable claim, courts can resolve the issue on a motion to dismiss. *See Philip S. Schwartzman, Inc. v. Pliskin, Rubano, Baum & Vitulli*, 187 N.Y.S.3d 702, 706 (App. Div. 2023) (affirming dismissal where breach-of-fiduciary-duty claim alleged only speculative damages); *Shopoff & Cavallo LLP v. Hyon*, 167 Cal. App. 4th 1489, 1509 (2008) (affirming dismissal where alleged damages were inadequate, uncertain, or speculative).

[17] The applicable pleading requirements for fraud are largely consistent across potentially relevant jurisdictions. Each requires, at a minimum, a misrepresentation or actionable omission, scienter, intent to induce reliance, justifiable reliance, and resulting damage. *See Lazar v. Superior Ct.*, 12

*First*, the Bank Defendants had no duty to disclose the alleged payments. A fraudulent concealment claim generally requires a duty to disclose, arising principally from a fiduciary or other "special" relationship, or from peculiar superior knowledge that renders nondisclosure inherently unfair.[18] *See Rattagan*, 17 Cal. 5th at 40; *P.T. Bank Cent. Asia*, 301 A.D.2d at 376; *Blon*, 519 N.E.2d at 367-68. A "special" relationship based on "superior knowledge," however, requires a direct transaction between the parties or a mutually understood relationship. *See Albion All. Mezzanine Fund, L.P. v. State St. Bank & Tr. Co.*, 8 Misc. 3d 264, 269 (N.Y. Sup. Ct. 2003).[19] Plaintiffs concede that Bank Defendants' liability here would arise only if "Bank Defendants, as custodians and depositories of court-supervised trust assets held for identifiable beneficiaries, owed a duty of disclosure arising from their fiduciary relationship to those beneficiaries …." Compl. ¶ 485. Because no fiduciary or heightened duty to Plaintiffs existed, the fraud claims fail.

---

Cal. 4th 631, 638 (1996); *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996); *O'Dell v. Vrable III, Inc.*, 200 N.E.3d 1208, 1230 (Ohio Ct. App. 2022); *Town & Country Chrysler Plymouth v. Porter*, 464 P.2d 815, 817 (Ariz. Ct. App. 1970). Fraudulent concealment requires a duty to disclose. *See Rattagan v. Uber Techs., Inc.*, 17 Cal.5th 1, 40 (2024); *P.T. Bank Central Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 376 (N.Y. App. Div. 2003); *Blon v. Bank One, Akron, N.A.*, 519 N.E.2d 363, 367-68 (Ohio 1988).

[18] While Arizona law does not require the defendant to have a duty to disclose to be liable for fraudulent concealment, it requires "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter." *Tavilla v. Cephalon, Inc.*, 870 F. Supp. 2d 759, 774 (D. Ariz. 2012) (quoting *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 38 P.3d 12, 35 (Ariz. 2002)). Plaintiffs' allegations here, which are framed almost entirely as mere silence and are otherwise speculative and conclusory, fail to establish such a claim. *See* Compl. ¶¶ 475–491; *Gould v. M & I Marshall & Isley Bank*, 860 F. Supp. 2d 985, 987–89 (D. Ariz. 2012) (no fraudulent concealment where mortgage lender stated that an appraisal "was accurate and in accordance with industry standards" without disclosing deficiencies, as "there are no facts alleged to show that [the lender] actively concealed the appraisal or its defects").

[19] *See also Groob*, 843 N.E.2d at 1175-76 (unilateral belief in special relationship insufficient); *cf. Sullivan v. Pulte Home Corp.*, 290 P.3d 446, 454-55 (Ariz. Ct. App. 2012), *vacated in part*, 232 Ariz. 344, 306 P.3d 1 (2013) (no fraudulent concealment where plaintiff did not transact with defendants).

*Second*, fraud requires a material misrepresentation by the defendant. *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 259 (2011); *Lama Holding Co.*, 668 N.E.2d at 1373; *O'Dell*, 200 N.E.3d at 1230; *Town & Country Chrysler Plymouth*, 464 P.2d at 817. Rule 9(b) requires Plaintiffs to plead with particularity the specific material fact allegedly concealed, the circumstances in which disclosure should have occurred (i.e., the who, what, when, where, and how of each defendant's allegedly fraudulent omission). *See* Fed. R. Civ. P. 9(b). Here, the Complaint identifies no specific fraudulent statement or omission by either Bank Defendant to any court, class counsel, or class member. Nor does it allege when any statement was made, where it appeared, who made it, what was allegedly concealed, or why disclosures were required. The generic categories of statements identified—including "every CAFA notice," "every fee application," and "every administrator declaration" across apparently hundreds of settlements, Compl. ¶¶ 9-11, 370–383— are plainly the responsibility of and issued by either class counsel or settlement administrators, depending on the specific circumstances of the settlement, *not* the Bank Defendants, *id*. ¶ 483.

*Third*, Plaintiffs fail to plead reliance. *See* Admin. Defs. Mot. § III.B.1. Plaintiffs allegedly relied on administrator statements, not any Bank Defendant communications. *See* Compl. ¶¶ 370–381, 488–490. And any alleged omissions were in information disclosed to "supervising courts and class counsel"—not plaintiffs. *Id.* ¶ 381. Third party communications cannot supply reliance for a fraud claim against the Bank Defendants. *See Wright v. Ernst & Young LLP,* 152 F.3d 169, 175 (2d Cir. 1998) ("Reliance only on representations made by others cannot itself form the basis of liability.") (cleaned up).[20] As an initial matter, Plaintiffs have not adequately alleged that the

---

[20] Some states, including California, follow the Restatement (Second) of Torts, under which "a plaintiff can sue the maker of a misrepresentation where the misrepresentation was made to a third party and the maker intends or has reason to expect that the misrepresentation will be repeated or communicated by the third party to the plaintiff," inducing the plaintiff's own reliance on it. *Burch v. CertainTeed Corp.*, 246 Cal. Rptr. 3d 99, 111 (Cal. Ct. App. 2019) (emphasis added).

Bank Defendants made any misrepresentations. In any event, the Complaint also contains no non-conclusory allegations that any court or class counsel actually relied on the absence of information concerning interest-sharing arrangements or other compensation in making decisions. Plaintiffs do not plausibly allege that any court would have denied approval, selected a different administrator, required different banking arrangements, or otherwise altered rulings had the allegedly omitted information been disclosed. Nor do Plaintiffs allege that any court or class counsel would have taken different action if the information had been disclosed. Instead, the Complaint merely assumes that disclosure would have mattered. Such speculation is insufficient.

