# Exhibit 3

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

**Date of report (Date of earliest event reported): March 11, 2026**

# Esquire Financial Holdings, Inc.

**(Exact name of the registrant as specified in its charter)**

| Maryland | 001-38131 | 27-5107901 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**100 Jericho Quadrangle, Suite 100**
**Jericho, New York**
**(Address of principal executive offices)**

**11753**
**(Zip Code)**

**(516) 535-2002**
**(Registrant's telephone number)**

**N/A**
**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (See General Instruction A.2. below):

☒  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4c)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.01 par value | ESQ | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01**          **Entry into a Material Definitive Agreement.**

On March 11, 2026, Esquire Financial Holdings, Inc., a Maryland corporation ("Esquire"), Esquire Merger Sub, Inc., a Maryland corporation and a direct, wholly owned subsidiary of Esquire ("Merger Sub"), and Signature Bancorporation, Inc., an Illinois corporation ("Signature"), entered into an Agreement and Plan of Merger (the "Merger Agreement"). The Merger Agreement provides that, upon the terms and subject to the conditions set forth therein, Merger Sub will merge with and into Signature, with Signature as the surviving entity (the "Merger"), and immediately following the Merger, Signature will merge with and into Esquire, with Esquire as the surviving entity (the "Second Step Merger"). The Merger Agreement further provides that immediately following the Second Step Merger, Signature Bank, an Illinois-chartered non-member bank and a wholly owned direct subsidiary of Signature, will merge with and into Esquire Bank, a national banking association and a wholly owned subsidiary of Esquire, with Esquire Bank as the surviving bank (the "Bank Merger" and, together with the Merger and the Second Step Merger, the "Transaction"). The Merger Agreement was unanimously approved by the board of directors of each of Esquire and Signature.

*Merger Consideration*

Upon the terms and subject to the conditions of the Merger Agreement, at the effective time of the Merger (the "Effective Time"), each share of common stock, par value $1.00 per share, of Signature ("Signature Common Stock") outstanding immediately prior to the Effective Time, other than certain shares held by Signature or Esquire, will be converted into the right to receive 2.630 shares (the "Exchange Ratio") of common stock, par value $0.01 per share, of Esquire ("Esquire Common Stock"). The exchange ratio is subject to adjustment based on the disposition of certain loans held by Signature Bank prior to closing based on the proceeds from the sale of such loans, with a maximum possible exchange ratio of 2.80 and a minimum possible exchange ratio of 2.50, as set forth in the Merger Agreement.

Holders of Signature Common Stock will receive cash in lieu of fractional shares.

*Treatment of Signature's Equity Awards*

Upon the terms and subject to the conditions of the Merger Agreement, at the Effective Time, each stock option in respect of shares of Signature Common Stock (each such stock option, a "Signature Option") granted under the Signature Stock Incentive Plan that is outstanding immediately prior to the Effective Time, shall vest and be assumed by Esquire (such, Signature Option, an "Assumed Option") and converted into a stock option that is exercisable for a number of shares of Esquire Common Stock equal to the number of shares of Signature Common Stock underlying the Signature Option immediately prior to the Effective Time multiplied by the Exchange Ratio, rounded down to the nearest whole share, with an exercise price per share of Esquire Common Stock equal to the exercise price applicable to the underlying Signature Option immediately prior to the Effective Time divided by the Exchange Ratio, rounded up to the nearest cent. Each Assumed Option shall continue to have, and shall be subject to, the same terms and conditions as applied to the corresponding Signature Option immediately prior to the Effective Time.

*Certain Governance Matters*

The Merger Agreement provides that, prior to the effective time of the Second Step Merger (the "Second Step Effective Time"), each of Esquire and Esquire Bank will take certain actions regarding governance matters to take effect as of the Second Step Effective Time related to Esquire as the surviving corporation and Esquire Bank as the continuing bank.

