# Exhibit 1

# Banking Handbook
# for Settlement Funds

**A resource guide for lawyers, claims administrators, regulators, and special masters.**





# Table of contents

**Introduction**                                           3

**Best Practices**                                         4

**Avoiding Pitfalls**                                      5

**Custody/Escrow Accounts**                                6

   Sample Custodian/Escrow Agreement          7

   Investment Criteria                        12

**Distribution Accounts**                                 17

   Automated Fund Investment                  18

   Controlled Disbursement                    19

   Fraud Mitigation                           20

   Checks                                     22

   Electronic Payments                        24

   Foreign Payments                           25

   Holdbacks                                  26

   Cy Pres                                    27

**Selecting a Bank**                                      28

   Banker's Blanket Bond                      29

   Errors & Omissions Insurance               30

**How to Apply for an EIN**                               31

**Tax Payments**                                          32

**Financial Dictionary**                                  33

# Introduction

### BACKGROUND

While working on thousands of settlement funds, our National Settlement Team received many questions about escrows and disbursements to claimants. We developed this handbook to be a resource guide for lawyers, claims administrators, regulators, and special masters.

The handbook is designed to help responsible parties make more informed decisions about banking matters for settlements.

The information contained in this handbook is  designed for informational purposes only, and is based on generally accepted banking principles. Each specific situation may vary, so a banker or tax advisor should be engaged directly for more information. Neither Huntington, its agents, employees, nor affiliates is intending to provide legal advice through this handbook. Nothing in this handbook should be considered a substitute for legal advice from an attorney.

The National Settlement Team welcomes your comments and suggestions to make the handbook more valuable. Please send questions and recommendations to nst@huntington.com.

### ABOUT THE NATIONAL SETTLEMENT TEAM

Huntington's National Settlement Team provides one of the leading settlement account programs in the country. Our National Settlement Team has handled more than 2,800 settlements for law firms, claims administrators and regulatory agencies. These cases represent over $60 Billion with more than 50 million checks distributed to class members. The Huntington National Bank is a wholly owned subsidiary of Huntington Bancshares Incorporated, a regional bank holding company headquartered in Columbus, Ohio, with over $100 billion in assets.





# Best Practices

While law firms, claims administrators and regulators sometimes operate differently, there are best practices universally accepted in the settlement industry. Here are some helpful guidelines to consider:

| BEST PRACTICE | WHY | REFERENCE |
|---|---|---|
| Appoint a bank to serve as Custodian/Escrow Agent | A bank provides greater oversight of the Settlement Fund | 6 |
| Select a bank with experience servicing Qualified Settlement Funds | Selecting a bank ensures proper execution and simplifies the fiduciary party's role | 6, 36 |
| Identify an appropriate investment structure in the Settlement Agreement | Choose investment options that allow for flexibility and appropriate liquidity, while ensuring safety of funds | 12-19 |
| Invest settlement funds exclusively in accounts backed by the full faith and credit of the U.S. Government | These investments will ensure the safety and soundness of the settlement fund | 12-19 |
| Prepare for distribution by transferring the settlement funds to the disbursement account before checks are mailed or use an automated funding (sweep) service | Ensure a smooth check clearing process for claimants | 17-18 |
| Use Fraud Mitigation Services | Reduce the risk of payments fraud and help protect the integrity of the settlement fund | 20-21 |
| For distributions over $100 million, holdback 10% — 20% of the fund for a second distribution later. | Effective way to redistribute unclaimed funds. Also acts as a self-insurance policy for late claims and unexpected issues. | 26 |



# Avoiding Pitfalls

Over the years, class action settlements have become larger and financial challenges more complex. Here are some issues to avoid and ways to reduce risks:

| RISK | MITIGANT | REFERENCE |
|---|---|---|
| Fiduciary: Your firm experiences a loss due to embezzlement or forgery | Appoint the bank as custodian/escrow agent | 6 |
| Market: The custody/escrow fund loses investment value | Invest in vehicles backed by the full faith and credit of the U.S. Government | 12-19 |
| Transactional: A settlement check bounces during distribution | Ensure that your bank closely monitors the settlement accounts and that they understand the importance of settlement funds | 17, 36 |
| Fraud: Payment fraud occurs during distribution phase | Use Fraud Mitigation Services | 20-21 |
| Fraud: A phisher or other scammer attempts to access funds/information | Build protocols to help identify malicious inquiries | 20-21 |
| Fiduciary: The financial institution fails | Select a stable bank with adequate capital ratios | 28 |
| Fiduciary: The bank loses funds as a result of embezzlement, forgery, robbery, wire transfer fraud, cyber-theft or human error | Select a bank with an adequate Banker's Blanket Bond and Errors and Omissions Insurance | 29-30 |

# Custody/Escrow Accounts

"Custody" and "Escrow" are terms frequently misunderstood in banking because it is applied differently in various situations. In its simplest form, a custody or escrow account refers to funds being held for another party. The "custody/escrow agent" is the person or entity that holds funds on behalf of the third party.

For a settlement account, typically three different entities may serve as a custodian/escrow agent:

> *Law firm*

> *Bank*

> *Claims Administrator*

Sometimes the law firm will serve as the custodian/escrow agent for their clients. Other times, particularly when multiple law firms are involved, a bank is appointed as an independent custodian/escrow agent. In other situations, a claims administrator may hold the funds as custodian/escrow agent prior to distributing the funds.

There are various reasons to consider a bank as custodian/escrow agent:

> *Multiple Parties Involved:* Defense counsel and Plaintiffs' counsel, or simply Co-Plaintiffs' counsel, may want a bank to serve as independent custodian/escrow agent.

> *Account Monitoring:* The bank can monitor the disbursement of funds based on authorized signer(s), even for custodian/escrow accounts with a single law firm or lawyer.

> *Banker's Blanket Bond Insurance:* The bank maintains insurance to protect against a variety of criminal acts including employee fraud, embezzlement, robbery, forgery, wire transfer fraud, and cyber-theft.

> *Investment Criteria:* The bank may serve as custodian/escrow agent to ensure compliance with investment guidelines.

When selecting a bank as custodian/escrow agent, it is important to inquire about fees. Some banks charge a variety of fees including an issuance fee, acceptance fee, annual administrative fee, disbursement fee, reporting fee and legal fee. Often banks may charge as little as $3,000–$5,000 to as much as $25,000–$35,000 before investment management expenses.

For Settlement Funds, two of the most important sections are: 1.) The Indemnification Language and 2.) The Investment Criteria.

1. The Indemnification Language

   The Indemnification Language determines the custody/escrow agent's standard of liability. There are two levels of care: Negligence and Gross Negligence

   According to Black's Law Dictionary, "negligence" is the failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation.[1]

   In contrast, "gross negligence" is a lower standard of care.

   > *Negligence:* Lower standard of immunity, which can be more advantageous for the beneficiaries, but less desirable for the escrow agent, e.g. "Escrow Agent shall be liable for its negligence or misconduct."

   > *Gross Negligence:* Higher standard of immunity, which is preferable for the escrow agent, but provides less recourse for the beneficiaries, e.g. "The Escrow Agent shall be liable for its gross negligence or *willful* misconduct.

2. The Investment Criteria

   The Investment Criteria determines which investment vehicles are appropriate placements for the Settlement Fund. We will address the investment criteria in further detail on page 12.

[1] Black's Law Dictionary 1056 (7th ed. 1999)

This is a custodian/escrow agreement template that may be helpful for settlements. It is available as a Microsoft Word document upon request to melissa.villain@huntington.com. **PLEASE NOTE:** This agreement template is a starting point. The agreement should be reviewed by qualified legal counsel and customized to fit the circumstances surrounding the relevant settlement.

