**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE CLASS ACTION SETTLEMENT ADMINISTRATION LITIGATION** | **Misc. Action No. 25-179 (JDB); MDL Docket No. 3162** |
| **This Document Relates To: ALL CASES** | |

**DECLARATION OF ROBERT J. KATERBERG IN SUPPORT OF JND LEGAL ADMINISTRATION'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

I, Robert J. Katerberg, declare as follows:

1. I am a partner at the firm Arnold & Porter Kaye Scholer LLP and counsel for Defendant JND Legal Administration ("JND") in the above-captioned litigation. I am admitted to practice in the District of Columbia and in this Court. I submit this declaration in support of JND's Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint.

2. Attached hereto as **Exhibit A** is a true and correct copy of JND's July 20, 2019 agreement to provide settlement administration services *In re Equifax Inc. Customer Data Security Breach Litigation*, MDL No. 2800 (N.D. Ga.), as referenced in Compl. ¶¶ 317–330, 371, 390, 460(d), and produced to Plaintiffs at **JND_CASAL_00000003–JND_CASAL_00000009**.

3. Attached hereto as **Exhibit B** is a true and correct copy of JND's March 22, 2022 proposal, including terms and conditions, for settlement administration services in *Lerman v. Apple Inc.*, No. 1:15-cv-07381-SJ-LB (E.D.N.Y.), as referenced in Compl. ¶¶ 331–343, 371, 390, 460(d), and produced to Plaintiffs in this action at **JND_CASAL_00000010–JND_CASAL_00000012**.

4. Attached hereto as **Exhibit C** is a true and correct copy of an October 27, 2020 email from Megan E. Jones of Hausfeld LLP to Jennifer M. Keough and Neil Zola of JND attaching "David Boies' edits" to JND's terms and conditions for providing settlement

administration services in *Blue Cross Blue Shield Payment*, Case No. 13-CV-20000-RDP (N.D. Ala.), referenced at Compl. ¶ 25.

5. Attached hereto as **Exhibit D** is a true and correct copy of my July 2, 2026 letter to counsel for Plaintiffs in this case, together with the enclosures transmitted with that letter.

6. Attached hereto as **Exhibit E** is a true and correct copy of the July 9, 2026 letter that I received from counsel for Plaintiffs in response to my July 2, 2026 letter.

7. Attached hereto as **Exhibit F** is a true and correct copy of a document filed in *In re Equifax Inc. Customer Data Security Breach Litigation*, MDL No. 2800, No. 1:17-md-02800-TWT (N.D. Ga.), on July 10, 2026 entitled Plaintiffs' Motion for Order to Disclose Information Related to Legal Administration (ECF No. 1293).

8. Attached hereto as **Exhibit G** is a true and correct copy of the Settlement Agreement and Release filed on May 3, 2022 as ECF No. 155-3 in *Lerman v. Apple Inc.*, No. 1:15-cv-07381-SJ-LB (E.D.N.Y.), as referenced in Compl. ¶¶ 331–333.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge, information, and belief.

Dated: July 17, 2026

/s/ *Robert J. Katerberg*
Robert J. Katerberg (D.C. Bar 466325)

# EXHIBIT A

This agreement ("Agreement") is effective as of July 20, 2019 by and between JND Legal Administration ("JND"), and Equifax Inc. ("Equifax"), relating to *Equifax Inc., Customer Data Security Breach Litigation*, MDL No. 2800 (the "Class Action"). Equifax and JND are individually referred to as a "Party" and together as the "Parties." References to Equifax herein shall also be deemed to include affiliates of Equifax.

1. SERVICES: JND shall perform all services or duties assigned to the "Settlement Administrator" in any orders, settlement agreements, protocols, plans and other documents (collectively, as described herein, the "Orders") that are approved by the court in the Class Action ("Court") that pertain to the administration of the settlement of the Class Action, or are set forth herein (collectively, the "Services"). JND shall comply with the Orders and perform all Services in accordance with the Orders. Any terms of the Orders that are required by their terms to be included in this Agreement are hereby incorporated herein. Such Services do not in any way constitute legal services or advice. The Services shall be performed within the United States, unless otherwise ordered by the Court. .

2. PAYMENT: In consideration for providing the Services, class counsel in the Class Action ("Class Counsel") will request the Court approve payment of JND's professional fees from the settlement fund in the Class Action ("Settlement Fund") in the amounts set forth on Schedule 1 of this Agreement ("Fees"). If approved by the Court, payment of Fees and reimbursement of expenses (as described in Section 3) shall be made in accordance with the general terms and conditions set forth on Schedule 1. Schedule 1 is not a cap, but rather a good faith estimate by JND, as of July 3, 2019, of the expected charges for the Services, and any material deviation must be approved in writing by the Court. JND reserves the right to increase its hourly rates annually upon agreement by Equifax and Class Counsel.

3. EXPENSES: In accordance with Section 2, JND shall be reimbursed for all expenses reasonably incurred in connection with the Services. These expenses include, but are not limited to, postage, FedEx, P.O. Box rental ($150/month), travel, copies ($0.20 per copy), box storage ($1.50/box per month), accounting fees, electronic storage ($0.003 per image/record), and other items outlined in Schedule 1 and associated with the Services. JND may receive rebates or credits from vendors in connection with volume of work performed in connection with its overall business. JND may also receive financial benefits from banks or other institutions based on settlement funds on deposit. These credits/rebates/awards are solely the property of JND.

4. BILLING:
    a. JND shall provide each invoice to Equifax and Class Counsel every thirty (30) days and expect payment from the Settlement Fund within thirty (30) days of receipt of invoices. Payment for postage and printing, as well as email notice, is due in advance of mailing.

    b. Subject to Section 3, JND shall be solely responsible for the payment of all employees, agents, approved subcontractors and other third parties engaged by or through JND to provide, perform or assist in the provision and delivery of the Services. JND shall bear all of its own expenses incurred in performing the Services specified in this Agreement or otherwise agreed to by Equifax and Class Counsel. Invoices for any expenses will be reimbursed only if these expenses are approved in writing in advance by Equifax and Class Counsel.

    c. For the Services or a part of the Services invoiced at an hourly rate: (i) JND employees, agents, subcontractors (including its employees), and consultants who are provided by JND to perform Services hereunder ("JND Employees") billing time for a particular Service or assignment shall maintain and submit a reasonably detailed timekeeping record with detail of the actual time being charged hereunder within the applicable timekeeping system(s); and (ii) back-up detail for invoices submitted shall be made available to the parties upon reasonable request.

5. CONFIDENTIALITY AND DATA USE LIMITATIONS: For the purposes of this Agreement, "Personal Information" shall mean any information that (a) identifies, relates to, is linked to, or is capable of being linked to an individual, household, or device; (b) is governed, regulated, or protected by one or more Applicable Privacy and Data Security Laws (as defined in Section 9 below); (c) is derived from other Personal Information; or (d) is associated with any other Personal Information. "Confidential Information" shall mean all information in any form or medium, including without limitation all Personal Information and

proprietary information, whether or not marked or identified as confidential, that is (i) disclosed or provided to JND by or on behalf of Equifax; (ii) received by JND from Equifax or any third party acting on behalf of Equifax; or (iii) collected, created, received, maintained, modified, transmitted, used, disclosed, or accessed by JND in connection with or during the performance of the Services.

Notwithstanding anything to the contrary in any agreement, instructions, or documents relating to the Services contemplated under this Agreement: (a) JND and its affiliates and subcontractors shall only access, use, store, or disclose Confidential Information to perform the Services; and (b) notwithstanding the foregoing, JND may not disclose any Personal Information that is collected or received under this Agreement (including the list of Settlement Class Members) to, or allow any other party (including, in each case, any assignee, affiliate or subcontractor) to access such Personal Information, without the express, advance, written consent of Equifax. JND shall only permit access to Confidential Information or disclose Confidential Information to those employees who have a need to know that Confidential Information, except as permitted in this Agreement. JND shall not have any right to access, use, or disclose Confidential Information for JND's own purposes or for any other purposes.

Each Party acknowledges that any unauthorized disclosure or use of the disclosing Party's Confidential Information would irreparably damage the disclosing Party in such a way that the disclosing Party could not be compensated adequately in damages in an action at law. Accordingly, if any dispute arises concerning the receiving Party's disclosure or use of any Confidential Information, the disclosing Party may seek injunctive relief restraining any unauthorized disclosure or use, in addition to any other legal or equitable remedy otherwise available. No bond or other security will be required in connection with the pursuit of this injunction.

Equifax grants JND a limited, non-exclusive license to use and display Equifax trademarks, trade names, product names, brands, logos, and service marks ("Equifax Marks") solely in connection with the activities and Services performed pursuant to this Agreement. Use of the Equifax Marks must comply with Equifax's advertising and usage guidelines provided to JND, which Equifax may change from time to time upon written notice. All use of the Equifax Marks will accrue solely to the benefit of Equifax. Equifax shall have the right to review all uses of Equifax Marks and all content related thereto (including website content), and JND shall make any reasonable changes requested by Equifax. Upon any termination of this Agreement, the preceding licenses shall terminate, and JND shall cease all use of the Equifax Marks.

JND does not convey to Equifax any right in the programs, systems, or methodologies used or provided by JND in the performance of this Agreement. Equifax shall retain ownership of any and all (i) pre-existing or future trademarks, tradenames, or service marks owned or used by Equifax or its affiliates, (ii) Equifax Confidential Information, (iii) registered and unregistered rights granted or applied for related to any trademarks and service marks, patents, copyrights, trade secrets, moral rights for all purposes and uses, or other similar intellectual property rights, whether protected under the all applicable laws, orders, statutes, codes, regulations, ordinances, decrees, rules, subordinate legislation, treaties, directives, bylaws, or other requirements with similar effect of any governmental authority, each as updated from time to time ("Laws") of the United States of America, or some other jurisdiction possessed by Equifax and its affiliates ("Equifax Intellectual Property Rights"), and (iv) all Equifax Intellectual Property Rights relating to any of the foregoing (collectively, "Equifax Intellectual Property"). Except as set in subsection (a) above, nothing herein shall be deemed to grant any ownership rights or any other rights in any intellectual property rights of Equifax or its affiliates. Equifax and its licensors reserve all rights not expressly granted to JND hereunder, and nothing in this Agreement or the relationship between the Parties shall be deemed to grant any implied right or license.

To the extent expressly permitted by this Agreement, and subject to the restriction on the disclosure of Personal Information above, JND may disclose Confidential Information to its subcontractors that have a need to know that Confidential Information in order to perform the Services, provided that each subcontractor that receives Confidential Information is contractually bound to comply with terms at least as restrictive as the terms set forth in this Agreement. In the event that JND provides Confidential Information to any permitted subcontractor, JND shall not be relieved of any of its obligations under this Agreement with regard to that Confidential Information, shall remain liable and responsible for the performance of all of its obligations under this Agreement with regard to that Confidential Information, and shall be liable to Equifax for any acts or omissions of that permitted subcontractor in relation to that Confidential Information.

JND is committed to taking all reasonable steps to ensure the security of all Confidential Information, including all client and claimant data entrusted to our care. JND protects Confidential Information in all of our engagements, including this one, regardless of the size of the matter or the amount of data at issue. Please see JND's complete Privacy Policy at www.jndla.com/privacy-policy regarding data collection and use. Without limitation to any of the terms of this Agreement or expansion of JND's rights to Confidential Information, JND shall comply with that privacy policy.

Upon the termination or expiration of this Agreement, and whenever JND no longer needs to retain all or part of the Confidential Information in order to perform the Services, JND shall, at Equifax's option, immediately return and/or destroy that Confidential Information. In the event that Equifax opts to have JND to destroy that Confidential Information, JND shall destroy it using a final, secure, and complete method that will render that Confidential Information permanently unrecoverable. Upon Equifax's request, JND shall certify in writing that it has completed the destruction of that Confidential Information.

JND may disclose Confidential Information to a governmental authority if that disclosure is required by Law provided that: (i) to the extent permitted by Law, JND provides prior written notice of such disclosure to Equifax within twenty-four (24) hours of receipt of the request and that notice shall include a copy of the request and any related documents; (ii) JND takes all reasonable and lawful actions to avoid, and minimize the extent of, that disclosure; and (iii) if possible and reasonable to do so, before disclosing Confidential Information to the governmental authority JND reasonably cooperates with Equifax to resist that disclosure if Equifax chooses to do so.

JND's obligations relating to Section 5 for Confidential Information shall survive for as long as JND has access to any such Confidential Information, but in no event for a period shorter than five (5) years following the expiration or termination of this Agreement.

For the avoidance of doubt, and without limitation to any other terms of this Agreement, the Parties acknowledge and agree that, solely for the purposes of determining the Parties' obligations under any applicable laws requiring the notification to individuals, governmental entities or the media in the event of a Data Breach or other unauthorized access to Personal Information or the provision of credit monitoring services to the subject of such Personal Information, as between the Parties, JND shall be the owner and controller of all Personal Information that is created or received by JND pursuant to this Agreement. JND shall comply with all such laws and shall be responsible for carrying out any obligations imposed on the owner or controller (or any similar term) under such laws.

6. LIMITATION OF DAMAGES: THE SETTLEMENT CLASS MEMBERS OF THE CLASS ACTION, CLASS COUNSEL, AND EQUIFAX SHALL NOT HAVE ANY LIABILITY WHATSOEVER WITH RESPECT TO ANY ACT OR OMISSION OF JND, OR ANY OF ITS SUBCONTRACTORS OR AFFILIATES, IN CONNECTION WITH ITS PROVISION OF THE SERVICES OR THE PERFORMANCE OF ITS DUTIES UNDER THIS AGREEMENT. NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY PUNITIVE, INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR SPECIAL DAMAGES (INCLUDING LOSS OF BUSINESS OPPORTUNITY OR LOST PROFITS OR REVENUE) IN CONNECTION WITH THIS AGREEMENT OR THE SERVICES TO BE PROVIDED UNDER THIS AGREEMENT, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR CONTEMPLATED. EACH PARTY'S LIABILITY UNDER THIS AGREEMENT SHALL BE LIMITED IN THE AGGREGATE FOR ALL CLAIMS TO AN AMOUNT NOT TO EXCEED THE GREATER OF (I) TOTAL AMOUNT BILLED HEREUNDER, OR (ii) IF EIGHTEEN (18) MONTHS HAVE NOT ELAPSED IN THE TERM AT THE TIME OF A CLAIM, THE ESTIMATED CHARGES FOR THE SERVICES SET FORTH HEREIN DURING THE FIRST EIGHTEEN (18) MONTHS OF THE TERM OF THIS AGREEMENT. THE FOREGOING LIMITATIONS OF LIABILITY SHALL NOT APPLY TO A PARTY'S BREACH OF SECTION 5 (CONFIDENTIALITY AND DATA USE LIMITATIONS), SECTION 9 (REPRESENTATIONS AND WARRANTIES), SCHEDULE 2 (CONFIDENTIALITY, PRIVACY AND DATA SECURITY), AND CLAIMS SUBJECT TO INDEMNITY PURSUANT TO SECTION 3 OF SCHEDULE 2 (INDEMNITY), OR A PARTY'S WILLFUL MISCONDUCT.

7. REPORTING:JND shall provide reports in accordance with the Orders, and shall provide the Annual Reports, as defined in Schedule 3, in accordance with Schedule 3.

8. JND EMPLOYEES:

a. JND represents that it conducts appropriate background checks for all its employees and requires its subcontractors to also conduct appropriate background checks for any subcontractor working on a JND matter. JND hereby attests that no one currently employed or contracted with JND (or any employee or contractor of any subcontractor) who will have access to Equifax Confidential Information (including any Personal Information) has a conviction, guilty plea or diversion to a crime involving Dishonesty (including theft), Breach of Trust, or money laundering, at least in the past seven (7) years. For purposes herein, "Dishonesty" means directly or indirectly to cheat or defraud; to cheat or defraud for monetary gain or its equivalent; or wrongfully to take property belonging to another in violation of any criminal statute, including acts involving want of integrity, lack of probity, or a disposition to distort, cheat, or act deceitfully or fraudulently, and may include crimes which Federal, state or local laws define as dishonest. For purposes herein, "Breach of trust" means a wrongful act, use, misappropriation or omission with respect to any property or fund that has been committed to a person in a fiduciary or official capacity, or the misuse of one's official or fiduciary position to engage in a wrongful act, use, misappropriation or omission. Whether a crime involves Dishonesty or Breach of Trust will be determined from the statutory elements of the crime itself. Notwithstanding the foregoing, if any JND Employee is unacceptable to Equifax for any lawful reason, Equifax will notify JND and JND will promptly remove the JND Employee from performing any further Services.

9. REPRESENTATIONS AND WARRANTIES:

a. Each Party represents and warrants to the other Party that the execution, performance, and delivery of this Agreement does not and shall not conflict with, violate, or result in the breach of any obligations or duties of any of them to any person or entity or a violation of applicable Law.

b. JND represents and warrants that: (i) JND and all JND Employees will perform all Services in a workmanlike and professional manner consistent with generally accepted industry standards; (ii) Services do not and will not infringe upon any patent, trademark, trade secret, copyright, or any other intellectual property or proprietary interest of any third party; (iii) JND will comply with and abide by all applicable Laws, including all Laws that limit, restrict, or otherwise govern the collection, use, security, storage, protection, and disclosure of Personal Information ("Applicable Privacy and Data Security Laws"), in its performance under this Agreement; (iv) to the extent JND Processes (as defined in Schedule 2) any Confidential Information after the Term, it will Process such information in compliance with all Applicable Privacy and Data Security Laws; and (v) JND, including its principals, officers, and directors, is not debarred, suspended, or proposed for debarment by an agency of the U.S. Government or any State and is not otherwise excluded from, or ineligible for, participation in federal, state, or county government contracts.

10. FORCE MAJEURE: If any event out of the reasonable control of JND prevents JND's performance, such performance shall be excused. Security incidents and data breaches incurred or experienced by JND or its affiliates or subcontractors shall not be considered force majeure events.

11. NOTICE: Any notice required in connection with the Services shall be in writing and sent by registered mail or overnight courier to the addresses listed on the signature pages hereto.

12. MISCELLANEOUS: This Agreement constitutes the entire agreement between the Parties with respect to its subject matter and supersedes all past and contemporaneous agreements, promises, and understandings, whether oral or written, between the Parties. Provisions of this Agreement may be amended and/or waived only if such amendment and/or waiver is in writing and signed by the Parties, in the case of an amendment, or, in the case of a waiver, by the Party against whom the waiver is to be effective. No failure or delay by any Party in exercising any right hereunder shall operate as a waiver of such right, nor shall any single or partial exercise thereof preclude any other or further exercise thereof, or exercise of any other right hereunder. Each of the Parties represents and warrants that the signatory below is authorized to bind such Party to this Agreement.

13. ASSIGNMENT: JND will not transfer or assign its rights, obligations, or performance under this Agreement to any third party without the prior written consent of Equifax. JND will not subcontract the performance of this Agreement to a subcontractor without the prior written consent of Equifax. This Agreement and the rights and obligations of JND and Equifax shall inure to the benefit of their successors and assigns, if any.

