**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE CLASS ACTION SETTLEMENT ADMINISTRATION LITIGATION**<br><br>-----------------------------------------------------------<br><br>**This Document Relates To:**<br>**ALL CASES** | **Misc. Action No. 25-179 (JDB);**<br>**MDL Docket No. 3162** |

## JOINT STATUS REPORT

Pursuant to Case Management Order No. 1 ("CMO"), the parties respectfully submit this Joint Status Report outlining the disputes to be addressed at the July 28, 2026 Case Management Conference and briefly summarizing the parties' positions on each. The parties have identified the following disputes: (1) the parties' competing proposed discovery schedules; (2) the scope of Early Discovery under the CMO; (3) Plaintiffs' counsel's preservation obligations; and (4) Rule 26(f) obligations relating to custodians, data sources, and discovery planning.

**1.     THE PARTIES' COMPETING PROPOSED DISCOVERY SCHEDULES**

The parties' scheduling dispute primarily concerns whether general discovery should open following the Court's ruling on the pending motions to dismiss, as Defendants propose, or on August 1, 2026, as Plaintiffs propose.

### *Defendants' Position.*

Defendants propose that the discovery schedule follow the Court's ruling on the pending motions to dismiss, which are potentially dispositive of all claims.

**A.     Discovery Should Be Deferred Pending Resolution of the Motions to Dismiss**

At the outset, Defendants propose that the Court defer setting any case schedule until after it rules on Defendants' motions to dismiss, at which point the parties will be able to confer over a

schedule tailored to the scope of any remaining claims and parties. If the Court prefers to set a schedule now, Defendants' proposal is the more efficient and reasonable option. Under Defendants' proposal, Defendants would answer any surviving claims within 60 days of the Court's ruling; general discovery would open upon the filing of those answers; and the schedule would then proceed through fact discovery and class-certification briefing, with the deadlines governing expert discovery and dispositive motions to be set by an interim joint status report filed within 14 days after the Court's ruling on class certification.  Defendants' full proposed schedule is attached as **Exhibit A**.

Plaintiffs' proposed approach has already been rejected. In the Joint Initial Management Report, Plaintiffs argued only for "initial discovery" pending forthcoming motions to dismiss, including, among other things, written discovery to identify the relevant class action settlements and to obtain documents related to those settlements.  *See* Dkt. 73 at 20.  And Plaintiffs grounded their arguments against a stay of all discovery in the allegedly limited burdens associated with the "initial discovery" they sought.  *Id.* at 21.  At the initial conference, the Court pared back Plaintiffs' request and further limited Early Discovery to documents connected to settlements expressly named in the consolidated complaints.  *See* Mar. 27, 2026 Hr'g Tr. 46:14-18.  Consistent with that direction, the Court's CMO No. 1 authorized only narrow discovery into a limited number of expressly identified class settlements, and the Order further reflects that general discovery would open, at the earliest, after the Court's decision on Defendants' motions to dismiss. *See* Dkt. No. 118 ("[T]he Court underscores that the scope of Early Discovery is not determinative of the scope of general discovery in this action, *should it progress past the motion to dismiss phase*." (emphasis added)); *id.* ("[T]he parties may conduct limited Early Discovery during the pendency of motion to dismiss briefing."). Plaintiffs' now-expanded position to open full general discovery on August

1, 2026—before the motions to dismiss are fully briefed, much less resolved—cannot be reconciled with the Court's prior directions or CMO No. 1.

Independent of this, deferral is the correct exercise of the Court's discretion. A deferral pending resolution of a dispositive motion is "an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources." *Chavous v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 201 F.R.D. 1, 2 (D.D.C. 2001) (citation omitted); *see also Moore v. Castro*, 2016 WL 10674309, at *1 (D.D.C. Jan. 14, 2016) (Bates, J.) (same, addressing stay of discovery). The decision as to whether to defer discovery pending a potentially dispositive motion is "committed to the sound discretion" of the Court and is warranted here. *White v. Fraternal Order of Police*, 909 F.2d 512, 517 (D.C. Cir. 1990). Courts in this District stay or defer discovery where (1) a pending motion is potentially dispositive of the entire case or a substantial portion of it, (2) the party seeking discovery does not need discovery to oppose the motion, and (3) that party would not be prejudiced by the deferral. *Chavous*, 201 F.R.D. at 2–3; *see also, e.g., In re Domestic Airline Travel Antitrust Litig.*, 174 F. Supp. 3d 375, 378 (D.D.C. 2016) (in multi-district litigation, declining to lift discovery stay "prior to the resolution of the planned motions to dismiss").

All three considerations favor deferral. The motions to dismiss raise threshold purely legal challenges that are dispositive of all claims and can be resolved on the pleadings without any factual development. *See Sai v. Dep't of Homeland Sec.*, 99 F. Supp. 3d 50, 58 (D.D.C. 2015) (deferring discovery where threshold motions "raise significant issues, and their resolution will likely define the scope of discovery, if any"). Plaintiffs do not need general discovery to oppose those motions. *See Loumiet v. U.S.*, 225 F. Supp. 3d 79, 83 (D.D.C. 2016) (deferral warranted where plaintiff "nowhere claimed that discovery is necessary for him to effectively oppose the

pending Motions to Dismiss"). And Plaintiffs face no cognizable prejudice from a temporary deferral, which may be lifted upon the Court's ruling; the parties are, moreover, already proceeding with the Early Discovery the Court authorized.

The class-action posture makes deferral especially appropriate. Opening general class and merits discovery now—across nine Defendants, numerous settlements, and voluminous ESI— would impose substantial and potentially unnecessary burden and expense that a ruling on the motions to dismiss may eliminate entirely or sharply narrow. *See Loumiet*, 225 F. Supp. 3d at 84 (stay appropriate where the discovery sought was "extensive"). Courts in this District have deferred discovery on precisely these grounds in putative class actions and MDLs pending motions to dismiss, concluding the burden on defendants of opening class and merits discovery outweighs any limited prejudice of delay. *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 174 F. Supp. 3d at 377-378 (declining to lift discovery stay in putative antitrust class-action MDL pending planned motions to dismiss, where "the burden on Defendants of responding to the discovery request and providing any responsive materials outweighs any" purported prejudice to Plaintiffs, and the requested materials "possibly[] may never have to be provided in this case"); *see also In re Graphics Processing Units Antitrust Litig.*, 2007 WL 2127577, at *5 (N.D. Cal. July 24, 2007) (in antitrust multi-district litigation, granting motion for stay of discovery in part because "adjudicating the motions to dismiss will shed light on the best course for discovery"); *In re Broiler Chicken Grower Litig.*, 2017 WL 3841912, at *6 (E.D. Okla. Sept. 1, 2017) (in putative antitrust class action, finding that a "limited delay in discovery to resolve threshold issues raised at the outset of litigation will not only prevent potentially unnecessary expenses, it will also serve judicial economy"); *In re Church of Jesus Christ of Latter-Day Saints Tithing Litig.*, 2024 WL 4349160, at *3 (D. Utah Sept. 30, 2024) (in putative class action, granting motion to stay discovery in part

because "it is 'eminently logical' to delay exposing these disputes and committing judicial resources to their resolution until the court has an opportunity to review and decide the threshold issues raised in Defendants' Motions to Dismiss").

Plaintiffs misread Rule 16.1 and overstate the asserted consensus among MDL courts of allowing general discovery to move ahead immediately. Rule 16.1 did not create a requirement that merits discovery proceed during the pendency of motions to dismiss, nor did it abrogate court discretion to tailor scheduling decisions to the circumstances of a specific MDL. To the contrary, the Rule provides a framework for case management and preserves the authority of transferee courts to sequence discovery in a manner that promotes efficiency and proportionality. Here, Defendants now have filed dispositive motions on threshold legal issues that, in Defendants' view, should resolve the case entirely—or, at a minimum, materially narrow the claims, parties, and scope of any ensuing discovery. Further, the Court already recognized that only limited Early Discovery should proceed while motions to dismiss remain pending. Plaintiffs' proposal would undo this staging and reset it in a more inefficient, burdensome sequence.

Plaintiffs' assertions of prejudice resulting from Defendants' proposed staging ring hollow. Disputes among Plaintiffs' counsel over consolidation and leadership resulted in over a year of delay from the filing of the original *Baker* complaint and the filing of the Consolidated Complaint in this MDL proceeding. *See, e.g.*, Dkt. 73 at 26-27.  Now, the parties are currently engaged in the Early Discovery that the Court authorized, and Defendants will complete their productions by the August 1 deadline.

### B.    Defendants' Proposed Schedule Is More Efficient and Proportional

The specific deadlines in Defendants' tentative schedule also provide a more efficient and proportional approach to managing this MDL. Plaintiffs' proposal requires the parties to complete

document production, litigate substantial-completion disputes, complete fact depositions, and only then begin class-certification briefing. By contrast, Defendants' proposal reflects the substantial overlap between class-related and merits discovery in this case. Defendants' proposal allows class-certification proceedings to commence while fact discovery continues, ensuring that the issues uniquely relevant to class certification are presented to the Court earlier and avoiding delay in resolving a question that will significantly affect the scope of the litigation. Rather than attempting to divide discovery into rigid phases that may generate disputes, Defendants' proposal permits discovery to proceed on a single coordinated track while preserving all parties' rights to raise relevance, proportionality, and Rule 23 objections to specific requests as appropriate.

Plaintiffs mischaracterize Defendants' position on the discovery cadence as "bifurcation." Defendants are not seeking to construct an artificial line between class and merits discovery. Defendants simply believe that discovery prior to class certification should be tailored to the merits information necessary to facilitate the Court's decision on class certification. Plaintiffs indeed ignore that Rule 23 states that the certification order is to issue "at an early practicable time after a person sues or is sued as a class representative . . . ." F.R.C.P. 23(c)(1)(A). Plaintiffs' position would eliminate that rule in favor of a sequence that positions class certification only after full merits discovery has completed. Plaintiffs' position is contrary to the Rule and common sense. When merits discovery begins it can and should focus on that which is needed and proportional to the class certification question and certainly should not include discovery that would be relevant and proportional only if a class is certified. That approach promotes efficiency by allowing the Court to resolve a threshold issue that may substantially affect the scope of the litigation without requiring the parties to complete every conceivable item of merits discovery before class-certification briefing. And, of course, this question is best informed

once the motions to dismiss have been decided and the parties understand the nature and scope of any claims that survive.

Plaintiffs' insistence on a substantial completion deadline is similarly unnecessary. Plaintiffs' proposal would make the timing of subsequent events dependent on subjective disagreements regarding whether production is sufficiently complete. And in a case involving nine defendants, numerous underlying settlements, extensive ESI, and rolling review and production, a substantial-completion certification requirement is likely to become a source of collateral disputes. Defendants' proposal instead permits discovery, depositions, and class-certification proceedings to advance without interruption as productions continue. That approach is particularly appropriate here because class certification principally concerns issues that can be litigated without waiting for every merits-related document production to conclude. Defendants' proposed schedule contains document production deadlines and discovery cutoffs, and Defendants intend to engage in rolling productions throughout general discovery, if any.

Defendants' proposal defers merits-expert discovery and dispositive-motion deadlines until after the Court rules on class certification. This allows the parties and the Court to assess, with the benefit of the class-certification decision, whether any additional fact discovery is necessary and to tailor the remaining schedule accordingly. In contrast, Plaintiffs' proposal attempts to establish a complete merits schedule now, before the pleadings are settled, before discovery has begun, and before the Court has ruled on class certification. Defendants' approach is more flexible, more efficient, and better calibrated to the realities of this case.

Plaintiffs' complaint about purported "date asymmetry" misses the mark. Defendants' proposed reply brief deadlines are consistent with ordinary practice because reply briefs are

typically subject to shorter deadlines than opening briefs and oppositions. In any event, Defendants remain willing to discuss reasonable modifications to individual deadlines.

Finally, Plaintiffs' invocation of what they call "ad hoc, case-by-case fixes" in the underlying settlements courts supports *Defendants*' position, not Plaintiffs. For starters, Plaintiffs mischaracterize the record in describing those cases. *See infra.* But more to the point here, those examples show that individual courts—to the extent they find it necessary to do so—are exercising their authority to inquire into issues they deem appropriate. This does not somehow imply that general discovery must open immediately *in this MDL* without any regard for efficiently staging deadlines.

Ultimately, Plaintiffs' proposal would require the parties to embark immediately on full merits discovery, complete fact discovery, and postpone class-certification proceedings until all merits discovery is complete, regardless of whether class certification renders that merits discovery unnecessary. Defendants' proposal follows a staged approach and avoids potentially unnecessary merits discovery while threshold motions are pending in manner proportionate and consistent with the Court's directives.

