**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE CLASS ACTION SETTLEMENT ADMINISTRATION LITIGATION** | **Misc. Action No. 25-179 (JDB); MDL Docket No. 3162** |
| **This Document Relates To: ALL CONSOLIDATED ACTIONS** | |

**STIPULATED ORDER REGARDING PRODUCTION OF ELECTRONICALLY STORED INFORMATION, ELECTRONIC DOCUMENTS OR DATA, AND HARD COPY DOCUMENTS**

This Order regarding the standards and procedures for the preservation, collection, review, and production of Hard Copy Documents, Electronic Documents or Data, and Electronically Stored Information in MDL 3162 ("ESI Protocol Order") shall apply to all cases now pending in MDL 3162, as well as to any cases later filed in, transferred to, or removed to this Court and included as part of MDL 3162, and to any Non-Parties who may produce Documents in MDL 3162. This ESI Protocol Order is designed to implement and promote an efficient and effective discovery process so that Documents are preserved, identified, collected, reviewed, and produced in a timely fashion, avoiding unnecessary, costly, or time-consuming discovery disputes, protecting applicable privileges, and positioning the Parties and the Court to move this MDL to resolution.

Nothing in this ESI Protocol Order shall be construed to affect the admissibility of discoverable information. Under this ESI Protocol Order, information regarding search processes and ESI practices may be disclosed, but compliance with this ESI Protocol Order does not constitute a waiver, by any Party, of any objection to the production of particular ESI as irrelevant,

not proportional to the needs of the case under Federal Rule of Civil Procedure 26(b)(1), inadmissible, or privileged, nor does it constitute a waiver of any right to discovery by any Party. For the avoidance of doubt, a Party's compliance with this ESI Protocol Order will not be interpreted to require disclosure of information potentially protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, nor shall this ESI Protocol Order be interpreted to require production of irrelevant information. The Parties expressly reserve all rights and objections under the Federal Rules of Civil Procedure and applicable law relating to the production of Documents. This ESI Protocol Order should be read together with and interpreted in light of the Stipulated Protective Order (Dkt. 130). This ESI Protocol Order applies equally to all ESI in this MDL regardless of whether such ESI is Custodial or Non-Custodial, and no provision of this ESI Protocol Order shall be construed to apply exclusively to Custodial ESI unless expressly stated.

The Parties understand and acknowledge their duty to work together cooperatively throughout the discovery process. The Parties shall cooperate in good faith and be reasonably transparent in all aspects of the discovery process, including the preservation, identification, collection, review, and production of potentially relevant Documents, and shall work to avoid or promptly resolve discovery disputes.

## I. GENERAL PROVISIONS

A. **Federal Rules:** This ESI Protocol Order does not alter or affect the applicability of the Federal Rules of Civil Procedure or the Local Rules for the District of Columbia.

B. **Deadlines**: References to schedules and deadlines in this ESI Protocol Order shall comply with Federal Rule of Civil Procedure 6 with respect to computing deadlines.

C. **Definitions:**

1. Plaintiffs and Defendants are referred to as the "Parties" solely for the purposes of this ESI Protocol Order.

2. "Plaintiffs" as used herein shall mean the plaintiffs named in the operative consolidated class action complaint.

3. "Producing Party" means any Party or Non-Party that produces Documents or ESI in response to a discovery request, subpoena, or court order in this MDL.

4. "Requesting Party" means any Party that has served a discovery request or subpoena in connection with which Documents or ESI are being produced.

5. "Defendants" as used herein shall mean the Defendants named in the operative consolidated class action complaint.

6. "Third-Parties" as used herein shall mean other individuals or entities who may produce ESI and paper documents in this Litigation, who will be subject to the terms of this ESI Protocol Order to the same extent as the Parties.

7. "Cloud" shall be broadly interpreted to mean any Web-based software, storage, hosting, messaging, or collaboration service.

8. "Custodial Source" means information maintained by, associated with, or reasonably attributable to a particular individual custodian, including email accounts, local device storage, user-created files, and other information maintained by or for that custodian in the ordinary course of business.

9. "Electronic Document(s) or Data" means electronic documents or files existing in electronic form at the time of creation or collection, including but not limited to e-mail, text messages, chats, posts, or any other forms or means of electronic

communications, word processing files (e.g., Microsoft Word), computer presentations (e.g., PowerPoint slides), spreadsheets (e.g., Excel), image files (e.g., .jpg and .pdf), and video and audio files.

10. "Hard Copy Document(s)" means Documents existing in physical tangible form at the time of creation or collection, including but not limited to paper Documents.

11. "Document(s)" is defined to be synonymous in meaning and equal in scope to the usage of this term in Rules 26 and 34 of the Federal Rules of Civil Procedure. The term "Document" shall include Hard Copy Documents, Electronic Documents or Data, and Electronically Stored Information as defined herein.

12. "Document Family" means a group of Documents that are related by virtue of a parent-child relationship, including but not limited to: (i) an email and its attachments; and (ii) a document and any embedded files or objects.

13. "Electronically Stored Information" or "ESI," as used herein has the same meaning as defined in Federal Rule of Civil Procedure 26 and 34, and includes, Electronic Documents or Data, and computer-generated information or data, created or stored in or on any storage media located on computers, servers, mobile or handheld devices, tablets, "Cloud" repositories or depositories, disks, USB or thumb drives, external hard drives, tapes, or other real or virtualized devices or digital media.

14. "Load File(s)" means electronic files provided with a production set of Electronic Documents or Data or ESI and images and used to load that

production set into the document review platform of the Party receiving a production and for the correlation of such data within that platform by conveying information identifying a set of document images, processed ESI, or Native Format files, as well as the corresponding extracted full text or OCR text files, and containing agreed-upon extracted or user-created metadata as well as information indicating physical and logical unitization (i.e., document breaks and document relationships such as those between an e-mail and its attachments). A load file is used to import all image, native, and text files and their corresponding production information into a review database. The Party producing Documents shall produce a Load File for all produced Documents with each particular production in accordance with specifications provided herein and Attachment A.

15. "Metadata" means: (i) information embedded in a Native Format file that is not ordinarily viewable or printable from the application that generated, edited, or modified such Native file, and (ii) information generated automatically by the operation of a computer or other information technology system when a Native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system, and for purposes of this Protocol.

16. "Native Format" or "Native" means the file format associated with the application by which it was originally created as collected from Individual Custodians or Non-Custodial sources. For example, the native format of an Excel workbook is an .xls or .xlsx file.

17. "Optical Character Recognition" or "OCR" means a technology process that captures text from an image for the purpose of creating an ancillary text file that can be associated with the image and searched in a database. OCR software evaluates scanned data for shapes it recognizes as letters or numerals.

18. "Hash Value" is a numerical identifier that can be determined from a file, a group of files, or a portion of a file, based on a standard mathematical algorithm that calculates a value for a given set of data, serving as a digital fingerprint, and representing the binary content of the data to assist in subsequently ensuring that data has not been modified and to facilitate duplicate identification. Unless otherwise specified, hash values shall be calculated using the MD5 or SHA-1 hash algorithm.

19. "MDL 3162" or "this MDL" means *In re Class Action Settlement Administration Litigation,* Misc. Action No. 25-179 (JDB), pending before the United States District Court for the District of Columbia, and all cases consolidated therein.

20. "Non-Custodial Source" includes centralized repositories and enterprise systems such as databases, shared drives, cloud repositories, collaboration platforms, enterprise messaging platforms, departmental files, multi-user messaging platforms online repositories, social media accounts, intranets and other sources not reasonably associated with a single individual custodian. For avoidance of doubt, this includes but isn't limited to structured databases, unstructured databases, and semi-structured databases.

21. "Searchable Text" means the native text extracted from Electronic Documents or Data or ESI or, when extraction is infeasible, by Optical Character Recognition text ("OCR text") generated from a Hard Copy Document or electronic image.

22. "Short Message Communication(s)" means any electronic communication sent or received through any messaging, chat, or collaboration software program, application, or service, regardless of the device, platform, account, configuration, or network used, and regardless of whether the software, application, or service was authorized, approved, contracted for, provided for, or managed by the Producing Party. Short Message Communications include but are not limited to: (i) SMS, MMS, and RCS text messages; (ii) messages sent through device-native messaging applications (*e.g.*, Apple iMessage, Google Messages); (iii) messages sent through third-party or over-the-top messaging applications (e.g., WhatsApp, Signal, Telegram, and direct messages sent through any social media platform); (iv) messages, posts, direct messages, and channel or group communications sent through any collaboration or messaging platforms (*e.g.*, Microsoft Teams, Slack, Google Chat, Zoom, etc.); and (v) any message sent through an application or setting that automatically deletes, expires, or renders the message unavailable after a period of time or after viewing.

23. "Unitization" means the assembly of a set of scanned Hard Copy Documents and indicates where individual pages or files belong together as Documents for functional, archival and retrieval purposes. Unitization includes both (i) Logical

Unitization, being the determination of pages that belong together as Documents and which capture family relationships such as a parent Document or message and its attachments, and (ii) Physical Unitization, which captures the assembly of individually scanned pages into Documents and where each Document begins and ends. Physical Unitization normally uses objects such as staples, paper clips, and folders to determine which pages that belong together as Documents for functional, archival, and retrieval purposes.

## II. GENERAL PRODUCTION FORMAT PROTOCOLS

**A.** Where a Producing Party determines that production of a specifically identified category of documents in the format required by this ESI Protocol is not technically feasible due to a limitation of the collection or processing tool used for that data source, the Producing Party shall promptly notify the Requesting Party in writing, identify the specific document category, data source, or platform at issue, describe the technical limitation and the steps taken to attempt compliance, and propose an alternative format. The alternative format shall preserve all metadata fields required by this ESI Protocol Order and Appendix 1 to the same extent as the required format, and shall not materially degrade the searchability, usability, or metadata integrity of the affected documents. The Producing Party and Requesting Party shall meet and confer within fourteen (14) days of such notice regarding the proposed alternative format and, if unable to agree, shall submit the dispute to the Court.

