**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE CLASS ACTION SETTLEMENT ADMINISTRATION LITIGATION** | **Misc. Action No. 25-179 (JDB); MDL Docket No. 3162** |
| **This Document Relates To: ALL CONSOLIDATED ACTIONS** | |

**PLAINTIFFS' OPPOSITION TO FINTECH DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

LEGAL STANDARD ........................................................................................................ 5

ARGUMENT ........................................................................................................ 5

I. PLAINTIFFS' FRAUD-BASED CLAIMS AGAINST THE FINTECHS ARE ADEQUATELY PLEADED ........................................................................................................ 5

A. Plaintiffs' Allegations Satisfy Rule 9(B) ........................................................................................................ 6

B. Plaintiffs Adequately Plead the Fintechs' Affirmative Participation in the Fraud and Class Members' Reasonable Reliance ........................................................................................................ 7

C. Plaintiffs' Fraudulent Concealment is Adequately Plead ........................................................................................................ 9

1. Plaintiffs allege affirmative acts of concealment by the FinTechs ........................................................................................................ 9

2. The FinTechs had a duty to disclose their compensation arrangements ........................................................................................................ 10

II. PLAINTIFFS ADEQUATELY PLEADED THE FINTECHS' RICO VIOLATIONS ..... 13

A. Each FinTech Committed Multiple Predicate Acts ........................................................................................................ 14

B. Each FinTech Engaged in A Pattern of Racketeering Activity ........................................................................................................ 16

C. Plaintiffs Adequately Pleaded the Administrator-centered Enterprises and the FinTechs' Conduct of their Affairs ........................................................................................................ 18

D. Plaintiffs Have RICO Standing ........................................................................................................ 22

E. The FinTechs Conspired to Violate RICO ........................................................................................................ 23

F. Plaintiffs' alternative RICO claims should not be dismissed ........................................................................................................ 25

G. The FinTechs' used racketeering proceeds to injure Plaintiffs ........................................................................................................ 26

III. THE REMAINING COMMON LAW CLAIMS SHOULD PROCEED ........................................................................................................ 27

A. The FinTechs' Aiding & Abetting Is Adequately Alleged ........................................................................................................ 27

1. The underlying primary wrong is adequately alleged ........................................................................................................ 27

2. The FinTechs' actual knowledge is adequately alleged ........ 28

3. The FinTech's substantial assistance is adequately alleged ........ 30

4. Proximate causation is adequately alleged ........ 33

B. Plaintiffs Adequately Allege Civil Conspiracy ........ 34

1. Rule 9(b) does not apply, and it is satisfied in any event ........ 36

2. Count VII is not "duplicative" of the aiding-and-abetting claims ........ 38

C. Plaintiffs Adequately Plead Unjust Enrichment ........ 39

IV. PLAINTIFFS HAVE ARTICLE III STANDING ........ 42

CONCLUSION ........ 44

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Acosta Orellana v. CropLife Int'l*,
711 F. Supp. 2d 81 (D.D.C. 2010) ........ 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 5

**Berdeaux v. OneCoin Ltd.*,
561 F. Supp. 3d 379 (S.D.N.Y. 2021) ........ 31

*Bhatia v. Silvergate Bank*,
725 F. Supp. 3d 1079 (S.D. Cal. 2024) ........ 33

**Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) ........ 22

**Cincinnati Terrace Member LLC v. Tartar Krinsky & Drogin LLC*,
258 N.Y.S.3d 11 (2026) ........ 11

**Georgia Malone & Co. v. Rieder*,
973 N.E.2d 743 (2012) ........ 40

**Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ........ 8, 34, 38

**Holmes v. Sec. Inv. Prot. Corp.*,
503 U.S. 258 (1992) ........ 22, 23

**Ideal Steel Supply Corp. v. Anza*,
652 F.3d 310 (2d Cir. 2011) ........ 26

**In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
27 F. Supp. 3d 447 (S.D.N.Y. 2014) ........ 41

**In re Parmalat Sec. Litig.*,
376 F. Supp. 2d 472 (S.D.N.Y. 2005) ........ 8

**Morris v. Castle Rock Ent., Inc.*,
246 F. Supp. 2d 290 (S.D.N.Y. 2003) ........ 8

*Osborn v. Visa Inc.*,
797 F.3d 1057 (D.C. Cir. 2015) ........ 43

**Reves v. Ernst & Young*,
507 U.S. 170 (1993) ........ 21, 22

**Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985) ........ 13

**United States ex rel. Heath v. AT&T, Inc.*,
791 F.3d 112 (D.C. Cir. 2015) ........ 7

**United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
389 F.3d 1251 (D.C. Cir. 2004) ........ 6

**W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*,
235 F.3d 629 (D.C. Cir. 2001) ........ 16

*Albion All. Mezzanine Fund, L.P. v. State St. Bank & Tr. Co.*,
8 Misc. 3d 264 (Sup. Ct. 2003) ........ 36

*Am. Nat. Ins. Co. v. FDIC*,
642 F.3d 1137 (D.C. Cir. 2011) ........ 43

*Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*,
57 F.3d 146 (2d Cir. 1995) ........ 12

*Boyle v. United States*,
556 U.S. 938 (2009) ........ 18, 19

*Brooks v. Peoples Bank*,
732 F. Supp. 3d 765 (S.D. Ohio 2024) ........ 42

*Brumfield v. Merck & Co., Inc.*,
2018 WL 2277835 (E.D.N.Y. May 18, 2018) ........ 8

*Casey v. U.S. Bank Nat'l Ass'n*,
127 Cal. App. 4th 1138 (2005) ........ 29

*Cheeks v. Fort Myer Constr. Corp.*,
216 F. Supp. 3d 146 (D.C. Cir. 2016) ........ 25

*Cisco Sys., Inc. v. Doe I*,
146 S. Ct. 1882 (2026) ........ 25

*Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Indus. Materials Corp.*,
887 F. Supp. 2d 9 (D.D.C. 2012) ........ 23

*Corsello v. Verizon New York, Inc.*,
18 N.Y.3d 777 (2012)........................................................................................................ 42

*Coubaly v. Cargill Inc.*,
144 F.4th 343 (D.C. Cir. 2025) .......................................................................................... 44

*Croixland Props. Ltd. P'ship v. Corcoran*,
174 F.3d 213 (D.C. Cir. 1999) ........................................................................................... 39

*Cromer Fin. Ltd. v. Berger*,
137 F. Supp. 2d 452 (S.D.N.Y. 2001) ............................................................................... 34

*CRT Invs., Ltd. v. BDO Seidman, LLP*,
925 N.Y.S.2d 439 (App. Div. 2011).................................................................................. 31

*Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*,
941 F.2d 1220 (D.C. Cir. 1991) ......................................................................................... 27

*Diamond Alternative Energy LLC v. EPA*,
606 U.S. 100 (2025)........................................................................................................... 44

*Direct Sales Co. v. United States*,
319 U.S. 703 (1943)........................................................................................................... 32

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
822 F.2d 1242 (2d Cir. 1987)............................................................................................. 37

*Doe v. Roman Cath. Diocese of Greensburg*,
581 F. Supp. 3d 176 (D.D.C. 2022) .................................................................................. 34

*Edison Elec. Institute v. Henwood*,
832 F. Supp. 413 (D.D.C. 1993) ....................................................................................... 21

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*,
48 F.3d 1268 (D.C. Cir. 1995) ........................................................................................... 18

*Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Rsch.*,
106 N.Y.S.3d 302 (2019) ................................................................................................... 37

*Facebook, Inc. v. MaxBounty, Inc.*,
274 F.R.D. 279 (N.D. Cal. 2011)....................................................................................... 33

*Falconi-Sachs v. LPF Senate Square, LLC*,
142 A.3d 550 (D.C. 2016)............................................................................................ 39, 41

*Feld Ent. Inc. v. ASPCA*,
873 F. Supp. 2d 288 (D.D.C. 2012) ................................................................................... 14

*Fleites v. MindGeek S.A.R.L.*,
801 F. Supp. 3d 1011 (C.D. Cal. 2025) ........ 35

*Freeman v. Giuliani*,
2022 WL 16551323 (D.D.C. Oct. 31, 2022) ........ 34, 36

*Freeman v. Sorchych*,
226 Ariz. 242 (Ct. App. 2011) ........ 41

*Glasgow v. Camanne Mgmt. Inc.*,
261 A.3d 208 (D.C. 2021) ........ 39, 40, 42

*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989) ........ 17, 18

*Heinert v. Bank of Am., N.A.*,
410 F. Supp. 3d 544 (W.D.N.Y. 2019) ........ 31

*Heinert v. Bank of Am., N.A.*,
835 F. App'x 627 (2d Cir. 2020) ........ 30

*Hettinga v. United States*,
677 F.3d 471 (D.C. Cir. 2012) ........ 5

*Humana, Inc. v. Biogen, Inc.*,
666 F. Supp. 3d 135 (D. Mass. 2023) ........ 9

*Immobiliare, LLC v. Westcor Land Title Ins. Co.*,
424 F. Supp. 3d 882 (E.D. Cal. 2019) ........ 13

*In re Aramid Ent. Fund Ltd.*,
664 B.R. 9 (Bankr. S.D.N.Y. 2024) ........ 30

*In re Bayou Steel BD Holdings, L.L.C.*,
642 B.R. 371 (Bankr. D. Del. 2022) ........ 28

*In re Craftmatic Sec. Litig. v. Kraftsow*,
890 F.2d 628 (3d Cir. 1989) ........ 37

*In re Gen. Motors LLC Ignition Switch Litig.*,
257 F. Supp. 3d 372 (S.D.N.Y. 2017) ........ 13

*In re Lehman Bros. Sec. & ERISA Litig.*,
903 F. Supp. 2d 152 (S.D.N.Y. 2012) ........ 27, 28

*In re Magnesium Oxide Antitrust Litig.*,
2012 WL 1150123 (D.N.J. Apr. 5, 2012) ........ 37

*In re Mercedes-Benz Antitrust Litig.*,
157 F. Supp. 2d 355 (D.N.J. 2001) ........ 37

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ........ 36

*In re Platinum-Beechwood Litig.*,
426 F. Supp. 3d 14 (S.D.N.Y. 2019) ........ 39

*In re Sharp Int'l Corp.*,
302 B.R. 760 (E.D.N.Y. 2003) ........ 30

*Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp.*,
2020 WL 4201661 (D.D.C. July 22, 2020) ........ 36

*JSC Transmashholding v. Miller*,
70 F. Supp. 3d 516 (D.D.C. 2014) ........ 40, 41

*Kidron v. Movie Acquisition Corp.*,
40 Cal. App. 4th 1571 (1995) ........ 35

*Klein v. Gen. Nutrition Cos., Inc.*,
186 F.3d 338 (3d Cir. 1999) ........ 8

*Krukas v. AARP, Inc.*,
458 F. Supp. 3d 1 (D.D.C. 2020) ........ 10

*Krys v. Pigott*,
749 F.3d 117 (2d Cir. 2014) ........ 29

*Lacks v. Ultragenyx Pharm., Inc.*,
734 F. Supp. 3d 397 (D. Md. 2024) ........ 40

*Lectrodryer v. SeoulBank*,
77 Cal. App. 4th 723 (2000) ........ 41

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
2016 WL 5719749 (S.D.N.Y. Sept. 29, 2016) ........ 39

*Mandarin Trading Ltd. v. Wildenstein*,
944 N.E.2d 1104 (2011) ........ 40

*Mass. Coal. for Immigr. Reform*,
621 F. Supp. 3d 84 (D.D.C. 2022) ........ 44

*McWreath v. Cortland Bank*,
2012 WL 2522933 (Ohio Ct. App. June 29, 2012) ........ 8

*MLSMK Invs. Co. v. JP Morgan Chase & Co.*,
737 F. Supp. 2d 137 (S.D.N.Y. 2010) ........ 29

*Mursau Corp. v. Florida Penn Oil & Gas, Inc.*,
638 F. Supp. 259 (W.D. Pa. 1986)........ 13

*N. Fork Partners Inv. Holdings, LLC v. Bracken*,
2021 WL 4124950 (S.D.N.Y. Sept. 9, 2021)........ 13

*N. Penn Towns, LP v. Concert Golf Partners, LLC*,
2022 WL 2985632 (E.D. Pa. July 28, 2022)........ 13

*Negrete v. Citibank, N.A.*,
187 F. Supp. 3d 454 (S.D.N.Y. 2016) ........ 13

*Nemec v. Shrader*,
991 A.2d 1120 (Del. 2010) ........ 41

*Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*,
1999 WL 558141 (S.D.N.Y. July 30, 1999) ........ 31

