**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE CLASS ACTION SETTLEMENT ADMINISTRATION LITIGATION** | **Misc. Action No. 25-179 (JDB); MDL Docket No. 3162** |
| **This Document Relates To: ALL CONSOLIDATED ACTIONS** | |

**PLAINTIFFS' OPPOSITION TO ADMINISTRATOR DEFENDANTS' CONSOLIDATED MOTION TO DISMISS**
**<u>PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

LEGAL STANDARD ..... 8

ARGUMENT ..... 8

I. THE ADMINISTRATORS ARE FIDUCIARIES OF THE CLASS ..... 8

A. Fiduciary Status is a Question of Fact that Follows Function Not Labels ..... 9

B. By Appointment and Action, the Administrators Were Fiduciaries in Each Settlement ..... 11

1. The Administrators are independently appointed fiduciaries whose duties are not displaced by the court and class counsel ..... 11

2. The Administrators exercised authority over the claims of the settlement class members and their money ..... 14

C. The Test the Administrators Propose is Satisfied by the Pleadings ..... 18

D. Plaintiffs Allege Other Elements of Breach of Fiduciary Duty ..... 20

II. PLAINTIFFS' ANTITRUST CLAIMS SHOULD NOT BE DISMISSED ..... 22

A. Plaintiffs Are Direct Purchasers ..... 22

B. Plaintiffs Have Antitrust Standing ..... 24

1. The Complaint alleges that Defendants' antitrust violation caused Plaintiffs' economic injury ..... 25

2. The Complaint alleges an injury the antitrust laws exist to prevent ..... 27

3. The Complaint alleges that Plaintiffs' injury flowed directly from Defendants' conduct. ..... 27

4. The Complaint alleges that Plaintiffs bear the economic loss ..... 28

5. Plaintiffs' damages are not speculative ..... 28

6. There is no serious danger of multiple recoveries and damages can be allocated without extraordinary complexity ........ 29

C. The Complaint Plausibly Alleges a Hub-and-Spoke Conspiracy ........ 29

1. The alleged conspiracy and Defendants' arguments ........ 29

2. The per se standard in a hub-and-spoke conspiracy ........ 30

3. Plaintiffs sufficiently allege horizontal agreement among the Administrators ........ 32

a. The Administrators Acted Against Their Individual Economic Self-Interests ..... 32

b. Plaintiffs Adequately Allege Additional Plus Factors ........ 34

4. Defendants' Arguments Concerning the Vertical Agreements are Contrary to Settled Law ........ 36

III. PLAINTIFFS RICO CLAIMS ARE ADEQUATELY PLED ........ 37

A. The Administrators' Racketeering Directly Injured Plaintiffs ........ 38

B. The Complaint Adequately Pleads Each Administrator-Centered Enterprise ........ 41

C. Each Administrator Conducted the Affairs of its Enterprise ........ 43

D. The Administrators Conspired to Violate RICO ........ 45

E. Each Administrator Committed Multiple Predicate Acts ........ 46

IV. PLAINTIFFS COMMON LAW CLAIMS SHOULD NOT BE DISMISSED ........ 47

A. The Administrators Had a Duty to Disclose ........ 47

1. The Administrators' silence was improper ........ 47

2. The Administrators told half-truths ........ 49

B. Plaintiffs' Fraud Claims Are Adequately Alleged ........ 50

1. Plaintiffs' allegations meet the Rule 9(b) standard ........ 50

2. Plaintiffs have sufficiently alleged direct reliance ........ 51

3. Plaintiffs also sufficiently alleged third party reliance ........ 52

4. Plaintiffs adequately plead causation ........ 53

C. Plaintiffs' Negligence and Negligent Misrepresentation Claims are Adequately Alleged ........ 54

1. Plaintiffs adequately plead several duties breached by the Administrators ........ 54

2. The economic loss rule does not bar the negligence claim ........ 55

3. Plaintiffs adequately plead reliance and causation ........ 56

D. Plaintiffs' Civil Conspiracy Claim is Adequately Alleged ........ 57

E. Plaintiffs' Unjust Enrichment Claim is Adequately Alleged ........ 59

1. Plaintiffs adequately allege a benefit conferred on the Administrators ........ 59

2. Plaintiffs allege facts showing that retention of those benefits was unjust ........ 61

V. PLAINTIFFS HAVE ARTICLE III STANDING ........ 62

CONCLUSION ........ 62

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*A.C. Excavating v. Yacht Club II Homeowners Ass'n*,
114 P.3d 862 (Colo. 2005) .......... 63

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*,
483 U.S. 143 (1987) .......... 47

*Alemayehu v. Abere*,
199 F. Supp. 3d 74 (D.D.C. 2016) .......... 35

*Am. President Lines, LLC v. Matson, Inc.*,
633 F. Supp. 3d 209 (D.D.C. 2022) .......... 33

*Andrx Pharms., Inc. v. Biovail Corp., Int'l*,
256 F.3d 799 (D.C. Cir. 2001) .......... 31, 36

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) .......... 46

**Apple, Inc. v. Pepper*,
587 U.S. 273 (2019) .......... 29, 36

*Associated General Contractors v. California State Council of Carpenters*,
459 U.S. 519 (1983) .......... 31

*Aston v. Johnson & Johnson*,
248 F. Supp. 3d 43 (D.D.C. 2017) .......... 68

*Avenarius v. Eaton Corp.*,
898 F. Supp. 2d 729 (D. Del. 2012) .......... 39, 40

*Bell v. Farmers Ins. Exch.*,
137 Cal. App. 4th 835 (2006) .......... 16

**Bell Atlantic Corp. v. William Twombly*,
550 U.S. 544 (2007) .......... 37, 65, 66

*Binder v. D.C.*,
1991 WL 11255755 (D.D.C. May 22, 1991) .......... 40

*Boeing v. Van Gemert*,
444 U.S. 472 (1980) .......... 28

**Boyle v. United States*,
556 U.S. 938 (2009) .......... 47

**Brickhouse Cap., LLC v. Coastal Cryo AL, LLC*,
393 So. 3d 467 (Ala. 2023) .......... 54

**Bridge v. Phoenix Bond & Indemnity Co.*,
553 U.S. 639 (2008) .......... 45, 46, 47

**Brink v. Cont'l Ins. Co.*,
787 F.3d 1120 (D.C. Cir. 2015) .......... 57

*Brooks v. Thomson Reuters Corp.*,
2025 WL 3201878 (N.D. Cal. Nov. 17, 2025) .......... 7, 56

*Burman v. Phoenix Worldwide Indus., Inc.*,
384 F. Supp. 2d 316 (D.D.C. 2005) .......... 63

*Business Electronics Corp. v. Sharp Electronics Corp.*,
485 U.S. 717 (1988) .......... 42

**Cabrera v. Google LLC*,
2025 WL 2494429 (N.D. Cal. Aug. 29, 2025) .......... 6, 7, 55

*Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
130 F. Supp. 3d 236 (D.D.C. 2015) .......... 69

*Campbell v. Tex. Tea Reclamation, LLC*,
2021 WL 2211690 (S.D. Tex. May 6, 2021) .......... 10, 14

*Cape, LLC v. Och-Ziff Real Est. Acquisitions LP*,
370 So. 3d 1010 (Fla. Dist. Ct. App. 2023) .......... 66

*Chao v. Day*,
436 F.3d 234 (D.C. Cir. 2006) .......... 21

*Cheeks v. Fort Myer Constr. Corp.*,
216 F. Supp. 3d 146, 162 (D.D.C. 2016) .......... 52

*Children's Wish Found. Int'l, Inc. v. Mayer Hoffman McCann, P.C.*,
331 S.W.3d 648 (Mo. 2011) .......... 63

*City of Oakland v. Oakland Raiders*,
83 Cal. App. 5th 458 (2022) .......... 66

*Cohen v. Beneficial Indus. Loan Corp.*,
337 U.S. 541 (1949) .......... 18

*Com. Painting Co. v. Weitz Co.*,
676 S.W.3d 527 (Tenn. 2023) ........ 62

*Commonwealth ex rel. Pappert v. TAP Pharm.*,
885 A.2d 1127 (Pa. Commw. 2005) ........ 66

*Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Industrial Materials Corp.*,
887 F. Supp. 2d 9 (D.D.C. 2012) ........ 47

*Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*,
636 N.E.2d 503 (Ill. 1994) ........ 63

*Cornish-Adebiyi v. Caesars Ent.,*
184 F.4th 172 (3d Cir. 2026) ........ passim

*Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*,
82 F. Supp. 3d 344 (D.D.C. 2015) ........ 68

*Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz,*
793 F. Supp. 2d 311 (D.D.C. 2011) ........ 11

*Daley-Bishop v. Long & Foster Prop. Mgmt.*,
2020 WL 4053595 (E.D.N.C. July 20, 2020) ........ 13

*Davis v. Hanna Holdings, Inc.*,
822 F. Supp. 3d 494 (E.D. Pa. 2026) ........ 41

**Davis v. Sun Ref. & Mktg. Co.*,
109 Ohio App. 3d 42, 671 N.E.2d 1049 (1996) ........ 55

*Democracy Partners v. Project Veritas Action Fund*,
453 F. Supp. 3d 261 (D.D.C. 2020) ........ 11

*Dittman v. UPMC*,
196 A.3d 1036 (Pa. 2018) ........ 63

*Doe v. Roman Cath. Diocese of Greensburg*,
581 F. Supp. 3d 176 (D.D.C. 2022) ........ 64

**Doherty v. Allianz Life Ins. Co. of N. Am.*,
2019 WL 3934100 (M.D. Fla. Aug. 20, 2019) ........ 61

*Douglas v. Western Union Co.*,
328 F.R.D. 204 (N.D. Ill. 2018) ........ 17

*Drazen v. Pinto*,
106 F.4th 1302 (11th Cir. 2024) ........ 18

**Eady v. TapFury LLC*,
2022 WL 986269 (D.N.J. Apr. 1, 2022)........................................................................ 55

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*,
720 F.3d 33 (1st Cir. 2013) ............................................................................. 38, 40, 43

*Falconi-Sachs v. LPF Senate Square, LLC*,
142 A.3d 550 (D.C. 2016)................................................................................................ 66

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
663 F.2d 253 (D.C. Cir. 1981).......................................................................................... 53

*Feld Ent. Inc. v. ASPCA*,
873 F. Supp. 2d 288 (D.D.C. 2012) ................................................................................. 47

*Firestone Tire & Rubber Co. v. Bruch*,
489 U.S. 101 (1989).......................................................................................................... 21

*Firestone v. Firestone*,
76 F.3d 1205 (D.C. Cir. 1996)...........................................................................................11

**Forbis v. Neal*,
361 N.C. 519, 649 S.E.2d 382 (2007).............................................................................. 58

**Franklin D. Nastasi Tr. v. Bloomberg, L.P.*,
206 N.Y.S.3d 333 (2024) .................................................................................................. 58

*Freeman Indus. v. Eastman Chem.*,
172 S.W.3d 512 (Tenn. 2005) ........................................................................................... 66

*Friends Christian High Sch. v. Geneva Fin. Consultants,
LLC*, 39 F. Supp. 3d 58 (D.D.C. 2014) .............................................................................. 25

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) .............................................................................................. 38

*Geriatrics, Inc. v. McGee*,
332 Conn. 1, 208 A.3d 1197 (2019).................................................................................. 66

*Gibson v. The Nat'l Ass'n of Realtors*,
2026 WL 1840538 (W.D. Mo. June 25, 2026)............................................................... 8, 55

**Giddings & Lewis, Inc. v. Indus. Risk Insurers*,
348 S.W.3d 729 (Ky. 2011)............................................................................................... 55

*Glasgow v. Camanne Mgmt. Inc.*,
261 A.3d 208 (D.C. 2021)............................................................................................ 66, 67

**Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983)....................64

*Heidi Aviation, LLC v. Jetcraft Corp.*,
573 F. Supp. 3d 182 (D.D.C. 2021)....................10, 14

*Hemi Group, LLC v. City of New York,*
559 U.S. 1 (2010)....................46

*Hoffman v. Atlas Title Sols., Ltd.*,
214 N.E.3d 1271 (Ohio Ct. App. 2023)....................63

**Holmes v. Securities Investor Protection Corp.*,
503 U.S. 258 (1992)....................45

*Honey Bum, LLC v. Fashion Nova, Inc.*,
63 F.4th 813 (9th Cir. 2023)....................39

*HPI Health Care Servs. v. Mt. Vernon Hosp.*,
131 Ill. 2d 145 (1989)....................66

*Iacurci v. Sax*,
313 Conn. 786 (2014)....................13

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)....................28

*In re ATM Fee Antitrust Litig.*,
686 F.3d 741 (9th Cir. 2012)....................34

*In re Auto. Parts Antitrust Litig., End-Payor Actions*,
33 F.4th 894 (6th Cir. 2022)....................18

*In re BankAmerica Corp. Securities Litigation,*
2022 WL 17609899 (E.D. Mo. Dec. 13, 2022)....................16

**In re Bloom,*
634 B.R. 559 (B.A.P. 10th Cir. 2021)....................59

*In re Celotex Corp.*,
487 F.3d 1320 (11th Cir. 2007)....................15, 22, 24

**In re Disposable Contact Lens Antitrust*,
215 F. Supp. 3d 1272 (M.D. Fla. 2016)....................41, 43

**In re Domestic Airline Travel Antitrust Litig.*,
221 F. Supp. 3d 46 (D.D.C. 2016)....................37, 39, 40

**In re Domestic Airline Travel Antitrust Litig.*,
691 F. Supp. 3d 175 (D.D.D. 2023) .......... 40

**In re Elec. Books Antitrust Litig.*,
859 F. Supp. 2d 671 (S.D.N.Y. 2012) .......... 39

*In re Generic Pharm. Pricing Antitrust Litig.*,
338 F. Supp. 3d 404 (E.D. Pa. 2018) .......... 38

*In re G-Fees Antitrust Litig.*,
584 F. Supp. 2d 26 (D.D.C. 2008) .......... 30

**In re Lorazepam & Clorazepate Antitrust Litigation*,
202 F.R.D. 12 (D.D.C. 2001) .......... 30

*In re Managed Care Litig.*,
2023 WL 7545315 (S.D. Fla. Nov. 14, 2023) .......... 23

*In re Managed Care Litig.*,
2025 WL 5236105 (S.D. Fla. Nov. 10, 2025) .......... 13, 16, 20, 27

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) .......... 30

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
2025 WL 927059 (E.D.N.Y. Mar. 27, 2025) .......... 30

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023) .......... 37

*In re Taxman Clothing Co.*,
49 F.3d 310 (7th Cir. 1995) .......... 20, 22

*In re Toilet Seat Antitrust Litigation,*
1977 U.S. Dist. LEXIS 14311 (E.D. Mich. August 24, 1977) .......... 30

**In re Whittington,*
530 B.R. 360 (Bankr. W.D. Tex. 2014) .......... 59

**In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) .......... 43

**Interstate Circuit, Inc. v. United States*,
306 U.S. 208 (1939) .......... 41

*IT Corp. v. Gen. Am. Life Ins. Co.*,
107 F.3d 1415 (9th Cir. 1997) .......... 12

*Jenkins v. Sterlacci*,
849 F.2d 627 (D.C. Cir. 1988)........................................................................................ 20

*Jewett v. Boihem*,
23 So. 3d 658 (Ala. 2009)................................................................................................ 66

*JPMorgan Chase Bank, N.A. v. Pro. Pharmacy II*,
508 S.W.3d 391 (Tex. App. 2014)..................................................................................... 62

*JSC Transmashholding v. Miller*,
70 F. Supp. 3d 516 (D.D.C. 2014) .................................................................................... 68

*Jupiter Enters., Inc v. Harrison*,
2002 WL 318305 (Tex. App. Mar. 1, 2002)...................................................................... 66

*Kim v. DP Capital LLC*,
2024 WL 4253168 (D.D.C. Sept. 20, 2024) ................................................................ 10, 14

*Klein v. Am. Land Title Ass'n*,
560 Fed. Appx. 1 (D.C. Cir. 2014).................................................................................... 31

**Klier v. Elf Atochem N. Am., Inc.*,
658 F.3d 468 (5th Cir. 2011) ............................................................................................ 67

*Kreuzer v. Am. Acad. of Periodontology*,
735 F.2d 1479 (D.C. Cir. 1984)........................................................................................ 40

*Kurd v. Republic of Turkey*,
374 F. Supp. 3d 37 (D.D.C. 2019) .................................................................................... 65

*Lamie v. U.S. Trustee*,
540 U.S. 526 (2004).......................................................................................................... 20

*Latta v. Rainey*,
202 N.C. App. 587 (2010)................................................................................................. 59

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007).......................................................................................................... 41

**Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024).................................................................................................... 56, 57

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013).............................................................................................. 41

*McCarthy v. Recordex Service, Inc.*,
80 F.3d 842 (3d Cir. 1996) ................................................................................................ 29

*McDowell v. CGI Fed. Inc.*,
2017 WL 2392423 (D.D.C. June 1, 2017) ........ 68

*Medical Marijuana, Inc. v. Horn*,
604 U.S. 593 (2025) ........ 46, 47

*Millennium Square Residential Ass'n v. 2200 M St. LLC,*
952 F. Supp. 2d 234 (D.D.C. 2013) ........ 14

*Mines v. Metagenics, Inc.*,
2023 WL 2930557 (D.D.C. Apr. 13, 2023) ........ 68

*Modern Home Inst., Inc. v. Hartford Accident & Indem. Co.*,
513 F.2d 102 (2d Cir. 1975) ........ 53

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) ........ 38

*Morris Pumps v. Centerline Piping*,
273 Mich. App. 187 (2006) ........ 66

*Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*,
156 F.4th 68 (2d Cir. 2025) ........ 37

