**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE CLASS ACTION SETTLEMENT ADMINISTRATION LITIGATION** | **Misc. Action No. 25-179 (JDB); MDL Docket No. 3162** |
| **This Document Relates To: ALL CONSOLIDATED ACTIONS** | |

**PLAINTIFFS' OPPOSITION TO BANK DEFENDANTS' MOTION TO DISMISS**
**<u>PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT ........................................................................................................ 6

I. THE COMMON LAW CLAIMS ARE WELL-PLED ........................................................ 6

A. The Complaint Plausibly Alleges the Banks Owed Fiduciary Duties to the Settlement Class Members ........................................................ 6

1. A bank that accepts property as escrow agent for identified beneficiaries owes duties concerning that property ........................................................ 7

2. The duty runs to the class members, and the banks' remaining arguments do not reach a bank that took a benefit from the QSF it held ........................................ 10

B. Plaintiffs Otherwise Plausibly State a Claim for Breach of Fiduciary Duty ............... 15

C. Plaintiffs Plausibly Assert Claims for Fraudulent Concealment and Fraud................. 18

1. The Banks had a duty to disclose........................................................ 18

2. The Complaint identifies specific material omissions with particularity ................ 19

3. Plaintiffs adequately plead reliance ........................................................ 20

D. The Aiding and Abetting Claims Are Sufficiently Pled........................................ 21

1. Plaintiffs adequately allege the Banks' actual knowledge ...................................... 22

2. Plaintiffs adequately allege the Banks' substantial assistance ................................ 24

E. The Civil Conspiracy Claim is Well Pled ........................................................ 25

F. Plaintiffs Plausibly Allege an Unjust Enrichment Claim........................................ 26

II. THE RICO CLAIMS ARE WELL PLED ........................................................ 28

A. The Complaint Adequately Pleads a RICO Enterprise ........................................ 28

B. Each Bank Conducted the Affairs of the RICO Enterprises ........................................ 29

C. Each Bank Committed Multiple Predicate Acts ........ 30

D. The Banks' Racketeering Directly Injured Plaintiffs ........ 32

E. The Banks' Use of Racketeering Proceeds Injured Plaintiffs ........ 33

F. The Banks Conspired to Violate RICO ........ 34

III. THE ANTITRUST CLAIMS ARE WELL PLED ........ 36

A. Plaintiffs are Direct Purchasers and Have Antitrust Standing ........ 36

B. The Complaint Plausibly Alleges a Hub-and-Spoke Conspiracy ........ 36

1. The alleged conspiracy ........ 36

2. The Banks knowingly participated in the antitrust conspiracy ........ 37

3. An agreement between the Banks is not required; the relevant inquiry is the Administrators' horizontal agreement ........ 39

4. The Banks' arguments of consistency with lawful competition and plus factors are also misplaced ........ 40

C. Market Definition is Irrelevant where a Per Se Illegal Horizontal Agreement is Alleged ........ 41

IV. THE RICO AND ANTITRUST CLAIMS ARE TIMELY ........ 42

A. The Banks' Fraudulent Concealment of the Schemes Tolled the Limitations Period... 42

B. Even If Fraudulent Concealment Does Not Apply, the Banks Misstate the Accrual Date ........ 44

V. PLAINTIFFS HAVE ARTICLE III STANDING ........ 45

CONCLUSION ........ 45

# TABLE OF AUTHORITIES

**Cases**

**Acosta Orellana v. CropLife Int'l*,
711 F. Supp. 2d 81 (D.D.C. 2010) ........ 26

*Albrecht v. Herald Co.*,
390 U.S. 145 (1968) ........ 40

*Alix v. McKinsey & Co.*,
2023 WL 5344892 (S.D.N.Y. Aug. 18, 2023) ........ 31

*Am. Pipe & Const. Co. v. Utah*,
414 U.S. 538 (1974) ........ 45

**Am. President Lines, LLC v. Matson, Inc.*,
633 F. Supp. 3d 209 (D.D.C. 2022) ........ 41

*Amen v. Merced Cnty. Title Co.*,
375 P.2d 33 (Cal. 1962) ........ 10

*Arista Recs., LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) ........ 41

*Avila v. CitiMortgage, Inc.*,
801 F.3d 777 (7th Cir. 2015) ........ 9

**Banneker Ventures, LLC v. Graham,*
798 F.3d 1119 (D.C. Cir. 2015) ........ 39

*Beckett v. Air Line Pilots Ass'n*,
995 F.2d 280 (D.C. Cir. 1993) ........ 10, 11

**Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 41

*Bell v. Safeco Title Ins. Co.*,
830 S.W.2d 157 (Tex. App. 1992) ........ 9

*Berry v. McLeod*,
604 P.2d 610 (Ariz. 1979) ........ 10

**Bhatia v. Silvergate Bank*,
725 F. Supp. 3d 1079 (S.D. Cal. 2024) ........ 17, 24

**Bridge v. Phoenix Bond & Indemnity Co.*,
553 U.S. 639 (2008) ........ 32, 33

**Burch v. CertainTeed Corp.*,
34 Cal. App. 5th 341 (2019) ........ 21

*Burkons v. Ticor Title Ins. Co. of Cal.*,
813 P.2d 710 (Ariz. 1991) ........ 10

**Cal X-Tra v. W.V.S.V. Holdings, L.L.C.*,
276 P.3d 11 (Ariz. Ct. App. 2012) ........ 24

**Capitol Servs. Mgmt., Inc. v. Vesta Corp.,*
933 F.3d 784 (D.C. Cir. 2019) ........ 39

**Casey v. U.S. Bank Nat'l Ass'n*,
127 Cal. App. 4th 1138 (2005) ........ 23, 25

*Cheeks v. Fort Myer Constr. Corp.*,
216 F. Supp. 3d 146 (D.D.C. 2016),
*aff'd*, 728 F. App'x 12 (D.C. Cir. 2018) ........ 36

*Childers v. New York & Presbyterian Hosp.*,
36 F. Supp. 3d 292 (S.D.N.Y. 2014) ........ 10

*Cisco Systems, Inc. v. Doe I*,
146 S. Ct. 1882 (2026) ........ 36

*Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Indus. Materials Corp.*,
887 F. Supp. 2d 9 (D.D.C. 2012) ........ 33

*Covey Run, LLC v. Wash. Cap., LLC*,
196 F. Supp. 3d 87 (D.D.C. 2016) ........ 8

*Danielsen v. Burnside-Ott Aviation Training Center, Inc.*,
941 F.2d 1220 (D.C. Cir. 1991) ........ 34

*De Wit v. Firstar Corp.,*
879 F. Supp. 947 (N.D. Iowa 1995) ........ 30

*Deslandes v. McDonald's USA, LLC*,
81 F.4th 699 (7th Cir. 2023) ........ 41

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ........ 40

*Edison Elec. Inst. v. Henwood*,
832 F. Supp. 413 (D.D.C. 1993) ........ 29

*F.T.C. v. Superior Ct. Trial Laws. Ass'n*,
493 U.S. 411 (1990) ........ 42

*Feld Ent. Inc. v. ASPCA*,
873 F. Supp. 2d 288 (D.D.C. 2012) ........ 31

*Firestone v. Firestone*,
76 F.3d 1205 (D.C. Cir. 1996) ........ 42, 45

**Flowers v. Exec. Off. of the President*,
142 F. Supp. 2d 38 (D.D.C. 2001) ........ 26

**Georgia Malone & Co. v. Rieder*,
973 N.E.2d 743 (2012) ........ 27

*Greenapple v. Cap. One, N.A.*,
939 N.Y.S.2d 351 (N.Y. App. Div. 2012) ........ 10

*Hamilton v. Fed. Home Loan Mortg. Corp.*,
2015 WL 144562 (D. Me. Jan. 12, 2015) ........ 8

*He Depu v. Yahoo! Inc.*,
950 F.3d 897 (D.C. Cir. 2020) ........ 11

*Hecht v. Commerce Clearing House, Inc.*,
897 F.2d 21 (2d Cir. 1990) ........ 26

**Holmes v. Sec. Inv. Protection Corp.*,
503 U.S. 258 (1992) ........ 33

*Hurst v. Enter. Title Agency, Inc.*,
809 N.E.2d 689 (Ohio Ct. App. 2004) ........ 10

**Ideal Steel Supply Corp. v. Anza*,
652 F.3d 310 (2d Cir. 2011) ........ 34, 35

*In re Cannon*,
277 F.3d 838 (6th Cir. 2002) ........ 7

**In re Domestic Airline Travel Antitrust Litig.*,
221 F. Supp. 3d 46 (D.D.C. 2016) ........ 40, 41

**In re Elec. Books Antitrust Litig.*,
859 F. Supp. 2d 671 (S.D.N.Y. 2012) ........ 38, 40

**In re First All. Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006) ........ 25

**In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004)........................................................................... 41

**In re LIBOR-Based Financial Instruments Antitrust Litig.*,
27 F. Supp. 3d 447 (S.D.N.Y. 2014)........................................................... 27, 28

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
175 F. Supp. 2d 593 (S.D.N.Y. 2001).................................................................. 26

*In re Rail Freight Fuel Surcharge Antitrust Litig. (NO. II)*,
2020 WL 5016922 (D.D.C. Aug. 25, 2020) ......................................................... 45

**In re Vitamins Antitrust Litig.*,
2000 WL 1475705 (D.D.C. May 9, 2000)............................................................ 44

**Interstate Circuit v. United States*,
306 U.S. 208 (1939)............................................................................................. 38

*Johnson v. U.S. Title Agency, Inc.*,
91 N.E.3d 76 (Ohio Ct. App., 2017) ...................................................................... 8

*Jones v. Rogers Memorial Hosp.*,
442 F.2d 773 (D.C. Cir. 1971) ............................................................................. 43

*Katt v. Riepe*,
2015 WL 3935354 (D. Ariz. June 26, 2015) ........................................................ 10

**Kaufman v. Cohen*,
760 N.Y.S.2d 157 (App. Div. 2003) ............................................................. 22, 25

*Kelly Cap., LLC v. S & M Brands, Inc.*,
873 F. Supp. 2d 659 (E.D. Va. 2012) ..................................................................... 8

*Kim v. DP Cap. LLC*,
2024 WL 4253168 (D.D.C. Sep. 20, 2024) ............................................................ 7

**Klier v. Elf Atochem N. Am., Inc.*,
658 F.3d 468 (5th Cir. 2011) ............................................................................... 27

*Lantz v. Lantz*,
192 N.Y.S.3d 698 (N.Y. App. Div. 2023) ............................................................ 10

**Laumann v. Nat'l Hockey League*,
907 F. Supp. 2d 465 (S.D.N.Y. 2012).................................................................. 40

*Ledbetter v. First State Bank & Trust Co.*,
85 F.3d 1537 (11th Cir. 1996) .............................................................................. 16

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006)........................................................................................ 15

*Lesti v. Wells Fargo Bank, N.A.*,
960 F. Supp. 2d 1311 (M.D. Fla. 2013) ........................................................................ 17

**Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024)...................................................................................................... 18

*Maganas v. Northroup*,
663 P.2d 565 (Ariz. 1983)............................................................................................ 10

*Merrill Lynch Mortg.Cap., Inc. v. FDIC*,
293 F. Supp. 2d 98 (D.D.C. 2003) .................................................................................. 9

*Michael v. FDIC*,
687 F.3d 337 (7th Cir. 2012) ........................................................................................ 17

*Miller v. Am. Nat'l Bank & Tr. Co.*,
4 F.3d 518 (7th Cir. 1993) ........................................................................................... 15

*Miller v. Bank of America, N.A.*,
352 P.3d 1162 (N.M. 2015)........................................................................................... 16

*Mirkin v. Wasserman*,
5 Cal. 4th 1082 (1993) ................................................................................................. 20

*Moss v. BMO Harris Bank, N.A.*,
258 F. Supp. 3d 289 (E.D.N.Y. 2017) ........................................................................... 30

*Nasrawi v. Buck Consultants LLC*,
231 Cal. App. 4th 328 (2014) ....................................................................................... 22

**Neilson v. Union Bank of Cal., N.A.*,
290 F. Supp. 2d 1101 (C.D. Cal. 2003) ......................................................................... 23

*Newmyer v. Philatelic Leasing, Ltd.*,
888 F.2d 385 (6th Cir. 1989)......................................................................................... 34

*NRT New England, Inc. v. Moncure*,
937 N.E.2d 999 (Mass. App. Ct. 2010) ........................................................................... 9

**O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*,
436 F. Supp. 3d 576 (E.D.N.Y. 2020) ........................................................................... 38

**Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)...................................................................................................... 18

**Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*,
81 F. Supp. 3d 1 (D.D.C. 2015) ........................................................................ 41