### D.      *The Aiding and Abetting Claims Are Insufficiently Pled (Counts II, V)*

Counts II and V for aiding and abetting breach of fiduciary duty and fraud fail because the Complaint does not plausibly plead—much less plead with Rule 9(b) particularity—any required element: (1) an underlying breach of duty or fraud by a third party, (2) the Bank Defendants' actual knowledge of that specific breach, and (3) substantial assistance or encouragement.[21]

As an initial matter, because Plaintiffs fail to plausibly allege an underlying breach of fiduciary duty or fraud by the Administrator Defendants, Counts II and V necessarily fail. *See* Admin. Defs. Mot. §§ I, III.A-B.

Nor does the Complaint plausibly allege the Bank Defendants' "actual knowledge" of breach or fraud, which requires knowledge of the specific primary wrong, not generalized awareness that a customer is a fiduciary or operates under QSF regulations. *Casey v. U.S. Bank*

---

[21] The applicable pleading requirements for civil aiding and abetting claims are largely consistent across potentially relevant jurisdictions. *See Nasrawi v. Buck Consultants LLC*, 231 Cal. App. 4th 328, 343 (2014); *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (App. Div. 2003); *Cal X-Tra v. W.V.S.V. Holdings, L.L.C.*, 276 P.3d 11, 40 (Ariz. Ct. App. 2012). However, to the extent that certain states do not recognize civil aiding-and-abetting claims, Plaintiffs' aiding and abetting claims also fail. *See, e.g., DeVries Dairy, L.L.C. v. White Eagle Coop. Ass'n, Inc.*, 974 N.E.2d 1194, 1194 (Ohio 2012) (Ohio does not recognize civil aiding-and-abetting as cause of action).

*Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1149–1153 (2005) (allegations that banks knew the fiduciaries were engaged in wrongful conduct were "too generic" to satisfy the actual-knowledge requirement). Although Plaintiffs allege that the Bank Defendants knew settlement administrators owed fiduciary duties and marketed banking services to them, Compl. ¶ 469, knowledge that a customer *is* a fiduciary is not knowledge that the customer *is breaching* a fiduciary duty. Plaintiffs allege no facts identifying anyone at either Bank Defendant who knew of any purported breach, let alone who reviewed, participated in, or knew of any filing that the Administrator Defendants made. Compl. ¶¶ 370–383; *see Stern v. Charles Schwab & Co.*, 2010 WL 1250732, at *10 (D. Ariz. Mar. 24, 2010) ("[S]uspicious activity does not satisfy the knowledge requirement of Arizona's aiding and abetting law.").

Nor do Plaintiffs adequately plead substantial assistance with Rule 9(b) particularity. Plaintiffs allege that the Bank Defendants "design[ed]" interest-sharing arrangements that made the alleged fraud "necessary and profitable." Compl. ¶ 496. But the primary alleged fraud was the Administrator Defendants' failure to disclose—not the banking arrangements themselves. *Id.* ¶¶ 370–383. As discussed above in Section I.A, accepting QSF deposits, paying negotiated interest, and remitting funds at the account holder's direction are routine banking services—those activities are not the significant and active participation required for aiding-and-abetting liability.[22] In some jurisdictions, "substantial assistance" may be based on "inaction . . . if the defendant owes

---

[22] *See Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 416 (S.D.N.Y. 2021) (providing "routine banking services to alleged fraudsters, even if it aids in the commission of the fraud, simply does not qualify as substantial assistance"); *Heinert v. Bank of Am., N.A.*, 410 F. Supp. 3d 544, 552 (W.D.N.Y. 2019) ("routine matters" such as assisting defendants by "providing banking services, including making wire transfers, opening accounts, and clearing account holds" were insufficient allegations of substantial assistance); *In re Mortg. Fund '08 LLC*, 527 B.R. 351, 365 (N.D. Cal. 2015) (without actual knowledge of alleged underlying tort, bank's ordinary commercial activity did not constitute "substantial assistance").

a fiduciary duty directly to the plaintiff." *Kaufman*, 760 N.Y.S.2d at 170. Because the Bank Defendants do not owe a fiduciary duty to Plaintiffs, Plaintiffs do not adequately allege substantial assistance on the basis of inaction.

### E.        The Civil Conspiracy Claim Is Legally Deficient (Count VII)

Civil conspiracy is not an independent cause of action in the exemplar jurisdictions; it is a theory of vicarious liability requiring (i) an underlying tort, (ii) an actual agreement to commit it, (iii) an overt act in furtherance of the agreement, and (iv) resulting damages.[23] Regardless, Plaintiffs' civil conspiracy claim also fails for several, independent reasons.

As an initial matter, a civil conspiracy claim depends on the viability of the underlying tort claims. *Alexander & Alexander*, 68 N.Y.2d at 969 (conspiracy to commit a tort is not itself actionable); *see Orbit Elec., Inc. v. Helm Instrument Co.*, 167 Ohio App. 3d 301, 313 (Ohio Ct. App. 2006) (same); *Applied Equip.*, 7 Cal. 4th at 511 (same). Here, the Complaint fails to plead any actionable tort against either Bank Defendant. The conspiracy claim fails as a result. Moreover, merely repackaging the breach of fiduciary duty and fraud claims as a civil conspiracy tort (as Plaintiffs have plainly done here, *compare* Compl. ¶¶ 458–463, 475–491, *with* ¶¶ 550 –56) warrants dismissal of the conspiracy claim as duplicative. *See In re Platinum-Beechwood Litig.*, 426 F. Supp. 3d 14, 21 (S.D.N.Y. 2019); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 2016 WL 5719749, at *8 (S.D.N.Y. Sept. 29, 2016).