Esquire will take all actions necessary to cause the number of directors that will comprise the full board of directors of the surviving corporation at the Second Step Effective Time to be increased by two members and shall appoint to the board of directors of the surviving corporation Michael O'Rourke and Leonard Caronia (such directors the "New Board Members"). At the next annual meeting of stockholders of Esquire, and subject to its applicable fiduciary duties, the Esquire Board of Directors will use reasonable best efforts to nominate (and recommend to Esquire's stockholders) the New Board Members to serve a three year term; provided that if it is not reasonably practicable to nominate one or both of the New Board Members to a three year term as a result of Esquire reasonably seeking to have the number of directors in each class be as equal in number as is reasonably possible, then Esquire will nominate such New Board Member(s) to a two year or one year term, provided that, subject to its applicable fiduciary duties, at subsequent annual meetings of stockholders of Esquire, the Esquire Board of Directors will nominate and recommend to Esquire's stockholders the re-election of such New Board Member(s) as necessary so that each New Board Member serves no less than three years on the Esquire Board of Directors (subject to election by the Esquire stockholders) following such New Board Member's initial appointment to the Esquire Board of Directors.

Esquire Bank will take all actions necessary to cause the number of directors that will comprise the full board of directors of the surviving bank at the effective time of the Bank Merger (the "Bank Merger Effective Time") to be increased by two members and will appoint to the board of directors of the surviving bank the New Board Members. The Esquire Bank Board of Directors will appoint each of the New Board Member for a term to expire at the next annual meeting of the shareholders of Esquire Bank and, subject to its fiduciary duties, at subsequent annual shareholder meetings the Esquire Bank Board of Directors will nominate and recommend to Esquire Bank's sole shareholder, Esquire, and Esquire will vote to approve, each of the New Board Members for election to the Esquire Bank Board of Director, such that each New Board Member will serve no less than three years on the Board of Directors of Esquire Bank following such New Board Member's initial appointment to the Esquire Bank Board of Directors.

The officers of Esquire as of immediately prior to the Second Step Effective Time will be the officers of the surviving corporation. At Esquire Bank, as the continuing bank, the officers will be the officers of Esquire Bank as of immediately prior to the Bank Merger Effective Time. Additionally, in connection with the Transaction, Michael O'Rourke, President and Chief Executive Officer of Signature, will join Esquire Bank as President of Signature, a division of Esquire Bank, Kevin Bastuga, Co-Founder and Executive Vice President of Signature, will join Esquire Bank as Executive Vice President of Signature, a division of Esquire Bank, and Bryan Duncan, Co-Founder and Executive Vice President of Signature, will join Esquire Bank as Executive Vice President of Signature, a division of Esquire Bank. In connection with these roles, Esquire Bank has entered into an employment agreement with each of Messrs. O'Rourke, Bastuga and Duncan, each of which agreement will become effective upon the completion of the Transaction.

***Certain Other Terms and Conditions of the Merger Agreement***

The Merger Agreement contains customary representations and warranties from both Esquire and Signature, and each party has agreed to customary covenants, including, among others, covenants relating to (i) the conduct of its business during the interim period between the execution of the Merger Agreement and the Effective Time, (ii) in the case of Esquire, its obligation to call a meeting of its stockholders to approve the issuance of shares of Esquire Common Stock pursuant to the Merger Agreement (the "Esquire share issuance") and, subject to its fiduciary duties, the obligation of its board of directors to recommend that its stockholders approve the Esquire share issuance, (iii) in the case of Signature, its obligation to call a meeting of its shareholders to approve the Merger Agreement, and, subject to certain exceptions, the obligation of its board of directors to recommend that its shareholders approve the Merger Agreement, and (iv) Signature's non-solicitation obligations related to alternative acquisition proposals. Esquire and Signature have also agreed to use their reasonable best efforts to prepare and file all applications, notices and other documents to obtain all necessary consents and approvals for consummation of the transactions contemplated by the Merger Agreement.

The completion of the Merger is subject to customary conditions, including (i) approval of the Merger Agreement by the requisite vote of the Signature shareholders, (ii) approval of the Esquire share issuance by the requisite vote of the Esquire stockholders, (iii) authorization for listing on Nasdaq of the shares of Esquire Common Stock to be issued in the Merger, (iv) receipt of required regulatory approvals, including the approval of the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency and the Illinois Department of Financial and Professional Regulation, without the imposition of any condition or restriction that would be reasonably expected to have a material and adverse effect on the business, properties, assets, liabilities, results of operations or financial condition of the surviving corporation of the Second Step Merger and its subsidiaries, taken as a whole, after giving effect to the Merger, the Second Step Merger and the Bank Merger, (v) effectiveness of the registration statement on Form S-4 for the Esquire Common Stock to be issued in the Merger and (vi) the absence of any order, injunction, decree or other legal restraint preventing the completion of the Merger, the Second Step Merger, the Bank Merger or any of the other transactions contemplated by the Merger Agreement or making the completion of the Merger, the Second Step Merger, the Bank Merger or any of the other transactions contemplated by the Merger Agreement illegal. Each party's obligation to complete the Merger is also subject to certain additional customary conditions, including (a) subject to certain exceptions, the accuracy of the representations and warranties of the other party, (b) performance in all material respects by the other party of its obligations under the Merger Agreement, and (c) receipt by such party of an opinion from its counsel to the effect that the Merger and the Second Step Merger, taken together, will qualify as a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended.