# CUSTODIAN/ESCROW AGREEMENT

This Custodian/Escrow Agreement dated _____ is made among _____ ("Class Counsel"), _____ ("Defense Counsel"), and **THE HUNTINGTON NATIONAL BANK**, as Custodian/Escrow agent ("Custodian/Escrow Agent").

**Recitals**

A. This Custodian/Escrow Agreement governs the deposit, investment and disbursement of the settlement funds that, pursuant to the Stipulation of Settlement (the "Settlement Agreement") dated _____ attached hereto as Exhibit A, entered into by, among others, Class Counsel on behalf of the Lead Plaintiffs and Defense Counsel on behalf of the Defendant, will be paid to settle the class action captioned _____ _____, pending in _____ (the "Court").

B. Pursuant to the terms of the Settlement Agreement, the Defendant has agreed to pay or cause to be paid the total amount of _____ in cash (the "Settlement Amount") in settlement of the claims brought against the Defendant in the Class Action.

C. The Settlement Amount, together with any interest accrued thereon, is to be deposited into Custodian/Escrow and used to satisfy payments to Authorized Claimants, payments for attorneys' fees and expenses, payments for tax liabilities, and other costs pursuant to the terms of the Settlement Agreement.

D. Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Settlement Agreement.

**Agreement**

1. Appointment of Custodian/Escrow Agent. The Custodian/Escrow Agent is hereby appointed to receive, deposit and disburse the Settlement Amount upon the terms and conditions provided in this Custodian/Escrow Agreement, the Settlement Agreement and any other exhibits or schedules later annexed hereto and made a part hereof.

2. The Custodian/Escrow Account. The Custodian/Escrow Agent shall establish and maintain an Custodian/Escrow account titled as _____ (the "Custodian/Escrow Account"). Pursuant to the Settlement Agreement, the Defendant shall cause the Settlement Amount to be deposited into the Custodian/Escrow Account within _____ days following entry of the Court's order preliminarily approving the settlement. Custodian/Escrow Agent shall receive the Settlement amount into the Custodian/Escrow Account; the Settlement Amount and all interest accrued thereon shall be referred to herein as the "Settlement Fund." The Settlement Fund shall be held and invested on the terms and subject to the limitations set forth herein, and shall be released by Custodian/Escrow Agent in accordance with the terms and conditions hereinafter set forth and set forth in the Settlement Agreement and in orders of the Court approving the disbursement of the Settlement Fund.

3. Investment of Settlement Fund. At the written direction of Class Counsel, Custodian/Escrow Agent shall invest the Settlement Fund exclusively in instruments or accounts backed by the full faith and credit of the United States Government or fully insured by the United States Government or an agency thereof, including a U.S. Treasury Fund or a bank account that is either (a) fully insured by the Federal Deposit Insurance Corporation ("FDIC") or (b) secured by instruments backed by the full faith and credit of the United States Government. Defendants shall not bear any responsibility for or liability related to the investment of the Settlement Fund by the Custodian/Escrow Agent.

4. Custodian/Escrow Funds Subject to Jurisdiction of the Court. The Settlement Fund shall remain subject to the jurisdiction of the Court until such time as the Fund shall be distributed, pursuant to the Settlement Agreement and on further order(s) of the Court.

5. Tax Treatment & Report. The Settlement Fund shall always be treated as a "Qualified Settlement Fund" within the meaning of Treasury Regulation §1.468B-1. Class Counsel and, as required by law, the Defendant, shall jointly and timely make such elections as necessary or advisable to fulfill the requirements of such Treasury Regulation, including the "relation-back election" under Treas. Reg. § 1.468B-1(j)(2) if necessary to the earliest permitted date. For purposes of §468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" of the Settlement Fund shall be Class Counsel. Class Counsel shall timely and properly prepare, deliver to all necessary parties for signature, and file all necessary documentation for any elections required under Treas. Reg. §1.468B-1. Class Counsel shall timely and properly prepare and file any informational and other tax returns necessary or advisable with respect to the Settlement Funds and the distributions and payments therefrom including without limitation the returns described in Treas. Reg. §1.468B-2(k), and to the extent applicable Treas. Reg. §1.468B-2(1).

6. Tax Payments of Settlement Fund. All Taxes with respect to the Settlement Fund, as more fully described in the Settlement Agreement, shall be treated as and considered to be a cost of administration of the Settlement Fund and the Custodian/Escrow Agent shall timely pay such Taxes out of the Settlement Fund without prior order of the Court, as directed by Class Counsel. Class Counsel shall be responsible for the timely and proper preparation and delivery of any necessary documentation for signature by all necessary parties, and the timely filing of all tax returns and other tax reports required by law. The Class Counsel may engage an accounting firm or tax preparer to assist in the preparation of any tax reports or the calculation of any tax payments due as set forth in Sections 5 and 6, and the expense of such assistance shall be paid from the Settlement Fund by the Custodian/Escrow Agent at Class Counsel's direction. The Settlement Fund shall indemnify and hold the Defendant harmless for any taxes that may be deemed to be payable by the Defendant by reason of the income earned on the Settlement Fund, and Custodian/Escrow Agent, as directed by Class Counsel, shall establish such reserves as are necessary to cover the tax liabilities of the Settlement Fund and the indemnification obligations imposed by this paragraph. If the Settlement Fund is returned to the Defendant pursuant to the terms of the Settlement Agreement, the Defendant shall provide Custodian/Escrow Agent with a properly completed Form W-9.

7. Disbursement Instructions

   (a) Class Counsel may, without further order of the Court or authorization by the Defendant's Counsel, instruct Custodian/Escrow Agent to disburse the funds necessary to pay Notice and Administration Expenses.

   (b) Disbursements other than those described in paragraph 7(a), including disbursements for distribution of Class Settlement Funds, must be authorized by either (i) an order of the Court, or (ii) the written direction of _____ of Class Counsel and _____ of Defense Counsel.

   (c) In the event funds transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by facsimile, e-mail, telecopier or otherwise, Custodian/Escrow Agent will seek confirmation of such instructions by telephone call back when new wire instructions are established to the person or persons designated in subparagraphs (a) and (b) above only if it is reasonably necessary, and Custodian/Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. It will not be reasonably necessary to seek confirmation if Custodian/Escrow Agent receives written letters authorizing a disbursement from each of the law firms required in subparagraphs (a) and (b), as applicable, on their letterhead and signed by one of the persons designated in subparagraphs (a) and (b). To assure accuracy of the instructions it receives, Custodian/Escrow Agent may record such call backs. If Custodian/Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it shall not execute the instruction until all issues have been resolved. The persons and telephone numbers for call backs may be validly changed only in a writing that (i) is signed by the party changing its notice designations, and (ii) is received and acknowledged by Custodian/Escrow Agent. Class Counsel and Defense Counsel agree to notify Custodian/Escrow Agent of any errors, delays or other problems within 30 days after receiving notification that a transaction has been executed. If it is determined that the transaction was delayed or erroneously executed as a result of Custodian/Escrow Agent's error, Custodian/Escrow Agent's sole obligation is to pay or refund the amount of such error and any amounts as may be required by applicable law. Any claim for interest payable will be at the then-published rate for United States Treasury Bills having a maturity of 91 days.

(d) The Custodian/Escrow Agent shall not be liable for any losses, costs or expenses arising directly or indirectly from the Custodian/Escrow Agent's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction. The party providing electronic instructions agrees; (i) to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Custodian/Escrow Agent, including, without limitation, the risk of the Custodian/Escrow Agent acting on unauthorized instructions, and the risk or interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Custodian/Escrow Agent and that there may be more secure methods of transmitting instructions than the method(s) selected by the Custodian/Escrow Agent; and (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances.