14. TERM AND TERMINATION:

a. This Agreement shall commence as of the date of the Parties' acknowledgement below (the "Effective Date") and shall continue until the completion of the Services, unless earlier terminated in accordance with this Section 14 (the "Term").

b. This Agreement may be terminated in the event that the Court orders an alternative provider of the Services outlined in the Agreement.

c. Subject to any applicable order of the Court, either Party may terminate this Agreement without penalty immediately upon written notice to the other Party if: (i) the other Party files a voluntary or involuntary petition for bankruptcy, is liquidated or dissolved, becomes insolvent, or makes an assignment of a substantial portion of its assets for the benefit of creditors; or (ii) the other Party fails to perform any material provision of this Agreement, provided that the terminating Party will first give thirty (30) days written notice to the breaching Party, and the breaching Party will have the opportunity to attempt to correct its performance within such 30 day period or provide sufficient evidence to evidence compliance with the terms of this Agreement.

d. The obligation of Class Counsel to pay for Services in progress at the time of notice of withdrawal shall continue throughout the 30 day period.

e. Both Parties agree after termination to cooperate reasonably with each other with respect to efforts for an orderly transition of work.

f. Upon termination, JND shall immediately return all unused prepaid fees and charges for Services applicable to the period following the effective date of termination to the Settlement Fund, including any prepaid, but unused supplies.

g. The obligations contained in Sections 5 (Confidentiality and Data Use Limitations), 6 (Limitation of Damages), 9 (Representations and Warranties), 12 (Miscellaneous), 14 (Term and Termination), and Schedule 2 (Confidentiality, Privacy and Data Security), and all other terms herein which by their nature survive beyond termination, will survive any termination of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**JND Legal Administration**

By: ______________________________

Print Name: Jennifer M. Keough

Title: CEO

Date: July 20,2019

**Address for Notice:**
JND Legal Administration
1100 2nd Ave, Ste 300 Seattle, WA 98101
**Attn:** Jennifer Keough
**Email:** jennifer.keough@jndla.com

**Equifax Inc.**

By: ______________________________

Print Name: John J. Kelley III

Title: Corporate Vice President, Chief Legal Officer

Date: 7-21-19

**Address for Notice:**
Equifax Inc.
1550 Peachtree Street
Atlanta, GA 30309

**Attn:** SVP US Legal
**Email:** jennifer.burns@equifax.com

# EXHIBIT B



MARCH 22, 2022

PROPOSAL

# Lerman v. Apple Inc. Settlement

## 5% Claims Rate

JND LEGAL ADMINISTRATION

# Pricing and Fee Schedules Omitted

JND | LEGAL ADMINISTRATION

All services to be provided by JND Legal Administration ("JND") are subject to the following terms and conditions:

1. SERVICES: JND agrees to perform all services necessary to complete the tasks outlined in the applicable proposal or other documents or per its understanding about the Client assignment. Such Services do not in any way constitute legal services or advice.

2. PAYMENT: The Client agrees to pay JND for the Services as outlined in the Proposal or other agreement between the parties. Client agrees and understands that fees charged by JND may include mark-ups, commissions, or other arrangements constituting potential profits to JND. Client further agrees that the prices to be charged by JND were negotiated at arm's length and that total fees are estimates and that the actual amount charged may be greater or lesser than the estimated amounts. JND reserves the right to increase its hourly rates annually.

3. EXPENSES: JND shall also bill for all expenses reasonably incurred in connection with the Services. These expenses include but are not limited to postage, FedEx, P.O. Box rental ($150/month), travel, copies ($0.20 per copy), box storage ($1.50/box per month), brokerage fees, accounting fees, electronic storage ($0.006 per image/record), and other items associated with the Services. JND may receive rebates or credits from vendors in connection with volume of work performed for all of its Clients. JND may also receive financial benefits from banks or other institutions based on settlement funds on deposit. These credits/rebates/awards are solely the property of JND.

4. BILLING: JND shall invoice clients every 30 days and expect payment within thirty (30) days of receipt of invoices. Payment for postage and printing is due in advance of mailing. Invoices not paid within thirty (30) days will be subject to a 1.5% monthly finance charge.

5. INDEPENDENT CONTRACTOR: JND is performing its Services as an Independent Contractor and neither it nor its employees shall be deemed to be employees of the Client.

6. CONFIDENTIALITY: JND and the Client will each treat as confidential any documents shared by one party with the other. JND does not convey to the Client any right in the programs, systems, or methodologies used or provided by JND in the performance of this assignment.

7. DATA PRIVACY: JND Is committed to taking all reasonable steps to ensure the security of all client and claimant data entrusted to our care. We seek to protect confidential data in all of our engagements, including this one, regardless of the size of the matter or the amount of data at issue. Please see JND's complete Privacy Policy at www.jndla.com/privacy-policy regarding data collection and use.

8. LIMITATION OF DAMAGES: JND is not responsible to the Client for any special, consequential or incidental damages incurred by Client and any liability of JND to the Client shall not exceed the total amount billed to the Client for the particular Services that give rise to any loss.

9. FORCE MAJEURE: If any event out of the reasonable control of JND prevents JND's performance, such performance shall be excused.

10. NOTICE: Any notice required in connection with the Services shall be in writing and sent by registered mail or overnight courier. Such notice is deemed given if mailed five days after the date of deposit in the U.S. mail, or if sent by overnight courier, one business day after delivery to such courier.

11. GOVERNING LAW: This contract will be governed by and construed by the laws of the State of Washington.

12. ASSIGNMENT: This Agreement and the rights and obligations of JND and the Client shall inure to the benefit of their successors and assigns, if any.

13. TERMINATION: This Agreement may be terminated by the Client upon at least 30 days prior written notice to JND. The Client's obligation to pay for services or projects in progress at the time of notice of withdrawal shall continue throughout the 30 day period. JND may terminate this Agreement (i) with 10 days prior written notice if the Client is not current in payment of charges or (ii) in any event, upon at least three months prior written notice to the Client. If Client terminates this Agreement, JND shall have no obligation to release any information or documentation related to the applicable matter until JND has been paid in full.

# EXHIBIT C

**From:** Megan E. Jones[mjones@hausfeld.com]
**Sent:** Tue 10/27/2020 11:12:12 PM (UTC)
**To:** Jennifer M. Keough[Jennifer.Keough@jndla.com]; Neil Zola[Neil.Zola@jndla.com]
**Subject:** One last turn
**Attachment:** 10_16_20 JND Terms and Conditions (BSF edits)[1].docx

**Security Notice:** This email originated outside of JND. Use caution when clicking links or opening attachments.

David Boies' edits. Sorry, I thought we were done. Hopefully nothing controversial.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

All services to be provided by JND Legal Administration ("JND") are subject to the following terms and conditions:

1. SERVICES: JND agrees to perform all services necessary to complete the tasks outlined in the applicable proposal or other documents or per its understanding about the Client assignment (the "Services"). This includes all settlement administration services necessary to ensure effective notice and claims administration for the *In re: Blue Cross Blue Shield ("BCBS") Settlement Agreement* (the "Settlement Agreement"), including but not limited to all actions that JND is ordered by the Court to perform pursuant to the Notice Plan. JND shall perform assigned duties and responsibilities in a professional manner, in good faith, and in a timely fashion. Such Services do not in any way constitute legal services or legal advice.

2. PAYMENT: ~~Plaintiffs' Counsel (the "Client") agrees to make payments for Services performed by~~ As set forth in the Settlement Agreement, JND shall be paid solely from the Notice and Administration Fund which shall be deposited by Defendants into an escrow account ~~funded by Defendants~~ upon Defendants' receiving written approval for the payments from Settlement Class Counsel, Self-Funded Sub-Class Counsel, and the designated representative of the Settling Defendants as required by the terms of the Settlement Agreement. Plaintiffs' Counsel ("Client") agrees and understands that fees invoiced by JND may include reasonable and justifiable mark-ups, commissions, or other arrangements constituting potential profits to JND. The current pricing proposal has been negotiated between JND and Client at arm's length, all total fees are estimates, and the actual amount charged may be greater or lesser than the estimated amounts. No monies come due until and unless Defendants deposit the Notice Fund in the Escrow Account, which shall be the sole source of payment for JND.

3. EXPENSES JND shall also submit invoices for all expenses reasonably incurred in connection with the Services. These expenses include but are not limited to postage, FedEx, P.O. Box rental ($150/month), travel, copies ($0.20 per copy), box storage ($1.50/box per month), brokerage fees, accounting fees, electronic storage ($0.006 per image/record), and other items associated with the Services. If expenses are incurred due to JND's own mistake or error (as determined by the Court), ~~—~~such expenses will not be permitted for reimbursement from the Notice and Administration Fund.

4. REBATES AND CREDITS: JND may receive rebates or credits from vendors in connection with volume of work performed for all of its Clients. JND may also receive financial benefits from banks or other institutions based on settlement funds on deposit. These credits/rebates/awards are solely the property of JND, but shall be disclosed upon request by Defendants or the Court if necessary to determine actual costs incurred. These financial benefits will not affect the amount of the settlement funds, including interest accrued thereon, deposited and or held in escrow in connection with the settlement.

5. BILLING: Upon Settling Defendants depositing the Notice and Administration Fund into Escrow Agreement as laid out in the Settlement Agreement, JND shall invoice Client ~~clients~~ every 30 days, and payment shall be transferred to JND within five business days of written approval for the payment from the Escrow Account by Settlement Class Counsel, Self-Funded Sub-Class Counsel, and the designated representative of the Settling Defendants as stipulated in the Settlement Agreement. As payment from the Escrow requires signatures from these three groups, the Client will seek to facilitate prompt payment of JND invoices by submitting all invoices for the approval of the other stakeholders within ~~5~~ 10 business days of receiving such invoices from JND. Payment for postage and printing is due in advance of mailing. The first invoice will issue upon the Notice and Administration Fund amount being deposited into the Escrow Account as laid out in the Settlement Agreement. All work accomplished prior to the Notice and Administration Fund being deposited shall be included in the first invoice. Invoices not paid within sixty (60) days of receipt by Client will be subject to a 0.66%% monthly finance charge to be paid solely out of the Notice and Administration Fund.

6. INDEPENDENT CONTRACTOR: JND is performing its Services as an Independent Contractor and neither it nor its employees shall be deemed to be employees of the Client.

7. CONFIDENTIALITY: JND and the Client will each treat as confidential any documents shared by one party with the other. JND does not convey to the Client any right in the programs, systems, or methodologies used or provided by JND in the performance of this assignment. Confidential material shall include all Client IP, all information and materials that the Client or Settling Defendants provide to JND, all documents or other materials that contain or are derivative of such information, and all deliverables, evidence, and non-public information relating to JND's services. As to both JND and the Client, confidential materials shall include the material terms of this agreement, including the Pricing Schedule, and all information not generally known to the public; *provided that*, Client shall be permitted to share the Pricing Schedule and this agreement with the Settling Defendants, and JND agrees to share such information as is necessary to comply with the audit provisions of paragraph 11.

Should JND ever be notified of any judicial order or other proceedings in which a third party seeks to obtain access

to the confidential data created by or for the Client, or access to any data provided by Settling Defendants, JND will promptly notify the Client, unless prohibited by applicable law. The Client shall have the option to (1) provide legal representation at the Client's expense to avoid such access or (2) promptly reimburse JND for any of its costs, including attorneys' fees, reasonably incurred in avoiding, attempting to avoid or providing such access and not paid by the entity seeking the data.

8. DATA PRIVACY**:** JND Is committed to taking all reasonable steps, including but not limited to all additional security protocols JND has agreed to orally and in writing with Client and Settling Defendants, to ensure the security of all data entrusted to our care. We seek to protect confidential data in all of our engagements, including this one, regardless of the size of the matter or the amount of data at issue. Please see JND's complete Privacy Policy at www.jndla.com/privacy-policy regarding data collection and use.

9. INDEMNIFICATION**:** JND shall defend, indemnify, and hold harmless, plaintiffs' class counsel, defense counsel, and defendants (the "Parties") from and against any and all claims, liabilities, damages, and costs that are asserted by any person or entity relating to or arising from (i) JND's breach of contract; (ii) JND's violation of any applicable law; (iii) JND's negligence or intentional or willful misconduct, subject to Section 11 below; or (iv) a data breach of JND controlled and operated systems exposing to any unauthorized party any data provided to JND for the purpose of providing the Services. JND will maintain liability insurance coverage in the amount agreed to and determined sufficient by Settling Defendants to cover any such expenses arising from a data breach until all data provided by Settling Defendants has been either returned or destroyed. The entire cost of this coverage shall be borne by Settling Defendants and will be paid from the Notice and Administration Fund. The Client shall be named as an additional insured under this coverage with a waiver of subrogation. JND is not responsible to the Client for any special, consequential or incidental damages caused by Client.

10. FORCE MAJEURE**:** Neither party shall be considered in default or in breach of contract hereunder nor be held liable for any failure to perform or for any delay in the performance when such failure to perform or delay in performance should be triggered by any act or force of nature beyond either party's control. Such acts of force or nature would include, but are not limited to an Act of God, hostilities, war, governmental restrictions, and viruses or communicable diseases such as would reasonably prevent or delay performance of duties. The party that declares the force majeure shall provide prompt written notice to the other party of the commencement of the circumstance, the nature of the delay or failure, and when the condition will terminate/cease. Should services become interrupted by any such act, every reasonable effort shall be made to resume full performance of the Services as promptly as possible.

11. AUDIT**:** The Parties, Special Master and any party appointed by the Court shall have the right to audit the pertinent records of JND related to the performance of its Services under this contract to substantiate the charges invoiced by JND and to otherwise confirm compliance by JND with its obligations under the Settlement Agreement and this agreement. JND agrees to cooperate with all such reasonable requests. JND may submit invoices seeking reimbursement at its standard hourly rates to perform any work necessary in response to such requests, and will be reimbursed for such work to the extent permitted by the Court. The Parties shall have the right to engage third-party providers to conduct such audits. However, the Parties may not engage an entity to perform such audits if, in the reasonable opinion of JND, such entity is a competitor of JND.

12. NOTICE**:** Any notice required in connection with the Services shall be in writing and hand delivered or sent by registered mail or overnight courier to the following recipients: For JND: Jennifer Keough, 1100 2nd Ave, Suite 300, Seattle, WA 98101. ~~ADDRESS OF WHOMEVER WILL RECEIVE NOTICE FROM CLIENT] For Client: [NAME, ADDRESS OF WHOMEVER WILL RECEIVE NOTICE FROM CLIENT].~~For Subscriber Plaintiffs, David Boies at Boies Schiller & Flexner, Michael Hausfeld at Hausfeld LLP, and Warren Burns, Burns Charest.Such notice is deemed given if mailed five days after the date of deposit in the U.S. mail, or if sent by overnight courier, one business day after delivery to such courier.

13. GOVERNING LAW**:** This agreement shall be governed by the laws of Alabama, without giving effect to any choice of law principles, and both JND and the Client consent to jurisdiction and venue in the Northern District of Alabama. Any dispute under this agreement shall be mediated by Special Master Ed Gentle, who shall have the right to recommend a resolution, subject to the right of any party to ~~with an~~ appeal to Judge Proctor on a *de novo* basis.

14. ASSIGNMENT**:** This Agreement and the rights and obligations of JND and the Client shall inure to the benefit of their successors and assigns, if any. JND shall not assign its rights and obligations without the written consent of the below signatories.

15. TERMINATION**:** This Agreement may be terminated by the Client upon at least 30 days prior written notice to JND. JND's right to be paid from the Notice and Administration Fund ~~The Client's obligation to pay~~ for services or projects in progress at the time of notice of termination ~~withdrawal~~ shall continue ~~within~~ for a period of 30 days from the date of such notice if such work cannot reasonably be terminated at an earlier date, and subject in all instances to ~~of~~ approval by the Court. JND may terminate this Agreement (i) with sixty (60) days prior written notice if the ~~Client is not current in~~ payments are not current from the Notice and Administration Fund ~~of charges~~ or (ii) in any event, upon at least three months prior written notice to the Client. Upon termination of the Agreement by either Client or JND, all rights shall immediately return to Client, and JND will without unreasonable delay return or destroy at the Client's discretion any and all information or documentation

related to the BCBS settlement, without prejudice to money that may be due or become due.

**JND Legal Administration LLC**

By: ______________________________
**Jennifer Keough** DATE
CEO

And

Settlement Class Counsel on behalf of Hausfeld:

______________________________
NAME OF BUSINESS

By: ______________________________
SIGNATURE DATE

______________________________
PRINT NAME

______________________________
TITLE

Settlement Class Counsel on behalf of Boies Schiller & Flexner:

______________________________
NAME OF BUSINESS

By: ______________________________
SIGNATURE DATE

______________________________
PRINT NAME

______________________________
TITLE

Self-Funded Sub-Class Counsel:

______________________________
NAME OF BUSINESS

By: ______________________________
SIGNATURE DATE

______________________________
PRINT NAME

______________________________
TITLE

# EXHIBIT D

Arnold & Porter

**Robert J. Katerberg**

+1 202.942.6289 Direct
Robert.Katerberg@arnoldporter.com

July 2, 2026

**VIA EMAIL**

*Plaintiffs' Lead Counsel and Executive Committee*
cseeger@seegerweiss.com
sitri@seegerweiss.com
dboies@bsfllp.com
ashaw@bsfllp.com
baylstock@awkolaw.com
kgrombacher@bradleygromacher.com
elechtzin@edelson-law.com
dstone@smcomplex.com

Re: *In re Class Action Settlement Administration Litigation*, Misc. Action No. 25-179 (JDB); MDL No. 3162

Dear Counsel:

We write on behalf of JND Legal Administration ("JND") to express our serious concerns about allegations in the Consolidated Class Action Complaint that "[i]nstead of paying interest payments to the QSF, Huntington paid a portion of that money to JND." Compl. ¶¶ 342, 355. There is no factual basis for those allegations. JND has never received payment of any kind from Huntington, has never had a financial relationship with Huntington, and had no role in the selection or retention of Huntington in the cases featured in the Complaint or any other cases for that matter. JND and Huntington have each confirmed in sworn statements to the court in other litigation that Huntington has never made a payment to JND and the two have no financial relationship. Plaintiffs cannot continue to rely on allegations lacking any factual basis and should therefore withdraw and refrain from repeating them.

In the Complaint, Plaintiffs allege that Huntington paid money to JND in connection with *Lerman v. Apple, Inc.*, No. 1:15-cv-07381-LB (E.D.N.Y.), and *In re Yahoo! Inc. Securities Litigation*, No. 5:17-cv-00373 (N.D. Cal.). According to the Complaint,

Arnold & Porter



"[b]y not paying a market interest rate to the QSF, on information and belief," Huntington saved "hundreds of thousands of dollars" in *Lerman*, and "millions of dollars" in *Yahoo!*, "during the course of the administration" of those settlements. Compl. ¶¶ 342, 355. Plaintiffs then allege that "[i]nstead of paying interest payments to the QSF, *Huntington **paid a portion of that money to JND***." Compl. ¶¶ 342, 355 (emphasis added). This is the sole basis alleged in the Complaint for connecting JND to the so-called Bank Interest Track scheme.