### C.    Plaintiffs Mischaracterize the "Case-by-Case" Fixes

Plaintiffs mischaracterize the purported "case-by-case fixes" implemented by courts actively overseeing class action settlements. *See Burnett et al. v. National Association of Realtors, et al.*, No. 4:19-cv-00332-SRB (W.D. Mo.) (court ordered a quarterly accounting on the heels of the filing of the first case that became part of this MDL; that quarterly accounting revealed that JND has not received any payments from banks or fintechs and the court has not identified any specific concerns); *R., et al. v. Clay-Platte Family Medicine, P.C. et al.*, No. 4:24-cv-00704 (W.D. Mo.) (court directed Angeion to describe its compensation and asked whether Angeion would

receive financial benefits from third parties in connection with the case; Angeion explained that it had no such financial arrangements with vendors relevant to the case; the court thereafter granted preliminary approval without any "conditions" on Angeion's compensation); *Cabrera et al. v. Google LLC*, No. 5:11-cv-01263 (N.D. Cal.) (the court approved the use of digital payment cards after finding that "Angeion's agreement with Blackhawk will not impact the value of the Settlement Fund" and that "Class Members will still receive 100% of their damages"; the court did **not** order "disgorgement of Angeion's expense;" the court accepted Class Counsel's offer to voluntarily reduce its own award only to "ensure beyond reasonable doubt that the Class has not been harmed"); *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, MDL No. 2843, No. 3:18-md-02843-VC (N.D. Cal.) (the parties asked the court to review the distribution method after the allegations against Angeion asserted by Plaintiffs here were made public; Angeion submitted a declaration explaining that its agreement with the digital payment card vendor would not reduce class distributions; the court thereafter approved use of payment cards; Plaintiffs' assertion that the court "no longer had authority to halt" distribution is legally and factually baseless); *In re Equifax Inc. Customer Data Security Breach Litig., MDL No. 2800*, No. 1:17-md-2800-TWT (N.D. Ga.) (class counsel filed motion acknowledging that rebates, credits, and benefits were authorized under the governing agreement but seeking further disclosures; the case remains active and settlement funds remain to be distributed).[1]

Plaintiffs' misrepresentations about the facts of these other settlement cases underscore that courts overseeing settlements can and do review these issues, and highlight that Plaintiffs'

---

[1] Plaintiffs wrongly criticize Defendants for correcting Plaintiffs' mischaracterizations of what occurred in these cases, saying that Defendants offered the corrections of the record for inclusion in this report on the date the report is due. Plaintiffs omit that they first included these case references in a draft they circulated to defendants at 10:00 PM the night before.

conclusory allegations have been considered by other courts. For a full and truthful recitation of the facts relating to the *Google* and *Facebook* settlements administered by Angeion, *see* Angeion's motion to dismiss, Dkt. 148-1 at Arg. § II.

### *Plaintiffs' Position.*

Class members in federal court settlements have been harmed for years without redress. Only after the *Baker* complaint—the first-filed underlying case in this MDL—was filed did counsel and courts become aware of the schemes alleged in the Complaint. Since then, courts across the country have been left to fashion *ad hoc*, case-by-case fixes under sharply different conditions depending on when they acted: courts that identified the problem while still exercising supervisory jurisdiction over an ongoing proceeding have been able to impose meaningful conditions and compel disclosure; courts that encountered the same conduct after final approval have found themselves faced with the same troubling knowledge and far fewer remedial tools. *Compare Burnett et al. v. National Association of Realtors, et al.,* No. 4:19-cv-00332-SRB (W.D. Mo.) (court, while retaining active supervisory jurisdiction over rolling multi-defendant settlements still pending on appeal, identified concerns about JND's billing practices and investment returns on $519 million in class member funds, ordered full public disclosure of all JND contracts and invoices, and froze all JND payments pending determination of whether to appoint a special master)[2]; *R., et al. v. Clay-Platte Family Medicine, P.C. et al.,* No. 4:24-cv-00704 (W.D. Mo.)

---

[2] Defendants' characterization of the *Burnett* proceedings omits what matters most: that a court-ordered accounting was necessary at all. The fact that Judge Bough found it necessary to order a full public accounting of JND's contracts, invoices, and investment returns, and to freeze JND's payments pending determination of whether to appoint a special master, is itself the point Plaintiffs make. That the accounting is ongoing, and that no specific concern has yet been identified to Defendants' satisfaction, does not vindicate the status quo; it confirms that without judicial intervention, the information would never have been produced. The absence of a confirmed problem to date does not negate the structural deficiency Plaintiffs allege, and it does not address why that information required a court order to surface in the first place.

(condition that Angeion agree not to receive any vendor payments connected to case administration secured before any approval order entered)[3]; *Cabrera et al. v. Google LLC*, No. 5:11-cv-01263 (N.D. Cal.) (court learned of Angeion's undisclosed revenue-sharing agreement with Blackhawk at the final approval hearing, called it "disappointing," and imposed corrective measures including disgorgement of Angeion's expense award as a condition of granting approval, acting at the last moment within its jurisdiction to do so)[4], *with In re Facebook, Inc. Consumer Privacy User Profile Litig.*, MDL No. 2843, No. 3:18-md-02843-VC (N.D. Cal.) (Angeion's undisclosed revenue-sharing agreement with Blackhawk discovered only after final approval and during active distribution; court reviewed the arrangement *in camera* but proceeded with a distribution it no longer had authority to halt)[5]; *In re Equifax Inc. Customer Data Security Breach Litig.*, MDL No.

---

[3] Defendants describe the *Clay-Platt*e outcome as though it demonstrates the system working as designed. It demonstrates the opposite. Angeion's representation that it had no relevant financial arrangements with vendors came only after the court directly asked. That representation, whatever its content, would not exist in the record had the court not inquired. The condition securing that representation was not volunteered by Angeion or proposed by class counsel; it was the product of a judicial question that would never have been asked but for the *Baker* complaint and the scrutiny it generated. A system that produces transparency only when a court intervenes to demand it is not a functioning disclosure system, it is the problem this MDL was created to address.

[4] Defendants' account of the *Cabrera* proceedings turns on a distinction without a difference. Whether the corrective measure is characterized as a court-ordered disgorgement or a voluntary fee reduction accepted by the court as a condition of final approval, the operative fact is the same: the court learned of Angeion's undisclosed revenue-sharing agreement with Blackhawk at the final approval hearing, called it "disappointing," and required a financial concession before it would grant approval. The label attached to that concession does not change what it was,  a remedy extracted under judicial pressure at the last moment within the court's jurisdiction to act. That Angeion's arrangement was undisclosed until that moment, and that a corrective measure was required to obtain approval notwithstanding Defendants' contrary framing, is precisely the pattern Plaintiffs describe.

[5] Defendants characterize Plaintiffs' assertion that the Facebook court "no longer had authority to halt" distribution as "legally and factually baseless," but offer nothing to support that characterization beyond a description of what the court did. The relevant question is not what the court chose to do, it is what the court was in a position to do at the time Angeion's undisclosed

2800, No. 1:17-md-2800-TWT (N.D. Ga.) (class counsel moved to compel disclosure of JND's vendor agreements and financial arrangements in July 2026, years after the settlement fund was fully distributed and the matter administratively closed, leaving the court with a motion it can rule on and remedies it largely cannot provide).[6]

Both problems, the years of unredressed harms and the patchwork of *ad hoc* fixes now underway, are why this MDL needs to move forward under an efficient and effective schedule. Defendants' proposed schedule defeats that purpose: at its most optimistic, it would not open discovery until spring 2027, nearly two years after the first case was filed, through a series of sequenced prerequisites, each adding months of delay. Each is addressed below.

Defendants' recharacterization of the case-by-case record confirms, rather than refutes, Plaintiffs' position. Plaintiffs address it here because Defendants added this section to the Joint Status Report for the first time in a redline circulated less than six (6) hours before this submission

---

arrangement with Blackhawk came to light. Angeion's arrangement was discovered only after final approval had been entered and active distribution was underway. At that stage, a court's options are categorically different from those available before approval, when the court retains full supervisory authority over the settlement's terms and structure. Defendants' assertion that Plaintiffs' characterization is baseless does not engage with that distinction, and does not explain what affirmative relief the court could have imposed to halt or unwind a distribution already in progress.

[6] Defendants' description of the *Equifax* proceedings, that class counsel's motion "acknowledged that rebates, credits, and benefits were authorized under the governing agreement," reframes the issue in a way that confirms rather than answers Plaintiffs' point. Whether an arrangement was authorized by a governing agreement is a different question from whether it was fully and materially disclosed to counsel, the court, to class members, or in any proceeding in which those parties had an opportunity to evaluate it. A vague authorization term disguised and buried in an administrator agreement that was never surfaced in preliminary-approval submissions, administrator declarations, fee applications, class notices, or post-distribution accountings is not a disclosure, it is a concealment. The *Equifax* motion was filed years after the settlement fund was fully distributed, when the court's options were largely exhausted. The fact that class counsel had to move for disclosure at all, at that stage, is the clearest possible illustration of what Plaintiffs allege occurred across every settlement at issue in this MDL.

was due In each instance Defendants describe, the relevant information came to light only because a court was prompted to ask, either by the filing of the *Baker* complaint, by a direct judicial inquiry, or by a condition secured at the eleventh hour before final approval. None of these disclosures were volunteered. None were provided in the ordinary course. In *Burnett*, a court-ordered accounting was necessary to determine what JND had received; in *Clay-Platte*, Angeion's representation that it had no relevant financial arrangements came only after the court asked; in *Cabrera*, the undisclosed revenue-sharing agreement with Blackhawk surfaced at the final approval hearing and the court called it "disappointing" a characterization Defendants conspicuously omit. Whether the resulting corrective measures are labeled "voluntary" or "ordered" is beside the point: they were extracted under judicial pressure that would not have existed without this litigation. And in *Facebook* and *Equifax*, courts confronted the same arrangements after final approval, when their options were already constrained. Defendants' account of these cases is not a rebuttal to Plaintiffs' position, it is an illustration of it.

## A. General Discovery Should Open Before a Ruling on a Motion to Dismiss.

Fact discovery routinely proceeds on a parallel track with motion-to-dismiss briefing in complex MDLs, and courts have consistently structured cases this way to avoid the costs, evidence loss, and delay that come from waiting. *See, e.g., In re Google Play Store Antitrust Litig.*, MDL No. 2981, MDL Scheduling Order (N.D. Cal., Oct. 22, 2021) (discovery ran parallel with all motion practice from October 2021; court never conditioned discovery on MTD resolution); *In re Uber Technologies, Inc., Passenger Sexual Assault Litig.*, MDL No. 3084, Pretrial Order No. 5 (N.D. Cal. Dec. 28, 2023) (discovery stay lifted December 28, 2023, with Rule 12 briefing running on a parallel track); *In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, MDL No. 3047, Case Management Order No. 10 (N.D. Cal., Feb. 8, 2024) (fact

discovery ran concurrent with motion-to-dismiss practice throughout 2024); *In re Hair Relaxer Marketing Sales Practices and Products Liability Litig.*, MDL No. 3060, Case Management Order No. 6 (N.D. Ill., July 27, 2023) (general discovery opened August 2023 concurrent with early motion practice); *In re Valsartan, Losartan, and Irbesartan Products Liability Litigation*, MDL No. 2875 (D.N.J.) (discovery proceeded in parallel with all motion practice without regard to pending motions). Defendants' principal authority, *In re Domestic Airline Travel Antitrust Litig.*, 174 F. Supp. 3d 375, 377–78 (D.D.C. 2016), declined to lift a discovery stay in a putative antitrust class-action MDL pending motions to dismiss because the burden of production outweighed any prejudice to plaintiffs, and the requested materials might never be needed. That case-specific decision is nearly a decade old, and the MDL landscape has changed substantially since it was issued.

As the courts managing the *Google Play*, *Uber*, *Social Media Addiction*, *Hair Relaxer*, and *Valsartan* MDLs each recognized, parallel discovery is not only compatible with motion-to-dismiss briefing, it has become the prevailing approach in complex MDLs, precisely because the costs of delay outweigh speculative savings from waiting. Rule 16.1, which took effect December 1, 2025, reflects that same accumulated experience: the Advisory Committee explained that the rule was designed to provide "a framework for the initial management of MDL proceedings" consistent with "approaches judges have typically already followed in practice," and that "experience has shown that in many cases an early exchange of information about the factual bases for claims and defenses can facilitate efficient management." The rule does not create new authority, it memorializes what transferee courts in complex MDLs have found effective. *Domestic Airline* predates both that accumulated experience and its codification in Rule 16.1, and it offers no basis for departing from the approach that MDL courts have consistently followed because it

works. Defendants' remaining authorities fare no better. *In re Graphics Processing Units Antitrust Litig.*, 2007 WL 2127577 (N.D. Cal. July 24, 2007), *In re Broiler Chicken Grower Litig.*, 2017 WL 3841912 (E.D. Okla. Sept. 1, 2017), *Chavous*, *Moore*, *White*, *Sai*, and *Loumiet* are one to two decades old and were decided before Rule 16.1 took effect, before the *Google Play*, *Uber*, *Social Media Addiction*, *Hair Relaxer*, and *Valsartan* MDLs established the prevailing approach to parallel discovery, and before the Advisory Committee memorialized that accumulated experience in the Rules themselves. None of those decisions grapple with the MDL management framework that governs this Court's exercise of its scheduling discretion today. *In re Church of Jesus Christ of Latter-Day Saints Tithing Litig.*, 2024 WL 4349160 (D. Utah Sept. 30, 2024), is Defendants' only recent citation, and it is materially distinguishable. Unlike this proceeding, *Latter-Day Saints* appears to be a single-district putative class action involved a discrete threshold legal challenges — statute of limitations and Frist Amendment issues — capable of resolution on the pleadings without factual development.