**B.** Where a Requesting Party determines that documents produced in the agreed format are insufficient to allow effective review, analysis, or use, including but not limited to where TIFF production of a document type that is natively searchable prevents

meaningful text search or where production format strips metadata necessary to establish custodial or temporal context , the Requesting Party may submit a written request for production of a targeted, specifically identified category of documents in an alternative format, with a statement of the basis for the request. The Producing Party and Requesting Party shall meet and confer within fourteen (14) days of such request and, if unable to agree, shall submit the dispute to the Court.

**C.** **TIFFs**: Except for structured data and specified file types addressed in "Production of Native Items" below, all Electronic Documents or Data or ESI will be produced as black-and-white, single-page Group IV TIFFs of at least 300 DPI resolution or better, and 8.5"x11" page size, except for Documents requiring different resolution or page size, with corresponding document-level extracted text files, or where extracted text is not available, OCR text, and necessary load files. Metadata to be included, as applicable, is specified in Appendix 1. Each image will have a file name that is the unique Bates number of that image, pursuant to Section G below. Each image shall be branded according to the Bates number and any confidentiality designation. Original document orientation should be maintained to the extent technologically possible using industry-standard processing tools. (i.e., portrait to portrait and landscape to landscape To the extent possible, TIFFs of ESI shall convey the same information and image as the original Document, including all comments or commentary, speaker notes, tracked changes (deletions and revision marks, including the identity of the person making the deletion or revision and the date and time thereof), hidden text, embedded Documents or images or other user-entered data, and formatting that is visible in the native format version of the file. All hidden content will be expanded, extracted, and rendered in the

TIFF file and to the extent technologically possible using industry-standard processing tools the Producing Party will instruct its vendor to force off Auto Date. Documents produced natively shall be produced with the native link (i.e., the link between the native and TIFF file) provided in the accompanying load file. Each native file shall be named after its Bates number including any confidentiality designation, and shall have a corresponding single-page TIFF placeholder endorsed with the document's Bates number, confidentiality designation (if any), and the notation "File Produced in Native Format." Any Document produced in native format that a Party identifies and/or marks as an exhibit at a deposition must include as part of that identification or exhibit the produced corresponding cover page in TIFF image format, endorsed with the document's Bates number and confidentiality designation (if any). Documents that are difficult to render in TIFF and which require redaction may be produced with redactions applied in the native file, so long as the redactions are applied using an industry-recognized native redaction tool, such as "Blackout" or "BlackBar." A Producing Party retains the option to produce ESI in alternative formats if so agreed by the Requesting Party or Parties, which may include native format or a combination of native and TIFF formats.

**D.** **Text Files**: Each ESI item produced under this ESI Protocol Order shall be accompanied by a single Unicode text file containing extracted text as set out below. All text files shall be provided as a single document level text file for each item, not one text file per page. Each text file shall be named with the Bates number of the first page of the corresponding production item. File names shall not have any special characters or embedded spaces. Electronic text must be extracted directly from the

native electronic file to the extent reasonably feasible unless the Document is an image file or contains redactions, in which case a text file created using OCR shall be produced in lieu of extracted text. Text files shall contain all hidden content, tracked changes, revisions, comments, speaker's notes, and text from Documents with comments or tracked changes, and hidden and very hidden worksheets, slides, columns, and rows. Text extracted from e-mails shall include all header information that would be visible if the e-mail was viewed in Outlook including: (1) the individuals to whom the communication was directed ("To"); (2) the author of the e-mail communication ("From"); (3) who was copied and blind copied on such e-mail ("CC" and "BCC"); (4) the subject line of the e-mail ("RE" or "Subject"); (5) the date and time of the e-mail; and (6) the names of any attachments.

1. **OCR**: A Producing Party may make paper documents available for inspection and copying/scanning under Fed. R. Civ. P. 34 or, additionally or alternatively, scan and OCR paper documents if it chooses. Where OCR is used, the Producing Party shall generate OCR text at a minimum resolution of 300 DPI using industry-standard OCR software and shall take reasonable quality control steps to verify the accuracy of the OCR output prior to production. The Parties acknowledge that, due to poor quality of the originals, not all documents lend themselves to the generation of accurate OCR. In instances where accurate OCR cannot be generated due to the poor quality of the original document, the Producing Party shall: (a) produce the document as a high-resolution TIFF image consistent with the TIFF production requirements of Section II.B of this

Protocol; and (b) populate the applicable metadata field in Appendix 1 with a notation that no OCR text is available for the document.

**E. Production of Native Items**: The Parties agree that responsive and not privileged ESI shall generally be produced as TIFFs with an accompanying load file containing the ESI data points listed in Appendix 1 hereto. The exceptions to this rule shall be: (a) spreadsheet-application files (e.g., Microsoft Excel), (b) presentations (e.g., Microsoft PowerPoint), (c) source code, (d) multimedia audio/visual files, such as voice and video recordings (e.g., .wav, .mpeg, and .avi), and (e) any other user-generated responsive and not-privileged native file types that cannot accurately be rendered as TIFF images without material loss of content, formatting, or functionality. For the avoidance of doubt, user-generated files do not include routine system-generated files, application-generated files, or technical embedded files that are automatically extracted during document processing (e.g., .xml,.dat, .bin, font files, other structural files), and word processing files containing tracked changes, revision history, or embedded comments shall be evaluated under the “material loss of content, formatting, or functionality” standard of this provision, and the Producing Party shall produce such files natively where TIFF production would not preserve the identity of the author of tracked changes. Each produced native file shall be named with the assigned Bates number and any appropriate confidentiality designation.

1. In addition to producing the above file types in native format, the Producing Party shall produce a single-page, Bates-numbered TIFF slip sheet indicating that a native item was produced with the wording “File Produced in Native Format,” along with extracted text where available and with the applicable data

points listed in Appendix 1. The corresponding load file shall include NativeLink information for each native file that is produced.

2. The Producing Party and Requesting Party agree to meet and confer before producing native file types other than those described in (a)-(e) above, in which case the Producing Party shall disclose the file type to, and meet and confer with, the Requesting Party on a reasonably useable production format.

3. The Producing Party and Requesting Party agree to meet and confer regarding potentially relevant structured data that resides in a fixed field within a record or file, or stored in a structured format, such as databases/data application files (such as Oracle, SQL, Access, SAP) or data sets, to determine the best reasonable form of production of usable data, including whether there are pre-existing reports that can satisfy the production obligation.

4. Through the pendency of MDL 3162, the Producing Party shall exercise reasonable, good-faith efforts to maintain all preserved and produced native files in a manner that does not materially alter or modify the file or the metadata.

F. **Requests for Other Native Files**: If a Requesting Party would like a particular document produced in native format and this ESI Protocol Order does not require the production of that document in its native format, the Requesting Party shall explain by identifying by Bates number(s) the specific document(s) at issue and explaining the reason for its request that the document(s) be produced in its native format, as to which request the Requesting Party and Producing Party shall meet and confer in good faith and shall submit to the Court for resolution only if the Requesting Party and Producing Party have been unable to resolve any dispute through the meet-and-confer process.

Any native files that are produced pursuant to this paragraph should be produced with a link in the NativeFile field, along with all extracted text and applicable metadata fields set forth in Appendix 1.

**G.** Short Message Communications constitute Semi-Structured Data for purposes of this Protocol, meaning they contain both unstructured conversational content and semi-structured metadata, that must be preserved and produced in a manner that captures both the content and the metadata.

a. Responsive, non-privileged Short Message Communications shall be produced in Relativity Short Message Format ("RSMF") in 24-hour increments" with all available metadata and attachments for the full calendar day in which a responsive message appears. For purposes of producing Short Message Communications, a full calendar day is the 24-hour period from 12:00 am to 11:59 pm in a single calendar day.

b. Short Message Communications shall be produced so that they reflect the short message communication thread for the full twenty-four day containing the short message communication, as well as the day(s) in the short message communication thread prior to or subsequent to such day that contain related or contextual content, or as may be necessary to demonstrate the inception or conclusion of the responsive conversation (the "complete communication thread")."

c. Search terms, if any, will be run across the 24-hour increments. The Parties acknowledge that search terms developed for email and document review may not effectively capture responsive Short Message Communications, which may include informal language, abbreviations, shorthand, emoji and reaction content, platform-

specific syntax, and contextual meaning not amenable to standard keyword searching. If a Producing Party elects to use search terms to identify potentially relevant or responsive Short Message Communications, the Search Term Methodology is governed by the applicable provisions of this Protocol.

d. To the extent a Producing Party contends that responsive, non-privileged Short Message Communications cannot be produced in RSMF the Producing Party shall notify the Requesting Party in writing, identify the specific platform or data source at issue, explain the basis for its contention. The Parties shall meet and confer regarding the appropriate metadata fields and format of production for such Short Form Communications. The Producing Party shall honor reasonable requests from the Requesting Party for production of native short message communication files.

e. Where a responsive message is part of a group conversation or channel, the complete communication thread shall to the extent technically feasible include all messages in the group conversation or channel, not merely the messages of the Individual Custodian whose files are being produced.

f. Privileged content within an otherwise responsive 24-hour increment shall be redacted or withheld consistent with the Privilege provisions of this Protocol. To the extent privileged content is redacted from an RSMF production, the redaction shall be clearly indicated within the produced thread.