*NW Airlines*, *Inc. v. FAA*,
795 F.2d 195 (D.C. Cir. 1986) ........ 44

*Or. Env't Council v. Internal Revenue Serv.*,
2026 WL 1631612 (D.D.C. June 6, 2026) ........ 43, 44

*Orangeburg, S.C. v. FERC*,
862 F.3d 1071 (D.C. Cir. 2017) ........ 43

*Pasternack v. Lab'y Corp. of Am. Holdings*,
27 N.Y.3d 817 (2016) ........ 8

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
446 F. Supp. 2d 163 (S.D.N.Y. 2006) ........ 33

*Premier Cap. Mgmt., LLC v. Cohen*,
2008 WL 4378313 (N.D. Ill. Mar. 24, 2008)........ 31

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
471 F. Supp. 3d 981 (N.D. Cal. 2020) ........ 9

*Riddell v. Riddell Washington Corp.*,
866 F.2d 1480 (D.C. Cir. 1989) ........ 37

*Rotella v. Wood*,
528 U.S. 549 (2000)........ 14

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
682 F.3d 1043 (D.C. Cir. 2012) ............ passim

*Salinas v. United States*,
522 U.S. 52 (1997) ............ 23

*Schmuck v. United States*,
489 U.S. 705 (1985) ............ 15

*Schuler v. United States*,
617 F.2d 605 (D.C. Cir. 1979) ............ 5

*Sec. Inv. Prot. Corp. v. BDO Seidman, L.L.P.*,
95 N.Y.2d 702 (2001) ............ 9

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
605 U.S. 280 (2025) ............ 32

*Smith v. Fed. Title & Escrow Co.*,
2018 WL 11666412 (D.D.C. June 21, 2018) ............ 18

*Smith v. Rubicon Advisors, LLC*,
254 F. Supp. 3d 245 (D.D.C. 2017) ............ 42

*Steele v. Isikoff*,
130 F. Supp. 2d 23 (D.D.C. 2000) ............ 10

*Suarez v. Compass Coffee LLC*,
2025 WL 3062798 (D.D.C. Nov. 3, 2025) ............ 14

*Taragan v. Nissan N. Am., Inc.*,
2013 WL 3157918 (N.D. Cal. June 20, 2013) ............ 10

*Taylor v. Howard Univ.*,
200 F. Supp. 3d 196 (D.D.C. 2016) ............ 39

*Terrell v. Childers*,
920 F. Supp. 854 (N.D. Ill. 1996) ............ 9

*Thompson v. Trump*,
590 F. Supp. 3d 46 (D.D.C. 2022) ............ 34, 36

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) ............ 32

*United States ex rel. Head v. Kane Co.*,
798 F. Supp. 2d 186 (D.D.C. 2011) ............ 5

*United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*,
251 F. Supp. 2d 114 (D.D.C. 2003) ... 5

*United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*,
2020 WL 686009 (D.D.C. Feb. 11, 2020) ... 7

*United States ex rel. Winnon v. Lozano*,
146 F.4th 1197 (D.C. Cir. 2025) ... 5

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
571 F. Supp. 2d 1 (D.D.C. 2008) ... 14

*United States v. Bikundi*,
926 F.3d 761 (D.C. Cir. 2019) ... 16

*United States v. Falcone*,
109 F.2d 579 (2d Cir.) (L. Hand, J.),
*aff'd*, 311 U.S. 205 (1940) ... 32

*United States v. Perholtz*,
842 F.2d 343 (D.C. Cir. 1988) ... 18, 19

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) ... 15, 21

*United States v. Philip Morris USA, Inc.*,
449 F. Supp. 2d 1 (D.D.C. 2006) ... 19

*United States v. Shi*,
991 F.3d 198 (D.C. Cir. 2021) ... 24

*United States, ex rel. Hood v. Satory Glob., Inc.*,
946 F. Supp. 2d 69 (D.D.C. 2013) ... 37

*Vichi v. Koninklijke Philips Elecs. N.V.*,
62 A.3d 26 (Del. Ch. 2012) ... 41

*Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*,
201 Ariz. 474 (2002) ... 38

*Wuerth v. Nationwide Energy Partners, LLC*,
275 N.E.3d 670 (Ohio App. 2025) ... 41

**Statutes**

18 U.S.C. § 1343 ... 14

18 U.S.C. § 1956 ... 15

26 U.S.C. § 468B ........................................................................................................ 10, 12

**Other Authorities**

Restatement (Second) of Torts § 551(2) ............................................................10, 11, 12

## INTRODUCTION

With sleight of hand, an illusionist moves a dollar from one hand to another where it seems to disappear. The FinTechs[1] did this with settlement class members' QSF funds. In one hand, they received all the QSF funds approved by the settlement court for e-payment to settlement claimants and kept hidden in their other hand all the QSF funds that were never redeemed. The magician performs magic. The FinTechs committed fraud.

The FinTechs were not mere vendors of the Administrators; the FinTechs were active architects of the scheme itself. "Without the Fintechs' design and provision of the kickback compensation structure there would have been nothing to conceal and no motive for the fraudulent misrepresentations." ¶496[2]. The Fintechs' repeated selection arrangements, secret payments, and operation of their QSF sleight of hand were not incidental to the alleged fraud; they are the conduct that made the fraud profitable and the injury direct, promising kickbacks to the Administrators.

But the FinTechs did not act alone. The FinTechs conspired alongside the Administrators and the Banks to operate a coordinated enterprise across hundreds of class action settlements where the FinTechs' retention of QSF and its kickbacks were actively concealed. ¶¶8, 10, 366-383. The settlement courts properly believed the settlement funds were being distributed to settlement claimants. They were not.

[1] The Fintechs refers to Defendants Blackhawk Network Holdings, Inc., Tremendous, LLC, and Digital Settlement Technologies, LLC (d/b/a Digital Disbursements Payments)

[2] The Consolidated Class Action Complaint will be referred to as "the Complaint" or "CCAC", and references to the allegations in the CCAC will be made by unattributed paragraph references, "¶¶."

## **BACKGROUND**

*The QSF*

Not a single penny can be released from the QSF without approval of the settlement court. ¶101. But by the time the settlement court approved anything, the FinTechs' enterprise level compensation arrangements, under which they would retain QSF funds and share the proceeds as kickbacks, were already in place, already concealed from the court, and already operating across the Administrators' book of business. ¶¶8, 10, 159-160, 168, 380, 366-369.

Digital Disbursements occupied a particularly significant structural role within this arrangement by operating a payment-selection portal through which settlement recipients could choose from among available payment options. ¶¶137, 140, 144-45. Digital Disbursements functioned as the upstream gatekeeper that facilitated payment products that Administrators determined were presented to class members. After Western Alliance acquired Digital Disbursements in January 2022, ¶55, Digital Disbursements continued to operate that portal function — appearing alongside Blackhawk in multiple exemplar settlements including *T-Mobile, Yahoo! Data Breach*, and *Juul*, ¶¶171, 186, 233 — while Western Alliance simultaneously held the QSF deposits at below-market rates on the Bank Interest Track. ¶163.

For approved claims to be paid through digital means, the FinTechs issued various forms of electronic payment products to class members, including eCards and other digital payment vehicles. ¶¶132-133. The FinTechs undertook substantial efforts to open settlements to their products with a consistent message: eCard and other e-payment options are cheaper and easier than checks. ¶¶142-151. To deliver their message, the FinTechs and some Administrators published reference materials, hosted webinars, contributed to a Federal Trade Commission study, and helped draft the James F. Humphreys' Complex Litigation Center at George Washington University School of Law's draft Guidelines and Best Practices in Class Actions. ¶¶146-149. Blackhawk's

own marketing materials specifically targeted the class action settlement market, promoting its products to settlement administrators as a cost-saving alternative to checks. ¶157. As a result of these efforts, and burnished with such credentials, the FinTechs' e-payment systems were rapidly adopted as a routine and widely used method for settlement payments, with an upswell from only 245,000 digital payments in 2020 to over 16 million only two years later. ¶¶139, 144. Use has only continued to increase since 2022.

*The Backroom Deal – The Digital Disbursement Track*

What the FinTechs did not disclose is their key profit source: unredeemed eCards or "breakage," and the full architecture of extraction built around it. ¶¶133-137, 139. When a class member is paid by check, the funds remain in the QSF until the check is cashed; if the check is never cashed, the balance remains in the QSF for further *pro rata* distribution to the settlement class. ¶154. Digital payment instruments operated differently. When a class member's claim was converted to a digital payment, upon final approval of the settlement, the full amount of that payment was debited from the QSF at the moment the payment instrument was issued, not when the claimant redeemed it. ¶155. From that moment forward, the funds belonged to the FinTechs, not to the QSF, and they would not return. ¶155. No settlement court was ever told or approved this breakage and mechanism and no document ever disclosed it. ¶¶10, 152, 366-369.

The FinTechs extracted QSF funds through two mechanisms, neither disclosed to any court: breakage and inactivity and maintenance fees that, by design, actively consumed the remaining balances of class members who received but did not immediately redeem their instruments; and neither ever returned to the class. ¶¶5, 133-136. One of Tremendous' Vice Presidents described breakage rates as "insane" and a *Forbes* article detailed how the "discount" paid to the Administrators in a $5 million settlement distribution would yield "$100,000 to

$175,000" on top of the avoided costs of printing and mailing checks; this was not a discount, but a payment to the Administrators for selecting the FinTechs, funded by QSF assets belonging to the settlement class. ¶¶136, 157.

The FinTechs' efforts to avoid state escheat laws further confirm they were not passive payment processors: rather than comply, they indemnified Administrators against escheat liability, designed payment instruments with redemption windows and fee structures calibrated to exhaust balances before escheat obligations attached, and in some instances routed funds through structures designed to obscure the connection between the QSF and the unredeemed balances. ¶¶158-160. Blackhawk's November 2020 email to administrators made the arrangement explicit: "we actually pay you to issue these cards," with a tiered discount structure and projected administrator revenue calibrated to the breakage the payment instruments were expected to generate. ¶157. By 2024, Hilsee received reports that the "discounts" offered by the FinTechs to Administrators had grown up to 20%, and breakage was anticipated to reach 80-90% in some settlements. ¶162.

*The Claims in this Case*

Plaintiffs, as claimants in settlements with *pro rata* distribution of QSF funds, seek what they are owed – the *pro rata* distribution of the QSF breakage taken and kept by the FinTechs and shared with the Administrators. Plaintiffs assert several causes of action which each highlight different aspects of the FinTechs' long-standing scheme with the Administrators. By their own course of conduct, they committed fraud and fraudulent concealment and aided and abetted the Administrators' fraud and breach of fiduciary duties. Working actively alongside the other Defendants, the FinTechs violated the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* and engaged in civil conspiracy. The FinTechs designed the compensation structures, operated the payment infrastructure, priced the breakage, engineered

around escheat obligations, and shared the proceeds — while every court that approved these settlements believed the funds were being distributed in the ordinary course. Finally, like each of the other Defendants, the FinTechs were otherwise unjustly enriched at the expense of Plaintiffs.

## LEGAL STANDARD

A Rule 12(b)(6) motion tests whether the complaint states a plausible claim for relief. The Court accepts well-pleaded factual allegations as true, construes the complaint in Plaintiffs' favor, and draws all reasonable inferences in their favor; it does not resolve competing factual characterizations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)).

Rule 9(b) requires the circumstances constituting fraud or mistake to be pleaded with particularity, including the time, place, content, participants, and what was retained or given up. It does not require a plaintiff to plead a legal theory or every fact concerning every instance of a multi-year scheme. *United States ex rel. Winnon v. Lozano*, 146 F.4th 1197, 1211 (D.C. Cir. 2025); *United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 118 (D.D.C. 2003); *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011). The application of Rule 9(b) to complex schemes and information controlled by defendants is addressed below.

## ARGUMENT

### I. PLAINTIFFS' FRAUD-BASED CLAIMS AGAINST THE FINTECHS ARE ADEQUATELY PLEADED

The FinTechs seek dismissal of claims of fraud and fraudulent concealment by characterizing themselves as passive vendors who merely supplied "payment products." That characterization ignores the detailed allegations that the FinTechs designed, marketed, and

operated the very financial arrangements that made the Administrators' fraud possible and profitable—and then took deliberate steps to ensure those arrangements remained hidden. ¶¶142-151, 155, 157-160, 168, 366-369.

### A. Plaintiffs' Allegations Satisfy Rule 9(B)

Rule 9(b) requires only that a plaintiff state the "time, place, [and] content" of the fraud, identify the individuals involved, and describe "what was retained or given up as a consequence of the fraud." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1255–56 (D.C. Cir. 2004).