*MSP Recovery Claims, Series LLC v. Pfizer, Inc.*,
728 F. Supp. 3d 89 (D.D.C. 2024) ........ 46

*Nat'l Title Ins. Co. v. Lakeshore 1 Condo. Ass'n*,
691 So. 2d 1104 (Fla. 3d DCA 1997) ........ 62

*NCB Mgmt. Servs., Inc. v. FDIC*,
843 F.Supp.2d 62 (D.D.C.2012) ........ 35

*New Restoration & Recovery Servs., LLC v. Dragonfly Pond Works, LLC*,
2023 WL 4025890 (N.C. Super. June 15, 2023) ........ 66

**Nissan Motor Acceptance Cases*,
63 Cal. App. 5th 793 (2021) ........ 54

**O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*,
436 F. Supp. 3d 576 (E.D.N.Y. 2020) ........ 37, 38, 40, 43

*Olson v. Ferrara Candy Co.*,
2025 IL App (1st) 241126, 275 N.E.3d 439 ........ 63

*Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund,*
575 U.S. 175 (2015) ........ 56

*Optionality Consulting Pte. Ltd. v. Nekos*,
2019 WL 4523469 (S.D.N.Y. Sept. 18, 2019) .......... 10, 14

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) .......... 20

**Osborn v. Visa Inc.*,
797 F.3d 1057 (D.C. Cir. 2015) .......... 33

*Pearson v. Target Corp.*,
968 F.3d 827 (7th Cir. 2020) .......... 13

*Pernice v. Bovim*,
2015 WL 5063378 (D.D.C. Aug. 26, 2015) .......... 68

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) .......... 17

*Pub. Bldg. Auth. of Huntsville v. St. Paul Fire & Marine Ins. Co.*,
80 So. 3d 171 (Ala. 2010) .......... 62

*Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*,
254 Mich. App. 372, 656 N.W.2d 858 (2002) .......... 62

**Rattagan v. Uber Techs., Inc.*,
17 Cal. 5th 1, 553 P.3d 1213 (2024) .......... 58, 63

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) .......... 47

**Reves v. Ernst & Young*,
507 U.S. 170 (1993) .......... 49, 51, 52

*Reyner v. Crawford*,
334 S.W.3d 168 (Mo. Ct. App. 2011) .......... 66

*Rise v. Bagshaw*,
2025 WL 1380478 (D.D.C. May 13, 2025) .......... 65

*Ross v. Lockheed Martin Corp.*,
267 F. Supp. 3d 174 (D.D.C. 2017) .......... 19

*Rougvie v. Ascena Retail Grp., Inc.*,
2019 WL 944811 (E.D. Pa. Feb. 21, 2019) .......... 16, 20

**RSM Production Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
682 F.3d 1043 (D.C. Cir. 2012) .......... 44, 52, 53

**Salinas v. United States*,
522 U.S. 52 (1997) ..... 52

*Salzman v. Bachrach*,
996 P.2d 1263 (Colo. 2000) ..... 66

*Savage v. Mayer*,
33 Cal. 2d 548 (1949) ..... 24

*SEC v. Binance Holdings Ltd.*,
738 F. Supp. 3d 20 (D.D.C. 2024) ..... 63

**Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985) ..... 44

*Seidel v. Gordon A. Gundaker Real Est. Co.*,
904 S.W.2d 357 (Mo. Ct. App. 1995) ..... 55

*SEIU Health & Welfare Fund v. Philip Morris Inc.*,
249 F.3d 1068 (D.C. Cir. 2001) ..... 46

*Shaffer v. George Washington University*,
27 F.4th 754 (D.C. Cir. 2022) ..... 49

*Smith v. Rubicon Advisors, LLC*,
254 F. Supp. 3d 245 (D.D.C. 2017) ..... 69

*Sound Around, Inc. v. Friedman*,
2026 WL 972984 (S.D.N.Y. Apr. 10, 2026) ..... 28

**Sperry v. Crompton Corp.*,
8 N.Y.3d 204, 863 N.E.2d 1012 (2007) ..... 66

*Sports Tech. Applications, Inc. v. MLB Advanced Media, L.P.*,
188 A.D.3d 619, 132 N.Y.S.3d 759 (2020) ..... 55

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010) ..... 39, 40

*Sun Chem. Corp. v. Fike Corp.*,
235 A.3d 145 (N.J. 2020) ..... 62

*Swedish Hosp. Corp. v. Shalala,*
1 F.3d 1261 (D.C. Cir. 1993) ..... 28

**Tapply v. Whirlpool Corp.*,
148 F.4th 407 (6th Cir. 2025) ..... 55

*The Florida Bar v. Adorno*,
60 So. 3d 1016 (Fla. 2011) .......... 12

*Tiara Condo. Ass'n v. Marsh & McLennan Cos.*,
110 So. 3d 399 (Fla. 2013) .......... 62

*U.S. ex rel. Folliard v. CDW Tech. Servs., Inc.*,
722 F. Supp. 2d 20 (D.D.C. 2010) .......... 63

**United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) .......... passim

*United States v. Gen. Motors Corp.*,
384 U.S. 127 (1966) .......... 37

*United States v. Cammarata*,
145 F.4th 345 (3d Cir. 2025) .......... 17

*United States v. Chestman*,
947 F.2d 551 (2d Cir. 1991) .......... 21

*United States v. Lemire*,
720 F.2d 1327 (D.C. Cir. 1983) .......... 53

*United States v. Maxwell*,
920 F.2d 1028 (D.C. Cir. 1990) .......... 53

*United States v. Mitchell*,
463 U.S. 206 (1983) .......... 12

**United States v. Philip Morris USA Inc.,*
566 F.3d 1095 (D.C. Cir. 2015) .......... 51, 53

*United States v. Perholtz*,
842 F.2d 343 (D.C. Cir. 1988) .......... 48

*United States v. Shi*,
991 F.3d 198 (D.C. Cir. 2021) .......... 52

*Vox Media, Inc. v. Mansfield*,
322 F. Supp. 3d 19 (D.D.C. 2018) .......... 10

*Ward v. Taggart*,
51 Cal. 2d 736 (1959) .......... 24

*Wilbur v. United States ex rel. Kadrie*,
281 U.S. 206 (1930) .......... 23

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*,
89 F.4th 430 (3d Cir. 2023) ........ 44

*Xereas v. Heiss*,
987 F.3d 1124 (D.C. Cir. 2021) ........ 10

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*,
913 F.2d 948 (D.C. Cir. 1990) ........ 51

**Statutes**

15 U.S.C. § 15 ........ 31

18 U.S.C. § 1961 ........ 8

28 U.S.C. § 2072(b) ........ 20

**Rules**

Fed. R. Civ. P. 8(d)(2)–(3) ........ 49

Fed. R. Civ. P. 23 ........ 19, 20

Fed. R. Civ. P. 23(e) ........ 18, 19, 20

Fed. R. Civ. P. 23(e)(2) ........ 19

Fed. R. Civ. P. 23(e)(2)(C)(ii) ........ 19

Fed. R. Civ. P. 23(e)(2)(D) ........ 19

Fed. R. Civ. P. 23(g)(4) ........ 18, 20

Fed. R. Civ. P. 23(h) ........ 19

**Regulations**

Treas. Reg. § 1.468B-2(k)(3)(i)-(ii) ........ 15

**Other Authorities**

H.R. Rep. No. 93-533 ........ 21

Pub. L. No. 91-452 ........ 44

Restatement (Third) of Agency § 8.02 (2006) ........ 24

Restatement (Third) of Restitution and Unjust Enrichment § 47 (2011) ........ 67

Restatement (Third) of Torts: Liab. for Econ. Harm § 3 (2020)................................................. 63

Restatement (Third) of Trusts § 5 ........................................................................................ 12

Restatement (Third) of Trusts § 75 ...................................................................................... 21

Restatement (Third) of Trusts § 78 ...................................................................................... 27

**INTRODUCTION**

After exploiting the class action settlement process for over a decade, the Administrators' hubris is palpable. They inexplicably claim that they owed no candor to the tribunals or fiduciary duties to the settlement classes whose notices they served and claims they decided, and dismissal of Plaintiffs' claims is self-evident. Ignoring the well-pled allegations against them, the Administrators portray themselves and their responsibilities as ministerial, leaving them free to do what they will. However, with court-appointment to serve as settlement administrators whose core responsibilities included administration of the QSF, the Administrators were fiduciaries to Plaintiffs, settlement claimants in the Administrators' settlements. Furthermore, even without a fiduciary duty, they committed fraud behind the Administrators' half-truths and abuse of trust of the settlement courts, settlement counsel, and settlement class members by actively concealing their schemes to take QSF funds without oversight. And even without fraud, they were negligent in carrying out their duties to the settlement classes. And even without negligence, they were unjustly enriched at the expense of the settlement classes.

The Administrators, along with the other Defendants turned settlement administration into a vehicle for self-enrichment – skimming from settlement funds through standing backroom deals. They racketeered, turning a legitimate business front into a means for lucre. Now caught, each of the racketeers deny there was any agreement or coordination. They are each "shocked" at the accusations of illegality in claiming that secretly paying and accepting kickbacks out of settlement funds as simply carrying on their regular business.

To support their arguments[1] that there is no wrong alleged, the Administrators offer nothing more than puffing. The Consolidated Class Action Complaint,[2] which must be seen as true and read in Plaintiffs' favor, includes extensive details of the agreements entered into between the Defendants to skim settlement funds, information provided by insiders about these standing agreements, the lies that were told to settlement courts and settlement counsel, and thirteen particular examples of settlements they administered in the recent years.

## BACKGROUND

*The Class Action Settlement*

Gone are the days of simple franked notice, single state settlements, paper claim forms, and settlement claims checks. The modern class action encompasses hundreds of thousands, and often even millions of class members nationwide sharing between them an agreed-upon single class settlement payment by a defendant, complex notice programs to disseminate notice more deeply and widely through a variety of channels, and virtual payment systems. ¶¶ 58–62.

Settlement counsel negotiate the class settlement including the amount of the class settlement payment, which may be tens or hundreds of millions of dollars a portion of which covers the administration of the court-approved settlement, among other approved litigation fees and costs. ¶ 59.

The settlement court being preliminarily presented with the settlement will review, among many facts and factors: the settlement terms, the class notice plan, and the value being made available to, and divided among, the class members, including projected fees, costs and expenses to be paid from the settlement fund before a penny goes to settlement claimants. ¶¶ 60, 76.

---

[1] References to the Administrator Defendants' Memorandum of Law in Support of Consolidated Motion to Dismiss will be to "Admin Br."

[2] The Consolidated Class Action Complaint will be referred to as "the Complaint" or "CCAC", and references to the allegations in the CCAC will be made by unattributed paragraph references, "¶¶."

With any settlement approval, the court will also appoint a settlement administrator. ¶ 61. Often founded by former class action lawyers, the settlement administrators implement and run the day-to-day operations of the settlement. ¶ 81. Once chosen by counsel of one or all parties, the settlement administrator will provide a declaration to the court as part of preliminary approval. ¶ 59. In it, the settlement administrator outlines their qualifications, their proposed notice program, and other measures they will bring to ensure that the benefits of the settlement, including payments from the QSF, reach the settlement class members. ¶¶ 60–61, 77.

After the settlement is approved, the settlement administrator will shepherd the settlement through for class members: from delivering notice, through receiving, approving and denying claims, and ending with the distribution of the settlement funds *pro* rata to each settlement claimant. ¶¶ 62, 78–79. Just as it was meant to be.

*The QSF*

Between notice to the settlement class and payment of approved claims, the settlement funds are sitting in the hands of the settlement administrator, who is often also appointed the administrator and/or trustee of the Qualified Settlement Fund ("QSF") that will hold the settlement funds. ¶¶ 63–69.

At the front-end of the QSF, settlement administrators will secure a bank to hold the settlement funds deposited by the defendant for the benefit of the class until distribution is made to the class members. ¶¶ 96–101.While the settlement payments sit in the QSF, the QSF will increase based on the interest set by the bank and, given the possibility of appeals, will likely generate further QSF funds for the settlement class. ¶ 75.

At the back-end of the QSF, the settlement administrators will offer different payment options for approved claims, and *pro rata* distributions to the settlement claimants. ¶ 78. These

back-end options used to be just paper checks which would draw no money from the QSF until cashed, leaving uncashed funds for later, residual *pro rata* distribution to settlement claimants. ¶¶ 138, 154. The modern class action might also offer modern e-payment systems like purportedly convenient eCards. ¶¶ 132, 138–141.

*The Backroom Deals*

Long before any appointment as a settlement administrator, and undisclosed to the settlement courts during the approval process, the Administrators cut deals with the Banks,[3] which had developed QSF expertise, and the FinTechs,[4] which brought the purported convenience of commercial eCards to judicially approved settlements. ¶¶ 2–4, 8, 16. Through these "Master Services Agreements" ("MSAs"), which were kept secret from the settlement courts, settlement counsel and settlement classes in any single class action settlement, the Administrators along with their co-Defendants, took value from the QSF to enrich themselves. ¶¶ 8, 10, 380. While the Defendants were carrying out the business of implementing a judicially approved settlement for the benefit of the settlement class members, they were covertly diverting monies from the settlement classes' QSF funds to themselves on two tracks. ¶¶ 3–4, 122–123.

On the Bank Interest Track: the Banks generated large returns on the QSF they held while agreeing with the Administrator to offer below market rates of interest on the QSF, providing kickbacks from the profits to the Administrators for future engagements. ¶¶ 98, 122, 128–129.[5]

On the FinTech Digital Disbursement Track: the Administrators paid the funds for approved claims to the FinTechs from the QSF for e-Cards. ¶¶ 153–156. The FinTechs held the

---

[3] "The Banks" refers to the Bank Defendants Huntington National Bank and Western Alliance Bank.
[4] "The FinTechs" refers to the Fintech Defendants Blackhawk Network Holdings, Inc., Tremendous, LLC, and Digital Settlement Technologies, LLC (d/b/a Digital Disbursements Payments).
[5] Plaintiffs provide further details about the Bank Interest Track in their Background for their Opposition to the Bank Defendants' Motion to Dismiss ("Bank Opp.")

QSF funds, distributing their eCards, but keeping all the "breakage" or unredeemed claimant funds from eCards that expired along with maintenance and service fees. ¶¶ 4-5, 155, 157-159. While an uncashed check leaves funds in the QSF for later *pro rata* distribution, "breakage" remains with the FinTechs who, under the MSAs with the Administrators, cut the Administrators into this secret profit source. ¶¶ 155, 157-159.[6]

And, while each of the Defendants knew about the other's backroom deals, none ever disclosed them to the settlement courts, settlement counsel or the settlement class members despite the innumerable times they could or should have, whether in declarations to the settlement courts, in notices to attorneys general and the settlement classes, in communications with settlement claimants, or in bills to be paid from the QSF for settlement administrative services. ¶¶ 10, 171-357, 371-381. Any word would blow-up the whole operation.

The long-kept secret agreements began to surface in or around October 2024, when Todd B. Hilsee, a 34-year expert in class action administration, prepared a white paper based on his discussions with industry insiders. Those insiders explained that the Administrators were profiting alongside the FinTechs, and demanding a share of the interest held back from the QSF funds by the Banks.[7] ¶ 11. Months later, in May 2025, *Forbes* Magazine published findings form its own investigation, which uncovered a 2020 email of one of the FinTechs in which three administrator insiders described the interest-sharing practice as a "standard practice" and that "the judges approving the settlements, and the plaintiffs' lawyers representing the consumers, are largely

[6] Plaintiffs provide further details about the Digital Disbursement Track in their Background for their Opposition to the FinTech Defendants' Motion to Dismiss ("Fintech Opp.")

[7] *See* Todd B. Hilsee, *Information on Potentially Deceptive Banking and Claims Administration Practices in Class Action Settlement "Digital Payment" Distribution and Reporting re: Allege Systematic Misappropriation of Qualified Settlement Fund Money Without Court Approval*, (October 16, 2024), https://www.hilseegroup.org/wp-content/uploads/2024/10/Hilsee-DP_QSF-White-Paper.pdf (last visited Aug. 29, 2026)

unaware of how the digital cards work, or who is collecting the breakage they generate."[8] ¶¶ 12, 125-126, 157.

By August 2025, Steven Weisbrot, Esq., CEO of Defendant Angeion, confirmed in a declaration filed at the direction of the settlement court overseeing *In re: Facebook, Inc. Consumer Privacy User Profile Litig.* (N.D. Cal.), that Angeion's agreement with one FinTech, Defendant Blackhawk, predated appointment as the settlement administrator. ¶ 13. And when called by the court overseeing final approval of the settlement in *Woods v. Google*, Mr. Weisbrot stated that the same Blackhawk MSA was in force, and that "Angeion generates revenue in connection with the settlements for which Blackhawk acts as Angeion's subcontractor," but refused to produce that agreement. ¶ 14.