*Pan-Am. Life Ins. Co. v. Antarctica Cap. Mgmt., LLC*,
2022 WL 992840 (S.D.N.Y. Mar. 31, 2022) ........................................................ 8

*Peoples Westchester Sav. Bank v. FDIC*,
961 F.2d 327 (2d Cir. 1992)................................................................................ 15

*Pippin v. Kern-Ward Bldg. Co.*,
456 N.E.2d 1235 (Ohio Ct. App. 1982)................................................................ 10

*Rattagan v. Uber Techs., Inc.*,
17 Cal. 5th 1 (2024) ...................................................................................... 18, 19

**Reves v. Ernst & Young*,
507 U.S. 170 (1993)...................................................................................... 29, 31

*Richards v. Mileski*,
662 F.2d 65 (D.C. Cir. 1981) .............................................................................. 43

**Rickley v. Goodfriend,*
212 Cal. App. 4th 1136 (2013) ........................................................................... 26

**Riss & Co. v. Ass'n. of Am. R.Rs.*,
187 F. Supp. 306 (D.D.C 1960) .................................................................... 38, 39

*Robinson-Smith v. Gov't Emps. Ins. Co.*,
424 F. Supp. 2d 117 (D.D.C. 2006). ................................................................... 44

*Rotella v. Wood*,
528 U.S. 549 (2000).............................................................................................. 28

**RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
682 F.3d 1043 (D.C. Cir. 2012).................................................................... 35, 36

*Saad v. Rodriguez*,
506 N.E.2d 1230 (Ohio Ct. App. 1986)................................................................ 10

**Salinas v. United States*,
522 U.S. 52 (1997)................................................................................................ 35

*Schmuck v. United States*,
489 U.S. 705 (1989)...................................................................................... 31, 32

**Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985).............................................................................................. 28

*Solano v. Delmed, Inc.*,
759 F. Supp. 847 (D.D.C. 1991) .......... 44

*Spalding v. Coulson*,
661 N.E.2d 197 (Ohio Ct. App. 1995) .......... 10

*St. Paul Title Co. v. Meier*,
226 Cal. Rptr. 538 (Cal. Ct. App. 1986) .......... 10

*Stern v. Charles Schwab & Co., Inc.*,
2010 WL 1250732 (D. Ariz. Mar. 24, 2010) .......... 23

*Summit Fin. Holdings, Ltd. v. Cont'l Lawyers Title Co.*,
41 P.3d 548 (Cal. 2002) .......... 10, 14

**Toys "R" Us, Inc. v. F.T.C.*,
221 F.3d 928 (7th Cir. 2000) .......... 40

*Turrey v. Vervent, Inc.*,
2026 WL 2330561 (9th Cir. Aug. 12, 2026) .......... 44

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) .......... 31

**United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) .......... 37, 38, 40

**United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) .......... 29, 35

*Uzyel v. Kadisha*,
188 Cal. App. 4th 866 (2010) .......... 17

*Virtanen v. O'Connell*,
44 Cal. Rptr. 3d 702 (Cal. Ct. App. 2006) .......... 10

**Wagman v. Lee*,
457 A.2d 401 (D.C. 1983),
cert. denied, 464 U.S. 849 (1983) .......... 7

*Welborne v. Ryman-Carroll Found.*,
22 Cal. App. 5th 719 (2018) .......... 27

*Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*,
201 Ariz. 474, 38 P.3d 12 (2002) .......... 25

**Woodward v. Metro Bank of Dallas*,
522 F.2d 84 (5th Cir. 1975) .......... 23

*Wright v. Ernst & Young LLP*,
152 F.3d 169 (2d Cir. 1998) .......... 21

**Statutes**

26 U.S.C. § 468B .......... 1, 7, 9

Pub. L. No. 91-452, § 904(a), 84 Stat. 922 .......... 28

**Regulations**

12 C.F.R. § 9.1(c) .......... 11, 13

26 C.F.R. § 1.468B .......... 9, 13

**Other Authorities**

Restatement (Second) of Torts § 551 .......... 19

## INTRODUCTION

Each deposit with the Banks to establish a class settlement Qualified Settlement Fund ("QSF") is not a regular deposit, like a checking account where a bank takes title to the funds as assets on its balance sheet and deploys them as it chooses. A QSF is created by court order to hold a settlement payment (in the millions) for the benefit of an identifiable class of beneficiaries, and by statute, must not commingle the QSF assets with its assets and ensure all earnings on those assets belong to the QSF. 26 U.S.C. § 468B(b)(3)(C).

A bank may earn a net interest spread on the cash deposits it holds on behalf of a QSF the same way it does with any other deposit account, that is ordinary banking. What is not ordinary banking is suppressing interest rates on court-supervised QSFs and secretly routing a portion of the suppressed spread back to the court-appointed Administrators who steered those deposits to the bank. That is the scheme the CCAC alleges and the Administrators'[1] own submissions confirm it exists. The Banks[2] do not deny the spread-sharing arrangements existed — they argue the conduct was lawful. It was not.

The scheme depended on concealment. The Administrators struck standing arrangements with the Banks before any settlement court or settlement counsel was involved—before counsel was retained, before any administrator was appointed, and before anyone could evaluate the rate. When a bid did reach counsel, the bidding was already collusive: the Banks quoted matching, suppressed rates "without any desire to outbid each other,"[3] while hiding the kickback underneath.

---

[1] The Administrators refers to the Administrator Defendants Angeion Group, LLC, Epiq Class Action & Claims Solutions, Inc., JND Legal Holdings, LLC (d/b/a JND Legal Administration, Kroll LLC, and Kroll Settlement Administration LLC.

[2] The Banks refers to the Bank Defendants Huntington National Bank and Western Alliance Bank.

[3] *See* Consolidated Class Action Complaint (ECF 123) ¶ 430. The Consolidated Class Action Complaint will be referred to as "the Complaint" or "CCAC," and references to the allegations in the CCAC will be made by unattributed paragraph references, "¶¶".

Plaintiffs allege that the Banks, singly and in concert with the Administrators, breached their fiduciary duties to the QSF beneficiaries, committed a variety of frauds, conspired with one another, aided and abetted in the Administrators' own torts, and were otherwise unjustly enriched. But the wrongs did not stop with these common law claims. Rather, recognizing the far-wider enterprises between the Defendants to illegally profit from the QSFs, Plaintiffs allege that the Banks, Administrators, and Fintechs violated RICO, and the Banks and Administrators violated the antitrust laws.

## **BACKGROUND**

*The QSF*

The Banks are not passive bystanders who inadvertently found themselves holding settlement funds. They are sophisticated institutional actors who spent years and substantial resources marketing themselves into the heart of the class action settlement ecosystem—and who reaped the financial rewards of that position at the direct expense of the class members they were obligated to serve. The motion to dismiss asks this Court to accept the premise that the Banks were simply providing "everyday banking services." The Complaint tells a different story.

For a bank, a class action QSF is a prize. ¶ 97. A single class action settlement fund will place hundreds of millions of dollars of stable, captive deposits on a bank's balance sheet with no credit risk, no marketing cost to acquire the depositors, and no ability on the part of those depositors to move their money elsewhere. *Id*. The funds are locked in once deposited; there is no competitive pressure on the bank to offer better terms after the initial deposit relationship is secured. ¶ 101. The Banks understood this perfectly. They built entire dedicated business divisions around the pursuit of exactly these deposits. ¶¶ 97, 99.

Accordingly, the Banks positioned themselves as trusted fiduciary partners for the

settlement administrators who control where the class settlement funds are placed. ¶ 110. Defendant Huntington markets its "National Settlement" team and the tens of billions of dollars in settlement funds it has handled, and it supports industry groups like the National Association of Shareholder and Consumer Attorneys. ¶¶ 112, 113. Defendant Western Alliance hosts an annual Class Action Law Forum and publishes a Handbook for Settlement Funds. ¶¶ 115, 116. The Handbook prominently features a class action attorney's testimonial that settlement funds entrusted to it "will be safe and provide the highest possible return for the class." ¶¶ 115, 119. Huntington also publishes a free Banking Handbook for Settlement Funds that instructs administrators to evaluate bank fees "to allow selection of a bank with a competitive pricing schedule to maximize the economic benefit for the class"—guidance Huntington published while simultaneously offering the below-market interest rate structures alleged herein. ¶ 116. The message of competency, integrity, and trust runs through the efforts of the Banks' public representations. ¶¶ 114–20. A bank that markets itself in these terms has represented to the professional community that it understands what fiduciary administration of settlement funds requires. It cannot simultaneously disclaim that understanding when its conduct falls short of it. ¶ 120.

*The Backroom Deal – the Bank Interest Track*

The Banks paid rates on the QSF deposits far below any market rate, which would not make sense outside of the Banks' standing *quid pro quo* agreements with the Administrators to share the interest spread in exchange for continued QSF referrals. ¶¶ 121–23. As Federal Reserve interest rates rose, the interest spread and kickbacks only increased. *Id.* A $500 million fund receiving 0.5% interest rather than 4% is $17 million poorer and has less to distribute *pro rata* to its beneficial owners, the settlement class. ¶ 123.

The Banks argue that paying below-market interest on a QSF is ordinary commercial banking. But the Complaint does not allege that the Banks merely set their own rates. It alleges that the Banks entered into standing agreements under which they shared the suppressed interest spread with the Administrators who directed the deposits, that served no legitimate commercial purpose, and were actively concealed from every settlement court. ¶¶ 10, 121–31, 366–83.

The Administrators and Banks kept their agreements between themselves. In 2024, however, Todd Hilsee, a veteran in settlement administration, reported that a representative of one of the Banks "told me that Admins were asking banks to share the interest a QSF account would otherwise earn. This occurred, it was explained to me, because the judiciary and counsel were not informed of fully available interest rates, had no reason to question interest rates during the recent past low-interest rate environment, and counsel and the judiciary increasingly rely on Admins to handle more settlement duties." ¶ 124. Hilsee confirmed that in every public record he reviewed, he found no disclosure to any court that QSF bank interest was diverted—establishing that the concealment was uniform, deliberate, and successful across the full scope of the scheme. *Id*.

This was later corroborated by a *Forbes* journalist's discussions with other insiders who confirmed that "claims administrators sometimes take a cut of the interest income earned by settlement funds in the months or years before they're distributed." ¶ 125. This was "standard practice." *Id*. One former employee stated: "Suddenly, we were making a lot of money that had nothing to do with the administration of benefits to class members." *Id.* Another confirmed: "When these administrators are pulling down 4% straight to them, with no benefit to the fund, there won't be a judge in the country that will think that's right." ¶ 126. In March 2025, Plaintiffs' own counsel solicited QSF bids from both Banks. Both offered rates below 0.5% per year—against a federal funds rate of 4.33%—without any apparent desire to compete on rate. ¶ 430. That uniform below-

market pricing is not the product of independent commercial judgment. It is the product of an ongoing coordinated arrangement operating across Banks and Administrators. ¶¶ 430–31.

*The Digital Disbursement Track*

The Banks also participated directly in the Digital Disbursement Track—the scheme by which QSF funds loaded onto eCards were extracted through breakage, inactivity fees, and unredeemed balances that never returned to the fund. ¶¶ 131–68.[4]

In January 2022, Western Alliance acquired Digital Disbursements (Digital Settlement Technologies, LLC)—which Western Alliance itself described as "the leading digital payment solution for class actions and other legal payments," having partnered with "more than 60% of class action administrators." ¶ 55. After that acquisition, Western Alliance simultaneously held QSF deposits at below-market rates on the Bank Interest Track and operated the digital payment platform extracting breakage on the Digital Disbursement Track—in the same settlements, against the same QSF assets, belonging to the same class beneficiaries. ¶ 163.

Huntington likewise participated. On information and belief, Huntington entered revenue-sharing arrangements with FinTechs in settlements where it was able to select or influence the selection of digital payment platforms. ¶ 163.

A bank representative confirmed to Hilsee that Administrators were simultaneously demanding that banks share QSF interest and participating in the eCard breakage extraction. ¶ 162. The Banks' knowledge of these schemes also imposed obligations under the Bank Secrecy Act that they violated by failing to file required Suspicious Activity Reports on transactions that bore the hallmarks of money laundering. ¶ 167.

[4] The Digital Disbursement Track is explained further in Plaintiffs' Opposition to the Fintech Defendants' Motion to Dismiss.

*The Claims in this Case*

Plaintiffs, as claimants in settlements with *pro rata* distribution of QSF funds, seek what they are owed from the Banks, the further *pro rata* distribution of the interest-spread captured and shared by the Banks, and eCard breakage captured and shared by the Fintechs.

## LEGAL STANDARD

Plaintiffs refer to the Legal Standard set forth in their Opposition to the Fintechs' Motion to Dismiss.