To the extent Plaintiffs allege conspiracy to commit fraud, Rule 9(b) requires Plaintiffs to plead the alleged conspiratorial agreement with particularity. Fed. R. Civ. P. 9(b). Plaintiffs

---

[23] The applicable pleading requirements of civil conspiracy are largely consistent across potentially relevant jurisdictions. *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510– 11 (1994); *Williams v. Aetna Fin. Co.*, 83 Ohio St. 3d 464, 475 (Ohio 1998); *Wells Fargo Bank*, 38 P.3d at 36; *Abacus Fed. Sav. Bank v. Lim*, 75 A.D.3d 472, 474 (N.Y. App. Div. 2010); *see also Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (N.Y. App. Div. 1986).

identify no time, place, content, participants, or circumstances of any agreement between either Bank Defendant and any Administrator Defendant. *See* Compl. ¶¶ 550–55. But inferring conspiracy from such conclusory allegations is not particularity. *See Filler v. Hanvit Bank*, 2003 WL 22110773, at *3 (S.D.N.Y. Sept. 12, 2003) (dismissing conspiracy to defraud claim against bank defendants where plaintiff failed to identify each defendant's specific role in the alleged misconduct and did not plead the "who, where and when" required by Rule 9(b); explaining that "conclusory allegations" are insufficient and "[r]hetoric is not a substitute for specificity"). Nor can Plaintiffs premise their civil conspiracy claim on a breach of fiduciary duty. Here, neither the Bank Defendants nor the Administrator Defendants owe such duties, and the Complaint does not allege that the FinTech Defendants had such duties. *See supra* § I.A; *see also* Admin. Defs. Mot. § I.B; Compl. ¶¶ 456–463.

Further, even if some underlying tort had been adequately pled, Plaintiffs do not plausibly allege that either Bank Defendant agreed to commit it. Alleged conspirators must agree to a common tortious plan, know its objective, and concur in the scheme with knowledge of its unlawful purpose. *See Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581–82 (1995). At most, Plaintiffs allege ordinary bilateral commercial relationships between banks and customers, with banks independently pricing deposit products. Compl. ¶¶ 127–130, 553; ¶¶ 11, 16, 553. They do not show that either Bank Defendant ever "agreed to a common plan" to commit a tort. *Kidron*, 40 Cal. App. 4th at 1582. Parallel conduct, or mere awareness of, acquiescence in, or failure to prevent wrongdoing does not constitute conspiracy absent an agreement and intentional participation. *Id.*; *see also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 634 (S.D.N.Y. 2001); *Fleites v. MindGeek S.A.R.L.*, 801 F. Supp. 3d 1011, 1037 (C.D. Cal. 2025) ("The agreement required cannot solely be a business relationship or

overlapping commercial interests."). As explained below, *infra* § III.A, the Complaint fails to allege facts plausibly showing that either Bank Defendant entered into any such conspiracy.

### F.    Plaintiffs Fail to Plausibly Allege an Unjust Enrichment Claim (Count X)

Plaintiffs' unjust enrichment claim fails because Plaintiffs—class members in settlements administered by third parties—conferred no benefit on either Bank Defendant.[24] Plaintiffs' own allegations confirm that class members did not transact with the Bank Defendants; the Administrator Defendants (or class counsel) directed QSF deposits to the banks, which paid negotiated interest. *See* Compl. ¶¶ 127–130. An unjust enrichment claim "will not be supported if the connection between the parties is too attenuated," *Mandarin*, 944 N.E.2d at 1111, and mere awareness of another entity's existence is insufficient to support a claim for unjust enrichment absent some direct connection between the parties. *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 747–48 (N.Y. 2012) (relationship between defendant and plaintiff was "too attenuated because they simply had no dealings with each other").[25] The Complaint does not plausibly allege any direct benefit from Plaintiffs to the Bank Defendants.

---

[24] The applicable pleading requirements of unjust enrichment are largely consistent across potentially relevant jurisdictions: each requires, at a minimum, a benefit conferred on the defendant, an impoverishment of the plaintiff, a connection between the two, and circumstances making retention of the benefit unjust. *See Lectrodryer v. SeoulBank*, 91 Cal. Rptr. 2d 881, 883 (Ct. App. 2000); *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011); *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011); *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984).

[25] *See also Freeman*, 245 P.3d at 936-37 (affirming rejection of unjust enrichment claim where any benefit to defendant was merely incidental to expenditures plaintiffs made for their own purposes); *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59-61 (Del. Ch. 2012).(unjust enrichment requires direct relationship between plaintiff's impoverishment and defendant's enrichment); *see, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014) ("[I]t makes little sense to conclude that [defendant bank] somehow improperly obtained profits intended for … plaintiff when those two parties never transacted or otherwise maintained a business relationship at all.").

Moreover, unjust enrichment "is not a catchall cause of action to be used when others fail" and "is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).[26] Yet Plaintiffs refer to the same alleged "concealed schemes" and "self-dealing" as Plaintiffs' fraud and fiduciary-duty claims. *See* Compl. ¶¶ 573-75. Plaintiffs cannot use this quasi-contract claim to remedy deficient fraud claims.

Nor can Plaintiffs establish that Bank Defendants were unjustly enriched. Plaintiffs claim that Bank Defendants paid below-market interest on QSF deposits, "saved millions of dollars," and paid "a portion of that money" to Administrator Defendants. *See, e.g.,* Compl. ¶ 183; *see also id*. ¶¶ 121-129. But Plaintiffs failed to plead specific facts plausibly establishing that Bank Defendants owed any fiduciary duties to Plaintiffs. *See supra*, Section I.A. Thus, any deposits to the QSF accounts held by Bank Defendants attributable to Plaintiffs established "a debtor-creditor relationship between the bank and the depositor" and, therefore, Plaintiffs were "not entitled to the profits earned by the bank, even if those profits could in theory be traceable to [Plaintiffs'] deposited funds." *Hamilton*, 134 F.4th at 81 n.4 (cleaned up). The Bank Defendants' alleged retention and disbursement of those profits, to which Plaintiffs established no entitlement, is not unjust. *See Geier v. Conway, Homer & Chin-Caplan, P.C.,* 983 F. Supp. 2d 22, 40-41 (D.D.C. 2013) (dismissing unjust-enrichment claim where plaintiffs failed to plead any reasonable expectation that they should have received money).

---

[26] *See also Kachuck Enters.* v. *Mission Produce, Inc.*, 823 F. Supp. 3d 1054, 1068 (C.D. Cal. 2026) (dismissing unjust enrichment claim because it was "duplicative" of other failed claims); *Morgulis v. Bus Patrol Am., LLC*, 2026 WL 603607, at *1 (2d Cir. Mar. 4, 2026) (affirming dismissal of unjust enrichment claim that arose from "same factual allegations" as fraudulent concealment and inducement claims).

## II.    The RICO Claims Are Fatally Flawed

### A.    The Complaint's RICO Theory Fails to State a Claim Against the Bank Defendants (Count VI)

A civil RICO violation under Section 1962(c) requires "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity" which (4) causes injury. *Cheeks v. Fort Myer Constr. Corp.*, 216 F. Supp. 3d 146, 153 (D.D.C. 2016) (quoting *Salinas v. United States*, 522 U.S. 52, 62 (1997)). A plaintiff must also plead proximate cause. *Id.* (citing *Hemi Grp., LLC v. City of N.Y., N.Y.*, 559 U.S. 1, 9 (2010)). The Complaint fails to plausibly allege any of these elements.