The Merger Agreement provides certain termination rights for both Esquire and Signature and further provides that a termination fee of $15.0 million will be payable by Signature upon termination of the Merger Agreement under certain circumstances.

The representations, warranties and covenants of each party set forth in the Merger Agreement have been made only for purposes of, and were and are solely for the benefit of the parties to, the Merger Agreement; may be subject to limitations agreed upon by the contracting parties, including being qualified by confidential disclosures made for the purposes of allocating contractual risk between the parties to the Merger Agreement instead of establishing these matters as facts; and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. Accordingly, the representations and warranties may not describe the actual state of affairs at the date they were made or at any other time, and investors should not rely on them as statements of fact. In addition, such representations and warranties (i) will not survive consummation of the Merger and (ii) were made only as of the date of the Merger Agreement or such other date as is specified in the Merger Agreement. Moreover, information concerning the subject matter of the representations and warranties may change after the date of the Merger Agreement, which subsequent information may or may not be fully reflected in the parties' public disclosures. Accordingly, the Merger Agreement is included with this filing only to provide investors with information regarding the terms of the Merger Agreement, and not to provide investors with any other factual information regarding Esquire or Signature, their respective affiliates or their respective businesses. The Merger Agreement should not be read alone, but should instead be read in conjunction with the other information regarding Esquire, Signature, their respective affiliates or their respective businesses, the Merger Agreement, the Merger, the Second Step Merger and the Bank Merger that will be contained in, or incorporated by reference into, the Registration Statement on Form S-4 that will include a joint proxy statement of Esquire and Signature and a prospectus of Esquire, as well as in the Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and other filings that Esquire makes with the Securities and Exchange Commission ("SEC").

The foregoing description of the Merger Agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the Merger Agreement, which is attached hereto as Exhibit 2.1 and incorporated herein by reference.

*Voting Agreements*

Simultaneously with the execution of the Merger Agreement, Esquire entered into a voting agreement (a "Signature Voting Agreement") with each of the directors and executive officers of Signature. Each Signature director and executive officer, as a shareholder party to a Signature Voting Agreement, has agreed, among other things, to vote shares of Signature Common Stock owned by such shareholder, and over which such shareholder has the right to dispose of and has voting power, in favor of the Merger Agreement and the other transactions contemplated by the Merger Agreement, and against any competing acquisition proposal, any action, agreement transaction or proposal which could reasonably be expected to result in a breach of any representation, warranty, covenant, agreement or other obligation of Signature in the Merger Agreement in any material respect, or other action that is intended or would reasonably be expected to prevent, impede, interfere with, delay, postpone or discourage any of the transactions contemplated by the Merger Agreement. The Signature Voting Agreements will terminate in certain circumstances, including upon consummation of the Merger or the termination of the Merger Agreement in accordance with its terms.

The foregoing description of the Signature Voting Agreements does not purport to be complete and is qualified in its entirety by reference to the full text of the Signature Voting Agreements, the form of which is attached as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated by reference herein.

*Lock Up Agreements*

Simultaneously with the execution of the Merger Agreement, Esquire entered into a lock-up agreement (a "Lock-Up Agreement") with each of the executive officers of Signature (the "Executives"). Pursuant to the Lock-Up Agreement, each Executive has agreed, among other things, to (i) other than 5% of the Esquire Common Stock received by or to be received by the Executive pursuant to the Merger Agreement, not sell or dispose of any shares of the Esquire Common Stock received by or to be received by the Executive pursuant to the Merger Agreement for 365 days following the Effective Time; (ii) not sell or dispose of more than 33% of the Esquire Common Stock received by or to be received by the Executive pursuant to the Merger Agreement between 366 days and 730 days following the Effective Time; and (iii) not sell or dispose of more than 66% of the Esquire Common Stock received by or to be received by the Executive pursuant to the Merger Agreement between 731 days and 1,095 days following the Effective Time.