8. Termination of Settlement. If the Settlement Agreement terminates in accordance with its terms, Class Counsel and the Defendant shall jointly notify Custodian/Escrow Agent of the termination of the Settlement Agreement. Upon such notification, the balance of the Settlement Fund, together with any interest earned thereon, less any Notice and Administration Expenses paid and actually incurred in accordance with the terms of the Settlement Agreement but not yet paid, and any unpaid Taxes due, as determined by Class Counsel and the Defendant, shall be returned to the Defendant in accordance with instruction from the Defendant's Counsel.

9. Fees. The Custodian/Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached as Exhibit B. All fees and expenses of Custodian/Escrow Agent shall be paid solely from the Settlement Fund. The Custodian/Escrow Agent may pay itself such fees from the Settlement Fund only after such fees have been approved for payment by Class Counsel. If Custodian/Escrow Agent is asked to provide additional services, such as the preparation and administration of payments to Authorized Claimants, a separate agreement and fee schedule will be entered into.

10. Duties, Liabilities and Rights of Custodian/Escrow Agent. This Custodian/Escrow Agreement sets forth all of the obligations of Custodian/Escrow Agent, and no additional obligations shall be implied from the terms of this Custodian/Escrow Agreement or any other agreement, instrument or document.

(a) Custodian/Escrow Agent may act in reliance upon any instructions, notice, certification, demand, consent, authorization, receipt, power of attorney or other writing delivered to it by Class Counsel or Counsel for the Defendant, as provided herein, without being required to determine the authenticity or validity thereof or the correctness of any fact stated therein, the propriety or validity of the service thereof, or the jurisdiction of the court issuing any judgment or order. Custodian/Escrow Agent may act in reliance upon any signature which is reasonably believed by it to be genuine and may assume that such person has been properly authorized to do so.

(b) Custodian/Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder, and it shall incur no liability and shall be fully protected to the extent Custodian/Escrow Agent acts in accordance with the reasonable opinion and instructions of counsel. Custodian/Escrow Agent shall have the right to reimburse itself for reasonable legal fees and reasonable and necessary disbursements and expenses actually incurred from the Custodian/Escrow Account only (i) upon approval by Class Counsel and the Defendant or (ii) pursuant to an order of the Court.

(c) The Custodian/Escrow Agent, or any of its affiliates, is authorized to manage, advise, or service any money market mutual funds in which any portion of the Settlement Fund may be invested.

(d) Custodian/Escrow Agent is authorized to hold any treasuries held hereunder in its federal reserve account.

(e) Custodian/Escrow Agent shall not bear any risks related to the investment of the Settlement Fund in accordance with the provisions of paragraph 3 of this Custodian/Escrow Agreement. The Custodian/Escrow Agent will be indemnified by the Settlement Fund, and held harmless against, any and all claims, suits, actions, proceedings, investigations, judgments, deficiencies, damages, settlements, liabilities and expenses (including reasonable legal fees and expenses of attorneys chosen by the Custodian/Escrow Agent) as and when incurred, arising out of or based upon any act, omission, alleged act or alleged omission by the Custodian/Escrow Agent or any other cause, in any case in connection with the acceptance of, or performance or non-performance by the Custodian/Escrow Agent of, any of the Custodian/Escrow Agent's duties under this Agreement, except as a result of the Custodian/Escrow Agent's bad faith, willful misconduct or gross negligence.

(f) Upon distribution of all of the funds in the Custodian/Escrow Account pursuant to the terms of this Custodian/Escrow Agreement and any orders of the Court, Custodian/Escrow Agent shall be relieved of any and all further obligations
and released from any and all liability under this Custodian/Escrow Agreement, except as otherwise specifically set forth herein.

(g) In the event any dispute shall arise between the parties with respect to the disposition or disbursement of any of the assets held hereunder, the Custodian/Escrow Agent shall be permitted to interplead all of the assets held hereunder into a court of competent jurisdiction, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets. The parties further agree to pursue any redress or recourse in connection with such a dispute, without making the Custodian/Escrow Agent a party to same.

11. Non-Assignability by Custodian/Escrow Agent. Custodian/Escrow Agent's rights, duties and obligations hereunder may not be assigned or assumed without the written consent of Class Counsel and the Defendant.

12. Resignation of Custodian/Escrow Agent. Custodian/Escrow Agent may, in its sole discretion, resign and terminate its position hereunder at any time following 120 days prior written notice to the parties to the Custodian/Escrow Agreement herein. On the effective date of such resignation, Custodian/Escrow Agent shall deliver this Custodian/Escrow Agreement together with any and all related instruments or documents and all funds in the Custodian/Escrow Account to the successor Custodian/Escrow Agent, subject to this Custodian/Escrow Agreement. If a successor Custodian/Escrow Agent has not been appointed prior to the expiration of 120 days following the date of the notice of such resignation, then Custodian/Escrow Agent may petition the Court for the appointment of a successor Custodian/Escrow Agent, or other appropriate relief. Any such resulting appointment shall be binding upon all of the parties to this Custodian/Escrow Agreement.

13. Notices. Notice to the parties hereto shall be in writing and delivered by hand-delivery, facsimile, electronic mail or overnight courier service, addressed as follows:

If to Class Counsel:

If to Defendant:

If to Custodian/Escrow Agent:

THE HUNTINGTON NATIONAL BANK
Christopher Ritchie, Executive Managing Director
650 E. Swedesford Road, Suite 310
Wayne, PA 19087
Telephone: (215) 568-2328
E-mail: chris.ritchie@huntington.com

Susan Brizendine, Trust Officer
Huntington National Bank
7 Easton Oval – EA5W63
Columbus, Ohio 43219
Telephone: (614) 331-9804
E-mail: susan.brizendine@huntington.com

14. Patriot Act Warranties. Section 326 of the USA Patriot Act (Title III of Pub. L. 107-56), as amended, modified or supplemented from time to time (the "Patriot Act"), requires financial institutions to obtain, verify and record information that identifies each person or legal entity that opens an account (the "Identification Information"). The parties to this Custodian/Escrow Agreement agree that they will provide the Custodian/Escrow Agent with such Identification Information as the Custodian/Escrow Agent may request in order for the Custodian/Escrow Agent to satisfy the requirements of the Patriot Act.

15. Entire Agreement. This Custodian/Escrow Agreement, including all Schedules and Exhibits hereto, constitutes the entire agreement and understanding of the parties hereto. Any modification of this Custodian/Escrow Agreement or any additional obligations assumed by any party hereto shall be binding only if evidenced by a writing signed by each of the parties hereto. To the extent this Custodian/Escrow Agreement conflicts in any way with the Settlement Agreement, the provisions of the Settlement Agreement shall govern.

16. Governing Law. This Custodian/Escrow Agreement shall be governed by the law of the State of Ohio in all respects. The parties hereto submit to the jurisdiction of the Court, in connection with any proceedings commenced regarding this Custodian/Escrow Agreement, including, but not limited to, any interpleader proceeding or proceeding Custodian/Escrow Agent may commence pursuant to this Custodian/Escrow Agreement for the appointment of a successor Custodian/Escrow agent, and all parties hereto submit to the jurisdiction of such Court for the determination of all issues in such proceedings, without regard to any principles of conflicts of laws, and irrevocably waive any objection to venue or inconvenient forum.

17. Termination of Custodian/Escrow Account. The Custodian/Escrow Account will terminate after all funds deposited in it, together with all interest earned thereon, are disbursed in accordance with the provisions of the Settlement Agreement and this Custodian/Escrow Agreement.

18. Miscellaneous Provisions.

   (a) Counterparts. This Custodian/Escrow Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Custodian/Escrow Agreement.