These allegations have absolutely no basis and should never have been included in the Complaint. In fact, in multiple statements to the court in the *Realtors* litigation in the Western District of Missouri, JND and Huntington have both disavowed the notion of any payments from Huntington to JND, either in that case or any other case. Huntington advised the *Realtors* court over a year ago that it "makes no payments, contractual or otherwise, to JND Legal Administration in this matter, ***or in any other matter***, for the distribution of class proceeds." Letter from Christopher W. Ritchie, Huntington National Bank, to Hon. Stephen R. Bough dated June 5, 2025, ECF No. 1694, *Burnett v. Nat'l Ass'n of Realtors*, No. 4:19-cv-332 (W.D. Mo.) (emphasis added) (Ex. A). Huntington's Executive Managing Director of its National Settlements Team later confirmed in sworn testimony to the *Realtors* court that "[t]here are no payments directly from Huntington to JND," and that Huntington has "no relationship" with JND as a depositor, including no "operating accounts, no payroll account" and "no relationship with the principals at JND for their personal banking." Tr. of 10/26/25 Hr'g at 29:1–16, ECF No. 1718, *Burnett v. Nat'l Ass'n of Realtors*, No. 4:19-cv-332 (W.D. Mo.) (Ex. B). JND likewise confirmed in its CEO's own sworn declaration that "JND has never received any payment of any kind from Huntington National Bank—directly, indirectly, or through any arrangement of any sort," and "has no relationship with HNB." Decl. of Jennifer M. Keough dated June 17, 2026, ¶¶ 24, 26, ECF No. 1734-1, *Burnett v. Nat'l Ass'n of Realtors*, No. 4:19-cv-332 (W.D. Mo.) (Ex. C).

The reason JND and Huntington made these sworn statements to the *Realtors* court is that there has never been a situation where JND received payment of any kind from Huntington. JND should not have to bear the burden and expense of defending against allegations that have zero basis in fact. Plaintiffs have now had over a year since the first complaint consolidated in this MDL to investigate and flesh out their allegations, and a minimal level of diligence would have revealed that no relationship and no payments exist.

Arnold & Porter



As such, Plaintiffs should immediately withdraw those allegations and refrain from repeating them going forward. If Plaintiffs nevertheless intend to stand on these allegations, please identify the factual basis for the assertion that Huntington paid money to JND in connection with the administration of *Lerman*, *Yahoo!*, or any other class-action settlement.

As the deadline for moving to dismiss the Consolidated Class Action Complaint is approaching, we would appreciate your response by Thursday, July 9. JND reserves all rights.

Sincerely,

/s/ *Robert Katerberg*

Robert Katerberg

# **Exhibit A**

Huntington

**National Settlements Team**
The Huntington National Bank
650 E. Swedesford Road, Suite 310
Wayne, PA 19807-1600

June 5, 2025

Honorable Stephen R. Bough
United States District Court
Western District of Missouri
Charles Evans Whittaker Courthouse
400 East 9th Street
Kansas City, MO 64106-2635

RE: *Burnett et al. v. National Association of Realtors, et al.*
*Case No. 4:19-cv-00332-SRB and*
*Gibson et al. v. National Association of Realtors et al.,*
*Case No. 23-CV-788-SRB*

Dear Judge Bough:

I am Executive Managing Director of the National Settlements Team at Huntington National Bank ("HNB") and write in response to Your Honor's May 7, 2025 Order requiring a quarterly accounting of all fees and charges made to the settlement fund in the above captioned case. HNB received a copy of this Order from Class Counsel as HNB is not a party in this case and was not otherwise served.

In response to the Court's Order, HNB states as follows:

First, HNB's only involvement in this matter is the provision of banking services as escrow agent to co-lead class counsel Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, Ketchmark and McCreight PC, Susman Godfrey LLP, and Williams Dirks Dameron LLC and Boulware Law.

Second, HNB receives no fees or charges, rebates, awards, and/or credits from vendors, nor does it receive financial benefits from any other banks or non-bank financial institutions while serving as escrow agent in this matter.

Third, like all banks that hold deposits, including as escrow agent for the settlement fund, HNB generates revenue by using the escrow deposits as a source of funding for loan originations through its normal course of business as a bank. The interest rate spread, or net interest margin, is HNB's profit margin on deposits.

Fourth, HNB makes no payments, contractual or otherwise, to JND Legal Administration in this matter, or in any other matter, for the distribution of class proceeds.


Confidential

Sincerely,

Christopher W. Ritchie

Christopher W. Ritchie
Executive Managing Director
chris.ritchie@huntington.com

cc: Cohen Milstein Sellers & Toll PLLC
Hagens Berman Sobol Shapiro LLP
Ketchmark and McCreight PC
Susman Godfrey LLP
Williams Dirks Dameron LLC
Boulware Law

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| JOSHUA SITZER and AMY WINGER, SCOTT BURNETT, and RYAN HENDRICKSON, on behalf of themselves and all others similarly situated, | ) Case No. 19-cv-00332-SRB |
| vs. | ) |
| THE NATIONAL ASSOCIATION OF REALTORS, et al., | ) Kansas City, Missouri |
| | ) October 16, 2025 |
| Defendants. | ) |
| DON GIBSON, LAUREN CRISS, JOHN MEINERS, and DANIEL UMPA, on behalf of all others similarly situated, | ) Case No. |
| Plaintiffs, | ) 23-cv-00788-SRB |
| vs. | ) (Consolidated with 23-cv-00945-SRB) |
| THE NATIONAL ASSOCIATION OF REALTORS, et al., | ) Kansas City, Missouri |
| | ) October 16, 2025 |
| Defendants. | ) |

..............................

TRANSCRIPT OF STATUS HEARING
BEFORE THE HONORABLE STEPHEN R. BOUGH
UNITED STATES DISTRICT COURT JUDGE

Proceedings recorded by electronic stenography
Transcript produced by computer

APPEARANCES

For the Plaintiffs: MR. MICHAEL S. KETCHMARK
MR. BENJAMIN H. FADLER
Ketchmark & McCreight PC
11161 Overbrook Road, Suite 210
Leawood, Kansas 66211

MR. BRANDON J.B. BOULWARE
Boulware Law LLC
1600 Genessee Street, Suite 760
Kansas City, Missouri 64102

For Huntington Bank: MR. GEORGE MASTORIS
Winston & Strawn LLP
200 Park Avenue
New York, New York 10166

MR. PETER K. ANDREONE
Kennyhertz Perry, LLC
2000 Shawnee Mission Parkway
Mission Woods, Kansas 66205

Gayle M. Wambolt, RMR, CRR
U.S. Court Reporter, Room 7552
Charles Evans Whittaker Courthouse
400 East Ninth Street - Kansas City, MO 64106

THURSDAY, OCTOBER 16, 2025

THE COURT: Good afternoon. We're here on the case of Burnett v. NAR and Gibson v. NAR, Case Nos. 19-332 and 23-788, which has also been consolidated with 23-945.

May I have appearances by the parties, please?

MR. KETCHMARK: Michael Ketchmark, Ben Fadler, and Brandon Boulware on behalf of the plaintiffs.

MR. MASTORIS: George Mastoris from Winston & Strawn on behalf of Huntington Bank.

MR. ANDREONE: And also Peter Andreone on behalf of Huntington Bank as well.

THE COURT: Mr. Andreone, where are you at?

MR. ANDREONE: I'm at Kennyhertz Perry law firm.

THE COURT: Where?

MR. ANDREONE: Kennyhertz Perry.

THE COURT: Oh, great.

You told me you have an update, but I think we have a -- don't have very good representation from --

MR. KETCHMARK: Actually this will be the issue that's in front of the court here.

THE COURT: Okay.

MR. KETCHMARK: When the -- I guess I'll describe it this way: Decisions were made early on in this case as to who was going to hold the escrow funds by class counsel, and we had a variety of options that we can choose from. And we went

through those and made the decisions to place them at Huntington and to get the rates that we agreed with Huntington, and that as far as everything Huntington has done from class counsel's standpoint, they've done exactly what we requested they do, contractually what we expect them to do, and things that we felt were in compliance with the market.

But recently we had the fed fund change rate and I was also -- as I become more adept at diving into these issues, we made a decision, Mr. Dirks and I did, to do an exhaustive search for an escrow agent and to see if we should make a change and where we're doing that. We recently made the decision in which class counsel, we all uniformly agreed to transfer the funds to an institutional money market fund on a Morgan Stanley platform.

And what Morgan Stanley does for large institutional investors holding large -- hundreds of billions of dollars of cash, they put it into an institutional money market fund that's regulated by the SEC, and they have specific sections of the SEC that deal with those, the requirements that they have to follow, the regulations they have to follow. And the fund -- the rate to that is tied to the fed fund rate.

Banks, regional banks would have money market options, but in the past, we were always concerned about the costs that were associated with it. But when you have an institutional investor like Morgan Stanley, they have the

abilities to do that without charging us those funds -- or without charging us those rates.

And so we've made that decision to switch that with the recent change in the fed fund rate. The money still remaining at Huntington, we don't want to do anything prior to coming here, but we're ready to pull the trigger on the change, and we would be receiving a 4-percent rate.

It can fluctuate very small percentages on a daily basis, very, very small. But it's typically averaged right at 4, and would only go up or down if there's a change in the fed fund rate. The thing we like the most about it is there's no additional fees at all. There's no additional costs, expenses, nothing, not even wiring fees or expenses, and we can monitor the rates online. It's a platform that we're very comfortable with.

We spent a lot of time investigating it. There's escrow accounts that are set up, and we're really very comfortable. Mr. Dirks and I had all counsel go through the same disclosure questionnaires that the court had before with the current one. We did the same thing with Morgan Stanley. We do have some people -- there's an affiliated group with Morgan Stanley here that Cohen -- I can't remember the whole name of the group.

MR. FADLER: Ferguson Cohen.

MR. KETCHMARK: Ferguson Cohen. Thank you.

Mr. Fadler knows.

That we -- some of us -- my firm has a 401(k) with and some people have individual accounts with them, but it's part of the Morgan Stanley family. But other than that, you're not going to see anything in any of these affidavits that's not already on there.

But I don't want the court or anyone who is reading this record to think that there's any criticism that we have at all of Huntington. Chris is somebody who has been dealing with -- he's at the highest level of Huntington that I've had personal dealings with, I dealt with as part of our investigation on the disclosure issues. They've always done what we expected them to do.

When we told him we were going to make this shift and change, they offered to have conversations with us about the rate because of the fed fund change. We said that was fine, we've already made the decision to make the switch. So I wouldn't want anybody who's looking at this to think that we're somehow second-guessing what they've done. We are very comfortable with what they've done.

I did want to disclose that to the court, and if you have any questions about that, happy to answer it, but if not, Mr. Ritchie is here to answer any questions that the court may have. As I understand it, they have counsel that appear here as well.

THE COURT: Anything else, sir?

MR. KETCHMARK: No, Your Honor.

THE COURT: Are you planning on making some filing with the court that will be public so we --

MR. KETCHMARK: Absolutely.

THE COURT: And I'm assuming with that change and your disclosure here today about this Ferguson Cohen group, that doesn't sound like a conflict, that you've got a 401(k) with Morgan Stanley. But you'll be updating your ethics filing?

MR. KETCHMARK: We've already done all the internal affidavits, and we are -- the same disclosure is going to be filed. There was no additional issues that we saw with anybody on that. We're definitely going to file that.

We simply wanted to wait and alert the court this was our intention if there was any questions or feedback before we do it. But, yes, when we do it, we'll do the full disclosure and full filing, and then it's our plan to continue to delegate that as -- Ferguson Smith & Cohen is the -- and they're just an affiliated broker with Morgan Stanley.

But, yes, we will absolutely get that filed and be there for the public to see.

THE COURT: Thank you.

MR. KETCHMARK: You're welcome, Your Honor.

THE COURT: So it's my intention here today to

invite Mr. Ritchie to the stand, swear him in to tell the truth, ask some questions mostly for my own edification.

I want to be clear, I don't think anybody's done something illegal. I'm not upset. I'm not mad. I want more information and why we're doing things the way you are.

But as you've got counsel here, Mr. Ritchie, and wanted to give them an opportunity to object or state anything on the record that you'd like.

MR. MASTORIS: No, Your Honor. George Mastoris again. No objection whatsoever.

Mr. Ritchie, as Mr. Ketchmark pointed out previously, is a senior executive at Huntington Bank. He is the executive managing director overseeing their national settlements group.

Obviously we took the court's order very seriously. We made sure to bring someone with knowledge, who is at a high level within the bank, to hopefully answer Your Honor's questions and put any lingering concerns to rest.

So he's here today to talk about, I think, the issues that you had pointed out in the order with respect to the investment and terms thereof.

And I'll turn it over to you and him.

THE COURT: Outstanding.

Mr. Ritchie, I have your letter here that you wrote me previously. And so do you have a copy of that letter?

MR. RITCHIE: I do, Your Honor.

Again, at any time during this process if you want to take a break and consult with your lawyers, that's perfectly fine, and if there's issues that you can't disclose because they're private internal banking information. As I put in my order --

THE REPORTER: Did you want to swear him in?

THE COURT: Yes, I do. Thank you.

CHRIS RITCHIE, being duly sworn by the courtroom deputy, testified:

EXAMINATION BY THE COURT:

Q So I'm trying to do what I think is -- I'm not sure it's a fiduciary duty. There's some cases that talk about the judge sits as a fiduciary to the class members. I don't want to take that on because I no longer carry legal malpractice insurance. These guys do have a fiduciary duty, abundantly clear, to the class members.

But I have to have some monitoring role, as pointed out in the Manual for Complex Litigation. That's what I'm trying to do, and so it started out with these initial questions.

A lot of these questions are helping me become better at monitoring assets being held for class members through MDLs or big class actions like this or others, making sure they go the way they're supposed to.

So I think I'd like to start with just kind of following up on some of the relationship between Huntington and the plaintiffs' counsel in this case.

As I understand it, you know, when the money started coming in, there were solicitations from banks -- requested from banks, not that you reached out to them but they probably reached out to you, seeking information from folks. Is that kind of your understanding?

A Yes, Your Honor.

Q And I know Huntington is involved in a host of class actions. Do you have your own special group that deals with class actions?

A We do, Your Honor. We have a dedicated team.

Q Tell me about that.

A We have a group of 21 people who focus on QSFs for counsel and claims administrators.

Q And is that just a business model that your bank has decided to get into?

A Yes, Your Honor. It's a specialty team dedicated to this sector.

Q And why?

A Because of the deposits.

Q And I'm assuming the deposits mean rather large deposits?

A Yes, sir.

Q And I'm also kind of assuming that this case maybe is not what every case is. Sometimes there's a large amount of money that's only there for 30 days or only there for 60 days. Of course, there's ones like this that are there until the Eighth Circuit rules on the objectors, which is an unknown period of time; is that fair?

A Yes, sir.

Q I have a very basic knowledge of investing, and anybody can get all my investments on the internet. And people do every day -- every year. So all my investments are known, and you and everybody else could figure out they're all in mutual funds. So just about the most boring investments known to man.

I say that because I really do want more information from you. I'm assuming that if you know you're only going to have it for 30 days and there's a fixed amount, that's obviously harder to invest in a way that produces returns than if you knew you had a whole year.

A I generally agree with that. An important point, Your Honor, is that the bank has no investment discretion. The bank takes instruction from class counsel.

Q Where's the money sitting right now?

A It's in an FDIC-insured money market account.

Q Do the plaintiffs' lawyers tell you where to invest that money --

A Yes, Your Honor.
Q Where do they tell you?
A In the bank deposit account. We have an instruction letter from class counsel for each of the accounts that were set up instructing us where to place those funds.
Q It's not invested -- and it sits in your money market. I think as you detailed, you -- what do you do with the money that's sitting in that money market account?
A So the money is sitting on the bank's balance sheet fully FDIC insured. The account is liquid so that the funds can be distributed as class counsel dictates; administrative costs, notice, taxes, other expenses that might come up.
Q You invest that money and do something with it?
A Sure. Yes, sir. The account is a bank deposit and is used as a funding source for loans by the bank.
Q And that's it? It's not any short-term investments, overnight?
A No, no, sir.
Q Banks traditionally do that?
A Yes. This is a conventional model in the banking industry.
Q And you're saying a conventional model is what you're talking about to fund the loans --
A Yes.
Q -- also issued by Huntington?

A That's right.
Q You're not doing anything else with it?
A Correct.
Q Because more aggressive banks would invest that overnight in the Nikkei average or they would know out of a money market account if it was going to be here for 30 days, that they could make other more speculative investments?
A It's possible. But typically for a QSF, an important guideline is to make sure the funds are backed by the full faith and credit of the U.S. government. That is an investment principle that we follow. It's in our escrow agreement. So there's a very narrow band of investment options that would meet that criteria.
Q How are you paid?
A We generate revenue based on that spread between the loan and the deposit. It's the difference between the rate that the bank charges for the loan and the rate that we pay on the deposit account.
Q No other payments?
A Correct. There are no other fees.
Q Nothing from the plaintiffs' lawyers?
A No, sir.
Q And you know where this is going because you've already answered these questions for me before in written form, which is why I asked you about these letters.

There's no other people like JND paying you money?
A No, Your Honor.
Q And nobody else like that paying you money?
A No, sir.
Q How is your bank owned?
A The bank is owned by shareholders. We're publicly traded. The symbol is HBAN.
Q Is there a majority owner?
A No.
Q It's all publicly traded?
A It is.
Q And you don't know any one individual that has some larger interest than others?
A No. The information is publicly available through the SEC; so I don't know who the majority shareholders would be offhand. Traded on NASDAQ.
Q Sometimes if there's an outsized majority owner, that is disclosed in filings.
A I see.
Q But other areas, you know, depending on the size, you don't have to disclose, right?
A I don't have any firsthand knowledge.
Q Do you have other -- do you have any idea how many cases you have with JND?
A Maybe ten. It's a relatively small number.

Q Do you know how many class actions you're sitting at the bank?

A About 3,000.

Q What kind of materials did you send to the plaintiffs' team here?

A On this particular case, we didn't provide anything at the time because we received that instruction letter from class counsel. However, we've had conversations in the past with class counsel about investment options that are available. They have used other investments in other cases.

We also have information available on our website. We have a banking handbook for settlement funds that includes the investment options that the bank can offer.

Q And so they reached out to you and you don't know what you sent them; is that fair?

A Yes. It was a member of my team, but it's likely we just sent account opening paperwork at that stage. We're very grateful to have the opportunity to work on the realtors case.

Q Was there any type of presentation or bid or, you know, sometimes people will look at three or four different services?

A Class counsel may have done that, looked at other banks that they work with. You know, there are numerous firms that are serving as co-leads. So I'm assuming that they did that. That would be customary. But I wasn't involved in any of

those discussions.
Q Have you done work with Mr. Ketchmark before?
A No, sir.
Q How about Cohen Milstein?
A Yes, sir.
Q Hagens Berman?
A Yes, sir.
Q Susman Godfrey?
A Yes, sir.
Q Williams Dirks & Dameron?
A No.
Q For Cohen Milstein, do you know about how many times?
A Probably done 30 cases.
Q Do you -- does your bank have relationships with -- my bank used to invite me to go sit in a suite for basketball games out here at T-Mobile. Do you guys have relationships with these firms like that?
A We have deposit relationships with Cohen Milstein and with Susman Godfrey. We have never done any entertainment with any of those firms.
Q So what does that customer relationship look like?
A Depository, serving as escrow agent on the settlement funds, and then also it would be common for us to be the distribution bank to work with the administrator and counsel as clearly stakeholders in the disbursement.

Q What does that mean?
A So typically in the escrow phase, class counsel is driving the decision making and providing oversight. Typically then during the distribution phase, that work responsibility and the work shifts to the claims administrator. So the bank would typically work with class counsel on the escrow and the administrator on the distribution.
Q And let's -- you are just sending the money to the settlement administrator?
A We don't send it to them. The money would sit in a disbursement account at Huntington, and when the claims administrator generates payments, makes checks and also perhaps digital payments, those would be cleared through Huntington.
Q So I think you said you had prior relationships with Cohen and Susman?
A Yes, and Hagens Berman.
Q Somehow in that conversation, I kind of lost Hagens Berman. Is that not somebody that you do a lot of business with?
A Oh, we do. We do quite a bit. They're one of our largest clients, and, you know, one of the most active firms in the country in this practice area. You had asked me how many cases we've done with Cohen Milstein. Hagens is larger.