Under *Chavous v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 201 F.R.D. 1, 2–3 (D.D.C. 2001), the same three-factor test Defendants invoke, a court considers whether the motion is potentially dispositive, whether the party seeking discovery needs it to oppose the motion, and whether that party would be prejudiced by deferral. None of the three factors favor deferral here: Defendants' motions raise fact-bound fiduciary-duty, standing, and RICO issues that cannot be resolved on the pleadings alone; Plaintiffs do not need discovery to oppose the motions but will need it once they are denied; and Plaintiffs and class members are prejudiced by continuing delay, as evidence ages and the alleged schemes remain ongoing and in some cases, unaddressed.

**B. Defendants' Schedule Is Bifurcated Class and Merits Discovery With a Different Label.**

Despite Defendants' "single track" label, their schedule requires Plaintiffs to brief class certification, with all expert disclosures and reports, just 150 days after discovery opens, before document production is substantially complete and before any depositions are taken, while fact discovery does not close until another 195 days later. Defendants confirm that they are proposing to bifurcate class and merits discovery by reserving the right to object to requests that are relevant only if a class is certified and by proposing a follow-on status report on additional fact discovery within 14 days of the certification ruling. That proposal would bifurcate class and merits discovery regardless of Defendants' label, and Plaintiffs' disagree with that approach.

Class certification requires a rigorous Rule 23 inquiry that is inseparable from the merits, and the claims here involve complex schemes and defenses that require meaningful factual development before the Court can evaluate class scope, predominance, and manageability; the Court must have sufficient information to support a well-reasoned ruling. Manual for Complex Litigation (Fourth) § 21.133; *see also Curtin v. United Airlines, Inc.*, 275 F.3d 88, 93 (D.C. Cir. 2001) (pre-certification dispositive proceedings appropriate only where the claims can be readily resolved without prejudice to plaintiffs, conditions not present here, where the critical facts are in Defendants' exclusive possession). Plaintiffs' proposal instead builds that record once, efficiently, before class issues are briefed: substantial completion of document productions 150 days after discovery opens, fact depositions completed 180 days later, and class certification 90 days after that date. This non-bifurcated, unified structure is consistent with numerous other MDLs and class actions. *See, e.g., In re Loestrin 24 Fe Antitrust Litig.*, MDL No. 2472, Interim Case Mgmt. Order No. 7 (D.R.I. Aug. 3, 2017) (class-certification motion and supporting expert reports due the same day fact discovery closed); *In re Google Play Store Antitrust Litig.*, MDL No. 2981, MDL Scheduling Order (N.D. Cal., Oct. 22, 2021) (fact discovery cutoff ran concurrent with class-

certification briefing); *In re Valsartan, Losartan, and Irbesartan Products Liability Litigation*, MDL No. 2875, Case Management order No. 23 Revised (D.N.J., Oct. 27, 2021) (class-certification motion and expert reports due on a fixed date without awaiting completion of a separate merits-discovery phase); *In re MultiPlan Health Insurance Provider Litigation*, MDL No. 3121, Case Management Order No. 17 (N.D. Ill., July 3, 2025) (fact discovery cutoff preceded class-certification briefing); *In re: Google Digital Advertising Antitrust Litig.*, MDL. No. 3010, Pre-Trial Order No. 5 (S.D.N.Y. Nov. 21, 2022) ("[M]otions for class certification are deferred until after the close of fact and expert discovery.").

### C.  The Absence of a Substantial Completion Deadline Is Unacceptable.

Defendants' refusal to include a substantial-completion deadline for document production is not a neutral scheduling choice. Without a defined benchmark, there is simply no mechanism to compel completion of document discovery, which is Defendants' clear objective. *See* Manual for Complex Litigation (Fourth) § 11.422 (without defined completion benchmarks, productions in large, multi-party cases have no accountability structure and no end point). Their conduct in Early Discovery bears that out: two months after Plaintiffs served their Early Discovery, and roughly a month after Defendants committed to produce non-privileged responsive documents, from the date of the filing of this joint status report, nine Defendants have collectively produced just eleven pages of cherry-picked, redacted documents. A substantial-completion deadline with a written certification requirement is necessary in this MDL proceeding and its become standard in other MDLs. *See, e.g., In re Uber Technologies, Inc., Passenger Sexual Assault Litig.*, MDL No. 3084, Pretrial Order No. 21 (N.D. Cal. Dec. 12, 2024) (fact discovery substantially complete by June 16, 2025); *In re: Google Digital Advertising Antitrust Litig.*, MDL. No. 3010, Pre-Trial Order No. 5 (S.D.N.Y. Nov. 21, 2022) (substantial completion of document production within four months of

service of RFPs); *In re MultiPlan Health Insurance Provider Litigation*, MDL No. 3121, Case Management Order No. 17 (N.D. Ill., July 3, 2025) (substantial completion of responses to third set of RFPs by Jan. 23, 2026); *In re Commodity Exchange, Inc. Gold Futures & Options Trading Litig.*, MDL No. 2548, Amended Fact Discovery Schedule (S.D.N.Y. May 24, 2019) (requiring each party to certify by Dec. 6, 2019 that it has substantially completed its production of documents responsive to initial discovery requests); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, MDL No. 2503, Order (D. Mass. Apr. 13, 2016) (requiring parties to certify substantial completion of document production by June 15, 2016).

**D. Defendants' Schedule Imposes Systematic Date Asymmetry to Prejudice Plaintiffs.**

Defendants' proposal also inflates their own deadlines while compressing Plaintiffs'. For example, Defendants propose 90 days to oppose class certification versus 45 days for Plaintiffs to reply—a 2-to-1 ratio—and add roughly 60 additional days of buffer into their expert-discovery and dispositive-motion deadlines. Any extension should apply equally to both sides.

For these reasons, the Court should adopt a schedule along the lines Plaintiffs propose, attached as **Exhibit B**: one that opens general discovery now, with non-bifurcated discovery and a defined substantial completion deadline, so this MDL can reach resolution without the additional years of delay Defendants' proposal would impose. A single, non-bifurcated track avoids litigating class and merits discovery twice, lets the Court consider class certification issues on a complete record instead of revisiting the question later, and matches how numerous other MDLs and class actions have proceeded. A defined substantial-completion deadline is equally efficient: it gives the parties and the Court a fixed point to measure progress and forecloses the kind of open-ended, unaccountable production Defendants' own conduct in Early Discovery has already demonstrated. Together, these features let this MDL proceed on one track, on a real schedule.

2.    **SCOPE OF EARLY DISCOVERY UNDER CMO 1**

The parties dispute the scope of the Early Discovery the Court authorized in the CMO. Specifically, the parties disagree concerning: (1) the meaning of the terms "deposit" and "administration" in Plaintiffs' discovery requests; (2) whether Early Discovery encompasses agreements involving non-parties; (3) whether Early Discovery extends to settlements in which no named Plaintiff alleges participation, injury, or membership in an underlying settlement class; (4) the scope of discovery with respect to disclosures of Defendants' agreements; (5) whether successful bid materials are discoverable; (6) to what extent Early Discovery requires production of interest-rate information; (7) whether Early Discovery encompasses escrow-related and account-related documents; (8) whether breakage-related materials and projections fall within the scope of Early Discovery; and (9) Defendants' response to interrogatory 3, addressing compensation connected to Early Discovery settlements.  The parties' respective positions are set forth below.

### *Defendants' Position.*

At the Initial Conference and in the ensuing CMO No. 1, the Court recognized the significance of Defendants' then-forthcoming motions to dismiss, and the burden on Defendants of proceeding with broad-scale discovery pending resolutions of potentially dispositive motions on threshold legal issues.  Accordingly, while the Court determined that some discovery could proceed, the Court ordered that it would be narrow and targeted.  Plaintiffs ignored those directives, serving discovery requests that vastly exceeded the proper scope of Early Discovery under CMO 1.  *See, e.g.*, Ex. C (Plaintiffs' First Set of RFPs to Administrator Defendants).  Defendants objected, while also engaging in extensive correspondence and meet-and-confer efforts in an attempt to clarify requests, narrow disputes, and identify reasonable compromises.  Defendants

have diligently undertaken the document collections required by the CMO and are conducting targeted, go-get collections designed to identify and produce responsive materials within the limited scope of Early Discovery. Many of the issues Plaintiffs present, however, stem from Plaintiffs' continuing efforts to expand Early Discovery beyond the carefully circumscribed categories in CMO No. 1.

Early Discovery reaches agreements "relating to the handling or disbursement of settlement funds," and the negotiation thereof, not anything else, including financial and transactional records. CMO ¶ 4(B). Plaintiffs' requests reach well past that line. They seek documents showing payments and conveyances of money or things of value and their remittance advice, payment descriptions, or account statement notations; the calculation, tracking, and allocation of breakage; the total value of digital payment instruments issued, redeemed, and unredeemed; the calculation, payment, or receipt of rebates, revenue shares, or other compensation; Form 1099-NEC and Form 1099-MISC information returns; and projections, estimates, models, and analyses of expected redemption rates, non-redemption rates, and breakage amounts. Ex. C (Plaintiffs' First Set of RFPs to Administrator Defendants). They also seek documents that are neither agreements nor negotiation materials, including internal approvals, approval memoranda, and signature-routing records; any revenue sharing, rebate, discount, or incentive program offered; bids, quotes, and responses to requests for proposal; and disclosures to courts, class counsel, defense counsel, claimants, class members, CAFA notice recipients, settlement websites, and settlement notices. *See id.* Defendants address each of Plaintiffs' attempts to push past that boundary below:

*First*, in their RFPs to Defendants, Plaintiffs redefined the scope of an "Agreement" subject to Early Discovery to include not only agreements related to settlement fund "handling or disbursement"—as defined in CMO 1—but also documents related to the "deposit and

administration" of settlement funds.  Defendants objected to the extent that Plaintiffs' injection of these new terms was intended to expand the scope of Early Discovery beyond what CMO 1 authorized.  At a meet and confer on July 7, Administrator Defendants asked whether these terms were intended to expand the scope of Early Discovery, and the Plaintiffs stated that they were not.  Defendants agreed.  In a July 16 follow-up letter, Administrator Defendants confirmed that they view the "deposit and administration" as surplusage that add nothing to the scope of "handling or disbursement" under CMO 1.[7]  Defendants assured Plaintiffs that they are executing their go-get collections based on CMO 1's delineation of the bounds of Early Discovery.  Defendants have never argued that agreements fall outside Early Discovery merely because they relate to the deposit or administration of settlement funds.

It is unclear to Defendants what remains in dispute, and Defendants asked Plaintiffs to clarify this in a July 19 email, to no avail.  As best Defendants can tell, Plaintiffs appear to argue that "deposit" and "administration" *do* expand the scope of CMO 1 beyond "handling and distribution" to include, for example, bank records, accounting records, transmittals, and other materials expressly excluded from Early Discovery in CMO 1, ¶ 4(B).  Defendants address Plaintiffs' separate arguments seeking to compel production of these categories of documents below. In short, however, there is no need for the Court to declare that "deposit" and "administration" fall within CMO 1's use of the phrase "handling or disbursement" language because it would have no impact on Defendants' present execution of go-get collections and productions in Early Discovery.

*Second*, Early Discovery reaches an agreement only where each party to it is a Defendant in this litigation or was counsel for the class in one of the underlying class actions listed in the

---

[7] The July 7 meet and confer and July 16 letter involved only the Administrator Defendants.

Consolidated Complaint.  That is what the CMO provides, authorizing discovery into agreements "entered into by defendants in this litigation, or by plaintiffs' counsel in the underlying class actions." CMO ¶ 4(B).  It is also how the Court described the limit at the Initial Management Conference, explaining that Early Discovery "is tagged to contracts and agreements that exist *between the various players here*," Mar. 27, 2026 Hr'g Tr. at 52:8-11 (emphasis added).  Plaintiffs read the provision instead to reach any agreement a Defendant entered with any entity if it relates to the disbursement of class action settlement funds.  That cannot be right because the Defendants in this case are the ones whose alleged conduct is at issue: The alleged schemes consist of arrangements among the Defendants named in the Complaint, and the role of underlying class counsel in selecting them.  An agreement is probative of those alleged schemes only if it is "between the various players here." Mar. 27, 2026 Hr'g Tr. at 52:8-11.  Contracts between one Defendant and outside vendors or entities that had no part in the alleged schemes, to the extent they exist, cannot show that Defendants in this action allegedly agreed among themselves to conspire against or otherwise harm Plaintiffs.  Early Discovery was not intended to be a fishing expedition for "industry-wide" information, new defendants, or third-party agreements that Plaintiffs speculate may be "useful comparator[s]" to alleged agreements between Defendants that the Complaint actually puts at issue.

*Third*, seven of the 30 settlements identified in Exhibit A to Plaintiffs' First Set of Requests for Production of Documents and First Set of Interrogatories are settlements in which no named plaintiffs allege participation, injury, or membership in the underlying settlement class, either in

their initial complaints or in the Consolidated Class Action Complaint.[8]  Defendants have objected to producing Early Discovery for those settlements.