g. A Producing Party shall not withhold any portion of a complete communication thread from production solely on the basis that such portion is not independently responsive to a discovery request, provided that privileged content within a thread may be redacted consistent with the Redactions provision of this Protocol.

h. Each RSMF production of Short Message Communications shall include, to the extent available for the platform and data source, all of the following metadata fields in the accompanying load file:

i. Message-level timestamp for each individual message (date and time, normalized to UTC);

ii. Sender identifier for each individual message (name and, where available, account identifier, phone number, or handle);

iii. Recipient(s) for each individual message, including all participants in the conversation or channel;

iv. Platform or application identifier (e.g., iMessage, WhatsApp, Microsoft Teams, Slack, SMS);

v. Thread or conversation identifier linking messages within the same conversation;

vi. Participant list for group chats or channels, including any participants who joined or departed the conversation during the production period;

vii. In-line representations of emojis, reactions (including emoji value, count, and reacting participants), and @mentions;

viii. Inline references to any attachment, linked file, or embedded file referenced in or associated with any message in the thread;

ix. Edit history, including the timestamp of any edit and, where available, the prior and revised message content;

x. Deletion indicators, reflecting whether any message in the thread was deleted;

xi. Read receipts and delivery indicators, to the extent available for the platform;

xii. Custodian from whose account or device the communication was collected;

xiii. RSMF version (X-RSMF-Version header); and

xiv. Such additional metadata fields as may be specified in Appendix 1 to the extent available for the document type or data source.

i. Attachments, resolved linked files, and embedded files associated with any short message communications shall be produced as child documents in the same document family as the parent communication and are governed by the applicable provisions of this Protocol including the Parent-Child Relationships provision.

**H. Bates Numbering**:

a. All produced Documents, whether produced as TIFF images or in native format, must be assigned a Bates number that must always: (1) be unique across the entire document production, (2) maintain a constant prefix and length (e.g., ten-digits and 0-padded) across the entire production, (3) contain no special characters or embedded spaces, except hyphens or underscores, (4) be sequential within a given document, and (5) identify the producing Party. No two Producing Parties shall use the same prefix. To the extent technologically feasible, the Bates number must also maintain consistent sequential numbering across a family of documents such that a parent document and all of its attachments or child documents receive consecutive Bates numbers.

b. If a Bates number or set of Bates numbers is skipped in a production, the Producing Party will so note in production log accompanying the production.

c. The Producing Party shall brand all TIFF images at a location that does not obliterate or obscure any part of the underlying image content. If Bates number branding obliterates or obscures any part of an underlying image, the Producing Party shall re-produce the affected ESI items with the branding in a different location that does not obliterate or obscure the underlying images.

**I. Parent-Child Relationships**: Parent-child relationships between a parent document and its attachments, embedded files, and linked documents shall be preserved as they existed at the time of collection. Parent-child relationships include without limitation: (i) an email and its attachments; and (ii) a document and any embedded files or objects; and (iii) a Short Message Communication thread and any attachments or linked documents associated with messages within that thread. The family of documents shall also be identified using a family ID number or other unique identifying number, such as the beginning Bates number of the parent document.

**J. Load Files**: All production items will be provided with a delimited data file or "load file," which will include both an image cross-reference load file (e.g., an Opticon (.opt) or IPRO format file), as well as a Concordance format metadata (.dat) file with the metadata fields identified in Appendix 1 on the document level to the extent available. All metadata will be produced in UTF-16LE or UTF-8 with Byte Order Mark format. The metadata load file shall use the following standard Concordance delimiters: pipe (|) as the field separator or ¶ (ASCII 020) as the field separator, caret (^) as the quote character or þ (ASCII 254) as the quote/text-qualifier character, and ® (ASCII 174) as the newline character. The first line of the metadata load file shall contain the field names corresponding to the metadata fields identified in Appendix 1. The load file must reference each TIFF and each native file in the

corresponding production, including a populated NativeLink field for all documents produced in native format. Production volumes shall only include one image load file per production volume. The name of the image load file shall mirror the name of the delivery volume. Volume names shall be consecutive. The total number of documents referenced in a production's data load file shall match the total number of designated document breaks in the Image Load files in the production. Load files shall not vary in format or structure within a production, or from one production to another. In the event a load file varies in format or structure from prior productions, the Producing Party shall notify the Requesting Party promptly upon discovery of the variation and shall provide a corrected load file within fourteen (14) days of such discovery. Production Folder Structure: All productions shall be organized in the following folder structure:

a. All native format files shall be produced in a folder named "NATIVE."

b. All TIFF images shall be produced in a folder named "IMAGE," which shall contain sub-folders named "0001," "0002," etc. Each sub-folder shall contain no more than 10,000 images. Images from a single Document shall not span multiple sub-folders.

c. All extracted text and OCR files shall be produced in a folder named "TEXT."

d. All load files shall be produced in a folder named "DATA" or at the root directory of the production media.

**K.** **Color**: Documents that contain color used to convey information (e.g., color coding and highlighting versus merely decorative use) shall be produced in color. Any Hard Copy Documents that are scanned in color shall be produced in color. If a native file, including but not limited to a PDF, word processing document, spreadsheet, or

presentation, is converted to images to effectuate redactions, the redacted version shall be produced in color faithful to the original file. If the Producing Party does not promptly agree to produce any other requested document or item in color, the Producing and Requesting Party shall promptly meet and confer in good faith before submitting any dispute to the Court. The production of any documents and/or ESI in color shall be made in single-page JPEG format (300 DPI compression set to the highest-quality setting to avoid degrading the utility of the original image). All requirements for productions stated in this ESI Protocol Order regarding productions in TIFF or native format apply to any productions of documents and/or ESI in color made in such an alternative format.

**L.** **Confidentiality Designations**: Documents with any confidentiality designation under the terms of any protective order entered by the Court in the MDL 3162, shall be branded on the document's image at a location that does not obliterate or obscure any part of the underlying image content. The confidentiality designation shall also be included in the file name of any produced native file, as described in Section II(D). This confidentiality designation also should be included in the appropriate data field in the load file as identified in Appendix 1. Failure to comply with the procedures set forth in this ESI Protocol Order shall not waive any protection or confidential treatment. If confidentiality designation branding obliterates or obscures any part of an underlying image contents, on request of the Receiving Party, the Producing Party shall re-produce the affected ESI items with the branding in a different location that does not obliterate or obscure the underlying image contents.

M. **Production Media & Protocol**: The preferred means of production is via secure FTP or secure file share. Productions shall remain available for download for no less than ten (10) calendar days. The Producing Party will retain a copy of all productions made hereunder. Upon request from the Requesting Party, the Producing Party will make the production available via secure FTP within two (2) business days of the request. Any Requesting Party that is reasonably unable to resolve any technical issues with the electronic production method used for a particular production may request that a Producing Party provide a copy of that production using Production Media, as described below. If there is a reasonable concern regarding confidentiality or the size of the production, the Producing Party may use appropriate electronic media (DVD, thumb drive, or hard drive) for its ESI production and will endeavor to use the highest capacity suitable media.

a. All Production Media will be encrypted, and the Producing Party will provide a decryption key to the Requesting Party in a communication separate from the production itself.

b. Each piece of Production Media will be assigned a production number or other unique identifying label corresponding to (1) the name of the Producing Party; (2) text referencing that it was produced in MDL 3162; (3) the date of the production of documents; (4) the media volume name and the sequence number; and (5) the Bates number range(s) of the materials contained on the Production Media.. For example, "[PARTY] Production [DATE]-001 [BATES RANGE]," "[PARTY] Production [DATE]-002 [BATES RANGE],"," and "[PARTY] Production [DATE]-003 [BATES RANGE]."

c. Where the Production Media used is an external hard drive (with standard PC compatible interface) or USB drive, such production media must be sent no slower than overnight delivery via FedEx, UPS, USPS, or private courier.

d. Each item of Production Media (or, in the case of productions made via FTP link or other secure online transfer, each production transmittal letter) shall include (1) the Producing Party's name; (2) text referencing that it was produced in this MDL, (3) the production date, and (4) the Bates number range of the materials contained on such Production Media item. In addition, the Producing Party shall maintain and update with each production a production log in Excel spreadsheet format identifying: (a) the date of production; (b) the production wave or volume name; (c) the Bates range start; and (d) the Bates range end. The production log shall be produced to all other Parties contemporaneously with each production and shall be cumulative so that the most recent log constitutes a complete record of all productions to date.

e. Replacement productions shall be accompanied by a cover letter identifying the original Bates numbers being replaced, and the reason for the replacement. Each Party shall designate the appropriate physical address for productions that are produced on Production Media. However produced, a producing Party shall provide clear instructions for accessing the production, including any necessary passwords or encryption keys.

**N.** **Materials Collected for or Produced in Other Proceedings**: If a Producing Party intends to satisfy a request for production by producing materials produced in a different litigation or investigation and/or administrative actions by federal, state, or

local government entities, it shall disclose in writing (a) the fact that the Producing Party intends to use such materials to satisfy certain request(s) for production, and (b) the case caption or information necessary to identify the entity conducting the investigation. Such prior productions may be provided in the format in which they were previously produced, including any previously produced metadata, load files, and accompanying text files, and with the same Bates numbers and confidentiality designations, so long as the Producing Party deems them to be produced in a reasonably usable form as required by Federal Rule of Civil Procedure 34. Where a prior production is reproduced with its original Bates numbers, the Producing Party shall also assign and affix new sequential Bates numbers using its MDL 3162-specific Bates prefix to each Document, and shall provide a cross-reference index in Excel format identifying the original Bates number and the corresponding new Bates number for each Document reproduced. The cross-reference index shall be produced to all Parties contemporaneously with the reproduction. A Requesting Party retains the right to challenge the sufficiency of any production not produced in a reasonably useable form as required by Federal Rule of Civil Procedure 34. If a Requesting Party raises such a challenge, the Requesting and Producing Parties shall promptly meet and confer in a good faith effort to resolve any dispute and shall submit the matter to the Court for resolution only if they are not able to reach resolution through the meet-and-confer process.