The CCAC pleads the FinTechs' roles with specificity:

> **Who:** Blackhawk Network Holdings, Inc., Tremendous, LLC, and Digital Settlement Technologies LLC, with specific conduct attributed to each. ¶¶134–137.
>
> **What:** Specific fraudulent conduct includes designing invisible compensation arrangements including executing master service agreements (MSAs) making undisclosed compensation the governing terms across administrators' entire book of business, ¶¶ 160, 380, 468; creating and marketing the breakage-extraction program, "knowing that concealment was the condition of its continued operation," *id.* ¶367; Blackhawk wrote "we actually pay you to issue these cards," offered a tiered discount structure tied to expiration periods (3.5% for six months, 3.0% for twelve, 2.5% for eighteen, 2.0% for twenty-four), and projected "$100,000 to $175,000 additional revenue" for the administrator on a $5 million distribution, *id.* 157; the FinTech and issuing bank would "fully indemnify against all escheat liability," thereby eliminating the legal mechanism that might return unredeemed balances to class members. *Id.* ¶ 158; structuring platforms and agreements to characterize breakage as a standard feature, *id.* ¶ 476; and operating the debit-at-issuance infrastructure that transferred QSF assets irrevocably at the moment of card issuance making the diversion permanent and undetectable. *Id.* ¶¶ 155–156, 538(v).
>
> **When:** November 2, 2020 Blackhawk email (¶157); Western Alliance's January 2022 acquisition of Digital Disbursements (¶137); Blackhawk's March 2022 article (¶143); the 2023 Western Alliance/Digital Disbursements report (¶144); and the class period from at least 2018 through the present (¶395).
>
> **Where:** The settlements in which the scheme operated, including *In re T-Mobile* (W.D. Mo.), *In re Yahoo! Data Breach* (N.D. Cal.), *In re Capital One* (E.D. Va.), *In re JUUL Labs* (N.D. Cal.), *In re Equifax* (N.D. Ga.), and *In re TikTok* (N.D. Ill.), among others. ¶¶171–356.

**How:** QSF funds were debited at issuance; unredeemed balances retained were breakage; inactivity fees depleted card values, and kickbacks flowed to administrators through MSAs. ¶¶153–169.

**What was retained:** FinTechs retained breakage, inactivity fees, interchange fees, and maintenance charges extracted from QSF-funded distributions. ¶¶132–133, 155–156.

This specificity exceeds Rule 9(b)'s requirements. *See United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 124 (D.C. Cir. 2015) (Rule 9(b) satisfied where CCAC identified a specific "scheme to defraud," the time frame, and the general method by which it was perpetuated).

Where the alleged fraud is a systematic scheme operating across multiple transactions and participants over time, the particularity requirement is met by identifying the scheme, its participants, its mechanism, and its general time frame — not by cataloging every individual fraudulent communication. *See United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*, 2020 WL 686009, at *23 n.25 (D.D.C. Feb. 11, 2020) (requiring specification of "which individuals took action within each distinct corporate entity, and how these actions relate to the particular allegations of fraud"). Somewhat relaxed pleading is also permissible where, as here, the defendants are alleged to have acted in concert through a common scheme and the facts are "peculiarly within the knowledge of the opposing party." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 98 (D.D.C. 2010). The precise terms of the FinTechs' MSAs with the Administrators, the per-settlement compensation structures, and the internal communications through which those arrangements were designed, maintained, and concealed from every supervising court are all facts exclusively within Defendants' possession and unavailable to Plaintiffs without discovery.

### B. Plaintiffs Adequately Plead the FinTechs' Affirmative Participation in the Fraud and Class Members' Reasonable Reliance

Plaintiffs allege that the FinTechs "actively participated in this fraud by designing and maintaining the financial arrangements that made Administrators' misrepresentations possible,

and by themselves failing to disclose the terms on which they held QSF assets and generated breakage revenue." ¶489. This is affirmative participation, not mere vendor silence. *Cf. Halberstam v. Welch*, 705 F.2d 472, 477–78 (D.C. Cir. 1983) (participant in wrongful scheme liable for damages caused by the concerted action).[3]

The FinTechs cited cases are inapposite; each involved a defendant with no role in creating or sustaining the underlying fraud. *See Brumfield v. Merck & Co., Inc.*, 2018 WL 2277835, at *6 (E.D.N.Y. May 18, 2018) (the complaint merely "pinned" misrepresentations on a different defendant without alleging the co-defendant's involvement in creating or sustaining the fraud); *Klein v. Gen. Nutrition Cos., Inc.*, 186 F.3d 338, 345 (3d Cir. 1999) (plaintiff failed to "identify the speaker of allegedly fraudulent statements"). *Pasternack v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 829 (2016), and *McWreath v. Cortland Bank*, 2012 WL 2522933, at *11 (Ohio Ct. App. June 29, 2012), involved defendants alleged only to have made statements to third parties.

The relevant inquiry is not whether class members relied on FinTech statements. It is whether the FinTechs' active participation in the scheme caused the injury flowing from reliance on the incomplete disclosures; disclosures that were rendered false because the FinTechs designed, sustained, and concealed the undisclosed arrangements that made them incomplete. ¶¶479, 490. Courts sustain fraud claims on exactly that theory. *See In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005) (denying dismissal where defendant actively participated in the fraudulent scheme even though direct misstatements were made by others). *See also, Morris v.*

---

[3] Like the other Defendants, the Fintechs' arguments related to Plaintiffs' common law claims are based on general principles of law, and the Fintechs' offer no conflict of law analysis. Because there are no identified conflicts, Plaintiffs arguments are also based on general principles of the common law in representative cases and authorities.

*Castle Rock Ent., Inc.*, 246 F. Supp. 2d 290, 296–97 (S.D.N.Y. 2003) (distinguishing active participants from defendants who merely made a statement to a third party).

### C. Plaintiffs' Fraudulent Concealment is Adequately Plead

#### 1. Plaintiffs allege affirmative acts of concealment by the FinTechs

The FinTechs characterize the CCAC as alleging only "the design of commercial arrangements." FinTech Br. 15. But the CCAC alleges far more than a passive business structure.

First, each FinTech "designed their compensation arrangements to be invisible to supervising courts[,]" ¶468, and "structured their payment platforms and governing agreements to characterize breakage retention as a standard feature of prepaid card products rather than a diversion of class member funds." ¶476. These were purposeful efforts to obscure the truth from settlement courts and class settlement members, not ordinary commercial activity.

Second, the FinTechs structured the payment system to increase funds they could secretly retain by designing a discount schedule to accelerate fund depletion, ¶159; avoiding escheat laws so the funds would not revert to the class, *see id.* ¶538(vi); and implementing debit-at-issuance which "extinguishes the court's control over those funds before any class member has had an opportunity to redeem them." *Id.* ¶156. None of these features were disclose18 U.S.C; each was an affirmative step to prevent discovery and remedy.

The FinTechs' reliance on *Humana, Inc. v. Biogen, Inc.*, *Reveal Chat Holdco, LLC v. Facebook, Inc.*, and their remaining authority is misplaced. *Humana* dismissed "generalized" allegations that a defendant "concealed its arrangements" with co-conspirators where the complaint alleged no dates, no identified communications, and no described mechanisms. 666 F. Supp. 3d 135, 146 (D. Mass. 2023). *Reveal Chat* held that "private actions" and agreements alone do not establish affirmative concealment absent an external-facing component and affirmative acts directed as misleading anyone. 471 F. Supp. 3d 981, 992–93 (N.D. Cal. 2020). The remaining

cases follow the same pattern, rejecting fraud liability where the moving defendant had no role in creating the scheme and the complaint specified only other defendants' concealment. *See Sec. Inv. Prot. Corp. v. BDO Seidman, L.L.P.*, 95 N.Y.2d 702, 709–11 (2001) (liability depended on independent actions of third party rather than defendant's own misrepresentations); *Terrell v. Childers*, 920 F. Supp. 854, 861 n.5 (N.D. Ill. 1996) (complaint "detail[ed] only how the [other] Defendants allegedly concealed the facts"); *Taragan v. Nissan N. Am., Inc.*, 2013 WL 3157918, at *7 (N.D. Cal. June 20, 2013).

This case is the opposite in every relevant dimension. The Complaint alleges with specificity that the FinTechs structured their agreements to be invisible to courts, designed the debit-at-issuance payment infrastructure to extinguish court control over QSF funds at the moment of issuance, and eliminated the escheat mechanisms that might otherwise have triggered disclosure of the unredeemed balances. ¶¶155, 158-160. Those are external-facing acts directed at preventing discovery by class members and supervising courts, not merely private commercial decisions, and they are alleged with exactly the specificity that *Humana* and *Reveal Chat Holdco* found lacking.

**2. The FinTechs had a duty to disclose their compensation arrangements**

The FinTechs' argument that they had no fiduciary relationship and no duty to speak ignores multiple independent bases for their duty to disclose, any one of which is sufficient to defeat dismissal. Two of those bases, partial disclosure and knowledge of a mistake basic to the transaction, do not depend on fiduciary status at all.

Whether a fiduciary relationship exists is a fact-intensive inquiry that cannot be resolved on a motion to dismiss, for the reasons set forth in Plaintiffs' Oppositions to the Administrators' Motion, which Plaintiffs incorporate by reference. *See* Admin. Opp. § I.A. The FinTechs citation of *Krukas v. AARP, Inc.*, 458 F. Supp. 3d 1, 8 (D.D.C. 2020), and *Steele v. Isikoff*, 130 F. Supp. 2d 23, 37 (D.D.C. 2000), do not describe this case. Unlike there, the FinTechs received legal title to

QSF funds at issuance, funds already impressed, as a matter of federal law with beneficial ownership running to the class members whose distributions they represented. ¶¶64, 155; 26 U.S.C. § 468B(b)(3)(C). They held those funds over the redemption period, charged inactivity and maintenance fees directly against individual class member balances, ¶¶155-156, controlled the payment-selection portal through which class members accessed their court-approved distributions, ¶137, and contractually assumed responsibility for unredeemed balances through escheat indemnification provisions that removed those funds from any regulatory recapture mechanism. ¶158. A party that takes legal title to funds beneficially owned by identified third parties, holds them over time, charges fees against them, controls access to them, and assumes responsibility for their disposition does not stand at arm's length from those beneficiaries.

The FinTechs also had a duty to disclose because they made partial representations about their eCards, promoting them as superior, low-cost, and beneficial for class members. ¶¶142, 143-148. Each of those representations were "accurate in what [they] disclosed and false in what [they] omitted," ¶489, because none of them disclosed that QSF funds would be debited at the moment of issuance rather than redemption, ¶155, that unredeemed balances would be retained as breakage rather than returned to the class, ¶133, that inactivity fees would actively consume remaining balances over time, ¶¶133-136, or that Administrators would receive a share of those funds as compensation for selecting the FinTech. ¶157. A party that makes affirmative representations about the benefit of its product to identified beneficiaries while simultaneously omitting the mechanism by which it extracts value from those same beneficiaries has made a partial statement that triggers an independent duty to disclose the omitted information. *Restatement (Second) of Torts* § 551(2)(b); *Cincinnati Terrace Member LLC v. Tartar Krinsky & Drogin LLC*, 258

N.Y.S.3d 11, 16 (2026) ("[A] party may be liable for nondisclosure . . . when it has made a misleading partial disclosure.") (citations omitted).[4]

A defendant who knows that another party is acting under a mistaken belief also has a duty to disclose facts "basic to the transaction." *See Restatement (Second) of Torts* § 551(2)(e). The FinTechs knew, with actuarial precision, that availability and election of e-payments would dilute *pro rata* payments to class members. ¶¶ 133, 165. This is not a defendant passively unaware of a counterparty's mistaken belief. It is one that quantified the mistaken belief. There is nothing more basic to this transaction than the expectation of receiving a full *pro rata* share, and the FinTechs built their revenue model on the certainty that class members would not. The FinTechs' reliance on *Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 153–54 (2d Cir. 1995) for the proposition that knowledge of the plaintiff's mistake must be shown does not help them: the Complaint alleges that class members' mistaken belief was not incidental to the FinTechs' business model. It was the revenue source. ¶133.

The FinTechs also had a duty to disclose because of their superior knowledge. *Cincinnati Terrace Member LLC*, 258 N.Y.S.3d at 16 "[A] party may be liable for nondisclosure where it has special knowledge or information not attainable by plaintiff . . . .") (citations omitted).[5] By design, the FinTechs' skimming of QSF funds was concealed from everyone involved except the other Defendants – they had not only superior, but exclusive knowledge.