Similarly, in *Cabrera v. Google LLC*, which Defendant Angeion confusedly points to as an exoneration (ECF 148), the court discovered the kickback agreement between Angeion and Defendant Blackhawk on the eve of final approval and asked "what should the Court do with the lack of transparency?" *Cabrera v. Google LLC*, 2025 WL 2494429, * 5 (N.D. Cal. Aug. 29, 2025) (Davilla, J.). The case had been contentiously litigated for fourteen years, and a $100 million common fund settlement was ready for distribution to settlement claimants. The *Google* court stated that it and class counsel "should have been [made] aware of this arrangement earlier in the proceedings to permit review of any potential conflicts of interest in advance of preliminary approval . . . . [but] are now informed that Angeion has a financial interest." *Id.* In addition to requiring belated, remedial disclosures to the settlement class, and offering settlement claimants a second opportunity to their preferred payment method, the court accepted class counsels' offer to

---

[8] *See* Jeff Kauflin, *Online Prepaid Cards Have Proliferated as a Way to Compensate Consumers Harmed by Companies. Critics Say FinTechs and Claims Administrators Have Unfairly Profited from the Trend*, FORBES, (May 21, 2025), https://www.forbes.com/sites/jeffkauflin/2025/05/21/how-private-equity-owned-companies-quietly-pocket-class-action-payouts/ (last visited Aug. 29, 2026)

reduce its expense award by $260,000 to keep the settlement on track: "Given the late stage of [ ] discovery [of the Angeion/Blackhawk agreement] and the severity of the recent disclosures, the Court finds that the $260,000 deduction appropriate to ensure beyond a reasonable doubt that the Class had not been harmed." *Id.*

Following the *Google* court, other courts assessing the administration of active settlements have redoubled the call for "full disclosure of all financial arrangements [the Defendant Administrators have] with third parties related to the administration of the settlement[s]." *Brooks v. Thomson Reuters Corp.*, 2025 WL 3201878 (N.D. Cal. Nov. 17, 2025) (discussing Angeion) (Chen, J.); *see also Gibson v. The Nat'l Ass'n of Realtors*, 2026 WL 1840538 (W.D. Mo. June 25, 2026) (discussing JND) (Bough, J.). ¶¶ 13-15.

*The Claims in this Case*

Seeking to address the hundreds of long-finalized settlements in which Defendants' schemes and MSAs were secretly in play, Plaintiffs filed this litigation. ¶¶ 9, 18. Plaintiffs are settlement claimants who received a *pro rata* payment from a QSF as part of a class action settlement in which one or more of the Defendants were skimming from the QSF and, thus, received a smaller payment than they were entitled to receive. ¶ 9; ¶¶ 23-44.

If Defendants just did their jobs as they promised the appointing settlement courts they would, and did so transparently, Plaintiffs would not be here before this Court. As Defendants carried out their official business, however, they violated not only the trust of the courts, but a wide range of common and statutory laws with their backroom deals. ¶¶ 6, 358-365.

For Defendants' concerted action, Plaintiffs allege Defendants' violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* ¶¶ 384-442 and the Sherman Act, 15 U.S.C. § 1, ¶¶ 406-442, civil conspiracy, and the other

Defendants aiding and abetting the Administrators' fraud and breaches of fiduciary duty. For individual conduct, Plaintiffs allege that the Administrators and Banks breached their fiduciary duties, ¶¶ 358-365, that the Administrators made negligent misrepresentations and were negligent, that all Defendants committed fraud and fraudulent concealment, and were unjustly enriched.

## LEGAL STANDARD

Plaintiffs incorporate the Legal Standard in their Opposition to the FinTechs' Motion to Dismiss.

## ARGUMENT[9]

### I. THE ADMINISTRATORS ARE FIDUCIARIES OF THE CLASS

The Administrators held exclusive control over billions of dollars in court-supervised settlement funds. They decided which banks would hold QSF deposits, selected the payment platforms for distributing settlement proceeds, determined which claims were valid, calculated each claimant's share, and controlled the information disclosed to courts, counsel, and class members. ¶¶ 79, 82, 458. While exercising that authority, they entered secret compensation arrangements with the Banks and FinTechs—arrangements that siphoned value from the very QSFs they were appointed to protect—and concealed those arrangements from every actor charged with overseeing the settlement process and the claimants. ¶¶ 8, 10, 171–357, 371–381. Whether these facts give rise to a fiduciary duty is a question of fact that cannot be resolved at the pleading stage.

[9] The Administrators attach several appendices to their briefing purporting to be law surveys of jurisdictions they believe may, ultimately, provide some law-of-decision. Because there are no identified conflicts, and the issues raised in their motion do not pertain to any particular states' law, Plaintiffs have not prepared their own, rebuttal general surveys. Rather, the law generally affirms the adequacy of Plaintiffs allegations of the illegality of Defendants' conduct.

### A. Fiduciary Status is a Question of Fact that Follows Function Not Labels

Defendants insist that Plaintiffs must point to specific "settlement documents, court orders, or some statute or Rule" that explicitly designated them as fiduciaries. Admin. Br. 14, 20. But imputing a fiduciary relationship from services performed is elemental fiduciary duty law.

Fiduciary status is a fact-intensive inquiry that courts consistently decline to resolve at the pleading stage. *See Vox Media, Inc. v. Mansfield*, 322 F. Supp. 3d 19, 25 (D.D.C. 2018) (whether defendant was a fiduciary presented "contested question[] of fact" the court could not resolve at the pleading stage).[10] A claim for breach of fiduciary duty is "generally not amenable to dismissal for failure to state a claim when the claimed ground for dismissal is the absence of a fiduciary relationship." *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz,* 793 F. Supp. 2d 311, 341 (D.D.C. 2011). Defendants' motion should be denied on this threshold ground alone.

The substance of a relationship, not its label, controls whether a fiduciary duty exists. Courts "have deliberately left the definition of a 'fiduciary relationship' open-ended, allowing the concept to fit a wide array of factual circumstances." *Democracy Partners v. Project Veritas Action Fund*, 453 F. Supp. 3d 261, 279 (D.D.C. 2020). The controlling inquiry is practical and substantive: "the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties." *Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C. Cir. 1996). A property arrangement may be a trust, and its manager a fiduciary, "even though such terms as 'trust' or 'trustee' are not used." Restatement (Third) of Trusts § 5 cmt. f (2003). The Supreme Court has inferred the relationship despite the absence of an express fiduciary provision when a

[10] *See also Xereas v. Heiss*, 987 F.3d 1124, 1133-34 (D.C. Cir. 2021) (reversing dismissal); *Kim v. DP Capital LLC*, 2024 WL 4253168, at *4 (D.D.C. Sept. 20, 2024); *Heidi Aviation, LLC v. Jetcraft Corp*., 573 F. Supp. 3d 182, 208 (D.D.C. 2021); *accord Optionality Consulting Pte. Ltd. v. Nekos*, 2019 WL 4523469, at *12 (S.D.N.Y. Sept. 18, 2019); *Campbell v. Tex. Tea Reclamation, LLC*, 2021 WL 2211690, at *8 (S.D. Tex. May 6, 2021).

party assumes control property belonging to another. *United States v. Mitchell*, 463 U.S. 206, 224-25 (1983). And a claims administrator that had written "purely ministerial duties" into its own contract was still bound as a fiduciary because "putting the magic words in the contract, 'purely ministerial duties,' does not avoid fiduciary responsibility, if the characterization . . . is not correct. The issue is not just how the duties are characterized, but what they are." *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1419-20 (9th Cir. 1997).[11]

When "a party temporarily takes 'control of the common rights of all' the class members," that party "assumes 'a duty fairly to represent those common rights.'" *Pearson v. Target Corp*., 968 F.3d 827, 832-34 (7th Cir. 2020). This principle is not limited to formally designated fiduciaries. Anyone who controls assets held for class members is a fiduciary. *Id.* at 832. The Administrators assumed exactly that position — control over settlement funds held exclusively for the benefit of absent class members — and they may not disclaim the ensuing obligations. *See In re Managed Care Litig.*, 2025 WL 5236105, at *13-14 (S.D. Fla. Nov. 10, 2025).

Because the duty is determined by roles, responsibilities, and relationships, rather than mere titles, a fiduciary relationship is "a fact-intensive question". *Millennium Square Residential Ass'n v. 2200 M St. LLC,* 952 F. Supp. 2d 234, 248 (D.D.C. 2013).[12] Plaintiffs allege that the Administrators assumed the trust of the settlement courts, settlement counsel, and settlement

[11] The approach is not limited to the D.C. Circuit. *See, e.g., The Florida Bar v. Adorno*, 60 So. 3d 1016, 1028 (Fla. 2011) ("Under [Defendants'] argument, an implied fiduciary duty would extend only to those situations where a Florida court expressly recognized the exact duty previously, a result that is inconsistent with well-established precedent."); *Daley-Bishop v. Long & Foster Prop. Mgmt.*, 2020 WL 4053595, at *5 (E.D.N.C. July 20, 2020) (denying dismissal where "plaintiff entrusted her property to defendants" who held "considerable discretion to act on behalf of plaintiff and her property"); *Iacurci v. Sax*, 313 Conn. 786, 800 (2014) (Connecticut has adopted "a flexible approach" that "allows the law to adapt to evolving situations wherein recognizing a fiduciary duty might be appropriate").

[12] *See also Kim v. DP Capital LLC*, 2024 WL 4253168, at *4 (D.D.C. Sept. 20, 2024); *Heidi Aviation, LLC v. Jetcraft Corp.*, 573 F. Supp. 3d 182, 208 (D.D.C. 2021); *accord Optionality Consulting Pte. Ltd. v. Nekos*, 2019 WL 4523469, at *12 (S.D.N.Y. Sept. 18, 2019); *Campbell v. Tex. Tea Reclamation, LLC*, 2021 WL 2211690, at *8 (S.D. Tex. May 6, 2021).

members, and were given responsibility for the care of settlement funds and truthful communications to each. If there is any question as to whether fiduciary duty exists, and there should be no question here, it must be resolved on the facts.

### B. By Appointment and Action, the Administrators Were Fiduciaries in Each Settlement

#### 1. The Administrators are independently appointed fiduciaries whose duties are not displaced by the court and class counsel

Settlement administrators are independently appointed fiduciaries charged with responsibilities for overseeing the QSFs and the review of claims for payment from that fund. The Treasury Regulations governing these funds confirm that authority: the "administrator" of a QSF is, in order of priority, the person designated or approved by the court that ordered the fund, or the person designated in the settlement agreement itself. Treas. Reg. § 1.468B-2(k)(3)(i)-(ii). The regulation's duties may be tax-administrative and run to the government, but its designation criteria identify whoever the court or the settlement agreement placed in control of the fund. That the Administrators meet that definition, settlement after settlement, confirms what the Complaint alleges: they, and not some other entity, held and controlled the assets. *In re Celotex Corp.*, 487 F.3d 1320, 1331 (11th Cir. 2007) ("[T]he nature of the Administrator's relationship and powers with respect to the trust beneficiaries determines whether he is a fiduciary."); *Bell v. Farmers Ins. Exch.,* 137 Cal. App. 4th 835, 840 (2006) ("[T]he claims administrator held the funds solely for distribution to class members, thereby creating a trust relationship in which the claims administrator acted as trustee and class members enjoyed the rights of beneficiaries"); *In re Managed Care Litigation*, 2025 WL 5236105, at *12-13 (S.D. Fla. Nov. 10, 2025) (fiduciary obligations run from "an agent holding class funds"); *Rougvie v. Ascena Retail Grp., Inc.*, 2019 WL 944811, at *5 (E.D. Pa. Feb. 21, 2019) (claims administrator "must perform diligently with a fiduciary duty to the Class"); *see also In re BankAmerica Corp. Securities Litigation,* 2022 WL

17609899, at *1-2 (E.D. Mo. Dec. 13, 2022) (describing the appointed administrator as "acting in a fiduciary capacity"); *Douglas v. Western Union Co.*, 328 F.R.D. 204, 217 (N.D. Ill. 2018) ("the settlement administrator is an agent of the court").

An absent class member "is not required to do anything" and instead "may sit back and allow the litigation to run its course, content in knowing that there are safeguards provided for his protection." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810 (1985). Once a class has been certified, its members "effectively lose nearly all of their litigative individuality," relying on others whose roles bound them as fiduciaries to the class members. *United States v. Cammarata*, 145 F.4th 345, 372 (3d Cir. 2025).

A class representative occupies "a position, not technically as a trustee perhaps, but one of a fiduciary character," because "[t]he interest of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949). Class counsel likewise owes fiduciary duties to the class. Fed. R. Civ. P. 23(g)(4); *In re Auto. Parts Antitrust Litig., End-Payor Actions*, 33 F.4th 894, 904 (6th Cir. 2022). And under Rule 23(e), the district court itself "acts as a fiduciary who must serve as a guardian of the rights of absent class members." *Drazen v. Pinto*, 106 F.4th 1302, 1328 (11th Cir. 2024) (*en banc*); *see Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 193 (D.D.C. 2017) (describing the court's role as "akin to the high duty of care that the law requires of fiduciaries").

The structure of Rule 23 demands the Administrators' independent fiduciary status. Under Rule 23(e), no settlement may take effect without court approval, and the court's approval depends on complete and accurate information from the administrator. Rule 23(h) separately addresses attorneys' fees. Settlement administration costs are handled through a still-separate mechanism: the administrator is independently appointed by the court, submits independent sworn declarations

directly to the court, and receives compensation from the QSF pursuant to court order — not as a line item within class counsel's fee application. The 2018 amendments to Rule 23(e)(2) further directs courts to evaluate "the effectiveness of any proposed method of distributing relief to the class," Fed. R. Civ. P. 23(e)(2)(C)(ii), and whether "the proposal treats class members equitably relative to each other," Fed. R. Civ. P. 23(e)(2)(D) — factors squarely implicated where, as here, the administrator's own discretion ultimately determines what each settlement claimant receives. The court's finding that a settlement is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2); depends on, among other things, the administrator's declarations — attesting to notice implementation, claim validity, distribution calculations, and administrative costs — are submitted independently to the court as the basis for the court to make such findings. *See* ¶ 483. That independent submission to, and reliance by, the court is incompatible with treating the administrator as merely class counsel's vendor. It reflects a direct relationship of trust between the settlement court and the appointed administrator for the benefit of the settlement class.

The Administrators' independent duties are not displaced by the existence of other fiduciaries. "Certainly, this Court owes a duty to class members to ensure proper distribution of class funds, but that does not mean that an agent holding class funds does not also have fiduciary obligations." *In re Managed Care Litig.*, 2025 WL 5236105, at *13. Multiple fiduciaries can and do coexist; a trustee's appointment of a sub-trustee does not eliminate the sub-trustee's independent obligations. *See, e.g.*, *In re Taxman Clothing Co.*, 49 F.3d 310, 314 (7th Cir. 1995), overruled on other grounds by *Lamie v. U.S. Trustee*, 540 U.S. 526 (2004) (appointee bears independent fiduciary duty and "is not a wind-up toy set in motion by" the directing party); *Rougvie*, 2019 WL 944811, at *5 ("the Claims Administrator, like an attorney hired on a contract basis to help Class Counsel, must perform diligently with a fiduciary duty to the Class as the Class Counsel's agent");

*Jenkins v. Sterlacci*, 849 F.2d 627, 631-32 (D.C. Cir. 1988) (rejecting argument that court-supervised appointees owe a lesser standard because they remain subject to district-court control). Defendants' argument that Rule 23(g)(4)'s identification of class counsel's duty "negates" any administrator duty, Admin. Br. 16, would equally mean that the court's own Rule 23(e) duty eliminates class counsel's duty — an argument no court has ever accepted. Defendants nevertheless read Rule 23(g)(4)'s identification of class counsel's duty to "negate Plaintiffs' fiduciary duty claim against Administrator Defendants." Admin. Br. 16. The mere fact that Rule 23 makes no mention of administrators (*id*. 15) is irrelevant to the rights of Plaintiffs. Silence in a rule of procedure does not extinguish a duty substantive law imposes. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999) ("no reading of the Rule can ignore the Act's mandate that 'rules of procedure "shall not abridge, enlarge or modify any substantive right."'" (quoting 28 U.S.C. § 2072(b))).

**2. The Administrators exercised authority over the claims of the settlement class members and their money**

Contrary to Defendants' argument, a finding of fiduciary duty does not turn on how much discretion the holder exercises, but on what the holder does with the trust it is given. Admin. Br. 12-13. Reasoning from trust principles, and construing language that "codif[ies] and mak[es] applicable . . . certain principles developed in the evolution of the law of trusts," the Supreme Court rejected the argument that a fiduciary must hold "entirely discretionary authority or control." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 113 (1989). "Rather, one is a fiduciary to the extent he exercises any discretionary authority or control."[13] *Id.*

[13] *Firestone* construed ERISA's fiduciary definition, and Defendants read that statute the other way, arguing that Congress's decision to impose a functional test there implies its absence everywhere else. Admin. Br. 20. The Supreme Court has described that test as "codif[ying] and mak[ing] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts." *Firestone*, 489 U.S. at 110 (quoting H.R. Rep. No. 93-533, at 11 (1973)). A codification of trust principles is not a departure

Power held over another's money, exercisable for that other's benefit, carries a duty to that person. "If a power to control the actions of a trustee is for the benefit of the beneficiaries generally, or in whole or in part for the benefit of someone other than the holder of the power, the power holder is subject to fiduciary duties in the exercise of the power." Restatement (Third) of Trusts § 75 cmt. e (2007). The rule reaches any "third party otherwise unconnected with the trust," whose "relationship to the trust is unimportant, except as it may be a factor in determining the nature or extent of the power." *Id.* cmt. a. The duty attaches when the holder "expressly or impliedly accept[s] the power," and the holder's "fiduciary duties and liabilities with respect to the power are generally comparable to those of a trustee." *Id.* cmt. f.

Defendants' own authority states the same measure. Admin. Br. 13 (quoting *United States v. Chestman*, 947 F.2d 551, 568-569 (2d Cir. 1991) (*en banc*)). *Chestman* states that one acts in a fiduciary capacity when "the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person . . . as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part." *Id.* at 568-69. The assumed duty is straightforward. Chestman only narrowed that definition for one reason absent here: it called the broader equitable formulation "[u]seful . . . in the civil context" and declined to import it into a criminal prosecution. *Id.* at 569-70.