## ARGUMENT

### I. THE COMMON LAW CLAIMS ARE WELL-PLED

#### A. The Complaint Plausibly Alleges the Banks Owed Fiduciary Duties to the Settlement Class Members

The Complaint alleges a paradigmatic fiduciary arrangement. The Banks accepted court-supervised settlement funds as escrow agents and depositories, to be held for the benefit of settlement class members, agreed to retain them until a court authorized release, structured the financial terms on which those funds were held(including the interest rate credited to the fund and the spread retained),charged fees from the fund itself for performing that function, and simultaneously entered into undisclosed arrangements under which a portion of the retained spread was paid back to the administrators who directed the deposit. ¶¶ 35–38, 103, 458. Under any law, this is a fiduciary relationship. The Banks do not address this, opting instead to cite an array of ordinary banking decisions that uniformly involve banks holding someone else's funds and taking nothing out of them, while ignoring the feature of this case that distinguishes every one of those decisions: here, the Banks accepted QSF deposits into court-supervised, segregated accounts, charged the fund a fee for performing that function, structured concurrent below-market interest arrangements under which they retained a spread the fund's beneficiaries should have received,

and routed a portion of that spread back to the administrators who steered them the deposit.

To the extent the Court concludes that the escrow character of the QSF deposits does not by itself establish fiduciary status as a matter of law, whether a fiduciary relationship exists is in any event a fact-bound question that cannot be resolved on the pleadings. *See* Admin. Opp. § I.A.[5]

### 1. A bank that accepts property as escrow agent for identified beneficiaries owes duties concerning that property

The Banks are correct to note that their relationship with a general depositor is ordinarily one of debtor and creditor, not of fiduciary and beneficiary. Bank Br. 9.[6] But that argument has no traction here. The Banks did not receive ordinary deposits from ordinary depositors. They received court-supervised, segregated funds—funds that were legally separated by regulation from the moment of transfer, ¶ 64, impressed with beneficial ownership running to the class members by statute, 26 U.S.C. § 468B(b)(3)(C), and received pursuant to instruments that consistently identify the Banks as escrow agents or custodians over accounts subject to the continuing jurisdiction of the court. ¶¶ 172, 187, 203, 218, 235, 259, 278, 291, 305, 318, 332, 345.

Money entrusted by one person to another to be held for the benefit of a third person is held in trust. "[T]here can be no question as to the existence of the fiduciary capacity in a case where the agent has been entrusted with money to be used for a specific purpose." *Kim v. DP Cap. LLC*, 2024 WL 4253168, at *4 (D.D.C. Sep. 20, 2024). Where a person accepts property understanding that it is not held as the recipient's own but applied to specified purposes or for specified persons, "a valid and enforceable express trust exists." *In re Cannon*, 277 F.3d 838, 849-50 (6th Cir. 2002).

---

5 References to Plaintiffs' Opposition to the Administrator Defendants' Motion to Dismiss will be to "Admin. Opp."

6 References to the Bank Defendants' Motion to Dismiss will be to "Bank Br."

A QSF account is an escrow account. *Kelly Cap., LLC v. S & M Brands, Inc.*, 873 F. Supp. 2d 659, 663 (E.D. Va. 2012) (characterizing QSF-type settlement funds as escrow accounts). An escrow agent is a person or entity that holds funds on behalf of a third party, pending fulfillment of specified conditions, with a duty to pay those funds only to the persons entitled to receive them. *See* Huntington Banking Handbook for Settlement Funds, ECF 149-7 at 6 ("a custody or escrow account refers to funds being held for another party"). One who undertakes to act as an escrow holder, which both Banks did, "assumes fiduciary duties as a matter of law." *Covey Run, LLC v. Wash. Cap., LLC*, 196 F. Supp. 3d 87, 1034 (D.D.C. 2016) (internal citation omitted); *accord Pan-Am. Life Ins. Co. v. Antarctica Cap. Mgmt., LLC*, 2022 WL 992840, at *5 (S.D.N.Y. Mar. 31, 2022). "[T]here is a fiduciary relationship created by and inherent in the nature of an escrow agreement." *Hamilton v. Fed. Home Loan Mortg. Corp.*, 2015 WL 144562, at *18 (D. Me. Jan. 12, 2015). Courts have recognized that "[t]he very name 'escrow' gives it the earmarks of a trust[,]" *Johnson v. U.S. Title Agency, Inc.*, 91 N.E.3d 76, 86 (Ohio Ct. App., 2017), and that characterization is reinforced here by the QSF regulatory framework, which impresses these assets with the essential characteristics of trust property before the first bank account is ever opened.

The Complaint alleges a book-of-business-level arrangement under which the Administrators directed their QSF deposits to the Banks pursuant to arrangements that were concealed from every supervising court, ¶ 122, with undisclosed payments routed back to the administrators through arrangements that appeared in no court filing. ¶ 431(d). Western Alliance sells the same service, advertising "competitive interest rates and fee structure" as a feature of its escrow phase solutions for class action and mass tort settlements. ¶ 421. The funds themselves are created by court order, must be kept "entirely separate from the assets of the administrator, the bank, or any other party," and cannot be moved without a court order. ¶¶ 61, 64, 101. The earnings

belong to the fund, and through the fund to claimants—not as a policy preference, but as a matter of federal tax law. ¶¶ 64–65; 26 U.S.C. § 468B(b)(3)(C); 26 C.F.R. § 1.468B-2(b).

The Banks answer that these were interest-bearing deposit accounts, and that placing funds in such an account is "very strong evidence that the title to the money deposited passed out of the depositor." Bank Br. 15. This Court has rejected that reasoning. "Creating a special deposit is not just a matter of magic words," and "the fact that the [account] was, or could have been, a time deposit or demand account, interest bearing, or a business checking account is not material." *Merrill Lynch Mortg.Cap., Inc. v. FDIC*, 293 F. Supp. 2d 98, 108 (D.D.C. 2003). What matters is the arrangement. The QSF regulatory framework answers the Banks' argument directly: the segregation of assets is not accomplished by the type of account but by the legal structure imposed by 26 C.F.R. § 1.468B-1(c)(3) and (h), which mandate physical segregation as a condition of QSF status regardless of the account type. A bank's treatment of entrusted money as its own does not retroactively convert a special deposit into a general one; it merely constitutes a breach of obligation. *Merrill Lynch*, 293 F. Supp. 2d at 111.

An escrow agent "assumes a fiduciary duty to the parties to an escrow agreement when it accepts funds and deposits them into its account," and that duty "exists as long as the funds remain, undisbursed, in the escrow agent's account." *NRT New England, Inc. v. Moncure*, 937 N.E.2d 999, 1003 (Mass. App. Ct. 2010). This duty is broad, encompassing "(1) the duty of loyalty, (2)the duty to make a full disclosure, (3) and the duty to exercise a high degree of care to conserve the money and pay it only to those persons entitled to receive it." *Bell v. Safeco Title Ins. Co.*, 830 S.W.2d 157, 161 (Tex. App. 1992). The holder must act impartially toward every principal, both "the party making the deposit and the party for whose benefit the deposit is made." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 782 (7th Cir. 2015). *See also, Childers v. New York & Presbyterian Hosp.*, 36

F. Supp. 3d 292, 307 (S.D.N.Y. 2014) (handing money for a third party's "best interest" is a "hallmark of a fiduciary relationship"). Every jurisdiction the Banks surveyed demands the same,[7] which is why they conceded that "the principles governing the claims are materially similar across all potentially relevant jurisdictions." Bank Br. 9 n.10.

**2. The duty runs to the class members, and the banks' remaining arguments do not reach a bank that took a benefit from the QSF it held**

The Banks say that they and Plaintiffs "are strangers, separated by at least two, and perhaps three, intermediaries." Bank Br. 10. That describes the chain of administration, not the duty. This Circuit has held that the holder of a settlement fund owes fiduciary duties to beneficiaries it has never met. In *Beckett v. Air Line Pilots Ass'n*, a consent decree directed a settlement into an account held by a union that would "act as trustee and agent for distribution of this fund to the beneficiaries," to be distributed on a third party's instructions. 995 F.2d 280, 283 (D.C. Cir. 1993). The intended recipients were not parties to the case that produced the decree. *Id.* This Circuit held

[7] In Arizona, an escrow agent has a fiduciary relationship of trust and confidence to the parties to the escrow and must perform with scrupulous honesty, skill, and diligence. *Maganas v. Northroup*, 663 P.2d 565 (Ariz. 1983); *accord Burkons v. Ticor Title Ins. Co. of Cal.*, 813 P.2d 710, 718 (Ariz. 1991); *Berry v. McLeod*, 604 P.2d 610, 616 (Ariz. 1979); *Katt v. Riepe*, 2015 WL 3935354, at *4 (D. Ariz. June 26, 2015). In California, an escrow holder "is the agent of all the parties to the escrow at all times prior to performance of the conditions of the escrow []; bears a fiduciary relationship to each of them []; and owes an obligation to each measured by an application of the ordinary principles of agency[,]" which duty runs to the party for whose benefit the funds are held. *Virtanen v. O'Connell*, 44 Cal. Rptr. 3d 702, 713 (Cal. Ct. App. 2006); *St. Paul Title Co. v. Meier*, 226 Cal. Rptr. 538, 539 (Cal. Ct. App. 1986); *accord Summit Fin. Holdings, Ltd. v. Cont'l Lawyers Title Co.*, 41 P.3d 548, 551–52 (Cal. 2002); *Amen v. Merced Cnty. Title Co.*, 375 P.2d 33, 36–37 (Cal. 1962). Ohio goes furthest, calling the escrow holder "an agent of both parties, as well as a paid trustee with respect to the . . . funds placed in his hands." *Hurst v. Enter. Title Agency, Inc.*, 809 N.E.2d 689, 697–98 (Ohio Ct. App. 2004); *accord Pippin v. Kern-Ward Bldg. Co.*, 456 N.E.2d 1235, 1237 (Ohio Ct. App. 1982); *Spalding v. Coulson*, 661 N.E.2d 197, 209 (Ohio Ct. App. 1995); *Saad v. Rodriguez*, 506 N.E.2d 1230, 1233 (Ohio Ct. App. 1986). And, in New York, an escrow agent owes a fiduciary duty to the party holding the beneficial interest in the escrowed funds. *Lantz v. Lantz*, 192 N.Y.S.3d 698, 701 (N.Y. App. Div. 2023); *Greenapple v. Cap. One, N.A.*, 939 N.Y.S.2d 351, 352–53 (N.Y. App. Div. 2012).

that the decree "established a trust," that the recipients could sue to enforce and that the holder "breached its fiduciary duty" when "it retained a portion of the trust funds." *Id.* at 285, 289.

*He Depu* supplies the elements. A trust exists where an agreement identifies a holder, trust property, and beneficiaries and subjects the fund to imperative terms. *He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901-04 (D.C. Cir. 2020). The settlor's intent may be manifested "by written or spoken language or by conduct, in light of all surrounding circumstances." *Id.* at 902 (internal citation omitted). "No magic words are required." *Id.* A command that the fund be kept separate from the holder's own money is itself an indicator of trust intent, as is a holder's taking of legal but not equitable title. *Id.* at 904–05 & n.6. Here, each of those features is pleaded, along with one the *He Depu* agreement did not have: instruments that call the holder a trustee. ¶¶ 218, 305, 332.

The Complaint alleges that fiduciary status arises from "multiple independent and converging sources, federal banking regulation, trust law, and constructive trust principles, each sufficient on its own." ¶ 103. On the OCC regulatory ground (12 C.F.R. §§ 9.2(e) and 9.2(i)), which governs Huntington as a national bank, *see* 12 C.F.R. § 9.1(c), Huntington argues that § 9 classifies fiduciary activities without creating them, and that setting interest rates on a demand deposit is not "investment discretion." Bank Br. 12–13. The Complaint does not allege that Huntington merely set interest rates. It alleges that the Huntington determined what investment vehicles QSF assets would be placed in, structured spread-sharing arrangements under which retained interest was routed back to the administrators who directed the deposits, and controlled the terms on which QSF assets were deployed. ¶¶ 98, 104–06. The OCC's own Comptroller's Handbook on Custody Services, submitted by the Banks as Dkt. 149-5 at 5 (page 11 of the Handbook), states expressly: "Custody is generally not considered a fiduciary capacity under 12 CFR 9. However, a custodian may perform functions that are fiduciary in nature. For example, a

custodian exercising discretion in managing a securities lending cash collateral pool would be acting in a fiduciary capacity and must comply with the relevant provisions of 12 CFR 9." The Banks read only the general statement and ignore the condition on which it depends. When a bank exercises discretion over how QSF fund assets are deployed, as the Complaint alleges Huntington did, ¶¶ 104–06, the Handbook confirms that Part 9 applies. And 12 C.F.R. § 9.10(a), which applies to fiduciary accounts for which a national bank has investment discretion, expressly requires that the bank "shall obtain for funds awaiting investment or distribution a rate of return that is consistent with applicable law." If the Huntington exercised investment discretion over QSF assets, as the Complaint alleges, ¶ 106, that regulation imposed an affirmative obligation to pay a competitive rate for the account itself. Huntington cannot satisfy that obligation by pointing to a below-market rate credited to the account paired with a private side payment routed to the administrator who steered the deposit. Section 9.10(a) requires the competitive rate for the fund, not a *quid pro quo* for the gatekeeper. Western Alliance's duties do not depend on § 9. They arise from the escrow relationship, the segregation and beneficial-ownership rules of the QSF regulations, its possession and control of fund assets, and the office it assumed for compensation, each of which ¶ 103 pleads as independently sufficient.