#### 1.    The Alleged "Enterprise" Is Nothing More Than Ordinary Commercial Relationships

As described in the Administrator Defendants' Motion, the Complaint fails to allege a cognizable RICO enterprise. For each Administrator Defendant, Plaintiffs allege an association-in-fact enterprise of the Administrator, FinTech, and Bank Defendants formed with the common purpose of "extract[ing] undisclosed compensation from court-supervised settlement funds." *See, e.g.*, Compl. ¶¶ 501-502. But Plaintiffs allege only ordinary commercial relationships, which are insufficient to comprise an enterprise. *See* Admin. Defs. Mot. § III.F.2.

#### 2.    Plaintiffs Allege Routine Banking Services, Not the "Operation" of an "Enterprise"

A RICO claim under Section 1962(c) requires participation "in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). A plaintiff must "show[ ] that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (citation omitted). "[S]imply taking direction and performing tasks helpful or necessary to the enterprise's purpose 'without more, is insufficient to bring a defendant within the scope of § 1962(c).'" *Superb Motors Inc. v. Deo*, 776 F. Supp. 3d 21, 67–68 (E.D.N.Y. 2025) (quoting *United*

-27-

*States v. Diaz,* 176 F.3d 52, 92 (2d Cir. 1999)). A bank providing financial services and engaging in "arms length commercial transactions" "does not qualify as 'conducting or participating' in the affairs of a RICO enterprise, even when the defendant is aware of the enterprise's unlawful activity." *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 307 (E.D.N.Y. 2017).

Even if Plaintiffs had alleged a RICO enterprise (they do not), the Complaint falls far short of plausibly alleging that the Bank Defendants participated in its operation or management. It instead describes ordinary bank-depositor relationships between the Bank and Administrator Defendants. *See* Admin. Defs. Mot. § III.F.3.[27] A bank that holds deposits and pays contractual sums to its customer is not operating or managing the customer's enterprise. *See Moss*, 258 F. Supp. 3d at 307; *De Wit v. Firstar Corp.*, 879 F. Supp. 947, 965 (N.D. Iowa 1995) (no RICO claim where complaint "alleged only that defendants conducted that enterprise's banking scheme").[28] Otherwise, RICO liability would attach to every financial institution that unwittingly accepted deposits derived from racketeering activity.

     3.     *The Complaint Identifies No Predicate Acts by the Bank Defendants*

---

[27] Plaintiffs' assertion that "the Bank Defendants knew they were operating within an industry-wide deposit program" and failed to disclose it, Compl. ¶ 589(c), does not change the outcome. As explained *supra* Background § III, the Complaint does not include any factual allegations to support the assertion that each Bank Defendant was aware that the other was operating the same interest-sharing program. And where there was no duty to disclose, as is the case here, a failure to do so does not support any of Plaintiffs' claims. Compl. ¶ 383 ("a party with no fiduciary or similar obligation may generally remain silent without committing fraud").

[28] *See also In re Sunpoint Sec., Inc.*, 350 B.R. 741, 750 (Bankr. E.D. Tex. 2006) (providing banking services to enterprise does not constitute participation in conduct of enterprise); *Chi v. MasterCard Int'l, Inc.*, 2014 WL 5019917, at *2 (N.D. Ga. Oct. 7, 2014) ("providing financial services or processing credit card transactions is not enough to establish 'operation or management' of an enterprise") (citation omitted); *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1052 n.7 (D.C. Cir. 2012) (declining to extend RICO liability to provision of routine legal services); *Demaree v. Castro*, 2023 WL 6465881, at *10 (S.D.N.Y. Oct. 4, 2023) (providing professional services to enterprise insufficient to satisfy participation requirement).

Plaintiffs allege three categories of RICO predicate acts: wire fraud under 18 U.S.C. § 1343, mail fraud under 18 U.S.C. § 1341, and money laundering under 18 U.S.C. § 1956. Compl. ¶ 391. To allege fraud as a RICO predicate, a plaintiff must satisfy the heightened pleading standard of Rule 9(b) and state with particularity the who, what, when, where and how of the conduct at issue. *Cheeks*, 216 F. Supp. 3d at 157.

The Complaint cannot meet this standard. It concedes that "a party with no fiduciary or similar obligation may generally remain silent without committing fraud." Compl. ¶ 383. Given that Plaintiffs fail to allege that Bank Defendants owed any fiduciary duties, *supra* Argument § I.A, and that "[t]he duty to disclose is what transforms the omissions catalogued [in the Complaint] into actionable misrepresentations," *id.*, to the extent that Plaintiffs' RICO claims against the Bank Defendants are predicated upon such omissions (as they appear to be, *see id.* ¶¶ 371–381), they must be dismissed.

Nor does the Complaint identify a single affirmative misrepresentation by either Bank Defendant. Plaintiffs do not allege that the Bank Defendants submitted filings to any court, sent notices to any class member, maintained settlement websites, or mailed any CAFA notices to any State Attorney General. The allegations expressly assert that it was the *administrators*—not the banks—who did those things. *See, e.g.*, *id.* ¶¶ 371–379. Indeed, every exemplar predicate act identified in the Complaint was the product of an action allegedly undertaken by an Administrator Defendant. *See id.* ¶ 505 (Angeion mailings and filings); *id.* ¶ 513 (Epiq mailings and filings); *id.* ¶ 519 (JND mailings and filings); *id.* ¶ 526 (Kroll mailings and filings).

The Complaint's sole attempt to implicate the Bank Defendants in wire and mail fraud is its passing reference to "electronic filing or transmission between Defendants to organize, establish, and maintain the enterprise and its business" and documents "sent by the United States

Postal Service, FedEx, or other private or commercial interstate carrier between Defendants." *Id.* ¶ 391. That allegation identifies no specific communication, no sender, no recipient, no date, and no contents. It is precisely the kind of conclusory, fact-free allegation that Rule 9(b) exists to prevent. *See Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 91-92 (D.D.C. 2006) (plaintiffs' complaint did not meet Rule 9(b) pleading standard as it failed to "provide a date on which the [purported] fraudulent scheme . . . commenced" or to include "specific allegations as to which defendant caused what to be mailed" (citation omitted)); *see also S.H. v. District of Columbia*, 270 F. Supp. 3d 260, 273 (D.D.C. 2017) (Rule 9(b) "does not mean [a plaintiff] may rely on 'conclusory' allegations of knowledge" (citation omitted)).