   (b) Further Cooperation. The parties hereto agree to do such further acts and things and to execute and deliver such other documents as Custodian/Escrow Agent may request from time to time in connection with the administration, maintenance, enforcement or adjudication of this Custodian/Escrow Agreement in order (a) to give Custodian/Escrow Agent confirmation and assurance of Custodian/Escrow Agent's rights, powers, privileges, remedies and interests under this Agreement and applicable law, (b) to better enable Custodian/Escrow Agent to exercise any such right, power, privilege or remedy, or (c) to otherwise effectuate the purpose and the terms and provisions of this Custodian/Escrow Agreement, each in such form and substance as may be acceptable to Custodian/Escrow Agent.

   (c) Non-Waiver. The failure of any of the parties hereto to enforce any provision hereof on any occasion s hall not be deemed to be a waiver of any preceding or succeeding breach of such provision or any other provision.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

THE HUNTINGTON NATIONAL BANK, as Custodian/Escrow Agent

By: _____

      Christopher W. Ritchie, Executive Managing Director

Class Counsel

By: _____

Defense Counsel

By: _____

# Investment Criteria

**PROPOSED INVESTMENT LANGUAGE FOR A SETTLEMENT AGREEMENT**

When developing the settlement agreement, the responsible party may want to consider investment guidelines similar to the following examples:

**CONSERVATIVE OPTION:**

The settlement funds shall be invested in one or more of the following: short-term money market funds that include government agencies, commercial paper or repurchase agreements, or accounts backed by the full faith and credit of the United States Government or fully insured by the United States Government or an agency thereof, including a U.S. Treasury Money Market Fund or a bank account insured by the Federal Deposit Insurance Corporation ("FDIC") up to the guaranteed FDIC limit.

**MORE CONSERVATIVE OPTION:**

The settlement funds shall be invested exclusively in accounts backed by the full faith and credit of the United States Government or fully insured by the United States Government or an agency thereof, including a U.S. Treasury Money Market Fund or a bank account insured by the Federal Deposit Insurance Corporation ("FDIC") up to the guaranteed FDIC limit.



# Investment Options

In light of the uncertain rate environment, fiduciaries are even more concerned when investing settlement funds. Money can remain in escrow for several months or years before distribution. There are a variety of options depending upon your investment guidelines, need for liquidity, and time frame.

Investment options for a Settlement Fund may include one or more of the vehicles below:

i.   U.S. Treasury Bills (T-Bills)

ii.  Insured Cash Sweep (ICS)

iii. U.S. Treasury Money Market Fund

iv.  U.S. Government Money Market Fund

v.   FDIC Pass Through Insurance Account

vi.  Ginnie Mae Backed Securities (GNMA)

*Important Note:* Any specific securities, or types of securities, used as examples are for illustration purposes only. None of the information provided should be considered a recommendation or solicitation to invest in, or liquidate, a particular security or type of security. Further, investors should consider the investment objectives, risks, charges and expenses of a mutual fund carefully before investing. A mutual fund's prospectus contains this and other information about the mutual fund. Please read the prospectus carefully before investing.

Securities products are: Not FDIC insured, Not insured by any federal government agency, Not obligations of, deposits of, or guaranteed by The Huntington National Bank or its affiliates, May Lose Value.

### U.S. TREASURY BILL

| | |
|---|---|
| **Description:** | T-Bills are short-term direct obligations of the U.S. Treasury. |
| **Term:** | Terms range from one week to one year. |
| **Details:** | T-Bills are sold at a discount from the paramount (face value). For example, you might invest $999,000 to buy a $1 million T-Bill, which reaches par upon maturity. |
| **Advantages:** | Safety of U.S. Treasury. |
| | Tax free at state and local level. |
| **Disadvantages:** | A term investment provides less liquidity than some other options. May sacrifice part of yield if T-Bill needs to be sold before maturity date. |

*continued >>*



# Investment Options (continued)

### INSURED CASH SWEEP (ICS®)

| | |
|---|---|
| **Description:** | The Insured Cash Sweep, or ICS, service enables depositors to access multi-million-dollar FDIC Coverage by placing funds into money market deposit accounts at multiple FDIC Insured Banks. Each bank will receive a portion of the settlement fund that is $250,000 or less in order to comply with the FDIC maximum deposit insurance amount. |
| **Term:** | Liquid account. Funds may be withdrawn at any time with a limit of 6 withdrawals per month. |
| **Details:** | The participating banks are accepted into the ICS network based on an assessment of the safety and soundness of the bank, among other criteria. |
| **Advantage:** | Access multi-million-dollar FDIC protection backed by the full faith and credit of the U.S. Government, while maintaining only one bank contact. |
| **Disadvantage:** | Limit of 6 withdrawals from the network per month. Some settlement funds may be too large to qualify for ICS given the number of available and participating banks. In this case, a portion of the settlement fund may be invested in ICS, or a different investment vehicle may be selected. Taxable at federal, state, and local level. |



Up to $250,000 in principal and interest per settlement per bank

### U.S. TREASURY MONEY MARKET FUND

| | |
|---|---|
| **Description:** | Money market mutual fund that invests in T-Bills. |
| **Term:** | Liquid account. Funds may be withdrawn at any time. |
| **Details:** | Some Treasury funds are primarily composed of Treasuries (e.g., 60%), and they enhance their yield by including U.S. agencies. Other Treasury funds are exclusively composed of Treasuries (100%). Check the prospectus for details. |
| **Advantages:** | Underlying safety of U.S. Treasuries. Funds with 100% Treasuries are tax free at the state and local level. |
| **Disadvantage:** | Uncertainty surrounding interest volatility provides low yield. |

*continued >>*



# Investment Options (continued)

### U.S. GOVERNMENT MONEY MARKET FUND

**Description:**   Money market fund that invests in T-Bills, repurchase agreements, and U.S. agencies.

**Term:**   Liquid account. Funds may be withdrawn at any time.

**Details:**   Not all U.S. agencies are backed by the full faith and credit of the U.S. Government. Securities such as those issued by the Government National Mortgage Association (Ginnie Mae), are supported by the full faith and credit of the U.S. Government. In contrast, securities issued by the Federal Home Loan Mortgage Corporation (Freddie Mac), the Federal National Mortgage Association (Fannie Mae), and the Federal Home Loan Bank System (FHLB) are not backed by the full faith and credit of the U.S. Government. Check the prospectus for details.

**Advantage:**   Provides a slightly higher yield than a Treasury Money Market Fund.

**Disadvantages:**   More risk than T-Bills or a Treasury Money Market Fund due to inclusion of U.S. agency securities.

Taxable at federal, state, and local level.

### FDIC PASS-THROUGH DEPOSIT INSURANCE

**Description:**   FDIC Pass-Through Deposit Insurance applies when a Qualified Settlement Fund (QSF) meets the requirements for coverage. The insurance refers to the way the interests of the beneficiaries in a QSF are protected. Each beneficiary, or claimant, is entitled to up to $250,000 of FDIC Insurance per financial institution. Each beneficiary's share of the settlement fund is divided among a network of credit worthy financial institutions to ensure full FDIC Insurance coverage for the QSF and its beneficiaries.

**Term:**   Liquid account. Funds may be withdrawn at any time.

**Details:**   FDIC Pass-Through Insurance can provide multi-million-dollar FDIC insurance per beneficiary by spreading the beneficiary's deposits into smaller amounts up to $250,000 per beneficiary per institution.

**Advantage:**   Multi-million-dollar FDIC insurance.

**Disadvantages:**   Taxable at federal, state, and local level.



For each claimant, up to $250,000 in principal & interest per financial institution: totaling millions of dollars in FDIC coverage, depending on the number of claimants.

*continued >>*

# Investment Options (continued)

### GINNIE MAE BACKED SECURITIES (GNMA)

**Description:**     Government National Mortgage Association (GNMA), a federal agency, guarantees mortgage-backed securities.

**Term:**     Typically, liquid by investing in Ginnie Maes through an automatic investment account or collateralized structure.