We may have done, oh, gosh, 60, maybe 70. I'd have to go back, but off the top of my head, it's definitely -- we had more activity from Hagens Berman.

Q And any entertainment relationships with them?

A No, sir.

Q No entertainment relationships with any of the --

A Any of the firms.

Q Any of these five firms?

A That's right.

Q Does your bank just not do that or --

A We do. We do. Primarily part of it is because of concerns the court is expressing now. We've been very judicious, very careful about how we approach that.

As a practical matter, the bank is headquartered in the Midwest and in Ohio specifically. And so the contact that we have with counsel is typically by phone, Zoom calls, and we don't do a lot of entertainment that way.

Q What percentage of Huntington Bank is associated with these type of MDLs or class actions?

A It's probably 5 percent of the deposit base is my guess.

Q 5 percent?

A Yes, sir.

Q What I heard you say is that all the money that's being held in this case are in FDIC-insured escrow deposit accounts?

A Yes, sir.

Q And then the funding -- the money that's being deposited back into the account as some sort of income is based purely on you using this money to fund other loans through Huntington Bank?
A Yes, Your Honor.
Q They're not being used to fund loans through other banks. You're not loaning it outside --
A No.
Q And that I'm going to call it an ultra-conservative loan or investment?
A That's right.
Q Ultra-conservative?
A As an FDIC-insured institution, we are regulated by the FDIC and the OCC, the Office of the Comptroller of the Currency. So there are specific guidelines about what banks are permitted to do, and there are regular audits that are done to ensure the safety of those loans that any bank would be making.
Q I get it. But there's a lot of banks that do a lot of other more aggressive things that are FDIC regulated as well.
A I understand your point.
Q I mean Goldman Sachs does some ultra-aggressive things, and they may have ultra-conservative things as well, true?
A Yes, it's very likely. One thing the bank has publicly said in terms of our risk profile, we have a deliberate

strategy to have a moderate-to-low profile for the kind of lending that we do.

Q And you're saying that this particular ultra-conservative investment is all defined by a contract that you have with plaintiffs' counsel?

A That's right, Your Honor, the escrow agreement.

THE COURT: Mr. Ketchmark, do you think I have that?

MR. KETCHMARK: I don't know. But if the court does not have it, we can certainly make a copy of it.

THE WITNESS: Your Honor, if it would help the court, I have it here. I can give that to you now.

THE COURT: I do have this.

THE WITNESS: You're welcome to keep that, Your Honor, if it helps to have it in front of you.

THE COURT: You have some notes in there; so I'm going to give it back to you.

THE WITNESS: I've just underlined a few things but, yes, sir.

Q (BY THE COURT) So there are a variety of money markets out there, and I looked around at Goldman Sachs, which has a Financial Square Government Fund that appears to be all invested in government funds, and they have a Goldman Sachs Financial Square Treasury Obligations Fund, which, again, is all associated with T-Bills. I think you'd agree those are -- those -- if those are the investments, those are pretty

conservative as well?

A Yes, Your Honor.

Q Help me understand why Huntington is paying around 3 1/2, Goldman Sachs is paying 4.25 and 4.20 on those ultra-conservative investments.

A There are different investment categories. Huntington can provide four options that would comply with the escrow agreement for something that's backed by the full faith and credit of the U.S. government. What you just described, Your Honor, is a money market mutual fund. There are many fund families. You mentioned Goldman. Mr. Ketchmark mentioned Morgan Stanley.

Both of those are offered by Huntington, and there are other fund families federated. So there are a number of options in that category. It's different from a bank deposit in a couple of ways.

One is the liquidity. The bank offers same-day liquidity. A money market mutual fund would typically offer next-day liquidity. There are other aspects to that too. The fees that we would typically waive for our serving as escrow agent would apply to a bank deposit. We would charge for a money market mutual fund.

So what Mr. Ketchmark described earlier, those are more favorable terms than the bank would provide in a bank deposit.

Q And it sounds like there was some conversation between you, possibly you or your bank, with Mr. Ketchmark or the other plaintiffs' lawyers once this order kind of came down; is that fair?

A Yes, sir.

Q And there was a conversation about what would be a better rate of return; is that fair?

A Yes. Class counsel came to that decision independently about what the investment would be, and we learned about it after they made that decision.

Q And what did you offer that would have offered a better return than what you currently have it in?

A We presented four investment options. The one that they're in now, the FDIC-insured account. A second was Treasury Bills. A third was a Treasury money market like you just described, and the fourth was the IntraFi cash service, which is a program to place up to $250,000 per bank among multiple banks. So those are the four typical offerings that we would have available for any QSF.

Q And those are slightly more aggressive investments; is that fair?

A They're different investments. I don't know that I would use the word "aggressive" because I think they're all very conservative options. But I understand Your Honor's point.

Q Of the most conservative options, these new ones are just a tad bit more aggressive and, therefore, have a tad bit more return?

A I think the biggest drive for Your Honor of the different rates of return is the underlying investment. So, for example, in the Treasury money market, like you described, you have a pool of T-Bills, and because of the SEC guidelines, you can go out no further than 90 days, three months.

And so in a Treasury money market, you're looking backwards at T-Bills that were invested in the past. In a bank money market, it's based on what rates are today. In a T-Bill in contrast, you're looking forward at what the rates are anticipated to be in the future when that T-Bill matures.

So the biggest driver of the difference in the rate is the underlying investment. They all carry the safety --

Q Right.

A -- of the government, but the difference is the -- those are -- that's the primary driver of the difference in the yields.

Q But as opposed to the money market that you have it in, which is paying 3 1/2, I'm assuming those four options paid more?

A Yes. Your Honor, you said 3 1/2. Just to clarify, the rate is 3.75 with an --

Q Thank you.

A -- with an annual percentage yield of 3.82. The annual percentage yield reflects compounding of interest. And so as the court and counsel are considering different choices, it would be important to look at the APY to compare apples and apples against the other options, because the other investment options do include compounding of interest.

Q And those other investment options, you're talking about those four?

A Yes, sir.

Q And those all have compounding?

A Yes, they do.

Q And what was that anticipated rate of return for those four?

A I have that here, Your Honor. These are today's rates. I looked them up earlier today --

Q Thank you.

A -- to be prepared.

So today, as we just discussed, the current yield in the FDIC-insured account is 3.82. Similarly, the IntraFi cash service is the same APY of 3.82. The Treasury money market fund is 3.95. And the T-Bill -- T-Bills can be anywhere from one week to one year. I looked at the three-month T-Bill. That's a typical term that most counsel would select for a QSF. And the three month is currently 3.91. That's the net after we would charge a three basis point fee.

Q So the numbers I got from both BlackRock and Goldman Sachs were on September 8th, 2025. Is there anything substantially changed between September 8th and now in October that would make -- I'm trying to figure out why their rates are a little bit higher.

A Yes. It's the anticipated rate cuts that are coming. On the Bloomberg Terminal that we looked at earlier today, there's a 97-percent chance of a 25-basis point rate reduction during the Fed's next meeting, which is the last week of October. There is a second cut anticipated in December. So that would be a 50-basis point reduction between now and year end. So the -- that is driving interest rates down.

Q So what I hear you saying is obviously BlackRock and Goldman Sachs know all the same things you know about the anticipated actions by the Fed, and you would anticipate their rates of return on different government fund and T-Bill funds to have gone down too?

A Yes, sir. When talking about a Treasury money market fund, the pool of investment options that are available are the same, and whether it's BlackRock or Goldman Sachs or Morgan Stanley, it's the same pool of T-Bills. There is very little differentiation between the rates on any treasury money market fund for institutional investors.

If there is, it might be a basis point or two, and it will only be temporary because eventually everyone will

have to cycle through. Money markets by definition can have a maximum average rate of maturity of 90 days. So you're talking about constant churn.

Q And obviously there's not much difference between 4.25 and 4.10, which was the difference between BlackRock and Goldman Sachs, but some, right?

A I do believe over time, those rates would be very similar.

Q And you think if I called up Huntington on September 8th and had half a billion dollars to invest in some sort of government fund or T-Bill fund, you would have been close to that 4-point something?

A Yes, sir. It's also noteworthy, Your Honor, that it's regulated by the SEC. So there's full transparency in terms of the portfolio holdings, the average weighted life, the fee structure.

Q It's all governed by the SEC, but clearly there are different rates of returns among different banks, right?

A Yes, sir.

Q And my concern is that's why I'm looking at the 3.75 and I can call up Goldman Sachs and get 4.25, obviously that's quite a bit when you throw in compounding over a period of time, right?

A Yes, sir.

MR. MASTORIS: If I may, Your Honor, on that point,

I thought Mr. Ritchie had talked about the difference between a bank deposit account, which was 3.75, and the accounts you're talking about now which are money market accounts. So there are differences between those, and the rates of return tend to be higher in one than the other.

Huntington's money market accounts, as I understand, would have rates more comparable to the ones that you've seen from Goldman and BlackRock. That just wasn't the selection which was made by class counsel here.

THE COURT: I got it. Which is why I preempted that with what I was concerned about. When looking out for this particular class dollars, you know, a half a percentage point would mean a lot of money in an account as we patiently wait on the Eighth Circuit.

MR. MASTORIS: I appreciate that, Your Honor. I think there are different attributes to those accounts also which obviously may have factored into the decision, but we just don't have transparency to what class counsel's decision was made based on.

Q (BY THE COURT) Does Huntington have relationships with any other of the settlement administrators out there that you do business with?

A Yes, Your Honor.

Q I guess I should -- relationship is vague. If there was a deposition, somebody would have objected, said "vague."

What type of relationships do you have with the existing settlement administrators that do business?

A It's primarily deposit relationships where the bank would be holding accounts for distributions in these settlement funds.

Q And so you -- those relationships typically are with the plaintiffs' lawyer and the bank, true?

A Yes. In the escrow phase, we would work with counsel. It could be defense counsel and/or class counsel. And in the distribution phase, it would typically be the administrator.

Q But you don't have, otherwise, other than distributing the money per the court orders, you don't have any relationship, any business type relationship with settlement administrators?

A We have a couple of settlement administrators where we are providing financing in addition to the deposit services that we offer. But nearly all the administrators are just deposit relationships.

Q And so I won't ask you about anybody else, because that's way beyond what I get to ask about. But do you have a depositor relationship with JND?

A We do.

Q I'm showing you the June 5th letter that was filed, that sentence there.

A Yes, sir.

Q Help me understand what this means, that Agent B makes no payments, contractual or otherwise, to JND in this matter. What does that mean to you?
A There are no payments directly from Huntington to JND. Any payments Huntington has been making from the realtors escrow accounts have been at the direction of class counsel for services rendered for the administration on the case.
Q But you do hold their own personal money in --
A No, no, Your Honor.
Q What kind of relationship do you have with JND as a depositor of their own --
A We have none. So if in our role as a service provider to the claims administrator for the qualified settlement fund distributions, we do not have any operating accounts, no payroll account. We have no relationship with the principals at JND for their personal banking.
Q I guess I thought you told me you did hold some money from the settlement administrators.
A We hold settlement accounts. It's a core part of our business on the distribution phase with the administrators.
Q But nothing for their own personal --
A No, sir.
Q -- business operations or loans --
A No, Your Honor.
Q -- for operating expenses for JND?

A None.
Q Okay. Are there any contracts between you and JND?
A The only contracts are the deposit account opening agreements that we establish when we open up a bank account for that distribution.
Q And typically how long does that distribution take?
A It varies by case. On average, probably two years. We've seen cases that will come and go in a year. There are some cases that might last longer if there are multiple distributions over time. Two years is the typical average.
Q So you entered into some contractual relationship with JND at the beginning of this case?
A No. We don't have anything right now with JND because we're still in the escrow phase. We have not opened up any distribution accounts yet with JND. We've done that in other cases that they've handled with other counsel but nothing for realtors.
Q Because there's nothing been distributed?
A Correct.
Q And you anticipate when there is a distribution, you would then open up an account and then have a contract?
A Yes, we're hopeful, yes, sir.
Q Sir, I've asked you lots of questions, and I know you came prepared and you have a nice notebook with colored dividers.

Is there anything else you want to tell me that you think I should know as I'm trying to do my job of looking out for the class?

A The only thing I would add is that we have a great deal of respect for class counsel. They are some of the leading firms in the country, and Huntington has tried to act ethically and appropriately in this matter. We have no relationship with JND at this stage, and our role has been very simple in terms of our roles and responsibilities. The duties of the bank are well-defined in the escrow agreement. We've been very careful to follow those requirements.

THE COURT: Counsel, would you like to ask your client any questions?

MR. MASTORIS: No, Your Honor. I don't think I have anything further. But thank you.

THE COURT: Mr. Ketchmark?

MR. KETCHMARK: No, Your Honor.

THE COURT: Well, that's going to conclude the hearing at least from my perspective. I just wanted to learn more. I appreciate you being here. Thank you so much.

THE WITNESS: Thank you, Your Honor.

THE COURT: You may step down.

Mr. Ketchmark, when do you think you'll be filing new information about how this money is being held?

MR. KETCHMARK: Next week. We'll get the

disclosures and affidavits in order and we'll make a filing.

THE COURT: Is it something you anticipate seeking approval to move?

MR. KETCHMARK: We're happy -- if the court wants us to seek approval, we've looked at the orders, and the authority that we have, it appears that we have the ability to make those decisions. We're very careful. We've spent a ton of time looking at the various options and finding what we did. But we're obviously very willing to file a motion and ask for the court's approval.

THE COURT: How about this: If you were going to file a motion, you would tell me all the good reasons why you're doing what you're doing and lots of attachments to support good decisions. Just do that as a notice as opposed to a motion. So you can go about doing it because due process means you file a motion, somebody gets to file a response, somebody gets to file a reply. I'm known for dragging out orders. So --

MR. KETCHMARK: We have no complaints about the court's thoroughness in responding to orders.

THE COURT: Maybe not thoroughness. Speed, speed. Even the Eighth Circuit would like me to do a little more than a text order sometimes.

MR. KETCHMARK: So we will do a notice then, Your Honor.

THE COURT: Give me lots of good information. Do you anticipate any of it will need to be sealed?

MR. KETCHMARK: No.

THE COURT: And you -- what I hear you saying is sometime next week or the week after, you're going to file a notice that you're moving over to a money market and Morgan Stanley and you anticipate it's going to have a higher rate of return?

MR. KETCHMARK: That's correct, Your Honor.

THE COURT: Do you anticipate Huntington will still be the escrow?

MR. KETCHMARK: No. Our intention is we've opened up, I believe, 28 separate escrow accounts. We'll have a separate escrow account for each of the settlements. We've opened all of those, and we have the wiring instructions. Huntington has been in contact working with our team at Morgan Stanley.

Once we file the notice, our intention would be just to move that, and at that point, that would sever the relationship as it relates to this matter with Huntington.

But as I stated before, I'll state it again, obviously Mr. Ritchie is an extremely knowledgeable and talented person. We have absolutely zero complaints about Huntington. We've just made the decision for a whole variety of reasons to make that move, but that would sever the

relationship as it relates to this litigation.

THE COURT: And in the past, I've had you and the escrow agent and the settlement administrator file documents detailing any relationships or lack thereof. Do you anticipate that Morgan Stanley would just do that automatically to comply with other things, or should I issue an order?

MR. KETCHMARK: No. We have made sure to follow the same protocol that the court put in place for the current vendors, and we will continue to do that for Morgan Stanley and for any new vendors.

We understand the need for it. I appreciate the request for it and the transparency. So we need no further direction from the court, and we understand what we're to do. And we will take care of that with respect to all that matters relating to this case.

THE COURT: All right. Well, we'll be in recess. Thank you.

REPORTER'S CERTIFICATE

I certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

______________ ______________________________

Date /s/Gayle M. Wambolt
GAYLE M. WAMBOLT, CRR, RMR
United States Court Reporter

# **Exhibit C**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| RHONDA BURNETT, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, et al.,<br><br>Defendants. | Case No. 4:19-cv-00332-SRB |
| DON GIBSON, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL ASSOCIATION OF REALTORS, et al.,<br><br>Defendants. | Case No. 4:23-cv-00788-SRB |

**SUPPLEMENTAL DECLARATION OF JENNIFER M. KEOUGH**

I, Jennifer M. Keough, declare as follows:

1. I am Chief Executive Officer, President, and Co-Founder of JND Legal Administration LLC ("JND"). I submit this Supplemental Declaration in response to the Court's Order of May 26, 2026 in the matter of *Burnett et al. v. National Assoc. of Realtors et al.* (Doc. 1731[1]), as well as to

[1] For the sake of convenience, unless otherwise indicated, the remaining docket citations in this Supplemental Declaration refer to the *Burnett* docket.

the Court's Order of May 22, 2026, in the matter of *Gibson et al. v. National Association of Realtors et al.* (Doc. 920), each of which directed the parties to show cause on or before June 18, 2026, why the Court should not appoint a special master to audit past and future JND bills, and which ordered that JND receive no payments until the Court has determined whether to appoint a special master.

2. This declaration contains six sections. *First*, it will describe JND's background and qualifications. *Second*, it will explain that JND was selected as the Claims Administrator in this action following a competitive bidding process and has only an arms-length relationship with Class Counsel. *Third*, it will describe how the scope of work that JND was originally retained to perform changed dramatically and that all of the changes in work were directed and approved by Class Counsel. *Fourth*, it will explain that JND has advanced nearly $3 million in outstanding out-of-pocket costs for the benefit of the class. *Fifth*, it will demonstrate that JND has no financial relationship with Huntington National Bank or Morgan Stanley, and that JND played no role in the selection of either bank. *Sixth*, it will explain how JND's billing practices have been transparent and consistent with industry practices.

**I. JND'S BACKGROUND AND QUALIFICATIONS**

3. JND was founded in the spring of 2016 by three former attorneys and industry veterans who had each built their careers at The Garden City Group, Inc. ("GCG"), which by the end of 2015 was the largest legal administration firm in the country. The firm's name—JND—reflects its three founders: Jennifer Keough (J), Neil Zola (N), and David Isaac (D).

4. Each founder brings substantial individual credentials:

a. I am a graduate of Seattle University, where I earned both an MSF and JD. I began my career at Perkins Coie in Seattle, as a class action settlement manager. I joined GCG in 2003 to establish its West Coast office and later served as Chief Operating Officer of GCG from 2009 through 2015.

b. **Neil Zola** (Co-Founder) graduated from the University of Pennsylvania, *cum laude*, in 1987 and from UCLA School of Law in 1990. He began his career at Wolf Haldenstein Adler Freeman & Herz in New York, where he specialized in securities class action litigation and became a partner in 1997. He joined GCG as its first-ever General Counsel in 2000 and became President of GCG in 2006.

c. **David Isaac** (Co-Founder) graduated from the Benjamin N. Cardozo School of Law in 1989. Mr. Isaac is also a former attorney at Wolf Haldenstein. He began his administration career at Poorman Douglas (later known as Epiq) in 1995 and joined GCG in 1996. Mr. Isaac later became GCG's Chief Executive Officer.