Settlements that do not involve any named plaintiffs are, by definition, not relevant to Plaintiffs' *individual* claims and are therefore beyond the scope of permitted discovery under Rule 26. Rule 26 limits discovery to "nonprivileged matter that is relevant to any *party's* claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) (emphasis added). No named plaintiff could have a *personal* claim for any alleged diminished settlement fund or alleged breakage in any settlement in which they were not a class member. Discovery into settlements not involving any named plaintiff is plainly irrelevant, unduly burdensome, and not proportional to the needs of this case, and not permitted by Rule 26.[9]

---

[8]   There are no named plaintiffs associated with the following settlements listed in Exhibit A to Plaintiffs' discovery requests for remaining defendants: *Culbertson v. Deloitte Consulting LLP*, No. 1:20-cv-03962 (S.D.N.Y.), administered by Angeion; *Stoffers v. Daves, Inc.*, No. 20-st-cv-35381 (Cal. Super. Ct.), administered by Angeion; *Guarnaschelli v. East River Medical Imaging, P.C.*, No. 659099-2023 (N.Y. Sup. Ct.), administered by Angeion; *Hameed-Bolden v. Forever 21 Retail, Inc.*, No. 2:18-cv-3019-GW-JPR (C.D. Cal.), administered by Epiq; and *Smith v. BHGXXXIV, LLC*, No. 24-CI-002796 (Ky. Cir. Ct., Jefferson Cnty.), administered by Kroll.  In addition, *Buescher v. Brenntag North America, Inc.*, No. 5:20-cv-00147-JMG (E.D. Pa.), administered by JND, is listed in Exhibit A, but that settlement is not referenced in the Consolidated Class Action Complaint and no named Plaintiff is associated with that settlement.  Although *Buescher* was mentioned in an earlier complaint, it was cited solely as a basis for venue and was not accompanied by any allegation of misconduct by JND. Plaintiffs claim they had "no way of knowing that Western Alliance held the QSF in that settlement" until that was disclosed during Early Discovery, but a public filing in *Buescher* referenced Western Alliance Bank. *Buescher v. Brenntag North America, Inc.*, No. 5:20-cv-00147-JMG (E.D. Pa.), Dkt. No. 29-3 at 4.  The seventh settlement without a named plaintiff, *Gregory v. Tubi, Inc.*, No. 24-LA-0000209 (Ill. Cir. Ct. 17th Cir.), was administered by Simpluris, which has since been voluntarily dismissed from the action.

[9]   Certain Defendants respectfully submit that they bear a disproportionate burden. For instance, Angeion is the administrator for 13 Early Discovery Settlements, yet Angeion intends to produce responsive documents 10 of its 13 settlements. Similarly, Defendants Western Alliance Bank and Digital Settlement Technologies LLC (Western Alliance Bank's wholly owned subsidiary) are involved in a combined over 20 of the listed settlements. Their objections are

Similarly, settlements not involving any named plaintiffs are appropriately excluded from Early Discovery because Plaintiffs lack Article III standing personally to pursue recoveries concerning those settlements. Defendants have raised this argument in their motion-to-dismiss briefing. *See, e.g.*, Dkt. 143-1 at 60-62 (arguing that Plaintiffs have not plausibly alleged that they have suffered a fairy traceable injury with respect to any of the identified settlements, let alone those absent a named plaintiff). Requiring Defendants to search for and produce documents solely relating to settlements in which no named plaintiff alleges involvement and no named plaintiff asserts any claim or injury would improperly expand the scope of Early Discovery beyond the claims presently before the Court. In seeking Early Discovery pertaining to settlements in which no named plaintiff asserts an injury, Plaintiffs are leapfrogging ahead to discovery related to the certification of a putative class while motions to dismiss are pending. Plaintiffs are attempting to sue on behalf of other individuals who might have standing, but to do so at this stage would contravene the intended limitations of Early Discovery. *See* Hr'g Tr. at 46:22-48:2 (describing the limitations imposed by the Court on Early Discovery). Nor should Early Discovery extend to information about settlements that the Complaint has not put at issue through an individual named Plaintiffs' claims, but that Plaintiffs speculate "may demonstrate: the existence and scope" of an alleged conspiracy. They can be explored, if appropriate, when general discovery opens. Accordingly, Plaintiffs should not be permitted to take discovery tantamount to class member discovery at this stage.

*Fourth*, Plaintiffs' dispute regarding disclosures of compensation arrangements, appears to misstate the scope of the dispute. Defendants, and particularly Administrator Defendants, have

---

narrowly tailored, applying only to a few settlements in which no named plaintiff alleges participation or injury.

agreed to conduct targeted searches for relevant agreements, negotiations documents, and bids/proposals for the applicable early discovery settlements. Any disclosures of compensation arrangements between the Administrators and other Defendants in those documents will be produced. But Defendants are not searching for publicly available documents, which plaintiffs already have. Nor are Defendants conducting broad and final searches, or conducting third party discovery of important third parties like class counsel. This is Early Discovery, which the Court made clear would be limited in scope. There is no way to confirm what discovery might ultimately show as to who had knowledge of administration financial arrangements, and when they acquired such knowledge. Plaintiffs are trying to use the "pertain[s] to" language in CMO 1 to ask Defendants to conduct for Plaintiffs an exhaustive search for any possible disclosures of administrator compensation in the Early Discovery settlements, and fully and finally identify them. Plaintiffs' position is inconsistent with the language of CMO 1, and also with the fact that this is early discovery.

*Fifth*, Plaintiffs' dispute about bids appears to create a dispute where none exists. Plaintiffs contend that Defendants are refusing to produce successful bids or proposals connected to the Early Discovery Settlements. That characterization is not accurate. Following the Parties' meet and confer calls, Defendants agreed that, to the extent a Defendant has a successful bid or proposal in connection with an Early Discovery Settlement, and that settlement is not otherwise subject to the parties' separate disputes over which Early Discovery Settlements fall within the scope of Early Discovery or to other issues that remain in dispute, Defendants intend to produce those successful proposals/bids. Any remaining disagreement over successful proposals/bids therefore does not reflect a blanket refusal to produce, but rather traces back to the parties' separate, unresolved disputes over the proper scope of Early Discovery, including which settlements are covered.

*Sixth*, instead of issuing requests tailored to the Court's CMO No. 1, Plaintiffs have turned Early Discovery into an improper fishing expedition. Bank Def. RFP No. 7 seeks: "In each case arising from or relating to any Early Discovery Settlement, documents sufficient to show the following, to the extent such documents were generated, maintained, or furnished under any Agreement or the negotiation of any Agreement: a. all transfers to and from the account including date, sender, and recipient from inception through closure; b. the rates of interest paid; and c. the purpose of any payment between you and any Administrator Defendant, Fintech Defendant, or class counsel, including any remittance advice, payment description, or account statement notation accompanying or describing any such payment." Bank Def. Interrogatory No. 4 seeks: "For each Early Discovery Settlement, identify the interest rate paid to the funds in any escrow or QSF account and identify the Agreement or other document pursuant to which that interest rate was established or governed."

While Plaintiffs now appear to acknowledge that they issued requests that they now believe are beyond the scope of CMO 1 and the contours of Early Discovery this Court laid out during the March 27, 2026 hearing, it is unclear exactly how Plaintiffs are narrowing these requests. To the extent that the interest rate is included in a responsive agreement, or accompanying exhibit, the Bank Defendants will produce that information consistent with the CMO. But Plaintiffs seek banking records that extend far beyond those agreements.

As Plaintiffs acknowledge, the interest rate any given account may have received at a particular time is not necessarily articulated in each of the agreements Plaintiffs' Requests properly seek. Rather, this information is often in bank records, accounting records, and transmittals and this Court was clear such documents were not included in Early Discovery. *See* Mar. 27, 2026 Hr'g Tr. 51:14-52:6; *see also* Case Management Order No. 1 ¶ 4C ("Early Discovery may not seek

bank records; accounting records; transmittals; or any records not tied to either (i) an existing contract or agreement, or (ii) the negotiation of such a contract or agreement"). In fact, the Court noted that such documents "may be very relevant in this case, but it's not something I'm including in this initial flight of discovery." *Id.* 52:1-6. Yet Plaintiffs nevertheless seek these bank records in their purported "narrowed" requests on the sole basis that they are relevant to the claims—this is not enough to disregard the Court's prior clear limitations on Early Discovery.

*Seventh*, Plaintiffs again seek records that go beyond the scope of CMO 1. The CMO is clear that "Early Discovery may not seek bank records; accounting records; transmittals; or any records not tied to either (i) an existing contract or agreement, or (ii) the negotiation of such a contract or agreement." Both the Bank and Administrator Defendants have agreed to produce escrow agreements responsive to the Request. But Plaintiffs are not satisfied with the agreements and insist that the Bank and Administrator Defendants also produce documents associated with the opening of a bank account (requested in Request No. 14) in the context of escrow agreements or in response to Request Nos. 1 and 2 (seeking agreements relating to Early Discovery settlements).

Though Plaintiffs attempt to categorize these documents as anything other than bank records—account opening documents and signature cards are plainly bank records. *See also* U.S. Dep't of Justice, *Subpoena for Bank Records Checklist* (last accessed July 20, 2026), *available at* https://www.justice.gov/d9/2024-01/Subpoena%20for%20Bank%20Records%20Checklist.pdf (bank records subpoena checklist includes account opening documents and signature cards). The broad swath of records Plaintiffs have requested go far beyond the permissible scope of discovery as laid out in ¶ 4 of the CMO.

*Eighth*, again, instead of issuing requests tailored to Case Management Order No. 1, Request No. 13 seeks: "For each of the Early Discovery Settlements, documents sufficient to show the calculation, tracking, or allocation of breakage pursuant to any Agreement or the negotiation of any Agreement, or incorporated into any Agreement as a pricing, compensation, or revenue-sharing term." Request No. 15 seeks: "For each Early Discovery Settlement, documents sufficient to show Your policies and procedures for handling breakage." Request No. 16 seeks: "For each Early Discovery Settlement, Documents sufficient to show any revenue sharing, rebate, discount, or incentive program offered by You to any Administrator Defendant, class counsel, or Bank Defendant in connection with Digital Payment Instruments." Request No. 17 seeks: "All Documents, prepared pursuant to any Agreement or the negotiation of any Agreement, containing projections, estimates, models, or analyses of expected redemption rates, non-redemption rates, or breakage amounts of Digital Payment Instruments in any Early Discovery Settlement." On their face, these requests are clearly beyond the scope of Case Management Order No. 1. The FinTech Defendants will not produce documents in response to these requests, which even when narrowed, would require burdensome, extensive searches not fit for Early Discovery. To the extent any such information related to "breakage" exists within an otherwise discoverable agreement or exchanged draft, the FinTech Defendants will not redact or otherwise withhold it. But to the extent that such information exists in a form separate and apart from a responsive agreement or exchanged drafts, Blackhawk, Digital Disbursements, and Tremendous maintain that such information is outside the ambit of permissible Early Discovery.

*Ninth*, Plaintiffs' final Early Discovery issue relates to Interrogatory No. 3 to the Administrator Defendants, which sought details about any transfer of funds between an Administrator Defendant, on the one hand, and a FinTech Defendant or Bank Defendant, on the

other, pursuant to an Agreement. After Administrator Defendants objected that Interrogatory No. 3 was outside the scope of Early Discovery, Plaintiffs proposed a compromise in satisfaction of this interrogatory and related document requests seeking the same information. Specifically, Plaintiffs said they would accept an answer that simply (a) stated *whether*, for each Early Discovery Settlement, the relevant Administrator Defendant received any payment pursuant to an Agreement, and (b) identified the relevant Agreement.

By letter of July 16, Administrator Defendants advised Plaintiffs that they agreed to the proposed compromise. Thus, it is unclear why Plaintiffs believe there is a remaining issue. To the extent Plaintiffs object that the compromise would be in satisfaction of both Interrogatory No. 3 and related document requests, that was *Plaintiffs*' own proposal. And it would make no sense to compromise on a narrowed version of Interrogatory No. 3, while leaving Plaintiffs free to pursue the broader information sought by the original, *unnarrowed* version, just through other parallel discovery requests. For example, Document Request No. 8 seeks documents sufficient to show all payments between an Administrator Defendant, on the one hand, and a Bank Defendant or FinTech Defendant, on the other, pursuant to an Agreement—the exact same information as Interrogatory No. 3. Thus, any compromise of Interrogatory No. 3 also would have to include Document Request No. 8 and the other interrelated discovery requests.