## III. PAPER DOCUMENT PRODUCTION PROTOCOL

A. **Scanning Specifications.** Hard Copy Documents shall be scanned to single-page black and white Group IV TIFF format, 300 DPI quality or better, with corresponding

searchable OCR text as indicated in this Protocol. The Document's original orientation should be maintained *(i.e.,* portrait-to-portrait and landscape-to-landscape). Image file names will be identical to the corresponding Bates numbered images with a ".tiff" file extension. The file name of each text file should correspond to the file name of the first image file of the Document with which it is associated.

B. **Coding Fields**: The following information shall be produced in the load file accompanying production of paper documents: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Source Location/Individual Custodian, (f) Confidentiality, (g) Redacted, and (h) Text Path. Additionally, all paper documents will be produced with a coding field named "Paper" marked with a "Y."

C. **Unitization of Paper Documents**: The Parties shall use reasonable best efforts to ensure that paper documents, including those in files and binders, are logically unitized for production. When scanning paper documents for production, distinct documents shall not be merged into a single record and single documents shall not be split into multiple records. Hard Copy Documents stored in a binder, folder, or similar container shall be produced in the same order as they appear in their original container. A scanned version of the front cover of the container shall be produced immediately before the first Document in the container, and the back cover of the container shall be produced immediately after the last Document in the container. The Parties and their vendors will undertake reasonable efforts to logically and correctly unitize Documents and commit to promptly and reasonably address situations of improperly unitized Documents.

## IV. ESI METADATA FORMAT AND PROCESSING ISSUES

**A. Excluded Files**: ESI productions may be de-NISTed using the industry standard list of files maintained in the National Software Reference Library by the National Institute of Standards & Technology as it exists at the time of de-NISTing. Other file types and forms of data that may be excluded are described in IV.G, and additional file types may be added to the list of excluded files by further written agreement of the Parties.

**B. Metadata Fields and Processing**:

a. **Date and Time/Time Zone**: No Party shall modify the date or time as contained in any original ESI. Each Producing Party shall normalize times and dates to conform to UTC. If a Producing Party cannot process ESI with UTC normalization, the Producing Party shall notify the Requesting Party in writing of the specific data source or platform for which UTC normalization is not technically feasible and the basis for that determination, and the Parties shall meet and confer to determine a reasonable alternative

b. **Auto Date/Time Stamps or Other Automatically Updating Fields**: ESI items shall be processed so to preserve the date and time shown metadata fields as they existed in the native file at the time of collection, including both the original creation date and the last modified date, rather than the date of collection or processing. The Producing Party shall instruct its vendor to force off Auto Date fields during processing.

c. If a producing Party believes the above provision(s) are not reasonably practicable for some portion of its production, it shall inform the requesting Party or Parties and promptly meet and confer in a good faith effort to resolve

any dispute. The Parties may submit any such dispute to the Court for resolution only if they have been unable to reach resolution through the meet-and-confer process.

d. Except as otherwise set forth in this ESI Protocol Order, ESI files shall be produced with all the data fields set forth in Appendix 1 to the extent such fields are available for the document type or data source being produced. For specific document types or platforms requiring additional metadata fields beyond those identified in Appendix 1 — including but not limited to Short Message Communications — the applicable metadata fields shall be as specified in the relevant provisions of this Protocol.

e. The Parties are not obligated to manually populate any of the fields in Appendix 1 if such fields cannot reasonably be extracted from the document using an automated process, with the exception of the following fields: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) all Custodians of the document, (f) Confidentiality, (g) Redacted (Y/N), and (h) NativeFile fields, which shall be populated, when applicable, regardless of whether the fields can be populated by an automated process. In addition, the following fields shall be manually populated when applicable: (i) AllCustodians, identifying all custodians in whose files a deduplicated document appeared; and (ii) HiddenContent, flagging documents containing tracked changes, hidden content, or embedded objects consistent with the TIFF production requirements of this Protocol.

f. The Parties will use reasonable efforts and standard industry practices to address and resolve exception issues for items that present processing, imaging, or form of production problems, including encrypted, corrupt, password-protected, and/or unprocessable files identified during the processing of ESI. The Producing Party shall maintain a log of all exception files identified during processing, including for each exception file: (a) the Bates number or other unique identifier assigned to the file; (b) the file type; (c) the custodian; (d) the nature of the exception (e.g., encrypted, corrupt, password-protected); and (e) the steps taken to attempt to resolve the exception. The exception log shall be produced to the Requesting Party contemporaneously with each production in which exception files are identified. The Parties shall meet and confer within fourteen (14) days of production of the exception log regarding procedures to identify, access, process, and resolve any exception issues, including requests to the Producing Party's custodians for passwords or decryption keys for password-protected files.

g. For archive files (zip, jar, rar, gzip, tar, and similar container formats), all contents shall be extracted from the archive with source pathing, and file relationships will be preserved within path and Container Name metadata field identifying the source archive for each extracted file preserved and produced. Archive files that cannot be extracted due to password protection or corruption shall be handled in accordance with the Exception Files provision of this Protocol.

**C. Redaction**:

a. The Parties agree that, for any ESI items for which this ESI Protocol otherwise permits production in TIFF format, redactions may be made in TIFF format, with each redaction clearly indicated on the face of the Document and identified as such in the load file provided with the production. Each redaction shall include information identifying the reason for the redaction in the "Redaction Reason" metadata field. In the alternative, if a producing party's document review platform does not support automated population of the RedactionReason metadata field, the producing party shall stamp or annotate the face of the redacted document with the applicable redaction reason in lieu of populating the metadata field. Any metadata fields reasonably available and that can be disclosed without disclosing privileged information shall be provided. The Producing Party may, alternatively, produce the item as a redacted native file in accordance with the following paragraph.

b. To the extent that a native file must be redacted, the Producing Party may redact the native file using an industry-recognized native redaction tool that permanently removes the redacted content from the produced file such that the underlying content cannot be recovered, such as "Blackout" or "BlackBar." If native file redaction is not practicable, the Producing Party shall produce TIFF images with burned-in redactions in lieu of the native file and TIFF placeholder image, provided the TIFF images are reasonably usable. Nothing herein is intended to override the Color provisions of this Protocol.

c. If an item otherwise required to be produced as a native file under this ESI Protocol Order must be withheld in part, then, the entire ESI item must be produced in TIFF format, including all unprivileged pages, hidden fields, and other information that may not print when opened as last saved by the custodian or end user. For PowerPoint-type presentation decks, this shall include, but is not limited to, any speaker notes. For Excel-type spreadsheets, this shall include for any particular Excel file, but is not limited to, all worksheets, hidden rows and columns, all cell values, annotations, and notes. The producing Party shall also make reasonable efforts to ensure that any spreadsheets produced only as TIFF images due to redaction are formatted so as to be legible. For example, column widths should be formatted so that the values, including, but not limited to, all data and any column name or column header in the column will display, rather than show "##########."

d. A Party may not redact any Document based upon any objection related to the relevance or responsiveness of a Document. Nothing in this paragraph abridges a Producing Party's right and/or obligation to redact Personal Identifying Information ("PII"), Personal Health Information ("PHI"), or sensitive personal information (including but not limited to sensitive health information, social security numbers, dates of birth, etc.), provided that the information to be redacted is limited to personal information that is not relevant to the case.

e. If audio/visual or other media files require "redaction," the parties shall promptly meet and confer concerning the format of production and privilege

assertions. If the parties are unable to reach agreement through meet and confer discussions, they may seek resolution from the Court.

**D.** **Email Threading**: A Producing Party may use email threading to organize and facilitate review of email communications and to avoid review and production of duplicative information contained within an existing email thread in another document being reviewed and produced, but no email shall be withheld from production solely because it is included in whole or in part in a more inclusive email. Under no circumstances shall email thread suppression (a) eliminate the ability of a Party to identify every custodian who had a copy of a produced document or sent or received an email, or (b) remove from a production any unique branches and/or attachments contained within an email thread. Parties may make reasonable and targeted requests for unthreaded copies of particular documents in advance of depositions, which will not be denied absent good cause. If a Producing Party does not use email threading to organize and facilitate review of email communications and to avoid review and production of duplicative information contained within an existing email thread in another document being reviewed and produced, the Producing Party does not need to populate the Email Thread ID and Thread Index fields in Appendix 1. However, if a Receiving Party determines that the lack of data of these fields is impacting document review, the involved Parties agree to meet and confer within 7 days to try to address and resolve this issue following written notice to the relevant Producing Party.

**E.** **Rolling Productions**: The Parties agree to produce documents in phases on a rolling basis consistent with the Court's orders relating to scheduling.