Finally, contrary to the FinTechs' assertion, class members were not strangers to them. The FinTechs did not receive funds from the Administrators as a commercial payment for services rendered to the Administrator. They received QSF funds already beneficially owned by the class

---

[4] *See* Admin Opp. § IV.A.2 for further discussion of this duty to disclose.
[5] *See* Admin Opp. § IV.A.1 for further discussion of this duty to disclose.

members whose distributions they represented, 26 U.S.C. § 468B(b)(3)(C); ¶64, at the moment of issuance, held those funds over the redemption period, and charged inactivity and maintenance fees directly against each class member's individual balance. ¶¶132, 155-156. The party on whose behalf those funds were held was not the Administrator, it was the class member. ¶132. That direct economic relationship distinguishes every case the FinTechs cite, each of which involved defendants who never received, held, or charged fees against the plaintiffs' funds. *See Immobiliare, LLC v. Westcor Land Title Ins. Co.*, 424 F. Supp. 3d 882, 889 (E.D. Cal. 2019) (parties were complete strangers); *N. Fork Partners Inv. Holdings, LLC v. Bracken*, 2021 WL 4124950, at *3 n.2 (S.D.N.Y. Sept. 9, 2021) (defendants never received or held plaintiff's funds); *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 454 (S.D.N.Y. 2017) (plaintiffs never "interacted with [defendant] directly"); *N. Penn Towns, LP v. Concert Golf Partners, LLC*, 2022 WL 2985632, at *23 (E.D. Pa. July 28, 2022) (defendant was not a party to the transaction). The FinTechs' reliance on *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 464 (S.D.N.Y. 2016) and *Mursau Corporation v. Florida Penn Oil & Gas, Inc.*, 638 F. Supp. 259, 261–62 (W.D. Pa. 1986), similarly fails. Both involved arms-length commercial transactions, not court-supervised funds already impressed with beneficial ownership running to identified third parties before the defendant ever received them. ¶¶64, 155. The FinTechs were not merchants selling a product. They were recipients of court-supervised trust assets belonging to identifiable beneficiaries, and they knew it.

## II. PLAINTIFFS ADEQUATELY PLEADED THE FINTECHS' RICO VIOLATIONS

The FinTechs raise multiple challenges to the RICO violations asserted in Counts VI-A through VI-J. Plaintiffs have addressed the legal framework governing those challenges — including the liberal construction mandate. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985), the Rule 8 pleading standard applicable to non-fraud predicates, *RSM Prod. Corp. v.*

*Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012), and the private-attorney-general remedial purpose, *Rotella v. Wood*, 528 U.S. 549, 557 (2000), in Plaintiffs' oppositions to the Administrators' and Banks' motions, which are incorporated herein. *See* Admin. Opp. § III; Bank Opp. § II. This section addresses the arguments specific to the FinTechs.

**A. Each FinTech Committed Multiple Predicate Acts**

The FinTechs argue that they committed no predicate acts, FinTech Br. 21-22, but ignore allegations of mail and wire fraud, and money laundering. Mail and wire fraud require: "(1) a scheme to defraud; and (2) use of the mails or wires for the purpose of executing the scheme." *Feld Ent. Inc. v. ASPCA*, 873 F. Supp. 2d 288, 317 (D.D.C. 2012) (citation omitted). The FinTechs' assertion that they "never made 'use of the mails or wires' is both factually and legally wrong." FinTech Br. at 21.

The CCAC identifies specific wires each FinTech transmitted. *See* 18 U.S.C. § 1343. Emails and electronic fund transfers satisfy the wire element. *See Suarez v. Compass Coffee LLC*, 2025 WL 3062798, at *8 (D.D.C. Nov. 3, 2025) (emails); *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 10 n.8 (D.D.C. 2008) (wire transfers of funds). The CCAC identifies the transmissions settlement by settlement. Blackhawk and Digital Disbursements in *In re T-Mobile*, ¶¶182, 84; Blackhawk and Digital Disbursements in *Yahoo! Data Breach*, ¶¶198, 200; Blackhawk and Digital Disbursements in *Luxottica*, ¶¶213, 215; Tremendous in *In re Capital One*, ¶¶228, 231; Blackhawk and Digital Disbursements in *JUUL*, ¶¶244-45; Tremendous in *In re Auto Parts*, ¶¶254-55; Blackhawk in *Lithium Ion Batteries*, ¶¶270-75; Blackhawk in *In re TikTok*, ¶¶287-88; and Blackhawk in *In re Equifax*, ¶¶327-329. Across those settlements the FinTechs transmitted digital payment instruments to class members via wire, sent emails to class members containing activation mechanisms, and communicated with Administrators by email — countless times, across settlement after settlement.

Each of the FinTech transmissions need not be "fraudulent at all" to qualify as a predicate act, so long as it is "in furtherance of the scheme." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1129 (D.C. Cir. 2009). Even "innocent" or "routine" wires "that contain no false information" satisfy the element. *Schmuck v. United States*, 489 U.S. 705, 711 (1985). Every wire each FinTech sent to a class member transmitting a digital-payment instrument caused the instrument's face value to leave the court-supervised QSF before redemption ¶¶153-156, implemented the distribution method from which breakage and fees arose, and was thus "step in [the] plot" and "incident to an essential part of the scheme." *Schmuck*, 489 U.S. at 711. The FinTechs' argument that they had no duty to disclose therefore misses the point: Plaintiffs do not rely on FinTech silence as the scheme's deceptive component. The CCAC alleges that the Administrators made materially misleading court and class communications while concealing the compensation-for-selection arrangements, ¶¶10, 366-80, 388, and that the FinTechs knowingly designed those arrangements to be invisible, understood that concealment was necessary to preserve them, concealed the arrangements themselves, and transmitted the digital payments that executed the resulting property transfer. ¶¶161, 468.

The money-laundering predicates are equally well-pleaded. The FinTechs' assertion that they had "no dirty money to launder," FinTech Br. 22, misreads the statute. RICO "Proceeds" include "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9). After the underlying wire and mail fraud secured or maintained the Administrators' appointments and the routing of QSF distributions, the FinTechs used digital-payment wires to obtain QSF value through breakage— the proceeds from the mail and wire fraud – and thereafter transferred a portion of those fraud proceeds to the selecting Administrators as consideration for continued routing. ¶391.

The *mens rea* for money laundering is plausibly alleged. The use of fictitious or nominee business accounts to funnel unlawful proceeds is a recognized "hallmark of money laundering." *United States v. Bikundi*, 926 F.3d 761, 784 (D.C. Cir. 2019). The Complaint alleges exactly that: the FinTechs transferred fraud proceeds to Special Purpose Entities instead of directly to the Administrators to evade judicial oversight, ¶391, and recycled fraud proceeds from one settlement as kickbacks to secure the Administrators' continued routing of later QSF distributions, thereby promoting additional acts of mail and wire fraud. *Id.* ¶391(c). The use of SPEs to obscure the source, ownership, and recipient of the payments, combined with the use of those payments to perpetuate the scheme, supports a plausible inference that the FinTechs knew the transfers were designed to conceal fraud proceeds and intended them to promote further unlawful activity.

**B. Each FinTech Engaged in A Pattern of Racketeering Activity**

The FinTechs argue that their predicate acts in each settlement constituted only a single scheme to defraud rather than a RICO pattern. FinTech Br. 23. The argument is beside the point because "a single scheme may suffice for purposes of RICO," *W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001), and because the FinTechs' own characterization of a "standardized . . . compensation structure," FinTech Br. at 23, concedes the point that defeats their pattern argument: a standardized program implemented repeatedly across separate settlements, QSFs, courts, and claimant groups is not a single scheme — it is a recurring pattern. Courts evaluate pattern by looking to the "specific circumstances" of the case to assess "relatedness and continuity." *W. Assocs.*, 235 F.3d at 633.

Relatedness is established by the CCAC's allegations and the FinTechs' own admissions. The CCAC alleges that the FinTechs operated a standing compensation-for-selection program under which each offered "materially identical revenue-sharing terms to multiple competing administrator clients" because it was "operating a standardized program" under which "each new administrator

client joined an existing structure." ¶389(b). That program was established at the book-of-business level before any individual settlement appointment, ¶8, governed by standing agreements under which the FinTech "agreed to compensate" the Administrators "in connection with each settlement for which" it served as the Administrator's subcontractor, ¶168, and operated "across hundreds of class action settlements." ¶¶502, 522. The Complaint traces each FinTech's repeated implementation of the same concealed *quid pro quo* with the same Administrators across separate QSFs, judicial proceedings, and settlement claimants. ¶¶227-228, 253-255 (Tremendous with Epiq in *In re Capital One* and *In re Auto Parts*); *id.* ¶¶182-83, 197-98 (Blackhawk and Digital Disbursements with Kroll in *Yahoo! Data Breach* and *T-Mobile*). The alleged acts shared a common purpose, method, result, and recurring participants, the definition of relatedness under *H.J. Inc. v. Northwestern Bell Telephone Company*, 492 U.S. 229, 240 (1989).

Both open-ended and closed-ended continuity are established. Open-ended continuity follows from the books of business nature of the arrangements: MSAs with no planned endpoint, designed to govern future engagements across the Administrators' entire book of business, ¶¶8, 168, expanding in scope over time as the "discounts" offered to the Administrators grew to 20% and breakage was anticipated to reach 80-90% in some settlements by 2024. ¶ 162. Angeion's own principal described the Angeion-Blackhawk arrangement as "enterprise-wide" — confirming a program designed for unlimited continuation, rather than a defined transaction. ¶389(a). The arrangements thus posed "a threat of continued racketeering activity." *H.J. Inc.*, 492 U.S. at 242. Closed-ended continuity is independently established: the CCAC identifies at least six settlement-specific executions by Blackhawk, four by Digital Disbursements, and two by Tremendous, each involving multiple predicate wire transmissions, and each involving a separate QSF, a separate claim distribution

program, and a distinct class of victims whose recoveries were reduced. ¶¶171-357. That is "a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242.

The cases the FinTechs cited involved the opposite fact pattern - a single transaction, a single goal, and a discrete victim group. *Edmondson & Gallagher v. Alban Towers Tenants Association*, 48 F.3d 1268, 1265 (D.C. Cir. 1995), involved one attempted real-estate sale, one discrete goal, one injury, and three victims; *Smith v. Federal Title & Escrow Company*, 2018 WL 11666412, at *3 (D.D.C. June 21, 2018) (one home purchase and one theft of $1.57 million from the purchasing couple). Here, each settlement involved a new settlement court, new settlement counsel, a new QSF and fund distribution, separate execution wires, and a distinct class of victims. The FinTechs' pattern is not a single transaction with a defined end. It is a standing program that was designed, as Angeion's own principal confirmed, to be enterprise-wide. ¶389(a).

### C. Plaintiffs Adequately Pleaded the Administrator-centered Enterprises and the FinTechs' Conduct of their Affairs

The FinTechs challenge both the existence of the four Administrator-centered enterprises and their own conduct of those enterprises' affairs. FinTech Br. 23–24. Both challenges fail. The organization and continuity are adequately pleaded. An enterprise need not have an organization distinct from the conduct through which it operates; its existence may be inferred from the defendants' coordinated, repeated conduct. *United States v. Perholtz*, 842 F.2d 343, 362 (D.C. Cir. 1988). Continuity requires only "longevity sufficient to permit [the enterprise's members] to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Both are established here.

Each primary enterprise was organized around an Administrator hub that controlled which Bank obtained the QSF deposits, which FinTech obtained the distributions, and which information concerning those selections and compensation arrangements reached the settlement court, settlement counsel, and settlement class. ¶¶384-390. The FinTechs supplied the Digital Disbursement Track's

infrastructure, set the breakage-generating payment terms, and shared resulting revenue with the Administrator hub, and maintained secrecy — participating time and again across the exemplar settlements. ¶¶171-357. The enterprise's organization is solidified in two ways: through the overarching MSAs that connected the Administrator Hub to each FinTech, ¶168, and by the "pattern of racketeering activity" from which its existence "may be inferred." *Perholtz*, 842 F.2d at 362. Continuity is equally clear: each enterprise operated from at least 2015 to the present, was designed to govern successive settlements across each Administrator's book of business and was implemented repeatedly over multiple years in unrelated settlements by the FinTechs. ¶¶ 8, 170—356. *Boyle*'s longevity requirement is readily satisfied. 556 U.S. at 946.

The FinTechs misread the enterprise structure. Their demand for allegations of "improper coordination among the FinTechs" misunderstands the alleged enterprises. FinTech Br. 24. Plaintiffs do not allege a freestanding FinTech cartel; they allege Administrator-centered enterprises in which FinTechs participated through their preexisting compensation arrangement with the Administrator hub and its repeated implementation of that arrangement across the Administrator's settlements. ¶¶501, 510, 516, 522. A RICO enterprise merely requires "relationships among those associated with the enterprise." *Boyle*, 556 U.S. at 946. Those relationships are pleaded with precision: ¶¶182-183, 197-198, 227-228, 253-255. Nor were the FinTechs required to know the details of the Bank Interest Track. They need only have known "the general nature of the enterprise" and "that the enterprise extend[ed] beyond [its] own role." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 873 (D.D.C. 2006). The CCAC alleges exactly that: the FinTechs knew the essential nature of the undertaking, designed their compensation programs to remain invisible to courts, knew that the disclosure would jeopardize them, supplied the recurring digital-payment mechanism through which

QSF value was extracted and shared, and secretly remitted kickbacks through standing MSAs. ¶¶161, 168, 380, 389(b), 468.