An administrator who decides which claims are allowed, and whose decisions bind whoever writes the checks, holds that power as a fiduciary. In *Celotex*, the administrator held "virtually exclusive authority over the day-to-day processing and the allowance or disallowance

---

from them. See *Chao v. Day*, 436 F.3d 234, 237 (D.C. Cir. 2006) ("Even though our holding in this case rests exclusively on ERISA's statutory definition of a 'fiduciary,' our conclusion is also consistent with the long-prevailing common law definition of the term.").

of PD claims," which gave him "the power to bind the Trust" and mandated payment by the trustees in accordance with his determinations, operating as "a final, non-appealable judgment against the Trust." *In re Celotex Corp.*, 487 F.3d at 1330-31.

Here, Plaintiffs allege the Administrators held a wide range of authority over the settlement funds held for the benefit of Plaintiffs and other settlement class members. The Administrators exercised "discretionary authority and control over the administration, management, investment, and distribution of QSF assets," including determining which bank held the deposits, selecting the payment platforms, and "controlling the information that was disclosed." ¶ 458. Before distribution, the Administrators performed "an allocation calculation for each class member, determining the precise disbursement amount each claimant is entitled to receive based on the total funds available in the QSF, including accrued interest, less any court-approved fees and costs." ¶ 79. As "administrators" of court-supervised QSFs, the Administrators "direct which bank[s] hold QSF deposits, select platforms to distribute settlement payments to claimants, and determine what claimants received and through what mechanisms." ¶ 82(b). And in each of the thirteen exemplar settlements Plaintiffs provide, the Administrators are shown, time and again, to assume the responsibilities of trust, particularly as to the settlement funds. ¶¶ 171-357.

Defendants say Plaintiffs "do not identify any meaningful act by any Administrator Defendant that was not subject to review by class counsel." Admin. Br. 17-18. The Administrators are confused as to the nature of their appointment and the allegations. First, any oversight was effectively blinkered by the Administrator's fraud.

Second, they are neutrals and can be retained equally by class or defense counsel, and are appointed by the settlement court to apply the terms of the settlement neutrally. ¶ 80 (Administrators "hold themselves out to the public, courts, class counsel, and defendants as

neutral, court-supervised fiduciaries"). The Administrators review and approve or deny claims, and these determinations may be final and unreviewable, even by the court. And where a settlement made an administrator's determinations "final and not subject to review by the Court or any other court or tribunal," a claimant who asked the supervising court to correct one was told that "[e]ven if EPIQ erred," it could not. *In re Managed Care Litig.*, 2023 WL 7545315, at *13-14 (S.D. Fla. Nov. 14, 2023).

Against all this, Defendants offer a word: "ministerial." Admin. Br. 18. Ministerial is not a synonym for routine. Franking an envelope is ministerial. A ministerial duty is one "so plainly prescribed as to be free from doubt and equivalent to a positive command," and "where the duty is not thus plainly prescribed but depends upon a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion." *Wilbur v. United States ex rel. Kadrie*, 281 U.S. 206, 218-19 (1930). Courts compel ministerial acts. What they will not do is "direct the exercise of judgment or discretion in a particular way nor to direct the retraction or reversal of action already taken in the exercise of either." *Id.* at 218. While there may be "procedural and substantive limitations on the Administrator's authority to allow claims," such limitations only defined "the extent of the Administrator's discretion." *In re Celotex Corp.*, 487 F.3d at 1331, 1336. In each settlement, banks needed to be found, and payment mechanisms selected — decisions the Administrators made using their own discretion, not at anyone else's direction.[14]

[14] Even if the Administrators' responsibilities tended toward the ministerial, and they are very well compensated for carrying out merely ministerial tasks, each "has a duty not to acquire a material benefit from a third party in connection with transactions conducted or other actions taken on behalf of the principal or otherwise through the agent's use of the agent's position." Restatement (Third) of Agency § 8.02 (2006). That duty does not vary with the breadth of the agent's authority, and disgorgement does not require proof of loss. *Id.* § 8.02 cmt. e; *see Ward v. Taggart*, 51 Cal. 2d 736, 741 (1959) ("all profits resulting from that relationship belong to the principal") (quoting *Savage v. Mayer*, 33 Cal. 2d 548, 551 (1949)). Indeed, the

The Eleventh Circuit would say that the Administrators "put the cart before the horse in first declaring the Administrator to be a non-fiduciary and deducing therefrom that the Trust Agreement cannot be read as assigning any power of control to the Administrator." *Id.*. "In the absence of an express provision, the nature of the Administrator's relationship and powers with respect to the trust beneficiaries determines whether he is a fiduciary." *Id*.

Accordingly, Plaintiffs have established the Administrators' fiduciary duties.

### C. The Test the Administrators Propose is Satisfied by the Pleadings

The Administrators contend that "no State" recognizes a fiduciary duty unless four requirements are met. Admin. Br. 12. As demonstrated above – fiduciary duty is not a checklist. *See supra* Sections I.A-B. However, because the Complaint satisfies Defendants' self-serving test on its own terms, its motion has identified no deficiency in the pleadings.

**First, the Complaint alleges justified trust.** The appointing courts placed that trust when they selected the Administrators at preliminary approval and entrusted them with the claims process and settlement funds. ¶¶ 61, 102. That reliance was justified for the reason the Complaint alleges: "[t]he judiciary trusts the guardrails provided by the fiduciary duty imposed on the appointed administrator." ¶ 102; *see supra* § I.B.1. Absent class members were entitled to rely on the protections of a court-supervised settlement, trust inhered in the court-conferred office, not in private dealings.

**Second, the Administrators consciously accepted the responsibility.** They competed for the appointments, promoted their ability to perform the work, accepted appointment, and then exercised the authority the appointment conferred. ¶ 80 (Administrators "compete for appointments by submitting bid proposals and term sheets") *supra* § I.B.1. Having sought and

narrower Defendants characterize their role, the clearer the governing obligation becomes: one entrusted with another's money may not take an undisclosed benefit from transactions conducted with that money.

exercised the powers of the office, they cannot disclaim the responsibilities that accompanied them.

**Third, the Administrators exercised discretion beyond ministerial tasks.** They determined whether claims were valid, calculated each claimant's share, deducted administrative expenses and their own fees, and directed the timing and method of payment. ¶¶ 79, 180. These functions required judgment, not mere clerical execution. *See supra* § I.B.2.

**Fourth, there was dependence and vulnerability.** There were no arm's-length dealings between these parties. Class members did not negotiate with the Administrators, select them, retain them, set their compensation, or participate in defining the terms of their engagement. They were absent from the transaction altogether. The Administrators' arm's-length negotiations, if any, were with class counsel, not with the beneficiaries whose funds they received and administered.

Nor does this District apply an arm's-length commercial framework to a custodian of entrusted funds. Although "the mere existence of a contract does not create a fiduciary duty," an "escrow/depositor relationship, regardless of contractual underpinnings," creates an independent fiduciary relationship "irrespective of any contractual relationship." *Friends Christian High Sch. v. Geneva Fin. Consultants, LLC*, 39 F. Supp. 3d 58, 63 (D.D.C. 2014). The duty follows from custody of money held for another's benefit, not from bargaining between fiduciary and beneficiary.

The dependence alleged here is complete. Class members rely almost entirely on the Administrators for information concerning the settlement and decide whether to submit claims, object, opt out, or do nothing. ¶¶ 71–72. They cannot move the settlement funds. ¶ 101. They did not choose the Administrators, cannot replace them, and have no practical means to audit their performance. The Administrators, by contrast, hold the funds, administer the claims, determine

individual payment amounts, and control the mechanics of distribution. Those allegations establish dependence, vulnerability, and ceded control at the pleading stage.

This theory does not transform every settlement vendor into a fiduciary. A printer that mails notice or a contractor that hosts a settlement website does not hold the class's money or determine who receives it. The Administrators allegedly did both. It is that combination, custody of a fund maintained for the class and authority over entitlement and distribution, that places them in a materially different position.

The Court therefore need not adopt Defendants' proposed test. The Complaint clears even the heightened bar constructed by Defendants, and the fiduciary-duty claim should not be dismissed.

**D. Plaintiffs Allege Other Elements of Breach of Fiduciary Duty**

The Administrators argue that, even if they were fiduciaries, Plaintiffs' allegations are about "ordinary commercial arrangements" and fail to allege a breach of their fiduciary duties. Admin Br. 43-44. The Administrators ignore the detailed list of their breaches of: (a) their duty of loyalty, (b) their duty not to self-deal, (c) their duty of impartiality, (d) their duty of prudent administration, (e) their duty of full disclosure, (f) their duty of account; and (g) their duty of candor to the tribunals that appointed them to serve the settlement classes.[15] ¶¶ 459, 460. These detailed allegations must be accepted as true for the purposes of the Administrators' motion. So Administrators seek to distract from these allegations, pointing to un-alleged and unidentified "industry practice, available alternatives, competing bids, comparative pricing, or what a prudent administrator supposedly would have done differently." Admin Br. 44.

---

[15] *See, e.g.* Restatement (Third) of Trusts §§ 77, 78, 80, 82, 83.

As alleged, and as prohibited to fiduciaries, a "prudent administrator" is not to skim and personally benefit from monies held for the benefit of settlement classes, is not to enter undisclosed agreements to enrich themselves and with those funds, and, when seeking appointment, to keep these secret standing agreements secret from the appointing courts, settlement counsel, and the settlement classes. There is nothing "competitive" or "comparative," as the Administrators put it, to be assessed beyond their imprudent self-dealing.

In contrast to the two cases Administrators cite, their compensation was not public (*Lemond*) and they are alleged to have set up an actual, not the mere potential of a conflict of interest (*Anderson*) through their secret agreements with the other Defendants. The law imposes on the holder of settlement funds an obligation "to account for those funds and to distribute those settlement funds to class members." *Managed Care*, 2025 WL 5236105, at *12. Accordingly, a trustee "normally violates the duty of loyalty by personally accepting from a third person any fee, commission, or other compensation for an act done by the trustee in connection with the administration of the trust." *Restatement (Third) of Trusts* § 78 cmt. d(1) (2007). "An agent may not receive undisclosed compensation from a counterparty in connection with a transaction conducted on the principal's behalf," and "no reasonable jury could find that the receipt of undisclosed payments from counterparties in transactions conducted on [the principal's] behalf was consistent with their duty of loyalty." *Sound Around, Inc. v. Friedman*, 2026 WL 972984, at *5 (S.D.N.Y. Apr. 10, 2026) (granting summary judgment against defendant).

As alleged, the Administrators, in coordination and agreement with the other Defendants, took monies from QSFs without oversight or disclosure, placing their own interests in direct conflict with those of Plaintiffs.

## II. PLAINTIFFS' ANTITRUST CLAIMS SHOULD NOT BE DISMISSED

### A. Plaintiffs Are Direct Purchasers

The Administrators argue that Plaintiffs are "indirect" purchasers under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), because class counsel or a court were involved in the selection of the claim's administrator. Admin Br. 31-34. That argument misreads and misapplies *Illinois Brick* and conflates the role of an agent with that of a purchaser. *Illinois Brick* stands for the proposition that only the initial purchaser in a chain of distribution may bring antitrust claims. Subsequent or "indirect" purchasers in a chain of distribution are not permitted to pursue antitrust claims because their cases could result in duplicative litigation or conflicting results, *Illinois Brick*, 431 U.S. at 737-41, and are fraught with complex evidentiary issues trying to prove an overcharge or anticompetitive damages through the chain of distribution. *Id*. at 741-45. *Illinois Brick* does not bar Plaintiffs here because the alleged transactions were not part of any chain of distribution and Plaintiffs paid directly.

The Administrators were paid directly for their services from the class settlement funds. Funds residing in a settlement fund, even before distribution, belong to the class. *See Boeing v. Van Gemert,* 444 U.S. 472, 478-479 (1980); *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1265 (D.C. Cir. 1993). That principle applies with particular force where, as alleged here, the limited settlement funds are distributed *pro rata* among the class members. Any funds illegally taken or denied by Defendants' anticompetitive conduct should (and would) have been distributed to the settlement class members.

Contrary to Defendants' argument, the fact that settlement counsel negotiated agreements or "set the price" of the services does not make settlement counsel direct purchasers. Settlement counsel may have contracted, but settlement counsel did not pay the Administrators – the QSF, which belongs to the settlement class, paid the price. Defendants' argument was specifically

rejected by the Supreme Court in *Apple, Inc. v. Pepper*, 587 U.S. 273 (2019). In *Apple*, defendants argued that iPhone owners could not sue Apple as direct purchasers where third-party app developers had "set the price" paid by the iPhone owners. The Supreme Court held that *Illinois Brick* was not intended to prevent such a suit because, although third parties may have set the price, the purchases were made by the iPhone owners themselves. *Apple, Inc.*, 587 U.S. at 287-88. The fact that class counsel negotiated the engagement is no more dispositive than the fact that app developers set prices in *Apple*. The relevant inquiry is who purchased the service and who paid the overcharge. Here, the class purchased settlement-administration services through its agents and paid for those services directly from class-owned settlement funds.

The Administrators' reliance on *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842 (3d Cir. 1996), is similarly misplaced. In *McCarthy*, malpractice attorneys who initially paid overcharges buying photocopies contingently from their own funds and "for their own use in representing their clients" would pass through these charges only if they successfully recovered on behalf of their client. *Id.*, 80 F.3d at 852-53. Here, class counsel never paid a cent to the Administrators. Rather, class members paid directly from their settlement funds, with class counsel serving as their agent. The *McCarthy* court found that because "none of the plaintiffs retained their lawyers to act as mere purchasing agents," the lawyers themselves were "the direct purchasers of the hospital-record photocopies."

Courts have recognized that purchases made through agents[16] can satisfy the direct purchaser rule in *Illinois Brick*. *See, e.g., In re Lorazepam & Clorazepate Antitrust Litigation*, 202 F.R.D. 12, 25 (D.D.C. 2001) (holding that plaintiffs who purchased drugs themselves or through

---

[16] Here, Plaintiffs have sufficiently alleged facts that class counsel acted as Plaintiffs' agent, who procure settlement administration services in "only one transaction" and only for the direct benefit of (not for resale to) the class. *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 34 (D.D.C. 2008); ¶¶ 59-61, 80, 82

agents had standing to bring antitrust claims).[17] Accordingly, Plaintiffs were the direct purchasers injured by the anticompetitive prices charged for claims administration services. Moreover, courts have held that the existence of an agency relationship for the purpose of Illinois Brick standing is a fact intensive inquiry that should generally be decided by the trier of fact after discovery. *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 2025 WL 927059, at *11 (E.D.N.Y. Mar. 27, 2025), report and recommendation adopted in part, 2025 WL 2490442 (E.D.N.Y. Aug. 29, 2025) ("Discovery, including into the scope of the agency relationships among Plaintiffs and their [alleged agents] . . . will be essential in resolving the direct-purchaser inquiry under *Illinois Brick*.").

**B. Plaintiffs Have Antitrust Standing**

Plaintiffs also have standing to bring this lawsuit because they suffered injuries that the antitrust laws were designed to prevent. The Complaint alleges that the Defendant Administrators conspired with Defendant Banks to artificially lower the interest rates offered to Plaintiffs' settlement funds and to use that money to pay kickbacks to Administrators. ¶ 425. This simultaneously lowered the amounts in the class fund to be distributed to the class and raised the price of administrative services. ¶¶ 426-31. The conspiracy also eliminated competition in the Administrator Services market because, absent the conspiracy, Administrators would have offered higher interest rates that were available in the market – precisely the type of injury the antitrust laws were designed to prevent. ¶¶ 432.

[17] *See also, e.g.*, *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 505-506 (S.D.N.Y. 1996) (distinguishing *McCarthy* and holding that plaintiffs who purchased securities through non-defendant owned brokers were direct purchasers "where those brokers did not function as a distinct economic entity in the chain of purchase or sale")); *In re Toilet Seat Antitrust Litigation,* 1977 U.S. Dist. LEXIS 14311 at *5-6 (E.D. Mich. August 24, 1977) (holding that a buyer who employed a purchasing agent is not "an indirect purchaser" and may pursue antitrust claims)

Section 4 of the Clayton Act provides a remedy to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" 15 U.S.C. § 15. In *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), the Supreme Court identified several "factors that circumscribe and guide" whether a plaintiff's injury is too remote from the antitrust violation to warrant a remedy under Section 4: (1) whether the antitrust violation caused the harm to the plaintiff (*id.* at 537); (2) the nature of the plaintiff's alleged injury, *i.e.,* whether it was of the type that Congress sought to redress in providing a private remedy for violations of the antitrust laws (*id.* at 538); (3) the directness or indirectness of the asserted injury (*id.* at 540); (4) the existence of more direct victims (*id.* at 542); (5) whether the claim for damages is speculative (*ibid.*); and (6) the potential for duplicative recovery and the complexity of apportioning damages (*id.* at 545). *See also Andrx Pharms., Inc. v. Biovail Corp., Int'l*, 256 F.3d 799, 806 (D.C. Cir. 2001). Courts need not discuss every *AGC* where not all are relevant. *See, e.g., Klein v. Am. Land Title Ass'n*, 560 Fed. Appx. 1 (D.C. Cir. 2014). Thus, no one factor is determinative.

In this case, each of the *AGC* considerations Each of these factors weighs in Plaintiffs' favor.

**1. The Complaint alleges that Defendants' antitrust violation caused Plaintiffs' economic injury**

The Complaint alleges a direct economic connection between Defendants' anticompetitive conduct and Plaintiffs' injury. As noted above, because the services here were purchased with class settlement funds, Plaintiffs were the direct purchasers who overpaid for settlement administrative services and received lower interest rates than they would have absent the alleged conspiracy. ¶¶ 426-31.