The Banks argue that the Huntington template assigns investment direction to class counsel, not the bank, and that Part 9 therefore does not apply. Bank Br. 4–5. But the Complaint does not allege that the template governed in practice. It alleges that the Banks determined the interest rate credited to QSF accounts, ¶ 98(a), 106; independently deployed those funds into commercial lending and other instruments at market rates, ¶ 98(a); and structured bilateral spread-sharing arrangements with the Administrators that no settlement counsel in any settlement ever reviewed or approved, ¶¶ 106, 122, 128–29. Where a bank nominally holds a template assigning

investment direction to settlement counsel but in practice exercises control over what rate the fund earns and where the assets go, the substance governs over the label. The Complaint alleges exactly that substance. *See* 12 C.F.R. § 9.2(i) (shared authority "whether or not that authority is exercised" suffices).

Further, the same exercise of control over QSF assets carries independent significance under Treasury Regulation § 1.468B-2(k)(3), which the Complaint draws on not as a tax argument but as a property and administrative-status argument. ¶ 67. That regulation establishes a four-tier administrator cascade, the third tier of which is "the escrow agent, custodian, or other person in possession or control of the fund's assets." 26 C.F.R. § 1.468B-2(k)(3). ¶¶ 67–69. Where a Bank was in possession or control of QSF assets—which is precisely what holding, investing, structuring, and disbursing those assets means—the Banks qualified as the "administrator" of the QSF under the very regulation it claims is irrelevant, with the attendant obligations to account for all fund income and administer the fund in compliance with the regulations governing it. The Banks cannot simultaneously hold and deploy QSF assets and disclaim the regulatory designation that flows from exercising exactly that control.

On the constructive fiduciary ground: The Banks argue that marketing settlement banking services does not create a fiduciary relationship with the class. Bank Br. 16–17. But the Complaint does not rest constructive fiduciary status on the class's reliance on the Banks' marketing. It rests it on the Banks' assumption of the functions of a fiduciary office for compensation: building dedicated institutional divisions around QSF administration, charging fees for performing that office, publishing guidance specifically on the obligations of settlement fund administrators, and representing in their own template instruments that all fund interest "shall remain subject to the jurisdiction of the Court." ¶¶ 107, 110–120. Huntington's own Banking Handbook instructs

counsel and administrators that in selecting a settlement bank they should ask whether the bank has "trust powers and experienced advisors who can act in a fiduciary manner," and positions Huntington as the answer to that question. ECF 149-7 at 28. A bank that markets itself in those terms, charges a fee for performing that office, and then structures bilateral spread-sharing arrangements under which the bank retains interest belonging to the class and routes a share back to the administrator who steered the deposit has voluntarily assumed functions that are fiduciary in substance regardless of the label the bank attaches to its account. That voluntary assumption, for compensation, is constructive fiduciary status. *See Summit Fin. Holdings, Ltd.*, 41 P.3d at 551–52 (escrow holder "is an agent and fiduciary of the parties to the escrow").

On Section 43 and co-fiduciary accountability: Neither is offered as the sole source of duty. Section 43 of the Restatement (Third) of Restitution fixes liability for a benefit obtained in consequence of another fiduciary's breach. Co-fiduciary accountability under Restatement (Second) of Trusts § 224 and Restatement (Third) of Trusts § 81 adds a further head of liability once the Banks' own duty is established by the escrow, regulatory, and constructive grounds above. The Banks are not fiduciaries by derivation from the Administrators' status. They are fiduciaries because they took the office.

That leaves the test the Banks propose, which asks whether the class reposed "special confidence and trust" in them. Bank Br. 10. That is the test for informal confidential relationships built through dealings. This is not that kind of case. The duty comes from (i) the property, (ii) the regulatory framework that impressed that property with beneficial ownership the moment it entered the QSF, (iii) the escrow arrangement the Banks voluntarily accepted for compensation, and (iv) the office voluntarily assumed. The Banks' no-duty cases involve institutions that held funds passively and took nothing out of them. *See Miller v. Am. Nat'l Bank & Tr. Co.*, 4 F.3d 518,

519–21 (7th Cir. 1993) (unpaid and "reluctant" bank holding a minor's own account under a court order, with no escrow agreement and no office conferred); *Peoples Westchester Sav. Bank v. FDIC*, 961 F.2d 327, 331–32 (2d Cir. 1992) (IOLA account, where the statute gave the bank "no greater obligation . . . than to follow the instructions of the legal signatory"). Even the line of authority the Banks cite preserves liability where a bank acts "by itself acquiring a benefit." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 287 (2d Cir. 2006). That is exactly the case here.

**B. Plaintiffs Otherwise Plausibly State a Claim for Breach of Fiduciary Duty**

The Banks argue that, even if they owed fiduciary duties, Plaintiffs' allegations of breach are conclusory and describe no more than the ordinary business of banking. Bank Br. 17–18. That argument ignores the breaches the Complaint pleads in detail: (a) the duties of loyalty and not to self-deal, which the Banks violated by structuring their deposits to divert the interest the funds earned to themselves and to the Administrators rather than crediting it to the class; (b) the duty of impartiality, which they violated by rewarding the Administrators for directing deposits to them; (c) the duty of prudent administration, which they violated by holding the funds at below-market rates while deploying the same money at market; and (d) the duties of full disclosure and to account, which they violated by concealing from every court, class counsel, and class member the terms on which they held the funds, the rates they earned, and the share of the spread they paid the Administrators. ¶¶ 459, 460.

A bank entrusted with money held for the benefit of a settlement class does not, consistent with those duties, skim the interest that money earns, enter secret agreements to hand a portion of it to the administrators who send the bank its business, and keep those agreements from the courts, the settlement counsel, and the classes it was trusted to serve. ¶¶ 122, 128–31. There is nothing "ordinary" or "commercial" to be weighed here beyond the Banks' own self-dealing.

The Banks' own Handbook is instructive. Huntington instructs administrators that bank fees "should be reviewed to allow selection of a bank with a competitive pricing schedule to maximize the economic benefit for the class," Dkt. 149-7 at 29, and lists "Interest Rates" as one of five key factors in selecting a settlement bank. Huntington published that standard while simultaneously offering the below-market interest rate structures alleged herein. The Handbook's sample Custodian/Escrow Agreement expressly states that "the Settlement Fund [defined as "the Settlement Amount and all interest accrued thereon"] shall remain subject to the jurisdiction of the Court," a representation Huntington made in template form to every administrator who requested it, while simultaneously entering into arrangements no court ever saw. Dkt. 149-7 at 8. OCC Bulletin 2010-37 confirms why this matters: the primary supervisory concern for self-deposits of fiduciary funds is that "a bank may fail to fulfill its duties of undivided loyalty and care to fiduciary account beneficiaries if the bank's interests conflict with those of its fiduciary clients." OCC Bulletin No. 2010-37, Fiduciary Activities of National Banks: Self-Deposit of Fiduciary Funds, Office of the Comptroller of the Currency, Sept. 20, 2010.What the Complaint describes is disloyalty, and a fiduciary's disloyalty under the remedy of disgorgement is measured by its own gain, not only by any loss to those it serves. *See Miller v. Bank of America, N.A.*, 352 P.3d 1162, 1169 (N.M. 2015). A fiduciary that puts itself in a position where its interest may conflict with the beneficiary's is presumed to have acted disloyally. *Ledbetter v. First State Bank & Trust Co.*, 85 F.3d 1537, 1540 (11th Cir. 1996). The fairness of the transaction is not open to inquiry, and the burden falls on the fiduciary to show it took no benefit. *Id.* The beneficiary need not prove bad faith, advantage, or harm. *Id.* A fiduciary that profits from its position must account for that profit whether or not the beneficiary lost anything because the measure of disgorgement is the fiduciary's gain, not the beneficiary's loss. *Miller*, 352 P.3d at 1168–69 (N.M. 2015). The beneficiary need

not even trace the profit to a particular asset as long as the enrichment is identifiable and measurable; the risk of uncertainty in fixing the amount falls on the wrongdoer. *See Uzyel v. Kadisha*, 188 Cal. App. 4th 866, 892–94, 905–06 (2010).

Concealment is not a separate wrong the Complaint must plead on its own. The duty of candor is part of the duty of loyalty, and a fiduciary breaches it by withholding what it is bound to disclose, whatever the transaction's ultimate result. *Michael v. FDIC*, 687 F.3d 337, 350–51 (7th Cir. 2012). The spread the Banks kept, the payments they routed to the administrators, and their silence about both are not the incidents of ordinary banking. They are the disloyalty a fiduciary may not commit.

The authorities the Banks cite do not hold otherwise. Bank Br. 17–18. Each involves a bank that took nothing from the funds it held and stood in no conflict with the party whose money it kept. This case is the opposite, and it is pleaded the way courts require. A depository that draws a concrete, traceable benefit from the funds it holds, knowing they are held for others, is not a mere debtor to the account, and a claim built on that benefit survives a motion to dismiss. *See Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1120–25 (S.D. Cal. 2024) (denying dismissal where the bank's fee and interest income from the deposited funds was a concrete, quantified benefit, not the ordinary debtor-creditor relationship); *accord Lesti v. Wells Fargo Bank, N.A.*, 960 F. Supp. 2d 1311, 1327 (M.D. Fla. 2013) (denying dismissal of an unjust enrichment claim against a bank that received fees paid out of the funds). The decisions dismissing such claims turn on the absence of a concrete benefit. The Complaint pleads no abstract spread. It quantifies the interest the Banks suppressed, ¶ 98, identifies the payments they routed to the Administrators through special-purpose entities, ¶ 129, and alleges the Banks' knowledge that the funds were held for the class, ¶¶ 364, 368. That is the concrete benefit—and the knowledge—these cases require.

As alleged, the Banks took the interest earned on funds they held for the class, shared it with the administrators who steered them the deposits, and disclosed none of it. That is a breach of the Banks' duties, and it is adequately pleaded.

### C. Plaintiffs Plausibly Assert Claims for Fraudulent Concealment and Fraud

#### 1. The Banks had a duty to disclose

The Banks argue that they owed no duty to disclose because they had no fiduciary relationship with Plaintiffs. That argument ignores the multiple, independent bases for that duty alleged in the Complaint.

As discussed in Section I.A. above, the Banks owed Plaintiffs a fiduciary duty. The Banks also owed a duty under several non-fiduciary bases. One of which is the "superior knowledge" doctrine, which arises where a party possessing peculiar knowledge renders nondisclosure inherently unfair. *See, e.g.*, *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 40 (2024).[8] Here, Plaintiffs allege that the Banks exclusively controlled the interest-rate differentials, spread-sharing arrangements, and volume incentives, knowledge about which were unavailable to Plaintiffs, courts, and class counsel. ¶¶ 15, 380, 381, 479. Nondisclosure was therefore inherently unfair regardless of any formal fiduciary label.

The Banks also had a duty to complete their partial disclosures. A party that speaks must disclose what is necessary to prevent its statements from being misleading. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263-64 (2024) (half-truths "state the truth only so far as it goes, while omitting critical qualifying information"); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 193-94 (2015).[9] The Banks published handbooks, hosted forums, operated settlement websites, and made

---

[8] *See also* Admin. Opp. § IV.A.1.
[9] *See also* Admin. Opp. § IV.A.2.

representations about QSF administration. ¶¶ 114–120, 476. Those representations disclosed some facts while omitting the interest-sharing and kickback arrangements, rendering them misleading.

A duty also arises where a defendant knows the other party is acting under a mistaken belief about facts basic to the transaction. Restatement (Second) of Torts § 551(2)(b) and (e). Plaintiffs and settlement courts reasonably believed that QSF interest was not being diverted.