Moreover, even if any such communications were sent, the Complaint fails to allege that anyone outside the purported enterprise(s) received or relied upon them. They therefore cannot constitute predicate acts of mail or wire fraud. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658–59 (2008) ("RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can[not] prevail without showing that *someone* relied on the defendant's misrepresentations.").[29]

Plaintiffs' money-laundering allegations fare no better. Plaintiffs allege that "each transfer of the proceeds of wire and mail fraud from the FinTech and Bank Defendants to Special Purpose Entities belonging to the Administrator Defendants and/or periodic payments to the Administrator Defendants under master services agreements" constitutes money laundering under 18 U.S.C. § 1956(a)(1)(A) and (B). Compl. ¶ 391. But this theory is entirely derivative of the alleged wire and

---

[29] *See also Bates*, 466 F. Supp. 2d at 88 ("[f]raud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on [the] defendant's false statement of fact") (quoting *Blount Fin. Servs., Inc. v. Walter E. Heller & Co.,* 819 F.2d 151, 152 (6th Cir. 1987)); *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 108–09 (D.D.C. 2015) (describing allegations of mail and wire fraud as "woefully deficient" where complainant failed to allege a time or a place for any of the alleged frauds, or attribute any fraudulent acts to any individual defendants).

mail fraud, as Plaintiffs simply recount transfers of purported "proceeds" from those fraudulent acts. Because Plaintiffs fail to plead those predicate acts, they cannot plead money laundering either. *See Hourani v. Mirtchev*, 796 F.3d 1, 10 (D.C. Cir. 2015) (any purported violation of the federal money laundering statute "require[s] that the money being laundered must in some way be associated with 'unlawful activity.'").[30] And because the Complaint fails to plead even one predicate act by the Bank Defendants, Plaintiffs necessarily cannot plead a "pattern" of racketeering activity. *See* FinTech Defs. Mot. § I.B.1.ii.

### 4.     *The Complaint Cannot Establish Proximate Cause*

To plead a Section 1962(c) RICO claim, "plaintiffs must also show proximate cause—that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." Cheeks, 216 F. Supp. 3d at 153 (cleaned up). Plaintiffs cannot do so where at least two layers separate the alleged victims from the Bank Defendants (*supra* Argument § I.A). It is black letter law that "indirect purchasers" of this sort cannot demonstrate RICO injury. *See MSP Recovery Claims, Series LLC v. Pfizer, Inc.*, 728 F. Supp.3d 89, 105 (D.D.C. 2024); *see also* Admin. Defs. Mot. § III.F.1. The Administrator Defendants, the FinTech Defendants and the courts were all intermediaries between Plaintiffs and Bank Defendants, precluding any claim of a proximately caused injury.

### 5.     *The Complaint Fails to Plead any Investment of Racketeering Proceeds*

For the reasons set forth above, the Complaint pleads no RICO enterprise or proceeds so its claim for investment of racketeering proceeds pursuant to 18 U.S.C. § 1962(a) necessarily fails as well. *Sandza*, 151 F. Supp. 3d at 109–10 (dismissing Section 1962(a) claim where plaintiff

---

[30] *See also Republic of Kazakhstan v. Stati*, 380 F. Supp. 3d 55, 62-63 (D.D.C. 2019), *aff'd sub nom. Republic of Kazakhstan, Ministry of Just. v. Stati*, 801 F. App'x 780 (D.C. Cir. 2020) (dismissing RICO claims where alleged "money laundering" was mere "payment of legal fees").

alleged that bank invested funds that were not racketeering proceeds). The claim also fails because Plaintiffs do not plead an injury caused by any investment of racketeering proceeds, as opposed to injury purportedly flowing from the predicate acts themselves. *See Danielsen v. Burnside–Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1229 (D.C. Cir. 1991) ("It is not sufficient to allege injury flowing from the predicate acts of racketeering.").

### B.      The RICO Conspiracy and Aiding and Abetting Claims Fail

To state a Section 1962(d) claim, a "complaint must allege that (1) two or more people agreed to commit a subsection (c) offense, and (2) a defendant agreed to further that endeavor." *RSM Prod. Corp.*, 682 F.3d at 1048. The Complaint's failure to allege an underlying RICO claim means that the conspiracy claim necessarily fails as well. *See Danielsen, Inc.*, 941 F.2d at 1233.

The Complaint's conspiracy claims directed at the Bank Defendants should also be dismissed because the Complaint does not plausibly allege any actual agreement. Plaintiffs must allege "agreements to commit RICO offenses and agreements to further the endeavor to commit RICO offenses." *Cheeks*, 216 F. Supp. 3d at 162 (citing *RSM Prod. Corp.*, 682 F.3d at 1047). But the Complaint does not sufficiently plead any such agreements, with the requisite particularity or otherwise. At most, the Complaint charges the Bank Defendants with *awareness* that the *Administrators*—as part of their court-appointed role as settlement administrators—would be required to make *some* disclosures (as opposed to pleading facts regarding the falsity of those disclosures). Even if that awareness existed (it did not), it would not be enough. *Id.* at 168.

The Complaint's conclusory allegation that the Bank Defendants "structured" agreements to conceal the scheme is also insufficient. Compl. ¶ 530. Failing to disclose others' alleged illegal acts, without any duty to disclose, does not support an inference that Bank Defendants knew "the essential nature and scope of the [RICO] enterprise." *See RSM Prod. Corp.*, 682 F.3d at 1050 (internal quotations omitted).

Finally, Plaintiffs' claim for aiding and abetting civil RICO violations pursuant to 18 U.S.C. § 2 (Count VI-F) fails because no such cause of action exists. *See* FinTech Defs. Mot. §.I.B.3. And even if it did, there would still be no underlying RICO violation that could have been aided or abetted. *See supra* Argument § II.A.

## III.    The Complaint Does Not Plausibly Allege any Antitrust Claim as to the Bank Defendants (Count XI)

The Complaint's antitrust claim fails because the Complaint does not plausibly allege (i) an agreement to restrain trade; (ii) a relevant product market; or (iii) an actionable antitrust injury.