**Details:**     Securities issued by the GNMA are supported by the full faith and credit of the U.S. Government. This should not be confused with securities issued by the Federal Home Loan Mortgage Corporation (Freddie Mac), the Federal National Mortgage Association (Fannie Mae), and the Federal Home Loan Bank System (FHLB) which are not backed by the full faith and credit of the U.S. Government.

**Advantages:**     Safety of U.S. Government.

Higher yield than Treasury Bills or a Treasury Money Market.

**Disadvantage:**     Taxable at federal, state, and local level.

# Distribution Accounts

The distribution phase of a class action settlement spans the funding of a distribution account, the printing and mailing of checks, and reconciling payments until the final funds have been paid out to claimants or via cy pres. Checks have been the payment vehicle of choice, but depending on the characteristics of the class, other or additional payment methods may be most effective. Typically, a claims administrator will work closely with a bank partner during the distribution phase.

If funds need to be invested, there are two common account structures available to support the disbursing of funds class members: An automated funds investment account or a controlled disbursement account.

Each structure supports the liquidation of investment products as funds are disbursed to claimants:

1. **Automated Funds Investment** sweeps invested funds from a Money Market Fund into a checking account to support daily liquidity. This function occurs seamlessly to fund checks presented to clear against the distribution account.

2. **Controlled Disbursement Account** performs an early calculation of the total dollar amount of payments that will clear the distribution account later that day. The client may then liquidate any investments necessary in order to transfer the appropriate dollar amount to the distribution account for payment.

Fraud mitigation services are recommended regardless of the type of account structure above. There are several methods of fraud mitigation, all of which are important tools to help protect against malicious and unauthorized access to funds.



# Automated Funds Investment

Automated Funds Investment (AFI) accounts, often referred to as "sweep" accounts, may be used for settlement funds during the escrow and disbursement phases. This service automatically transfers funds between a checking account and an investment account, based on the investment criteria of the settlement fund. Funds remain available through the checking account to cover transactions such as checks and wire transfers.

Financial institutions offer a variety of sweep vehicles to provide safety, collateralization, interest or dividends together with the full scope of treasury management services for disbursement accounts such as positive pay, account reconciliation, and transactional online banking. Interest or dividends may be posted daily or monthly, depending upon the investment product.

AFI service saves time by eliminating these steps.

> First, a target balance for the checking account is established based on the investment option selected.

> Then, each night, after all the debits and credits have been posted to the account, the financial institution automatically sweeps excess funds above the target balance into the investment option chosen.

> The next morning or as needed, funds are moved back into the account.

Some common investment products used for sweep accounts include:

> Treasury Money Market Fund

> Government Money Market Fund

Most sweep accounts can be established with a target balance, over which balance funds will sweep into the given investment choice. This may be used to accrue earnings credits to cover bank service charges.



# Controlled Disbursement

A Controlled Disbursement Account (CDA) provides early notification of the total value of checks that will post to the account that day. If the funds are held in an account other than the CDA, then the client transfers funds into that account to cover the presenting checks by wire transfer, ACH transfer, manual transfer from another account within the same bank, or automatic transfer through a Zero Balance Account (ZBA) arrangement. Account information is available through the online banking portal and can also be sent as an image file via direct file transmission.

This type of account may be used when the settlement funds will not reside in the same account from which checks will be issued. Typically, this would result from the funds being held in a non-liquid investment product, such as T-Bills. It also may be used for accounts disbursing a high volume of checks to allow additional time for the bank's operations department to process incoming items.

Controlled Disbursement Accounts are given a routing number separate from standard checking accounts which identifies checks to the Federal Reserve for early processing.

Check presentments are usually reported twice in the morning, with the majority of items being reported in the first notification by 9:30 a.m. EST, which includes early direct presentments, on-us items, and the first Reserve Bank presentments. The second notification is typically made by 11:00 a.m. EST and includes the second Reserve Bank presentment from the high dollar group sort program and most same-day settlement presentments.

CDAs cannot be used to clear ACH debits, including checks converted to ACH through Accounts Receivable Entry (ARC), Point of Purchase (POP), or Back Office Conversion (BOC). To ensure that checks are ineligible for check conversion for Automated Clearing House (ACH) they should be longer than 6" wide and contain an Auxiliary On-Us field.

While CDAs are useful for disbursing checks from T-Bills, the process is more complicated than managing a disbursement through a single account, due to multiple presentments, accounts, and transfers.



# Fraud Mitigation

Unfortunately, the amount of fraud in settlement distributions has increased during recent years. As the size of settlements has increased, so has the amount of attempted fraudulent activity.

One way this occurs is an impostor may intercept a legitimate distribution check to retrieve the ABA number, account number, and signature. They use this information to gain unauthorized access to the settlement fund by creating counterfeit checks. Alternatively, criminals may attempt ACH debits to steal funds electronically. The ABA reports that banks successfully prevented 91% of all check fraud attempts in 2018 through early identification.[2]

There are several tools clients may use to help mitigate the risk of fraudulent activity:

> Positive Pay

> ACH Debit Blocks

> Security Features for Checks

> Business Email Compromise (BEC) – Red Flags

## POSITIVE PAY

Using Positive Pay can reduce losses from check fraud. This tool systematically compares checks presented for payment against a list of checks issued by the claims administrator. Each day, the program provides early detection of fraudulent, altered, or counterfeit checks, and allows these transactions to be returned without payment. The bank notifies the claims administrator of exceptions that do not match the provided check information (e.g., no issuing information recorded, dollar amount discrepancies, payee mismatch, duplicate items, and voids).

The administrator of the account can view images of all check exceptions and make all pay/return decisions online. An email alert sends a notice when there are exceptions that need to be reviewed.

Information on additional security features with Positive Pay:

**Max Dollar** allows customers to set maximum dollar limitations on their account. In the event an item is in excess of the defined Maximum Dollar Amount, the item will pass to the customer to review and decision on the online banking portal. A return default decision is recommended on exceptions since these items don't match the check register data that the customer provided to the bank. That means if a decision isn't made by the cutoff time those items will be returned.

**Stale Date** allows customers to set stale date limitations on their account (i.e.- don't pay anything after 180 days). In the event that an item is received that is stale, the item will pass through to the customer as an exception on the online banking portal.

**Dual Authorization**, aka dual approval, is an optional control which segregates the decision and approval process—effectively minimizing risk for both internal fraud potential and human keying errors.

## ACH DEBIT BLOCKS

With Automated Clearing House (ACH) blocks, the claims administrator can prevent any outgoing ACH debit, incoming ACH credit, or both against the distribution account. This can help prevent any unauthorized electronic transactions from occurring on custodian/escrow and disbursement accounts.

With ACH Filters, the administrator can instruct a bank to block all incoming ACH transactions except for specific companies and/or specific dollar thresholds. This can prevent unauthorized transactions while allowing certain transactions, such as IRS tax payments, to occur as expected.

Similar to the Positive Pay service, the administrator is notified of pending transactions that need to be approved or rejected.

[2]American Bankers Association. January 2020. Banks Stop $22.3 Billion in Fraud Attempts in 2018

continued >>

# Fraud Mitigation (continued)

## SECURITY FEATURES FOR CHECKS

To reduce the risk of check fraud, there are key security features which may be utilized:

> Checks may contain a watermark on optically dull paper with the image in the body of the paper to prevent checks from being copied or scanned.

> Check paper may have bleach and oxidizer reactivity that triggers a color reaction with a brown stain on paper if the checks were to be washed, rendering the checks unusable.

> Check paper may have full solvent reactivity that triggers color reaction to polar and non- polar solvents including alcohol, acetones, mineral spirits, and degreasers; this creates blue/black/red stains on paper, rendering the checks unusable.

> Checks may contain invisible embedded fibers that produce fluorescent yellow under UV light.

> A visible "Void" may appear in orange when a check is tampered with, such as through erasing.