5. At GCG, Mr. Zola, Mr. Isaac, and I worked together on numerous landmark administration programs. These included the $20 billion Gulf Coast Claims Facility ("GCCF"), where we were retained by and worked directly for Kenneth Feinberg—the nation's foremost administrator of large-scale compensation programs. *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL No. 2179 (E.D. La.) (Barbier, J.). As part of that effort, we built and operated an 80,000-square-foot mail processing and claims intake facility in Hammond, Louisiana—that has been described as a "shining star" of the administration program. (*See* Doc. 1696-1 at 7.)

6. After years of building GCG into the industry's leading firm, Mr. Zola, Mr. Isaac, and I made the decision to strike out on our own, founding JND. JND was immediately sought out for its expertise in large, complex matters.

7. JND is an approved vendor for the United States Securities and Exchange Commission, the Federal Trade Commission, and the Consumer Financial Protection Bureau. JND has also worked with numerous other government agencies, including the U.S. Equal Employment Opportunity Commission (which engaged JND just recently to audit the work of a competitor administrator), the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Federal Communications Commission, the Department of Justice, and the Department of Labor. Each government engagement was awarded only after rigorous review of JND's systems, privacy policies, and procedures.

8. JND has over 300 employees. (*See* Doc. 1696-1 at 3.) And because of the dedication and hard work of these employees, JND was named the No. 1 class action claims administrator in the country by *The National Law Journal* in its very first year of operation in 2016, and has received that recognition every year since by at least one leading legal publication. *The National Law Journal* has honored JND with its prestigious Hall of Fame designation every year since 2022.

## II. JND WAS SELECTED THROUGH A COMPETITIVE BIDDING PROCESS

9. JND's work in the instant matter reflects the same standards of diligence, responsiveness, and professionalism that have built the company's reputation. JND was selected through a formal competitive Request for Proposal ("RFP") process.

10. JND received an invitation to submit a proposal on October 2, 2023, on behalf of all co-lead class counsel: Boulware Law LLC, Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, Ketchmark and McCreight PC, Susman Godfrey LLP, and Williams Dirks Dameron LLC ("Class Counsel"). The RFP covered a joint class certification notice for the *Moehrl* matter and notice of settlements for both *Moehrl* and *Burnett*. The RFP was revised by counsel via email on October 5, 2023, and October 6, 2023. JND submitted its proposal on October 20, 2023, and was informed it had been selected on November 8, 2023.

11. Importantly, the original RFP was limited in scope: it covered noticing efforts only and expressly excluded costs for claims processing and distribution, because, as Class Counsel advised at the time, "we don't yet know what that's going to look like." The substantial expansion of JND's role—and the corresponding costs—occurred only later, as the litigation developed and at Class Counsel's direction.

12. JND has no ownership relationship, referral arrangement, or financial entanglement with any of the Class Counsel firms. While Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Susman Godfrey LLP have engaged JND on other matters over the years, those law firms also regularly hire JND's competitors, and JND is not their exclusive vendor. To illustrate the arm's-length nature of the relationship: JND aggressively pursued the administration work for Hagens Berman's largest case ever—the NCAA matter regarding compensation of collegiate athletes. Nevertheless, JND was not selected for that engagement. None of the Class Counsel firms has any ownership or investment interest in JND. (*See* Doc. 1730-2 ¶ 14; Doc. 1696 ¶ 12; *Gibson* Doc. 532, Transcript of Oct. 31, 2024 Settlement Hearing, at 6:18-7:24.) These relationships are, and have always been, strictly arms-length.

## III. THE SCOPE OF WORK CHANGED DRAMATICALLY AFTER RETENTION; ALL CHANGES WERE DIRECTED AND APPROVED BY CLASS COUNSEL

13. Since JND submitted its October 2023 proposal, the scope of this project has changed dramatically. What began as an RFP for a single combined notice campaign has developed into six separate noticing campaigns involving over 138 million emails and over 44 million postcards. (*See* Doc. 1730-2 ¶¶ 5, 7; Doc. 1730-3.) With every change, JND followed the direction of Class Counsel and acted only with their approval. Throughout the administration, JND routinely provided Class Counsel with real-time information about the costs associated with their requested changes, as well as advice regarding how to potentially save the class money without sacrificing the adequacy of notice.

14. A detailed summary of all work performed is set forth in Exhibit 3 to Plaintiffs' May 18, 2026 Statement (Doc. 1730-3). The following paragraphs address several specific categories of cost that may benefit from explanation.

### A. Separate Noticing Campaigns

15. As part of its service, JND routinely looks for opportunities to recommend efficiencies and cost-saving opportunities. In this case, for instance, JND recommended saving the class money by deferring notice until additional settlements were reached and, later, by combining noticing efforts. For example, JND suggested that the *Moehrl* Notice of Pendency and initial *Burnett* settlement notice could be combined, given that the *Moehrl* class was a subset of the *Burnett* population. However, Class Counsel directed that those campaigns proceed as separate efforts.

16. Similarly, in the summer of 2024, JND recommended combining all pending notice campaigns into a single consolidated effort, which would have been more efficient. That did not happen, however, because of the timing of the finalization of the settlement in the various cases.

17. These four separate direct-mail campaigns—the *Moehrl* Notice of Pendency, the February 2024 *Burnett* mailing, the August 2024 *Burnett* mailing, and the July 2024 *Gibson* mailing—cost approximately $18.7 million in postage alone. (*See* Doc. 1730-3.) JND makes no money on postage. The entire $18.7 million was a pass through expense.

**B. Purchase of Class Member Contact Data**

18. Class Counsel advised that the direct-notice data used in the *Burnett* Notice of Pendency, a notice program for which JND was not responsible, had been fraught with bad addresses. Accordingly, Class Counsel asked JND to develop a notice plan that did not rely on defendant-supplied data. Further, while not originally contemplated in the proposal, JND researched and negotiated with third-party data providers to obtain the best available noticing lists at the best cost to the class to further increase direct notice. The purchase of all data lists was approved by Class Counsel. JND also received and absorbed 36 spreadsheets of buyer and seller data from Settling Defendants, containing more than 6.5 million records. JND standardized and deduplicated that data against the existing class database to identify new class members. Where only mailing addresses were provided, and with Class Counsel's approval, JND performed an email append process to locate email addresses and reduce paper mailing costs.

**C. Destruction of More Than 10 Million Already-Printed Postcards**

19. One significant and unforeseeable cost arose in January 2024. With Class Counsel's approval, JND had begun printing postcards for the Anywhere Real Estate and RE/MAX settlements when

counsel urgently directed JND to halt the print run because an additional defendant was entering into a settlement. JND advised Class Counsel that destroying the more than 10 million already-printed postcards would result in approximately $520,000 of waste. Class Counsel determined that this cost was acceptable in order to avoid the substantially greater postage expense that would have been incurred by sending Keller Williams Realty, Inc. as a standalone campaign. Accordingly, JND complied with Counsel's directive, destroyed the printed materials, reprinted all postcards with newly approved content, and performed expedited and unplanned work on the settlement website and toll-free number scripting.

**D. Contact Center Operations**

20. When JND first began work on this case, after the RFP, the proposal did not contemplate telephone or email agent staffing. Nonetheless, JND handled class member communications forwarded by Class Counsel and inquiries received through JND's main telephone number. At Class Counsel's request, JND also created a dedicated email address to receive and respond to class member inquiries, separate from the main inbox used for opt-out, objection, and claim form submissions. At the direction of Class Counsel, full-time telephone and email agents were added in July 2024. JND provided a cost estimate for contact center staffing prior to Class Counsel authorizing that expense. To date, JND has handled more than 30,000 telephone calls and 43,000 emails from class members. (*See* Doc. 1730-2 ¶ 8.)

**E. Claims Intake and Fraud Prevention**

21. Throughout the claims period, JND received and processed more than 2.7 million claim submissions—a volume that dwarfs what was anticipated at the time of the original RFP. (*See* Doc. 1730-2 ¶ 9.) JND conducted routine and robust fraud identification and prevention efforts to

identify bad actors submitting illegitimate claims. JND also identified a third-party website that was causing confusion among class members, coordinated with Class Counsel upon discovery, and provided guidance that led the third party to revise its website and marketing materials to eliminate misleading messaging.

## IV. JND HAS ADVANCED NEARLY $3 MILLION IN OUT-OF-POCKET COSTS FOR THE BENEFIT OF THE CLASS

22. To serve the best interests of the class and Class Counsel, JND agreed to front the costs associated with the *Moehrl* Notice of Pendency ("NOP") until case resolution or until a settlement was reached. In connection with the NOP, JND sent over 5 million postcards, 13.5 million emails, and completed a media publication campaign. JND agreed to defer payment of its invoices until after any Settlements were entered into and approved, or until after any payments were received as a result of a final judgment. While settlements have since been entered into and approved by this Court, certain objectors have appealed, and settlement funds have not been distributed. Accordingly, JND has not received any payment for the *Moehrl* Notice of Pendency work, totaling $2,996,807.75, even though JND incurred those expenses over two years ago. (*See* Doc. 1730-2 ¶ 5; Doc. 1696 ¶ 4.)

## V. JND HAS NO FINANCIAL RELATIONSHIP WITH HUNTINGTON NATIONAL BANK OR MORGAN STANLEY, AND PLAYED NO ROLE IN THE SELECTION OF EITHER INSTITUTION

23. JND had no involvement in the selection of Huntington National Bank ("HNB") as the escrow agent for settlement funds in this matter. That decision was made exclusively by Class

Counsel. (*See* Doc. 1718, Transcript of Oct. 16, 2025 Status Hearing, at 3:22-4:14.) The escrow agreement governing the settlement funds is a contract between Class Counsel and HNB. JND is not a party to that agreement. In fact, JND was not yet retained when those bank accounts were first established—a fact evidenced by the circumstance that the tax identification numbers for the original accounts were created by a different settlement administrator. JND later coordinated with Class Counsel to supply new tax identification numbers for the existing accounts and for newly created accounts, but JND was not otherwise involved in the creation or management of the escrow accounts.

24. JND has never received any payment of any kind from Huntington National Bank—directly, indirectly, or through any arrangement of any sort, as confirmed by the sworn testimony of Christopher W. Ritchie, the Executive Managing Director of HNB's National Settlements Team. (Doc. 1718, Transcript of Oct. 16, 2025 Status Hearing, at 29:1-30:19.) HNB's letter to the Court, dated June 5, 2025, likewise confirmed: "HNB makes no payments, contractual or otherwise, to JND Legal Administration in this matter, or in any other matter, for the distribution of class proceeds" (Doc. 1694 at 1).

25. Similarly, the decision to transfer the settlement escrow from HNB to a Morgan Stanley institutional money market platform was made exclusively by Class Counsel, without any involvement by JND. (Doc. 1718 at 3:22-7:24; *see also* Class Counsel's Notice of Change in Escrow Agent, Doc. 1716). JND likewise has no financial relationship of any kind with Morgan Stanley.

26. As JND previously reported to the Court: "None of JND, its employees and officers, or any entity affiliated with JND has received any compensation (including but not limited to rebates,

awards, and/or credits) from any bank, vendor, or other third party in connection with any of our work on the NOP or Realtors Settlements." (Doc. 1696 ¶ 11.) That statement remains true today. JND has repeated that representation in each of its subsequent quarterly accountings. (*See* Doc. 1720 ¶ 12; Doc. 1723 ¶ 5; Doc. 1726 ¶ 5; Doc. 1727 ¶ 5.) Indeed, JND has no relationship with HNB or Morgan Stanley. If and when parties to settlements hire those banks as escrow agents and instruct us to work with those banks, or any other banks, we follow such direction and do so.

## VI. JND'S BILLING PRACTICES ARE TRANSPARENT AND CONSISTENT WITH INDUSTRY STANDARDS

27. In virtually every engagement, as here, JND provides a pricing proposal to its clients and bills in accordance with that proposal unless there are material changes to the scope of the engagement—which, as described above, occurred repeatedly and at Class Counsel's direction in this matter. Where JND works with vendors on a regular basis, it attempts to negotiate volume discounts based on the cumulative volume of work over time, not based on any individual case. These and other billing practices are outlined in JND's standard terms and conditions, which are provided with every proposal, as they were here.

28. In this matter, JND submitted monthly invoices to three plaintiff firms: Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Williams Dirks Dameron LLC. In addition, JND has provided monthly summaries on each of the cases to Class Counsel that details all of the work JND performed each month.

**VII. CONCLUSION**

29. JND has done substantial work in this matter—all of it requested by Class Counsel and all of it of the highest quality. JND vigilantly looks for cost-saving opportunities to benefit the class in each matter it handles, but has never compromised the adequacy of class notice to save money, as reflected by the Court's recognition that "the direct notice program was extremely successful." (Doc. 1487 at 2.) In this matter, JND not only prevailed in a competitive bidding process, but kept Class Counsel informed at every step of changing costs as settlement parameters evolved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 17, 2026, in Seattle, Washington.

Jennifer M. Keough

JENNIFER M. KEOUGH

# EXHIBIT E

SEEGERWEISS LLP
NEW YORK • NEW JERSEY • PHILADELPHIA

July 9, 2026

**Via Email**
Robert J. Katerberg
robert.katerberg@arnoldporter.com

Re: *In re Class Action Settlement Administration Litigation*
Case No.: 1:25-mc-00179-JDB

Dear Robert:

We write in response to your July 2 letter. We have reviewed it, along with the enclosures, and do not agree that the Bank Interest Track allegations concerning JND lack a factual basis or that they should be withdrawn. The materials attached to your letter do not establish otherwise.

Specifically, Mr. Ritchie's testimony and Ms. Keough's declaration were given in a different case, address a different account relationship, and cover a different period of time. Huntington's June 2025 letter is an unsworn submission in that same unrelated matter and, by its own terms, addresses only payments to "JND Legal Administration" as a named entity.

The allegations are pled on information and belief, which is properly permitted where, as here, the underlying facts are within Defendants' own knowledge and control. *Kowal v. MCI Commc'ns Corp*., 16 F.3d 1271, 1279 (D.C. Cir. 1994). Plaintiffs are not required to marshal further evidentiary support for a pleading at this stage.

In any event, we do not think correspondence is the right vehicle for testing the sufficiency of the pleadings. To the extent JND believes the Complaint falls short, that is an argument that should be made on a complete record. Plaintiffs reserve all rights, including the right to amend the Complaint as discovery warrants.

Sincerely,

*s/Shauna Itri*

cc: David J. Weiner
Sonia Kuester Pfaffenroth
E. Alex Beroukhim
Chris Seeger
David Boise
Adam Shaw
Eric Lechtzin
Kiley Grombacher
Bryan Aylstock
David Stone

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: Equifax Inc. Customer Data Security Breach Litigation | MDL Docket No. 2800<br>No. 1:17-md-2800-TWT<br><br>ALL ACTIONS<br><br>Chief Judge Thomas W. Thrash, Jr. |

**PLAINTIFFS' MOTION FOR ORDER TO DISCLOSE INFORMATION RELATED TO LEGAL ADMINISTRATION**

Class Counsel, on behalf of Plaintiffs and the Settlement Class, seek to invoke the Court's continuing jurisdiction over this Settlement and ask the Court to direct the Court-appointed Settlement Administrator, JND Legal Administration LLC ("JND"), to disclose certain information related to the compensation it may have received in connection with this Settlement as set forth below.

### A. The Settlement and Appointment of JND as Settlement Administrator and the Court's Retention of Jurisdiction.

In its Order preliminarily approving the Settlement of this case, the Court appointed JND as the settlement administrator in this case. Among other things, the Court ordered that "[t]he settlement administrator's fees, as approved by the parties, will be paid from the settlement fund pursuant to the settlement agreement." [Doc. 742, ¶9, at 5-6]. The Settlement itself provided that "[t]he Administrative Costs and

Notice Costs will be paid from the Consumer Restitution Fund." [Doc. 739-2, ¶9.1, at 25].

Upon final approval of the Settlement, in its Final Order and Judgment, the Court "confirm[ed] its earlier appointment of [JND] as the Settlement Administrator, and directs it to continue to carry out its duties pursuant to the Settlement Agreement, subject to the jurisdiction and oversight of this Court." [Doc. 957, ¶12, at 7].

The Final Order and Judgment also stated that "[t]he Court retains jurisdiction over this action and the Settling Parties, Settlement Class Members, attorneys, and other appointed entities, for all matters relating to this action, including (without limitation) the administration, interpretation, effectuation or enforcement of the Settlement Agreement and this Final Order and Judgment." [*Id.* ¶21, at 10]. The Settlement also provides the following retention of jurisdiction provision:

> The administration and consummation of the Settlement as embodied in this Agreement shall be under the authority of the Court, and the Court shall retain jurisdiction over the Settlement and the Parties for the purpose of enforcing the terms of this Agreement.

[Doc. 739-2, ¶21.16, at 42].

Therefore, the Court has the authority and continuing jurisdiction to entertain the request of and grant the relief herein sought by Class Counsel.

### B. **<u>Litigation Against JND Related to Administration of Equifax Settlement</u>.**

On April 24, 2025, a lawsuit was filed in the Eastern District of Pennsylvania against several class action administrators, including JND, regarding, among other things, its issuance of supplemental settlement payments via digital payments. *See Tyler Baker v. Angeion Group LLC, et al* ("*Baker*"), No. 25-cv-02079-KBH, E.D. Penn., Doc. 1. Generally, the *Baker* plaintiff alleged that fintech companies offer rebates to digital pay card issuers, who, in the context of class action settlement administration, split the rebate with the settlement administrator. *See id.* ¶27. The plaintiff alleged that digital payment card issuers "are able to offer such rebates because of 'breakage,' which is a term used to describe revenue gained by retainers through unredeemed gift cards and digital payment cards that are never claimed. In these cases, the retailers pocket the money paid for the prepaid cards[.]" *Id.* ¶29. The plaintiff further alleged that payments to settlement administrators under these circumstances "represent an undisclosed windfall for Defendants, as it is already being paid in full for providing settlement administration services to the class." *Id.* ¶29.

Relative to the Equifax Settlement, the *Baker* complaint alleged that "JND enlisted Blackhawk Network to issue digital payments" as part of the redistribution of remaining funds distributed Settlement effected in December 2024. *See id.* ¶¶ 44-

46.[1] The plaintiff further alleged that "[t]here is nothing in the record to indicate that the court or class counsel were aware that JND and/or a subsidiary thereof would receive kickbacks from Blackhawk Network for agreeing to distribute payments using its digital payment platform." *Id.* ¶51.

*Baker* and a number of similar actions were eventually consolidated into MDL No. 3162, presently pending in the District Court of the District of Columbia. *See In re: Class Action Settlement Administration Litigation*, 25-mc-179-JDB, MDL Docket No. 3162. The plaintiff in *Baker*, along with others, filed a consolidated class action complaint in MDL 3162 on May 18, 2026 [Doc. 123], which again alleged wrongdoing regarding the administration of the Equifax settlement. The consolidated complaint alleged that "instead of treating digital payments like uncashed checks – by preserving the funds in the [Qualified Settlement Fund] until redemption or returning unused amounts to the QSF after a reasonable period – Blackhawk was permitted to retain a substantial portion of settlement funds intended for class members as breakage." *Id.*, ¶329. The consolidated complaint further alleged that "JND received undisclosed compensation from Blackhawk for choosing

[1] To distribute remainder funds after the payment of approved out-of-pocket loss claims, the Settlement provided that the capped amounts in the Settlement of $31,000,000 for time spent and Alternative Reimbursement Compensation (if class members chose not to enroll in the credit monitoring offered under the Settlement and had an existing credit monitor) would be lifted and distributed *pro rata* with respect to those claimants. *See* Settlement, Doc. 739-2, §§ 5.4.1; 6.2.6; and 7.5, at pp 14, 16-17, and 18-19.