### *Plaintiffs' Position*.

Plaintiffs seek straightforward relief: the agreements that governed the handling and disbursement of class members' money, and the facts necessary to understand those agreements. Plaintiffs have already substantially narrowed their requests in response to Defendants' objections, and several of the issues Defendants continue to press are not genuinely in dispute. What remains is a series of linguistic objections that obscure, rather than identify, what Defendants are

withholding and why. Because the alleged scheme was deliberately concealed from counsel and from the courts overseeing the underlying settlements, Plaintiffs cannot know whether they are being deprived of critical evidence, or what that evidence might show. Only Defendants know which settlements were affected, which agreements were entered into, and what those agreements say, because the alleged arrangements were specifically structured to be invisible to counsel and to the courts. The settlements identified in the Consolidated Complaint were identified on information and belief, based on publicly available records. Plaintiffs do not represent that the list is complete, nor must they prove, at this stage, that each and every listed settlement is confirmed to be implicated. The full picture, which settlements were affected, which agreements governed them, and what those agreements provided, is known only to Defendants, because the alleged arrangements were designed to be invisible to everyone else. That asymmetry is exactly why Rule 34 requires an objecting party to state whether it is withholding responsive materials on the basis of each objection. Fed. R. Civ. P. 34(b)(2)(C). Defendants have not made that statement here, and Defendants' assertion that they are conducting targeted "go-get" collections does not supply the required withholding statement or permit Defendants to define the scope of Early Discovery through their chosen collection methodology. And the need for disclosure is heightened by the posture of this case: the Court authorized this limited Early Discovery because it found it "proper and proportional here," CMO 1 ¶ 4, and specifically noted that restricting Early Discovery to finally-approved settlements prevents this Court from "intruding upon the jurisdiction of other courts that have not yet approved the settlement administration structures and agreements that

plaintiffs challenge in this litigation." Those structures and agreements are what Plaintiffs seek. Plaintiffs set forth their position for each remaining dispute below.[10]

*First*, CMO 1, ¶4(B), authorizes Early Discovery into "contracts or agreements . . . relating to the handling or disbursement of settlement funds." As examples of what this included, Plaintiffs requested agreements that cover handling, disbursement, deposit, and administration of settlement funds. Defendants objected to the inclusion of "deposit" and "administration" of settlement funds, but they have never clearly stated what they believe "handling" *does cover* or confirmed whether responsive documents are being withheld on the basis of their objection. Plaintiffs cannot evaluate what they are being denied, because Defendants have not said what they are keeping back. Rule 34 requires precisely that disclosure. Fed. R. Civ. P. 34(b)(2)(C). On the merits, Defendants' position is indefensible. Settlement funds do not travel directly from a defendant's check to a class member's mailbox. They are deposited into Qualified Settlement Funds, held by banks under escrow agreements, and administered by claims administrators, all before a single dollar is disbursed. agreements governing that entire process are agreements about how settlement money is handled. To read "handling" as excluding deposit and administration would strip the word of

---

[10] Early Discovery has been open since May 1, 2026. Plaintiffs served their Early Discovery in early May 2026. Defendants served their Responses and Objections 30 days later in early June 2026. The parties conducted a meet-and-confer on July 7, 2026. Defendants sent a follow-up conferral letter on July 16, 2026 at 9:00pmET the same day they sent a draft of their disputes related to, *inter alia*, Early Discovery. Plaintiffs responded to their disputes and asserted additional disputes that arose from Defendants' July 16th letter. At approximately 6:00 p.m. on the evening this submission was due, Defendants circulated a revised draft of the joint status report that materially changed the positions of some Defendants and conceded some of the disputes addressed in Plaintiffs' first, fifth, seventh, and ninth sections. Given the timing of those revisions, Plaintiffs have left those sections in the submission as drafted. To the extent Defendants' revised positions fully resolve any of those disputes, however, no ruling from the Court is necessary on the conceded issue.

independent meaning and exclude the very agreements at the center of this case—the escrow agreements, QSF deposit arrangements, and administration contracts that determined where the money sat, at what rate it earned income, and what happened to it while Defendants allegedly extracted undisclosed compensation. CMO 1 does not limit Early Discovery to agreements governing only the final act of transmitting payments to class members.  The Court should hold that agreements relating to the deposit and administration of settlement funds fall within CMO 1's "handling or disbursement" language, and order Defendants to comply with Rule 34's requirement to state what, if anything, is being withheld.[11]

*Second*, CMO 1, ¶ 4(B) authorizes Early Discovery into "contracts or agreements **entered into by** defendants in this litigation, or by plaintiffs' counsel in the underlying class actions." The plain text asks whose agreements are covered, not who the counterparty must be. The answer is clear: agreements entered into *by* a Defendant. Defendants have rewritten that language to cover only agreements entered into *between* defendants, a limitation that appears nowhere in the Order and that would exclude agreements at the center of this case. That distinction is consequential because, in several Early Discovery Settlements, the QSF was held by a bank that is not named as a Defendant. Under Defendants' reading, an Administrator Defendant's agreement with that bank, governing exactly how it handled class members' money, falls entirely outside Early Discovery, even where that agreement reflects the same alleged arrangements at issue in the Complaint. For example, any agreement entered into by Epiq with Citibank governing the handling of settlement funds in the *In re JUUL Labs* settlement would fall within the plain language of CMO 1. These agreements are directly relevant to the allegations at issue. The Consolidated Complaint alleges

---

[11] As noted above, *supra* n.10, it appears that, on the evening of filing, the Defendants have represented that they are not withholding documents relating to the deposit or administration of settlement funds on the basis of this objection.

that the challenged arrangements were not isolated bilateral transactions, but components of an industry-wide network implemented through enterprise-level agreements governing the Administrator Defendants' books of business. *See* Consol. Compl. ¶¶ 7–8, 389–90. Alternatively, materially different agreements may provide a useful comparator for determining whether the terms offered by the named Bank Defendants reflected ordinary commercial practices or the alleged interest-sharing scheme. Production at this stage also serves the purpose of early discovery, as "some discovery is necessary to identify the proper parties." *Manual for Complex Litigation* (Fourth) § 22.631, at 408; *see also* Fed. R. Civ. P. 16(b)(3)(A). Withholding agreements based solely on the nonparty status of one signatory would risk amendment after amendment if the agreements later establish that additional entities should be joined, expending the resources of both the parties and the Court without any clear benefit. These agreements exist; they are within the possession, custody, and control of the Defendants; and the burden is light, if not non-existent.

*Third*, CMO 1 defines the universe of Early Discovery by objective criteria: settlements identified in the complaints filed in the twelve cases consolidated in this litigation as of the specified date. CMO 1 ¶ 4(A). The Order does not impose an additional requirement that a named Plaintiff in the subsequently filed Consolidated Complaint allege membership in each settlement. Defendants have imported that limitation from whole cloth in an apparent attempt to deny responsive documents.

Five of the six settlements that the Defendants would exclude[12] are expressly discussed in the Consolidated Complaint as additional examples in which a Defendant settlement administrator reported a below-market interest rate and, on information and belief, received undisclosed

---

[12] These are the *Hameed-Bolden*, *Smith*, *Culbertson*, *Stoffers*, and *Guarnaschelli* settlements.

compensation from a Bank Defendant. Consol. Compl. ¶ 357. During the course of Early Discovery, Plaintiffs learned for the first time from counsel for Western Alliance that, for the sixth settlement,[13] Western Alliance held the QSF. Had Plaintiffs known that fact, they would have included that settlement alongside the others in the Consolidated Complaint, as it provides the first example known to Plaintiffs of a settlement administered by JND in which Western Alliance held the QSF.

The six disputed settlements illustrate a broader problem that runs through every dispute in this joint submission: Plaintiffs frequently cannot determine from public records which bank held the QSF in a given settlement, because that information is not disclosed in court filings, class notices, settlement agreements, or any other document available to the public. The name of the escrow bank, the terms on which it held the funds, and the financial arrangements it entered into with the administrator are not matters of public record, they are contained in the very agreements Defendants are withholding. *Buescher v. Brenntag* is the clearest example: Plaintiffs had no way of knowing that Western Alliance held the QSF in that settlement until Defendants' own counsel disclosed it for the first time during Early Discovery. That disclosure was not a courtesy, it was an accident of the discovery process. The full accounting of which banks held which QSFs, on what terms, and through which administrators exists exclusively in Defendants' possession, custody, and control. Defendants designed and operated these arrangements; they are the only parties who know their full scope. The settlements in Plaintiffs' complaints are not a confirmed list of affected settlements, they are the examples that upon information and belief, Plaintiffs could piece together from publicly available information. Whether additional settlements are implicated, and which

---

[13] This is the *Buescher* settlement.

ones, is a question only Defendants can answer. Restricting Early Discovery would reward concealment and defeat the purpose of the discovery the Court authorized.

The disputed settlements bear directly on Plaintiffs' claims. The Consolidated Complaint alleges that Defendants operated a single enterprise-wide scheme through master agreements and financial arrangements that governed conduct across the Administrator Defendants' broader books of business—not through isolated decisions made separately in each settlement. Consol. Compl. ¶¶ 7–8, 16–17. Information from the disputed settlements may demonstrate: the existence and scope of those standing arrangements; the identities and roles of participants; Defendants' knowledge, intent, and course of conduct; the consistency of the alleged concealment; and whether the challenged terms differed from ordinary commercial arrangements. A conspiracy cannot be evaluated by "dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). Those subjects bear directly on the core of this MDL.

Moreover, a named Plaintiff who personally received a diminished settlement distribution caused by the alleged antitrust conspiracy and RICO scheme has Article III and statutory standing to represent class members injured by the same conduct across different settlements and may seek to represent other class members injured by the same conduct, including class members in different settlements; she need not have participated in every transaction. *See In re Domestic Airline Travel Antitrust Litigation*, 221 F. Supp. 3d 46, 56-57, 67-68 (D.D.C. 2016) (holding that plaintiffs alleging a nationwide conspiracy to inflate airfares were not required to identify injury on every particular route or city-pair; it was sufficient that the named plaintiffs alleged that they personally paid prices inflated by the alleged conspiracy); and *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1117–20 (9th Cir. 2017) (holding that named plaintiff in RICO class action need only allege that her

"injuries stem from the same scheme, although the specific predicate act that caused her injury may differ from the acts that caused injury to other class members"). Regardless, whether the named Plaintiffs may represent persons injured in other settlements is a Rule 23 question, not a basis for excluding discovery into other implementations of the same conspiracy. Moreover, the Court adopted that settlement-based definition with Defendants' anticipated motions to dismiss expressly in view. A pending standing argument therefore does not supply a new limitation absent from the Order.

Defendants' proportionality objection is entirely conclusory; they identify no search burden, document volume, or cost or other evidence showing that production would be disproportionate. *See Inova Health Care Servs. for Inova Fairfax Hosp. & Its Dep't, Life with Cancer v. Omni Shoreham Corp.*, No. CV 20-784 (JDB), 2021 WL 6503725, at \*5 (D.D.C. Jan. 29, 2021). Plaintiffs request the Court hold that all thirty settlements identified in Plaintiffs' Complaint are within Early Discovery.

*Fourth*, CMO 1 does not restrict Early Discovery to documents consisting of agreements and negotiation records. It provides that Early Discovery must "pertain to" covered agreements or their negotiation. CMO 1 ¶ 4(B). A document disclosing a covered agreement, to a court, class counsel, defense counsel, in a CAFA notice, on a settlement website, or in a settlement notice – pertain to that agreement. *See* Administrator RFP No. 10; Bank and FinTech RFP No. 9; Interrogatory No. 2 (identifying and/or requesting information constituting or reflecting disclosures of agreements). A document disclosing an agreement pertains to that agreement—it identifies the agreement, communicates its existence or terms, and establishes when and to whom the agreement was revealed. Defendants position, that only the agreement itself and documents

created during contract formation are within scope, substitutes "consist of" for the language the Court actually used.

Evidence of whether the agreements were ever disclosed, to whom, when, and in what form, is the very evidence that goes to whether Defendants concealed the challenged arrangements from class members and the courts. Concealment is central to Plaintiffs' claims. The Consolidated Complaint alleges that Defendants failed to disclose the challenged financial arrangements in preliminary-approval submissions, administrator declarations, fee applications, class notices, settlement websites, post-distribution accountings, and CAFA notices. The requested discovery is narrow, Plaintiffs seek only documents constituting or reflecting disclosures of the agreements to an identified class of recipients and an identification of those disclosures. Plaintiffs request the Court hold that such documents fall within Early Discovery.

*Fifth*, Plaintiffs seek bids or quotes that resulted in a Defendant obtaining work in connection with an Early Discovery Settlement. *See* Administrator RFP No. 7; Bank and FinTech RFP No. 6 (narrowed to address Defendants' burden objections, to only successful bids or quotes). Some Defendants have agreed to produce those successful bids, others continue to resist without coherent explanation.[14]

A successful bid is not a pre-contractual curiosity, it is the document in which a Defendant proposed the terms on which it would handle settlement funds and obtained the engagement. It sets forth the proposed scope of work, compensation, payment mechanisms, banking arrangements, distribution methods, and other material terms. It may have been accepted, revised, incorporated into, or used as the basis for the resulting agreement. CMO 1 encompasses discovery that "pertain[s]

---

[14] As noted above, *supra* n.10, it appears that on the evening of filing, the remaining Defendants withdrew their objections and agreed to produce successful bids.

to" an agreement or its negotiation. CMO 1 ¶ 4(B). A successful bid is the antecedent of an agreement, and if it led directly to the engagement, it satisfies the Court's delineation of permissible discovery. Defendants' contrary position improperly limits Early Discovery to the executed agreement and formal redlines, a restriction CMO 1 does not impose. Plaintiffs request the Court require production of the document that initiated the contractual relationship and set its terms. Plaintiffs request the Court order production of successful bids for all agreements concerning the handling or disbursement of funds in Early Discovery Settlements.

*Sixth*, Plaintiffs have narrowed their interest rate request to only seek documents sufficient to show the interest rate and the amount paid to each QSF for each Early Discovery Settlement or, in the alternative, an answer to that question in response to an Interrogatory, the minimum necessary to understand what the agreements provided. *See* Admin Def. RFP No. 8 (as narrowed); Bank Def. RFP No. 7 (as narrowed); and Bank Def. Interrogatory No. 4 (as narrowed). The interest the Bank Defendants earned on class settlement funds is not a collateral financial detail. It is the very conduct this case is about. Plaintiffs allege an enterprise that "operated from at least 2015, when non-zero interest rates led to increasing profits via the Bank Interest Track," Compl. ¶ 395, built on compensation arrangements the Bank Defendants concealed from class counsel and the courts, *id.* ¶ 423.