**F.** **De-duplication**: A producing Party may de-duplicate files in a method that does not result in the responsive documents with unique content being withheld from production. The Producing Party will horizontally (globally) de-duplicate only exact duplicate Documents based on the individual file or file family's MD5-Hash, SHA-1 hash, SHA-256 values, Relativity duplicate spare messages, or Message ID, or other agreed-upon standard methodology for e-mail deduplication, in a manner that does not break up Document families such as e-mails and attachments. Near-duplicate Documents shall not be removed. The original exact duplicate ESI shall continue to be preserved. Unless otherwise agreed by the Parties, the following requirements apply to all document de-duplication by a Producing Party:

a. All BCC recipients whose names would have been included in the BCC metadata field, to the extent such metadata exists, but are excluded because of de-duplication, must be identified in the BCC metadata field specified in Appendix 1 to the extent such metadata exists. In the event of rolling productions, the Producing Party will supplement the load files with updated AllCustodians information, as well as BCC information contemporaneously with each production. Duplicate custodian information shall be provided by a metadata "overlay" contemporaneously with each production.

b. Duplicate electronic documents shall be identified by MD5 or SHA-1 or SHA-256 hash values for binary file content. All electronic documents bearing an identical value are a duplicate group. The Producing Party may produce only one document or native file for duplicate ESI documents within the duplicate

group to the extent practicable. The Producing Party is not obligated to extract or produce entirely duplicate ESI documents.

c. Duplicate messaging files shall be identified by MD5 or SHA-1 or SHA-256 hash values for the email family, which includes the parent and email attachments.

d. Attachments to parent Documents may not be deduplicated against a duplicate standalone version if the attachment exists, and standalone versions of Documents may not be suppressed if a duplicate version exists as an attachment.

e. As to Custodial Data, a Producing Party may de-duplicate globally or only within an Individual Custodian's file, but the produced metadata shall identify each and every Individual Custodian in whose files the Document was found in the "All Custodians" field. If a Producing Party intends to de-duplicate within Non-Custodial Data, or between Custodial Data and Non-Custodial Data, the metadata provided with the produced Documents shall indicate the other source(s) for the de-duplicated Documents.

f. Upon reasonable written request identifying a specific basis to believe that the deduplication methodology may have resulted in improper suppression of unique documents, the Producing Party shall disclose the process by which hash values were calculated for email deduplication.

**G.** If a producing party intends to use a de-duplication method that does not comply with the above provisions, it shall inform the Requesting Party in writing identifying the specific alternative method proposed, after which the parties shall promptly meet and confer in a good faith effort to resolve any disputes about such proposal. The Parties

may submit any dispute on this issue to the Court for resolution only if they have been unable to reach resolution through the meet-and-confer process.

H. **Zero-byte Files, Duplicative, and Otherwise Extraneous Data**: The Parties do not have an obligation to search and produce, and may filter out the following files and data:

a. Zero-byte files—stand-alone files identified as zero-bytes in size—that do not contain responsive file links or file names. The Producing Party shall maintain a log of all zero-byte files filtered from production identifying for each: (a) the file name; (b) the file path; (c) the custodian; and (d) the creation and modification dates. The log shall be produced to the Requesting Party contemporaneously with each production in which zero-byte files are filtered and the number of zero-byte files filtered from that production exceeds fifty (50). If the Requesting Party in good faith believes that a specific zero-byte file contains information responsive to a request for production, the Requesting Party may request production of that file by reference to the zero-byte file log.

b. Backup data files that are maintained in the normal course of business solely for purposes of disaster recovery and that are duplicative of data available from other sources, including (but not limited to) backup tapes, disks, SAN, cloud-based backup services, and other forms of media, provided, however, that nothing in this provision shall preclude a Requesting Party from seeking (through meet and confer and if necessary application to the Court) production of backup data containing unique ESI not reasonably available from other

sources to the extent the Requesting Party contends such review and production is appropriate and proportional to the case;

c. On-line access data such as temporary internet files, history files, cache files, and cookies;

d. Operating system files and executable files, except for any source code or executable files used in connection with the settlement administration, fund distribution, or payment processing activities that are the subject of this MDL; and

e. Structural files not material to individual file contents (e.g., .CSS, .XSL, .XML, .DTD, and structural .XML schema files.), provided that data XML files containing actual data records shall not be excluded under this provision.

f. Notwithstanding the foregoing, a Requesting Party may seek production of any category of files excluded under this provision upon a particularized showing of need and good cause, including a specific basis for believing the excluded files contain relevant evidence not available from other sources. The Parties shall meet and confer and, if unable to agree, may submit the dispute to the Court.

**I.** **Hidden Text**: ESI items shall be processed in a manner that preserves hidden columns or rows, hidden text, worksheets, speaker notes, tracked changes, and comments. At the time of production, all hidden columns or rows, hidden text, worksheets, speaker notes, tracked changes, and comments are visible on the face of the TIFF image(s), unless redacted in accordance with this ESI Protocol Order. In all cases, the HiddenContent metadata field identified in Appendix 1 shall be populated to indicate

the presence of hidden content, tracked changes, or embedded objects in the produced document. To the extent that hidden content processing is not technically feasible for a specific document type or data source using industry-standard processing tools, the Producing Party shall: (a) notify the Requesting Party in writing identifying the affected document category; (b) produce the affected documents in native format; and (c) populate the HiddenContent metadata field with a notation identifying the nature of the hidden content that could not be processed.

J. **Embedded Objects and Spreadsheets**: Objects embedded in documents (e.g., in Word or Excel documents) shall, to the extent technically feasible, using the processing tools employed by the Producing Party in this matter, which shall be industry-standard tools, be extracted and produced as separate documents and treated like attachments to the document with parent-child relationships preserved in the load file consistent with the Parent-Child Relationships provision of this Protocol. The Parties agree that system-generated embedded objects with no independent evidentiary value, including logos, icons, footers, and similar decorative or structural elements, may be culled from a document set and need not be produced as separate documents by a Producing Party (i.e., such embedded objects will be produced within the document itself, rather than as separate attachments). The Producing Party shall not cull any embedded object that contains user-generated content, data, or information, regardless of file type.

K. **Hyperlinked Documents**

a. For purposes of this ESI Protocol Order, a "hyperlinked document" is a discrete file stored within the Producing Party's organizational environment (e.g., within the same Microsoft 365 tenant, Google Workspace account, or equivalent internal

system) to which a hyperlink in a collected document directs. A hyperlink that directs to a folder, document library, site, or repository containing multiple internal documents is a "linked location."

b. Prior to collection, each Producing Party shall disclose in writing which platforms within its organizational environment support automatic collection of hyperlinked documents using the collection tool it has employed, and which do not. This disclosure obligation is continuing.

c. Where automatic collection of hyperlinked documents is technically feasible the Producing Party shall collect and produce the hyperlinked documents in the version closest in time to the message containing the hyperlink, if technically feasible, as part of the same document family as the parent communication, with the parent-child relationship preserved in the load file.

d. Where a hyperlink directs to a linked location that may contain unique responsive information, it shall be addressed through the Non-Custodial Source provision of this Protocol.

e. Where a Producing Party contends that automatic collection is not technically feasible for a specific platform, this ESI Protocol Order imposes no obligation to manually locate, collect, or associate hyperlinked documents with the message containing the hyperlink unless and until that contention is resolved. At the meet-and-confer, the Parties shall address: (i) the technical feasibility of automatic hyperlink collection for that platform using the industry-standard collection tool employed; (ii) the scope of hyperlinked documents subject to collection; and (iii) the appropriate collection methodology. The Parties shall use best efforts to

conclude the platform meet-and-confer within fifteen (15) days of initiation. If the parties cannot reach agreement within that period, either party may submit the dispute to the Court in accordance with the Court's procedures.

f. If the Parties agree that automatic collection is not feasible, the Producing Party shall use reasonable efforts to locate and produce specifically identified hyperlinked documents upon written request under the request procedure set forth below. If the Producing Party's infeasibility claim is subsequently shown to be incorrect, the production obligation shall attach retroactively from the date of the platform meet-and-confer.

g. The Parties acknowledge that hyperlinks may be broken or otherwise unavailable. The Parties acknowledge that the version of the hyperlinked document collected may differ from the version of the document viewed by the recipient at the time the hyperlink was sent, and the Producing Party shall use reasonable efforts to collect the version closest in time to the message containing the hyperlink. A Producing Party makes no representation that the recipient(s) of a hyperlink ever actually opened or viewed the hyperlinked document or that the contents of the hyperlinked document actually viewed are consistent with the version produced.

h. In the event that automatic collection is not feasible, a Requesting Party may submit a written request for specifically identified hyperlinked documents identifying: (i) the Bates number of the message containing the hyperlink; and (ii) the specific hyperlink text or URL as it appears in the message. Upon receipt of such a request, the Producing Party shall use reasonable efforts to locate and produce the version of the hyperlinked document closest in time to the message a within 15 business

days of the request, unless the Producing Party objects in writing with a specific explanation of the basis for the objection within 7 business days of receipt, and if unable to resolve the dispute, either Party may submit the issue to the Court in accordance with the Court's procedures. No more than 25 targeted hyperlink requests may be made per Producing Party per 30-day period; this cap shall not apply to requests made in connection with a noticed deposition. This cap may be modified by agreement of the Parties or by order of the Court upon a showing of good cause.

i. For requests made in connection with a noticed deposition, any such requests must be reasonable and proportional and made sufficiently in advance of a noticed deposition so that compliance is practicable. At a minimum, the written request shall be submitted no later than 21 days before the deposition date (assuming the documents were produced at least 28 days before the deposition date). The Producing Party shall then respond no later than 7 days before the deposition date. If the Parties are unable to resolve any dispute regarding a hyperlink request after good faith meet and confer, either Party may submit the issue to the Court in accordance with the Court's procedures.

j. In the event a Producing Party contends that review of any automatically or manually collected linked files would be overly burdensome, disproportionate to the needs of the case, or otherwise objectionable, the Producing Party may request a meet and confer with the Requesting Party and identify the reason for its objection. If the parties cannot reach agreement on review of the linked documents, the Producing Party may seek relief from the Court. Nothing in this provision

precludes a Producing Party from seeking relief from the Court on proportionality or other grounds with respect to the review and production of hyperlinked documents.

k. Nothing in this provision alters any Party's preservation obligations under applicable law.