The FinTechs' "similar pricing structures" characterization ignores the fraud. The FinTechs' effort to reduce the scheme to "similar pricing structures by independent vendors" fails for the same reason as the Administrators' "ordinary commercial relationships" label: it ignores what the supposed "discounts" purchased, who received them, and whose money funded them. Blackhawk's own email to a settlement administrator made the arrangement explicit: "we actually pay you to issue these cards," tied the Administrator's "additional revenue" to card terms that accelerated breakage, and projected $100,000 to $175,000 in Administrator revenue on a $5 million distribution. ¶¶157-59. The payments were not incidental to ordinary pricing; they were calibrated to the extraction itself: shorter redemption windows and higher inactivity fees generated more breakage and larger payments to the selecting Administrator. ¶159. A discount paid to a purchaser spending its own money may be ordinary "pricing." A concealed, breakage-funded kickback for steering a court-supervised trust to the vendor is not.

The FinTechs' participation in the Administrator-centered enterprises further confirms the integrated structure. ¶¶161, 163, 168 186-201, 217-232. Each FinTech participated in multiple Administrator-centered enterprises through its preexisting compensation arrangements: Blackhawk and Digital Disbursements participated in both the Angeion Enterprise, ¶¶501-509, and the Kroll Enterprise, ¶¶521-526; Tremendous participated in the Epiq Enterprise, ¶¶510-514 — confirming the enterprise-wide scope of the standardized program and the FinTechs' knowing participation in each. ¶389(b).

Each FinTech conducted the affairs of the enterprises it joined. Section 1962(c)'s "conduct" element only requires a defendant to have "some part in directing" the enterprise's affairs and reaches

lower-rung participants and even outsiders. *Reves v. Ernst & Young*, 507 U.S. 170, 179, 184–85 (1993). A legitimate business may simultaneously conduct both its own and the enterprise's affairs through the same conduct. *Id.* at 185; *see Philip Morris USA Inc.*, 566 F.3d at 1116. (competing corporations that "jointly committed fraud" thereby "participated in the conduct of not just their own affairs but the enterprise's as well"); *Edison Elec. Institute v. Henwood*, 832 F. Supp. 413, 416–17 (D.D.C. 1993) (paying an enterprise to influence its contracting decisions can satisfy the conduct element). The FinTechs' compensation agreements were designed to be invisible, implemented debit-at-issuance structures that transferred QSF funds before redemption, offered Administrators compensation tied to those terms, sought to incentivize Administrators to maximize breakage and therefore harm to class members, and secretly shared breakage with the Administrators to ensure future QSF access. ¶¶132–33, 153–61, 385(c). Those actions determined when funds left court-controlled QSFs, how much would remain unredeemed, who would retain that value, and how the Administrator Defendant would be compensated — the core financial affairs of each enterprise.

*RSM Production Corporation v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051 (D.C. Cir. 2012), which the FinTechs invoke, confirms rather than undermines this conclusion. *RSM* distinguished a law firm providing "ordinary legal services" and "nothing more," from a professional who "under the guise of providing [professional] services," agrees to assist in the commission of illegal acts. The FinTechs "agreed to assist in the commission of illegal acts." The FinTechs fall squarely in the latter category: they did not merely provide payment processing services — they designed and implemented the compensation mechanism to operate beyond judicial oversight, made payments under MSAs to ensure their selection in settlement after settlement, ¶168, and knew that disclosure of those arrangements would jeopardize both the arrangements and the

enterprises that depended on them. ¶¶161, 389(b). Those allegations demonstrate "some part in directing" the enterprise's core financial affairs. *Reves v. Ernst & Young*, 507 U.S. at 179.

### D. Plaintiffs Have RICO Standing

The FinTechs argue that their conduct did not proximately cause Plaintiffs' injury and that the Administrators' fraud broke the causal chain. FinTech Br. 24-25. Both arguments fail.

Proximate cause under RICO only requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). The FinTechs directly caused Plaintiffs' losses through a mechanism the CCAC describes with precision. When a paper check remained uncashed, the funds stayed in the QSF and were redistributed *pro rata*. ¶154. Under the digital structure the FinTechs designed and operated, the full face value of every digital payment was debited from the QSF at the moment of issuance — before activation, before redemption, and before the class member had any opportunity to act. *Id.* ¶¶155-56. The injury did not first occur to an Administrator and then travel to Plaintiffs. It occurred when the FinTechs took QSF value out of the fund and retained the unredeemed portion as breakage, funds that would otherwise have remained in the QSF for further *pro rata* distribution. ¶¶154-156, 399(b). The causal path is one structural step: the FinTechs debited the QSF, retained the breakage, and Plaintiffs received less. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658-59 (2008). The Administrators' omissions were neither independent nor intervening causes.

The Administrators' fraud did not breach the causal chain. FinTech Br. 25. First, the Administrators' omissions typically preceded, not followed, the FinTechs' receipt of QSF funds, ¶¶366-380, meaning they cannot logically constitute an intervening cause of an injury that occurred after them. Second, and more fundamentally, the Administrators' concealment was not independent of the FinTechs' conduct; it was a designed operating requirement of the FinTechs' program. The FinTechs structured their compensation arrangements specifically to remain invisible to courts and

class counsel, ¶¶161, 468, knowing that "concealment was the condition of its continued operation." ¶389(b). Concealment was therefore a feature the FinTechs built into the program, not an unforeseeable intervening act by a third party. A causal chain that the defendant itself engineered does not constitute a superseding cause. S*ee Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Indus. Materials Corp.*, 887 F. Supp. 2d 9, 21-22 (D.D.C. 2012) (fraudulent scheme designed to produce government action that harmed plaintiff does not break causal chain).

Finally, all three *Holmes* factors support standing. First, the settlement class members are the primary and direct victims, because the enterprise's proceeds came directly out of their QSF distributions, ¶¶155-156, 399(b), and there is no more directly injured party who "can generally be counted on to vindicate the law as private attorneys general." *Holmes*, 503 U.S. at 269-70. The settling defendants have been fully discharged, the settlement courts suffered no monetary loss, and the Administrators' role was to conceal the extraction rather than to suffer it. Second, damages are calculable settlement by settlement: the measure is the difference between what class members would have received absent the debit-at-issuance structure and what they actually received, a calculation anchored to specific QSF balances, specific distribution periods, and specific breakage rates already alleged. ¶¶183, 199, 214, 230, 399(b). Third, settlement-by-settlement calculation both avoids speculative allocation and eliminates the risk of duplicative recovery. *Holmes*, 503 U.S. at 269.

### E. The FinTechs Conspired to Violate RICO

The FinTechs' derivative challenge to RICO conspiracy fails because the primary RICO claims survive, and because the conspiracy standard is independently satisfied. The governing legal framework, including the *Salinas* standard that a § 1962(d) defendant need only "adopt the goal of furthering or facilitating the criminal endeavor," *Salinas v. United States*, 522 U.S. 52, 65 (1997), the *RSM* "plausible inference" pleading standard, 682 F.3d at 1048, and the *RSM* distinction between ordinary service providers and those who agree under the guise of providing services to assist in

illegal acts, *id*. at 1051, is addressed in Plaintiffs' oppositions to the Administrators' and Banks' motions, which are incorporated herein. *See* Admin. Opp.§ III. D; Bank Opp. § II. F. This section addresses what is specific to the FinTechs.

The FinTechs memorialized their compensation-for-selection arrangements in written MASs operating across each Administrator Defendant's book of business before any individual settlement appointment. ¶¶8, 168. Those agreements documented the *quid pro quo* in writing: the FinTechs would divert QSF breakage to the selecting Administrators; in return, the Administrators would steer QSF distributions to those FinTechs across their entire settlement inventory. ¶168. A written agreement memorializing an arrangement under which both parties benefit from the secret extraction of court-supervised assets is not circumstantial evidence of a conspiracy; it is direct evidence of one. *United States v. Shi*, 991 F.3d 198, 207 (D.C. Cir. 2021).

Each FinTech repeatedly aided the Administrators' execution of the concealed compensation-for-selection mechanism with multiple Administrators across multiple unrelated settlements — generating breakage from QSF assets, paying a portion back to the selecting Administrators, and concealing the arrangement from every supervising court. *Id.* ¶¶171-357; *see, e.g.*, ¶¶184 (Blackhawk and Digital Disbursements), ¶231 (Tremendous). The FinTechs designed those arrangements specifically to remain invisible to courts, ¶161, knowing that "concealment was the condition of its continued operation," ¶367, and engineered the compensation mechanism — including the debit-at-issuance structure, the escheat indemnification, and the calibrated fee schedules — to ensure the extraction could not be detected from any court filing. ¶¶155, 158-160, 468. That is not the conduct of a vendor unaware of the scheme it is facilitating. It is the conduct of a co-conspirator that designed the scheme's concealment architecture. The repetition of the same structure with multiple Administrators across multiple judicial proceedings demonstrate the "relationships and

circumstances" from which a RICO conspiracy agreement "may be inferred." *See Cheeks v. Fort Myer Constr. Corp.*, 216 F. Supp. 3d 146, 162 (D.C. Cir. 2016).[6]

The FinTechs' remaining arguments do not change this result. Their contention that they had no disclosure obligations and did not make or review the Administrators' court submissions misses the point. The CCAC alleges that the FinTechs conspired not by remaining silent but by designing and maintaining the financial architecture that made the Administrators' fraud economically necessary and structurally invisible, knowing the scheme "required concealment from the judiciary to remain viable." ¶¶161, 468. Taken together, the CCAC pleads: (i) knowledge of the nondisclosures and the importance thereof, ¶¶161, 389(b); (ii) secret payments to the court-appointed administrator making the selection, ¶¶157-160; (iii) deliberate creation of an economic structure tying both parties' benefits to the secret extraction of settlement assets; ¶¶132-133, 385(c); (iv) memorialization of those structures in MSAs operating across each Administrators' book-of-business, ¶168; (v) repeated implementation with the same Administrators across multiple settlements, ¶¶171-357; and (vi) consistent concealment of compensation arrangements from supervising courts. ¶¶10, 366-380. Accepted as true, those facts support the plausible inference that each FinTech knew of the racketeering conspiracy and agreed to its goals. *RSM*, 682 F.3d at 1048.

### F. Plaintiffs' Alternative RICO Claims Should Not Be Dismissed

The FinTechs offer no independent basis for dismissing Counts VI-G and VI-I, contending only that those claims fail for the same reasons as primary RICO claims. FinTech Br. at 27. Because each of those challenges fails for the reasons set forth above and in Plaintiffs' oppositions to the

---

[6] Based on the Supreme Court's intervening decision in *Cisco Sys., Inc. v. Doe I*, 146 S. Ct. 1882, 1892–93 (2026), the Plaintiffs are no longer pursuing the RICO aiding and abetting claim alleged in Count VI-F.

Administrators' and Banks' motions, *see* Admin. Opp. § III; Bank Opp. § II, the derivative challenge to Counts VI-G and VI-I fails as well.

### G. The Fintechs Used Racketeering Proceeds to Injure Plaintiffs

The legal framework governing § 1962(a) proceeds claims — including the *Danielsen* injury standard, the *Ideal Steel* "use or investment" test, and the *Newmyer* holding that using proceeds from an ongoing fraud to continue the fraud that harms later plaintiffs satisfies § 1962(a) — is addressed in Plaintiffs' opposition to the Banks' motion and is incorporated herein. *See* Bank Opp. § II. E. This section addresses the FinTech-specific application of that framework.

The FinTechs argue that they never received racketeering proceeds and therefore could not have used them. FinTech Br. at 27-28. The CCAC directly refutes this. Count VI-J expressly identifies the income the FinTechs derived from the pattern of wire and mail fraud: "interchange fees" and "breakage" fraudulently extracted from court-supervised QSFs. ¶545. The mechanisms are pleaded with precision: the FinTechs obtained control of QSF value through debit-at-issuance digital payments, retained unredeemed balances and related fees, and shared part of those proceeds with the Administrators who selected their platforms. *Id.* ¶¶4-5, 156-61. Transfers of those fraud proceeds were "designed to perpetuate the ongoing enterprise" and conceal the source and control of the funds. *Id.* ¶391(c). That is racketeering income and it is pleaded. *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 322 (2d Cir. 2011) ("moneys unlawfully saved or withheld by means of a pattern of mail and wire frauds" constitute "income" under § 1962(a)).