The Complaint also alleges that the Defendants' antitrust conspiracy[18] was both the "but for" and material cause of Plaintiff's harm and explains that, absent the conspiracy, the alleged kickback scheme was not sustainable. ¶ 589. Plaintiffs' harm flowed directly from the Administrators' conspiracy to reduce competition in the Settlement Administration market, (¶¶ 427-32), and Plaintiffs are not downstream purchasers alleging injury from someone else's loss, (¶¶ 23-44). Because the settlements provided for *pro rata* distribution, the anticompetitive conduct directly increased the costs charged against the settlement funds and suppressed QSF interest, reducing the amounts available for distribution to class members. ¶¶ 173, 188, 204, 219, 248, 260, 279, 292, 306, 319, 333, 346.

Defendants' contention that Plaintiffs have not alleged that another administrator would have offered the same services at a lower price is irrelevant because Plaintiffs' injury does not depend on proving settlement counsel would have selected a different administrator. Admin Br. 36. The Complaint alleges that the challenged compensation arrangements themselves increased the costs charged against the settlement funds and that every dollar paid to the alleged conspirators reduced class-member recoveries dollar-for-dollar. *See, e.g.,* ¶¶ 248, 260, 279. Further, Plaintiffs' allegations rely on standard economic principles of supply and demand: in a competitive market, Administrators would compete on QSF interest to win appointments (¶¶ 80, 432); the conspiracy short-circuited that competitive dynamic (¶¶ 407, 425, 440) resulting in higher prices and lower interest to the class (¶¶ 427, 429, 583). At the pleading stage, such economic assumptions are sufficient. *See Osborn v. Visa Inc.*, 797 F.3d 1057, 1066 (D.C. Cir. 2015).

[18] Defendants' focus on whether the arrangements were disclosed misapprehends the alleged antitrust conspiracy. Admin Br. 35. The alleged antitrust conspiracy is not that the Defendants kept the kickback conspiracy secret (although this was a part of their alleged conduct and central to their fraud); rather, it was that they agreed to not compete on interest rates.

### 2. The Complaint alleges an injury the antitrust laws exist to prevent

Contrary to the Administrators' argument (Admin Br. 37-38), the Complaint alleges that the Administrators agreed to eliminate competition, which increased the price of settlement administration services and diverted interest that otherwise would have gone to class members. ¶¶ 406–408. It further alleges that Banks agreed to maintain deposits at below-market rates and paid the Administrators the difference between reported and market interest. ¶ 431. The concrete economic consequences of that restraint were that the anticompetitive agreement raised the price of administration services, reduced total payouts, and caused Plaintiffs themselves to pay more for administrative services and receive less than they otherwise would have received. ¶¶ 427–428. The Complaint therefore alleges precisely the type of injury the antitrust laws are intended to prevent: the suppression of competition resulting in "increase in price" and reduced economic returns to consumers. *See Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 221 (D.D.C. 2022).

### 3. The Complaint alleges that Plaintiffs' injury flowed directly from Defendants' conduct.

Defendants argue that Plaintiffs' alleged injury is too remote because courts, class counsel, other administrators and banks, attorneys general, and other third parties would have to act differently before Plaintiffs could receive more money. Admin Br. 36-37. Defendants erect a strawman. Plaintiffs do not allege that their injury resulted from a third party's decision to select the "wrong" administrator. Plaintiffs allege that the challenged arrangements directly reduced the money available for distribution to Plaintiffs from the QSFs. The Complaint alleges that administration expenses were deducted from settlement funds and that each dollar paid to the conspirators reduced class-member recovery dollar-for-dollar. *See, e.g.,* ¶¶ 248, 260, 279. The Complaint alleges a similarly direct economic relationship with respect to QSF interest—the Bank

Defendants paid below-market interest, and the difference was shared with Administrators (through kickbacks) who looked no further for better rates of return.[19] ¶¶ 428, 431–432. The Complaint also expressly alleges that Plaintiffs' harm "flows directly" from the conspiracy. ¶ 589. Other parties' involvement in administering the settlements does not sever that causal connection. The relevant question under *AGC* is not whether other actors participated in administering the settlements, but whether Plaintiffs' alleged injury was a direct consequence of the challenged restraint rather than the independent result of those actors' separate conduct.

**4. The Complaint alleges that Plaintiffs bear the economic loss**

The Administrators contend that Plaintiffs are not the proper parties because class counsel constitute an identifiable group that could have challenged the alleged conduct. Admin Br. 37. But the ability to object to conduct does not make class counsel the party who suffered the economic injury. The "more direct victim" inquiry concerns the antitrust injury – not simply the party who was better positioned to detect, prevent or challenge the conduct. *Plaintiffs* and *class members* were the people whose settlement distributions were reduced. ¶¶ 23-44, 248, 260, 279, 508. There is no more direct economic victim.

**5. Plaintiffs' damages are not speculative**

Defendants contend that the Complaint "assumes" that their conduct reduced Plaintiffs' distributions dollar-for-dollar, rendering any damages conjectural. Admin Br. 35. Initially, plaintiff "is not required to make a precise damages calculation" at this stage of the litigation *Alemayehu v. Abere*, 199 F. Supp. 3d 74, 86 (D.D.C. 2016) (citing *NCB Mgmt. Servs.,*

[19] Courts have recognized a "co-conspirator exception" to *Illinois Brick* where an upstream defendant conspires with the intermediary in conduct that directly causes the plaintiff's injury. *See, e.g.*, *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 750-51 (9th Cir. 2012) ("This co-conspirator exception allows an indirect purchaser to sue when co-conspirators set the price paid by the plaintiff."). The same reasoning applies here. Plaintiffs allege that the Banks were not remote actors but active co-conspirators who knowingly participated in suppressing QSF interest and diverting the resulting value to the Administrator Defendants.

*Inc. v. FDIC*, 843 F.Supp.2d 62, 70 (D.D.C.2012) (holding that "[a]t [the pleadings] stage," a plaintiff "need not plead with particularity damages that would typically be expected to flow from its claims")).

There is no conjecture. In every specific settlement example discussed in the Complaint, administration expenses were deducted directly from the settlement funds before distribution. *E.g.*, ¶¶ 248, 260, 279. Calculating Plaintiffs' damages consists merely of reversing the harm in each settlement, such as measuring the difference between the interest actually credited to each QSF and the competitive-market interest, or between the amount effectively paid for settlement services versus a fair market value of those services. These methodologies permit damages to be calculated from objective financial data rather than speculation.

#### 6. There is no serious danger of multiple recoveries and damages can be allocated without extraordinary complexity

The primary and direct injury is to the class members of the various settlements: less money in the QSF meant less money for class members. Any other claimed injury by any other third party would be indirect and remote compared to the injury alleged to the class. Accordingly, there is no issue here regarding the apportionment of damages as in *Illinois Brick*. *See* § I.A.

The Complaint identifies objective methods for calculating interest- and payment-related losses on a class-wide basis. ¶¶ 399, 451. And there is no basis at the pleading stage to assume duplicative recovery. *See Apple Inc.*, 587 U.S. at 287; *Andrx Pharms.,* 256 F.3d at 817-19.

### C. The Complaint Plausibly Alleges a Hub-and-Spoke Conspiracy

#### 1. The alleged conspiracy and Defendants' arguments

Plaintiffs allege an antitrust claim under Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count XI), against both the Administrators (Epiq, Angeion, JND, and Kroll) and the Banka (Western Alliance and Huntington). ¶¶ 578–91. Beginning around 2015, the Administrators

allegedly orchestrated a conspiracy to restrain trade among them by artificially reducing or eliminating competition and increasing the costs of settlement administration in the United States. ¶ 579.

The alleged conspiracy is hub-and-spoke because it requires agreements at two levels of the marketplace to operate. *See* ¶ 434. At the core of this hub-and-spoke conspiracy is a horizontal agreement among the four Administrators not to compete against each other in offering optimal bank deposit interest rates. And for the conspiracy to be implemented, the Administrators needed the cooperation—vertically—of the Banks, which the Banks happily accommodated via a kickback scheme in which the Bank Defendants paid portions of QSF interest to the Administrators through special purpose entities. ¶¶ 407–409, 431, 434. The Administrators contend that Plaintiffs have not alleged that horizontal agreement in restraint of trade. They are wrong.

**2. The per se standard in a hub-and-spoke conspiracy**

"Establishing a per se violation with the hub-and-spoke model requires showing that the spokes are connected to each other via a horizontal agreement." *Cornish-Adebiyi v. Caesars Ent.,* 184 F.4th 172, 180 (3d Cir. 2026). Once a horizontal agreement among the spokes is sufficiently alleged, the whole conspiracy is per se unlawful and the court "need not consider whether the vertical agreements restrained trade." *U.S. v. Apple, Inc.*, 791 F.3d 290, 325 (2d Cir. 2015).

Horizontal agreement may be alleged directly or through circumstantial evidence. *U.S. v. Gen. Motors Corp*., 384 U.S. 127, 142–43 (1966). "A plaintiff may properly allege an antitrust conspiracy by asserting direct or indirect evidence of an illegal agreement." *O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc*., 436 F. Supp. 3d 576, 587 (E.D.N.Y. 2020). At the motion to dismiss stage, "a plaintiff must simply allege enough facts to support the *inference* that a conspiracy actually existed." *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 77 (2d Cir. 2025) (emphasis in original). Typically, an allegation of parallel conduct alongside at least

one circumstantial plus factor is sufficient for a court to infer that a conspiracy exists. *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 502 (M.D. Tenn. 2023).[20] Courts have identified several factors that support a plausible inference of agreement: (1) defendants' motive to enter into a conspiracy; (2) defendants acting contrary to their own interests; (3) conduct that can only be explained rationally as concerted conduct; (4) historically unprecedented changes in pricing structure; and (5) the nature of the industry, such as a highly concentrated market with high barriers to entry and homogeneity in products. *Bell Atlantic Corp. v. William Twombly*, 550 U.S. 544, 556 n.4 (2007); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 58 (D.D.C.); *Cornish-Adebiyi v. Caesars Ent., Inc.*, 2026 WL 2182291, at *4 (3d Cir. July 29, 2026); *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 76 (2d Cir. 2025); *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 502 (M.D. Tenn. 2023). However, "[p]arallel conduct alone may support an inference of conspiracy [] if it consists of complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Apple, Inc.*, 791 F.3d at 315 (internal citations omitted).

The Administrators wrongly state that to "allege a plausible §1 claim based on circumstantial evidence, the facts pleaded must 'exclude the possibility of independent action.'" Admin Br. 39 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)). That is the standard at *summary judgment*, not on a motion to dismiss. At the motion to dismiss stage, "[a] complaint pleading an antitrust conspiracy 'need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action,' and '[s]kepticism of a conspiracy's existence is insufficient to warrant dismissal.'" *O.E.M. Glass*

[20] *See also In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 58 (D.D.C. 2016).

*Network, Inc. v. Mygrant Glass Co*., Inc., 436 F. Supp. 3d 576, 587 (E.D.N.Y. 2020) (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016); *Evergreen Partnering Group, Inc. v. Pactiv Corp*., 720 F.3d 33, 47 (1st Cir. 2013). Said simply, at this stage "the Court considers plausibility, not probability" and "Plaintiffs are not required to plead facts that, if true, definitely rule out all possible innocent explanations." *In re Generic Pharm. Pricing Antitrust Litig*., 338 F. Supp. 3d 404, 435 (E.D. Pa. 2018) (cleaned up).

**3. Plaintiffs sufficiently allege horizontal agreement among the Administrators**

Administrators do not dispute Plaintiffs' allegations of parallel conduct. Admin. Br. 38–42, 48. Thus, as Defendants concede, the only question is whether Plaintiffs plausibly allege at least one plus factor. *Id.* at 39. It does. First, Plaintiffs plausibly allege that Defendants' parallel conduct was against their independent economic interest. Second, Plaintiffs allege several other plus factors—none of which Defendants address—that independently support a plausible inference of a conspiracy.

a. <u>The Administrators Acted Against Their Individual Economic Self-Interests</u>

"While there is no finite set of plus factors, one recognized, and important, plus factor is parallel action that is contrary to self-interest." *Avenarius v. Eaton Corp.,* 898 F. Supp. 2d 729, 737–38 (D. Del. 2012). The Administrators argue that Plaintiffs cannot allege that they acted against their own self-interests because they "acted in a profit-maximizing manner" in deciding to divert interest from the QSFs to their own pockets. Admin. Br. 39-40. Defendants misunderstand the principle at issue. The question is whether Defendants' behavior is against their self-interest *in the absence of collusion*. *See Apple, Inc.*, 791 F.3d at 316. ("Apple understood that its proposed Contracts were attractive to the Publisher Defendants *only* if they collectively shifted their relationships with Amazon to an agency model—which Apple knew would result in higher

consumer-facing ebook prices") (emphasis in original); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 682 (S.D.N.Y. 2012) (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).

Plaintiffs allege that the Administrators acted against their own self-interest by not competing on the basis of QSF interest rates, thereby increasing the costs of administration services to class members. *See In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d at 64. This behavior would not make sense in the absence of an agreement to collude among the Administrators because "[n]o rational economic actor would forgo the competitive advantage of offering superior returns to class members unless it was assured that its competitors were doing the same." ¶ 441. Each Administrator's conduct was thus "in its own self-interest only if the other alleged co-conspirators followed suit," providing "strong circumstantial evidence of a conspiracy." *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 823 (9th Cir. 2023) ("Where the conduct of an alleged co-conspirator is in its own economic self-interest *only if* the other alleged co-conspirators follow suit, there is strong circumstantial evidence of a conspiracy.") (emphasis in original); *Avenarius v. Eaton Corp.*, 898 F. Supp. 2d 729, 738 (D. Del. 2012).

Finally, Plaintiffs are not required at the motion to dismiss stage to plead allegations that exclude the possibility that Defendants acted independently. Defendants' cited cases each applied the summary judgment standard. *See Kreuzer v. Am. Acad. of Periodontology*, 735 F.2d 1479 (D.C. Cir. 1984); *In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 183 (D.D.C. 2023). In *In re Domestic Airline Travel* the district court earlier denied the defendants' motions to dismiss. *See* 221 F. Supp. 3d 46. Although *Binder* was a motion to dismiss case, it is readily distinguishable. In *Binder v. D.C.*, the court noted that the Plaintiffs "completely fail[ed] . . . to allege . . . *any* wrongdoing by defendants" and dismissed because the complaint failed to

"establish[] the existence of any joint action." 1991 WL 11255755, at *5 (D.D.C. May 22, 1991) (emphasis in original).

b. Plaintiffs Adequately Allege Additional Plus Factors

The Administrators fault Plaintiffs for not identifying any specific meeting, communication, speaker, term, or mechanism establishing the alleged horizontal agreement. Admin Br. 40–41. Defendants misstate settled law. Courts have repeatedly underscored that anticompetitive conspiracies are rarely evidenced by explicit agreements. *O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, 436 F. Supp. 3d 576, 592 (E.D.N.Y. 2020). Therefore, when "the claim of agreement rests on the parallel conduct . . . plaintiffs [a]re not required to mention a specific time, place or person involved in each conspiracy allegation." *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010). Indeed, courts have expressed caution over "placing too much significance on the presence or absence of 'plus factors' at the pleadings stage" in a § 1 case. *Evergreen Partnering Group v. Pactiv*, 720 F.3d 33, 46-47 (1st Cir. 2013). Rather, "more general allegations informing the context of an agreement may be sufficient" at the pleading stage. *Id.*

Moreover, "[p]arallel conduct alone may support an inference of conspiracy . . . if it consists of 'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason.'" *Apple, Inc.*, 791 F.3d at 315 (quoting *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013)).[21] The Complaint here alleges that Defendants' conduct was historically

[21] *See also Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 222 (1939) (finding collusion by relying in part on the fact that compliance with the proposed scheme "involved a radical departure from the previous business practices of the industry"); *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1295 (M.D. Fla. 2016) ("'Complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason,' support a plausible inference of conspiracy") (*citing Apple, Inc.*, 791 F.3d at 315).).

unprecedented and a "radical break" from prior business practices by "transform[ing] the pre-existing deposit structures into ones generating unprecedented kickback revenue." ¶¶ 438–39.

As a hub-and-spoke conspiracy, Plaintiffs here have alleged not only that Defendants engaged in parallel conduct but also that the Administrators' vertical agreements with the Banks were in furtherance of this conspiracy. Courts have recognized that "vertical agreements, lawful in the abstract, can in context 'be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel.'" *Apple, Inc.*, 791 F.3d at 319–20 (*quoting Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007)) ; *Davis v. Hanna Holdings, Inc.*, 822 F. Supp. 3d 494, 523 n. 17 (E.D. Pa. 2026). Here, the fact that the Banks were incentivized and willing to facilitate the conspiracy further supports an inference that the Administrators were motivated to conspire. The Complaint alleges that "[t]here were billions of dollars in potential cash deposits available from class action settlements every year" and that the rising interest rates in 2022 provided an opportunity for "potential profit that could be extracted from these deposits." Compl ¶ 440. The opportunity to make additional profits combined with allegations of agreements with Bank Defendants supports a plausible inference of an antitrust conspiracy.

The Complaint does not stop there. Contrary to Defendants' mischaracterization, the Complaint alleges other plus factors," specifically that Defendants: (1) exist in a highly concentrated market where the Administrators control approximately 80% of the administrator market, ( ¶ 436); (2) had the motive to conspire given that their kickback scheme could only succeed if other administrators did likewise (¶ 440); and (3) had no legitimate reason to confine their deposits exclusively to the two Bank Defendants at below-market rates (¶ 442). Taken together, these allegations are more than sufficient at this stage. *Cornish-Adebiyi*, 184 F.4th at 191 (3d Cir. 2026).

### 4. Defendants' Arguments Concerning the Vertical Agreements are Contrary to Settled Law

The Administrators next attack the adequacy of the alleged vertical agreements between them and the Banks. Admin. Br. 41-42. This argument misunderstands the Complaint's allegations as well as the law.