### 2. The Complaint identifies specific material omissions with particularity

The Banks' contention that no specific statement or omission is attributed to them is wrong. Plaintiffs specifically allege that the Banks failed to disclose to any settlement court or settlement counsel: (a) the interest rate paid on deposited funds; (b) the rate earned on deployment of those funds; (c) aggregate fees charged against the settlement corpus; and (d) the master agreements under which the Banks shared the interest spread with the Administrators for future QSF work. ¶ 381; *see also* ¶ 380 (describing confidential Master Service Agreements). Plaintiffs further allege active concealment. *See, e.g., Rattagan*, 17 Cal. 5th at 40. The Banks "structured their deposit arrangements to appear facially consistent with ordinary banking relationships, without disclosing the rate differential, the spread-sharing arrangements, or the volume incentives that made those relationships remunerative at the class's expense." ¶ 476. By making the arrangements appear ordinary while omitting those facts, the Banks created a false appearance. That is active concealment, not mere silence.

Plaintiff's fraud allegations satisfy Rule 9(b)'s "who, what, when, where, and how" requirements. In addition to specific allegations of the Banks' practices from settlement to settlement (¶¶ 121–31), Plaintiffs detail seven settlements in which the scheme operated.[10] For

[10] *See* ¶¶171–85, 217–32, 304–16, 331-56 (Huntington in *T-Mobile*, *Capital One*, *Fusion Elite*, *Lerman*, and *Yahoo! Securities*); *id.* ¶¶186–216 (Western Alliance in *Yahoo! Data Breach* and *Luxottica*). The Banks' payments to influence the Administrators' bank selections in these settlements—as well as the Banks' decisions about deposit terms, compensation allocation,

example, in the *In Yahoo Data Breach* settlement, Western Alliance allegedly paid less than 0.5% interest on a $117.5 million QSF while the federal funds rate exceeded 5%, then paid a portion of the spread to Kroll without disclosing those payments to the court or class members. ¶ 199.

The Banks' claim that "every CAFA notice" and "every fee application" was prepared exclusively by Administrators misses the point. Plaintiffs do not allege that the Banks authored those submissions. The Banks had an *independent* duty to disclose and yet they "made none of these disclosures in any court, to any class counsel, or in any document any party to any settlement could have reviewed." ¶ 381. The banks' own silence—not the administrators' filings—is the actionable omission.

**3. Plaintiffs adequately plead reliance**

The Banks argue that Plaintiffs relied only on Administrator statements, not on anything the Banks said. Bank Br. 20. But reliance in a fraudulent concealment case does not require reliance on an affirmative statement. It requires that the plaintiff was unaware of the concealed fact and would have acted differently had it been disclosed. *See Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993) (in omission cases, plaintiff need show only that the misrepresentation or nondisclosure was material and that had disclosure been made, a reasonable person would have behaved differently).[11]

The Complaint alleges exactly this. Plaintiffs allege they reasonably relied on the completeness of the disclosures they received as settlement class members, while the information necessary to discover the scheme was "in the exclusive possession of Defendants." ¶ 479. Plaintiffs also allege materiality; that had the concealed facts been disclosed, "a reasonable class member

---

account structure, and implementation— constitute participation in directing each enterprises' financial affairs.

[11] *See also* Admin. Opp., § IV.B.2.

would have considered those facts significant" in evaluating whether to object, opt out, or (as Plaintiffs decided), to file a claim. ¶ 477.

Moreover, Plaintiffs allege indirect reliance through the court-approval mechanism. Courts approved settlements, appointed administrators, and authorized distributions based on incomplete information. ¶¶ 372, 488. Had the Banks disclosed their arrangements, courts would not have approved administration on those terms. *See Burch v. CertainTeed Corp.*, 34 Cal. App. 5th 341, 354 (2019) (reliance may be established through a third party to whom the defendant intended or had reason to expect the misrepresentation would be communicated). Plaintiffs allege that the Banks knew that their silence would preclude judicial oversight and intervention—precisely the intent-to-induce element. ¶¶ 369, 390, 488.

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998), is distinguishable. There, the plaintiff sought to hold an auditor liable for misrepresentations made by unrelated third parties. *Id.* at 175. Here, Plaintiffs allege that the Banks created and maintained the concealment scheme, knew their silence prevented disclosure, and intended settlement courts and settlement counsel to act on incomplete information. The Banks were participants in a scheme whose independent concealment made the fraud possible. *See* ¶¶ 368–69, 476, 489.

**D. The Aiding and Abetting Claims Are Sufficiently Pled**

The Banks contend that the aiding-and-abetting claims are "insufficiently pled" by mischaracterizing Plaintiffs' allegations. Each of the three aiding and abetting elements—(1) an underlying breach or fraud, (2) actual knowledge, and (3) substantial assistance—is pleaded with ample factual specificity. As discussed in Sections I.B. and I.C., Plaintiffs sufficiently allege, in detail, the underlying breach of fiduciary duty and fraud claims. Moreover, as discussed below, the remaining elements of actual knowledge and substantial assistance are sufficiently pleaded.

**1. Plaintiffs adequately allege the Banks' actual knowledge**

The Banks' claim that Plaintiffs allege only "generalized awareness" that administrators are fiduciaries, and no knowledge of any "specific primary wrong" (Bank Br. 21), misstates both the law and the allegations.

The Banks need not have known that the Administrators actually committed a wrong; they only need to have known facts making a wrong substantially certain. *See Nasrawi v. Buck Consultants LLC*, 231 Cal. App. 4th 328, 343-44 (2014) ("actual knowledge" satisfied where defendant knew facts from which breach was substantially certain); *see also Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169–70 (App. Div. 2003) (actual knowledge may be established by circumstantial evidence showing defendant was aware of the breach). Plaintiffs allege exactly that, with specificity.

The Banks built and marketed "dedicated institutional divisions staffed by specialists who designed investment structures for QSF assets, charged fees for professional administration, trained specialized personnel, and published guidance on settlement trust asset management" acknowledging the Administrators' fiduciary roles. ¶¶ 107, 111–20, 469; ¶¶ 111–12 (Huntington operated its "National Settlement team," a dedicated division that has "handled more than 7,800 settlements representing over $99 billion in funds distributed."); ¶ 114 (Western Alliance operated its "Juris Banking Group," a national banking division marketed specifically to law firms and claims administrators). Huntington told administrators it recognizes the importance of their fiduciary role in settlement administration, ¶ 118, and its published Banking Handbook instructs counsel to select a bank with "trust powers and experienced advisors who can act in a fiduciary manner." ¶ 117.

Plaintiffs also allege the Banks' direct knowledge of, and participation in, the Administrators' breaches: the Banks paid below-market rates to the QSF to draw profits to be

shared with the Administrators for future business, all while concealing this from settlement class members and settlement courts. ¶¶ 10, 370–81, 469, 539(ii); ¶ 390 (alleging "disclosure would have exposed all participants to liability"). Western Alliance admitted to Forbes that it implemented interest diversions at administrator direction with knowledge of the QSF regulatory framework. ¶¶ 127, 495; *see also* ¶ 124 (Todd Hilsee's 2024 white paper states that a representative from a Defendant Bank "told me that Admins were asking banks to share the interest a QSF account would otherwise earn.").

Each Bank was aware that the other was operating the same interest-sharing program with the same administrator clients because "the Administrator Defendants directed their books of QSF deposits almost exclusively to the two Bank Defendants, meaning each Bank Defendant's administrator clients were also the other Bank Defendant's administrator clients." ¶ 389(c). Their collective silence protected the enterprise's concealment across its full scope. ¶¶ 389(c), 390; *see Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975) (noting that the bank's knowledge of the scheme was inferred from circumstantial evidence).

The Banks' "actual knowledge" cases are distinguishable. Unlike in *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1149–53 (2005), where the court found the allegations of knowledge too generic, Plaintiffs allege particularized facts linking the Banks to the Administrators' specific breaches. Indeed, the banks were architects of the very arrangements that constituted the breach. *Cf. Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118–21 (C.D. Cal. 2003) (finding actual knowledge sufficiently alleged where bank was not merely a passive depository but actively structured the challenged transactions).

In *Stern v. Charles Schwab & Co., Inc.,* 2010 WL 1250732, at *8, *10 (D. Ariz. Mar. 24, 2010) the court held that "suspicious activity does not satisfy the knowledge requirement" because

the alleged connection to the wrongdoing was indirect and inferential. In contrast, here, Plaintiffs allege the Banks' actual knowledge and participation, not merely suspicious activity or constructive knowledge. *See Cal X-Tra v. W.V.S.V. Holdings, L.L.C.*, 276 P.3d 11, 42 (Ariz. Ct. App. 2012) (actual knowledge may be inferred from the totality of the circumstances, including defendant's direct involvement in the challenged conduct).[12]

**2. Plaintiffs adequately allege the Banks' substantial assistance**

As discussed at length regarding the Banks' role in the RICO enterprise, they provided "substantial assistance" to the Administrators' scheme. *See* supra § II, ¶ 539.[13]

The Banks' actions are qualitatively different from merely maintaining bank accounts.[14] Here, the allegations go well beyond "routine banking services": the Banks set up the scheme, including but not limited to setting sub-market rates of return, through which the primary wrong was accomplished. *See Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1120 (S.D. Cal. 2024) (citations omitted) (finding that "'Defendants did more than conduct ordinary business activities,' . . . [they] 'defied industry norms' . . . [and] 'designed the SEN to facilitate and speed up crypto

[12] While Ohio may not recognize a civil aiding-and-abetting cause of action, *see* Bank Br. 21 n. 21, this case involves exemplar settlements and class members from multiple jurisdictions, including California, New York, and Arizona, all of which recognize civil aiding-and-abetting claims. *See, e.g., Nasrawi*, 231 Cal. App. 4th at 343; *Kaufman*, 760 N.Y.S.2d at 169; *Cal X-Tra*, 276 P.3d at 40. Any Ohio-specific limitation does not warrant dismissal, particularly as no conflict-of-law analysis has been conducted or even asked for by any Defendant for any claim, and this claim (as each of Plaintiffs' other claims) is more generally viable.

[13] Western Alliance acquired Digital Disbursements in January 2022, thereby simultaneously providing the infrastructure for *both* the interest and breakage tracks of the scheme. ¶ 539(vi). Huntington entered into its own revenue-sharing agreements with FinTechs. ¶ 539(vii).

[14] *See Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 416 (S.D.N.Y. 2021) (stating that substantial assistance requires "facts from which the Court can infer that [] the defendant affirmatively assisted, helped conceal, or failed to act when required to enable the fraud to proceed[,]" and finding insufficient substantial assistance where bank did not design the fraudulent scheme, share in its proceeds, or market its services to fiduciaries while acknowledging their duties but merely provided "routine banking services" and otherwise did not help to conceal the breach); *accord Heinert v. Bank of America, N.A.*, 410 F. Supp. 3d 544, 552 (W.D.N.Y. 2019); *In re Mortgage Fund '08 LLC*, 527 B.R. 351, 365 (N.D. Cal. 2015).

transactions by eliminating the due diligence time built into traditional bank transfers') (citing cases including *Casey*, 127 Cal. App. 4th at 1145); *see e.g., In re First All. Mortg. Co.*, 471 F.3d 977, 994-95 (9th Cir. 2006). Thus, *even if* the Banks provided only "routine services" (which they did not), Plaintiffs allege the additional conduct some jurisdictions require, including actual knowledge of the breach and active concealment.

Finally, to the extent the Banks contend that Rule 9(b) applies to the aiding-and-abetting claims, Plaintiffs satisfy the heightened pleading standard. *See* Section I.C. The Banks' reliance on *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (App. Div. 2003) for the proposition that their "alleged inaction" cannot suffice as "substantial assistance" because they owed no fiduciary duty to Plaintiffs ignores the allegations that the Banks owed an independent fiduciary duty (*See supra* § I.A) and actively participated alongside the Administrators.

**E. The Civil Conspiracy Claim is Well Pled**

To plead civil conspiracy, a plaintiff must allege (1) an underlying tort or other unlawful act; (2) an agreement between the parties; (3) an act in furtherance of the agreement; and (4) resulting damages. Bank Br. 23, n.23. Unlike aiding and abetting the commission of a tort, civil conspiracy turns on the parties' agreement to participate in the scheme. *See, e.g., Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12, 37 (2002).

The Banks argue that Plaintiffs do not allege an underlying tort, which is addressed elsewhere. *Supra* §§ I.A-I.D. The Banks further argue that Plaintiffs' allegations of the Banks' agreement with the Administrators fails to meet either Rule 9(b) or Rule 8's pleading requirements.

"[A]part from the underlying acts of fraud," a civil conspiracy claim is "properly measured under the more liberal pleading requirements of Rule 8(a)." *Hecht v. Commerce Clearing House,*

*Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990); *see also Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 114 n.37 (D.D.C. 2010) ("[T]here is no heightened pleading requirement for civil conspiracy."). Plaintiffs have alleged their claims of fraud with specificity. *Supra* § I.C.