### A.    *Plaintiffs Do Not Allege Any Agreement Between the Bank Defendants*

A Section 1 claim requires a "contract, combination, or conspiracy" in restraint of trade. *Twombly*, 550 U.S. at 553. Parallel conduct alone—that is, similar behavior among competitors that could equally reflect independent business decisions—does not state a Section 1 claim. *Id.* at 553-54. Plaintiffs must plead facts that "plausibl[y] suggest[]" an unlawful agreement, not conduct merely "consistent with" one. *Iqbal*, 556 U.S. at 680. The Complaint here does not include a single factual allegation of coordination—let alone communication—between the Bank Defendants or any other facts plausibly showing the existence of an agreement between them in restraint of trade.

Although Plaintiffs allege, for their RICO claims, that the Administrator Defendants "occupied the hub" of the purported conspiracy, Compl. ¶ 385(a), Plaintiffs reverse field for their antitrust conspiracy, alleging instead that "[e]ach Bank Defendant operated as a hub, and the Administrator Defendants took the kickbacks as spokes," *id.* ¶ 434. The reason for that change in theory is obvious: Plaintiffs cannot plead any agreement between the Bank Defendants, leaving only a rimless wheel that cannot give rise to an antitrust conspiracy based on a hub and spokes theory. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203–04 (4th Cir. 2002).

Specifically, the Complaint does not include any well-pled allegations that the Bank Defendants ever communicated with each other regarding the purported scheme (or otherwise). It identifies no meeting, phone call, email, or other communication between Huntington and Western Alliance, let alone one resulting in agreement. This pleading gap is dispositive. Courts have consistently held that even allegations of direct communications are insufficient, standing alone, to establish a conspiracy.[31] If such allegations are insufficient by themselves to establish antitrust conspiracy, the total *absence* of any such allegations must also be fatal.[32] *See Twombly*, 550 U.S. at 565 n.10 (conclusory allegations of agreement insufficient to allege conspiracy); *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 139–40 (2d Cir. 2013) (affirming dismissal where complaint failed to "provide any evidence of interfirm communications").

It is precisely to evade the rimless wheel defect, that Plaintiffs assert that the alleged conspiracies run separately and vertically—between each Bank Defendant and the Administrator Defendants—rather than horizontally between the two Bank Defendants themselves. *See* Compl. ¶ 434. But this theory simply posits a *different* rimless wheel, as it would require Plaintiffs to adequately plead the existence of anticompetitive agreements between the various *Administrator Defendants* making up the spokes emanating from each Bank Defendant, and no such allegations

---

[31] *City of Moundridge v. Exxon Mobil Corp.*, 2009 WL 5385975, at *9 (D.D.C. Sept. 30, 2009) ("Evidence that competitors had contact with each other or exchanged information does not establish a conspiracy."), *aff'd sub nom. City of Moundridge, KS v. Exxon Mobil Corp.*, 409 F. App'x 362 (D.C. Cir. 2011).

[32] The Complaint's conclusory assertion that the Bank Defendants "[p]articipat[ed] in meetings and conversations to discuss the payouts on class action settlements" and "[c]ommunicat[ed] orally and in writing to fix the payouts on class action settlements," Compl. ¶ 588(a)–(b), are insufficient. *See Twombly*, 550 U.S. at 565 n.10 (allegations of agreement were insufficient where the complaint fails to detail "which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place"). The Complaint does not specify when, where, or between whom any such communication occurred, let alone specify whether the referenced meetings and conversations were among the two Bank Defendants or between each Bank Defendant and the Administrator Defendants separately.

exist. *See* Admin. Defs. Mot. § II.C. At best, Plaintiffs have alleged conscious parallel behavior by the Administrator Defendants and a rimless hub-and-spoke conspiracy.

Simply put, because there are no plausible agreements alleged between either the Bank Defendants or the Administrator Defendants, Plaintiffs cannot state a Section 1 claim under either of their two theories.

### B.    The Alleged Parallel Conduct Is Equally Consistent with Lawful Competition

Absent direct evidence of an agreement, a plaintiff must allege parallel conduct and sufficient "plus factors." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 391 (2d Cir. 2024); *In re Musical Instruments*, 798 F.3d at 1194. These "plus factors" must "suggest[] an antecedent agreement, rather than 'parallel conduct that could just as well be independent action.'" *City of Pontiac Police & Fire Ret. Sys.*, 92 F.4th at 391 (quoting *Twombly*, 550 U.S. at 557). They "may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Mayor & City Council of Baltimore, Md.*, 709 F.3d at 136 (citation omitted); *see also In re Rail Freight Fuel Surcharge Antitrust Litig. (No. I)*, 2025 WL 1784519, at *17 (D.D.C. June 27, 2025). But "[i]f a benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor." *In re Rail Freight Fuel Surcharge Antitrust Litig. (No. I)*, 2025 WL 1784519, at *17 (quoting *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1310 (11th Cir. 2003)). None of the allegations against the Bank Defendants clear that bar. Instead, Plaintiffs' allegations of parallel conduct by the Bank Defendants are just as consistent with independent decision-making, requiring dismissal under *Twombly*. 550 U.S. at 553-54; *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).

The alleged parallel conduct by the Bank Defendants boils down to two assertions: that the Bank Defendants offered similar below-market interest rates over the course of many years, *see, e.g.*, Compl. ¶¶ 420, 429, and that "both Bank Defendants provided identical or near-identical bids of less than 0.5% interest," *id.* ¶ 438. But the Complaint does not allege any specific *facts* supporting those broad, conclusory allegations, let alone some systematic quantitative analysis demonstrating that the rates offered by Western Alliance and Huntington were below market and/or similar to one another—either market-wide *or* even across just the two dozen settlements referenced in the Complaint. And because Plaintiffs allege a "period of historically suppressed rates," *id*. ¶ 121, compressed and low interest rates would be expected.