> A two-bar pattern may be printed on both sides of the check, making cutting, and pasting impossible.

> Checks may contain a microprint signature line that looks like a black line for the signature, but under magnification has the name of the bank repeated in micro-type.

> Checks may contain a warning bar that lists the security features of the paper for teller use.

## PHISHING & BUSINESS EMAIL COMPROMISE SCAMS

As custodians of highly sensitive personal and financial information, law firms and claims administrators are targets of cyber-thieves. Be aware of common red flags and establish protocols for handling electronic requests.

**Red Flags:**

> Requester sends a rush request, insisting funds be wired  immediately.

> Communication includes incorrect grammar/ spelling or awkward formatting.

> Email address is incorrect.

> Email shows inconsistencies between the "Sender" and "From" domain names, or the email originates from a non-corporate email address.

> Request is sent at an unusual time of day.

> Request includes suspicious attachments/links.

**How to Help Protect Yourself:**

> When receiving email requests, verify the sender's email address with a known source.

> Implement email banners/notifications to easily identify an externally originated message.

> Establish safety protocols for all types of payment origination, including call backs, dual controls, and contingency plans.

> Never accept wire instructions via email in a format that is not secure/encrypted.

> Never wire money to a company without speaking to a representative of that company directly using a phone number you have on file.

> Beware of emails stating wire instructions have changed, as they generally never do.

> Monitor your domain names (or pay a firm to do so) for infringement or "typo-squatting" (sitting on similar domain names and targeting users who incorrectly type a web address into a browser, then redirecting traffic to another URL; also known as URL hijacking).

> Consider purchasing cyber liability and fraud insurance coverage.

# Checks

### PROCESS-ORIENTED CHECK FRAUD MITIGATION METHODS

> Require the check production facility to separate duties to ensure no one person has access to data, stock, the printing resources, or a printer, and that no single person can produce a check. Require multiple personal verifications for production to be set up and run for any check cycle. Confirm the provider is a SAS70 certified company with annual third-party audits designed to identify situations that might allow for this type of occurrence.

> Use PDF versions of checks for manual review when producing images of checks, which would suppress the MICR or signature line so that duplicate checks can't be produced from this file.

> Confirm the bank can implement Positive Pay (see page 20), which is a reporting and review system that allows daily verification of checks presented for payment. If the check's dollar amount, date, check number, and/or payee name do not match with the data file provided by the client, the check will be presented to the client for review so it can be rejected if it is a fraudulent item.

### POST CARD CHECKS

> For cases with high check volumes and low dollar amounts, post card checks may be considered, as this will significantly reduce postage costs for the distribution. Not all banks can provide full processing for accounts issuing post card checks including services such as Positive Pay and Account Reconciliation. Therefore, a bank that can accommodate these needs should be sought when choosing this option. Confirm details associated with the unique magnetic character arrangement specification sheet as to size, paper weight, and number of digits for post card check distributions with the bank.

> In order to receive 1st Class Post Card Postage rates by the U.S. Postal Service, mailings must be no larger than 4.25" x 6" and be between 0.007 and 0.016 inches thick. Mailings larger than this will be charged letter or envelope rates, depending on the size. The check size must be at least 2.75" x 6" and no taller than 3.66" to comply with Federal regulations.

> There are several items to consider in addition to postage costs when selecting post card checks. Checks that are 6" wide and do not contain an Auxiliary On-Us Field are eligible for check conversion for Automated Clearing House (ACH) through Accounts Receivable Entry (ARC), Point of Purchase (POP), or Back Office Conversion (BOC). This means some checks issued could clear as an ACH, rather than a check, and would bypass Positive Pay controls. Using a bank that offers ACH screening services will allow the account administrator to monitor those items. Also, there is greater potential for damage in the mail to perforated post card checks than to traditional checks in envelopes. Finally, due to consumer suspicion, post card checks have lower clearing rates than conventional checks.



*continued >>*

# Checks (continued)

### PRINT AND MAIL CHECKS TO FUND BENEFICIARIES

> Seek an experienced bank or check printer offering services which include form set-up and design, laser printing, document inserting, and mailing. The ability to provide printing and mailing in conjunction with reconciliation provides a complete solution for receivables and payments from one source.

> The bank or check printer should work with the claims administrator to build the process to produce the required check documents and issue files. An agreed upon implementation schedule should be established to ensure all preparation tasks are assigned and completed prior to productions. The process should also include check printing quality control whereby a 5% sample size or every 500 items is pulled and checked for MICR quality.

> The bank or check printer should identify large dollar checks (e.g. $100,000 or greater), and those items should be sorted for certified mailing or handled according to instruction by the customer.

> As required, check reissues should be processed as files are received from the claims administrator after the administrator verifies that the original item has not been paid and cancels of the original item through the account reconciliation system.

> The bank's operation center must be a secure location with limited card reader access with a camera-monitored production area with all checks under camera view. Documents should be MICR printed so that no account information is placed on checks until print production starts.



# Electronic Payments

Electronic payments are becoming an increasingly prevalent payment method in consumer class actions. The primary advantage to offering one or more types of electronic payments when distributing funds is to offer the claimant a choice, resulting in a higher probability of redemption. This is positive for multiple stakeholders in a class action because it more effectively achieves the overall resolution of the matter – compensating the class.

The most common electronic payment methods offered to class members include:

> ACH Payments (Direct Deposit)

> Prepaid debit cards (typically digital)

> The Zelle Network

> Venmo

> PayPal

When electronic payment methods are offered, they are typically supplemented / accompanied by the option of receiving a check, should the claimant prefer a traditional payment. Depending on the type(s) of electronic payment method offered, they reduce the costs of issuing digital disbursements. Specifically, the Claims Administrator can reduce their expenses by avoiding costly check printing and mailing costs.

The electronic payment method(s) available to class members should be tailored to suit the characteristics of the class.  Offering one or more electronic payment methods makes it easier to pay class members who do not participate in the US banking system, such as the unbanked or internationally located class members. We expect that the flexibility offered by electronic payments will contribute to their growing momentum in consumer class action compensation.

# Foreign Payments

Occasionally, a settlement may involve claimants living outside of the United States. Sending funds in a claimant's local currency is faster, less expensive, and more convenient than a typical payment in U.S. dollars.

Claimants abroad have difficulty cashing American checks. An American check presented at a bank outside of the United States may take 2-6 weeks to clear or may not be accepted at all. The expense of cashing an American check at a foreign bank may range from $75 - $125 due to collection fees. This is in addition to fees associated with the currency exchange.

A best practice to preserve the value of the settlement fund payment to the claimant abroad is to issue a payment in the claimant's local currency. Both foreign currency checks and wires are appropriate payment vehicles for this purpose.



# Holdbacks

Settlements over $100 million may consider employing a "holdback" from the initial claimant distribution. The holdback provision is written into the settlement agreement and typically constitutes 10-20% of the net settlement amount.

The holdback funds are disbursed to the claimants in a second distribution which would generally occur 6-12 months after the first distribution.

The purpose of the holdback is to allow corrections to the initial distribution due to errors, late claims, and duplicate claims caused by submissions filed both by claimants and their fiduciaries. The holdback allows for ease in these re-calculations, and ultimately maximizes the amount that class members receive.

Also, it reduces the possibility of recalling funds from claimants in the event of an overpayment.

The disadvantages of a holdback include the added cost of a second distribution and a delay to claimants in receiving the full amount of their claim.





# Cy Pres

The term *cy pres* is derived from the Norman French phrase *cy pres comme possible*, which means "as near as possible." This legal doctrine allows the Court to amend the terms of a settlement to honor the intended purpose as closely as possible.[3]

In a class action or mass tort settlement, when it becomes impractical or impossible to directly distribute all of the monies to the class, a cy pres distribution of the remainder of the settlement fund to a nonprofit organization whose work advances the public interest and indirectly benefits the class members has been accepted as the next best use of the funds. It also has been used for the entirety of a statutory damage award when the amount of the damages is too small to warrant distribution.