Blackhawk to issue digital payments to class members" allegedly allowing Blackhawk to "profit at the class members' expense." *Id.*

### C. <u>Class Counsels' Request for Information Related to JND's Compensation</u>.

After the filing of the *Baker* complaint, Class Counsel asked JND for information regarding any compensation JND may have received from outside of the fund, including from the issuance of digital prepaid cards. Over the past year, JND has provided Class Counsel with limited information regarding these arrangements, but has not disclosed specific amounts it has received as a result of these arrangements.

In its communications with Class Counsel, JND has also pointed to the contract that Equifax signed in connection with the services it has provided in administration with the Settlement. That contract has a provision that states: "JND may receive rebates or credits from vendors in connection with volume of work performed in connection with its overall business. JND may also receive financial benefits from banks or other institutions based on settlement funds on deposit. These credits/rebates/awards are solely the property of JND." Whether or not this general provision permitted JND to engage in the conduct as alleged in *Baker*, and whether or not JND has an independent fiduciary duty to disclose these payments, are questions for another day. For now, Plaintiffs simply request an order compelling

JND disclose all agreements with vendors, and the financial benefits it recovered through such arrangements.

Class Counsel should have had the opportunity to assess any such benefits in the context of compensation that JND was due to receive from the digital prepaid cards. This is especially true due to 1) the language in the Settlement and preliminary approval order that JND was to receive costs and fees from the Settlement Fund, and 2) the Settlement provisions allowing residual funds to be distributed to the Class Members and/or to purchase additional Restoration Services. [*See* Doc. 739-2, ¶¶5.4.1-5.4.2 and 5.5]. In light of the allegations made in *Baker*, Class Counsel respectfully requests that the Court issue an order directing JND to the disclose the agreements and payments it has received outside of the fund.

Since the filing of the *Baker* case, other courts have similarly ordered or received the disclosure of similar information. For example, in the *In re: Facebook, Inc. Consumer Privacy User Profile Litigation* ("*Facebook*"), the settlement administrator (Angeion) agreed to provide to the court a copy of the agreement between it and the prepaid card distributor Blackhawk. (*See id.*, No. 3:18-md-2843-VC, N.D. Cal., Joint Status Report Regarding Settlement Administration and Distribution, Doc. 1238, at 3-4 (filed August 14, 2025)). Presumably alerted to the allegations from *Baker*, Class Counsel in *Facebook* ensured a number of conditions applied to subsequent distributions, including that funds would be retained in the

settlement fund until claimed and inactivity fees would be refunded for prepaid cards ultimately used. *See id.* at 5-6; *see also id.* Docs 1240-41 (approving usage of prepaid cards).

Additionally, overseeing the settlement reached in *Gibson, et al v. The National Association of Realtors, et al* ("NAR"), Judge Bough of the Western District of Missouri has ordered an accounting of fees and charges made to the settlement funds, including but not limited to rebates, awards and/or credits from vendors, and financial benefits from banks or any institutions. *See Gibson v. NAR*, No. 23-cv-788-SRB, W.D. Mo., at Docs. 739, 757, 831, 920. In response to such court orders, JND declared that it received no additional fees, charges, rebates, awards, credits from vendors, or financial benefits from banks or other institutions in connection with its work on that settlement. (NAR Doc. 755). As shown in *Facebook* and *NAR*, disclosure of compensation that administrators have received outside of a settlement fund is warranted and appropriate.

Class Counsel seek such disclosure here, and respectfully request that the Court order JND to disclose to Class Counsel, Defendant, and the Court the amount of any rebates, awards and/or credits from vendors, and financial benefits from banks or any institutions.  JND has been provided notice of this filing and intends to provide a response.

Dated: July 10, 2026.

Respectfully submitted,

/s/ Roy E. Barnes
Roy E. Barnes
Ga. Bar No. 039000
J. Cameron Tribble
Ga. Bar No. 754759
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel. 770.227.6375
roy@barneslawgroup.com
ctribble@barneslawgroup.com

/s/Norman E. Siegel
Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel. 816.714.7100
siegel@stuevesiegel.com

/s/ Amy E. Keller
Amy E. Keller
**DICELLO LEVITT LLP**
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Tel. 312.214.7900
akeller@dicellolevitt.com

***Consumer Plaintiffs' Counsel***

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this document has been prepared in compliance with Local Rules 5.1 and 7.1.

*/s/ Roy E. Barnes*
Roy E. Barnes
Ga. Bar No. 039000
J. Cameron Tribble
Ga. Bar No. 754759
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel. 770.227.6375
roy@barneslawgroup.com
ctribble@barneslawgroup.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed with this Court via its CM/ECF service, which will send notification of such filing to all counsel of record this 10th day of July, 2026.

I also certify that a copy of the foregoing was sent to counsel for JND Legal Administration via electronic mail this 10th day of July, 2026.

*/s/ Roy E. Barnes*
Roy E. Barnes
Ga. Bar No. 039000
J. Cameron Tribble
Ga. Bar No. 754759
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Tel. 770.227.6375
roy@barneslawgroup.com
ctribble@barneslawgroup.com

# EXHIBIT G

# Exhibit 1

**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| Chaim Lerman, individually and on behalf of others similarly situated, Plaintiffs, | : | |
| v. | : | 15-cv-07381 (SJ) (LB) |
| Apple Inc., Defendant. | : | |

# SETTLEMENT AGREEMENT AND RELEASE

## TABLE OF CONTENTS

PAGE


**1.** DEFINITIONS ..........1

**2.** RECITALS ..........6

**3.** CONFIDENTIALITY ..........8

**4.** THE SETTLEMENT CLASS ..........9

**5.** SETTLEMENT CONSIDERATION ..........10

**6.** NOTICE AND SETTLEMENT ADMINISTRATION ..........12

**7.** COURT APPROVAL ..........22

**8.** ATTORNEYS' FEES AND EXPENSES AND NAMED PLAINTIFF SERVICE AWARDS ..........23

**9.** RELEASES AND DISMISSAL OF ACTION ..........25

**10.** DEFENDANT'S DENIAL OF LIABILITY; AGREEMENT AS DEFENSE IN FUTURE PROCEEDINGS ..........27

**11.** MODIFICATION OR TERMINATION OF THE SETTLEMENT ..........28

**12.** NOTICES ..........30

**13.** MISCELLANEOUS ..........30

The Parties, by and through their respective counsel, in consideration for and subject to the promises, terms, and conditions contained in this Settlement Agreement, hereby warrant, represent, acknowledge, covenant, stipulate and agree, subject to Court approval pursuant to Rule 23 of the Federal Rules of Civil Procedure, as follows:

**1. DEFINITIONS**

As used herein, the following terms have the meanings set forth below:

1.1 "Action" means the litigation styled *Lerman v. Apple Inc.*, No. 15-cv-07381 (SJ) (LB) (E.D.N.Y.), filed in the United States District Court for the Eastern District of New York.

1.2 "Apple" means Apple Inc.

1.3 "Approved Claims" means those Claims which are approved by the Settlement Claims Administrator for payment.

1.4 "Attorneys' Fees and Expenses" means the amount of attorneys' fees and reimbursement of costs and expenses awarded to Class Counsel by the Court from the Gross Settlement Amount.

1.5 "CAFA Notice" means notice of this settlement to the appropriate federal and state officials, as provided by the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, and the form of which is attached in **Exhibit A.**

1.6 "Claim" means any claim submitted by a Settlement Class Member.

1.7 "Claim Form" means the proof of claim and release form(s) substantially in the form attached as **Exhibit B**, which form is to be approved by the Court.

1.8 "Claims Period" means the period between the Notice Date until the deadline set forth in paragraph 6.4.

1.9 "Class Counsel" means the law firms of Pomerantz LLP and Bronstein, Gewritz & Grossman, LLC, who have any and all authority and capacity necessary to execute this Settlement Agreement and bind all of the Named Plaintiffs who have not personally signed this Settlement Agreement, as if each of those individuals had personally executed this Settlement Agreement.

1.10 "Class Notice" means the form of notice to be disseminated to Settlement Class Members informing them about the terms of this Settlement Agreement, their right to participate in this Settlement Agreement, to opt out, or to object to same, and to appear at the Final Approval Hearing, and instructing Settlement Class Members on how to submit requests for the cash payment. A copy of the proposed Class Notice is attached as **Exhibit C.**

1.11 "Court" means the United States District Court for the Eastern District of New York.

1.12 "Defense Counsel" means the law firm of DLA Piper LLP (US).

1.13 "Effective Date" shall be the date on which all appellate rights with respect to the Final Order and Judgment have expired or have been exhausted in such a manner as to affirm the Final Order and Judgment, and when no further appeals are possible.

1.14 "Final Approval Order" and "Final Judgment" mean the final approval order and judgment dismissing and closing the Action, respectively, in the form attached as **Exhibit D.**

1.15 "Final Approval Hearing" means the hearing(s) held by the Court to consider and determine whether the requirements for certification of the Settlement Class have been met and whether the Settlement should be approved as fair, reasonable, and adequate; whether Class Counsel's Attorneys' Fees and Expenses and/or Named Plaintiff Service Awards should be approved; and whether the final judgment approving the Settlement and dismissing the Action on the merits and with prejudice should be entered. The Final Approval Hearing may, from time to

time and without further notice to the Settlement Class (except those who have filed timely and valid objections and requested to speak at the Final Approval Hearing), be continued or adjourned by order of the Court.

1.16 "Gross Settlement Amount" means Twenty Million U.S. Dollars ($20,000,000.00), which constitutes the non-reversionary funds used to resolve the claims asserted against Apple in this Action.

1.17 "Mediator" means the Honorable Diane M. Welsh (Ret.).

1.18 "Named Plaintiffs" means Chaim Lerman, Roslyn Williams, and James Vorrasi. Notwithstanding the foregoing, the "Named Plaintiffs" shall further exclude any individual who requests exclusion from the Settlement Class and/or submits an objection to the Settlement.

1.19 "Named Plaintiff Service Awards" means the service awards for the Named Plaintiffs, as set forth in paragraph 8.6.

1.20 "Net Settlement Amount" means the Gross Settlement Amount, less any amounts paid for Class Counsel's Attorneys' Fees and Expenses, administrative and notice costs, any Named Plaintiff Service Awards, and any other costs associated with resolving the claims asserted against Apple.

1.21 "Notice Date" means thirty (30) days after the deadline for the Settlement Administrator to receive the names, e-mail addresses, mailing addresses (where available), and serial numbers (where available) for the members of the Settlement Class as provided in paragraph 6.2.3.

1.22 "Notice Plan" means the plan created by the Parties for the purpose of providing notice of this Settlement Agreement to the Settlement Class Members, as described in Section 6.

1.23 "Opt-Out and Objection Date" means the date ordered by the Court.

1.24 "Parties" means Apple and the Named Plaintiffs.

1.25 "Preliminary Approval Order" means the order preliminarily approving the Settlement, providing for notice to the Settlement Class, and other related matters in the form attached as **Exhibit F**.

1.26 "Release" means the release set forth in Section 9.

1.27 "Released Claims" means any and all claims (excluding claims for personal injury), whether known or unknown, relating to the Action during the Class Period under federal, state, foreign, or any other law or regulation.

1.28 "Released Parties" means Apple and its successors and predecessors in interest, subsidiaries, affiliates, direct or indirect parents, wholly or majority-owned subsidiaries, affiliated and related entities, partners and privities, and each of Apple's past or present officers, directors, shareholders, employees, agents, principals, heirs, representatives, accountants, auditors, consultants, attorneys, insurers, and reinsurers.

1.29 "Residual" means the difference between the value of the Approved Claims and the Net Settlement Amount.

1.30 "Settlement" and "Settlement Agreement" mean the settlement described in this Settlement Agreement and Release, including all of its exhibits.

1.31 "Settlement Claims Administrator" and "Settlement Administrator" means JND Legal Administration, which shall provide settlement notice and administration services pursuant to the terms of this Settlement Agreement.

1.32 "Settlement Administration Protocol" means the protocol attached as **Exhibit G**.

1.33 "Settlement Class Member" means and includes every member of the Settlement Class who does not validly and timely request exclusion from the Settlement Class.

1.34 "Settlement Class" encompasses the following classes, as defined by the Court in its Order Granting Plaintiffs' Motion for Class Certification (ECF No. 127 in the Action):

> <u>Class One</u>: All individuals and entities in New York who currently own or have owned an iPhone 4S that was updated to any version of iOS 9 from any version of iOS 7 or iOS 8.
>
> <u>Class Two</u>: All individuals and entities in New Jersey who currently own or have owned an iPhone 4S that was updated to any version of iOS 9 from any version of iOS 7 or iOS 8.

The Settlement Class excludes: (a) directors, officers, and employees of Apple or its subsidiaries and affiliated companies, as well as Apple's legal representatives, heirs, successors, or assigns; (b) the Court, the Court staff, as well as any appellate court to which this matter is ever assigned and its staff; (c) Defense Counsel, as well as their immediate family members, legal representatives, heirs, successors, or assigns; (d) any other individuals whose claims already have been adjudicated to a final judgment; and (e) those individuals who timely and validly request exclusion.

1.35 "Settlement Escrow Account" means an interest-bearing escrow account at Huntington National Bank that receives the Gross Settlement Amount and is administered by the Settlement Administrator.

1.36 "Settlement Funds" means funds available to pay the Approved Claims and the Named Plaintiff Service Awards.

1.37 "Settlement Website" means an Internet website that the Settlement Claims Administrator shall establish to inform the Settlement Class of the terms of this Settlement, their rights, dates, deadlines, and related information. The website and URL will not include any Apple trademarks, Apple tradenames, or Apple logos. For the avoidance of doubt, the Settlement Website may reference "Apple" or "Apple Inc."

1.38 "Summary Notice" means the Summary Notice of Settlement, substantially in the form attached as **Exhibit H.**

1.39 Notwithstanding the foregoing definitions and terms, the following individual and former plaintiff is not a Settlement Class Member, because her claims have been dismissed with prejudice: Christina Gonzalez. This individual shall have no right to any payment(s) pursuant to this Settlement.

**2. RECITALS**

2.1 On December 29, 2015, Plaintiff Chaim Lerman filed the initial Complaint. The initial Complaint alleged that Mr. Lerman upgraded his iPhone 4S devices to iOS 9 as a result of Apple's allegedly false and deceptive representations about iOS 9, and that Apple allegedly violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–1 et seq., and New York General Business Law §§ 349 and 350.

2.2 The First Amended Class Action Complaint was filed on January 18, 2016, on behalf of plaintiffs Roslyn Williams, Chaim Lerman, Christina Gonzalez, and James Vorrasi. Apple filed an initial Motion to Dismiss on March 14, 2016.

2.3 The Second Amended Class Action Complaint was filed on March 28, 2016, on behalf of plaintiffs Roslyn Williams, Chaim Lerman, Christina Gonzalez, and James Vorrasi. Apple again moved to dismiss. On November 1, 2017, the Court denied Apple's Motion to Dismiss.

2.4 On May 15, 2018, the Court granted the Parties' stipulation to the dismissal with prejudice of the claims brought by Plaintiff Christina Gonzalez.

2.5 The Second Amended Class Action Complaint asserted claims on behalf of New York and New Jersey classes, and on September 27, 2019, the Named Plaintiffs moved for

certification of the New York and New Jersey classes. On October 7, 2020, the Court granted the motion in part, certifying the New York and New Jersey classes for monetary relief, and denied the motion in part as to the claims for injunctive relief.

2.6 The Parties have investigated the facts and have analyzed the relevant legal issues regarding the claims and defenses asserted in this Action, including through extensive fact and expert discovery, including more than fifteen depositions, briefing, arguments, a decision on class certification, *Daubert* briefing, a Rule 23(f) petition to the Second Circuit Court of Appeals, and more than six years of hard-fought litigation and is the product of extensive, arm's-length settlement negotiations and a mediation session before the Mediator on February 16, 2022.

2.7 The Settlement is not an admission by Apple of wrongdoing, fault, liability, or damage of any kind. Apple vigorously disputes the claims alleged in the Action and is entering into this Settlement to avoid burdensome and costly litigation. Apple denies each and every one of the plaintiffs' allegations, Apple has asserted numerous defenses to the plaintiffs' claims, Apple disclaims any liability whatsoever, and Apple further denies that this case satisfies the requirements to be tried as a class action under Federal Rule of Civil Procedure 23. Apple specifically denies that it made any misrepresentation or omission with respect to iOS 9 on the iPhone 4S. Without admitting any of the allegations made in the Action or any liability whatsoever, the Parties recognize that the outcome of this Action is uncertain, and that a final resolution through the litigation process would require several more years of protracted, adversarial litigation, trial, and appeals, substantial risk and expense, the distraction and diversion of Apple's personnel and resources, and the expense of any possible future litigation raising similar or duplicative claims. Apple is willing to enter into this Settlement solely in order to eliminate the burdens, distractions,

expense, and uncertainty of protracted litigation and in order to obtain the releases and Final Judgment contemplated by this Settlement.

2.8 Class Counsel and the Named Plaintiffs believe that the claims asserted in the Action have merit and have examined and considered the benefits to be obtained under this Settlement, the risks associated with the continued prosecution of this complex and potentially time-consuming litigation, and the likelihood of ultimate success on the merits, and have concluded that the Settlement is fair, adequate, reasonable, and in the best interests of the Settlement Class.

2.9 The Parties desire to settle the Action in its entirety as to the Named Plaintiffs, the Settlement Class, and Apple with respect to all claims arising out of the facts underlying this Action. The Parties intend this Agreement to bind Named Plaintiffs (both as the class representatives and individually), Apple, Class Counsel, and all Settlement Class Members.

## 3. CONFIDENTIALITY

3.1 The Parties must comply with all portions of the Stipulated Protective Order (ECF No. 46).

3.2 This Settlement Agreement and its terms, including the fact of the proposed Settlement, shall remain completely confidential until all documents are executed, and the Motion for Preliminary Approval is filed with the Court. Pending the filing of that Motion, Class Counsel may disclose this Settlement Agreement and its terms to the Named Plaintiffs, who will also maintain the complete confidentiality of this Settlement Agreement and its terms, including the fact of the proposed Settlement. Apple may, at its sole discretion, disclose the terms of the Settlement Agreement to its auditors and other parties as reasonably necessary.

3.3 If, through the actions of any of the Parties or their counsel, this Settlement Agreement and the proposed Settlement become public before the Motion for Preliminary Approval is filed with the Court, the responsible Party or counsel shall pay liquidated damages of Twenty-Five Thousand U.S. Dollars ($25,000.00) to the non-responsible Party.

**4. THE SETTLEMENT CLASS**

4.1 This Court has certified a class as defined at paragraph 1.34, above.

4.2 Apple contends that this Action should not have been certified as a class action under Federal Rule of Civil Procedure 23(b). Nothing in this Settlement Agreement shall be construed as an admission by Apple that this Action or any similar case is amenable to class certification for trial purposes. Furthermore, nothing in this Settlement Agreement shall prevent Apple from opposing class certification or seeking decertification of the Settlement Class if final approval of this Settlement Agreement is not obtained, or not upheld on appeal, including review by the United States Supreme Court, for any reason. Apple supports certification of the class for settlement purposes only.

4.3 The Parties stipulate and agree that, subject to Court approval, the Settlement Class should be conditionally certified pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure solely for purposes of the Settlement embodied in this Settlement Agreement. If, for any reason, this Settlement Agreement is not approved by the Court, the stipulation for certification and all of the agreements contained herein shall be considered null and void as provided in paragraph 7.4.