Where the interest rate appears on the face of a qualifying agreement, the production of the agreement answers this Request. The rate is often fixed not in the body of an agreement but in the schedules, amendments, and rate riders attached to it, in the negotiation documents that set it, or in the account control agreements and depository instructions that operate the account. A contractual term does not become a bank record because it is expressed in numbers or set forth in an exhibit or other document pertaining to the agreement rather than the recital page. Plaintiffs

do not seek account statements or other excluded bank records to prove the rate. If the applicable rate does not appear in any producible document, the Bank Defendant can answer Interrogatory No. 4 with the rate and identify the source on which the answer is based, while stating that no nonexcluded responsive document exists. Defendants are withholding the most basic fact in this case, what interest rate was actually paid to each QSF, and on what terms. The *Burnett* proceedings confirm why this matters: Judge Bough's inquiry went directly to the rate Huntington was paying (3.75%), what other options were available, and whether the class was receiving the benefit of those alternatives. Plaintiffs need the same documents here and request the Court hold that documents sufficient to show the interest rate paid to each Early Discovery QSF are within scope.

*Seventh*, the Bank Defendants have agreed to produce the escrow agreements for the Early Discovery Settlements; the Administrator Defendants have refused to produce escrow agreements unless Plaintiffs agree to withdraw other valid Requests. [15] Request No. 14 to both the Bank and Administrator Defendants seeks escrow agreements, as well as the remaining operative components of the same instrument: the account-opening documents, account control agreements, signature cards, and depository instructions. These are not "bank records" excluded by CMO ¶ 4(C). They are agreements and related documents that establish the QSF account and fix the terms on which it operates, including the authorized signatories, the depository bank, and the interest rate terms. An account control agreement is, as a matter of law, a tripartite contract among the account holder, the secured party, and the bank. U.C.C. § 9-104(a)(2) (control of a deposit account exists where "the debtor, secured party, and bank have agreed in an authenticated record").

---

[15] As noted above, *supra* n.10, it appears the Administrator Defendants withdrew this condition on the evening of filing, and have agreed to produce escrow agreements, but maintain their objection to the remainder of this Request.

Signature cards and depository instructions supply the escrow agreement's own operative terms, and they fall within the very definition of "Escrow agreement" the Bank Defendants have agreed to produce, which reaches "any amendments, exhibits, schedules, or other attachments." At a minimum, they are "records . . . tied to . . . an existing contract or agreement," the residual category ¶ 4(C) expressly preserves. Defendants are withholding documents that govern how the escrow account actually works, who controls it, what interest rate it earns, and on what terms. The Department of Justice checklist cited by Defendants identifies categories that may be requested in a subpoena directed to a bank; it does not interpret CMO 1 or establish that every document maintained by a bank is categorically excluded even when the document is itself a contract or an incorporated component of one. The *Burnett* proceedings illustrate precisely why these documents matter: the court's entire inquiry centered on the escrow agreement's terms, the investment options it provided, and the rate being paid. Plaintiffs request the Court order their production here.

*Eighth*, Plaintiffs have already narrowed their breakage requests to documents expressly referenced in, or used to negotiate, covered agreements. *See* Request Nos. 13, 15, 16, and 17 to the Fintech Defendants (as narrowed). Breakage is unredeemed settlement money, funds class members were owed and never received. Revenue-sharing terms tied to that breakage are the alleged kickback itself. Plaintiffs seek the breakage and revenue-sharing terms, calculations, policies, and projections that are referenced in, or were used to negotiate, the agreements governing how FinTech Defendants disposed of settlement funds. While FinTech Defendants now state they will produce those materials if directly incorporated in an agreement or negotiation document, they decline to produce responsive materials that were incorporated by reference in or prepared pursuant to an agreement or the negotiation thereof.

Documents that fix, project, or allocate breakage, or that set a revenue-sharing term, included or reference in a covered agreement or in negotiating one, pertain to "the handling or disbursement of settlement funds" as directly as any document in this case. CMO ¶ 4(B). The FinTech Defendants have conceded they would not withhold an agreement or negotiation document that contains a breakage figure or revenue-sharing term. A breakage projection used to price and negotiate an agreement is not meaningfully different from a breakage term written into one. It does not become an accounting record because it is expressed in numbers. The economic terms that determined how much unredeemed settlement money would flow to Defendants, and how the parties negotiated those terms, plainly "pertain to" the agreement or the negotiation thereof. Those documents go to the heart of the alleged disbursement scheme. The FinTech Defendants' own concession, that they will produce agreements and negotiation documents containing these figures, forecloses any remaining objection, because every request Plaintiffs pursue is limited to documents tied to a covered agreement or its negotiation. CMO 1, ¶ 4(C) excludes records not tied to an agreement or its negotiation; it does not exclude records that are.

The FinTech Defendants' assertion that the narrowed requests would require "burdensome, extensive searches" is unsupported by any custodian count, document estimate, search proposal, or cost information. The narrowed requests target the agreement files, negotiation custodians, and materials used to establish the economic terms of identified agreements; Defendants should be required either to conduct that targeted search or substantiate the burden with evidence. The Plaintiffs request the Court hold that breakage and revenue-sharing terms, calculations, policies, and projections tied to covered agreements or their negotiation are within Early Discovery.

*Ninth*, Interrogatory No. 3 to the Administrator Defendants requests a yes-or-no answer to whether the Administrator Defendants received compensation pursuant to each agreement

produced in response to Requests No. 1, 2, or 3. *See* Interrogatory No. 3 (as narrowed). The Administrator Defendants have refused to answer even this narrowed question, conditioning any response on the withdrawal of other valid Requests.[16] The narrowed Interrogatory falls squarely within CMO 1. It concerns compensation received pursuant to the very agreements that are the subject of early discovery and bears directly on the financial arrangements alleged in the Complaint. It does not seek bank records, transaction-level accountings, or payment transmittals; it asks only whether compensation was received under each produced agreement. The requested information is readily available to the Administrator Defendants and imposes minimal burden. Plaintiffs respectfully request that the Court require the Administrator Defendants to answer Interrogatory No. 3 as narrowed, without conditioning their responses on the withdrawal of other valid requests. Plaintiffs ask the Court to compel Administrator Defendants to respond to this Interrogatory.

### 3.    PLAINTIFFS' COUNSEL'S PRESERVATION OBLIGATIONS

The parties also have a difference of views on whether Plaintiffs' counsel have an obligation to preserve evidence relevant to the claims in the Complaint and Defendants' defenses to those claims.

### *Defendants' Position*.

Defendants believe Plaintiffs' counsel has an obligation to preserve documents and information in their possession relating to administration of settlements in which they were class counsel and that they consider to be at issue in this case.  In the parties' Rule 26(f) discussions, Plaintiffs' counsel disclaimed any such obligation, advised that they have not instituted any

---

[16] As noted above, *supra* n.10, it appears the Administrator Defendants withdrew this condition on the evening of filing, and have agreed to comply with this Interrogatory.

litigation holds, and declined to institute any litigation hold, creating a serious risk that relevant evidence may be lost or destroyed.

Plaintiffs' counsel do not dispute that they served as class counsel in underlying settlements that they consider to be at issue in this case. It is highly likely that they have information relevant to the claims and Defendants' defenses to those claims. For example, Plaintiffs' complaint is replete with allegations that defendants failed to make various disclosures to class counsel in underlying settlements and that Administrator Defendants "steered" settlement deposit business to the Bank Defendants. *See*, *e.g.*, Compl. ¶¶ 2, 122, 128, 129, 381, 390, 441, 460(d). These allegations make class counsel in underlying settlements uniquely situated by virtue of their present involvement in the case and their status as obvious percipient witnesses who would naturally have information, including internal communications, relevant to those allegations.

For instance, documents confirming that class counsel were aware of disclosures of the allegedly improper financial arrangements involving Defendants would disprove the non-disclosure allegations, and documents showing class counsel selecting and retaining a bank for purposes of holding class settlement funds without input from the relevant administrator would disprove Plaintiffs' "steering" allegations. Similarly, documents confirming class counsel knew of QSF interest rates and market rates are directly relevant to Plaintiffs' knowledge of their injury and diligence and may well confirm that certain of Plaintiffs' claims are time-barred. Indeed, at the case management conference in March, Plaintiffs' counsel emphasized that "one of things we're going to have to address at some point is what did the lawyers know and when did they know it." Initial Mgmt. Conf. Tr. 54:16-18 (Mar. 27, 2026); *see also id.* at 53:25-54:2 ("if they want to ask me, for example, what I knew about settlements and what were in contracts and were things disclosed to me, I'm happy to answer those questions").

Indeed, documentary evidence shows Plaintiffs' counsel in this case personally reviewed and edited the terms and conditions of one Administrator Defendant in one major settlement referenced in the Complaint, and did not object to the provision expressly authorizing rebates, credits, and benefits from banks and vendors, leaving it untouched.  Dkt. 150-3.  While that particular document was emailed to the relevant Administrator Defendant, it is a strong indicator that there also internal communications about these topics, to which only Plaintiffs' counsel have access.  Those documents should be preserved so that they can be available as evidence in this case, should it proceed past the pending motions to dismiss.

Plaintiffs' various objections to preservation lack merit.  Plaintiffs mainly argue that their documents relating to administration of underlying class settlements are irrelevant because they allege Defendants concealed information from them.  Of course, if the complaint survives motions to dismiss, Defendants must be entitled to use discovery to test the veracity of those allegations.  Plaintiffs say they are not "suggesting Defendants are foreclosed from testing" their allegations.  But loss or destruction of internal documents that would illuminate or corroborate what Plaintiffs' counsel knew and when they knew it would of course severely prejudice Defendants in testing those allegations.

Plaintiffs' counsel also note that Defendants should already possess copies of written disclosures they made to Plaintiffs' counsel in underlying settlements.  But written communications from Defendants hardly exhaust all of the potential evidence bearing on what underlying class counsel knew and when they knew it.  External and internal communications of Plaintiffs' counsel reacting to disclosures—whether oral or written—or otherwise deliberating over bank selection, interest, or digital disbursements would have significant evidentiary value.

Plaintiffs also complain that their preservation obligation is "unbounded and irrelevant." To the contrary, Defendants asked Plaintiffs' counsel to preserve "all information relating to administration of settlements in which you were class counsel and that you consider to be at issue in this case." That description provides more than ample guidance to enable institution of litigation holds. Even if Plaintiffs' counsel protest that they do not know for certain every last settlement that they might consider affected by the so-called "scheme" they allege, they still must preserve relevant information in their possession about the settlements they do now know about that they handled as class counsel and that they consider to be within the scope of this case. Again, Plaintiffs' counsel do not deny that such settlements exist.

Defendants have been clear about their preservation demand throughout the parties' discussions. Plaintiffs' contention that it "has been a moving target" is a baseless attempt to distract from the substantive issue at hand. Nor can Plaintiffs' counsel divert attention from their own obligations by criticizing Defendants for not yet serving subpoenas on other class counsel in underlying cases, or speculating that defense firms in underlying cases might have relevant evidence. That other class counsel in underlying cases (*i.e.* counsel who are not representing Plaintiffs in this case) may *also* have discoverable evidence and preservation obligations—as to which Defendants have reserved all rights—does not somehow exempt Plaintiffs' counsel in this case from the basic obligation to preserve relevant evidence in *their* possession.

Defendants therefore request that the Court confirm that Plaintiffs' counsel are obligated to institute litigation holds and otherwise preserve documents and information in their possession relating to administration of settlements in which they were class counsel and that they consider to be at issue in this case.

### *Plaintiffs' Position*.

Plaintiffs have already confirmed that potentially relevant information is being preserved consistent with this Court's Order, and that MDL Leadership's documents, including those relating to settlement administration, are retained as a matter of ordinary professional practices. There is no preservation problem to solve, only a sweeping and untethered demand to create one. Defendants' demand for non-party MDL Leadership to preserve "all information related to administration" seeks preservation of information that is unbounded and irrelevant, and that, to the extent it exists at all, is likely privileged. Nor can it be reconciled with the allegations of the Consolidated Complaint, which alleges a concealed kickback and disclosure scheme that Defendants structured specifically to avoid detection by class counsel, supervising courts, and claimants alike, Compl. ¶¶ 2, 122, 381, 390, 460(d), which means only Defendants knew of the schemes and know which of the underlying settlements were actually affected by them.

That allegation is confirmed by direct evidence already in the record: when Angeion's CEO filed a sworn declaration in the $725 million Facebook settlement, class counsel confirmed that they "w[ere] not informed or aware of th[e] agreement between Angeion and Blackhawk prior to these discussions," and disclosure came only *ex parte* because a judge ordered it. Compl. ¶¶ 13, 169. That class counsel had no knowledge of the alleged kickback arrangements is confirmed by evidence in the record of another implicated settlement: after the *Baker* complaint was filed, class counsel in the Equifax data-breach MDL asked JND for information about compensation received outside the settlement fund, and reported to the court that, "[o]ver the past year, JND has provided Class Counsel with limited information regarding these arrangements, but has not disclosed specific amounts it has received as a result of these arrangements.'" Pls.' Mot. for Order to Disclose Info. Related to Legal Admin. at 5, *In re Equifax Inc. Customer Data Sec. Breach Litig.*,

No. 1:17-md-02800-TWT (N.D. Ga. July 10, 2026), Dkt. 1293. Defendants may not now use that opacity, of their own making, to justify an open-ended demand on only MDL Leadership counsel to preserve "all information" about any settlement administration in hopes to find a smoking gun in the form of deliberations about their schemes that were ***not*** disclosed.