**L. Compressed Files**: Compression file types (i.e., .CAB, .GZ, .TAR, .z, and .ZIP) shall be decompressed in a reiterative manner to ensure that a compressed file within a compressed file is fully extracted into its constituent individual files and folders, with source pathing and original folder structure preserved. The Container Name metadata field shall identify the source archive for each extracted file, consistent with the Archive Files provision of this Protocol.

**M. Password-Protected, Encrypted, or Proprietary-Software Files**: With respect to any ESI items that are password-protected or encrypted, the Producing Party will take reasonable steps to disable the protection so that the documents can be reviewed and produced if appropriate. The Producing Party shall identify all password-protected and/or encrypted files in the load file and include a slip sheet reflecting that the Document is password-protected and/or encrypted. In the event that encrypted or password-protected documents, which are reasonably likely to be responsive, remain for a particular custodian after such reasonable efforts have been made, the Requesting and Producing Parties shall meet and confer regarding the next steps, if any, with respect to such ESI. ESI that cannot be reviewed because proprietary software is necessary to view the ESI will, to the extent identified, be disclosed to a Requesting Party, in the load file with a slip sheet indicating that the document is password protected as, and the Requesting and Producing Parties shall

meet and confer regarding the next steps, if any, with respect to such ESI. Where the Producing Party no longer possesses the software required to read or decipher files otherwise subject to production, it is under no obligation to obtain such software and provide it to the Requesting Party, provided, however, that, if the Requesting Party attempts to obtain such software, the Producing Party shall cooperate with the Requesting Party to the extent reasonably necessary to identify the software, its licensor, and any technical information or permissions needed for the requesting Party to read or decipher the files.

N. **Corrupted or Technical Issue Documents**: If a Document being produced (i.e., it is otherwise relevant, responsive or in a responsive family) cannot be processed (e.g., it is corrupt provided that password-protected files shall first be subject to the reasonable efforts requirements of the Password-Protected, Encrypted, or Proprietary-Software Files provision of this Protocol before being treated as unprocessable under this provision)), a single-page, Bates-stamped image slip sheet stating "File Could Not Be Processed" or similar wording will be provided and a metadata field for "Technical Issue" as identified in Appendix 1 shall be populated with a description of the nature of the technical issue (e.g., corrupt file, unavailable password, proprietary software required, file format not supported).

## V. PARAMETERS FOR COLLECTING DOCUMENTS

A. **Document Custodians and Custodial Data Sources**: The Parties will disclose in writing a list of its own proposed custodians and custodial data sources in accordance with Rule 26, the Court's July 10, 2026 and July 29, 2026 Orders, and any subsequent orders. If a Requesting Party contends that additional Custodians or custodial sources

should be added, then the Parties shall meet and confer in good faith and, if the parties are unable to reach agreement, the Requesting Party may seek relief from the Court.

**B.** **Non-Custodial Sources**: The Parties will disclose in non-custodial data sources in accordance with Rule 26, the Court's July 10, 2026 and July 29, 2026 Orders, and any subsequent orders. If a Requesting Party contends that additional Non-Custodial source(s) should be added, then the Requesting and Producing Parties shall meet and confer in good faith and, in the event the parties are unable to reach agreement, the Requesting Party may seek relief from the Court. Prior to the collection of any database or structured data source identified pursuant to Section B, the Producing Party shall provide the Requesting Party with sufficient technical information about each such source to enable a meaningful meet and confer. The Parties shall thereafter meet and confer regarding the scope and format of production before collection commences. Data from Non-Custodial Sources shall be produced in accordance with the Forms of Production provisions of this Protocol, to the extent technically feasible. To the extent a Producing Party identifies any data from non-custodial sources not susceptible to production in those formats, it shall disclose the existence of such data and the basis for any production difficulty, and the Parties shall meet and confer accordingly.

**C.** **Search Methodology**

a. **Search Term Methodology:** If a Producing Party elects to use search terms to review and produce Custodial and Non-Custodial Data, the Parties agree to cooperate and collaborate as follows:

1. If the Producing Party is identifying or culling potentially relevant materials, the Producing Party shall disclose its identification and culling criteria,

including without limitation file type and date restrictions, data sources (including custodians), and other methodologies, employed in assembling a collection to be searched or reviewed.

2. The Parties shall continue to cooperate in testing, evaluating, and revising the appropriateness of any search terms or search term methodology, including:

    a. *Producing Party Proposes an Initial Set of Search Terms*: The Producing Party who elects to use a search term process will propose a set of search terms to the Requesting Party which shall include any relevant project names, code names, acronyms, and abbreviations.

    b. *Requesting Party's Proposed Revisions:* The Requesting Party will review the search terms list and provide reasonable revisions or additions and shall explain the basis for any proposed additions.

    c. *Producing Party Provides Information*: The Producing Party will identify the search terms that it is willing to run and any modifications it is willing to make to its proposed search terms in light of the Requesting Party's proposed revisions.

    d. *Hit Reports*: Upon request, the Producing Party will provide search term hit reports that contain at least the following information: the aggregate hits for each of the terms (i.e., the number of Documents returned by a search term); the number of hits for each term including family

members; the number of unique hits for each of the search terms; and the number of Documents which contain the particular search term.

e. *Cooperation*: The Producing Party and the Requesting Party will work together in good faith to reasonably and meaningfully narrow the number of documents returned via search term hits and narrow the number of irrelevant documents captured as a result of the search terms. The Producing Party shall not be required to run search terms that are unreasonably overbroad, cumulative, disproportionate to the needs of the case, or generate an excessive volume of non-responsive documents.

3. Following the application of any agreed search terms to a Producing Party's document collection, and prior to commencing review of search term results, the Producing Party shall conduct and disclose to the Requesting Party a validation process sufficient to demonstrate that the agreed upon search terms are performing as intended against the actual Document review population. Such validation shall include at minimum, to the extent technically possible, and without restricting the Parties' ability to agree to alternative validation procedures:

a. a statistically valid random sample of documents from the population of Documents that did not hit any agreed search term (the "null set") reviewed by the Producing Party for responsiveness. Unless the Parties agree to a different sample size, the sample shall be of sufficient size to achieve a ninety-five percent (95%) confidence level with a margin of error not to exceed two percent (2.5%). The Producing Party shall

disclose the sample size, confidence level, margin of error, and the number and percentage of relevant or responsive Documents identified in the null set sample; and

b. to the extent the Receiving Party contends that the null set sample reveals or indicates exclusion of a material number of potentially responsive documents and the disclosed metrics demonstrate a substantial deficiency in the search terms methodology, the Parties shall meet and confer regarding appropriate supplementation and/or modification of the agreed search terms or other remediation measures to address the identified gap. If the Parties cannot reach agreement through meet and confer, either Party may submit the dispute to the Court in accordance with the Court's procedures.

4. The Producing Party shall complete the validation process and disclose the results to the Requesting Party within a reasonable period of time prior to the commencement of productions from the validated collection, or such other time as the Parties may agree, to afford the Requesting Party a meaningful opportunity to evaluate the validation results and propose supplemental or modified search terms before the production process.

5. The Producing Party shall not be required to disclose any document, coding decision, work product, attorney mental impression, quality-control analysis, review methodology, or other information protected by privilege, work-product doctrine, or any applicable immunity. Nothing in this provision shall require

the Producing Party to disclose the contents of privileged documents identified in the null set sample. To the extent privileged documents are identified in the null set sample, they shall be counted for purposes of the responsive document rate calculation but need not be produced. The Requesting Party may request the total number of privileged documents identified in the null set and withheld. This provision does not exempt from disclosure: (i) the statistical outputs of the validation process, including responsive rate, sample size, confidence level, and margin of error; or (ii) the documents identified as responsive in the null set sample upon request by the Receiving Party.

6. If the Parties are unable to resolve any dispute regarding search term validation results or proposed supplemental search terms after good faith meet and confer discussions, either Party may submit the issue to the Court or its designee in accordance with the Court's procedures.

7. Upon a showing of good cause and where directly relevant to a disputed discovery issue, a Requesting Party may request reasonable additional information concerning Producing Party information systems or data sources beyond the information disclosed pursuant to Rule 26(f) and the Court's orders. The Producing Party may object on grounds including burden, relevance, security, confidentiality, proportionality, or privilege. Such requests should not be made routinely but only when the information sought is reasonably calculated to support greater accuracy, efficiency or economy in discovery.

8. To the extent that a Producing Party believes that any of the search terms proposed by a Requesting Party are unreasonably overbroad and will result in

the identification of disproportionate numbers of irrelevant Documents or undue burden, the Parties will meet and confer to discuss whether the disputed terms should be revised or eliminated from the review and confer in good faith to discuss any additional information or metrics needed to enhance the effectiveness of the proposed search terms.

9. Nothing in this Order limits a Producing Party's ability to review Documents for relevance or privilege.

10. The Parties acknowledge that search terms developed for email and Document review may not effectively capture responsive Short Message Communications, which may include informal language, abbreviations, shorthand, emoji and reaction content, platform-specific syntax, and contextual meaning not amenable to standard keyword searching.

11. If a Producing Party elects to use search terms to identify potentially relevant or responsive Short Message Communications, the Parties may meet and confer within a reasonable period of time after the start of general discovery, but prior to collection and processing of Short Message Communications, to separately to develop search terms specifically tailored to messaging data. The Short Message Communication meet and confer may address: (i) platform-specific search terms that account for the informal language, abbreviations, shorthand, and communication conventions used by Individual Custodians on each identified messaging platform; (ii) any technical limitations of the collection or review tool with respect to searching messaging data, including emoji and reaction content, @mentions, and channel names; and (iii) possible

supplemental review methodologies, including date range review, custodian-specific review, channel or group-specific review, or manual review, to identify relevant or responsive Short Message Communications not captured by keyword search terms.