The "investment-based injury" is also specifically pleaded. The FinTechs used breakage-derived proceeds as the inducement to purchase continued access to future QSF distributions from the Administrators— embodied in standing MSAs expressly requiring compensation "in connection with each settlement for which" a given Administrator selected that FinTech to distribute payments. ¶168. The CCAC provides specific settlement-by-settlement examples of this use-to-injury sequence:

Tremendous paid Epiq breakage-derived kickbacks from *Capital One* disbursements beginning in 2023, and Epiq then selected Tremendous for the 2025 *Auto Parts* disbursements ¶¶227-228, 253-255. Blackhawk and Digital Disbursements paid Kroll breakage-derived kickbacks from the 2023 *Yahoo! Data Breach* disbursements, and Kroll later selected them for the 2026 *T-Mobile* disbursements, causing new reductions in those distributions. ¶¶182-183, 197-198. In each instance, the later extraction of breakage, interchange, and inactivity-fee revenues caused new reductions in class member distributions. ¶¶448(a), 546-547. The CCAC thus pleads a direct sequence from racketeering income, to its use as an inducement, to the future settlement routing that caused additional and distinct property loss to later class members, satisfying § 1962(a)'s proceeds-injury requirement. *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1229-30 (D.C. Cir. 1991).

## III. THE REMAINING COMMON LAW CLAIMS SHOULD PROCEED

### A. The FinTechs' Aiding & Abetting Is Adequately Alleged

Contrary to the FinTechs' contentions, Plaintiffs have adequately pleaded the aiding-and-abetting claims including alleging (1) an underlying primary wrong, (2) the FinTechs' actual knowledge, (3) substantial assistance, and (4) causation.

#### 1. The underlying primary wrong is adequately alleged

The FinTechs' threshold argument that Plaintiffs "fail to plausibly allege any underlying wrong by the Administrators" refers to the Administrators' Motion to Dismiss, which Plaintiffs refuted in their opposition thereto. Admin Br. § I, IV.B. Both cases the FinTechs cite are inapposite because each involved only conclusory allegations of the underlying wrongs. In *In re Lehman Brothers Securities & ERISA Litigation*, 903 F. Supp. 2d 152, 192 (S.D.N.Y. 2012) the court dismissed fraud-based claims because the complaint failed to allege the predicate fraud with specificity including only "conclusory" allegations that defendants made "misleading statements."

No plaintiff alleged ever reading any of the Offering Documents or relying on the alleged misrepresentations. *Id.* at 191. In *In re Bayou Steel BD Holdings, L.L.C.*, 642 B.R. 371, 405 (Bankr. D. Del. 2022), the complaint similarly contained only conclusory allegations of breach of fiduciary duty. Here, by contrast, the CCAC devotes over 130 paragraphs to the underlying breaches, supported by specific exemplar settlements, independently corroborated admissions, and particularized omission-by-omission analysis. ¶¶80–95, 122–131, 358–383, 456–497. [7]

**2. The FinTechs' actual knowledge is adequately alleged**

The FinTechs' argument that Plaintiffs allege, at most, an "ordinary commercial relationship" at arm's length from the Administrators (FinTech Br. 29) disregards the detailed allegations that the FinTechs knew both the Administrators' fiduciary relationship with the class members and of the specific breach arising from the taking of undisclosed compensation from QSF funds.

The FinTechs "specifically targeted court-appointed settlement administrators as their client base, marketed their platforms on the basis of undisclosed revenue the administrators would receive, and designed their compensation arrangements to be invisible to supervising courts." ¶468. Plaintiffs identify particularized evidence of actual knowledge:

> **(a) The November 2, 2020 Blackhawk Email.** This email demonstrates that "Blackhawk knew the recipient was a court-appointed fiduciary and structured its discount arrangement specifically to generate compensation outside any court-approved structure." ¶468. It offered "additional revenue" of up to $75,000 on a $1

[7] As detailed in Plaintiffs' Opposition to the Administrators' Motion to Dismiss, as court-appointed fiduciaries, the Administrators entered into undisclosed financial arrangements with the Fintechs and Bank under which they each received substantial compensation, including breakage revenues, interchange fee revenues, and other kickbacks, all of which were contingent on directing QSF distributions through the Fintechs' platforms. *See, e.g.,* ¶460(a). Defendants concealed those arrangements in every fee application, administrator declaration, distribution plan, and CAFA notice, ¶¶10, 370–381, and the CCAC identifies eleven categories of material omissions constituting predicate acts of fraud, *id.*, corroborated by the Hilsee white paper, the Forbes investigation, Western Alliance's public admission, and the November 2, 2020 Blackhawk email. *Id.* ¶¶ 11, 124–127, 157, 170–356.

million distribution, stating "we actually pay you to issue these cards," with no proposal that it be disclosed to any court. *Id.* ¶538(ii). A FinTech that "markets to court-appointed fiduciaries on the basis of revenue those fiduciaries will receive without disclosing it to supervising courts knows it is facilitating a breach of the fiduciary's disclosure obligations." *Id.* ¶468.

**(b) Enterprise-Wide Master Service Agreements.** The FinTechs "executed and maintained MSAs with Administrators establishing the undisclosed compensation arrangements as governing terms across those administrators' entire book of business, which agreements appeared in no court filing, fee application, administrator declaration, or CAFA notice in any case." *Id.* ¶538(iii). The FinTechs thus knew these arrangements were industry-wide, not merely bilateral. *See also id.* ¶389(b) (The Declaration of Steven Weisbrot describes the Angeion-Blackhawk agreement as an "enterprise-wide" arrangement).

**(c) Actuarial Breakage Projections.** The FinTechs "provided actuarial breakage projections quantifying the revenue those administrators would receive from unredeemed card balances. *Id.* ¶538(iv)." The projections were "the instrument by which the FinTechs induced Administrators to select their platforms for undisclosed financial reasons." *Id*. Providing these projections demonstrates knowledge that the arrangements were not being disclosed.

**(d) Industry-Wide Awareness.** Each FinTech Defendant offered "materially identical revenue-sharing terms to multiple competing administrator clients because it was operating a standardized program." *Id*. ¶389(b). As confirmed to Forbes by three independent industry insiders, receipt of bank interest and digital payment revenue was "standard practice" across the settlement administration industry. *Id.* ¶¶125–126, 552.

The FinTechs' cases are distinguishable. In *Casey v. U.S. Bank National Association*, 127 Cal. App. 4th 1138 (2005), the knowledge allegations were "too generic" because the complaint alleged only that a bank knew its customer was a fiduciary without linking the bank to any specific breach. *Id.* at 1152-53. Similarly, in *MLSMK Investments Company v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 144–45 (S.D.N.Y. 2010), the complaint identified only a standard banking relationship. And in *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014), the court found no actual knowledge where defendants knew every other feature of the deals but not the facts that made the transactions fraudulent. *Id.* at 133. Here, unlike in *Casey*, *Krys,* and *MLSMK*, the FinTechs did not merely know their clients were fiduciaries—they designed, marketed, and directly participated in

the very compensation structures the fiduciaries were obligated to disclose but did not. *See, e.g.*, ¶¶157, 468, 460(a)–(c), 470, 538(ii)-(iv). That is active participation, not the "suspicious activity" at issue in *Heinert v. Bank of America, N.A.*, 835 F. App'x 627, 631–32 (2d Cir. 2020), and *In re Sharp International Corp.*, 302 B.R. 760, 771 (E.D.N.Y. 2003).

Finally, the FinTechs cite *In re Aramid Entertainment Fund Limited*, 664 B.R. 9, 79 (Bankr. S.D.N.Y. 2024) for the proposition that "improper group pleading" cannot establish actual knowledge. But the Complaint identifies FinTech-specific conduct: Blackhawk's November 2020 email, ¶¶157, 468; Digital Disbursements' public representation that it had partnered with "more than 60% of class action administrators," *id.* ¶¶55, 551; Tremendous's disclosed operations across more than 200 class action cases, *id*. ¶551; and Western Alliance's acquisition of Digital Disbursements in January 2022, *id.* ¶ 539(vi). Plaintiffs also identify each FinTech in the exemplar settlements. *See, e.g., id*. ¶¶171 (*In re T-Mobile*: Blackhawk and Digital Disbursements), 217 (*In re Capital One:* Tremendous), 247 (*In re Juul*: Blackhawk).

**3. The FinTechs' substantial assistance is adequately alleged**

The FinTechs argue that there are no allegations of their providing "substantial assistance" to the Administrators. FinTech Br. 31-33, But Plaintiffs allege that the FinTechs substantially assisted the Administrators' breaches through specific affirmative conduct:

> **(a)** Specifically targeting court-appointed settlement administrators with actual knowledge that they were fiduciaries, ¶538(i);
>
> **(b)** Designing, marketing, and participating in, the undisclosed kickback structure—described as a "discount," "revenue sharing," or "additional revenue," giving administrators a financial incentive to select their platforms and a corresponding motive to conceal that selection rationale from supervising courts, *id.* ¶¶538(ii) and (iv);
>
> **(c)** Executing and maintaining MSAs establishing undisclosed compensation as governing terms across administrators' entire book of business, "which agreements appeared in no court filing," *id*. ¶538(iii);

> **(d)** Operating the debit-at-issuance payment infrastructure through which QSF assets were transferred from the fund at the moment each eCard was issued—"making the diversion of class member funds irreversible before any court was given information sufficient to intervene," *id*. ¶538(v); and
>
> **(e)** Structuring escheat indemnification provisions to "eliminate the legal mechanism—state unclaimed property laws—that would otherwise have required unredeemed eCard balances to revert to class members." *Id*. ¶538(vi).

The Fintechs seek to recast their participation as providing "routine business services," but the cases they cite for this proposition, show that nothing was "routine" about their business with the Administrators. These cases involve routine banking services—opening accounts, processing transfers, clearing holds, and maintaining standard accounts—provided to customers whose fraud was external to the banking relationship, and routine auditing services. *See*, *e.g., Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 416 (S.D.N.Y. 2021) (routine banking services; no scheme design, proceeds-sharing, fiduciary marketing, or concealment); *Heinert v. Bank of Am., N.A.*, 410 F. Supp. 3d 544, 552 (W.D.N.Y. 2019) (routine wire transfers, account openings, and hold clearances insufficient); *CRT Invs., Ltd. v. BDO Seidman, LLP*, 925 N.Y.S.2d 439, 441 (App. Div. 2011) (routine auditing services insufficient); *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) (no knowledge or substantial assistance where standard accounts supported separate fraud schemes); *Premier Cap. Mgmt., LLC v. Cohen*, 2008 WL 4378313, at *5–6 (N.D. Ill. Mar. 24, 2008) (supposition insufficient to show knowledge that banking actions facilitated the specific fiduciary breach involving additional investments).

*Twitter, Inc. v. Taamneh* and *Smith and Wesson Brands, Inc. v. Estados Unidos Mexicanos* draw the same line, and the CCAC falls on the better side of it. Both dismissed claims against defendants who supplied a generally available product to everyone on the same terms and did nothing more. *Taamneh*, 598 U.S. 471, 493, 500 (2023) (no "conscious, voluntary, and culpable participation" where the relationship with the wrongdoer was "the same as their relationship with

their billion-plus other users: arm's length, passive, and largely indifferent"); *Smith & Wesson*, 605 U.S. 280, 295 (2025) (manufacturers "treat rogue dealers just the same as they do law-abiding ones—selling to everyone, and on equivalent terms"). Both cases also identify what crosses it. A merchant becomes liable when, "beyond providing the good on the open market, he takes steps to 'promote' the resulting crime and 'make it his own.'" *Smith & Wesson*, 605 U.S. at 292 (quoting *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.) (L. Hand, J.), *aff'd*, 311 U.S. 205 (1940)). *Direct Sales* was such a case: the seller there "actively stimulated" the wrongdoer's purchases "by giving him special discounts," and so "join[ed] both mind and hand with him to make [the] accomplishment possible." *Id.* at 292 (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 705, 711 (1943)).

The FinTechs are on the *Direct Sales* side of that line. They did not offer an off-the-shelf product on uniform terms. They built a compensation program for court-appointed fiduciaries specifically, ¶538(i), marketed it on the undisclosed revenue the fiduciary would receive, ¶¶468, 538(ii), stimulated its adoption through a tiered discount schedule calibrated to expiration periods and a projection of the administrator's resulting revenue, ¶¶157, 159, indemnified the fiduciary against escheat liability, ¶158, and made the arrangement the governing term across that administrator's entire book of business, ¶168. Each of those is affirmative conduct, so the nonfeasance limitation in both cases has no place. *Taamneh*, 598 U.S. at 501; *Smith & Wesson*, 605 U.S. at 292. "Without the FinTechs' design and provision of the kickback compensation structure there would have been nothing to conceal and no motive for the fraudulent misrepresentations." ¶496; *see Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1120 (S.D. Cal. 2024) (defendants "did more than conduct ordinary business activities" and "defied industry norms"); *In re First All. Mortg. Co.*, 471 F.3d 977, 994-95 (9th Cir. 2006).