To begin with, the analytical focus regarding the sufficiency of a hub-and-spoke conspiracy is on the horizontal agreement among competitors because "a facially vertical restraint imposed by a manufacturer only because it has been coerced by a 'horizontal cartel' . . . is in reality a horizontal restraint[.]" *Apple, Inc.*, 791 F.3d at 323 (quoting *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 730 n. 4 (1988)). Accordingly, the relevant "agreement in restraint of trade" in this case is not the Banks' vertical agreements with the Administrators; it is the horizontal agreement that the Administrators organized to use their agreements with the Banks as a means to stifle competition in the Administrator Market and increase the costs of settlement administration services by enacting a kickback scheme.

Moreover, as further addressed in Plaintiffs' Opposition to Bank Defendants' Motion to Dismiss, Defendants' motion is based in part on the mistaken premise that Plaintiffs must adequately allege vertical agreements that harm competition in their own right. *See* Bank Opp. § [II.B.3]; Admin. Br. 38-42.[22] It is well settled that the hub can be liable by knowingly participating or facilitating the spokes' unlawful scheme. *O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, 436 F. Supp. 3d 576, 588 (E.D.N.Y. 2020). In *Apple*, for example, the court's analysis focused

[22] *See also O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, 436 F. Supp. 3d 576, 587, 593 (E.D.N.Y. 2020); *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1295 (M.D. Fla. 2016); *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 46 (1st Cir. 2013); *Apple, Inc.*, 791 F.3d at 323; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 337 (3d Cir. 2010) ("The fact that Marsh, an entity vertically oriented to the insurers, appears to be a *sine qua non* of the alleged horizontal agreement is not necessarily an obstacle to plaintiffs' claim.").

on the horizontal agreement among the spokes, not the vertical ones. *Apple, Inc.*, 791 F.3d at 322-27. Knowingly participating in or joining the scheme is sufficient evidence of an agreement from the hubs. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 337 (3d Cir. 2010). Most recently, in *Cornish-Adebiyi*, 184 F.4th at 192, the Third Circuit reversed the dismissal of a case involving a hub-and-spoke conspiracy between casino-hotels and a pricing algorithm company by focusing on the anticompetitive horizontal agreement among the casino-hotel spokes to use the algorithm pricing company hub to increase room rates for consumers.

The same is true here. Plaintiffs allege that the Administrators understood that they all were committed to a common plan of not competing on the QSF interest rates based on the Banks' agreement to provide them with kickbacks. The Banks serve as the common conduit through which each Administrator learned that their rivals are accepting the same below-market rate: the Banks' identical, sub-0.5% bids to all four Administrators are the mechanism by which that assurance is communicated.[23]

Just as the Third Circuit inferred collusion from a "material exchange" that pooled competitors' data and signaled to each spoke that its rivals would adhere, the identical bids here supply the cross-firm assurance that no Administrator would forgo higher rates unless the others did the same. *See Cornish-Adebiyi*, 184 F.4th at 192. The circumstantial evidence of the Administrators' parallel conduct, and all plus factors, as explained above, plausibly support the existence of the alleged conspiracy.

## III. PLAINTIFFS RICO CLAIMS ARE ADEQUATELY PLED

Congress directed that RICO be "liberally construed to effectuate its remedial purposes." Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947. Accordingly, "RICO is to be read broadly."

---

[23] *Cf. Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 441–42 (3d Cir. 2023) ("In the EMMC's case, there is no set of horizontal spokes and nothing akin to a unilateral vertical conduit").

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985). That mandate carries particular force in RICO's private right of action, "where RICO's remedial purposes are most evident." *Id.* at 491 n.10.

Consistent with this broad remedial purpose, RICO imposes no heightened pleading standard. Except for circumstances constituting alleged fraud predicates, which are governed by Rule 9(b), the Complaint need only plausibly allege RICO's statutory elements under Rule 8. *See RSM Production Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012). Requiring more for a complaint to proceed to discovery would "severely handicap potential plaintiffs" and "largely defeat" Section 1964(c)'s purpose of "fill[ing] prosecutorial gaps." *Sedima*, 473 U.S. at 493.

**A. The Administrators' Racketeering Directly Injured Plaintiffs**

The Administrators argue that Plaintiffs have not alleged they suffered a cognizable RICO injury proximately caused by Defendants. However, proximate cause only requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). Directness is a "flexible concept" that turns on whether a "more immediate victim is better situated to sue," whether damages require speculative allocation among causal factors, and whether recovery creates a risk of duplication. *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 654-55, 658 (2008).

The Complaint alleges exactly the direct relationship Section 1964(c) requires. Each named Plaintiff submitted a valid claim for their *pro rata* share from a settlement QSF. ¶¶ 23-44, 79, 393-94. Defendants' undisclosed extraction of interest and breakage reduced the available QSF funds and, thereby, each Plaintiff's *pro rata* distribution. ¶¶ 122, 130, 153-56.

Incredibly, the Administrators seek to avoid RICO liability by arguing that the injury was to the QSF, not Plaintiffs, because the QSF is a "separate taxable entity." Admin. Br. 54. The QSF is

the temporary, non-reversionary fund from which settlement claimants, like Plaintiffs, are paid, not a separate injured party. The fund's tax status adds no causal step or "independent factors that account for respondents' injury," and does not create a "risk of duplicative recoveries by plaintiffs" or establish a distinct victim "better situated to sue" than Plaintiffs. *Bridge*, 553 U.S. at 658. [24]

The cases the Administrators cite involve an intervening victim clearly better situated to sue or an independent source of harm absent here. In *Holmes*, the fraud first injured broker-dealers, and the plaintiff-insurer's losses depended on the broker-dealers' resulting insolvency. 503 U.S. at 272-73. In *Anza v. Ideal Steel Supply Corp.*, the plaintiffs' injury was caused by conduct "entirely distinct from the alleged RICO violation," with a more direct victim better situated to sue. 547 U.S. 451, 458-60 (2006). In *Hemi Group, LLC v. City of New York*, the harm passed through third- and fourth-party victims before reaching the plaintiff, and the third party was "certainly better situated than the [plaintiff] to seek recovery." 559 U.S. 1, 12 (2010). And in *SEIU Health & Welfare Fund v. Philip Morris Inc.*, the plaintiff's expenditures were derivative of injuries to individual smokers who they insured, and depended on individualized health and treatment decisions made by the smokers who could sue directly. 249 F.3d 1068, 1073-75 (D.C. Cir. 2001). Here, there is no first victim, intervening causal layer, or party better situated to sue than the class members whose distributions were reduced.

The indirect-purchaser rule does not help Defendants either. That judge-made antitrust rule addresses a specific commercial pass-on problem: allocating a single unlawful overcharge among successive purchasers and avoiding duplicative recovery. Section 1964(c), by contrast, contains no direct-purchaser limitation, and the Supreme Court has repeatedly rejected importing antitrust injury restrictions into RICO. *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 608 (2025) (collecting cases). RICO asks whether a plaintiff suffered business-or-property harm caused by the predicate acts.

---

[24] To the extent the QSF was first in line, one of the Defendants, as trustees of the QSF would need to sue themselves for the injury. Plaintiffs are "better situated to sue."

In any event, the indirect-purchaser rule has no application here. *See supra* § II.A. The sole case the Administrators cite, *MSP Recovery Claims, Series LLC v. Pfizer, Inc.*, involved a four-level downstream manufacturer-distributor-pharmacy chain, ultimately reimbursed by the plaintiff-health plan. 728 F. Supp. 3d 89, 105 (D.D.C. 2024). Plaintiffs are claimants directly denied their full, *pro rata* payments for claims from the QSFs.

The Administrators' demand for first-party reliance is also foreclosed. Admin Br. 55. A civil RICO plaintiff asserting mail or wire fraud need not have personally received or relied on any false statement. *Bridge*, 553 U.S. at 648-49. There is no requirement that each Plaintiff identify a notice personally read, allege a personal objection, and prove that objection would have prevailed. *Bridge* expressly rejects imposition of any such first-party reliance requirement "through the back door." *Id.*

Regardless, the Complaint alleges reliance by every actor the scheme set out to deceive – the settlement courts, settlement counsel, and settlement class members, among others. *See infra* § B.2 & B.3. Moreover, when a RICO fraud scheme induces action by a court or another third party, that reliance may supply the causal link even though the plaintiff did not receive or rely on the misrepresentation. *Bridge*, 553 U.S. at 658-59.[25]

Finally, the Administrators' argument that a reduction in Plaintiffs' settlement payments is not a RICO injury is incorrect. A plaintiff is "injured in his business or property" when that business or property "has been harmed or damaged." *Medical Marijuana, Inc.*, 604 U.S. at 601. "Monetary injury, standing alone," suffices—even a "modest amount." *Reiter v. Sonotone Corp.*, 442 U.S. 330,

---

[25] *See also, e.g.*, *Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Industrial Materials Corp.*, 887 F. Supp. 2d 9, 21-22 (D.D.C. 2012) (finding RICO proximate cause where defendants' fraudulent petitions induced government action that excluded plaintiff from market); *Feld Ent. Inc. v. ASPCA*, 873 F. Supp. 2d 288, 321 (D.D.C. 2012) (finding RICO proximate cause where defendant used money obtained from third party via mail fraud to fund lawsuit that harmed plaintiff).

339–40 (1979).[26] Defendants' conduct reduced each Plaintiff's settlement, causing injury to property.

**B. The Complaint Adequately Pleads Each Administrator-Centered Enterprise**

The Administrators' enterprise arguments fare no better. An association-in-fact enterprise requires only "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). It must have some "organization," but not a structure distinct from the conduct through which it operates. *United States v. Perholtz*, 842 F.2d 343, 363 (D.C. Cir. 1988).

The Complaint identifies each enterprise's members, purpose, relationships, organization, and longevity. The Administrator was the hub, and brought in the FinTechs to handle digital disbursements, and the Banks to hold the QSF deposits. ¶¶ 501, 510, 516, 522. The shared purpose was to extract undisclosed compensation from court-supervised settlement funds while concealing the arrangements from courts and class members. *Id.* The Complaint explains the organization: the Administrator controlled which Bank received QSF deposits, which FinTech made distributions, and what information reached courts, counsel, and the class; the Banks ran the Interest Track; the FinTechs ran the Digital Disbursement Track; the Banks and FinTechs gave their kickbacks to the Administrators; and the Administrators coordinated both tracks by routing QSF assets, and receiving side compensation for future access to QSFs; and all Defendants maintained the secrecy. *Id.* ¶¶384-90. The schemes repeated across unrelated settlements for years, satisfying longevity. ¶¶ 171-357.

---

[26] *Reiter* interpreted the meaning of "business or property" in the Clayton Act, on which RICO's identical language was based. *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 150–51 (1987) (recognizing "the similarities in purpose and structure between RICO and the Clayton Act, the clear legislative intent to pattern RICO's civil enforcement provision on the Clayton Act").

The Administrators seek to reduce these allegations to "ordinary commercial relationships." Admin Br. 56-57. But the Complaint alleges far more: preexisting compensation-for-selection agreements designed never to see the light of day; repeated routing of court-supervised assets under those secret agreements; covert division of the resulting interest spread and breakage revenue; and coordinated concealment to preserve access to future QSFs.

Moreover, the Administrators' "ordinary commercial relationships" label forgets that they were not operating in an ordinary commercial environment. Rather, they sought and obtained court appointments to administer QSFs held for absent class members, exercised discretion over where settlement funds would be deposited and how they would be distributed, and controlled much of the information supplied to courts, counsel, and class members. ¶¶ 61-62, 71-83. The Banks and FinTechs paid the Administrators precisely because that entrusted authority enabled the Administrators to secure appointments and direct QSF deposits and distributions to them. A rebate to a purchaser dealing with its own money may be ordinary commerce. A secret payment to a court-appointed decisionmaker for steering assets held for others is not. That *quid pro quo* connected each enterprise's members and supplied their common purpose.

The payments also came directly from value extracted from the QSFs. The Banks shared interest from the QSF funds, and the FinTechs shared the "breakages" of settlement funds. ¶ 122. The more each Bank or FinTech expected to skim covertly from the QSF, the more each paid the Administrators. In return, each Administrator provided continued access to settlement assets across its book of business and concealed the arrangement from those charged with supervising it. ¶ 8. Converting court-conferred authority over class assets into a secret revenue stream is not an ordinary vendor relationship.[27]

[27] Contrary to what the Administrators suggest, the Plaintiffs' alternative RICO theories—which the Administrators make no effort to criticize—do not render the primary enterprises vague or suggest that

### C. Each Administrator Conducted the Affairs of its Enterprise

The Administrators contend that they did not conduct the enterprises' affairs. To conduct the affairs of an enterprise, the defendant need only have "some part in directing" those affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

Plaintiffs allege that each Administrator exercised decision-making authority over core functions of its enterprise. Each Administrator occupied the hub of its enterprise and controlled access to the court-supervised assets on which both tracks depended. The Administrators entered standing compensation arrangements before any particular appointment; selected and repeatedly routed QSF deposits and distributions to the participating Banks and FinTechs; controlled the bids, declarations, distribution plans, notices, websites, CAFA notices, and accountings that concealed the arrangements; received resulting side compensation; and received kickbacks outside judicial review. ¶¶384-90. The primary RICO counts place each Administrator at the center of their enterprises. ¶¶503-05 (Angeion), 512-13 (Epiq), 518-19 (JND), 524-26 (Kroll).

The Administrators' assertion that the Complaint contains no "nonconclusory factual allegation" of direction ignores nearly two hundred paragraphs showing how each directed the enterprises' core affairs across settlement after settlement. The *Capital One* settlement is illustrative. ¶¶ 217-232. Epiq entered undisclosed compensation arrangements with Huntington and Tremendous; administered the $190 million QSF with Huntington and selected Tremendous to distribute digital payments; determined the Net Settlement Fund and the timing, amount, and methods of distribution; directed Huntington to issue checks and Tremendous to transmit digital payments; and received portions of the interest spread and breakage those selections generated. ¶¶

Plaintiffs cannot identify them. Rule 8 permits a party to state claims "alternatively or hypothetically," in separate counts, Fed. R. Civ. P. 8(d)(2)–(3), and inconsistent and alternative theories may proceed at the pleading stage. *Shaffer v. George Washington University*, 27 F.4th 754, 768 (D.C. Cir. 2022).

218, 226-32. Those acts determined which enterprise members obtained QSF access, how the assets would be distributed, and how revenue was generated and divided.

Epiq also controlled the communications necessary to obtain and preserve the enterprise's access to the *Capital One* QSF. It submitted the declarations supporting appointment, final approval, and post-distribution accounting; disseminated millions of notices; and maintained the settlement website, all while concealing its plan to secretly divide up QSF assets with Huntington and Tremendous. ¶¶ 221–25, 229–32. Those communications secured and preserved the court appointment that gave Epiq control over the QSF. Epiq then used that control to route funds, direct the other participants, and allocate the proceeds. Comparable settlement-specific allegations show Kroll performing that directing role in *T-Mobile, Yahoo! Data Breach,* and *Luxottica*; Epiq in *JUUL, Auto Parts,* and *Lithium Ion*; Angeion in *TikTok, Lundy,* and *Fusion Elite*; and JND in *Equifax, Lerman,* and *Yahoo! Securities*. ¶¶ 171–356. That demonstrates the Administrators playing more than "some part in directing" who participated, how the enterprises obtained and maintained QSF assets, and how proceeds were generated, divided, and concealed. *Reves*, 507 U.S. at 179.

Corporate acts can simultaneously advance ordinary business and further an illegal RICO enterprise. *See Philip Morris*, 566 F.3d at 1116 (affirming district court's finding that "despite competing in some aspects of their business," companies "jointly committed fraud and participated in the conduct of *not just their own affairs but the enterprise's as well*" (emphasis added)). Here, each Administrator used its ordinary authority over settlement administration to implement and conceal the enterprise's distinct compensation-for-selection program.

The Administrators further contend that their predicate acts of wire and mail fraud cannot satisfy the conduct element. But they concede that the same act may satisfy both elements when it

is the "vehicle through which" the defendant conducted the enterprise's affairs. *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 913 F.2d 948, 955 (D.C. Cir. 1990) (*en banc*). Plaintiffs allege that the Administrators used mail and wire communications to settlement courts, settlement counsel, and settlement classes to obtain and maintain control of QSFs, thereby conducting enterprise affairs through mail and wire fraud. ¶¶ 384-91. It also alleges direction independent of those predicate acts: negotiating and adopting the standing MSAs, selecting the Banks and FinTechs, repeatedly routing deposits and payments under those secret arrangements across settlements. *Id,* That readily alleges "some part in directing" the enterprise's affairs. *Reves*, 507 U.S. at 179.

**D. The Administrators Conspired to Violate RICO**

The Administrators' derivative challenge to the RICO conspiracy claim fails because the primary RICO claims survive. The Administrators also misstate the law: a defendant may violate Section 1962(d) without committing a substantive violation and need only "adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997). Thus, conspiracy liability does not require that each Administrator individually satisfy each element of a substantive violation. *RSM*, 682 F.3d at 1048.

The Administrators insist there are "no nonconclusory factual allegations" of an agreement to violate RICO. Admin Br. 59. The question is whether the facts, "individually or taken together, support[] a plausible inference" that each Administrator "knew of the . . . racketeering conspiracy and agreed to foster its goals." *RSM*, 682 F.3d at 1048. An agreement need not be written or even explicit; a tacit understanding may be inferred from conduct and surrounding circumstances. *United States v. Shi*, 991 F.3d 198, 205-06 (D.C. Cir. 2021).

Here, the Complaint alleges both written agreements and corroborating circumstantial evidence. The Administrators memorialized their *quid pro quos* with the Banks and FinTechs in

enterprise-level, secret MSAs, and implemented those agreements across settlement after settlement. ¶¶ 8, 171-357. That repeated execution of the scheme with the co-conspirator Banks and FinTechs provides the "relationships and circumstances" from which a RICO conspiracy agreement "may be inferred." *Cheeks v. Fort Myer Constr. Corp.*, 216 F.Supp.3d 146 at 162 (D.D.C. 2016).