Further, when, as here, "necessary information lies within defendant's control," pleadings may be made on information and belief. *Flowers v. Exec. Off. of the President*, 142 F. Supp. 2d 38, 47 (D.D.C. 2001); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 635 (S.D.N.Y. 2001). Accordingly, a conspiracy may be proven with circumstantial evidence and "inferred from the nature of the act done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." *Rickley v. Goodfriend,* 212 Cal. App. 4th 1136, 1166 (2013). The Banks fault Plaintiffs for not pleading direct evidence of an agreement—but the law permits the agreement to be inferred. Plaintiffs have yet to see the agreements.

Plaintiffs have alleged an agreement among the Defendants, overt acts in furtherance of that agreement, and actual damages with the plausibility Rule 8(a) requires. While Defendants still are keeping the agreement secret, Plaintiffs have roughed-out the terms, including based on insider reports. ¶¶ 122–24, 553–54. Plaintiffs further allege how these agreements played out in settlement after settlement, with each of the Defendants understanding and agreeing to keep the schemes a secret. ¶¶ 423–32. This is not mere parallel conduct; it is a well-pleaded allegation of an agreement to engage in the unlawful taking of Plaintiffs' settlement money.

**F. Plaintiffs Plausibly Allege an Unjust Enrichment Claim**

The Banks argue they were not unjustly enriched because they are too far removed from Plaintiffs. Bank Br. 25–26.[15] Plaintiffs need not allege privity with the Banks for unjust

[15] The Banks also reprise their arguments that they were not fiduciaries and Plaintiffs have not adequately alleged their tort claims, which are addressed elsewhere by Plaintiffs. Sections I.A.-C. As for the latter, the remedy of restitution remains available even where a defendant has

enrichment. *See In re LIBOR-Based Financial Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014); *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746–47 (2012); *Welborne v. Ryman-Carroll Found.,* 22 Cal. App. 5th 719, 725 (2018) (the obligation is "created by the law without regard to the intention of the parties"). Although the relationship between the parties cannot be "too attenuated," *Georgia Malone*, 973 N.E.2d at 746–47, that requirement is satisfied where the plaintiff "had some relationship with a defendant." *In re LIBOR*, 27 F. Supp. 3d at 479.

Here, while Plaintiffs did not deal as retail customers of the Banks, this is not a relationship between strangers. *See supra* § I.A-B. Once the Banks were entrusted with "QSF assets held for the exclusive benefit of Plaintiffs and the Class," they effectively stood for and beside Plaintiffs as settlement claimants. While Plaintiffs were not the depositors, they were the effective owners, and any monies improperly taken from the QSF were taken from Plaintiffs. *See, e.g., Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) ("[A] class settlement generates property interests. . . The settlement-fund proceeds, having been generated by the value of the class members' claims, belong solely to the class members."). The Banks improperly benefitted from the QSF, at Plaintiffs' expense, through "kickbacks, float income, interchange fees, breakage, and other undisclosed compensation . . . through undisclosed self-dealing, in breach of fiduciary duties, and in violation of the terms on which Defendants were appointed and approved." ¶¶ 573–74.

The Banks misplace reliance on *In re* LIBOR, which strengthens Plaintiffs' claims. There, the court dismissed unjust enrichment claims only against a subgroup of defendants—the "non-counterparty banks" with which the plaintiffs "did not transact"—but sustained the unjust enrichment claims against the counterparty banks with which the plaintiffs did transact, and

"committed no tort and is not contractually obligated to the plaintiff." *Flooring Sys., Inc. v. Radisson Group, Inc.*, 772 P.2d 578, 581 (Ariz. 1989).

confirmed that "at this stage of the litigation, plaintiffs may plead breach of contract and unjust enrichment in the alternative." *In re LIBOR*, 27 F. Supp. 3d at 478, 483–84. The Banks here are the counterparties that retained the class's QSF assets—not remote strangers to the transactions.

## II. THE RICO CLAIMS ARE WELL PLED

The Banks echo many of the arguments made by the Administrators, such as the adequacy of the allegations of the RICO enterprise, the failure to allege anything but routine commercial practices, and problems with proximate cause. RICO is to be "liberally construed to effectuate its remedial purposes." Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947. Accordingly, "RICO is to be read broadly." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 (1985). That mandate carries particular force in RICO's private right of action, "where RICO's remedial purposes are most evident." *Id.* at 491 n.10. Civil RICO serves those remedial purposes by turning injured plaintiffs "into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity." *Rotella v. Wood*, 528 U.S. 549, 557 (2000).

### A. The Complaint Adequately Pleads a RICO Enterprise

The Banks offer no independent critique of the enterprise allegations, referring instead to the Administrators' argument that Plaintiffs only allege "ordinary commercial relationships." Bank Br. 27. As explained in response to the Administrators, Admin. Opp. § III.B-C, the enterprise was not a collection of bilateral commercial relationships. It was a coordinated, book-of-business-level arrangement under which each Administrator Defendant directed its inventory of court-supervised QSF deposits to the Banks in exchange for payments structured to be invisible to every supervising court. ¶¶ 8, 122, 385(a)–(b), 431(d). The Banks credited QSFs with below-market returns and secretly shared some of the interest-spread with the Administrators for future QSF deposits. ¶¶ 98(a), 122–29, 385(b). That arrangement was not a series of isolated bilateral deals; it was a

uniform program, operating across both Banks and all four Administrators simultaneously, under which the concealment of each participant's arrangements protected every other participant's arrangements. ¶¶ 389(a)–(c), 390.

**B. Each Bank Conducted the Affairs of the RICO Enterprises**

The Banks next say they merely provided "routine banking services" and did not conduct the affairs of any RICO enterprise. Bank Br. 27. Section 1962(c)'s "conduct" element only requires a defendant to have "some part in directing" the enterprise's affairs and reaches lower-rung participants and even outsiders. *Reves v. Ernst & Young*, 507 U.S. 170, 179, 184–85 (1993). Conduct that also serves a defendant's own commercial interest is not for that reason outside the section. In *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1116 (D.C. Cir. 2009), the D.C. Circuit affirmed that competing corporations that "jointly committed fraud" thereby "participated in the conduct of not just their own affairs but the enterprise's as well." 566 F.3d 1095, 1116. Likewise, paying to influence an enterprise's contracting decisions may satisfy the conduct element even when the payment also advances the participant's own commercial interests. *See Edison Elec. Inst. v. Henwood*, 832 F. Supp. 413, 416–17 (D.D.C. 1993). The relevant question, then, is not whether the challenged acts also resembled banking services or benefited each Bank's own business, but whether those acts *also* gave the Banks a role in directing the enterprise. That is precisely what Plaintiffs allege.

The Banks "design[ed] and maintain[ed]" the financial arrangements at the core of each enterprise; set and implemented below-market QSF rates; established the terms governing the spread retained by the Banks and the portion remitted to the Administrators; structured the accounts and payment channels through which QSF assets were held, deployed, and returned to administrators as undisclosed compensation; and routed that compensation back to the

Administrators in exchange for recurring QSF placements. ¶¶ 385(c), 504 (Angeion Enterprise), 512 (Epiq Enterprise), 518 (JND Enterprise), 525 (Kroll Enterprise). The CCAC then traces that same arrangement through seven identified settlements involving Defendants. *See* ¶¶ 171–85, 217–32, 304–16, 331–56 (Huntington); 186–216 (Western Alliance).

The Banks' "routine banking services" cases each involved arm's-length commercial transactions with no allegation that the bank designed or directed the enterprise's financial affairs. *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 307 (E.D.N.Y. 2017); and *De Wit v. Firstar Corp.,* 879 F. Supp. 947, 965 (N.D. Iowa 1995). Here, the interest-sharing program was not separate from each enterprise — it was the enterprise's primary revenue-generating activity, and the Banks designed and administered its financial terms.

Accepting a deposit is routine banking. Setting a below-market return on court-supervised funds, retaining the resulting spread, and secretly sharing part of it with the court-appointed Administrator for future business is not. The CCAC alleges that the Banks affirmatively structured below-market rates, designed the spread-sharing mechanism, and paid the Administrators as consideration for directing their book of deposits to the Banks—all while concealing every aspect of those arrangements from supervising courts. ¶¶ 98(a), 106, 122–29, 385(b). The Banks played more than "some part in directing" the enterprises' affairs. *See Reves*, 507 U.S. at 179.

### C. Each Bank Committed Multiple Predicate Acts

As for the predicate acts for which the Banks are responsible, wire fraud and mail fraud consist of: "(1) a scheme to defraud; and (2) use of the mails or wires for the purpose of executing the scheme." *See Feld Ent. Inc. v. ASPCA*, 873 F. Supp. 2d 288, 317 (D.D.C. 2012). Even "innocent" or "routine" mailings or wires "that contain no false information" can execute a scheme to defraud. *Schmuck v. United States*, 489 U.S. 705, 715 (1989).

The Banks argue that they could not have committed mail or wire fraud because they made no affirmative misrepresentation and had no duty to disclose. But Plaintiffs do not rely on the Banks' silence, standing alone, as the scheme's deceptive component. The CCAC alleges that the Administrators made materially misleading court and class communications while concealing the compensation-for-selection arrangements. ¶¶ 10, 366–80, 388. It further alleges that the Banks knew those arrangements were undisclosed and used the mails and wires to implement the very arrangement that the Administrators' misleading communications concealed. That adequately alleges mail and wire fraud. *Id.*; ¶¶ 138, 181, 197, 227.[16]

The Banks next contend that they did not use the mails or wires, calling the Complaints' contrary allegations "fact free." Bank Br. 29–30. This argument ignores the seven settlement-specific examples that the Complaint provides. For Huntington, the *T-Mobile* allegations: identify the dates, speakers, and contents of the statements that secured and maintained QSF access with particularity; specify the material information that was omitted in each of those statements; and specify the mailings to class members sent by Huntington in furtherance of the execution of the scheme, including a January 12, 2026 check mailed to a class member. ¶¶ 171–85. Comparable allegations reveal each Bank's execution of the fraud schemes through mailings to class members. ¶¶ 217–32, 304–16, 331–56 (Huntington in *Capital One*, *Fusion Elite*, *Lerman*, and *Yahoo!*

[16] Although not addressed by the Banks, the facts alleged support the plausible inference that the Banks aided and abetted the Administrators' mail and wire fraud by "consciously and culpably participat[ing] in a wrongful act so as to help make it succeed." *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493 (2023) (marks omitted and alteration adopted). "[A]iding and abetting a predicate act itself qualifies as a predicate act." *Alix v. McKinsey & Co.*, 2023 WL 5344892, at *12 (S.D.N.Y. Aug. 18, 2023). As alleged, the Banks offered or implemented the kickback arrangements, designed the below-market interest structures, accepted the QSF deposits, calculated and remitted the spread, and routed payments outside court-reviewed accounts. Combined with their knowledge of the Administrators' fraud, those allegations establish conscious participation at the pleading stage.

*Securities*); ¶¶186–216 (Western Alliance in *Yahoo! Data Breach* and *Luxottica*). The CCAC also alleges interstate mail and wire communications between Defendants used to establish, administer, and maintain the arrangements. ¶ 391. Mailing settlement checks from depleted QSFs was the final operational step: it distributed reduced pro rata payments to class members. The checks mailed by the Banks maintained the appearance of propriety and simultaneously consummated the RICO injury. Each such mailing was a "step in the plot" and "incident to an essential part of the scheme," regardless of whether the check itself contained a false statement. *See Schmuck*, 489 U.S. at 711 (cleaned up). Nor does mail fraud require reliance on the mailing. It requires only that the mailing be "incident to an essential part of the scheme." *Id*; *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 648 (2008) ("[U]sing the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud . . . even if no one relied on any misrepresentation.").

**D. The Banks' Racketeering Directly Injured Plaintiffs**

The Banks adopt the Administrators' proximate cause arguments, Bank Br. at 31, and Plaintiffs herein incorporate their response thereto. Admin Opp. § III.A. The Banks' one-sentence effort to cast the "Administrator Defendants, the FinTech Defendants and the courts" as intervening causes likewise fails.

*First*, the Bank Interest Track has no FinTech intermediary.

*Second*, the Administrators are not an intervening cause of the Bank Interest Track injury; they are fellow participants in a joint enterprise, and their conduct in directing the QSF deposits to the Banks was the intended result of the Banks' kickback payments. The Administrators' receipt of a kickback from the interest spread does not cut off liability for the party paying the kickback. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268–69 (1992) (noting proximate cause is satisfied where causal connection between violation and injury is direct).