Remarkably, Plaintiffs point to only one example of alleged parallel conduct that involves both Bank Defendants. In March 2025, Plaintiffs' *own counsel* supposedly requested bids from Huntington and Western Alliance for an unnamed settlement and were informed by each that the rate would be less than 0.5% per year. *Id*. ¶ 430. Plaintiffs do not allege that the two Bank Defendants offered the same rate (or that they maintained that bid in some auction process). But even assuming they did, this isolated anecdote says nothing without allegations about any of the other factors which might impact the interest rate being offered, including the size or complexity of the settlement, the risk involved, or the prevailing regulatory or rate environment. In other words, Plaintiffs allege no facts making collusion more likely than independent, profit-maximizing behavior in a competitive market. *See Brooke Grp.*, 509 U.S. at 227 (conscious parallelism not in itself unlawful).[33]

---

[33] *See also Twombly*, 550 U.S. at 556–57 ("[P]arallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"); *City of Moundridge, KS*, 409 F. App'x at 363; *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 37 (D.D.C. 2019), *aff'd*, 816 F. App'x 497 (D.C. Cir. 2020). Plaintiffs' allegations in Paragraphs 389 and 390 of the Complaint do not move the needle. Although

The same absence of facts or plus factors defeats the remaining allegations about the Bank Defendants. The Complaint offers no qualitative or quantitative analysis supporting the proposition that the interest rates offered by the Bank Defendants were the product of collusion or even below market, such as a regression analysis controlling for non-collusive factors. It also offers no reason to infer collusion from rates that allegedly ranged from below 0.5% to five times that amount, 2.5%. *Compare* Compl. ¶ 183 (alleging interest rate less than 0.5%), *with id.* ¶ 315 (alleging interest rate less than 2.5%). Such variation in pricing behavior is more consistent with independent decision-making, influenced by changing economic factors, than it is with the alleged collusion. This requires dismissal of the Section 1 claims against the Bank Defendants. *Twombly*, 550 U.S. at 554 (parallel business behavior is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market"); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (citing *Twombly*, 550 U.S. at 554), *aff'd*, 741 F.3d 1022 (9th Cir. 2014); *see also In re Baby Food Antitrust Litig.,* 166 F.3d 112, 131–32 (3d Cir.1999) (time lags of three to six months between pricing moves "refute rather than support" allegations of conspiracy).

### C.     The Complaint's "Plus Factors" Do Not Apply to the Bank Defendants

Tellingly, the Complaint does not assert any "plus factors" in support of any purported agreement between the Bank Defendants. The Complaint's alleged "plus factors" relate only to a

---

Plaintiffs allege that administrator clients were aware of each bank's purported "participation in the interest-sharing program," *see* Compl. ¶¶ 389–390, the Complaint nowhere alleges that any administrator conveyed that information to either Bank Defendant. Third-party knowledge of two competitors' independent business practices does not establish an agreement between those competitors. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330, 408 (S.D.N.Y. 2025), *appeal dismissed sub nom. In re Libor-Based Fin. Instruments Antitrust Litig. v. The Royal Bank of Scotland PLC*, 2025 WL 4092207 (2d Cir. Dec. 10, 2025) ("[C]ommunications with a third party 'tend to suggest the absence of [] [interfirm] communications.'" (quoting *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc*., 709 F.3d 129, 139 (2d Cir. 2013))).

purported agreement between the Administrator Defendants. *See* Compl. ¶ 397. Whether considered individually or collectively, those alleged plus factors do not support any conspiracy claim against the Bank Defendants. This is fatal. *See Twombly*, 550 U.S. at 556–57 ("Without more, parallel conduct does not suggest conspiracy."); *see also* Admin. Defs. Mot. § II.C (alleged plus factors do not support a conspiracy claim against the Administrator Defendants).

**D.     The Complaint's Own Allegations Undermine Its Market Definition**

A relevant antitrust market is another threshold requirement for Plaintiffs' Section 1 claim. *See Gross v. Wright*, 185 F. Supp. 3d 39, 49 (D.D.C. 2016). "[I]t is the plaintiff's burden to define the relevant market," *id.* at 50 (quoting *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir.1998)), and "[i]f the plaintiff fails to meet that burden, its complaint must be dismissed." *PhantomALERT v. Apple, Inc.*, 762 F. Supp. 3d 8, 17 (D.D.C. 2025). A "relevant product market is defined by the cross-elasticity of demand between the good at issue and substitutes for the good." *Id.* at 18. More simply, the product market "is defined by the good at issue and any other goods that a consumer would sub in if the good at issue were to get more expensive." *Id*. The Complaint fails to plausibly allege a product market, requiring dismissal. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, . . . the relevant market is legally insufficient and a motion to dismiss may be granted." (collecting cases)).

Plaintiffs purport to define a "Settlement Deposit Market" consisting of the specialized banking services required to hold and manage QSF deposits. Compl. ¶ 413. But this purported market is fatally undermined by other allegations. Specifically, the Complaint simultaneously contends that the Settlement Deposit Market is so specialized that "most banks do not have" the requisite "scale and expertise" to compete, *id.* ¶ 414, while also identifying "readily available

-38-

alternatives" to the products offered by the Bank Defendants, such as American Deposit Management and Esquire Bank that purportedly offer competitive QSF deposit solutions with "expanded multimillion-dollar FDIC insurance" and "a competitive rate of return," *id.* ¶ 442. A plaintiff cannot define a relevant market by excluding interchangeable products offered by competitors. *See Queen City Pizza, Inc.*, 124 F.3d at 437-38 (affirming dismissal where market excluded other items available on the market that were interchangeable); *Chapman v. N. Y. State Div. for Youth*, 546 F.3d 230, 238-39 (2d Cir. 2008) (affirming dismissal where complaint admitted plaintiffs competed for contracts for interchangeable product excluded from alleged market). But that is precisely what Plaintiffs have done here by excluding the products offered by Esquire Bank and American Deposit Management from the relevant market.

### E.    Plaintiffs Cannot Show Antitrust Injury

Finally, the Complaint fails to allege any plausible, non-speculative antitrust injury for which Plaintiffs can recover. Plaintiffs were not entitled to and could not have expected increased interest payments from the settlement funds, and any purported injury on that basis is thus wholly speculative. *See* Admin. Defs. Mot. § II.B. Moreover, Plaintiffs have not alleged, nor could they, that they were direct purchasers of any products or services from the Bank Defendants as the Bank Defendants entered into contracts with the Administrator Defendants, not the Plaintiffs. *Id.* § III.A.2. Under the *Illinois Brick* doctrine, indirect purchasers of products or services may not recover damages under the Sherman Act from the suppliers of those products or services. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730–31, 745–47 (1977); *see also MSP Recovery Claims, Series LLC v. Pfizer, Inc.*, 728 F.Supp.3d 89, 104 (D.D.C. 2024) (plaintiffs must be "immediate buyers").

## IV.    The RICO and Antitrust Claims Are Also Time-Barred

RICO and antitrust claims have four-year limitations periods. *See* 15 U.S.C. § 15b; *Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Indus. Materials Corp.*, 887 F.

Supp. 2d 9, 18–19 (D.D.C. 2012). The injury discovery rule or fraudulent concealment may extend that period only if a plaintiff plausibly pleads lack of knowledge and reasonable diligence to discover the alleged concealment. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194–96 (1997); *Molecular Diagnostics Lab'ys v. Hoffmann-La Roche Inc.*, 402 F. Supp. 2d 276, 283–86 (D.D.C. 2005).