The first *cy pres* application in the United States came in 1867 in *Jackson v. Phillips*, a case regarding a trust fund established to abolish slavery. Since the Emancipation Proclamation eliminated slavery, the monies were applied to charities that benefited people of African descent.[4]

Today, most settlements have residual funds. Lawyers have a fiduciary responsibility to complete the distribution of these funds. Claims administrators support this final resolution of the case to avoid trailing work due to taxes, bank statements, and other administration.

Bar foundations and legal service organizations across the country rely on *cy pres* contributions as part of their fundraising efforts.

The best time to designate a *cy pres* beneficiary is in the settlement agreement, so the parties can address the issue up front. Alternatively, it can be done in the distribution motion. The final option is after the distribution, when the amount of remaining funds is determined.

---

[3]Law French "as near as" Black's Law Dictionary 392 (7th ed. 1999)

[4]Jackson v. Phillips, 96 Mass. 539 (1867)

# Selecting a Bank

In volatile economic conditions, there is even more concern about selecting a bank for settlement accounts. There are five important factors to consider when choosing a bank:

1. Financial Safety
2. Knowledgeable Bankers
3. Convenience
4. Bank Fees
5. Interest Rates

### FINANCIAL SAFETY

Financial soundness may be the most important issue to consider when selecting an institution to hold settlement funds. The primary measure of safety is a bank's capital ratio, which is the percentage of capital to risk-weighted assets. The bank's capital serves as its rainy-day fund in case of losses. To be well-capitalized under federal regulatory agency definitions, a bank must have a Tier 1 capital ratio of at least 6%, and a combined Tier 1 and Tier 2 capital ratio of at least 10%. Other factors to consider include asset size, asset quality, profitability, and liquidity.

### KNOWLEDGEABLE BANKERS

Does the bank have expertise in working with large settlement accounts? Are they comfortable serving as escrow agent? Do they have experience handling large disbursements? Do they understand the roles of counsel, claims administrators, special masters, or independent distribution consultants? Can the bank provide references from customers in the settlement industry? Do you have a dedicated banker supported by a team of people?

### CONVENIENCE

Can the bank provide one-stop shopping to handle both the escrow and distribution phases of the settlement? Are the bank's products and services user-friendly? Since most settlement funds are transferred by wire, not a teller deposit, branch location is less important. The most important consideration is a high level of customer service from a banker who can make the settlement banking process easier.

### BANK FEES

Financial institutions charge settlement accounts for a variety of services including custodian/escrow fees, check activity, account reconciliation, positive pay, sweep accounts, monthly maintenance, bank statements, check copies, cashiers' checks, and wire transfers. Bank fees should be reviewed to allow selection of a bank with a competitive pricing schedule to maximize the economic benefit for the class.

Bank fees should also be compared with investment return, since a non-interest-bearing account may provide more benefit to the class depending on the interest rate environment.

### INTEREST RATES

Interest rates are an important factor to consider, though they may change over the lifetime of the distribution fund based on the interest rate environment.

# Banker's Blanket Bond

When selecting a bank, it is important to ask about the institution's Banker's Blanket Bond. This insurance policy covers a variety of criminal acts including employee fraud, embezzlement, robbery, forgery, wire transfer fraud, and computer crime. This can also be referred to as a fidelity bond.

This fidelity bond is purchased from a private insurance broker. This bond is not to be confused with insurance provided by the Federal Deposit Insurance Corporation (FDIC), which provides depositor insurance to protect against bank failure.

A Banker's Blanket Bond provides protection from internal employee dishonesty and contains some coverage for external hazards, such as forgery and theft. Internal hazards, which pose a far greater risk, include defalcations by the bank's own personnel. Banks try to protect themselves against these types of losses by maintaining internal systems and controls.

Bonds have a single loss limit that applies to individual claims, and an aggregate limit that applies to the total of all losses during the bond's period. For example, if there is a

$25,000,000 single loss limit and a $50,000,000 aggregate limit, payment of the single loss could reduce the remaining coverage to $25,000,000 during the policy period.

In addition to losses by bank employees, the Banker's Blanket Bond also covers attorneys retained by the bank and non-employee data processors while performing services for the bank. This bond generally excludes loss caused by a director, unless a director is also a salaried employee of the bank.

When the bank is a member of a holding company or group of affiliated banks, one fidelity bond is usually purchased to cover the parent company and affiliated banks.

There are no specific requirements to determine the amount of blanket coverage a financial institution should maintain. Bank management determines the coverage based on several factors including asset size, internal operations, number of employees and their experience level, delegations of authority to employees, personnel turn-over rates, information technology, and customer needs.



# Errors and Omissions Insurance

When selecting a bank, it is also important to ask about the institution's Errors & Omissions (E&O) insurance. Unlike a Banker's Blanket Bond that covers criminal acts, E&O insurance protects against errors or the failure of the work to perform as promised.

Policies have a single loss limit that applies to individual claims and an aggregate limit that applies to the total of all losses during the policy period. For example, if there is a

$25,000,000 single loss limit and a $50,000,000 aggregate limit, payment of the single loss could reduce the remaining coverage to $25,000,000 during the policy period.

There are no specific requirements to determine the amount of coverage that a financial institution should maintain. Bank management determines the coverage based on several factors including deposit size, internal operations, number of employees and their experience level, delegations of authority to employees, personnel turn-over rates, information technology, and customer needs.



# How to Apply for an EIN

The fastest and easiest way to receive an EIN from the IRS is through their online application system.

The process should take less than 15 minutes. The EIN and a confirmation notice will be available to download, save, and print upon completion. The bank will require the confirmation notice from the IRS in order to open an account.

It will take up to two weeks for the IRS's permanent records to be updated. This must occur before filing an electronic return or making an electronic payment.

Settlement Funds fall under the category of "Corporations" and the subcategory of "Settlement Fund (under IRC Sec 468B)," which designates that a settlement fund or qualified settlement fund is a trust or fund established under IRC Sec 468B. This code permits a defendant to deposit money or property into a trust or fund and receive a full and complete release of liability.

**The online SS-4 Application for Employer Identification Number can be found at:**
https://sa2.www4.irs.gov/modiein/individual/index.jsp

The online application is available Monday to Friday, 7 a.m. to 10 p.m. EST.

The IRS cannot process the application online if the responsible party is an entity with an EIN previously obtained through the Internet. If this is the case, another method, such as fax or mail, must be used to apply. The unique prefixes (20, 26 or 27) identify the EIN as a number issued via the Internet.

If applying by fax, a valid fax number should be supplied to the IRS along with the completed Form SS-4 (PDF) application. A fax will be sent from the IRS with the EIN within four (4) business days.

Visit www.irs.gov for more information.



# Tax Payments

**Qualified Settlement Funds may need to remit annual and/or quarterly estimated federal tax payments to the IRS. Consult with the QSF Claims Administrator or Accountant to determine if a tax payment will be needed.**

### TIMING

Arrangements for tax payments should be made well in advance of the payment due date to ensure calculations can be completed, payment authorization obtained, and investments liquidated in order to ensure timely remittance and avoid IRS penalties.

| PAYMENT PERIOD | DUE DATE |
| --- | --- |
| January 1 – March 31 | April 15 |
| April 1 – May 31 | June 15 |
| June 1 – August 31 | September 15 |
| September 1 – December 31 | December 15 |

If the due date for making an estimated tax payment falls on a Saturday, Sunday, or legal holiday, the payment will be due on the following business day.