4.4 Apple does not consent to certification of the Settlement Class (or to the propriety of class treatment) for any purpose other than to effectuate this Settlement. Apple's agreement to provisional certification does not constitute an admission of wrongdoing, fault, liability, or damage

of any kind, or that any class certification would be appropriate for litigation or any other purpose other than to effectuate this Settlement.

4.5 If for any reason the Effective Date does not occur or this Settlement Agreement is terminated, disapproved by any court (including any appellate court), or not consummated for any reason, the order certifying the Settlement Class for purposes of effectuating the Settlement (and all preliminary and final findings regarding that settlement class certification order) shall be automatically vacated upon notice of the same to the Court. The Action shall then proceed as though such findings had never been made. Additionally, the Parties and their counsel shall not refer to or invoke the vacated findings and/or order relating to class settlement or Rule 23 of the Federal Rules of Civil Procedure if this Settlement Agreement is not consummated, and the Action is later litigated and contested by Apple under Rule 23 or any equivalent statute or rule.

## 5. SETTLEMENT CONSIDERATION

5.1 **Cash Payment to Settlement Class Members.** In consideration of the releases and dismissals set forth in this Settlement Agreement, subject to Court approval, and subject to the other terms and conditions of this Settlement Agreement (including the Gross Settlement Amount), Settlement Class Members who meet the requirements of and follow the procedures set forth in paragraphs 6.3 to 6.7 and who submit a declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 that, to the best of their knowledge, (1) they downloaded iOS 9 (which was first released in September 2015), or any version thereof, onto their iPhone 4S; (2) they lived in New York or New Jersey at the time that they first downloaded any version of iOS 9; and (3) their iPhone 4S experienced a significant decline in performance as a result, shall be sent Fifteen U.S. Dollars ($15.00) per applicable device. The actual amount of payment may differ, depending on the amount of any Attorneys' Fees and Expenses, Named Plaintiff Service Awards, Claims

Administration Expenses, and whether the aggregate value of Approved Claims reaches the Net Settlement Amount, as set forth in paragraphs 5.2 to 5.3.2 below. Additionally, if multiple Settlement Class Members submit Claims pertaining to the same eligible device, the payment amount for that device shall be divided equally among those submitting Approved Claims regarding that particular device.

5.2 **Gross Settlement Amount**. Subject to the terms of this Settlement Agreement, Apple's total financial commitment under this Settlement shall not exceed the Gross Settlement Amount of $20,000,000. Apple shall have no other financial obligations under this Settlement Agreement. Moreover, notwithstanding anything to the contrary herein, in no event shall the aggregate cash payment to the Settlement Class Members exceed the Net Settlement Amount. If the total amount of validated claims submitted by members of the Settlement Class, inclusive of the Named Plaintiff Service Awards, exceeds the Net Settlement Amount, then the cash payment for each applicable device identified in the Approved Claims shall be reduced on a pro rata basis to ensure the aggregate cash payment to Settlement Class Members does not exceed the Net Settlement Amount.

5.3 Notwithstanding paragraph 5.1, if payment of Fifteen U.S. Dollars ($15.00) for each iPhone 4S device identified in Approved Claims submitted by Settlement Class Members does not reach the Net Settlement Amount, the Residual shall be allocated in order of priority as follows:

5.3.1 The cash payment for each Approved Claim shall be increased on a pro rata basis until the aggregate value of Approved Claims is equal to the Net Settlement Amount.

Notwithstanding the foregoing, the pro rata payment for each Approved Claim per applicable device shall not exceed One Hundred Fifty U.S. Dollars ($150.00).

5.3.2 If the total amount calculated in paragraph 5.3.1 does not reach the Net Settlement Amount following the pro rata adjustment described therein, the remaining Residual shall be distributed to the *cy pres* recipient. By the hearing on the motion for final approval, the Parties will publicly file with the Court a proposed *cy pres* recipient or recipients.

## 6. NOTICE AND SETTLEMENT ADMINISTRATION

6.1 **Neutral Settlement Claims Administrator**. Subject to Court approval, the Settlement Claims Administrator shall provide settlement notice and administration services, in accordance with the terms of this Settlement Agreement and the Settlement Administration Protocol. The reasonable costs of notice and the costs of administering the Settlement shall be paid from the Gross Settlement Amount. The Parties jointly will oversee the Settlement Administrator's administration of the settlement.

6.2 **Notice Procedures**. The Parties agree to the following forms and methods of notice to the Settlement Class:

6.2.1 A copy of the Class Notice, together with the Claim Form, the Settlement Agreement, the motions for Final Approval Order and Final Judgment, Attorneys' Fees and Expenses, and Named Plaintiff Service Awards, and Court orders pertaining to the Settlement, shall be posted and available for download on the Settlement Website maintained by the Settlement Claims Administrator. In addition, the Settlement Website will include a section for frequently asked questions and procedural information regarding the status of the Court-approval process, such as an announcement when the final approval hearing is scheduled, deadlines for opting out and objecting, when the Final Order and Judgment has been entered, and when the Effective Date

is expected or has been reached. The Settlement Website and URL may not include any of Apple's logos, tradenames, or trademarks. The Settlement Claims Administrator will terminate the Settlement Website thirty (30) days after either (1) the Effective Date, or (2) the date on which the settlement is terminated or otherwise not approved by a court. The Settlement Claims Administrator will then promptly transfer ownership of the URL to Apple.

6.2.2 The Settlement Administrator also shall establish a toll-free telephone number that will have recorded information answering frequently asked questions about certain terms of the Settlement Agreement, including, but not limited to, the claim process and instructions about how to request a Claim Form, Class Notice, and/or Summary Notice.

6.2.3 The Settlement Claims Administrator shall e-mail a copy of the Summary Notice to the e-mail address of record on the Apple ID account of the members of the Settlement Class. If the claims rate is below five (5) percent twenty-one (21) days after the e-mailing of the Summary Notice, the parties will meet and confer about whether to send a second e-mail with a copy of the Summary Notice to the e-mail address of record on the Apple ID account of the members of the Settlement Class. If the parties are not able to reach agreement from this meet-and-confer process within three (3) days, they will submit the matter to the Mediator for a binding decision within 24 hours. The electronic version of the Summary Notice shall contain a direct link to the Settlement Website and the instructions for the Claim Form. To facilitate the distribution of the Summary Notice, within thirty (30) days of the Court's entry of the Preliminary Approval Order, Apple shall provide the Settlement Claims Administrator with the names, e-mail addresses, mailing addresses (where available), and serial numbers (where available) in Apple's records for the members of the Settlement Class. If Apple does not have a valid e-mail address for a member of the Settlement Class, the Settlement Claims Administrator shall mail a copy of the

Summary Notice via postcard to that member of the Settlement Class. An e-mail address is not considered valid if it results in a hard bounce back.

6.2.4 The names, e-mail addresses, mailing addresses, and serial numbers are personal information about the members of the Settlement Class and shall be provided only to the Settlement Claims Administrator and solely for the purposes of providing notice, processing requests for exclusion, and administering payment. The Settlement Claims Administrator shall execute the Stipulated Protective Order (ECF No. 46), treat all such information as "Highly Confidential – Attorneys' Eyes Only," and take all reasonable steps to ensure that all such information is used solely for the purpose of administering this Settlement.

6.2.5 The Settlement Claims Administrator shall complete the initial e-mail notice (and, if applicable, the notice via postcard) by the Notice Date. If, despite using best efforts, the Settlement Claims Administrator is unable to complete the notice by the Notice Date, the Settlement Claims Administrator shall inform the Parties of the status of the notice and notify the Parties when the notice has been completed.

6.2.6 Apple shall serve notice of the settlement that meets the requirements of CAFA, 28 U.S.C. § 1715, on the appropriate federal and state officials not later than ten (10) days after the filing of this Settlement Agreement with the Court. A proposed form of CAFA Notice, without the accompanying attachments, is attached as **Exhibit A.** Within a reasonable time

thereafter, Apple shall file with the Court a certification of the date(s) on which the CAFA Notice was served.

6.2.7 If this notice plan is not approved or is modified in a material way by the Court, Apple shall have the right to unilaterally terminate the Settlement.

6.3 **Claim Form**. Settlement Class Members who wish to receive a cash payment will be required to submit a Claim Form. The Claim Form shall, among other things, require the Settlement Class Member to certify, under penalty of perjury, to the best of their knowledge, (1) they downloaded iOS 9 (which was first released in September 2015), or any version thereof, onto their iPhone 4S; (2) they lived in New York or New Jersey at the time that they first downloaded any version of iOS 9; and (3) their iPhone 4S experienced a significant decline in performance as a result. The Claim Form will also require the Settlement Class Member to provide their name, e-mail, and mailing address, and iPhone 4S serial number, if they have it. The Claim Forms shall be submitted to the Settlement Claims Administrator via U.S. mail or electronically through the Settlement Website.

6.4 **Claims Period**. To be valid, Claim Forms must be received by the Settlement Claims Administrator by no later forty-two (42) days from the Notice Date. Requests to opt out and objections must be received by the Settlement Claims Administrator within forty-two (42) days from the Notice Date.

6.5 **Process for Opting Out of Settlement**. The Parties agree to the following process:

6.5.1 Any Settlement Class Member who wishes to be excluded from the settlement; (i.e., to opt out of the Settlement Class), must mail or deliver a written request for exclusion to the Settlement Claims Administrator, received by the Opt-Out and Objection Date, which shall be no later than forty-two (42) days from the Notice Date. The written request must

provide the Settlement Class Member's name, address and telephone number, state that the Settlement Class Member requests exclusion from the Settlement Class, and must be signed by the Settlement Class Member. Any Settlement Class Member who does not submit a timely request for exclusion shall be bound by the terms of the Settlement including the releases defined herein in Section 9, all subsequent proceedings, orders, and the Final Order and Judgment in this Action relating to this Settlement Agreement, even if he or she has pending, or subsequently initiates, litigation, arbitration, or any other proceeding against Apple relating to the Released Claims.

6.5.2 The Settlement Claims Administrator shall receive and maintain the exclusion requests and provide copies of the exclusion requests to the Parties' counsel.

6.5.3 At least seven (7) court days before the Final Approval Hearing, the Settlement Claims Administrator shall provide the Parties' counsel with a list of all Settlement Class Members who submitted timely, valid exclusion requests as well as a statement as to the percent of the total number of members of the Settlement Class Members that such exclusion requests represent. As soon as practicable after the opt-out deadline, the Settlement Claims Administrator shall provide the Court with a list of the individuals who timely and validly requested exclusion from the Settlement.

6.6 **Process for Objections**. The Parties agree to the following process:

6.6.1 Objections shall be filed with the Court and served on Class Counsel and Defense Counsel within forty-two (42) days from the Notice Date.

6.6.2 The Parties shall request that the Court require any objection to be in writing, filed with the Court, and include the following information: (a) the objector's name, address, telephone number and, if represented by counsel, the name, address, and telephone number of his or her counsel; (b) proof of membership in the Settlement Class, as well as all other

materials the Settlement Class Member wants the Court to consider; (c) a statement whether the objector intends to appear at the Final Approval Hearing, either in person or through counsel; (d) all grounds for his or her objection, accompanied by any legal support for the objection known to the objector or his or her counsel; (e) copies of any papers, briefs, or other documents upon which the objection is based or upon which the objector or his or her counsel intends to rely; (f) a statement of whether the objector or his or her counsel will ask to speak at the Final Approval Hearing and, if so, the amount of time the objector or counsel requested; and (g) the objector's handwritten signature.

6.6.3 The Parties shall also request that the Court require any objector or his or her counsel who intends to make an appearance at the Final Approval Hearing to file, and serve on Class Counsel and Defense counsel, a notice of intention to appear at the Final Approval Hearing by no later than the Opt-Out and Objection Date.

6.7 **Review of Claims Submitted**. The Settlement Claims Administrator shall determine whether a submitted Claim Form meets the requirements set forth in this Settlement Agreement. Each Claim Form shall be submitted to and reviewed by the Settlement Administrator, who shall determine, based on its discretion and in consultation with the parties, whether each Claim shall be allowed. The Settlement Claims Administrator shall use best practices and all reasonable efforts and means to identify and reject duplicate and/or fraudulent claims, including, but not limited to: (i) indexing all payments provided to the Settlement Class Members; (ii) validating claims against Apple's records, (iii) determining the amount of the Cash Option payment based solely upon Apple's records, (iv) using a class member identifier, which will be matched to the notice list, and (v) screening for multiple or fraudulent claims which are not consistent with the facts. The Settlement Claims Administrator shall have the right to audit claims,

and the Settlement Claims Administrator may request additional information from members of the Settlement Class submitting claims.

6.8 **Rejection of Claims Forms.** The Parties agree as follows:

6.8.1 Claim Forms that do not meet the requirements set forth in this Settlement and/or in the Claim Form instructions shall be rejected.

6.8.2 Where a good faith basis exists, the Settlement Claims Administrator may reject a Claim Form for, among other reasons, the following: (a) the Claim Form identifies a product that is not covered by the terms of this Settlement; (b) failure fully to complete and/or sign the Claim Form; (c) illegible Claim Form; (d) the Claim Form is fraudulent; (e) the Claim Form is duplicative of another Claim Form; (f) the person submitting the Claim Form is not a Settlement Class Member; (g) the person submitting the Claim Form requests that payment be made to a person or entity other than the Settlement Class Member for whom the Claim Form is submitted; (h) failure to timely submit a Claim Form; or (i) the Claim Form otherwise does not meet the requirements of this Settlement Agreement. Claim Forms that do not meet the terms and conditions of this Settlement shall be promptly rejected by the Settlement Administrator.

6.8.3 The Settlement Claims Administrator shall have forty-five (45) days from the end of the Claims Period to exercise the right of rejection. The Settlement Claims Administrator shall notify the claimant using the contact information provided in the Claim Form of the rejection. Class Counsel and Defense Counsel shall be provided with copies of all such notifications of rejection, provided that the copies do not contain the name, email address, mailing address, or other personal identifying information of the claimant.

6.8.4 If any claimant whose Claim Form has been rejected, in whole or in part, desires to contest such rejection, the claimant must, within ten (10) days from receipt of the

rejection, transmit to the Settlement Claims Administrator by e-mail or U.S. mail a notice and statement of reasons indicating the claimant's grounds for contesting the rejection, along with any supporting documentation, and requesting further review by the Settlement Administrator, in consultation with Class Counsel and Defense Counsel, of the denial of the Claim.

6.8.5 If Class Counsel and Defense Counsel cannot agree on a resolution of the claimant's notice contesting the rejection, the disputed Claim shall be presented to the Court or to the Mediator if appointed by the Court for summary and non-appealable resolution.

6.8.6 No person shall have any claim against Apple, Defense Counsel, the Named Plaintiffs, Class Counsel, and/or the Settlement Claims Administrator based on any eligibility determinations, distributions, or awards made in accordance with this Settlement.

6.8.7 This provision does not affect or limit in any way the right of review by the Court or referee of any disputed Claim Forms as provided in this Settlement.

6.9 Information Regarding Claims Submitted, Approved, and Rejected. The Parties agree as follows:

6.9.1 Within sixty (60) days from the end of the Claims Period, the Settlement Claims Administrator shall provide a spreadsheet to Class Counsel and Defense Counsel that contains information sufficient to determine: (a) the number of Settlement Class Members that submitted a claim; (b) the number of submitted Claim Forms that are valid and timely, and which are not; (c) the number of submitted Claim Forms the Settlement Claims Administrator intends to

treat as Approved Claims; and (d) the number of submitted Claim Forms the Settlement Claims Administrator has denied and the reason(s) for the denials.

6.9.2 The Settlement Claims Administrator shall provide supplemental spreadsheets with respect to any Claim Forms submitted after the expiration of the deadline, within a reasonable time after receiving such Claim Forms.

6.9.3 The materials that the Settlement Claims Administrator provides to Class Counsel pursuant to this paragraph shall not contain the names, e-mail addresses, mailing addresses, or other personal identifying information of the Settlement Class Members.

6.9.4 The Settlement Claims Administrator shall retain the originals of all Claim Forms (including envelopes with postmarks, as applicable), and shall make copies available to Class Counsel or Defense Counsel (with redactions to remove the names, e-mail addresses, mailing addresses, or other personal identifying information of the Settlement Class Members) upon request.

6.9.5 All such spreadsheets and related materials (including Claim Forms) shall be designated as "Highly Confidential – Attorneys' Eyes Only" as provided in paragraph 6.2.4.

6.10 **Calculation of Cash Payments**. In addition to the spreadsheet(s) specified in paragraph 6.9, within sixty (60) days from the end of the Claims Period, the Settlement Claims Administrator shall provide to Defense Counsel and Class Counsel information sufficient to calculate the per-device and aggregate cash payment for the Approved Claims, calculated in accordance with paragraphs 5.1, 5.2, and 5.3. If multiple Settlement Class Members submit Claims pertaining to the same eligible device, the payment amount for that device shall be divided equally among those Settlement Class Members submitting Approved Claims regarding that particular device.

6.11 **Opportunity for Review**. Defense Counsel and Class Counsel shall have fourteen (14) days after receiving the spreadsheet(s) and information specified in paragraph 6.9 to contest the Settlement Administrator's determination with respect to any of the submitted Claims. Defense Counsel and Class Counsel shall meet and confer in good faith within ten (10) days to reach resolution of any such disputed Claim(s). If Class Counsel and Defense Counsel cannot agree on a resolution of any such disputed Claim(s), the disputed Claim(s) shall be presented to the Court, or to the Mediator if appointed by the Court for summary and non-appealable resolution.

6.12 **Timing of Payment to Settlement Administrator**. Within thirty (30) days after the Court enters the Preliminary Approval Order, and after provision to Apple of all information necessary to effectuate a transfer of funds, Apple shall deliver the Gross Settlement Amount to the Settlement Escrow Account, with the Settlement Administrator serving as escrow agent for the Settlement Escrow Account. The Settlement Administrator shall administer the Settlement Escrow Account that receives the Gross Settlement Amount, subject to the continuing jurisdiction of the Court and from the earliest possible date, as a qualified settlement fund as defined in Treasury Regulation § 1.468B-1, et *seq*. Any taxes owed by the Gross Settlement Amount shall be paid by the Settlement Claims Administrator out of the Gross Settlement Amount.

6.13 **Procedures for Distribution of Cash Payments**. Within ninety (90) days after the Effective Date, the Settlement Claims Administrator shall have substantially completed providing instructions for the payments to the Settlement Class Members for the Approved Claims (and in the case of Named Plaintiffs, the additional Named Plaintiff Service Awards) to be made from the Settlement Funds in the Settlement Escrow Account, which shall be sent to Settlement Class Members through electronic distribution, or in the form of checks that are mailed to the addresses provided on the submitted Claim Forms to those Settlement Class Members.

## 7. COURT APPROVAL

7.1 The Parties agree to recommend approval of the Settlement to the Court as fair and reasonable and to undertake their best efforts to obtain such approval. "Best efforts" includes that the Parties may not oppose any application for appellate review by one of the Parties in the event the Court denies preliminary or final approval. The Parties therefore agree that, by no later than April 29, 2022, the Named Plaintiffs shall submit this Settlement Agreement, together with its exhibits, to the Court and shall apply for entry of the Preliminary Approval Order.