Defendants' preservation demand has been a moving target on every axis: who must act has swung from "class counsel" generally, to "Plaintiffs' counsel in this case" only, and back to underlying counsel again; and what must be preserved has crept, in lockstep with each attempt by Plaintiffs to substantively engage with Defendants' preservation request and consider it on the merits, from communications with Defendants (which Defendants already have), to communications between Plaintiffs' counsel and unnamed non-parties (whose relevance Defendants have never explained), and finally to what Defendants call "all information relating to administration," including Plaintiffs' counsel's own internal deliberations about disclosures that were never made in the first place. A preservation demand that cannot be consistently defined is not a legitimate preservation demand, and the record of Defendants' shifting positions confirms that no coherent obligation has ever been articulated.

Defendants inserted their reliance on Dkt. 150-3 into this submission for the first time in a redline circulated six hours before filing, without advance notice to Plaintiffs; the document is an exhibit to JND's own motion to dismiss, filed by JND's counsel. Now that Plaintiffs have had occasion to review the document, Defendants' characterization of it is demonstrably incomplete. The provision Defendants characterize as one that Plaintiffs' counsel "did not object to" is JND's own standard boilerplate, language that appears nearly verbatim across multiple JND agreements in the record. The suggestion that transmitting a redline of a terms-and-conditions document, with a note that the edits were "hopefully nothing controversial," constitutes Plaintiffs' counsel's

knowing authorization of an undisclosed kickback scheme is not a legal argument, it is an inference built on inference, stacked on a document inserted into a joint filing hours before it was due. Beyond that, those redlines from a counsel in an underlying settlement does not transform MDL Leadership into a source of party discovery in this litigation. MDL Leadership does not have possession, custody, or control over the files or communications of other counsel who participated in underlying settlements in different capacities, if Defendants believe that firm has relevant documents, the mechanism is a targeted subpoena. And defense counsel for Blue Cross Blue Shield, who negotiated, reviewed, and in some instances countersigned the very same agreement containing the very same provision, received equal or greater access to the same document and has heard nothing from Defendants on the subject of preservation. That asymmetry confirms this is not a principled preservation argument but a demand targeted exclusively at MDL Leadership, with no limiting principle and no stopping point.

On the substance, the argument fails for reasons the document itself illustrates. Not objecting to a contractual provision, or editing other provisions of the same document without striking a piece of JND boilerplate, is not the same as authorizing the financial arrangements Plaintiffs allege were deliberately concealed. The provision in question does not disclose that JND's rebates and credits would flow from banks and fintechs through arrangements structured to be invisible to class counsel and courts; it authorizes JND to receive vendor rebates in the abstract, as a general term buried in a lengthy terms-and-conditions document circulated for signature. That is the distinction between a disclosed financial arrangement and a concealed kickback scheme. A material non-disclosure does not become a disclosure because it is buried in boilerplate. There is no reason to infer, and Defendants offer none, that there were any internal deliberations about this provision at all, let alone deliberations that would constitute relevant evidence. And critically:

counsel could not have recognized the significance of JND's standard rebates-and-credits language through the lens of an undisclosed kickback scheme that had not yet been alleged, that lens did not exist until the *Baker* complaint was filed (the email is from October 2020). The deliberations Defendants speculate about could not have existed before there was anything to deliberate about.

Defendants' position that the preservation demand is necessary because they "must be entitled to use discovery to test the veracity of [the] allegations" in the Consolidated Complaint misses the point entirely. No one is suggesting Defendants are foreclosed from testing whether underlying class counsel knew of the alleged scheme; Defendants remain free to pursue that question by searching their own records for what they disclosed—or, by Plaintiffs' theory, did not disclose—or through a properly targeted third-party subpoena to specific firm(s) after they have identified the settlement and the disclosure. What Defendants are not entitled to do is skip those channels and impose, unilaterally and directly on non-party Plaintiffs' counsel, an undefined preservation obligation untethered to any actual identified relevant settlement and category of information. Defendants' statute-of-limitations theory fares no better. When Plaintiffs' claims accrued turns on what the Plaintiffs knew or reasonably should have known, not on their MDL counsel's impressions. The Complaint alleges Defendants concealed the very arrangements on which the Plaintiffs claims depended. Compl. ¶¶ 2, 390.

Defendants' own conduct undercuts their professed need for non-parties to preserve this information. At the initial conference, Defendants were confident enough that class counsel possessed relevant knowledge to seek the Court's permission to pursue third-party discovery of counsel in the underlying settlements, and the Court, after cautioning about the burdens such discovery could create, allowed it. *See* Mar. 27, 2026 Hr'g Tr. 54:1–56:20; CMO No. 1 § 4. Yet, to date, Defendants never served a single such subpoena on any third-party class counsel. And

when Plaintiffs' own Early Discovery asked Defendants directly for the disclosures Defendants now say are so central to this case, RFP 10 and Interrogatory No. 2, Defendants neither produced responsive documents nor stated that none exist. Instead, Defendants took the position that any disclosures not contained in the agreements or negotiation documents themselves fall "beyond the scope of Early Discovery because they are not contracts, agreements, or negotiation documents," even while acknowledging that "discovery may reveal knowledge by class counsel regarding the financial institution agreements at issue in this case." If responsive disclosures existed, the ordinary course would have been to produce and identify them; if none exist, the ordinary course would have been to say so. Electing instead not to serve a third party subpoena and then invoke a scope objection to Early Discovery, after telling the Court that this same category of information justified third-party discovery, is difficult to reconcile with a genuine effort to test a known fact.

Defendants' demand for a preservation order or instruction to non-party counsel has no logical stopping point.  In their own position on the scope of Early Discovery, *see* Section 2, above, Defendants do not object to "defense counsel" as a recipient of disclosures relating to administration, alongside class counsel. Indeed, defense counsel was no passive bystander. In the underlying settlements, they sat across the table from class counsel, representing the parties funding the settlements, and received, or per Plaintiffs' allegations did not receive, the same disclosures at issue here. In a number of instances, those same law firms have since entered appearances for Defendants in this MDL. Despite that overlap, Plaintiffs are not aware of any effort by Defendants to secure preservation commitments from that same defense counsel, confirming that Defendants' demand is not motivated by an evenhanded concern for preservation, but is directed solely at Plaintiffs' non-party counsel. If mere proximity to an underlying settlement's negotiation and administration were enough to justify a court-ordered preservation

obligation on non-party counsel, Defendants' own litigation counsel here would fall within that same logic, a result Defendants do not propose. This omission confirms that the obligation Defendants ask the Court to impose on Plaintiffs' non-party counsel is unmoored from any coherent preservation principle. The Court itself has already cautioned against exactly this kind of open-ended, non-party discovery, observing it could generate "motions to quash" and unresolved "privilege issues," Mar. 27, 2026 Hr'g Tr. 60:13–61:1, a caution Plaintiffs already brought to Defendants' attention in correspondence quoting this same passage, to no avail.

Defendants' pattern of renewing and broadening the same preservation demand, across successive rounds of correspondence, without engaging the substance of Plaintiffs' questions regarding specificity, has gone beyond a legitimate discovery dispute;[17] it is a sideshow calculated to burden and distract Plaintiffs' counsel from litigating the merits of this case, not a genuine effort to protect evidence. For all these reasons, Plaintiffs respectfully request that the Court decline to impose any additional preservation obligation on Plaintiffs' counsel beyond what this Court's Order already requires. To the extent Defendants believe preservation by non-party settlement class counsel in an underlying action is warranted, Plaintiffs request that the Court direct Defendants to specify the settlement, firm, disclosure, and information requested, and pursue that request directly with those firms, by subpoena or otherwise, rather than through Plaintiffs' MDL counsel.

**4.** **RULE 26(f) OBLIGATIONS RELATING TO CUSTODIANS, DATA SOURCES, AND DISCOVERY PLANNING**

---

[17]Plaintiffs do not burden the Court with the parties' correspondence here, but will provide it promptly if the Court would find it useful.

***Plaintiffs' Position***.

Nine months into this litigation, none of the nine named Defendants have yet meaningfully identified their relevant custodians or data sources beyond the few names listed in their Rule 26(a)(1) initial disclosures, not because they lack the information, but because they treat every disclosure obligation as negotiable, deferrable, or subject to conditions or limitations of their own making. They have maintained this position despite the Court's clear directive to the contrary in its July 10 Order.

CMO No. 1 required the parties to complete the Rule 26(f) conference by June 30, 2026, and to submit a Joint Rule 26(f) Report and General Discovery Plan to the Court by July 31, 2026. The Rule 26(f) process was intended to be a forward-looking general discovery planning exercise, expressly separate from Early Discovery. That distinction was important and Defendants understood it at the time of its issuance. Specifically, when Defendants circulated their initial draft of CMO No. 1, it contained language stating that "a separate report and discovery plan under Rule 26(f) is unnecessary at this time" and contemplated only a limited conference tied to Early Discovery. Plaintiffs expressly objected to this language in transmitting their revised draft, flagging the issue directly in the document itself noting: "Defendants' Draft seems to imply that the 26(f) is related to only early discovery. But this is not how Plaintiffs view it. We believe the 26(f) should be robust and should inform a joint discovery plan going forward." Defendants accepted Plaintiffs' revisions without objection or rebuttal. Accordingly, both sides then submitted that agreed-upon framework to the Court, and the Court entered it as CMO No. 1. Having negotiated and accepted that framework for the Rule 26(f) conference, without disclosing to the Court any reservation about its scope or what was required, Defendants then agreed to provide

nothing and reverted in practice to the narrower approach they had proposed and then quietly abandoned.

Plaintiffs initiated the Rule 26(f) process on May 28th by transmitting a proposed conference agenda, draft Requests for Production (for scoping purposes), and 22 targeted Informal ESI Requests designed to elicit precisely the foundational information at issue: custodians, custodial and non-custodial data sources, retention policies, collaboration platforms, and the names of current and legacy IT systems. Plaintiffs also proposed multiple Rule 26(f) discussions (including in person meetings) to allow Defendants to consult with their IT personnel to answer follow-up questions or queries.  Defendants responded to Plaintiffs' proposal by limiting the Rule 26(f) conference to a single 90-minute videoconference and objecting to any discussion of IT infrastructure, custodians, or the ESI requests. At the June 15th conference, *every* Defendant declined to identify any custodial, non-custodial, or third-party source of discoverable information, and declined to identify any custodians beyond those in their Rule 26(a)(1) initial disclosures. When Plaintiffs tried to substantively engage in an actual discussion of the required Rule 26(f) topics citing MDL authorities, Defendants responded that those cases reflected mere voluntary accommodation. That characterization is wrong. Those disclosures were the product of court-supervised conferral, governed by the Federal Rules, local rules, and judges' standing orders.

The Court's July 10, 2026 Order should have resolved this dispute, as it expressly directed the Defendants to make these disclosures:

> Under Federal Rule of Civil Procedure 26(f), the parties must develop a discovery plan and that plan must address issues involving ESI. Accordingly, parties should be informed about their ESI custodians and sources ahead of that conference. Fed. R. Civ. P. 26(f)(2), (3)(C). On that basis, it does not appear burdensome to require the producing party to disclose custodians and sources within 14 days of the Rule 26(f) conference.

The Court then cited directly to CMO 1 in *In re Depo-Provera Prods. Liab. Litig*., No. 3:25-MD-3140 (N.D. Fla. Feb. 23, 2025). The Court's 14-day deadline ran from the June 15 Rule 26(f) conference, placing compliance due by June 29, more than ten days before the Order was even issued. Defendants have provided nothing to date.

Plaintiffs renewed their demand for the information required by Rule 26(f) or other court orders or checklists in order to draft a meaningful discovery plan on July 13th. On July 16th Defendants responded by demanding that Plaintiffs' MDL Leadership Counsel provide Rule 26(f) custodian and data source disclosures concerning information in their own possession as though they were parties to this litigation, and separately demanded plaintiff-by-plaintiff breakdowns of custodial sources from class representatives. However, there is no obligation under the Federal Rules requiring non-party attorneys to provide Rule 26(f) custodian and data source disclosures, and Defendants have identified none. Defendants" assertion that "the Complaint puts at issue what class counsel knew and when" inverts the pleadings. The Consolidated Complaint does not put class counsel at issue, it alleges that Defendants concealed the challenged arrangements from class counsel, from supervising courts, and from class members. Compl. ¶¶ 2, 122, 381, 390, 460(d). Class counsel's lack of knowledge is the consequence of Defendants' alleged concealment, not an independent claim against counsel, and it does not transform non-party MDL Leadership into a source of party discovery. Defendants' assertion that their own motions to dismiss "demonstrate that at least some class counsel, including MDL counsel, were on notice" is argument, not evidence, and it is argument made in a brief Plaintiffs dispute and that the Court has not credited. A contested litigation position in a motion to dismiss is not a basis for imposing Rule 26(f) disclosure obligations on opposing counsel. Under Defendants' own logic, defense counsel in the underlying settlements, who sat across the same negotiating table, received or per Plaintiffs' allegations did

not receive the same disclosures, and in several instances now represent Defendants in this very MDL, would be equally obligated to identify where their records reflecting that same knowledge reside.