12. Upon request, the Producing Party shall provide hit reports for search terms applied to Short Message Communications that identify, in addition to the information required by the general hit report provision set out above.

13. If the Producing Party does not elect to use search terms for Short Message Communications, the Parties shall meet and confer regarding alternative review methodologies.

**D. USE OF TECHNOLOGY ASSISTED REVIEW (TAR)**

1. "Technology Assisted Review" or "TAR" as used in this Protocol means predictive coding, continuous active learning, Generative Artificial Intelligence Review tools, or any machine-learning model used to make or inform relevance or responsiveness determinations at the document level. For the avoidance of doubt, TAR does not include standard automated processing tools used to organize, deduplicate, or format documents for review, including but not limited to: deduplication by hash value, de-NISTing against the NIST National Software Reference Library, email threading, date range filtering, file type filtering, OCR processing, exception handling, and other standard industry processing methodologies.

2. Producing Parties may not use TAR as defined herein to cull or review Documents for production in the absence of a negotiated and approved TAR

Protocol. Should a Producing Party decide or determine to use TAR to cull or review Documents for production for MDL 3162, then prompt written notice shall be provided to all other Counsel of Record and the Parties shall work cooperatively to negotiate an appropriate TAR Protocol for prompt submission to the Court for review and approval.

3. The parties shall meet and confer in good faith regarding, among other considerations relevant to the use of TAR, the tool, the basic process, and reasonable validation and quality-control measures, including a targeted recall rate.

**D. Validation Process and Procedures to establish Substantial Completion.**

**1. General Provisions**

**a.** The following procedures shall apply when a Producing Party asserts that its production of relevant or responsive Documents is substantially complete. These procedures apply regardless of whether the Producing Party used search terms, prioritized review, or a combination of both.

b. The Parties will cooperate in good faith to identify and address any material gaps in document collection or review identified through the validation process. Nothing herein requires supplemental collection or review (apart from the validation review itself) absent agreement of the Parties or Court order. To the extent disputes arise, the Parties shall

promptly meet and confer in an effort to resolve them. Absent resolution, either Party may seek relief from the Court.

**2. Validation Sampling**

a. When a Producing Party believes it has substantially completed its document productions, it shall draw a random sample as follows:

i. Non-Responsive-Coded Sample. A statistically valid random sample of Documents that hit on negotiated search terms and were coded as non-responsive. The sample shall achieve a 95% confidence level with a margin of error not to exceed ±5% and shall be no fewer than 750 Documents. The Producing Party shall disclose the total size of the non-responsive-coded population and the actual sample size to be used for this purpose.

ii. In the event any Producing Party contends that any required sample size would be unduly burdensome, the Parties shall meet and confer, and either Party may seek relief from the Court if the dispute cannot be resolved.

iii. To the extent that the volume of Documents falls below these thresholds, the Parties will meet and confer to reach agreement regarding the size of an appropriate Validation Sample.

3. **Assessment of Substantial Completion**

a. There is no predetermined level of recall or precision that is considered de facto acceptable. Rather, a determination of what is acceptable will be based on a reasonable overall balance of the two metrics, including the expected burden of further review versus the fruitfulness of the effort.

b. The Parties will thereafter meet and confer to discuss whether based on the reported recall and precision metrics and the novelty and substantiality of any responsive Documents identified in the sample, the Producing Party has substantially completed its production. If the Parties cannot reach agreement, either Party may seek relief from the Court.

**D. Otherwise Known Responsive Information**: The Parties shall produce known responsive Documents. A Producing Party's use of a search methodology does not relieve it of the duty to produce Documents that it knew about at the time of collection, identifies during the collection and review process, or becomes aware of at any time during the pendency of this MDL that are responsive to a request for production, even if that information was not captured in the Producing Party's document collection, review, or production.

## VI. PRODUCTION FORMAT FOR PLAINTIFFS'

A. Plaintiffs' must produce Documents in native file format, PDF, or such other reasonably useable format that retains the relevant characteristics of the original document. Any document that requires redaction must be produced in image format, e.g., TIFF or PDF. All of Plaintiffs' Documents must be uniquely named and numbered. For document families, the parent-child relationships shall be preserved. Attachments/linked files should be consecutively produced with the parent document that attached/referenced

them. To the extent Plaintiffs produce a document other than in native format, and Defendants request metadata or other information, the Parties must confer about an alternative production format for such Document. This provision applies to production formatting only and does not excuse Plaintiffs from the other obligations in this protocol, including, but not limited to preservation, collection, privilege logging, and other logging requirements. For avoidance of doubt, this Section does not apply to Third-Party productions made by Plaintiffs' Counsel in this action.

## VII. CLAIMS OF PRIVILEGE AND PRIVILEGE REDACTIONS

A. Any document that is withheld on the basis of a claim of privilege or work product doctrine, is to be identified by the Producing Party on a privilege log sixty (60) days after each production of documents.

B. Each Producing Party shall log Documents withheld from production on the basis of attorney-client privilege, attorney work product protection, or joint defense or common interest privilege, or any other applicable privilege or immunity (collectively, "Privilege Claims"), consistent with the 2025 amendments to the Federal Rules of Civil Procedure, using a metadata-based privilege log ("Metadata Log") as the default logging method for all productions in this MDL. Categorical logs will not be allowed.

C. The privilege log shall be produced as an Excel spreadsheet (.xlsx) permitting text searching, filtering, and sorting of all data fields, with no merged cells, one row per Document, and consistent naming conventions for all individuals across all fields and all log productions. The privilege log shall include for each withheld or redacted Document: (a) a Bates number or other unique privilege log identifier; (b) the beginning and ending Bates numbers of the complete Document family, including all

parent and child documents, so that withheld Documents can be cross-referenced against productions; (c) the Document type (e.g., email, edoc, attachment, hard copy) and file extension; (d) the type of privilege(s) asserted; (f) all Individual Custodians of the Document; (g) the date and time of creation or sending; (h) the author or sender; (i) all recipients separated into primary recipients, courtesy copy recipients, and blind courtesy copy recipients identified by full name and email address consistent with the underlying metadata; (j) the name of the file or subject line of the email as reflected in the metadata; (k) an indication, for every individual appearing in any field of the log, of whether that individual is an attorney, designated by an asterisk (*) immediately following their name; (m) the MD5 or SHA-1 hash value of the withheld Document; (n) for documents that are produced with redactions rather than withheld in full, the reason for each redaction; (o) an indication of whether the Document contains tracked changes, hidden text, or embedded objects (Y/N); and (p) the date on which the Document was added to the privilege log.

D. All attorneys appearing in any field of the privilege log shall be identified as such by an asterisk (*) immediately following their name wherever they appear, consistently applied throughout the log and all individuals shall be identified by first and last name and consistent with the information contained in underlying produced metadata.

E. Where the subject line, title, or other metadata field of a Document reflects privileged or protected content, the Producing Party may substitute a general, non-privileged description of the Document sufficient to allow the Requesting Party to evaluate the Privilege Claim, provided that the privilege log clearly indicates that a substitution has been made in the relevant field.

F. Following the receipt of a privilege log, a Receiving Party may identify by bates or production number, in writing, the particular documents that it believes requires further explanation within forty five (45) days of receipt of the privilege log. Within forty-five (45) days of such an identification, the Producing Party must respond to the request.

G. A Requesting Party may challenge a Producing Party's privilege claims or redactions. Any Requesting Party disagreeing with a privilege claim or redaction of any Document shall identify in writing the specific Document, identified by Bates number or privilege log identifier, challenged, and the specific reasons why the challenging Party does not believe the privilege claim or redaction is appropriate, and may request in writing that the designating Party remove the claim of privilege or redaction. The designating Party shall then have thirty (30) days after receipt of the written challenge notice to respond in writing and advise the challenging Party as to whether the privilege claims or redactions will be maintained or withdrawn.

H. If the designating Party does not withdraw the claimed privilege or remove redactions from the challenged Documents after expiration of the applicable timeframe set forth above, including any extension of time agreed to by the Parties, any Party may move to challenge the claimed privilege. If such motion is made, the designating Party bears the burden of establishing that the privilege claim or redaction is proper.

I. **Exclusions from Logging Potentially Privileged Documents**: The following categories of Documents need not be reflected in a Producing Party's privilege log, unless good cause exists to require that a Party do so or the Parties otherwise agree:

1. Any communications after the filing of the first complaint that was coordinated in this MDL exclusively between a Producing Party and its outside counsel retained specifically for this MDL, regarding the prosecution or defense of this MDL, provided that such communications do not include any third party other than co-defendants pursuant to a joint defense or common interest agreement concerning such matters.

2. Communications exclusively between a Producing Party and any non-testifying experts retained in connection with this MDL, including communications with its corporate in-house and/or outside counsel (including their agents) consistent with the protections afforded by Fed. R. Civ. P. 26(b)(4), between a Producing Party and testifying experts in connection with this MDL, including communications with its corporate in-house and/or outside counsel (including their agents).

3. Work product created exclusively by outside litigation counsel, or an agent of outside counsel, retained specifically, for this MDL and after the filing of any of the 12 initial complaints in this MDL, including draft pleadings, briefs, and internal attorney memoranda, provided that such work product does not reflect communications with the Producing Party or any third party.

J. **Documents Redacted for Privilege**: The Producing Party will undertake reasonable efforts to make limited, line-by-line redactions of privileged or work product information. For the avoidance of doubt, no Party shall be permitted to make wholesale redaction to documents, such as email bodies, to avoid the requirements imposed by this Order that privileged materials be adequately logged.