The FinTechs' reliance on *Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279, 285 (N.D. Cal. 2011) is similarly distinguishable because the financial incentives and services provided there could have been used for lawful purposes. Here, the FinTechs designed a compensation structure specifically for court-appointed fiduciaries, marketed it on the basis of undisclosed revenue, structured escheat provisions to prevent reversion to class members, and knew "concealment was the condition of its continued operation." ¶¶367, 538. The FinTechs' product was not a generic service repurposed for fraud—it was the financial architecture of the fraud itself.

**4. Proximate causation is adequately alleged**

The FinTechs' proximate cause challenge should be rejected. FinTech Br. 33. The FinTechs directly caused Plaintiffs' injuries: they structured escheat indemnification provisions to "eliminate the legal mechanism that would otherwise have required unredeemed eCard balances to revert to class members," *id.* ¶ 538(vi), and designed and operated debit-at-issuance infrastructure that made "the diversion of class member funds irreversible before any court was given information sufficient to intervene." *Id.* ¶538(v). As a result, claimants, including Plaintiffs, received reduced *pro rata* payments.

Because the FinTechs built concealment into the payment system, the Administrators' concealments were not an "independent" intervening cause, but the foreseeable and intended consequence of that conduct. *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*, 446 F. Supp. 2d 163, 202 (S.D.N.Y. 2006), cited by the FinTechs, does not hold otherwise. It requires a "substantial factor" analysis. *Id.* at 201 n.282. Here, the FinTechs' conduct was the "substantial factor" producing Plaintiffs' injury. ¶¶367, 496, 538(v)–(vi).

*Cromer Financial Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001) is likewise distinguishable. In *Cromer*, a bank provided standard credit and margin services to a fund manager

who independently conducted a Ponzi scheme. *Id.* at 472. The bank neither designed the scheme nor knew its details, and its services could have been lawful. *Id.* "While the Ponzi scheme may only have been possible because of Bear Stearns' actions, or inaction, Bear Stearns' conduct was not a proximate cause of the Ponzi scheme." *Id.*

The FinTechs' five-link chain (FinTech Br. 33) also fails because at least two supposed "independent" links were not independent. The Administrators' decision not to disclose (link 2) was the foreseeable product of a compensation program designed around concealment. ¶367 ("knowing that concealment was the condition of its continued operation"). And the platform's debit-at-issuance structure, which directly caused link 5, reduced distributions, was the FinTechs' design, not an administrator decision. *Id.* ¶ 538(v). The Complaint therefore alleges a direct connection between the FinTechs' conduct and Plaintiffs' injury, without a "long chain of intervening causes." FinTech Br. 25.

### B. Plaintiffs Adequately Allege Civil Conspiracy

A complaint need only contain "enough factual matter (taken as true) to suggest that an agreement was made" and to establish "plausible grounds to infer an agreement." *Thompson v. Trump*, 590 F. Supp. 3d 46, 97 (D.D.C. 2022). A civil conspiracy "need not involve an express agreement"; one "implied or indicated but not actually expressed" suffices. *Id.* at 101. "[I]n most civil conspiracy cases," courts must "infer an agreement from indirect evidence," *Freeman v. Giuliani*, 2022 WL 16551323, at *10 (D.D.C. Oct. 31, 2022) (quoting *Halberstam*, 705 F.2d at 486), and circumstantial evidence of a "common scheme" to conceal is sufficient. *Doe v. Roman Cath. Diocese of Greensburg*, 581 F. Supp. 3d 176, 215 (D.D.C. 2022). The CCAC alleges far more than parallel conduct. It alleges a single book-wide MSA structure rather than case-by-case dealing, under which the Administrators "entered into the master service agreements and financial arrangements with the [FinTechs] and Bank Defendants that governed their conduct across their

book of business," ¶8, "documented in the standing master service agreements that counsel, the public, and the judiciary never saw," ¶160; a standardized program under which each FinTech "offered materially identical revenue-sharing terms to multiple competing administrator clients" and "each new administrator client joined an existing structure," ¶389(b); transfers to SPEs "belonging to the Administrator Defendants and/or periodic payment under master services agreements governing their schemes," ¶391; simultaneous operation of "materially identical undisclosed compensation programs with multiple Administrator Defendants," each receiving information that the same program was already running across its competitors, ¶551; adoption of "materially identical SPE concealment structures" by competing fiduciaries who could not have "independently develop[ed] identical concealment vehicles," ¶554; and overt acts including "executing master service agreements with co-conspirators, directing QSF deposits and digital disbursements to co-conspirators on undisclosed financial terms,… and forming and funding SPEs to receive and conceal kickback payments." ¶555.[8]

These allegations of simultaneous, materially identical programs and uniform concealment structures are the "plus factors" that place parallel conduct "in a context that raises a suggestion of a preceding agreement." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015). The FinTechs' characterization of the MSAs as merely "bilateral, commercial"

---

[8] The FinTechs misplace reliance on *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995), decided on a motion for nonsuit at trial, which noted that "knowledge and intent" could be "inferred" from circumstantial evidence. *Fleites v. MindGeek S.A.R.L.*, 801 F. Supp. 3d 1011, 1037 (C.D. Cal. 2025), likewise recognizes that "a prolonged and actively pursued course of dealing—when coupled with the seller's knowledge of and shared stake in the buyer's unlawful venture, the standardization of transactions, the duration of the relationship and mutual trust—may support an inference of conspiratorial agreement." That is this case: standardized programs, shared revenue stakes, and coordinated concealment. Other federal courts are in accord. *See, e.g.*, *Musical Instruments*, 798 F.3d at 1194 (distinguishing "permissible parallel conduct from impermissible conspiracy" based on certain "plus factors," *i.e.*, "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action.").

presents a factual dispute not resolvable on the pleadings. *See Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp.*, 2020 WL 4201661, at *5 (D.D.C. July 22, 2020) (when reviewing a 12(b)(6) motion, the court must give plaintiff the benefit of all inferences that can be derived from the facts alleged).

The FinTechs' reliance on Plaintiffs' allegation that they "do not know who had the idea first" (¶161) proves nothing. FinTech Br. at 35. Plaintiffs need not know the identities of other coconspirators or the agreement's internal history; they need only allege that members "came to a mutual understanding to try to accomplish a common and unlawful plan." *Thompson*, 590 F. Supp. 3d at 97. Uncertainty about who first proposed the scheme does not negate an agreement. Regardless of who had the idea first, "Defendants adopted and developed the program knowing it required concealment from the judiciary to remain viable." (¶161).[9]

**1. Rule 9(b) does not apply, and it is satisfied in any event**

Contrary to FinTech's insistence, FinTech Br. 35-36, Rule 9(b) does not require Plaintiffs to "allege that an express or formal agreement was entered into" to defeat a motion to dismiss, and courts "infer an agreement from indirect evidence" in "most civil conspiracy cases." *Freeman*, 2022 WL 16551323, at *10 (citations omitted). Indeed, Rule 9(b)'s particularity requirement is relaxed where the facts constituting the fraud are peculiarly within the defendant's knowledge or control. *See*, *e.g.*, *United States, ex rel. Hood v. Satory Glob., Inc.*, 946 F. Supp. 2d 69, 79 (D.D.C. 2013) ("Pleading on information and belief for claims subject to the strictures of Rule 9(b) is permitted when essential information lies uniquely within another party's control.") (citing *In re*

---

9 The FinTechs' get no support from *Albion All. Mezzanine Fund, L.P. v. State St. Bank and Trust Company*, 8 Misc. 3d 264, 273, 797 N.Y.S.2d 699, 707 (Sup. Ct. 2003), decided on summary judgment, as plaintiffs alleged the bank had only "constructive," not actual, knowledge of a common scheme, and the bank's "mere suspicion" of fabricated accounts receivable did not establish coordination.

*Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989)); *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (same). The FinTechs' cited cases are inapposite.[10]

This principle applies with greater force to a concealed, multi-party conspiracy. Where a conspiracy "contemplates concealment," "affirmative acts of concealment by one or more of the conspirators can be imputed to their co-conspirators," so a plaintiff need not plead a concealing act by each defendant, because "secrecy is [the] natural lair" of such a scheme. *In re Magnesium Oxide Antitrust Litig.*, 2012 WL 1150123, at *7 (D.N.J. Apr. 5, 2012) (quoting *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1493 (D.C. Cir. 1989), and *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 372 (D.N.J. 2001)); *see also Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Rsch.*, 106 N.Y.S.3d 302, 305 (2019) ("the liability of a defendant as a conspirator for co-conspirators' wrongful acts does not necessarily depend upon his active participation in the particular overt acts.") (citation and internal quotes omitted).

Here, Plaintiffs identify the participants (the FinTech, Administrator, and Banks), the timeframe (¶¶131, 152, 157, 162), the mechanism (undisclosed revenue-sharing through MSAs and SPEs) (*id.* ¶¶152, 157, 160-62, 359, 380), the object (extraction of undisclosed compensation from QSF assets) (*id.* ¶¶155-58), the concealment (*id.* ¶¶389, 392), and ties together the overt acts

---

[10] In *Filler v. Hanvit Bank*, 2003 WL 22110773, at *3 (S.D.N.Y. Sept. 12, 2003), the court dismissed the complaint for impermissible group pleading. Here, Plaintiff pleads defendant-specific conduct, *e.g.*, a named Blackhawk employee's dated offer to a settlement administrator (¶157), an admitted Angeion–Blackhawk MSA (*id.* ¶389(a), and case-by-case pairings of each Fintech with the administrator that selected it. *Id.* ¶¶ 176, 189, 256. *In re Swervepay Acquisition, LLC*, 2022 WL 3701723, at *12-13 (Del. Ch. Aug. 26, 2022), is distinguishable as a single, two-sided M&A dispute in which the dispositive deficiency was the absence of "an unlawful act in furtherance of the conspiracy," and it confirms Plaintiffs' pleading burden: "[t]he existence of a confederation may be pled by inference [and] is not subject to the specificity requirement of Rule 9(b)." 2022 WL 3701723, at *12 (alteration in original.).

in furtherance of the scheme. *Id.* ¶¶550-56. The particulars of who proposed the arrangement and the precise terms of each bilateral understanding are peculiarly within the Defendants' knowledge and are properly the subject of discovery. Whether the Defendants' benign characterizations are "actually false or pretextual" is a fact question presumed true for the plaintiff on this motion.

**2. Count VII is not "duplicative" of the aiding-and-abetting claims**

The FinTechs argue that Plaintiffs may not pursue claims for civil conspiracy and aiding-and-abetting. FinTech Br. 36. Not so. Conspiracy and aiding-and-abetting are distinct theories of concerted liability. *See Halberstam*, 705 F.2d at 478 (recognizing the difference between proving an agreement to participate in tortious conduct and proving knowing action that substantially aids tortious conduct and instructing courts to "keep the distinctions clearly in mind" because they "can make a difference" as to who is liable for what). Unlike aiding and abetting the commission of a tort, civil conspiracy turns on the parties' agreement to participate in the scheme. *See, e.g., Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12, 37 (2002). Civil conspiracy is a "means for establishing vicarious liability for the underlying tort" rather than an independent tort. *Halberstam*, 705 F.2d at 479. While the allegations of the Complaint support both claims, each claim seeks recovery for a different wrong committed by Defendants.

In any event, Rule 8(d) permits alternative theories, "and if one of the theories can survive a Rule 12(b)(6) motion, the district court cannot dismiss the complaint." *Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 218 (D.C. Cir. 1999); *see also Taylor v. Howard Univ.*, 200 F. Supp. 3d 196, 201 (D.D.C. 2016) (refusing to dismiss a purported duplicative claim). The FinTechs' reliance on *Loreley Financing (Jersey) No. 3 Limited v. Wells Fargo Securities, LLC*, 2016 WL 5719749, at *7 (S.D.N.Y. Sept. 29, 2016), only proves the point. In *Loreley*, the conspiracy count was dismissed only because it "add[ed] no new allegations" beyond a fraud count

with "essentially identical" factual allegations — while the underlying fraud and aiding-and-abetting claims survived. *Id.* As for *In re Platinum-Beechwood Litigation*, 426 F. Supp. 3d 14, 19 (S.D.N.Y. 2019), there was no dispute that the primary fraud and the breach of fiduciary duty were adequately pled, and the civil conspiracy claim was dismissed because, under New York law, civil conspiracy is not an independent tort.