The Administrators' effort to recast their uniform and active concealment as independent self-interest ignores the economic realities. Each Administrator knew that the undisclosed compensation programs extended across its principal competitors, yet none broke ranks and competed by offering transparent terms, higher QSF returns or lower net administration costs, or revealing its competitors' conflicted arrangements—all obvious ways to win appointments. Any one Administrator could gain immeasurably by defecting; the alleged scheme survived only if none did. Thus, "[a]ll the Defendants said nothing . . . because any disclosure would have unraveled the scheme." ¶ 2. Conduct that is "only in [each Administrator's] self-interest if done in concert with others" supports "an inference of illegal conspiracy." *Modern Home Inst., Inc. v. Hartford Accident & Indem. Co.*, 513 F.2d 102, 111 (2d Cir. 1975); *see also Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 267 (D.C. Cir. 1981). Together with the common participants, standardized compensation arrangements, repeated implementation, and industry-wide knowledge, that refusal to defect supports the plausible inference that each Administrator knew of the racketeering conspiracy and agreed to foster its goals. *RSM*, 682 F.3d at 1048.

### E. Each Administrator Committed Multiple Predicate Acts

The Administrators contend that the mail and wire fraud allegations fail for a lack of duty to disclose. Admin Br, 27-28. As explained elsewhere (§§ I, IV.A), the Administrators had a duty as fiduciaries to disclose their agreements. Regardless, RICO is not so limited.

RICO predicate acts of mail fraud and wire fraud premised on omissions[28] do not require a duty to disclose expressly created by a statute, regulation, or formalized legal relationship. *United States v. Lemire*, 720 F.2d 1327, 1335–36 (D.C. Cir. 1983). The existence of a duty turns on the specific facts and circumstances of each case, and may arise from discretion carrying "obligations of loyalty and fidelity," *id.* at 1336, or from responsibilities assumed by a defendant's "own actions and representations," *United States v. Maxwell*, 920 F.2d 1028, 1035–36 (D.C. Cir. 1990). Here, the Administrators held themselves out as trusted experts to settlement courts and settlement counsel and sought court appointments to administer class funds, but never disclosed any aspect of their agreements with the Banks and FinTechs to generate undisclosed compensation for themselves at the class's expense. ¶¶ 359–81. Having assumed the role they sought from the courts for the settlement classes, the Administrators cannot use the absence of an express obligation to disclose as a license to conceal the arrangements underpinning their RICO enterprises.

## IV. PLAINTIFFS COMMON LAW CLAIMS SHOULD NOT BE DISMISSED

### A. The Administrators Had a Duty to Disclose

#### 1. The Administrators' silence was improper

Silence was the curtain behind which the Administrators carried out their schemes to take monies from the QSFs, and the Administrators argue that there was nothing wrong in their keeping silent. Their silence was as wrong as the taking. They could not silently conduct their fraud and unjustly enrich themselves.[29] Their duty to speak arose not just from their fiduciary duty (*supra* § I.A-B), but also because: they had superior (i.e. exclusive) knowledge of the MSAs and kept quiet

[28] Wire fraud and mail fraud may also be premised on half-truths. A statement need not be "literally false"; "even partially true statements can be actionable [mail and wire] fraud if intentionally misleading as to facts." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1128 (D.C. Cir. 2009).

[29] Although the Administrators argue that a duty to disclose needs to be alleged for Plaintiffs RICO claims, this is not the case. *Supra* § III.E.

in a circumstance of trust not only from Plaintiffs, but also from the settlement courts and settlement counsel.

The law imposes a duty to disclose where, as here, the defendants had superior knowledge, where the facts are known or only accessible to the defendant, the balance of the parties' relationship, and/or specific facts demonstrating it would be unfair not to disclose the omitted facts.[30]

Here, Plaintiffs have sufficiently alleged that the Administrators kept the settlement courts, settlement counsel and, thereby, Plaintiffs in the dark about their agreements. And with that, Plaintiffs allege Defendants' superior knowledge and Plaintiffs' (and everyone else's) inability to learn the true facts, Defendants' relative position of strength, and facts demonstrating the unfairness of the failure to disclose in the context of trust. Indeed, the Administrators sought actively to thwart efforts to seek out the existence and terms of the Administrators' agreements with the other Defendants.[31] Accordingly, as this Court should here, courts examining the Administrators' ongoing practices in still active settlements have roundly concluded that the courts

[30] *See, e.g., Brickhouse Cap., LLC v. Coastal Cryo AL, LLC*, 393 So. 3d 467, 475–76 (Ala. 2023) (a duty to disclose may be found based on "the relative knowledge of the parties . . . [and] the plaintiffs' opportunity to ascertain the fact"); *Nissan Motor Acceptance Cases*, 63 Cal. App. 5th 793, 826 (2021) (a duty to disclose may arise where "the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff") (citation omitted); *Tapply v. Whirlpool Corp*., 148 F.4th 407, 420 (6th Cir. 2025) ("[I]f a party is silent while suppressing material facts or deceiving another, a duty to disclose arises under Illinois law.") (citation omitted); *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747–48 (Ky. 2011) (duty to disclose may arise "where one party to a contract has superior knowledge and is relied upon to disclose same") (citation omitted); *Seidel v. Gordon A. Gundaker Real Est. Co*., 904 S.W.2d 357, 361 (Mo. Ct. App. 1995) (duty to disclose arises "where one of the parties has superior knowledge not within the fair and reasonable reach of the other party); *Eady v. TapFury LLC*, 2022 WL 986269, at *4 (D.N.J. Apr. 1, 2022) (duty to disclose may exist depending on "'the difference in bargaining power' between the parties 'and the difference in access to information.'" (citation omitted); *Sports Tech. Applications, Inc. v. MLB Advanced Media, L.P*., 188 A.D.3d 619, 620, 132 N.Y.S.3d 759, 760 (2020) (duty to disclose exists "when one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair); *Davis v. Sun Ref. & Mktg. Co*., 109 Ohio App. 3d 42, 55, 671 N.E.2d 1049, 1058 (1996) (a duty to disclose may arise where the party must "speak in order to place the other party on equal footing with him") (citations omitted).

[31] *See, e.g.* ¶¶ 168-69, 476.

and settlement counsel "should have been [made] aware of [these] arrangements"[32], that "[t]ransparency in a class action is crucial not only to not only the Class, but to the public's trust in the judicial system,"[33] and mandating "full disclosure of all financial arrangements [they have] with third parties related to the administration of a settlement" be made.[34]

### 2. The Administrators told half-truths

But the Administrators were not just silent. They also played on the trust given them as settlement administrators who repeatedly made trusted representations to settlement courts, settlement counsel, and Plaintiffs about the settlements and their role. The Administrators each provided information about their qualifications for appointment, and thereafter, disseminated information about the settlements, including the value of the settlements to the settlement classes. But they failed to disclose the Administrators' self-enriching agreements with the other Defendants which would reduce Plaintiffs' *pro rata* payments. *See, e.g.* ¶ 376.

Plaintiffs identify specific categories of affirmative statements—fee applications disclosing stated fees, distribution plans recommending specific payment methods, notices describing settlement amounts, CAFA notices to states attorneys general, and court submissions representing impartiality and qualifications[35]—each of which "state[d] the truth only so far as it [went], while omitting critical qualifying information" necessary to prevent the representations from being misleading. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024); Under *Macquarie*, 601 U.S. at 263, and *Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund,* 575 U.S. 175, 194 (2015), these are paradigmatic half-truths: Plaintiffs identify the "affirmative assertions" (disclosed fees, recommended payment methods,

---

32 *Cabrera*, 2025 WL 2494429, at *4.
33 *Gibson*, 2026 WL 1840538. * 1 (quoting *Cabrera*, 2025 WL 2494429, at *4)
34 *Brooks*, 2025 WL 3201878, at * 1.
35 *See* ¶¶ 371-380 (detailing Omissions Nos. 1-10)

representations of neutrality), then identify the "other facts . . . needed to make those statements" non-misleading (undisclosed kickbacks, revenue-sharing arrangements, conflicts of interest). Once Defendants chose to disclose partial truths, the specific assertions needed "other facts . . . to make those statements" true. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024); *see id.* at 263 (Half-truths "state the truth only so far as it goes, while omitting critical qualifying information" necessary to prevent representations from being misleading.).

**B. Plaintiffs' Fraud Claims Are Adequately Alleged**

**1. Plaintiffs' allegations meet the Rule 9(b) standard**

Plaintiffs allege the Administrators' fraudulent statements with sufficient specificity. *See Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1127 (D.C. Cir. 2015). They describe the Administrators' "Architecture of Concealment" by detailing 11 omissions, their recipients, their timing, and the intended impact of those falsehoods in each settlement. *See* ¶¶ 366-381.Plaintiffs go further, and provide settlement-specific details for each of the Administrators, including who communicated with class members, the dates, volume, medium and content of those communications, the content, and why each communication was fraudulent. The Kroll exemplar *In re T-Mobile* is illustrative. Kroll sent notice to millions of class members providing information about the settlement and directing them to a settlement website that touted digital payment options and addressed FAQs about the settlement—but never disclosed that Kroll would receive compensation, kickbacks, or other financial benefits from third parties involved in holding or distributing settlement funds, or that such arrangements would reduce class-member compensation. ¶¶ 177–78, 185. The same pattern is repeated in each of the thirteen exemplar settlements across all four Administrators. See ¶¶ 192–93, 198, 201, 208–09, 216 (Kroll); ¶¶ 223–24, 232, 240–41, 244, 246, 250, 256, 265, 270, 276 (Epiq); ¶¶ 283–84, 289, 296–97, 303, 310–11, 316 (Angeion); ¶¶ 323–24, 327, 330, 337–38, 343, 350–51, 356 (JND).

These are examples of the representations on which class members relied in deciding whether to participate, object, or select a payment method. Plaintiffs have met the Rule 9(b) standard.

**2. Plaintiffs have sufficiently alleged direct reliance**

The Administrators argue that Plaintiffs failed to allege reliance on these omissions. Admin Br. 45-46. Generally, a plaintiff need only plead an omission of material fact that influenced the plaintiff's choices. *See, e.g., Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 40, 553 P.3d 1213, 1238 (2024) (Plaintiff must have been "unaware of the fact and would have acted differently if the concealed or suppressed fact was known.") (citations omitted); *Franklin D. Nastasi Tr. v. Bloomberg, L.P.*, 206 N.Y.S.3d 333, 339 (2024) (Plaintiff must show "justifiable reliance on the misrepresentation or material omission." (citations omitted); *Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007) (same)

The court need look no further than the notices the Administrators sent to see that reliance is established. As the Administrators are uniquely aware, and alleged in the Complaint, class notice is "to enable class members to make informed decisions about whether to opt out or, in instances where a proposed settlement is involved, to object or make claims." Rule 23(c)(2), advisory committee comments to 2009 amendments; ¶ 483. For unsophisticated settlement class members, "class notice experts or professional claims administrators" like the Administrators come into play. Rule 23(c)(2), advisory committee comments to 2009 amendments. The Administrators cannot now complain that their notices did not reach Plaintiffs, that Plaintiffs did not rely on the notices in deciding what to do, or that Defendants' side deals depleting the QSFs, if simply explained,

would be unimportant. Indeed, it was material information about a reduction in Plaintiffs' *pro rata* payments from the QSF.[36]

As alleged, Plaintiffs, as "reasonable class member[s] would have considered those facts significant in evaluating whether the QSF was being administered consistently with the class's interests, whether the compensation being paid to administrators, banks, and payment platforms was reasonable, whether the selection of those vendors was made on competitive terms in the interest of the class, and whether the fee applications and accountings presented to the court were complete and accurate." ¶ 477.

**3. Plaintiffs also sufficiently alleged third party reliance**

Even if the Court characterizes any portion of Plaintiffs' claims as requiring third-party reliance, Plaintiffs plead more than "mere speculation" that settlement courts, settlement counsel, and attorneys general relied on the omissions as part of Defendants' schemes.

> ***Settlement Courts.*** The CCAC details how courts relied on Defendants' incomplete filings. *See* ¶ 76. To determine whether a settlement is "fair, reasonable and adequate under Rule 23(e), courts review administrator declarations that include descriptions of the notice program, "a breakdown of all administrative costs and fees sought," and a "certification that the proposed distribution is consistent with the settlement agreement." ¶ 77. The CCAC alleges—with case-specific detail—that courts granted final approval "in reliance on a declaration that was materially false and misleading by omission." *See, e.g.*, ¶¶ 513(b) (Juul); 519(b) (Equifax). These are not conclusory allegations that courts "relied" in the abstract. Courts had no reason—and no practical ability—to look behind Administrators' representations that appeared complete.
>
> ***Class counsel.*** The CCAC alleges that administrators submitted bids and proposals to class counsel representing that "their administrative fees" constituted "the complete cost of administration." ¶ 371. It also alleges reliance, class counsel in the $725 million Facebook settlement "was not informed or aware of this agreement

[36] A loss of money is material. *See, e.g., In re Bloom,* 634 B.R. 559 (B.A.P. 10th Cir. 2021) , *aff'd*, 2022 WL 2679049 (10th Cir. July 12, 2022) ("several material facts" included maintenance charges)); *In re Whittington,* 530 B.R. 360 (Bankr. W.D. Tex. 2014) (undisclosed portion of the purchase amounts retained by defendant as a large side profit was material); *Latta v. Rainey*, 202 N.C. App. 587 (2010) (omission regarding the size of agent's commission and overall payment structure was material).

> between Angeion and Blackhawk prior to these discussions," despite actively supervising one of the largest settlements in history. ¶ 13.
>
> ***Attorneys General***. The CCAC alleges that the AGs received "enough information to appear informed but not enough to exercise their regulatory function," and that the "systematic omission of these financial arrangements from every CAFA notice in every settlement administered during the class period deprived regulators of the information necessary to object." ¶ 379. Because CAFA notice exists to enable AG objections, omitting material financial arrangements necessarily prevented AGs from performing the oversight function for which the statute was enacted.

Moreover, Defendants' cases are distinguishable. Each case addresses the narrow question of whether a plaintiff who has *no direct relationship* with the defendant may recover based solely on misrepresentations made to a third party. Here, Plaintiffs also had a direct relationship with the Administrators who communicated *directly* with Plaintiffs through settlement notices, class websites, and call centers. ¶¶ 71–72, 376.[37]

#### 4. Plaintiffs adequately plead causation

Defendants' causation argument is derivative of—and fails for the same reasons as—their reliance argument. Moreover, Plaintiffs do not speculate that they would have recovered more absent the fraud; they plead a direct, unmediated link. If Defendants had not cut their secret deals depriving the QSF funds, Plaintiffs would have received larger *pro rata* payments. Specifically, they allege that "[b]ut for Defendants' agreements, Administrators would have competed to obtain higher interest rates on QSF accounts from Bank Defendants in order to present the most attractive bundle of settlement administration services," and that "Plaintiffs and class members, therefore, would have received higher payouts from settlement distributions." ¶ 432. Moreover, "[h]ad the

[37] Defendants' argument that four jurisdictions—Florida, New York, Ohio, and Vermont—"do not recognize third-party reliance," fails because Plaintiffs plead their *direct* reliance on the Administrators' materially incomplete disclosures—not only derivative reliance running through unrelated third parties. To the extent it may eventually matter if these four jurisdictions do not recognize third-party reliance, it would not warrant dismissal, particularly as no conflict-of-law analysis has been conducted or even asked for by any Defendant, and the claim is generally more viable.

secret remunerations to the Administrators Defendants not been made, the money would have either reduced the costs of administration, or more money would have been paid out to Plaintiffs and Class Members." ¶ 583.

Finally, the Administrators' efforts to muddy the water with questions about proximate cause are at odds with Plaintiffs' allegations: "Plaintiffs are direct first-party victims" and "[t]he predicate acts directly caused the injury—the court appointment and settlement approval was the instrument of the fraud, not an independent intervening cause." ¶¶ 393, 394.

### C. Plaintiffs' Negligence and Negligent Misrepresentation Claims are Adequately Alleged

The Administrators seek dismissal of Plaintiffs' negligence and negligent misrepresentation claims asserting that Plaintiffs have not alleged a duty the Administrators breached, that the economic-loss rule bars these claims, and that negligent misrepresentation is not pleaded with specificity. Admin Br. 26-27, 49-50. Each argument fails.

#### 1. Plaintiffs adequately plead several duties breached by the Administrators

The Administrators conceded that a fiduciary duty satisfies this element, and Plaintiffs allege the Administrators are fiduciaries. S*upra* § I. And, as detailed above, the Administrators had other duties to disclose. *Supra* § IV.A. But, the Administrators owed additional duties to Plaintiffs besides the duty to speak.

The Administrator Defendants held themselves out as professionals who "fulfill each of the responsibilities assigned to them for the benefit of the class members," ¶ 82, and who, by taking on responsibility for directing and disbursing another's funds, owe a duty to do so with reasonable care — a duty that arises from the assumption of that responsibility, not from a fiduciary label. *Doherty v. Allianz Life Ins. Co. of N. Am.*, 2019 WL 3934100, at 5 (M.D. Fla. Aug. 20, 2019) (finding a duty of care owed when managing funds for another). By taking charge of the

administration and disposition of the settlement funds, the Administrators assumed a duty to the settlement claimants whose recoveries depended on competent administration — the settlement class members whose funds they were "entrusted to protect and deliver." ¶¶ 9, 568. That triggers the general common-law duty to exercise reasonable care toward the foreseeable victims of one's conduct. *See Nat'l Title Ins. Co. v. Lakeshore 1 Condo. Ass'n*, 691 So. 2d 1104, 1107-08 (Fla. 3d DCA 1997) (defendant that "did not own the insurance proceeds" but undertook to manage them owed a duty of reasonable care because its administration "created a foreseeable zone of risk encompassing all persons who had an interest in the proceeds"). The Administrators breached this duty of care through its deals with the other Defendants that depleted the value of the QSFs.