*Finally*, the settlement courts' approvals are not superseding causes. The design of this fraud was to obtain and preserve court approval throughout each settlement by concealing from every supervising court the arrangements that, if disclosed, would have prompted objection or denial. ¶¶ 10, 366–83. Court or government action that a fraud was designed to procure is not a superseding cause of the injury it was designed to inflict. *See Bridge*, 553 U.S. at 658–59 (finding RICO proximate cause where court defendant used fraud to induce court to award liens to defendant instead of plaintiff); *Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Indus. Materials Corp.*, 887 F. Supp. 2d 9, 22 (D.D.C. 2012) (finding RICO proximate cause where defendants' petitions induced government action that excluded plaintiff from market).

The Banks set and maintained below-market QSF rates, retained the resulting spread, and remitted part to the Administrators, thereby reducing the funds from which Plaintiffs' *pro rata* distributions were calculated. The path to Plaintiffs' injuries is one step. That satisfies the "direct relation" necessary to establish proximate cause. *See Holmes*, 503 U.S. at 268.

**E. The Banks' Use of Racketeering Proceeds Injured Plaintiffs**

The Banks raise two challenges to the claims for investment of racketeering proceeds in violation of 18 U.S.C. § 1962(a). Bank Br. 31–32. Their first contention—that the Complaint identifies no racketeering proceeds—repackages their attacks on Plaintiffs' underlying RICO allegations. As explained above, the CCAC adequately alleges a pattern of mail fraud, wire fraud, and money laundering through which the Defendants extracted value from court-supervised QSFs. In their Investment of Racketeering Proceeds Count (VI-J), Plaintiffs expressly identify the income that the Banks derived including "float income" and the "interest rate spreads extracted from court-supervised QSF assets[,]" that is, the interest spread which the banks paid to Administrators "to perpetuate the ongoing enterprise." ¶¶ 391, 545. These QSF-funded kickbacks perpetuated the

scheme. That adequately alleges use of racketeering income. *See Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 322-23 (2d Cir. 2011) (holding that "moneys unlawfully saved or withheld by means of a pattern of mail and wire frauds" constitute "income" under § 1962(a)).

Second, the Banks claim that any injury flowed from the racketeering itself, not from the investment of its proceeds. To plead a racketeering investment count, Plaintiffs must allege injury flowing from the Defendants' "*use* or *investment* of racketeering income." *Danielsen v. Burnside-Ott Aviation Training Center, Inc.*, 941 F.2d 1220, 1229–30 (D.C. Cir. 1991) (emphasis in original). That injury is established where "the use or investment of the funds derived from the pattern of mail and wire frauds . . . is both the violation and the cause of" the plaintiffs' harm. *Ideal*, 652 F.3d at 327; *see also Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 396 (6th Cir. 1989) (holding that plaintiffs adequately pled Section 1962(a) violation where defendants used proceeds from ongoing fraud scheme to continue operation of fraud that later harmed plaintiffs).

As explained above, the Banks used a portion of the racketeering-derived spread to secure and preserve access to the next round of QSF deposits, sharing it with Administrators "as an inducement to maintain exclusive deposit relationships." ¶ 129. Administrators, "in exchange," continued to deposit class settlement funds with the Banks, which subjected those funds to the same suppressed-interest structure and reduced later distributions. ¶¶ 130, 431, 546–47.

The kickbacks were not merely the fruits of completed frauds; they were the juice for the next QSF placement, meeting the proceeds-injury requirement. *See Ideal,* 652 F.3d at 327.

### F. The Banks Conspired to Violate RICO

The Banks' derivative challenge to the RICO conspiracy claim fails because the substantive claims survive. It also misstates the law: a defendant may violate Section 1962(d) by "adopt[ing] the goal of furthering or facilitating the criminal endeavor" without personally committing any predicate

act. *See Salinas v. United States*, 522 U.S. 52, 65 (1997). Thus, conspiracy liability does not require that each Administrator individually satisfy each element of a substantive violation.

The Banks' remaining argument—that the CCAC does not allege any actual agreement—ignores the pleaded facts. *See supra* § I.E. To plead a RICO conspiracy violation, Plaintiffs must allege facts that, "individually or taken together support[] a plausible inference" that each Bank Defendant "knew of the . . . racketeering conspiracy and agreed to foster its goals." *See RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012). The agreement need not be written or even explicit; a tacit understanding may be inferred from conduct and surrounding circumstances. *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1130 (D.C. Cir. 2009) ("[A] conspiracy can be inferred from a combination of close relationships or knowing presence and other supporting circumstantial evidence.") . The Banks' repeated participation by making the required side payments while knowing that the arrangements were being concealed from the courts and the class provides precisely the "relationships and circumstances" from which a RICO conspiracy may be inferred. *See Cheeks v. Fort Myer Constr. Corp.*, 216 F. Supp. 3d 146, 162 (D.D.C. 2016), *aff'd*, 728 F. App'x 12 (D.C. Cir. 2018).

*RSM* does not compel a different result. In *RSM*, the defendant law firm provided "services as attorneys, nothing more[,]" with no allegation that it designed or funded any concealment structure or made any payments to influence anyone's conduct. 682 F.3d at 1051. Here, the Banks were sophisticated specialists that understood the Administrators' fiduciary role, knew the side compensation was undisclosed, designed and maintained the interest-splitting account structures, calculated and remitted spread payments, and laundered proceeds through SPEs to evade detection. ¶¶ 129, 166–67, 409, 530, 532. Those allegations describe knowing facilitation, not unwitting

provision of fungible services to a wrongdoer. They thus support the inference that each Bank knew of the racketeering conspiracy and agreed to foster its goals. *See RSM*, 682 F.3d at 1048.[17]

## III. THE ANTITRUST CLAIMS ARE WELL PLED

### A. Plaintiffs are Direct Purchasers and Have Antitrust Standing

For the reasons explained in response to the Administrators, Plaintiffs sufficiently pleaded that they are direct purchasers who suffered an antitrust injury for which they can recover. *See* Admin. Opp. § II.A.

### B. The Complaint Plausibly Alleges a Hub-and-Spoke Conspiracy

Plaintiffs allege an antitrust claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, against both the Administrators and the Banks. ¶¶ 578–91. Beginning around 2015, the Administrators allegedly orchestrated a hub-and-spoke conspiracy to restrain trade in the Settlement Administration Market by artificially reducing or eliminating competition and increasing the costs of settlement administration. ¶ 579. For the same reasons as described in response to the Administrators, Plaintiffs have adequately pleaded a hub-and-spoke conspiracy against the Banks.

#### 1. The alleged conspiracy

The alleged conspiracy is a hub-and-spoke conspiracy because its operation requires agreements at two levels of the marketplace. *See* ¶ 434. At the core of this hub-and-spoke conspiracy is a horizontal agreement among the four Administrators not to compete against each other for optimal bank deposit interest rates. To implement the conspiracy, the Administrators needed the cooperation—vertically—of the Banks, which the Banks provided through a kickback

[17] Based on the Supreme Court's intervening decision in *Cisco Systems, Inc. v. Doe I*, 146 S. Ct. 1882, 1892–93 (2026), the Plaintiffs are no longer pursuing the RICO aiding and abetting claim alleged in Count VI-F.

scheme in which the Banks paid portions of QSF interest to the Administrators via, among other means, SPEs. ¶¶ 407–09, 431, 434.

The Banks challenge the antitrust claim by asserting that Plaintiffs have not plausibly alleged an agreement between the Banks. Bank Br. 33–35. That argument misunderstands Plaintiffs' Complaint and the pleading requirements of a hub-and-spoke antitrust claim. Plaintiffs need not allege a horizontal agreement between the Banks; the relevant inquiry is only whether the Banks knowingly participated in the Administrators' horizontal scheme. *See, e.g.*, *United States v. Apple, Inc.*, 791 F.3d 290, 314–20 (2d Cir. 2015). The Complaint sufficiently alleges that each Bank knowingly participated in that scheme.

**2. The Banks knowingly participated in the antitrust conspiracy**

The Complaint explains the Banks' knowing participation in the scheme in which they would fix QSF interest rates at artificially depressed levels, pay undisclosed kickbacks to the Administrators in exchange for exclusive deposit relationships, and thereby suppress the rate competition that would benefit class members in a competitive settlement administration market. *See O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, 436 F. Supp. 3d 576, 588 (E.D.N.Y. 2020) ("All participants in such conspiracies are liable 'when the objective of the conspiracy was a *per se* unreasonable restraint of trade.'") (quoting *Apple*, 791 F.3d, at 323); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 685 (S.D.N.Y. 2012) ("It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.") (quoting *Interstate Circuit v. United States*, 306 U.S. 208, 226–27 (1939)); *see also Riss & Co. v. Ass'n. of Am. R.Rs.*, 187 F. Supp. 306, 312-13 (D.D.C 1960).

Plaintiffs allege concrete facts showing that the Banks knowingly participated in the scheme, rather than merely dealing with the Administrators in ordinary vertical relationships. The Banks took QSF deposits under arrangements that allowed them to retain the spread between a

true market rate and the rate actually credited to settlement funds, while paying a portion of the interest-spread to the Administrators as kickbacks. ¶¶ 407–09, 431, 434. Their willingness to pay those kickbacks to obtain Administrator-controlled deposits shows they understood and accepted the arrangement's purpose: rate suppression in exchange for Administrator business. *See also* Admin. Opp. § II.C.3. Specifically, Plaintiffs allege that the Banks "uniformly offer[ed] class members below-market interest rates, often at rates lower than 0.5%," ¶ 428. Plaintiffs further allege that when counsel solicited competing bids from both Banks in March 2025, both "reported their bid to be less than 0.5% per year, without any desire to outbid each other," ¶¶ 430, "despite a federal window rate of 4.33%," ¶ 438. Plaintiffs further allege that the Banks "continued to collude and report the same interest rate offered for prospective QSFs." ¶ 429. The Banks also participated in "meetings and conversations to discuss the payouts on class action settlements" and "[c]ommunicat[ed] orally and in writing" to fix the payouts on class action settlements. ¶¶ 588(a)–(b). The Banks' knowledge is further confirmed by the allegations that a Bank "confirmed awareness that the practice of sharing interest with administrators was industry-wide," and that "[e]ach Bank Defendant was aware that the other was operating the same interest-sharing program with the same administrator clients." ¶ 389(c).

The conduct also runs counter to each Banks' independent economic interest absent an anticompetitive scheme. *Id.* Each Bank would have had an incentive to disclose the other's involvement and capture more of the QSF deposit market, yet neither disclosed the practice. *Id.* That omission shows knowing participation: the Banks chose to preserve the arrangement rather than expose the conduct that was benefiting the Administrators and limiting competition.

Taken together, these facts plausibly establish knowing participation. *Riss & Co.*, 187 F. Supp. at 313 ("If the evidence is such that a jury could find that a conspiracy under the antitrust

laws existed, only slight evidence is necessary to connect individual conspirators with it.”).). The concentrated market, the failure to disclose the other bank’s involvement, and the rejection of available competitive alternatives reinforce the inference. *See* ¶ 389(c), 417, 430–31, 436. [18]

### 3. An agreement between the Banks is not required; the relevant inquiry is the Administrators’ horizontal agreement

A horizontal agreement between the Banks is not the relevant inquiry for their antitrust liability. The Banks are the alleged hubs, and in a hub-and-spoke conspiracy, a hub’s knowing participation in the scheme is the basis for liability. [19] *See e.g., Elec. Books*, 859 F. Supp. 2d at 685; *Laumann v. Nat’l Hockey League*, 907 F. Supp. 2d 465, 486 (S.D.N.Y. 2012) (a party that coordinated horizontal restraint “by entering into a series of identical vertical agreements with multiple parties may subject all participants to antitrust liability.”). Hub-and-spoke antitrust claims do not require direct communication between separate hubs.[20]

---

[18] The Banks’ suggestion that Plaintiffs’ lead counsel sat on the board of Esquire Financial Holdings rests on two SEC filings the Complaint never mentions, Bank Br. 8 n.9, so neither is incorporated. *Banneker Ventures, LLC v. Graham,* 798 F.3d 1119, 1133 (D.C. Cir. 2015). The Banks invoke judicial notice instead, but a court may notice such a filing only as evidence of what was filed and that the filing party believed its contents true, “never as proof that the proffered contents are true.” *Capitol Servs. Mgmt., Inc. v. Vesta Corp.,* 933 F.3d 784, 789 (D.C. Cir. 2019). The charter the Banks cite names an initial slate of directors who “will serve … until their successors are elected and qualify.” Lazarow Decl. Ex. 2, Art. 7, § B. It does not establish that anyone served, or for how long, and the inference the Banks draw from it is “subject to reasonable dispute.” Fed. R. Evid. 201(b). Plaintiffs do not object to the Huntington Handbook or the OCC’s Custody Services booklet, which the Complaint quotes. ¶¶ 105, 116–17.