Antitrust and RICO claims must be dismissed at the pleading stage where, as here, publicly available information would have alerted a reasonably diligent plaintiff to the alleged injury. In *Solano v. Delmed, Inc.*, for example, the court dismissed plaintiffs' RICO claims where publicly filed SEC documents put plaintiffs on inquiry notice, holding that "from the face of the complaint, there can be no doubt that plaintiffs had either actual or inquiry notice of defendants' alleged pattern of fraudulent activity," and that "[a]t the very least, the information plaintiffs received should have led them, through the exercise of due diligence, to make further inquiries." 759 F. Supp. 847, 853–54 (D.D.C. 1991); *see also Chalabi v. Hashemite Kingdom of Jordan*, 503 F. Supp. 2d 267, 274 (D.D.C. 2007) (claim was time barred where plaintiff was aware of "some evidence of wrongdoing" fifteen years before filing his complaint (citation omitted)), *aff'd*, 543 F.3d 725 (D.C. Cir. 2008).

Here, Plaintiffs fail to allege lack of knowledge or reasonable diligence. To the contrary, any purportedly below-market QSF interest rates, Compl. ¶¶ 420, 428–429, were or should have been known to Plaintiffs or their counsel because the information was readily available.

Specifically, the Complaint acknowledges that QSF interest rates were available to Plaintiffs' counsel. Plaintiffs allege that when "Plaintiffs' counsel was requesting bids from the Bank Defendants in March of 2025, both Bank Defendants reported their bid to be less than 0.5% per year." Compl. ¶ 430. The Complaint also alleges that the Bank Defendants "regularly

-40-

report[ed] to the settlement administrators and Courts" and "pa[id] out interests and other returns on the deposits." *Id.* ¶ 415. And Plaintiffs acknowledge that Huntington instructs counsel to review bank fees "to allow selection of a bank with a competitive pricing schedule to maximize the economic benefit for the class." *Id.* ¶ 116. Any diligent counsel would thus have known the interest rates their clients were receiving—or, at a *minimum*, could have asked the administrator or depository bank about those rates. Yet Plaintiffs allege no such inquiry.

Alleged market rates were also publicly available. Reasonable diligence thus required comparing such rates to those offered by the Bank Defendants. The Complaint relies on publicly available data from the Federal Reserve Bank FRED Database to establish market rates, *see* Compl. ¶ 230 & n.138, and published rate sheets from banks such as SoFi, *see id.* & n.139. If Plaintiffs could use that information in their Complaint, they—or class counsel acting on their behalf—could just as readily have accessed it earlier to investigate the Bank Defendants' rates.

Critically, information available to class counsel in the underlying settlements can be imputed to Plaintiffs here. "Clients generally are presumed to be accountable for and bound by their attorneys' conduct." *Robinson-Smith v. Gov't Emps. Ins. Co.*, 424 F. Supp. 2d 117, 120 (D.D.C. 2006) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962)). This presumption "holds true even in Rule 23 class actions." *Id*. (citation omitted). Here, class counsel in the underlying settlements owed fiduciary duties to the class, including the duty to monitor the administration of the settlement fund. *See Med. & Chiropractic Clinic, Inc. v. Oppenheim*, 981 F.3d 983, 990 (11th Cir. 2020) (putative class counsel owes fiduciary duties to the class as a whole); *Eubank v. Pella Corp.*, 753 F.3d 718, 723–24 (7th Cir. 2014) (same); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe

the entire class a fiduciary duty once the class complaint is filed."). Class counsel's access to information regarding QSF interest rates and publicly available rate data is therefore imputed to the Plaintiffs for purposes of the limitations analysis. *See Robinson-Smith,* 424 F. Supp. 2d at 120–23 (imputing class counsel's filing error to plaintiffs).

In addition, Plaintiffs have not plausibly alleged fraudulent concealment by the Bank Defendants. At best, Plaintiffs allege that the Bank Defendants "structured their deposit arrangements to appear facially consistent with ordinary banking relationships." Compl. ¶ 476. But structuring transactions in the ordinary course of business is a far cry from a fraudulent scheme to conceal the rates—especially since Plaintiffs allege that the rates were provided to class counsel in connection with the bidding process for at least some settlements, *see, e.g.*, *id.* ¶ 430. Although Plaintiffs allege that they did not know of the purported "*kickback*" *arrangements*, the core factual predicate of their antitrust and RICO claims against the Bank Defendants—that QSF interest rates were below market—was right out in the open for anyone who cared to look.

Plaintiffs assert that the conspiracy in question commenced over a decade ago. But the statute of limitations precludes them from seeking any recovery for their antitrust and RICO claims for any alleged injuries occurring before May 18, 2022, four years before the filing of the Complaint.

## V.    Plaintiffs Lack Article III Standing

Finally, this Complaint should also be dismissed pursuant to Rule 12(b)(1) because Plaintiffs lack Article III standing. *See* Admin. Defs. Mot. § IV.

<strong>CONCLUSION</strong>

For the foregoing reasons, the Court should dismiss all claims in the Consolidated Class Action Complaint against the Bank Defendants with prejudice.

Dated: July 17, 2026

Respectfully submitted,

/s/ *Brendan P. Cullen*
Brendan P. Cullen
(cullenb@sullcrom.com)
Kyle W. Mach
(machk@sullcrom.com)
Paul H. Lazarow
(lazarowp@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Telephone: (650) 461-5600
Facsimile: (650) 461-5700

*Counsel for Defendant Western Alliance Bank*

/s/ *Jeffrey L. Kessler*
Jeffrey L. Kessler
George E. Mastoris
Tyler M. Dato
WINSTON TAYLOR LLP
200 Park Avenue
New York, NY 10166
Phone: (212) 294-6700
Fax: (212) 294-4700
Jeffrey.Kessler@winstontaylor.com
George.Mastoris@winstontaylor.com
Tyler.Dato@winstontaylor.com

Amanda L. Groves
WINSTON TAYLOR LLP
333 S. Grand Avenue
Los Angeles, CA 90071
Phone: (213) 615-1700
Fax: (213) 615-1750
Amanda.Groves@winstontaylor.com

Lauren E. Duxstad
WINSTON TAYLOR LLP
200 S. Biscayne Boulevard, Suite 1700
Miami, FL 33131
Phone: (305) 910-0500
Fax: (305) 910-0505
Lauren.Duxstad@winstontaylor.com

-43-

-44-

*Counsel for Defendant The Huntington National Bank*