### PAYMENT

The authorization requirements and appropriate payment method will vary depending on the type of account the Qualified Settlement Fund is using (custodian/escrow, checking, custody, etc.) and should be coordinated between the QSF Claims Administrator or Accountant and the bank.

In general, the preferred method to remit payment is electronically through the IRS EFTPS® system. Payments may also be made as a same-day wire to the IRS.



# Financial Dictionary

**ABA (American Bankers Association) Number**
Number identifying a bank for check clearing and wire transfers.

**ACH (Automated Clearing House)**
Method of electronically depositing or withdrawing funds from an account.

**Account Analysis**
System which measures the account balance and transaction history and applies an earnings credit earned to offset bank fees for a non-interest-bearing account.

**AFI (Automated Funds Investment)**
Investment service that transfers funds automatically between a checking account and investment vehicle. (See page 16 for more details.)

**Agencies**
Type of security issued by a federal agency or federally sponsored corporation; such as the Government National Mortgage Association (GNMA), Federal Home Loan Mortgage Corporation (Freddie Mac), the Federal National Mortgage Association (Fannie Mae), and the Federal Home Loan Bank System (FHLB).

**APY (Annual Percentage Yield)**
Yield that a deposit would earn over an entire year, based on the compounding of interest.

**Auxiliary On-Us Field**
Field appearing in the leftmost position of the MICR line of large-sized checks. This field renders checks ineligible for check conversion for Automated Clearing House (ACH) through Accounts Receivable Entry (ARC), Point of Purchase (POP), or Back Office Conversion (BOC).

**Banker's Blanket Bond**
Bond which covers a financial institution for dishonest or fraudulent acts of employees, and losses resulting from reliance upon a document later discovered to be counterfeited or forged.

**Check Block**
Eliminates the risk of check fraud by restricting the business checking account to electronic activity. All paper-based transactions are automatically rejected and returned, which prevents checks from posting to the account.

**Controlled Disbursement**
Checking account service providing early morning notification of the total value of the checks that will post to the account that day. This service may be used when settlement funds need to be transferred from a non-liquid investment, such as T-Bills, to cover checks (see page 19 for more details).

**Custodian Bank**
Financial institution responsible for safeguarding a firm's or individual's financial assets.

**Cy Pres**
Legal doctrine permitting residual funds from a case to be directed to a nonprofit organization whose work advances the public interest and indirectly benefits the class members (see page 27 for more details).

**Earnings Credit**
Calculation based on the average available balance in an account to help offset bank fees.

**Escrow**
Money or property held by a third party (see page 6 for more details) for delivery to a grantee after the fulfillment of specified conditions.

**EFT (Electronic Funds Transfer)**
Movement of money by electronic means, such as an electronic terminal, telephone, computer, ATM, or magnetic tape.

**EFTPS® (Electronic Federal Tax Payment System®)**
Tax payment service provided free by the U.S. Department of the Treasury to make federal tax payments to the Internal Revenue Service (IRS)

**EIN (Employer Identification Number)**
Also known as a Taxpayer Identification Number (TIN), is used by the IRS to identify an entity, such as a Qualified Settlement Fund.

**E&O (Errors and Omissions) Insurance**
Helps protect a company, its employees, and others, from claims regarding negligence in performing or failing to perform professional services.

**FDIC (Federal Deposit Insurance Corporation)**
United States Government corporation provides deposit insurance up to $250,000 per depositor per bank.

*continued >>*

# Financial Dictionary (continued)

**Foreign Payments (FX)**
The conversion of a U.S. dollar payment into the local currency of a claimant who lives outside the United States.

**Ginnie Mae or GNMA (Government National Mortgage Association)**
U.S. Government agency that guarantees mortgage-back securities. Unlike Fannie Mae or Freddie Mac, the Ginnie Mae securities carry the full faith and credit guarantee of the U.S. Government (see page 18 for more details).

**Holdback**
Amount withheld from an initial distribution for a subsequent disbursement to class members 6-12 months later. The holdback allows corrections to be made for errors and duplicate claims, to maximize the funds that class members receive (see page 26 for more details).

**MICR (Magnetic Ink Character Recognition)**
Technique for reading and processing checks. The MICR line is the series of digits on the bottom of a check used to identify a bank and account number.

**Money Market Account**
Bank savings account eligible for FDIC insurance.

**Money Market Mutual Fund**
Invests in conservative short-term securities such as Treasury Bills, Government Agencies, and Commercial Paper. Not FDIC insured.

**Payee Positive Pay**
The customer is required to provide payee name detail within their Check Issue File. Banks will utilize this information to compare the checks presented against the account to the Check Issue File information provided by the company. When checks presented do not match the Check Issue File information, the check should be added to the exception list for customer decisioning

**Positive Pay**
A feature that matches certain data fields on the check register aka check issue file provided by the customer with the information that appears on the actual check, increasing the level of security.

**Qualified Settlement Fund (QSF)**
Established to administer monies to a class of plaintiffs and is governed by IRS regulations under Section 26 CFR 1.468B-1.  A QSF may also be referred to as a "468B Trust".

**Sweep Account**
Automatically transfers, or "sweeps," funds between a checking account and an investment account daily (see page 18 for more details).

**Teller Positive Pay**
A feature used in conjunction with Check Positive Pay, this service identifies potential fraud items before they reach the payment stream by systematically comparing the check number and dollar amount (payee name if applicable) of the check with the customer provided check register data aka check issue file at the time of presentment at any Huntington Branch location. If an item doesn't match the check issue file aka check register data provided by the customer then it will be rejected.

**Treasury Bill**
Marketable debt obligation of the U.S. Department of Treasury with a maturity of less than one year.

**Treasury Note**
Marketable debt obligation of the U.S. Department of Treasury with a maturity between one and ten years.

**USA Patriot Act**
Enacted in 2001 to help prevent terrorism-related activities. The Act increases the ability of law enforcement agencies to search financial and other records, and it expands the Secretary of the Treasury's authority to regulate financial transactions. The Act requires banks to collect personal and business information when opening new accounts.





Fees from a correspondent bank or depository bank may reduce value of the claimant's payment. Local government regulations apply.

Investment, Insurance and Non-deposit Trust products are: NOT A DEPOSIT • NOT FDIC INSURED • NOT GUARANTEED BY THE BANK • NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY • MAY LOSE VALUE

**The information provided in this handbook is intended solely for general informational purposes and is provided with the understanding that neither Huntington, its affiliates nor any other party is engaging in rendering financial, legal, technical or other professional advice or services, or endorsing any third-party product or service. Any use of this information should be done only in consultation with a qualified and licensed professional who can take into account all relevant factors and desired outcomes in the context of the facts surrounding your particular circumstances. The information in this handbook was developed with reasonable care and attention. However, it is possible that some of the information is incomplete, incorrect, or inapplicable to particular circumstances or conditions. NEITHER HUNTINGTON NOR ITS AFFILIATES SHALL HAVE LIABILITY FOR ANY DAMAGES, LOSSES, COSTS OR EXPENSES (DIRECT, CONSEQUENTIAL, SPECIAL, INDIRECT OR OTHERWISE) RESULTING FROM USING, RELYING ON OR ACTING UPON INFORMATION IN THIS HANDBOOK EVEN IF HUNTINGTON AND/OR ITS AFFILIATES HAVE BEEN ADVISED OF OR FORESEEN THE POSSIBILITY OF SUCH DAMAGES, LOSSES, COSTS OR EXPENSES.**

Member FDIC. ⓗ®, Huntington® and ⓗ Huntington® are federally registered service marks of Huntington Bancshares Incorporated.

©2025 Huntington Bancshares Incorporated. Zelle and the Zelle related marks are wholly owned by Early Warning Services, LLC and are used herein under license. RTP® is a registered service mark of The Clearing House Payments Company L.L.C. Other third-party product, service and business names are trademarks and/or service marks of their respective owners.