7.2 Upon filing of the Motion for Preliminary Approval, Apple shall provide timely notice of the Settlement as required by the Class Action Fairness Act, 28 U.S.C. § 1711, et seq., in the substantially the form of **Exhibit A.**

7.3 In accordance with the schedule set in the Preliminary Approval Order, Class Counsel shall draft the motion for Final Approval Order and Final Judgment and provide that draft to Defense Counsel at least ten (10) days before filing such motion with the Court.

7.4 In the event that the Settlement is not approved (following the exhaustion of any appellate review), then (a) this Settlement Agreement shall be null and void and of no force or effect, (b) any payments made to the Settlement Administrator, including any and all interest earned thereon less monies expended toward settlement administration and/or Settlement Funds, shall be returned to Apple within ten (10) days from the date the Settlement Agreement becomes null and void, (c) any release shall be of no force or effect, and (d) the Settlement may not be referred to or used as evidence or for any other purpose whatsoever in the Action or in any other action or proceeding. In such event, the Action will proceed as if no settlement has been attempted, and the Parties shall be returned to their respective procedural postures existing on the date the Settlement is executed, so that the Parties may take such litigation steps that they otherwise would

have been able to take absent the pendency of this Settlement. However, any reversal, vacatur, or modification on appeal of (a) any amount of the Attorneys' Fees and Expenses awarded by the Court to Class Counsel, or (b) any determination by the Court to award less than the amounts requested in Attorneys' Fees and Expenses or Named Plaintiff Service Awards shall not give rise to any right of termination or otherwise serve as a basis for termination of this Settlement.

## 8. ATTORNEYS' FEES AND EXPENSES AND NAMED PLAINTIFF SERVICE AWARDS

8.1 Class Counsel has the right to seek Attorneys' Fees and Expenses. Class Counsel shall make any motion for Attorneys' Fees and Expenses by no later than thirty-five (35) days before the Final Approval Hearing. Any objection or opposition to Class Counsel's request for Attorneys' Fees and Expenses shall be filed by no later than twenty-one (21) days before the Final Approval Hearing, and it shall be served on Class Counsel and Defense Counsel.

8.2 Within twenty (20) business days of the Court's Final Approval Order and Final Judgment, the Settlement Claims Administrator shall instruct for Class Counsel to be paid from the Gross Settlement Amount that was deposited into the Settlement Escrow Account, fifty percent (50%) of any Court-approved Attorneys' Fees and Expenses, subject to the Undertaking Regarding Attorneys' Fees and Expenses attached as **Exhibit I** that Class Counsel executed on February 17, 2022, and providing all information necessary to effectuate such transmission, including adequate payment instructions consisting of wire transfer instructions and completed IRS Forms W-9 (including addresses and tax identification numbers).

8.3 Pursuant to the Undertaking Regarding Attorneys' Fees and Expenses, Class Counsel hereby jointly and severally submit themselves and their law firms (including all shareholders, members, and/or partners of their law firms) to the obligation to repay to Apple the Attorneys' Fees and Expenses that have been paid if the Court's Final Approval Order and Final

Judgment and/or order regarding Attorneys' Fees and Expenses is vacated, overturned, reversed, or rendered void. Furthermore, the Undertaking Regarding Attorneys' Fees and Expenses authorizes the Court to summarily issue orders (including but not limited to judgments and attachment orders) against each of Class Counsel for up to the full amount of Attorneys' Fees and Expenses (plus any additional attorneys' fees or expenses incurred by Apple in connection with the litigation or enforcement of the Undertaking), and to make findings for sanctions for contempt of court and all other appropriate relief. Class Counsel submits to the jurisdiction of the Court to issue such orders.

8.4 Within ten (10) days after the Effective Date, the Settlement Claims Administrator shall instruct for Class Counsel to be paid from the Gross Settlement Amount that was deposited into the Settlement Escrow Account, the remainder of the Court-approved Attorneys' Fees and Expenses, net of any modifications or reversals on appeal or otherwise.

8.5 Class Counsel has the authority and responsibility to allocate and distribute the awarded funds to other counsel based, in its sole discretion, on counsel's efforts and contributions in the Action, provided that the allocation and distribution is consistent with the Court's order(s) regarding Attorneys' Fees and Expenses. Apple and Defense Counsel shall have no liability or other responsibility for allocation of any such awarded funds, and, in the event that any dispute arises relating to the allocation of fees or costs, Class Counsel and the Settlement Claims Administrator agree to hold Apple and Defense Counsel harmless from any and all such liabilities, costs, and expenses of such dispute.

8.6 Class Counsel will apply to the Court for the payment of a service award for the Named Plaintiffs for each Named Plaintiff. The Named Plaintiffs who are Settlement Class Members also shall be required to submit Claim Forms as specified in paragraph 6.3.

8.7 The Settlement Claims Administrator shall dispense the Named Plaintiff Service Awards from the Settlement Funds (as defined in paragraph 1.36), and in the manner and timing set forth in paragraph 6.13.

8.8 The Court's award(s) of Attorneys' Fees and Expenses and/or Named Plaintiff Service Awards, if any, shall be separate from its determination of whether to approve the Settlement. In the event the Court approves the Settlement but declines to award Class Counsel's Attorneys' Fees and Expenses and/or Named Plaintiff Service Awards in the amounts requested by Class Counsel, the Settlement will nevertheless be binding on the Parties.

**9. RELEASES AND DISMISSAL OF ACTION**

9.1 Upon the Effective Date, the Named Plaintiffs and each of the members of the Settlement Class who have not timely requested exclusion from the Settlement Class, and each of their respective successors, assigns, legatees, heirs, and personal representatives, will be deemed to have released the Released Parties of all manner of action, causes of action, claims, demands, rights, suits, obligations, debts, contracts, agreements, promises, liabilities, damages, charges, penalties, losses, costs, expenses, and attorneys' fees, of any nature whatsoever, known claims or unknown claims, in law or equity, fixed or contingent, which they have or may have arising out of or relating to any of the acts, omissions, or other conduct that was or could have been alleged or otherwise referred to in this Action (including in the Complaint, the First Amended Complaint, and the Second Amended Complaint), relating to iOS 9, or any version thereof, on the iPhone 4S, including, but not limited to, any and all acts, omissions, or other conduct asserting claims (including, without limitation, any unknown claims) arising out of, relating to, or in connection with, the defense, settlement or resolution of the Action.

9.2 As of the Effective Date, the Settlement Class Members and the Named Plaintiffs shall have fully, finally, and forever released, relinquished, and discharged all claims of abuse of process, malicious prosecution, violations of Federal Rule of Civil Procedure 11, and any other claims arising out of the defense of the Action that are known to the Settlement Class Members and/or the Named Plaintiffs as of the Effective Date, against Apple's attorneys, legal representatives, and advisors, including Defense Counsel. Notwithstanding the foregoing, this release shall not include any future claims relating to the continued enforcement of the Settlement, the Stipulated Protective Order, and all orders construing the Stipulated Protective Order, including but not limited to ECF No. 46. This release does not constitute a general release.

9.2.1 After entering into this Settlement, the Settlement Class Members and/or Named Plaintiffs may discover facts other than, different from, or in addition to, those that they know or believe to be true with respect to the claims released by this Settlement, but they intend to release fully, finally and forever any and all such claims. The Settlement Class Members and Named Plaintiffs expressly agree that, upon the Effective Date, they waive and forever release any and all provisions, rights, and benefits conferred by Section 1542 of the California Civil Code, which reads:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

and any law of any state, territory, or possession of the United States or principle of common law, which is similar, comparable, or equivalent to Section 1542 of the California Civil Code.

9.3 As of the Effective Date, the Released Parties shall have fully, finally, and forever released, relinquished, and discharged all claims of abuse of process, malicious prosecution,

violations of Federal Rule of Civil Procedure 11, and any other claims arising out of the initiation, prosecution, or settlement of the Action, including both known claims and unknown claims, against the Named Plaintiffs and Class Counsel. Notwithstanding the foregoing, this release shall not include any future claims relating to the continued enforcement of the Settlement, the Stipulated Protective Order, and all orders construing the Stipulated Protective Order, including but not limited to ECF No. 46. This release does not constitute a general release.

9.4 Upon the Effective Date, the Action shall be dismissed with prejudice.

9.5 The Court shall retain jurisdiction over this Action to enforce the terms of this Settlement. In the event that any applications for relief are made, such applications shall be made to the Court. To avoid doubt, the Final Judgment applies to and is binding upon the Parties, the Settlement Class Members, and their respective heirs, successors, and assigns.

## 10. DEFENDANT'S DENIAL OF LIABILITY; AGREEMENT AS DEFENSE IN FUTURE PROCEEDINGS

10.1 Apple has indicated its intent vigorously to contest each and every claim in the Action and denies all of the material allegations in the Action. Apple enters into this Settlement Agreement without in any way acknowledging any fault, liability, or wrongdoing of any kind. Apple nonetheless has concluded that it is in its best interests that the Action be settled on the terms and conditions set forth herein in light of the expense that would be necessary to defend the Action, the benefits of disposing of protracted and complex litigation, and the desire of Apple to conduct its business unhampered by the distractions of continued litigation.

10.2 Neither this Settlement Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be construed as an admission or concession by Apple of the truth of any allegations in the Action, or of any liability, fault, or wrongdoing of any kind.

10.3 To the extent permitted by law, neither this Settlement Agreement, nor any of its terms, nor any of the negotiations or proceedings connected with it, shall be offered as evidence or received in evidence in any pending or future civil, criminal, administrative, or other action or proceeding to establish any liability or admission by Apple.

10.4 To the extent permitted by law, this Settlement Agreement may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding which may be instituted, prosecuted, or attempted against any of the parties released by this Settlement Agreement for claims covered by the releases in this Settlement Agreement.

## 11. MODIFICATION OR TERMINATION OF THE SETTLEMENT

11.1 Apple has the option to withdraw from the Settlement and render the Settlement Agreement null and void if the aggregate number of the members of the Settlement Class who timely and validly request exclusion therefrom, equals or exceeds 5 percent of the total number of members of the Settlement Class. If Apple exercises this option, it shall notify Class Counsel of its intent to do so in writing.

11.2 The terms and provisions of this Settlement Agreement may be amended, modified, or expanded by written agreement of the Parties and approval of the Court; provided, however, that after entry of the Final Approval Order and Final Judgment, the Parties may by written agreement effect such amendments, modifications, or expansions of this Settlement Agreement and its implementing documents (including all exhibits) without further notice to the Settlement Class or approval by the Court if such changes are consistent with the Court's Final Approval Order and Final Judgment and do not materially alter, reduce, or limit the rights of Settlement Class Members.

11.3 Apple has sole and exclusive discretion to terminate and withdraw from the Settlement and declare it null and void as provided in paragraph 7.4 if prior to final judgment:

(a) the Court makes an order materially inconsistent with any term of the Settlement Agreement (other than reducing the award of Attorneys' Fees and Expenses or service award), including but not limited to an order denying preliminary or final approval, any modifications to the definitions of the Settlement Class, Settlement Class Members, Released Parties, or the scope of the releases (as provided in paragraph 9), any modifications to the terms of the Settlement consideration (as provided in paragraphs 5.1 to 5.3.2), and any changes to the notice provisions;

(b) This Settlement Agreement is not upheld on appeal, including review by the United States Supreme Court;

(c) any court certifies, on a conditional basis or otherwise, a class, collective, or representative action involving a claim described in this Action by any member(s) of the Settlement Class;

(d) the Named Plaintiffs do not execute the Settlement Agreement or submit a valid and timely objection or opt-out notice; or

(e) the Named Plaintiffs and/or Settlement Class Counsel materially breach the Settlement Agreement.

11.4 If the Effective Date is not reached, this Settlement Agreement is without prejudice to the rights of any party hereto, and all terms, negotiations, and proceedings connected therewith shall not be deemed or construed to be an admission by any Party or evidence of any kind in this Action or any other action or proceeding.

## 12. NOTICES

12.1 All notices to Named Plaintiffs shall be delivered to:

Jeremy A. Lieberman, Esq.
Michael Grunfeld, Esq.
Pomerantz LLP
600 Third Avenue, 20th Floor
New York, New York 10016
jalieberman@pomlaw.com
mgrunfeld@pomlaw.com

Peretz Bronstein, Esq.
Eitan Kimelman, Esq.
Bronstein, Gewirtz & Grossman, LLC
60 East 42nd Street, Suite 4600
New York, New York 10165
peretz@bgandg.com
ekimelman@bgandg.com

12.2 All notices to Apple shall be delivered to:

Raj N. Shah, Esq.
DLA Piper LLP
444 West Lake Street, Suite 900
Chicago, Illinois 60606
raj.shah@us.dlapiper.com

Keara M. Gordon
DLA Piper LLP
1251 Avenue of the Americas, 27th Floor
New York, New York 10020
keara.gordon@us.dlapiper.com

12.3 The notice recipients and addresses designated in paragraphs 12.1 and 12.2 may be changed upon written notice provided to all individuals identified in those paragraphs.

## 13. MISCELLANEOUS

13.1 Entire Agreement: The exhibits and appendices attached to this Settlement Agreement are integral parts thereof and together with this Settlement Agreement, contain the entire, complete, and integrated statement of each and every term and provision of the Settlement.

This Settlement Agreement may not be modified in any respect except upon the written consent of the Parties.

13.2 Authority: The individual signing this Settlement Agreement on behalf of Apple represents that he/she is fully authorized by Apple to enter into, and to execute, this Settlement Agreement on behalf of Apple. Class Counsel represent that they are fully authorized to conduct settlement negotiations with Apple's counsel on behalf of Plaintiffs, and to enter into, and to execute, this Settlement Agreement on behalf of the Settlement Class, subject to Court approval pursuant to Federal Rule of Civil Procedure 23(e). Plaintiffs enter into and execute this Settlement Agreement on behalf of themselves, and as representatives of and on behalf of the Settlement Class, subject to Court approval pursuant to Federal Rule of Civil Procedure 23(e).

13.3 Named Plaintiff Objections: If, prior to the Effective Date, Class Counsel knows, or has reason to know, of any Named Plaintiff who intends to exclude himself or herself from the Settlement or who intends to submit an objection to the Settlement, Class Counsel shall promptly notify Defense Counsel within three (3) days. The Parties shall thereafter meet and confer within seven (7) days of such notification to determine whether any modifications to the Settlement, or any other actions or filings, are required.

13.4 No Assignment: Class Counsel and the Named Plaintiffs represent and warrant that they have not assigned or transferred, or purported to assign or transfer, to any person or entity, any claim or any portion thereof or interest therein, including, but not limited to, any interest in the Action or any related action, and they further represent and warrant that they know of no such assignments or transfers on the part of any member of the Settlement Class.

13.5 No Primary Drafter of Settlement Agreement: The Parties, together with Class Counsel and Defense Counsel, have jointly participated in the drafting of this Settlement

Agreement. No Party hereto shall be considered the drafter of this Settlement Agreement or any provision hereof for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

13.6 Construction: As used in this Settlement Agreement, the masculine, feminine, or neutral gender, and the singular or plural wording, shall each be deemed to include the others whenever the context so indicates.

13.7 Calculation of Days: Unless otherwise noted, all references to "days" in this Settlement Agreement shall be to calendar days. In the event any date or deadline set forth in this Settlement Agreement falls on a weekend or federal legal holiday, such date or deadline shall be on the first business day thereafter.

13.8 Disputes and Governing Law: Any and all disputes arising from or related to this Settlement Agreement must be brought by the Parties, Class Counsel, Defense Counsel, and/or members of the Settlement Class exclusively to the Court. The Parties, Class Counsel, Defense Counsel, and members of the Settlement Class irrevocably submit to the exclusive and continuing jurisdiction of the Court for any suit, action, proceeding, or dispute arising out of or relating to this Settlement Agreement. All terms of this Settlement Agreement and any suit, action, proceeding, or dispute arising out of or relating to this Settlement Agreement shall be governed by and interpreted according to the substantive laws of the State of California without regard to choice of law or conflicts of laws principles; however, nothing in this Settlement Agreement shall operate as a waiver of any Party's position regarding the applicable law governing the underlying claims at issue in the Action.

13.9 Reasonable Extensions: Unless otherwise ordered by the Court, the Parties may jointly agree to reasonable extensions of time to carry out any of the provisions of this Settlement Agreement.

13.10 Stay of Proceedings: All motions, discovery, and other proceedings in the Action shall be stayed until the Court enters the Final Approval Order and Final Judgment, or this Settlement Agreement is otherwise terminated. Upon entry of the Preliminary Approval Order, all Settlement Class Members shall be barred and enjoined from prosecuting any of the Released Claims against any of the Released Parties.

13.11 Effect on Court Orders: Nothing in this Settlement Agreement shall alter or abrogate any prior Court orders entered in the Action, except to the extent necessary to give effect to a stay pursuant to Section 13.10.

13.12 Execution by Counterparts: This Settlement Agreement may be executed in counterparts. Facsimile or PDF signatures shall be considered valid as of the date they bear. Facsimile signatures or signatures sent by e-mail shall be treated as original signatures and shall be binding.

13.13 Best efforts: The Parties, together with Class Counsel and Defense Counsel, agree to prepare and execute all documents, to seek Court approvals, to defend Court approvals, and to do all things reasonably necessary to complete the Settlement.

13.14 Voluntary Execution: This Settlement Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them. The Parties represent and warrant to each other that they have read and fully understand the provisions of this Settlement Agreement and have relied on the advice and representation of legal counsel of their own choosing.

13.15 Variance In Terms: In the event of any variance between the terms of this Settlement Agreement and any of the Exhibits hereto, the terms of this Settlement Agreement shall control and supersede the Exhibit(s).

13.16 Tax Consequences: No opinion concerning the tax consequences of this Settlement Agreement to any Settlement Class Member is given or will be given by Apple, Apple's counsel, or Class Counsel, nor is any Party or his/her/its counsel providing any representation or guarantee respecting the tax consequences of the Settlement as to any Settlement Class Member. The Class Notice will direct Settlement Class Members to consult their own tax advisors regarding the tax consequences of the Settlement and any tax reporting obligations with respect thereto. Each Settlement Class Member is responsible for his/her tax reporting and other obligations respecting the Settlement, if any.

*[Signatures on following page]*

Dated: May 3, 2022

Michael Grunfeld

Jeremy A. Lieberman
Michael Grunfeld
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, New York 10016
T: (212) 661-1100
F: (212) 661-8665
E: jalieberman@pomlaw.com
E: mgrunfeld@pomlaw.com

Peretz Bronstein
Eitan Kimelman
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, New York 10165
T: (212) 697-8209
F: (212) 697-7296
E: peretz@bgandg.com
E: eitank@bgandg.com

*Counsel for Plaintiffs and the Class*

**Dated**: May 3, 2022

Keara M. Gordon
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
T: 212.335.4500
F: 212.335.4501
E: keara.gordon@dlapiper.com

Raj N. Shah
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
T: 312.368.4000
F: 312.236.7516
E: raj.shah@dlapiper.com

*Counsel for Apple Inc.*

**Dated**: May 2, 2022

Heather Grenier
Senior Director, Commercial Litigation
*Apple Inc.*

# INDEX OF EXHIBITS

| | |
|---|---|
| **Exhibit A** | CAFA Notice |
| **Exhibit B** | Claim Form |
| **Exhibit C** | Class Notice |
| **Exhibit D** | Final Approval Order and Judgment |
| **Exhibit E** | [Intentionally omitted] |
| **Exhibit F** | Preliminary Approval Order |
| **Exhibit G** | Settlement Administration Protocol |
| **Exhibit H** | Summary Notice |
| **Exhibit I** | Undertaking Regarding Attorneys' Fees and Expenses |