Defendants' attempt to redirect this Court's attention to those unfounded demands, at the precise moment they remain out of compliance with their own obligations, is consistent with the pattern described herein. To the extent any comparable obligation runs to Plaintiffs as parties, it has been discharged: as disclosed, the proposed class representatives are individual consumers whose potentially relevant sources consist of personal emails, text messages, and account records, consistent with Rule 26(b)(1)'s proportionality framework and the 2015 Advisory Committee Notes' recognition that the scope of any party's disclosure obligations must be calibrated to the nature and scale of that party's information holdings, bearing no comparison to the enterprise-scale data systems of nine corporate defendants.

Defendants also responded that they are willing to share "preliminary information" on custodians and non-custodial sources by July 23rd "and Defendants will supplement disclosures of data sources, as needed, as collection and review proceed". While this offer resolves the timing issue, Plaintiffs remain concerned about the qualifier "preliminary information" and Defendants' promise to supplement "as needed, as collection and review proceed" contains no standard, no trigger, no timeline, and no mechanism by which the Court or Plaintiffs can evaluate whether supplementation is warranted "As needed" reserves to Defendants the unilateral right to decide whether their July 23 disclosure was sufficient, a right they have exercised at every prior stage of this dispute to conclude that whatever they provided was enough. "As collection and review proceed" ties any future supplementation to a process Defendants control entirely, with no defined endpoint and no objective benchmark. A promise to supplement on those terms is not a

commitment to comply, it is a commitment to continue deciding for themselves whether compliance is required.

That phrase "preliminary information" appears in the *Depo-Provera* CMO, which the Court cited in its July 10th Order, but that language described the timing of disclosure, at the outset of the case, not a limitation on its content. What the *Depo-Provera* CMO required was substantive and specific: information about IT infrastructure and the locations of potentially discoverable material; identification of the number and nature of key custodians; what information those custodians have; and where custodial data is located — with IT personnel present to address those questions. Those disclosures are consistent across MDL proceedings confirming what actual compliance with Rule 26(f) looks like. *In re 3M Combat Arms* required disclosure of the number and identities of custodians whose data would be preserved and collected, and technical specifications for each type of ESI. *In re Taxotere* required a custodian list by name with job title and description of responsibilities and, for each database, its name, type, software platform, version, and business purpose. *In re Samsung Customer Data Security Breach Litig.* required identification of current and former custodians with role descriptions, the programs and systems used, and the locations of both custodial and non-custodial sources. *In re Philips Recalled CPAP* and *In re Generic Pharmaceuticals Pricing Antitrust Litig.* required those same disclosures. When Defendants offer "preliminary information" at a time of their own choosing, without any specification of what that means or what standard will govern it, they are once again reserving to themselves the unilateral right to define the outer bounds of their own discovery obligations, the same posture they have maintained since May, which the Court has already expressly rejected.

The pattern of Defendants' conduct is clear from the record in this matter: Defendants negotiated a framework which required disclosures, Defendants recharacterized their obligations

and provided none of the required information at the conference, withheld identification of sources almost certainly already being searched in active discovery, maintained that position despite repeated demands, and when the Court issued its Order, recharacterized their obligation rather than comply with it. A producing party cannot define its own compliance with a court order while simultaneously resisting any objective standard against which that compliance can be measured. As the Court observed in its July 10th Order, an adversarial system cannot function as a one-sided exercise in which the producing party controls all information about its own obligations without transparency or accountability.

Plaintiffs respectfully request that the Court order each Defendant, within seven days of the July 28 Case Management Conference, to provide the following specific written disclosures modeled on the requirements cited here in and in this Court's July 10 Order:

(1) Information about each Defendant's IT infrastructure, including the locations of potentially discoverable material and how best to collect and retrieve it;

(2) A list of proposed individual custodians, including name, job title, a brief description of job responsibilities and relevant employment period, and respective custodial sources — including email, personal computer, calendar, mobile device, collaboration platforms such as Teams or Slack, and any other platforms used to conduct business;

(3) A list of non-custodial sources that each Defendant believes, based on its investigation to date, may reasonably be likely to contain responsive information — including relevant databases, shared drives, cloud repositories, collaboration platforms, enterprise messaging platforms, claims management systems, fund management and accounting systems, payment processing platforms, and any vendor or third-party platforms holding potentially discoverable data; and

(4) For each database or structured data system identified under (3), its name, type, software platform, software version, and business purpose.

If, following submission of these disclosures, Plaintiffs contend that any Defendant's disclosures are insufficient to permit meaningful discovery planning, the parties shall conduct a follow-up conference within fourteen days, at which the relevant Defendant shall make available

a knowledgeable IT representative who can address the substance of the disclosures and answer questions about that Defendant's systems and data sources.

*Defendants' Position*.

The parties also dispute the timing and scope of preliminary disclosures regarding custodial and non-custodial sources of potentially discoverable information, including whether Defendants' agreement to disclose these sources on July 23 is too late, and whether Plaintiffs and Plaintiffs' Leadership Counsel must provide corresponding disclosures at all.

For their part, Defendants are willing to provide preliminary custodial and non-custodial source disclosures by July 23, 2026, more than a week before the July 31 deadline for the parties' Rule 26(f) report. Defendants' July 23 disclosure will comply with the Court's Order that they "share preliminary information about IT infrastructure, sources of discoverable material, and custodians," *see* Dkt. 132 at 8, and Defendants will supplement disclosures of data sources, as needed, as collection and review proceed.

Plaintiffs contend that Defendants have already missed the relevant deadline, pointing to June 29, fourteen days after the parties' June 15 Rule 26(f) conference. But that fourteen-day requirement did not exist until the Court's July 10 Order created it. *See* Dkt. 132 at 8. Defendants' proposed deadline complies with that Order by providing preliminary disclosures within two weeks of it issuing, and Plaintiffs identify no prejudice from receiving disclosures well before the July 28 conference and the July 31 deadline for the parties' Rule 26(f) report, the points at which this information actually needs to be in hand.  In all events, Defendants object to Plaintiffs' exacting request for relief, which appears nowhere in Rule 26, including Plaintiffs' request for what would amount to a preliminary deposition of Defendants' information technology personnel. That request for discovery on discovery, before discovery even begins, is entirely premature and

disproportionate. Ultimately, Defendants' proposed disclosures on July 23 will cover much of the information that Plaintiffs now demand, and—as Defendants have repeatedly advised Plaintiffs—Defendants expect that these disclosures will moot this issue, at least as to the Defendants.

Disclosures from the Plaintiffs' side, however, have not been as forthcoming. Defendants requested that Plaintiffs and Plaintiffs' Leadership Counsel disclose their own custodial and non-custodial sources on the same schedule as Defendants. Plaintiffs respond that they have already discharged this obligation because named Plaintiffs are individual consumers whose relevant sources are personal email, text messages, and account records, bear no comparison to nine corporate Defendants' enterprise systems, and that there is no basis to require non-party Leadership Counsel to make Rule 26(f) disclosures as though counsel were a party. Neither point excuses Plaintiffs' from the disclosures necessary to draft the 26(f) Report under the Court's July 10 Order. The relative size of a party's data footprint has never been the test for whether Rule 26(f) disclosure is required. That consideration bears on the burden of collection, not on whether the other side is entitled to know where the potentially relevant material sits before the parties finalize a discovery plan. If Plaintiffs' sources really are limited to personal email, text messages, and account records, identifying them costs Plaintiffs nothing and resolves this issue immediately.

As to Plaintiffs' Leadership Counsel, Defendants are not asking the Court to treat counsel as a party. Defendants are asking that counsel identify their own custodians and sources given that Plaintiffs' Complaint puts at issue what class counsel in the underlying settlements knew and when. Plaintiffs cannot have it both ways. The Complaint relies on class counsel's knowledge, or alleged lack of it, to support Plaintiffs' claims, yet Plaintiffs' counsel disputes any obligation to preserve materials bearing on that same knowledge, and now declines to say where that information resides. If class counsel's knowledge is relevant enough to support Plaintiffs' claims, it is relevant enough

to require disclosure of where the records reflecting that knowledge are kept. What's more, Defendants' motions to dismiss demonstrate that at least some class counsel—including MDL counsel—were on notice of the allegedly wrongful compensation practices. Plainly, discovery from class counsel—including MDL counsel—will be necessary and will constitute a significant portion of the Rule 26(f) Report discovery plan. The parties should prepare for discovery accordingly.

Defendants' time and proposed disclosures fully comply with the Court's Order, ensure that the parties exchange source information in time to develop a meaningful discovery plan, and fairly requires all participants whose information is put at issue by the pleadings to identify where relevant discoverable materials reside.

Dated: July 20, 2026                                 Respectfully Submitted,

/s/ Christopher A. Seeger                     /s/Albinas Prizgintas
Christopher A. Seeger                          Albinas Prizgintas
SEEGER WEISS LLP                               WILMER CUTLER PICKERING
55 Challenger Road, 6th Floor                  HALE AND DORR LLP
Ridgefield Park, NJ 07660                      2100 Pennsylvania Avenue NW
Telephone: 212-584-0700                        Washington, DC 20037
cseeger@seegerweiss.com                        Telephone: 202-663-6000
                                               albinas.prizgintas@wilmerhale.com

Shauna Itri
SEEGER WEISS LLP                               Sonal N. Mehta
325 Chestnut Street                            WILMER CUTLER PICKERING
Suite 917                                      HALE AND DORR LLP
Philadelphia, PA 19106                         2600 El Camino Real, Suite 400
Telephone: 267-973-4265                        Palo Alto, CA 94306
sitri@seegerweiss.com                          Telephone: 650-858-6000
                                               sonal.mehta@wilmerhale.com

Marc H. Edelson
Eric Lechtzin
EDELSON LECHTZIN LLP
411 S. State Street
Ste N-300
Newtown, PA 18940
Telephone: 215-867-2399
medelson@edelson-law.com
elechtzin@edelson-law.com

*Attorneys for Plaintiffs*

Denis R. Hurley
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich St.
New York, NY
Telephone: 202-230-8800
denis.hurley@wilmerhale.com

*Attorneys for Defendants Epiq Systems, Inc.*
*and Epiq Class Action & Claims Solutions, Inc.*

/s/ J. Gordon Cooney
J. Gordon Cooney, Jr.
Franco A. Corrado
William T. McEnroe
Matthew D. Klayman
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
Telephone: 215-963-5000
gordon.cooney@morganlewis.com
franco.corrado@morganlewis.com
william.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

Randall M. Levine
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: 202-373-6541
randall.levine@morganlewis.com

*Attorneys for Defendant Angeion Group LLC*

/s/ David J. Weiner
David J. Weiner
Robert J. Katerberg
Sonia Kuester Pfaffenroth
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
Telephone: 202-942-5000
david.weiner@arnoldporter.com
robert.katerberg@arnoldporter.com
sonia.pfaffenroth@arnoldporter.com

Eskander Alex Beroukhim
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017-5844
Telephone: 213-243-4059
Alex.Beroukhim@arnoldporter.com
*Attorneys for Defendant JND Legal
Administration*

*/s/ Scott Ahmad*
Scott Ahmad
Reid Smith
WINSTON TAYLOR LLP
300 N. LaSalle Dr.
Chicago, IL 60654-3406
Telephone: 312-558-5600
scott.ahmad@winstontaylor.com
reid.smith@winstontaylor.com

*Attorneys for Kroll Settlement Administration
LLC & Kroll LLC*

*/s/ Brendan P. Cullen*
Brendan P. Cullen
Kyle W. Mach
Paul H. Lazarow
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Telephone: 650-461-5600
cullenb@sullcrom.com
machk@sullcrom.com
lazarowp@sullcrom.com

*Attorneys for Defendants Western Alliance
Bank and Digital Settlement Technologies
LLC*

/s/ *Amanda L. Groves*
Amanda L. Groves
WINSTON & TAYLOR LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213-615-1700
Amanda.Groves@winstontaylor.com

Jeffrey L. Kessler
George E. Mastoris
Tyler M. Dato
WINSTON & TAYLOR LLP
200 Park Avenue
New York, New York 10166
Telephone: 212-294-6700
Jeffrey.Kessler@winstontaylor.com
George.Mastoris@winstontaylor.com
Tyler.Dato@winstontaylor.com

Lauren E. Duxstad
WINSTON & TAYLOR LLP
200 S. Biscayne Boulevard, Suite 2400
Miami, Florida 33131
Telephone: 305-910-0500
Lauren.Duxstad@winstontaylor.com

*Attorneys for The Huntington National Bank*

/s/ *David J. Lender*
David J. Lender
Gregory Silbert
Joseph R. Rausch
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David.Lender@weil.com
Greg.Silbert@weil.com
Joe.Rausch@weil.com

*Attorneys for Defendant Blackhawk Network Holdings, Inc.*

<u>/s/ John A. Pearce</u>
Jess M. Krannich
John A. Pearce
Paul J. Sampson
Rebecca J. Nelson
W. Bradford Barber
WILSON SONSINI GOODRICH & ROSATI
95 S State Street, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401-8510
Facsimile: (866) 974-7329
jkrannich@wsgr.com
jpearce@wsgr.com
psampson@wsgr.com
rnelson@wsgr.com
bbarber@wsgr.com

*Attorneys for Defendant Tremendous, LLC*