K. **Personally Identifiable Information ("PII") Redactions**: A Producing Party may redact personally identifiable information (e.g., Social Security Numbers).

## VIII. THIRD-PARTY DOCUMENT REQUESTS

A. **Third-Party Document Subpoenas**: All Non-Party document subpoenas shall be served on all counsel of record in compliance with Fed. R. Civ. P. 45. Service via email on a designated service list shall constitute compliance with Rule 45.

B. **Third-Party Document Productions**: Issuing Party shall serve a copy of that document production on all counsel of record within seven (7) days of receiving the document production. Service of documents or a file transfer link via email on a designated service list shall constitute compliance with this paragraph.

C. **Informing Third-Parties of This Order**: The Parties agree to provide a copy of this ESI Protocol Order with any document subpoena served in this Litigation.

## IX. MISCELLANEOUS PROVISIONS

A. **Inaccessible ESI**: If a Producing Party asserts that certain categories of ESI that are reasonably likely to contain responsive information are not reasonably accessible under Fed. R. Civ. P. 26(b)(2)(B) because of undue burden or cost, or if the Requesting Party asserts that, following production, certain ESI is not reasonably usable, the Producing and Requesting Parties shall promptly meet and confer in good faith to try to resolve such issues. The Producing and Requesting Parties shall submit the matter to the Court for resolution only if they are not able to reach resolution through the meet-and-confer process.

B. **Deleted, Destroyed, or Overwritten Materials**: If a Producing Party has reason to believe that ESI, paper documents, or other materials that are reasonably likely to

contain information responsive to the reasonably anticipated scope of discovery in this MDL, including ESI that is potentially relevant to the claims or defenses regardless of whether a formal request for production has been served, have been destroyed, deleted, or overwritten either intentionally or unintentionally, the producing Party shall disclose all pertinent facts concerning the deleted, destroyed, or overwritten ESI or hard-copy documents, including the type of data at issue, the information it may have contained, the identification of the person responsible for deleting, destroying, or overwriting it, and when that information was deleted, destroyed, or overwritten.

C. **Limitations**. Nothing in this ESI Protocol Order establishes any agreement as to either the temporal or subject matter scope of discovery or as to the relevance or admissibility of any Document or ESI. Nothing in this ESI Protocol Order shall be interpreted to require information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity recognized under the Federal Rules of Civil Procedure or applicable law. The Parties do not waive any objections as to the production, discoverability, admissibility, or confidentiality of Documents and ESI.

D. **Variations or Modifications**: Variations from this ESI Protocol Order may be required. Any practice or procedure set forth herein may be varied by agreement of all affected Plaintiffs and all affected Defendants, which will be confirmed in writing. In the event a producing Party determines that a variation or modification is appropriate or necessary to facilitate the timely and economical production of documents or ESI, including with respect to any applicable deadlines, the producing Party will notify the requesting Party of the proposed variation or modification and the Parties shall meet and confer within seven (7) days before any variation or modification is implemented.

No variation or modification shall be implemented without either the written agreement of the Parties or a Court order. If the Parties are unable to reach agreement through the meet-and-confer process, either Party may seek Court intervention.

E. **Best Efforts Compliance and Disputes**. The parties agree to use their reasonable good faith efforts to comply with and resolve any differences concerning compliance with any provisions of this ESI Protocol Order. If a Producing Party cannot comply in a particular circumstance with this ESI Protocol Order, such party shall promptly inform the Requesting Party in writing why compliance with the ESI Protocol Order is not reasonable or feasible. No party may seek relief from the Court concerning compliance or non-compliance with the ESI Protocol Order until it has met and conferred with the other party in a good faith effort to resolve or narrow the area of disagreement.

**SO ORDERED.**

Dated: August __, 2026 ____________________________________

## APPENDIX 1: ESI Metadata and Coding Fields

| **Field Name**[1] | **Populated For** (Email, Edoc, Calendar, Contact, Cellphone, or All) | **Field Description** |
|---|---|---|
| BegBates | All | Control Numbers (beginning Bates number as stamped on the production image). |
| EndBates | All | Control Numbers (ending Bates number as stamped on the production image). |
| PgCount | All | Number of pages in the Document. |
| FileSize | All | Size of native file Document/e-mail in KB. |
| BegAttach | All | Control Numbers (first production Bates number of the first document of the family). |
| EndAttach | All | Control Numbers (last production Bates number of the last document of the family). |
| AttachCount | Email | Number of attachments to an e-mail. |
| AttachName | Email | Names of each individual Attachment, separated by semicolons. |
| ParentsBates | All | First Bates identifier of parent Document/e-mail message (will not be populated for Documents that are not part of a family). |
| ChildBates | All | First Bates identifier of "child" attachment(s); may be more than one Bates number listed depending on number of attachments (will not be populated for Documents that are not part of a family). |
| Custodian | All | Custodian Name (e.g., John Doe) |
| AllCustodians | All | Individual Custodians whose file/message has been de-duplicated; separated by semicolons. |
| LogicalPath | All ESI Items | The directory structure of the original file(s). Any Container name is included in the path. |
| Container Name | Extracted Files (where applicable) | The name of the "container" file that held a given item — for example, a .zip, .pst, or other archive/compound file that contained loose files or emails. |
| Path | All | E-mail: Original location of e-mail including original file name. Native: Originating path where native file Document was collected including original file name. |

[1] Field Names can vary from system to system and even between different versions of systems. Thus, the Parties are to be guided by these Field Names and Descriptions when identifying the metadata fields to be produced for a given document pursuant to this ESI Protocol Order.

| **Field Name**[1] | **Populated For** (Email, Edoc, Calendar, Contact, Cellphone, or All) | **Field Description** |
|---|---|---|
| AllFilePaths | All | All file paths associated with a Document across all custodians and source locations from which the Document was collected, including duplicate instances. Where a Document has been de-duplicated across custodians, this field shall capture the full originating file path from each custodian's collection, separated by semicolons. Complements the AllCustodians field and ensures that path metadata is not lost as a result of de-duplication. |
| Hash Value | All | The MD5 or SHA-1 hash value. |
| NativeLink | Documents produced in Native Format | Relative path and filename for native file on production media. |
| TextLink | All | Relative path and filename for text file on production media. |
| Email Thread ID | Email | Unique identification number that permits threading of email conversations. For instance, unique MS Outlook identification number (“PR_CCONVERSATION-INDEX”) is 22 bytes in length, followed by zero or more child blocks each 5 bytes in length, which facilitates use of email threading. |
| Thread Index | Email | Message header identifier, distinct from “PR_Conversation_Index,” that permits threading of email chains in review software. |
| EmailSubject | Email | Subject line of email. |
| DateSent | Email | Date email was sent. |
| DateReceived | Email | Date email was received. |
| DateMod | Email, Edoc | Date the document was modified and time (mm/dd/yyyy hh:mm:ss AM).. |
| LastModifiedBy | Edoc | Person who last modified a Document. |
| TimeSent | Email | Time email was sent. |
| ReceiveTime | Email | Time email was received. |
| To | Email | All recipients that were included on the “To” line of the email. |
| From | Email | The name and email address of the sender of the email. |
| CC | Email | All recipients that were included on the “CC” line of the email. |
| BCC | Email | All recipients that were included on the “BCC” line of the email. |

| Field Name[1] | Populated For (Email, Edoc, Calendar, Contact, Cellphone, or All) | Field Description |
|---|---|---|
| MsgID | Email | E-mail: "Unique Message ID" field. |
| Importance | Email | For e-mails, "High," "Low," or "Normal" (or equivalent if an e-mail client other than Outlook was used); Null if no value selected. |
| Sensitivity | Email | For Outlook (or equivalent) e-mails, "Normal," "Private," "Personal," or "Confidential"; Null if no value selected. |
| ReadStatus | Email | Read or Unread |
| DateCreated | Edoc | Date the document was created. |
| TimeCreated | Edoc | Time the document was created. |
| FileName | Email, Edoc | File name of the edoc or email. |
| FileExt | All | Document: file extension |
| FileType | All | Document file typ. |
| DocType | Email, Edoc | Single choice field that indicates the file is an email, edoc, attachment or hard copy. |
| Title | Edoc | Any value populated in the Title field of the document properties. |
| Subject | Edoc | Any value populated in the Subject field of the document properties. |
| Author | Edoc | Any value populated in the Author field of the document properties. |
| Redacted | All | "X," "Y," "Yes," and "True" are all acceptable indicators that the document is redacted. Otherwise, leave blank. |
| Redaction Reason | All | Identifies the basis for each redaction applied to the Document. Shall be populated using one of the following values: (1) "Attorney-Client Privilege"; (2) "Work Product"; (3) "Joint Defense/Common Interest"; (4) "PII/PHI"; (5) "Confidential Third-Party Information"; or (6) "Other — See Privilege Log." Where a Document contains redactions on more than one basis, all applicable values shall be populated, separated by semicolons. This field supersedes and replaces the "Redacted" and "PrivRedacted" fields, which need not be separately populated if RedactionReason is populated. Otherwise, leave blank. |
| Withheld Placeholder | All | To the extent a document is fully withheld (on the basis of privilege or otherwise), this field must be populated with a "Y". |
| HiddenContent | All | Denotes presence of Tracked Changes/Hidden Content/Embedded Objects in item(s) (Y/N). |

| **Field Name**[1] | **Populated For** (Email, Edoc, Calendar, Contact, Cellphone, or All) | **Field Description** |
|---|---|---|
| Paper | All | “Y” if document is scanned from hard copy in connection with the collection and production of documents in this matter. |
| Confidentiality | All | Indicates if document has been designated as confidential or Highly Confidential – Outside Counsel Only material pursuant to the Stipulated Protective Order entered into by the Parties. |