### C. Plaintiffs Adequately Plead Unjust Enrichment

To state a claim for unjust enrichment, a plaintiff must allege that (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust. *Glasgow v. Camanne Mgmt. Inc.*, 261 A.3d 208, 220 (D.C. 2021). The claim applies when a person retains a benefit (usually money) which, in justice and equity, belongs to another. *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016). Here, the FinTechs received substantial financial benefits, including breakage and other undisclosed compensation, that were paid from or generated by QSF assets held for the exclusive benefit of Plaintiffs and the Class. Plaintiffs, unwittingly, conferred these benefits on Defendants at their expense. Retention is inequitable because FinTechs extracted such benefits from settlement funds through undisclosed self-dealing. (¶¶573–574.)

The FinTechs seek to avoid the plain allegations of unjust enrichment three ways.

First, the FinTechs argue the connection to Plaintiffs is too attenuated because the Administrators selected the digital payment platform and transmitted QSF funds to the FinTechs, so any benefit was conferred through those services, not by Plaintiffs. FinTech Br. at 38–39. However, a "direct payment is not a necessary component of an unjust enrichment claim." *Glasgow*, 261 A.3d at 214. When a third party "makes a payment to the defendant to which … the claimant has a better legal or equitable right, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment." *Glasgow*, 261 A.3d at 221 (citation omitted).

Where funds reach a defendant through an intermediary that facilitates the transactions, the plaintiff has still conferred the benefit. *See JSC Transmashholding v. Miller*, 70 F. Supp. 3d 516, 523 n.5 (D.D.C. 2014) ("While this benefit was conferred on [the defendant] through [a third-party], the theory of unjust enrichment could apply to indirect payments conveyed through a third-party intermediary.").

Here, the QSF assets belonged in equity to the class. On the FinTechs' own account, the administrators merely transmitted QSF funds to the FinTechs, which then retain[ed] the unredeemed balance and any fees as breakage. (¶155; FinTech Br. at 39.) The Administrators were the vessel through which the class's funds reached the FinTechs. *JSC Transmashholding*, 70 F. Supp. 3d at 523 n.5. Whether that connection is nonetheless too attenuated is not a question to be decided on the pleadings. Weighing the directness of a benefit requires the court to evaluate the merits of the claim, which would be inappropriate for Rule 12(b)(6) purposes. *Lacks v. Ultragenyx Pharm., Inc.*, 734 F. Supp. 3d 397, 430 (D. Md. 2024) ("remoteness limits unjust enrichment remedies, not unjust enrichment liability.").[11]

[11] The FinTechs' attenuation cases share a feature absent here — the parties had no dealings whatsoever. *See Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (2011) (dismissing on a pre-discovery CPLR 3211 motion where the pleadings alleged no "relationship between the parties, or at least an awareness by [the defendant] of [the plaintiff's] existence — the mere existence of a letter that happens to find a path to a prospective purchaser"); *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 747-48 (2012) (parties "simply had no dealings with each other" and had nothing other than arm's length business interactions, and noting the claim may be more properly pursued against the party with which plaintiff dealt); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014) (dismissing only as to non-counterparty banks with which plaintiffs "never transacted . . .at all"). Here, by contrast, the class's QSF funds reached the FinTechs, which retained them. *Vichi* is doubly inapposite: it was decided at summary judgment and turned on a governing contract (the Notes) that barred using unjust enrichment to reach a non-party, while the alternative "directness" ground rested on attenuated or speculative reputational benefits, not a traceable sum. *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 36, 58-61 (Del. Ch. 2012). Indeed, the FinTechs' own authority proves Plaintiffs' point: *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 483-84 (S.D.N.Y. 2014) sustained the unjust enrichment claim against the counterparty banks that received the disputed funds, and

Second, the FinTechs argue nothing is unjust because they earned their fees by providing legitimate payment services. FinTech Br. 38. This calls for the Court to credit the FinTechs' characterization over the Complaint, which alleges that the benefits were extracted from Plaintiffs settlement funds through undisclosed self-dealing. (¶574.) This cannot be resolved now. Whether retention is unjust "is a factual question that was not properly resolved at the motion to dismiss stage." *Falconi-Sachs*, 142 A.3d at 560. At the pleading stage, an allegation that retention was unjust, unfair, and inequitable suffices, and the recipient's asserted good faith is immaterial: "[a] claim of unjust enrichment does not require fault on the part of the recipient to the benefit." *JSC Transmashholding*, 70 F. Supp. 3d at 523. The FinTechs' legitimate services defense is precisely the kind of fact-bound merits argument reserved for summary judgment.[12]

Third, the FinTechs argue the claim is an impermissible catchall that duplicates the fraud, aiding-and-abetting, and conspiracy claims. FinTech Br. at 37. Not so. "Nothing precludes a plaintiff from pleading an unjust enrichment claim as an alternative . . . even when seeking the same amount." *Glasgow*, 261 A.3d at 217. A plaintiff "may advance unjust enrichment as an

---

*Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726, 91 Cal. Rptr. 2d 881, 882-83 (2000) affirmed a judgment for the plaintiff where a bank was unjustly enriched when it retained for itself the funds that should have been paid over.

[12] The FinTechs' injustice cases were resolved on developed records or on grounds absent here. *See Wuerth v. Nationwide Energy Partners, LLC*, 275 N.E.3d 670, 678-79 (Ohio App. 2025) (on summary judgment; the claim failed only for lack of evidence of unjust retention, and the court expressly rejected the contract-bar argument because the plaintiffs were not parties to the subject contracts); *Freeman v. Sorchych*, 226 Ariz. 242, ¶ 28, 245 P.3d 927 (Ct. App. 2011) (rejecting the claim only after a bench trial, where any benefit was an incidental by-product and an adequate legal remedy existed); *Nemec v. Shrader*, 991 A.2d 1120, 1130-31 (Del. 2010) (affirming dismissal because the defendants exercised an express contractual right, a contract-and-business-judgment rationale inapplicable where no contract authorized the FinTechs to keep the class's breakage). *Brooks* dismissed a traditional exchange of payment for goods and services, but it states the governing rule in Plaintiffs' favor: unjust enrichment occurs when a person has and retains money or benefits which in justice and equity belong to another. *Brooks v. Peoples Bank*, 732 F. Supp. 3d 765, 782 (S.D. Ohio 2024).

alternative theory of recovery" at the pleading stage, regardless of consistency. *Smith v. Rubicon Advisors, LLC*, 254 F. Supp. 3d 245, 248 (D.D.C. 2017). Courts in this District decline to dismiss unjust enrichment as duplicative at the pleading stage, recognizing that dismissal may be premature where the parties have not yet had the benefit of discovery. *Id.*[13]

## IV. PLAINTIFFS HAVE ARTICLE III STANDING

Finally, Defendants recast their merits arguments as a jurisdictional defect, contending that Plaintiffs were not injured at all and so may not sue under Article III. Admin Br. 60; Bank Br. 42; FinTech Br. 39. The Administrators argue (and all other Defendants adopt this argument) that any injury "is not fairly traceable" to Defendants' misconduct because, among other reasons, it is speculative to suggest that "class counsel in the underlying settlements, the reviewing courts, and class members all lacked knowledge about any alleged interest or breakage payments." *Id.* at 76. But that is what the CCAC alleges: the arrangements were kept secret among Defendants. ¶¶10, 366-383.

At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063–64 (D.C. Cir. 2015); *see also Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (on a jurisdictional challenge courts "grant [ ] plaintiff the benefit of all inferences that can be derived from the facts alleged"). A motion to dismiss "is not the occasion for evaluating the empirical

---

[13]The FinTechs' sole authority, *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790-91, 967 N.E.2d 1177, 1184 (2012), confirms the point. *Corsello* dismissed an unjust enrichment claim only because it was duplicative of the plaintiffs' surviving trespass and takings claims, and it recognized that the paradigm unjust enrichment case is one in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled — precisely the theory pleaded here. Nothing in *Corsello* permits dismissal of an unjust enrichment claim pleaded in the alternative at the Rule 12(b)(6) stage.

accuracy" of a theory. *Osborn*, 797 F.3d at 1066 (criticizing district court for relying on cases decided at summary judgment in holding that plaintiffs lack standing).[14]

Plaintiffs' injury is not merely "fairly traceable" to Defendants' scheme; it is directly traceable. Defendants' secrecy neutralized the safeguards the settlement courts and settlement counsel would otherwise have provided. The scheme was aimed at the settlement classes' QSFs, and the harm traces back to Defendants. Intervening knowing actors would not change that. As this Court recently observed, "[t]he causation prong of the standing analysis 'does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries...'" *Or. Env't Council v. Internal Revenue Serv.*, 2026 WL 1631612, at *13 (D.D.C. June 6, 2026) (quoting *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017)). The "existence of . . . an equally important player in the story does not erase [the Administrators'] role" in the causal chain for standing purposes. *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017).

In contrast to the cases the Defendants cite, the CCAC details the schemes, ¶¶ 121-169, each Defendant's role in the enterprise and conspiracy, ¶¶ 384-392, how the schemes were executed in specific settlements, ¶¶ 170-357, and the resulting economic harm and how it may be calculated. ¶¶ 393-399.[15] So too where "the 'entire purpose' of a policy is to induce certain

---

[14] The Administrators rely primarily on cases that resolved questions of standing at summary judgment. *See e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992); *Mideast Sys. & China Civ. Constr. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172 (D.C. Cir. 1986); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996). At *summary judgment*, the court "need *not* accept appellants' alleged chain of events if they are unable to demonstrate competent evidence to support each link." *Fla. Audubon Soc'y*, 94 F.3d at 672 (emphasis added).

[15] In *Coubaly*, plaintiffs lacked standing because they failed "to clearly — or even coherently — define the 'venture' in which the Importers allegedly participated." *Coubaly v. Cargill Inc.*, 144 F.4th 343, 348 (D.C. Cir. 2025). The CCAC defines the venture. ¶¶ 121-169. And *NW Airlines* held only that an airline lacked standing to challenge a pilot's certification because the possibility that he would fly its routes and injure its passengers was "too remote and speculative." *NW Airlines, Inc. v. FAA*, 795 F.2d 195, 201 (D.C. Cir. 1986). Here the harm has already fallen on Plaintiffs, and the scheme is ongoing. ¶ 532.

behavior from market participants, it is often 'predictable' that the policy will have its intended effect, even if the chain of causation runs through multiple intermediaries." *Or. Env't Council*, 2026 WL 1631612, at *13 (quoting *Diamond Alternative Energy LLC v. EPA*, 606 U.S. 100, 112–13 (2025)).

The Administrators' remaining objections are speculation, not an impediment to standing. Admin Br. 61-62. That a Defendant extracted more from one settlement than another does not change the fact of injury in each. And that some settlements may not have used pro rata distribution bears on the scope of the class Plaintiffs eventually seek to certify, not on standing.

Because Plaintiffs' factual allegations are "specific, plausible, and susceptible to proof at trial, they pass muster for standing purposes at the pleading stage." *Mass. Coal. for Immigr. Reform*, 621 F. Supp. 3d 84, 93–94 (D.D.C. 2022).

## CONCLUSION

For the foregoing reasons, the FinTechs' motion to dismiss should be denied in its entirety, and if the Court is inclined to dismiss any claim, Plaintiffs respectfully request leave to amend.

Dated: September 15, 2026

Respectfully Submitted,

*/s/ Christopher A. Seeger*
Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: 212-584-0700
Email: cseeger@seegerweiss.com

Shauna Itri
Scott A. George
**SEEGER WEISS LLP**
325 Chestnut Street, Suite 917
Philadelphia, PA 19106
Telephone: 267-973-4265
Email: sitri@seegerweiss.com

*Plaintiffs' Lead Counsel*

David Boies
Adam Shaw
**BOIES SCHILLER & FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Telephone: 914-749-8201
Email: dboies@bsfllp.com
Email: ashaw@bsfllp.com

Bryan F. Aylstock
**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ**
17 E. Main St.
Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Email: baylstock@awkolaw.com

Kiley Grombacher
**BRADLEY/GROMBACHER, LLP**
31365 Oak Crest Drive
Suite 240
Westlake Village, CA 91361
Telephone: 805-270-7100
Email:
kgrombacher@bradleygrombacher.com

Eric Lechtzin
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
Email: elechtzin@edelson-law.com

David S. Stone
**STONE & MAGNANINI LLP**
400 Connell Drive, Suite 6200
Berkeley Heights, NJ 07922
Telephone: (973) 218-1111
Email: dstone@smcomplex.com

*Plaintiffs' Executive Committee*