**2. The economic loss rule does not bar the negligence claim**

As the Administrators acknowledge, the economic loss rule presupposes a contract between the parties, so if none exists, it does not apply. Admin Br. 50. The Administrators' authorities limit application to economic losses "arising out of a breach of contract" and reach only the contracting parties. *See Sun Chem. Corp. v. Fike Corp.*, 235 A.3d 145, 150 n.2 (N.J. 2020).[38] The Restatement provision the Administrators invoke confirms the limit: it bars tort liability only for economic loss "caused by negligence in the performance or negotiation of a contract between the parties." Admin Br. 50 (quoting Restatement (Third) of Torts: Liab. for Econ. Harm § 3 (2020)).

[38] *See also, e.g.*, *JPMorgan Chase Bank, N.A. v. Pro. Pharmacy II*, 508 S.W.3d 391, 422-423 (Tex. App. 2014); *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 254 Mich. App. 372, 379-80, 656 N.W.2d 858 (2002) (rule inapplicable absent a contract governing the parties' economic expectations). Additionally, some jurisdictions among those focused on by the Administrators confine the economic-loss rule to the product liability context and/or the sale of goods or products, not to the provision of services. *See Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So. 3d 399, 407 (Fla. 2013); *Com. Painting Co. v. Weitz Co.*, 676 S.W.3d 527, 540–42 (Tenn. 2023); *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 254 Mich. App. 372, 379–80, 656 N.W.2d 858 (2002); *Pub. Bldg. Auth. of Huntsville v. St. Paul Fire & Marine Ins. Co.*, 80 So. 3d 171, 184–85 (Ala. 2010).

Plaintiffs' negligence claim is based on duties independent of any contract: the common-law duty to exercise reasonable care in safeguarding the settlement funds exists apart from any contract, but results from court appointment.[39]

**3. Plaintiffs adequately plead reliance and causation**

Finally, the Administrators seek to dismiss the negligence claims by reprising their arguments that Plaintiffs' insufficiently allege reliance and causation. Admin Br. 49-50. Plaintiffs plead the negligence claim "in the alternative" and "specifically disclaim any allegations of fraud and allege only negligence." ¶ 559. Accordingly, their negligence claim is only subject Rule 8(a) notice-pleading. *See Burman v. Phoenix Worldwide Indus., Inc.*, 384 F. Supp. 2d 316, 337 (D.D.C. 2005). And even if Rule 9(b) governs, its particularity requirement reaches only "the circumstances constituting fraud," *i.e.*, the misrepresentation or omission itself, while reliance and causation are governed by the Rule 8(a) plausibility standard. *See U.S. ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 27 (D.D.C. 2010); *SEC v. Binance Holdings Ltd.*, 738 F. Supp. 3d 20, 37 (D.D.C. 2024). Plaintiffs explain how their allegations regarding causation and reliance satisfy Rule 9(b) above. § B.

---

[39] *See Rattagan v. Uber Techs., Inc.*, 553 P.3d 1213, 1225 (Cal. 2024) (economic-loss rule is no bar where the defendant violated "a duty … independent of the [parties' contractual] rights and obligations"); *accord Dittman v. UPMC*, 196 A.3d 1036, 1056 (Pa. 2018); *A.C. Excavating v. Yacht Club II Homeowners Ass'n*, 114 P.3d 862, 864 (Colo. 2005); *Hoffman v. Atlas Title Sols., Ltd.*, 214 N.E.3d 1271, 1283 (Ohio Ct. App. 2023) (economic loss rule not applicable if it is "based exclusively upon [a] discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity."); *Children's Wish Found. Int'l, Inc. v. Mayer Hoffman McCann, P.C.*, 331 S.W.3d 648, 653-654 (Mo. 2011) (professional-negligence duty); *Olson v. Ferrara Candy Co.*, 2025 IL App (1st) 241126, ¶ 53, 275 N.E.3d 439, 459 (economic-loss doctrine does not bar a negligence claim founded on a common-law duty to safeguard rather than a contractual duty, though no traditional exception applied); *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 636 N.E.2d 503, 514 (Ill. 1994) ("Where a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty.").

**D. Plaintiffs' Civil Conspiracy Claim is Adequately Alleged**

The Administrators argue for dismissal of the civil conspiracy claim for three reasons — that Plaintiffs plead no viable underlying tort, no agreement, and no injury. Admin Br. 47-49. Plaintiffs establish that each of their tort claims should proceed (*supra* §§ I, IV.A-C) and that they have suffered injury (§§ II.B.1, II.B.3, II.B.6, III.A, IV.B.4, V). Defendants' assertion that there was no agreement fares no better.

The Administrators contend that the Complaint fails to allege an agreement, characterizing Defendants' work in concert as nothing more than "parallel conduct," and "collective silence" as part of an ongoing plan to extract funds from settlement QSFs without judicial oversight. Despite appearing like a conspiracy from the outside, the Administrators argue that there are no allegations of a "meeting, communication, document, speaker, recipient, [or] date" showing any agreement to conspire. Admin Br. 48. To reframe the Administrators' argument, they successfully hid the agreements. The Administrators are wrong on the law and elide key allegations.

An agreement to conspire only requires a shared understanding to participate in an unlawful act; it need not be pleaded or proved by direct evidence of an express understanding. "Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). Where the parties' "activities were symbiotic," and they pursued "the same object by different but related means" over time, the inference of agreement is proper. *Id*. at 486-87. Accordingly, where direct proof is lacking, the agreement may be inferred from circumstantial evidence. *Doe v. Roman Cath. Diocese of Greensburg*, 581 F. Supp. 3d 176, 212-13 (D.D.C. 2022) (sustaining a civil conspiracy claim because the plaintiff's "allegations of circumstantial evidence" suffice to "survive a motion to dismiss").

Here, Plaintiffs allege four pillars of Defendants' agreements to conspire. First, the FinTechs ran the same kick-back programs with the Administrators who were expressly or

implicitly aware of the wider conduct and MSAs between the FinTechs and the Administrators. ¶ 161 (the FinTechs approached each administrator with the same "standardized undisclosed compensation structure"), 551. Second, settlement industry insiders confirmed that the Bank and FinTech schemes were "standard practice" in the industry even though "there won't be any judge in the country that will think that's right," requiring tacit agreement between all the Defendants. ¶ 552; *see also* ¶ 161 ("the Defendants adopted and developed the program knowing it required concealment from the judiciary to remain viable"). Third, the Administrators demanded that the Banks share the QSF interest spread with them, leading to interest diversion across the Banks' book of business. ¶ 162, 554. Fourth, the Administrators who were purportedly in competition with one another, established materially identical means to conceal the kickbacks. ¶ 554.

These allegations plausibly show more than regular, parallel conduct. Under *Halberstam*, an agreement to conspire is inferred where alleged joint tortfeasors pursued the same object through different but related functions while in contact with one another. The Complaint pleads a symbiotic relationship among the Administrators, Banks, and FinTechs. Defendants' "obvious alternative explanation" does not fit these facts. Unlike the parallel pricing in *Twombly* that was "only natural anyway," 550 U.S. at 566, concealing court-approved compensation from the very courts that supervised these settlements serves no independent business purpose and is not ordinary competitive conduct (*see supra* §§ II.C.3, III.B), and its industry-wide uniformity confirms that each administrator acted knowing the others did the same.[40] Plaintiffs do precisely what *Twombly* requires: they place the alleged conduct "in a context that raises a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557.

---

[40] Defendants' cases involved a total absence of supporting facts. *See Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 61–62 (D.D.C. 2019) (plaintiffs failed to allege the defendants "communicated with each other" or had the "opportunity to form ... an agreement"); *Rise v. Bagshaw*, 2025 WL 1380478, at *9 (D.D.C. May 13, 2025) (only parallel conduct "at the same time … using similar means").

### E. Plaintiffs' Unjust Enrichment Claim is Adequately Alleged

The elements of an unjust enrichment claim are: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust. *See Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016).

#### 1. Plaintiffs adequately allege a benefit conferred on the Administrators

The Administrators argue that no Plaintiff "conferred" a benefit on them because the interest spread was paid by the Bank and the "breakage" was paid by the Fintechs — not "from Plaintiffs." Admin. Br. 50–52. "[A] direct payment is not a necessary component of an unjust enrichment claim." [41] *Glasgow v. Camanne Mgmt. Inc.*, 261 A.3d 208, 214 (D.C. 2021). "[I]f a third person makes a payment to the defendant in respect of an asset belonging to the claimant, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment." *Glasgow*, 261 A.3d at 214 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 47 (2011)). Where the funds reach the defendant through an intermediary that serves as "a mere

[41] *See also*, *e.g.*, *Jewett v. Boihem*, 23 So. 3d 658, 662–63 (Ala. 2009) ("sufficient to show that … the defendant has received the benefit indirectly"); *City of Oakland v. Oakland Raiders*, 83 Cal. App. 5th 458, 477–80 (2022) ("plaintiff need not confer a benefit on defendant"); *Geriatrics, Inc. v. McGee*, 332 Conn. 1, 25, 208 A.3d 1197, 1211 (2019) (unjust enrichment may arise from an indirect benefit conveyed by a third party); *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000) (unjust enrichment "does not require any promise or privity between the parties."); *Cape, LLC v. Och-Ziff Real Est. Acquisitions LP*, 370 So. 3d 1010, 1017 (Fla. Dist. Ct. App. 2023) ("[i]t would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the 'benefit' passed through an intermediary before being conferred on a defendant."); *HPI Health Care Servs. v. Mt. Vernon Hosp.*, 131 Ill. 2d 145, 161–62 (1989); *Morris Pumps v. Centerline Piping*, 273 Mich. App. 187, 194–97 (2006); *Reyner v. Crawford*, 334 S.W.3d 168, 174–75 (Mo. Ct. App. 2011); *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215, 863 N.E.2d 1012, 1018 (2007) ("plaintiff need not be in privity with the defendant to state a claim for unjust enrichment"); *New Restoration & Recovery Servs., LLC v. Dragonfly Pond Works, LLC*, 2023 WL 4025890, at *8 (N.C. Super. June 15, 2023) (no requirement that a plaintiff directly confer the benefit to state an unjust enrichment claim); *Commonwealth ex rel. Pappert v. TAP Pharm.*, 885 A.2d 1127, 1137–38 (Pa. Commw. 2005); *Freeman Indus. v. Eastman Chem.*, 172 S.W.3d 512, 525–26 (Tenn. 2005) ("a plaintiff need not establish that the defendant received a direct benefit"); *Jupiter Enters., Inc v. Harrison*, 2002 WL 318305, at *4 (Tex. App. Mar. 1, 2002) (unjust enrichment claim allowed where "plaintiff is seeking recovery from a third party foreign to the original contract but who benefitted from its performance.")

vessel to facilitate these transactions," plaintiff has still "conferred the benefit." *Id.* at 220-221. These elements "do not include an inquiry into whether the enricher was in rightful possession of the property conferred upon the enriched." *Id.* at 222.

The QSF is a court-supervised fund whose assets are "held for the exclusive benefit of Plaintiffs and the Class," and the interest earned on the deposits belongs to that fund. ¶¶ 79, 363, 573. The Administrators took a share of those assets: they "skimmed QSF funds intended for distribution to the claimants" and received "a portion of those proceeds." ¶ 4. That the money first passed through the Banks (as interest spread) or FinTechs (as breakage) before reaching the Administrators is "of no import"; those entities were the "mere vessel" through which the class's funds were routed. *Glasgow*, 261 A.3d at 221. The class's equitable interest in the fund is precisely the "better legal or equitable right" that supports restitution. *Id.* at 221.

The Administrators' characterize the allegation that the funds belonged to the class as a "bare legal conclusion." Admin. Br. 51. That characterization ignores the fund's legal character — a court-supervised QSF that "belong[s] solely to the class members." *See, e.g., Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011). The Administrators' reliance on *Aston*'s "remote and speculative" caution is misplaced here: Plaintiffs allege, "[h]ad the undisclosed kickbacks not been paid, the money retained by the Administrators and the Banks would have been distributed directly to Plaintiffs and Class Members as higher payments." (¶ 130) That is a direct, traceable diminution of the class's recovery, not the attenuated shareholder-profit theory rejected in *Aston*.[42]

[42] The cases the Administrators cite all failed for a reason absent here — the money either came from an unrelated third party or was never shown to belong to the plaintiff in equity. *See McDowell v. CGI Fed. Inc.*, 2017 WL 2392423, at *9 (D.D.C. June 1, 2017) (passport-application fees by law are paid to the Treasury, not to the defendant, and "inchoate demand" had no intrinsic value); *Mines v. Metagenics, Inc.*, 2023 WL 2930557, at *8 (D.D.C. Apr. 13, 2023) (after its account was terminated, plaintiff "had nothing to gain" and so conferred no benefit; no allegation the revenue ever belonged to plaintiff); *Council on Am.-*

### 2. Plaintiffs allege facts showing that retention of those benefits was unjust

The Administrators next argue that "there is no plausible claim that the retention of any alleged benefit from breakage [or the interest spread] was unjust." Admin Br. 53. That is a cocksure statement when a plaintiff adequately pleads injustice simply by "alleging that the retention of the conferred benefit was 'unjust, unfair, and inequitable.'" *JSC Transmashholding v. Miller*, 70 F. Supp. 3d 516, 523 (D.D.C. 2014). Plaintiffs do not even need to allege an independent tort: "[a] claim of unjust enrichment does not require fault on the part of the recipient," and even a defendant's "innocence in receiving the benefit does not mean that his retention of that benefit without payment is just." *JSC Transmashholding*, 70 F. Supp. 3d at 523.

Plaintiffs assert a wide range of torts and statutory violations (*see generally supra*). For example, the benefits Defendants took "were extracted from settlement funds through undisclosed self-dealing, in breach of fiduciary duties," (¶ 574), by administrators who owed the class a duty "to act solely in the interest of the class member beneficiaries and to subordinate all personal and institutional financial interests to the interests of the class." (¶ 459(a)). A fiduciary's retention of secret compensation carved from the beneficiaries' own fund is paradigmatic unjust enrichment. *See Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 130 F. Supp. 3d 236, 257 (D.D.C. 2015) (retention of an "unauthorized portion" of payments plausibly unjust). Even if some of these legal claims were not viable for some technical infirmity, Plaintiffs plainly allege facts of equitable

---

*Islamic Rels. Action Network, Inc. v. Gaubatz*, 82 F. Supp. 3d 344, 358 (D.D.C. 2015) (granting summary judgment because plaintiff "identified only benefits that Defendants … received from third parties or from other defendants," not benefits belonging to plaintiff); *Pernice v. Bovim*, 2015 WL 5063378, at *7 (D.D.C. Aug. 26, 2015) (claim dismissed where only a bankrupt LLC, not the plaintiff, conferred the benefit, and under the Delaware LLC Act a member "has no interest in specific [LLC] property"); *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 56 (D.D.C. 2017) (shareholder profits "far too remote and speculative," and plaintiffs never alleged that they, rather than insurers, paid for the product). Here, by contrast, the disputed funds are QSF assets held for the exclusive benefit of the class, and the administrators received and retained a share of them. (Compl. ¶¶ 4, 573.)

injustice and may plead unjust enrichment as an alternative to a legal theory of recovery of their diminished *pro rata* payments taken from the QSF. *See Smith v. Rubicon Advisors, LLC*, 254 F. Supp. 3d 245, 250 (D.D.C. 2017) (a plaintiff may pursue an unjust enrichment claim as an alternative theory of liability).

## V. PLAINTIFFS HAVE ARTICLE III STANDING

Plaintiffs have Article III standing because they suffered a concrete, particularized injury: each named Plaintiff received a reduced pro rata distribution from a court-supervised QSF as a direct result of Defendants' undisclosed extraction of settlement funds. ¶¶ 23–44, 393–394. That financial harm is traceable to Defendants' conduct and redressable by damages. Plaintiffs address this further in their Brief in Opposition to the FinTech Defendants' Motion to Dismiss.

## CONCLUSION

For all the foregoing reasons, the Administrators' Motion to Dismiss should be denied in its entirety. If the Court is inclined to dismiss any claim or any defendant, Plaintiffs respectfully request leave to amend.

Dated: September 15, 2026

Respectfully Submitted,

*/s/ Christopher A. Seeger*
Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: 212-584-0700
Email: cseeger@seegerweiss.com

Shauna Itri
Scott A. George
**SEEGER WEISS LLP**
325 Chestnut Street
Suite 917
Philadelphia, PA 19106

Telephone: 267-973-4265
Email: sitri@seegerweiss.com

*Plaintiffs' Lead Counsel*

David Boies
Adam Shaw
**BOIES SCHILLER & FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Telephone: 914-749-8201
Email: dboies@bsfllp.com
Email: ashaw@bsfllp.com

Bryan F. Aylstock
**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ**
17 E. Main St.
Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Email: baylstock@awkolaw.com

Kiley Grombacher
**BRADLEY/GROMBACHER, LLP**
31365 Oak Crest Drive
Suite 240
Westlake Village, CA 91361
Telephone: 805-270-7100
Email:
kgrombacher@bradleygrombacher.com

Eric Lechtzin
**EDELSON LECHTZIN LLP**
411 S. State Street
Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
Email: elechtzin@edelson-law.com

David S. Stone
**STONE & MAGNANINI LLP**
400 Connell Drive
Suite 6200
Berkeley Heights, NJ 07922
Telephone: (973) 218-1111

Email: dstone@smcomplex.com

*Plaintiffs' Executive Committee*