[19] Contrary to the Banks’ argument, it is not improper for them to be the hub of the antitrust claim while the Administrators sit as the hub for the RICO claims. Plaintiffs are allowed to plead in the alternative (Rule 8(d)(2)–(3)) and courts, including in cases cited by Defendants, have previously allowed for alternative pleading of conspiracy structures. *See e.g., Dickson v. Microsoft Corp.*, 309 F.3d 193, 203–04 (4th Cir. 2002).

[20] The Banks are wrong that Plaintiffs must allege direct communications between the Banks. *See* Bank Br. 34–35. An antitrust conspiracy may be, and routinely is, plausibly alleged through circumstantial evidence, in the form of parallel conduct and plus factors. *See In re Domestic Airline Travel Antitrust Litig*., 221 F. Supp. 3d 46, 58 (D.D.C. 2016).

The Complaint alleges that the Administrators agreed to eliminate rate competition in exchange for kickbacks from the Banks, in lieu of seeking competitive interest rates for class members. Each Bank entered into vertical agreements with the Administrators to implement that horizontal scheme: suppressing rates, retaining the spread, and paying kickbacks. The Banks knowingly facilitated the Administrators' horizontal restraint through those vertical arrangements. *See Apple, Inc.*, 791 F.3d at 314-20 (finding hub liable for knowingly facilitating horizontal agreement); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 934-36 (7th Cir. 2000).

The Complaint therefore plausibly alleges that each bank agreed to facilitate the Administrators' horizontal restraint, even if the banks did not originate the restraint or share its anticompetitive purpose. *Cf. Albrecht v. Herald Co.*, 390 U.S. 145, 152-54 (1968).

**4. The Banks' arguments of consistency with lawful competition and plus factors are also misplaced**

The Banks argue that the alleged parallel conduct is also consistent with lawful competition (Bank Br. 35), but that is not the relevant analysis here. To survive a motion to dismiss, Plaintiffs must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544*,* 570 (2007) (differentiating motion to dismiss "plausibility on its face" standard from summary judgment "tend to rule out [independent] possibility" standard).[21]

Weighing the plausibility of competing explanations is improper at the motion to dismiss stage. *See Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1, 11-12 (D.D.C. 2015); *Domestic Airline Travel*, 221 F. Supp. 3d at 63–65 ("While this behavior may be explained

[21] The Banks are also wrong that Plaintiffs must provide "systematic quantitative analysis" to survive a motion to dismiss. Bank Br. 36. Courts routinely reject that contention. *See, e.g.*, *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 223 (D.D.C. 2022) ("Whether the alleged markets, including the submarkets, can be supported by economic analysis is a factual question to be answered after discovery."); *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 705 (7th Cir. 2023); *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120–21 (2d Cir. 2010)).

by other factors as Defendants note in their briefing, it is at least some evidence that supports Plaintiffs' claim that this trend was the result of Defendants' collusion[.]").

Even so, the Banks' conduct is not "equally consistent with lawful competition." The identical suppression of QSF rates to below 0.5%, despite a federal funds rate of 4.33%, defies an innocent explanation, especially when the Banks publicly advertised "competitive interest rates." ¶¶ 421, 591. This unnatural parallelism is the result of the alleged scheme: when the Administrators agreed not to compete for better rates, the Banks could suppress rates in lockstep without fear of losing deposits. The Banks offer no explanation for why two independent banks would simultaneously offer rates significantly below the market rate while publicly promising competitive returns. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004).

The Banks argue that the Complaint's plus factors "relate only to a purported agreement between the Administrator Defendants," and that this is fatal to the conspiracy claim. Bank Br. 37–38. As above (*supra* at § III.B.3), the Banks misapprehend the hub-and-spoke structure. The applicable plus factors are those that establish the Administrators' horizontal restraint, which the Banks facilitated. The Banks effectively concede this point and admit that the Complaint alleges plus factors supporting an agreement among the Administrators. Bank Br. 37–38. Because the Banks' liability flows from their knowing participation in the horizontal scheme, the plus factors establishing the scheme's existence support the conspiracy claim against the Banks as well.

### C. Market Definition is Irrelevant where a Per Se Illegal Horizontal Agreement is Alleged

Because Plaintiffs adequately pleaded a *per se* illegal horizontal agreement as explained above, market power and market definition are irrelevant to the antitrust analysis. *See F.T.C. v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 435–36 (1990). And even if Plaintiffs were not alleging a *per se* illegal horizontal arrangement, an analysis of the Settlement Administration

Market—the market harmed by the horizontal agreement—would be the relevant subject for such an inquiry. Neither the Banks nor the Administrators raise arguments related to that market.

## IV. THE RICO AND ANTITRUST CLAIMS ARE TIMELY

Defendants' arguments regarding the statute of limitations for Plaintiffs' RICO and antitrust claims are premature because of the fact-intensive nature of the statute of limitations inquiry. Regardless, Plaintiffs' antitrust claims are timely because the fraudulent concealment doctrine tolled the limitations period and the continuing-violation theory applies.

As a threshold matter, a limitations defense may be resolved under Rule 12(b)(6) only when the complaint itself conclusively establishes that the claim is untimely. *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). Further, it is the Banks' burden to affirmatively establish that the statute of limitations bars the claims; Plaintiffs need not negate it in their complaint. *See Jones v. Rogers Memorial Hosp.*, 442 F.2d 773, 775 (D.C. Cir. 1971). Determining whether Plaintiffs exercised reasonable diligence investigating their claims requires factual development beyond the pleadings. *See Richards v. Mileski*, 662 F.2d 65, 73 n.13 (D.C. Cir. 1981) (collecting "overwhelming line of authority" holding that the issue of plaintiff's diligence in uncovering their claims typically cannot be decided on a motion to dismiss).

### A. The Banks' Fraudulent Concealment of the Schemes Tolled the Limitations Period

The Banks' fraudulent concealment of the RICO and antitrust kickback schemes tolled the statute of limitations on Plaintiffs' claims, so that the earliest possible accrual date was October 2024, the date of Todd Hilsee's white paper. ¶¶ 11, 124. As demonstrated above, Plaintiffs fully allege claims of the Banks' fraudulent concealment, which also serves to toll any statute of limitations. *Supra* § I.C.

*First*, Plaintiffs allege that the Banks took affirmative steps to conceal the kickback

scheme. ¶¶ 366-83, 479. Specifically, the Banks "structured their deposit arrangements to appear facially consistent with ordinary banking relationships, without disclosing the rate differential, the spread-sharing arrangements, or the volume incentives." ¶¶ 476, 539. And to further conceal Defendants' anticompetitive dealings, they routed the kickback payments through Special Purpose Entities specifically established to hide the payments from judicial review. ¶¶ 129, 431.

*Second*, Plaintiffs did not discover, and could not with reasonable diligence have discovered, the concealed kickback scheme. Plaintiffs allege that the scheme "was designed to be undiscoverable: the undisclosed arrangements appeared in no court filing, no class settlement notice, no public accounting, and no other document accessible to Plaintiffs through reasonable diligence." ¶ 400. The concealment extended across multiple layers of the settlement process, throughout which Defendants owed a duty to disclose to the class members. ¶¶ 371–81, 383. No settlement court—never mind class member[22]—reviewing any individual filing in a single case had full visibility into the agreements governing Defendants' dealings. ¶ 17.

The Banks make much of the fact that market interest rates were public knowledge, (Bank Br. 40–41). But "market trends as a matter of law do not constitute notice that particular defendants were engaged in acts of price fixing." *See In re Vitamins Antitrust Litig.*, 2000 WL 1475705, at *5 (D.D.C. May 9, 2000). Likewise for the RICO claims, which required "something more" than knowledge of an "otherwise ordinary financial transaction" to put Plaintiffs on notice; "[t]hat

[22] Though the Banks argue (Bank Br. 41) that class counsel's knowledge of the underlying settlements should be imputed to the class members, as explained, class counsel's knowledge of the public *market interest rates* does not equate to knowledge of the *kickback scheme*. *Robinson-Smith v. Government Employees Insurance Company*, is inapposite because the court there did not impute class counsel's knowledge to class members. *See* 424 F. Supp. 2d 117, 120–23 (D.D.C. 2006). Rather, the *Robinson-Smith* court refused to toll plaintiffs' claims because plaintiffs' justification for tolling rested on "a garden variety claim of excusable neglect." *Id.* at 122. In contrast, Defendants' scheme was not discovered earlier here because of Defendants' active concealment and not because of class counsel's neglect.

'something more' is the *fraudulent* nature of Plaintiffs' injury." *See Turrey v. Vervent, Inc.*, 2026 WL 2330561, at *6 (9th Cir. Aug. 12, 2026). Moreover, before the publication of the Hilsee white paper, there was no public disclosure of the systematic interest-sharing between the Banks and Administrators.[23] *See* ¶¶ 121–24, 401. And the Weisbrot Declaration, filed August 14, 2025, constituted the first sworn admission by any Administrator of an enterprise-level revenue-sharing agreement. ¶ ¶ 168, 403. The face of the Complaint affirmatively alleges that the scheme was undiscoverable through reasonable diligence prior to October 2024 (¶¶ 400–04), that the Banks took affirmative steps to conceal their wrongdoing (¶¶ 409, 476, 539), and that the arrangement operated through structures specifically designed to evade judicial oversight (¶¶ 366–69). These allegations, accepted as true, preclude any finding that this defense is established on the face of the pleadings. *See Firestone*, 76 F.3d at 1209-10.

*Third*, Plaintiffs "acted diligently upon discovery of the scheme by filing this action promptly after the Hilsee white paper and Forbes article brought the scheme to light." ¶ 405. The earliest class action complaint that made up this multidistrict litigation was filed in April 2025, a mere six months after the Hilsee white paper. This multidistrict litigation was consolidated in December 2025, and the CCAC was filed in May 2026, less than two years after the Hilsee white paper. Accordingly, Plaintiffs acted diligently to file the actions, which are timely.

### B. Even If Fraudulent Concealment Does Not Apply, the Banks Misstate the Accrual Date

Even if fraudulent concealment did not apply here, the Banks' assertion that the appropriate

[23] The Banks' reliance on *Solano v. Delmed, Inc.*, 759 F. Supp. 847 (D.D.C. 1991), is unavailing. In *Solano*, SEC filings made over four years before plaintiffs initiating suit contained information directly revealing defendants' fraud, as did an officer's certificate in the parties acquisition agreement. 759 F. Supp. at 852–55. Here, until the publication of the Hilsee white paper, no public document contained information revealing the kickback scheme. ¶¶ 121–31.

accrual date is May 18, 2022, or four years before the CCAC was filed in this MDL is wrong. The Supreme Court held that "commencement of a class action suspends the applicable statute of limitations as to all" putative class members. *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974). This principle has been extended to class actions later consolidated in MDLs. *See In re Rail Freight Fuel Surcharge Antitrust Litig. (NO. II)*, 2020 WL 5016922, at *12 (D.D.C. Aug. 25, 2020). The statute of limitations, therefore, was tolled beginning May 28, 2025, the date of the first-filed class action complaint.

## V. PLAINTIFFS HAVE ARTICLE III STANDING

Plaintiffs' Brief in Opposition to the Fintechs' Motion to Dismiss addresses the argument shared among the Defendants that, although Plaintiffs' *pro rata* claim payments were reduced as a result of Defendants' conduct, Plaintiffs somehow lack Article III standing.

## CONCLUSION

For the foregoing reasons, the Court should deny the Banks' Motion in its entirety.

Dated: September 15, 2026

Respectfully Submitted,

/s/ Christopher A. Seeger
Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: 212-584-0700
Email: cseeger@seegerweiss.com

Shauna Itri
Scott A. George
**SEEGER WEISS LLP**
325 Chestnut Street
Suite 917
Philadelphia, PA 19106
Telephone: 267-973-4265

Email: sitri@seegerweiss.com

*Plaintiffs' Lead Counsel*

David Boies
Adam Shaw
**BOIES SCHILLER & FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Telephone: 914-749-8201
Email: dboies@bsfllp.com
Email: ashaw@bsfllp.com

Bryan F. Aylstock
**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ**
17 E. Main St.
Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Email: baylstock@awkolaw.com

Kiley Grombacher
**BRADLEY/GROMBACHER, LLP**
31365 Oak Crest Drive
Suite 240
Westlake Village, CA 91361
Telephone: 805-270-7100
Email:
kgrombacher@bradleygrombacher.com

Eric Lechtzin
**EDELSON LECHTZIN LLP**
411 S. State Street
Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
Email: elechtzin@edelson-law.com

David S. Stone
**STONE & MAGNANINI LLP**
400 Connell Drive
Suite 6200
Berkeley Heights, NJ 07922
Telephone: (973) 218-1111

Email: dstone@smcomplex.com

*Plaintiffs' Executive Committee*